UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ROSS SHAPIRO and<br>MICHAEL GRAMINS,<br><br>                    Defendants. | S3 15-cr-00155 (RNC)<br><br>August 28, 2017<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MICHAEL GRAMINS' MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE, OR ALTERNATIVELY, FOR A NEW TRIAL PURSUANT TO RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

GREENBERG TRAURIG, LLP
Marc L. Mukasey (CT29885)
Jeffrey B. Sklaroff (PHV08423)
Robert S. Frenchman (PHV08424)
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: mukaseym@gtlaw.com
*Attorneys for Michael Gramins*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ...........................................................................1

PROCEDURAL BACKGROUND.........................................................................2

STATEMENT OF FACTS ....................................................................................2

     A.     The RMBS Market.................................................................................2

     B.     The Nomura RMBS Trading Desk .......................................................8

     C.     Negotiating Tactics ............................................................................10

     D.     The *Litvak* Indictment .......................................................................13

ARGUMENT ......................................................................................................17

POINT ONE:     GRAMINS SHOULD BE ACQUITTED OF COUNT ONE, CHARGING CONSPIRACY, BECAUSE THE GOVERNMENT FAILED TO PROVE THAT A CONSPIRACY EXISTED OR THAT GRAMINS AGREED WITH ANYONE TO VIOLATE THE LAW ..............................................................................17

     A.     Applicable Law...................................................................................17

          1.     Rule 29....................................................................................17

          2.     Conspiracy ..............................................................................19

     B.     Discussion..........................................................................................21

          1.     The Government Failed To Prove That There Was An Agreement To Violate The Law ..............................................................................21

          2.     The Government Failed to Establish the Existence of Any Co-Conspirators .................................................................................24

POINT TWO:     THE GOVERNMENT'S USE OF THE *LITVAK* INDICTMENT AND ITS OUTRAGEOUS STATEMENTS IN REBUTTAL SUMMATION WARRANT A NEW TRIAL UNDER RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE.................................................................................................30

     A.     Applicable Law...................................................................................30

     B.     Discussion..........................................................................................31

          1.     The *Litvak* Indictment's Only Use Was To Prejudice Gramins ...............31

2.      The Government's Outrageous Comments During Its Rebuttal Summation Prejudiced Gramins And Warrant a New Trial ......................33

POINT THREE: GRAMINS SHOULD BE ACQUITTED ON COUNT THREE, CHARGING SECURITIES FRAUD, BECAUSE NO RATIONAL JUROR COULD FIND THAT HE WAS INVOLVED IN MAKING A MATERIAL FALSE STATEMENT ....................................................................................................38

A.      Applicable Law ................................................................................39

B.      Discussion .........................................................................................41

1.      No Rational Juror Could Conclude That Gramins Made Material Misrepresentations In Connection With The Sale Of The PPSI Bond ......41

2.      No Rational Juror Could Conclude That The Alleged False Statement In Count Three Was Material ....................................................42

POINT FOUR:   GRAMINS SHOULD BE ACQUITTED ON COUNT NINE, CHARGING WIRE FRAUD, BECAUSE NO RATIONAL JUROR COULD FIND THAT HE ACTED WITH INTENT TO HARM OR THAT THE WIRES WERE USED IN FURTHERANCE OF A FRAUDULENT SCHEME ....................................................46

A.      Applicable Law ................................................................................47

B.      Discussion .........................................................................................50

1.      No Rational Juror Could Conclude, Based On The Evidence, That Gramins Acted With Intent To Harm ........................................50

2.      No Rational Juror Could Conclude, Based On The Evidence, That The "Trade Ticket" Forming The Basis of Count Nine Was In Furtherance Of Any Fraudulent Scheme ....................................................51

POINT FIVE:   GRAMINS SHOULD BE ACQUITTED UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT BECAUSE HE LACKED FAIR NOTICE THAT HIS CONDUCT WAS PROHIBITED ..................................................52

A.      Applicable Law ................................................................................53

B.      Discussion .........................................................................................55

CONCLUSION ..........................................................................................................57

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Adams v. Gunnell,*
    729 F.2d 362 (5th Cir. 1984) ...............................................................54

*Basso Sec. Ltd. v. Interstate Bakeries Corp.,*
    No. 01-CV-575 (PCD), 2002 WL 32255352 (D. Conn. Jan. 18, 2002) ................40

*Chasins v. Smith, Barney & Co.,*
    438 F.2d 1167 (2d Cir. 1970) ...............................................................39

*Chatin v. Coombe,*
    186 F.3d 82 (2d Cir. 1999) ...............................................................53, 55

*Chemical Bank v. Arthur Andersen & Co.,*
    726 F.2d 930 (2d Cir. 1984) ...............................................................39

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG,*
    752 F.3d 173 (2d Cir. 2014) ...............................................................42

*Crawford v. Washington,*
    541 U.S. 36 (2004) ...............................................................35

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,*
    343 F.3d 189 (2d Cir. 2003) ...............................................................40

*Faryniarz v. Ramirez,*
    No. 13-CV-01064 (CSH), 2015 WL 6872439 (D. Conn. Nov. 9, 2015) ...........50, 52

*Floyd v. Meachum,*
    907 F.2d 347 (2d Cir. 1990) ...............................................31, 34, 37, 38

*Holder v. Humanitarian Law Project,*
    561 U.S. 1 (2010) ...............................................................53

*Hutchins v. Wainwright,*
    715 F.2d 512 (11th Cir. 1983) ...............................................................35

*Inturri v. City of Hartford, Conn.,*
    365 F. Supp. 2d 240 (D. Conn. 2005) ...............................................................54

*Jackson v. Virginia,*
    443 U.S. 307 (1979) ...............................................................17, 18, 19

*Kann v. United States,*
    323 U.S. 88 (1944) ...............................................................50, 51

*List v. Fashion Park, Inc.*,
    340 F.2d 457 (2d Cir. 1965) ................................................................39

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ..............................................................40, 43, 45

*McCaw v. O'Malley*,
    249 S.W. 41 (Mo. 1923) ......................................................................39

*McCormick v. Fund American Co., Inc.*,
    26 F.3d 869 (9th Cir. 1994) ................................................................40

*Ogletree v. Graham*,
    559 F. Supp. 2d 250 (N.D.N.Y. 2008) ..............................................33

*Quintel Corp. N.V. v. Citibank, N.A.*,
    596 F. Supp. 797 (S.D.N.Y. 1984) ....................................................40

*Radiation Dynamics, Inc. v. Goldmuntz*,
    464 F.2d 876 (2d Cir. 1972) ................................................................39

*Ripy v. Cronan*,
    115 S.W. 791 (Ky. 1909) ....................................................................39

*SEC v. Rorech*,
    720 F. Supp. 2d 367 (S.D.N.Y. 2010) ..............................................40

*SEC v. Texas Gulf Sulphur Co.*,
    401 F.2d 833 (2d Cir. 1968) (en banc) ..............................................39

*Steiner v. Hughes*,
    44 P.2d 857 (Okla. 1935) ....................................................................39

*United States v. Aloi*,
    511 F.2d 585 (2d Cir. 1975) ................................................................19

*United States v. Altman*,
    48 F.3d 96 (2d Cir. 1995) ....................................................................49

*United States v. Bank of New York Mellon*,
    941 F. Supp. 2d 438 (S.D.N.Y. 2013) ..............................................47

*United States v. Biasucci*,
    786 F.2d 504 (2d Cir. 1986) ................................................................35

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) ........................................................47, 51

*United States v. Bordelon*,
   871 F.2d 491 (5th Cir. 1989) ..................................................................19

*United States v. Cassese*,
   428 F.3d 92 (2d Cir. 2005)..................................................................18, 28, 45

*United States v. Ceballos*,
   340 F.3d 115 (2d Cir. 2003)..................................................................19, 26

*United States v. Certified Envtl. Servs., Inc.*,
   753 F.3d 72 (2d Cir. 2014)..................................................................31, 34

*United States v. Clark*,
   740 F.3d 808 (2d Cir. 2014)..................................................................18, 19

*United States v. Corbin*,
   729 F. Supp. 2d 607 (S.D.N.Y. 2010)..................................................................41, 42

*United States v. Crosby*,
   294 F.2d 928 (2d Cir. 1961)..................................................................21

*United States v. Davis*,
   No. 13 Cr. 923 (LAP), 2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017)..................46, 49, 56

*United States v. Desimone*,
   119 F.3d 217 (2d Cir. 1997)..................................................................19, 24

*United States v. Friedman*,
   909 F.2d 705 (2d Cir. 1990)..................................................................34

*United States v. Fulkenberry*,
   614 F.3d 573 (6th Cir. 2010) ..................................................................41, 42

*United States v. Giffen*,
   326 F. Supp. 2d 497 (S.D.N.Y. 2004)..................................................................54

*United States v. Glenn*,
   312 F.3d 58 (2d Cir. 2002)..................................................................18, 45

*United States v. Goldberg*,
   105 F.3d 770 (1st Cir. 1997)..................................................................19, 24

*United States v. Grossman*,
   400 F.2d 951 (4th Cir. 1968) ..................................................................35

*United States v. James*,
   712 F.3d 79 (2d Cir. 2013)..................................................................30

*United States v. Jones*,
   393 F.3d 107 (2d Cir. 2004)................................................................25

*United States v. Kessi*,
   868 F.2d 1097 (9th Cir. 1989) .....................................................41, 42

*United States v. Lanier*,
   520 U.S. 259 (1997)........................................................................53

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015)..............................................................40

*United States v. Lorenzo*,
   534 F.3d 153 (2d Cir. 2008)........................................................18, 28

*United States v. Maldonado-Rivera*,
   922 F.2d 934 (2d Cir. 1990).......................................................19, 21

*United States v. Maze*,
   414 U.S. 395 (1974).............................................................50, 51, 52

*United States v. Nusraty*,
   867 F.2d 759 (2d Cir. 1989)..............................................................28

*United States v. Prawl*,
   168 F.3d 622 (2d Cir. 1999).............................................................21

*United States v. Provenzano*,
   615 F.2d 37 (2d Cir. 1980)..............................................................19

*United States v. Radomski*,
   473 F.3d 728 (7th Cir. 2007) ...........................................................22

*United States v. Regent Office Supply Co.*,
   421 F.2d 1174 (2d Cir. 1970)....................................................47, 48, 50

*United States v. Richter*,
   826 F.2d 206 (2d Cir. 1987)..............................................................34

*United States v. Spinelli*,
   551 F.3d 159 (2d Cir. 2008)..............................................................35

*United States v. Starr*,
   816 F.2d 94 (2d Cir. 1987)........................................................47, 48

*United States v. Teffera*,
   985 F.2d 1082 (D.C. Cir. 1993).........................................................35

*United States v. Torres,*
604 F.3d 58 (2d Cir. 2010)..................................................................19, 20

*United States v. Toscano,*
166 F.2d 524 (2d. Cir. 1948)...................................................................35

*United States v. Valle,*
807 F.3d 508 (2d Cir. 2015)................................................18, 20, 24, 28

*United States v. Washington,*
263 F. Supp. 2d 413 (D. Conn. 2003)......................................................31

*United States v. Weimert,*
819 F.3d 351 (7th Cir. 2016) ...................................................40, 46, 55

*Upton v. SEC,*
75 F.3d 92 (2d Cir. 1996) ........................................................................54

*In re Winship,*
397 U.S. 358 (1970)..................................................................................17

**Constitutional Provisions, Statutes, And Regulations**

U.S. Const. art. III, § 2 ............................................................................57

U.S. Const. amend. V..................................................................52, 53, 56

U.S. Const. amend. VI ...............................................................................57

15 U.S.C. § 78j ...........................................................................................39

15 U.S.C. § 78j(b) ........................................................................................2

15 U.S.C. § 78ff ............................................................................................2

18 U.S.C. § 371 .............................................................................................2

18 U.S.C. § 1343 ..........................................................................................2

17 C.F.R. § 240.10b-5 ....................................................................2, 39, 40

17 C.F.R. § 240.10b-10 ...............................................................................5

17 C.F.R. § 240.15c3-3 ..............................................................................54

Fed. R. Crim. P. 18 .....................................................................................57

Fed. R. Crim. P. 29 .........................................................................1, 17, 18, 59

Fed. R. Crim. P. 33 ................................................................................................1, 30, 57

**Other Authorities**

16 Am. Jur. 2d Conspiracy § 13 ......................................................................................20

*In re Kevin J. Blaney*,
    FINRA Letter of Acceptance, Waiver and Consent, No. 20160499622-01,
    dated September 1, 2016.........................................................................................56

James J. White, *Machiavelli and the Bar: Ethical Limitations on Lying in
    Negotiation*, 1980 Am. B. Found. Res. J. 926 (1980)............................................56

Michael Osnato Jr. & Meaghan Kelly, *SEC's Emerging Enforcement Priorities In
    The Bond Markets* (July 18, 2017), https://www.law360.com/articles/944550 ....................56

ABA Model Rule of Professional Conduct 4.1 cmt. 2 (Am. Bar Ass'n 1983)............................56

Order Instituting Proceedings, *In the Matter of Edwin K. Chin*, Exchange Act
    Release No. 78585, 2016 WL 4363882 (Aug. 16, 2016) ........................................56

Order Instituting Proceedings, *In the Matter of Nicholas M. Bonacci*, Exchange
    Act Release No. 78932, 2016 WL 5369311 (Sept. 26, 2016) ..................................56

Order Instituting Proceedings, *In the Matter of Yoon Seok Lee*, Exchange Act
    Release No. 80561, 2017 WL 1548263 (May 1,  2017)..........................................56

Scott R. Peppet, *Can Saints Negotiate? A Brief Introduction to the Problems of
    Perfect Ethics in Bargaining*, 7 Harv. Negot. L. Rev. 83 (2002) ...........................56

Defendant Michael Gramins, by his counsel, respectfully submits this Memorandum of Law in support of his motion for a judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure.  This Court should set aside the guilty verdict returned against Gramins on Count One of the Third Superseding Indictment (ECF No. 307) (the "Indictment") or, in the alternative, grant Gramins a new trial on Count One pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  The Court should enter a judgment of acquittal on that count and Counts Three and Nine, as to which the jury was unable to reach a verdict.

## PRELIMINARY STATEMENT

The government's investigation and prosecution of Michael Gramins has been marked by a dearth of evidence, unfairness, overzealousness, and a lack of fair notice of criminality.  The government has barreled forward like a prosecutorial bull in a legal china shop despite disagreement among courts on the legal issue of whether misrepresentations in the course of bilateral price negotiations that do not affect the benefit of the bargain can ever constitute fraud. The U.S. Attorney's Office for the District of Connecticut pressed forward with this case despite the fact that other federal prosecutor's offices have not.  The U.S. Attorney's Office in Connecticut sought a true bill from a grand jury, and a conspiracy conviction from a trial jury, blatantly disregarding the fact that its case relied on so-called "co-conspirators" who never testified they joined a conspiracy and swore that they never believed they were committing a crime when they engaged in the conduct at issue.  They have proceeded despite evidence that was too weak to obtain a conviction on 35 of the last 37 counts they presented to juries.  It is inexplicable why the government arbitrarily characterized certain similarly situated market participants as "criminals" and others as "victims."  And on top of it all, during rebuttal summation, the government made brazen and flagrantly improper comments about evidence outside the record in a desperate, last-ditch effort to tip the balance of a weak case in its favor.

In light of the foregoing, and as set forth below, the United States Constitution, the applicable case law, and traditional notions of fair play and justice require that Michael Gramins' conviction be set aside.

## PROCEDURAL BACKGROUND

Indictment S3 15 Cr. 155 (RNC) was returned on March 6, 2017, in nine counts against Michael Gramins, Ross Shapiro, and Tyler Peters.  Count One charged the defendants with conspiracy to commit wire fraud and securities fraud, in violation of 18 U.S.C. § 371.  Counts Two and Three charged the defendants with securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5.  Counts Four through Nine charged the defendants with wire fraud, in violation of 18 U.S.C. § 1343.

Trial commenced before the Honorable Robert N. Chatigny, United States District Judge, and a jury on May 8, 2017.  On June 15, 2017, the jury returned a guilty verdict as to Gramins on Count One and acquitted him on Counts Two, Four, Five, Six, Seven, and Eight.  The jury was unable to reach a verdict as to Gramins on Counts Three and Nine.  The jury acquitted Tyler Peters on all nine counts, and acquitted Ross Shapiro on all counts save for Count One, as to which the jury was unable to reach a verdict.

This motion follows.

## STATEMENT OF FACTS

### A.    The RMBS Market

The evidence at trial demonstrated that a residential mortgage backed security ("RMBS") bond is a financial instrument supported by the monthly interest and principal payments from a bundle of hundreds or thousands of home mortgage loans.  Trial transcript ("Tr.") 117:15-118:1, 1145:18-22.  Non-agency RMBS bonds are a specific type of mortgage bond carrying some amount of credit risk because the underlying loans are not guaranteed by the federal government

or any government agency.  Tr. 118:11-19, 370:15-23.  Bond owners derive value from these bonds by collecting the monthly payments that flow from individuals paying the principal and interest on their home mortgages.  Tr. 119:7-20.  The value of a particular bond is determined by many variables, including long-term interest rates and the frequency and timeliness of payments and prepayments on hundreds or thousands of mortgages.  Tr. 2205:17-2206:12.  To project cash flows over the life of a bond requires the potential buyer to engage in advanced computer analyses of dozens of factors related to each of the loans underlying the bond as well as projections of various macroeconomic conditions.  *See, e.g.*, DX 25 (HIMCO model).

The RMBS market was, during the relevant time period, dominated by enormous financial institutions and investment funds.  All of the "buy-side" counterparties (mis)characterized by the Government as "victims" of the alleged fraud were, in reality, "Qualified Institutional Buyers" ("QIBs") that each managed over $100 million in assets, and some of which managed more than $100 billion.  *See* Tr. 517:18-518:18.  The investment managers involved in the charged trades were highly sophisticated financial professionals with vast experience in the RMBS market.  *See* Tr. 690:7-18, 2201:10-16, 2202:15-19, 2357:22-25.  These investment managers purchased RMBS with an eye towards collecting interest and principal payments over the long-term, re-selling the bonds at a higher price than that at which they were purchased, or both.  Tr. 119:7-20, 337:8-10.

The "victim" counterparties also possessed abundant resources to determine appropriate price ranges at which to buy and sell RMBS, including highly complex proprietary modeling programs designed to forecast a bond's yield and the range of prices at which the bond could be profitably purchased.  *See, e.g.*, DX 6 (Ellington model); DX 25, DX 29 (HIMCO model); DX 1661 (Putnam model).  Each of the "victim" witnesses testified that their investment decisions

were dictated by their modeling analysis.  For example, Zachary Harrison, a fund manager at Putnam Investment Management, LLC ("Putnam"), referred to himself as a "hardcore modeler," and called Putnam's model his "secret sauce."  Tr. 1136:25-1137:2, 1137:6-8.  Aadil Abbas, who traded RMBS at Hartford Investment Management Company ("HIMCO"), helped design his company's proprietary model, and, during his negotiations with dealers, "continue[d] to be guided, very much so, by [his] model in terms of how much [he was] willing to pay or not willing to pay for a bond."  Tr. 1549:5-14.  Eric Marks, an investment manager at Ellington Financial, LLC ("Ellington"), testified that his computer models were "the best" and "fast, efficient, [and] reliable," in part because individual loans were assessed at the zip code-level, and he believed "in the output and the productions."  Tr. 2358:22-24; 2360:21-2361:19.  Joel Wollman, a fund manager at QVT Financial L.P. ("QVT"), conducted an "in-depth fundamental analysis" of RMBS before he made a purchase or sale, which entailed, among other things, forecasting the behavior of thousands of mortgages.  Tr. 2205:9-2206:16.[1]

The market for RMBS is over-the-counter and one in which "buy-side" counterparty funds did not transact directly with each another.  Tr. 264:18-21, 1434:6-25.  Rather, a buy-side counterparty fund that wished to purchase a particular RMBS would generally seek out a dealer like Nomura, Barclays, or Credit Suisse.  Tr. 126:24-127:7.  The dealer could sell the bond from its inventory, source the bond from a seller, or purchase the bond for the dealer's own portfolio, and then determine whether it wished to re-sell the bond in an independent transaction to the buy-side counterparty firm.  Buy-side counterparties typically worked with a number of different dealers.  Tr. 1435:7-14.

---

[1] The Indictment names eight different "victim" institutions.  Indictment ¶¶ 17-24.  The government declined to call witnesses from four of those institutions: Western Asset Management Company ("WAMCO"), Monarch Alternative Capital ("Monarch"), The TCW Group, Inc. ("TCW"), and Alliance Bernstein L.P.

Every trade in the RMBS market was executed on a principal-to-principal basis. That is, dealers such as Nomura used their own capital to purchase bonds from a counterparty in one transaction, and later sold the bonds to a different counterparty in a completely separate transaction. *See, e.g.*, DX 1101 (MKP sells INDX 2005-AR14 A1B2 bonds to Nomura); DX 1122 (Nomura sells INDX 2005-AR14 A1B2 bonds to QVT). Nomura's RMBS desk never acted as an agent or fiduciary of any counterparty; it assumed market and transactional risk in every transaction. *See* DX 1101, 1122; Tr. 549:6-551:16. And Nomura completed RMBS trades at one "all-in," total price; it never charged or earned commission on trades. *See, e.g.*, DX 1125, DX 1126.[2] Rather, Nomura's RMBS desk earned profits when bonds were purchased at one "all-in" total price and were later re-sold at a higher "all-in" total price. Tr. 1682:21-1683:1.

The RMBS market was opaque. Tr. 2373:13-17. Buy-side firms did not communicate directly with each other, there was no central exchange, and transaction prices were not listed or reported publicly. Tr. 126:12-17. Accordingly, participants in the RMBS market were "inherently skeptical" during trade negotiations. Tr. 2220:4-7. Buyers were well aware that market participants were "not always . . . completely truthful" about their acquisition cost and internal profit. Tr. 2220:8-11. Wollman, for example, knew that he had to be "on [his] guard with information that's volunteered to [him]." Tr. 2225:3-6. Marks "understood . . . that market participants may not be truthful all the time" and his "supervisor was always warning [him] that people might say anything to convince you to pay more for a bond than you really should be." Tr. 2375:4-9. Abbas understood that it was "a possibility that [he] could receive inaccurate

---

[2] SEC Rule 10b-10, codified at 17 C.F.R. § 240.10b-10, requires dealers to "disclose specified information in writing to customers at or before completion of a transaction." The Rule requires dealers to disclose, among other things, the "date and time of the transaction," "[w]hether the [dealer] is acting as an agent for such customer . . . or as principal for its own account," and the "dollar price at which the transaction was effected." *Id.* § 240.10b-10(a)(1), (2), 5(i). Rule 10b-10 does not require dealers to disclose their acquisition price, markup, or internal profit in RMBS transactions.

information when [he was] talking to market participants about trading prices," and that therefore "all [he could] really know for sure [was] the price that [he was] willing to pay for a bond based on [his] analytics and the price at which a bond [was] offered to [him]."  Tr. 1600:24-1601:10. A trader at Monarch, one of the "victim" counterparties, included the following disclaimer regarding bids and offers in the RMBS desk in his outgoing emails:

> Any bid we place with you is not exclusive, nor is it necessarily the best bid we have placed or will place with other parties for the offered security.  *Nothing discussed in connection with this or any other bid placed may be relied upon or taken as a representation of fact or intent.*  Any request for bids is not an invitation to a formal auction.  We reserve the right to reject or accept any bid, irrespective of price or quantity.  Your bid is not confidential and may be disclosed to other parties.  *Nothing discussed in connection with this request for bids should be relied upon or taken as a representation of fact or intent.*  By submitting a bid you consent to the foregoing terms

DX 913 (emphasis added).[3]

Zachary Harrison also knew that gamesmanship permeated the RMBS market.  He testified that, "[m]ultiple times per week I thought I was in situations where I was receiving misstatements or inaccurate information" and that "players in the market lied on occasion about where and what level bonds traded."  Tr. 1082:3-5, 1180:13-16.  He also complained in chats that "someone lying to my face is like [an] hourly occurrence" and that someone had "give[n] [him] bold faced lies repeatedly[,] like 100% false information."  DX 228 at 10; DX 544 at 24.

---

[3] The Court admitted this exhibit over the government's objection.  *See* Tr. 2580:15-22.  In doing so, the Court held that the exhibit was relevant to the issue of materiality:

> [The exhibit] bears on materiality in that it shows that, at least as far as Monarch is concerned you can do a BWIC on the understanding that basically all bets are off; that nothing you say can be relied upon as a representation of fact or intent; you can't come back at me for anything that I say; you either want it or you don't; and you've got to make up your own mind based on your own independent analysis.

*Id.*

Harrison even created several humorous animated videos making light of widespread dishonesty and deception in the market.  *See* Tr. 815:6-817:15.

In a market where rampant deception and misdirection prevailed, market participants disregarded information they could not verify, and instead adhered closely to verifiable data and modeling analyses when they made investment decisions.  The WAMU 2005-AR11 A1B2 trade is exemplary.  Nomura purchased the WAMU bonds at a price of 83-00, yet Nomura's John Fleisher misrepresented to Harrison that a counterparty was offering the bonds at 85-16.  *See* GX 27A; GX 27B at NSIUSAO00147399.  As Harrison contemplated whether or not to buy the bonds from Fleisher, he received information from Credit Suisse that led him to believe that someone – perhaps Fleisher – was being dishonest with him.  Harrison, caring about the "all-in" price he had to pay rather than Nomura's internal profit margin, decided to buy the bonds regardless:

> Q. [Y]ou didn't really know at the time whether it was Credit Suisse providing bad information, did you?
> A. I didn't really know.
> Q. And you didn't really know whether it was Nomura providing that information at the time?
> A. I didn't know.
> Q. You didn't know, maybe it was the seller on the other side of the transaction that was providing the bad information, right?
> A. Correct.
> Q. But you went ahead and you bought the bonds at 85, right?
> A. Yes.

Tr. 1168:1-13.

Because counterparties were always skeptical of unverified information, they did not rely on a dealer's acquisition cost or internal profit when they made an investment decision. Counterparties "very often" bought RMBS without knowing, considering, or caring about the dealer's acquisition cost.  Tr. 1525:8-12.  It was immaterial.  Not having that information "[did not] stop [them] from being able to assess whether a bond is a good investment."  Tr. 1525:13-

16; *see also* Tr. 2371:18-2372:12.   Counterparties satisfied their fiduciary duties to their investors without knowing a dealer's true acquisition cost or internal profit because they relied "in large measure" on verifiable data and their modeling and analytics to make an investment decision.   Tr. 2372:13-2373:12.   Counterparty funds even told their investors that "an *undisclosed amount* of profit or 'mark-up' is included in the price the fund pays" for fixed income securities, *see* DX 1741 at 77 (emphasis added), and counterparties believed that "cost basis," meaning the price at which the counterparty or another party previously purchased a bond, was not relevant to them "in the vast majority of instances."  Tr. 1143:11-22.

By way of example, in the JPMAC 2006-WMC1 A4 trade, Joel Wollman negotiated at "all-in" prices and even asked Gramins near the completion of the trade if the final price of 80-16 was "with you [Nomura] making something?"  GX 29D at NSIUSAO00147493.   Wollman never bothered to ask how much Nomura had earned because it was wholly immaterial to his investment decision.  *Id.*

## B.     The Nomura RMBS Trading Desk

During the relevant time period, Nomura's RMBS desk was managed by Ross Shapiro, a trader and Managing Director who joined Nomura in 2009.  Tr. 124:5-7, 377:12-15, 383:11-15. Shapiro reported to Charles Spero, who led the entire Securitized Products division.  Tr. 377:12-20, 378:25-379:2.   The traders who reported to Shapiro included Gramins, Tyler Peters, Frank Dinucci, Alejandro Feely, Caleb Chao, and John Fleisher.   Tr. 124:8-19, 382:3:8, 421:22-24, 1923:21-25.  Salespeople on the RMBS desk included Michael Romanelli, a Managing Director, and Conor O'Callaghan, an Executive Director.  Tr. 1746:13-17, 2187:6-13.

The trading strategies and negotiation tactics employed by members of Nomura's RMBS desk were the product of training they received prior to their arrival at Nomura.  Nearly every member of the desk worked and learned how to trade at other firms before coming to Nomura.

Spero, Shapiro, Peters, Feely, and Gramins all worked at Lehman Brothers and then Barclays, both dealers, before they moved to Nomura.   Tr. 377:12-378:17.   O'Callaghan previously worked at Credit Suisse, and Fleisher worked at Barclays before he joined Nomura.  Tr. 1829:12-14, 17-19.  Dinucci previously worked at Old Hill, a hedge fund that invested in RMBS, and then JP Morgan, another dealer.  Tr. 116:21-25, 120:13-17.

Traders and salespeople on the RMBS desk sat in rows on the trading floor, where computer screens were accessible to all and there were no dividers between individual workstations, which were positioned with seats "every four or five feet."  Tr. 514:17-515:16. Individuals on the trading floor could get up and walk over to a colleague's workstation, observe his monitors, see his Bloomberg chats, and hear his telephone calls.  Tr. 515:17-25.  Compliance personnel were also "scattered throughout [the] trading floor," to interface with traders and observe and review operations on the trading floor.  Tr. 516:5-11.  A compliance officer who was embedded close to the traders oversaw the RMBS desk during much of the relevant period. Tr. 516:13-517:13.   Compliance personnel actively monitored the traders' electronic chats, emails and phone calls and identified prohibited or problematic behavior, such as emails that contained graphic content, inappropriate language, or improper expense submissions.  *See, e.g.*, DX 1087; DX 1590 at 15; Tr. 286:14-287:13.  Compliance officers at Nomura never identified as prohibited any trading strategy or representation concerning acquisition cost or internal profit. Tr. 358:3-10, 1824:4-17.

Traders and salespeople at Nomura were compensated with a base salary and bonus, the latter of which was determined by a holistic review of a trader's performance and potential.  Tr. 541:10-543:3.  Even if the RMBS desk increased its profits by several million dollars, it would not impact the compensation Nomura paid to traders.  Tr. 541:5-9.  Certain traders, including

Gramins, had fully guaranteed compensation in various years.  Tr. 472:18-473:17; *see also* Tr. 1676:23-1677:10.

**C.     Negotiating Tactics**

It was undisputed at trial that Gramins and the other Nomura traders were always truthful with counterparties about the features of the bonds that Nomura sold, and that they always delivered the bond the buyer wanted at the agreed upon price.  There was no evidence that any buyer could have purchased or sold any bond at any better price than the one at which Nomura transacted.  In short, buyers and sellers always received the benefit of the bargain they expected from Gramins and the other Nomura traders.  The government did not allege and could not prove that Gramins – or anyone else at Nomura – made misrepresentations concerning the value of the RMBS at issue.

The government instead focused on instances in which Nomura traders, in the course of a negotiation, allegedly misrepresented to counterparties Nomura's own acquisition price or internal profit.  Tr. 41:19-24.  However, until January 2013, in a market that was opaque by intention, and in which QIBs relied on their analytical models and internal valuations to make investment decisions, none of the traders or salespeople at Nomura thought that it was potentially illegal to misrepresent to a counterparty Nomura's internal profit on a trade.  As Aadil Abbas aptly summarized, "what we're really talking about here is not that [the buyer] didn't get a good price but that [he] didn't know the slice of the price that went to Nomura was larger than [he] thought."  Tr. 1602:15-19.

Not a single alleged "conspirator" believed they were committing crimes by misrepresenting acquisition cost or internal profit.  Trader Caleb Chao did not even think it was "wrong" to do so:

Q. Now, yesterday you said that you didn't think it was – that the negotiating tactics that you used at Nomura, you didn't think that they were wrong; do you recall that?

A. Yes, I do.

Q. In fact, it was your understanding that those negotiating tactics that you testified about were industry practice, isn't that right?

A. That's what I thought.

\* \* \*

Q. And is it fair to say that it [the *Litvak* indictment] was the first time you ever heard that you could get into trouble for using the kinds of negotiating tactics that you've testified about here today?

A. Yes.

Q. And, in fact, until then, you didn't think that using those kinds of negotiating tactics was wrong, true?

A. That's true.

Q. And you certainly didn't think that using those kinds of negotiating tactics could be a violation of the law, right?

A. I wasn't thinking about that in legal terms.

Q. But you didn't think it was wrong, correct?

A. I didn't think it was wrong.

Tr. 1777:20-1778:8, 1830:4-12.

Frank Dinucci, another trader on the RMBS desk, did not think that the negotiating

tactics at issue in this case were illegal at the time he used them:

Q. So in 2014 . . . you told the government that the tactic did not involve a misrepresentation as to the cash flows of the bond; as a result, you didn't think the tactic was wrong, correct?

A. That's what I said.

Q. And at the time you didn't think it was illegal, correct?

A. That's correct.

\* \* \*

Q. When you said you were not aware that this was illegal at the time you were doing it, you were telling the truth, right?

A. That's correct.

\* \* \*

Q. You didn't think [the tactics] were illegal, right?

A. That's correct.

Q. You've testified repeatedly here and in the grand jury that you didn't think it was illegal, right?

A. That's correct.

11

Tr. 293:22-294:3; 330:15-17; 343:4-8.  Dinucci continued to use these trading tactics when he left Nomura and began working as a trader at Auriga USA, LLC ("Auriga"), because he believed he was using ordinary, acceptable negotiating tactics.  *See* Tr. 327:14-16; 328:14-330:5.

Alejandro Feely, a Nomura trader from 2009 to 2012, likewise never thought that his conduct at Nomura was illegal, Tr. 1935:7-9, 2040:5-13, and similar to Dinucci, he continued to use the same negotiating tactics when he left Nomura to work for Morgan Stanley.  *See* DX 1569, DX 1570 at 1, Tr. 2012:15-17.  Feely conceded that he did this to "mak[e] [the counterparty] believe [he was] working an order," and that this was "exactly" the kind of practice he employed at Nomura.  Tr. 2012:21-2013:5.

The evidence amply demonstrated that all of the alleged "conspirators" believed that although their conduct may have been hard-edged, it was common, regular, lawful market practice.  The uncontroverted evidence was that the tactics were used openly and accepted widely by the entire desk, and indeed "every trader on Wall Street had a similar trading tactic." Tr. 341:20-342:1.  There was a universal market understanding that if discovered, the tactics would, at most, create a business dispute with the counterparty, not a federal prosecution.  Tr. 348:17-20.

It stands to reason therefore that "[n]o one told [traders] to conceal the tactics from [the] compliance [officers]." Tr. 287:22-23.  Indeed, Caleb Chao, knowing that his communications were being monitored by compliance, wrote to a Nomura colleague stating that he "shaded" and "lied" to a counterparty about Nomura's acquisition cost and did so without fear of legal or compliance repercussions.   GX 25C at NSIUSAO00147310; Tr. 1794:24-1796:11.  Unsurprisingly, because none of the traders or salespeople ever considered the conduct illegal, no one ever reported the conduct to Nomura's compliance department, reported it via Nomura's

anonymous hotline, or brought it to the attention of any government agency.  Tr. 333:2-6, 1778:9-1780:15.  Nor did Nomura's lawyers or compliance personnel condemn the tactics.

## D.    The *Litvak* Indictment

In January 2013, Jesse Litvak, a trader at Jefferies & Co. ("Jefferies") was indicted for making misrepresentations to counterparties about the price at which Jefferies had purchased bonds it later re-sold, and about Jefferies' internal profit on such trades.  Litvak's indictment marked the first time in the thirty-year history of the RMBS market that any type of enforcement action was brought against a trader for using the types of negotiating tactics at issue in this case. Tr. 569:6-23.  News of the *Litvak* indictment hit the industry like a lightning bolt, and was "shocking" to traders on Nomura's RMBS desk.  Tr. 1894:17-18.[4]

Nomura held a compliance meeting shortly after the *Litvak* indictment, during which a group of experienced traders, including Gramins and Shapiro, were told that they should no longer make misrepresentations to customers regarding Nomura's acquisition cost or internal profit.  Tr. 435:19-436:9; 457:11-17.  Compliance instructed traders that they need not disclose their acquisition costs, but if they did, they had to be truthful.  *See, e.g.*, Tr. 605:25-611:19. Compliance personnel specifically instructed traders that, in light of *Litvak*, they should simply tell a counterparty, "this is the price *to you*," without mentioning Nomura's acquisition cost.  *See, e.g.*, Tr. 1846:23-1847:4.  After the compliance meeting, Gramins gathered the desk's more junior traders and told them that they could no longer misrepresent RMBS purchase prices to Nomura's counterparties.  Tr. 1780:25-1781:15.

---

[4] John Fleisher, a junior trader at Nomura whom the government declined to call at trial, testified about his reaction to the Litvak indictment in the grand jury, characterizing it as "[e]xtreme shock and concern" because "[u]p to that point I had no idea what we were doing could have been considered securities fraud."  DX 3516T at 58:10-17.

The government introduced evidence of only a single trade that occurred after Litvak was indicted – Nomura's purchase of JPMAC 2006-WMC1 A4 ("JPMAC") bonds from Harrison Choi at TCW at a price of 79-08 and its subsequent sale to Wollman at QVT at a price of 80-16. This trade was executed at "all-in" prices on both sides, with neither counterparty paying "on top" of their respective levels or inquiring into the size of Nomura's spread.  *See* GX 29A-F. After Gramins gave a 78-24 bid to Choi, Choi sought clarification about whether this level reflected the potential buyer's bid.  *See* GX 29E ("You have [78-24] from him?").  Gramins responded truthfully, saying that 78-24 was not the buyer's actual bid, but the "all-in" price that Choi would receive from Nomura.  *See id.* (Gramins clarifying that the bid was "to you," *i.e.*, "to Choi").  Choi ultimately sold at a price of 79-08 without asking about Nomura's internal profit. *See id.*; GX 29G.  Similarly, Gramins made no representation about Nomura's internal profit to Wollman, who purchased the bonds from Nomura.

Shortly before Gramins presented the final offer of 80-16 to Wollman, Gramins called Romanelli, a senior salesperson and relationship manager, to discuss how to accurately present the offer consistent with the new, post-*Litvak* compliance instructions.  *See* GX 29F.  They agreed that Gramins would simply tell Wollman that "80-and-a-half is the best I can get them to you," and that, if asked, Gramins should neither reveal nor misrepresent Nomura's spread.  *Id.* Romanelli informed Gramins that Wollman might get "suspicious" if Romanelli entered into the negotiation at the last minute to try and convince Wollman to pay a particular price for the bond. *Id.*  Instead, Romanelli encouraged Gramins to continue to negotiate with Wollman on his own via Bloomberg chat.

The "to you" language and price that Romanelli and Gramins discussed during the call adhered to the instructions they had received from Nomura compliance personnel – *i.e.*, they

could give counterparties the price "to you" without saying more and avoid any misrepresentations. *See* Tr. 1846:23-1847:4. Gramins relayed this message to Wollman nearly verbatim, and Wollman followed up by asking whether the offer of 80-16 was "with you [Gramins] making something?" GX 29D at NSIUSAO00147493. Gramins confirmed that the price included a spread for Nomura. *Id.* at NSIUSAO00147494. Wollman agreed to the trade at 80-16 without asking about how much Nomura was earning from the sale to QVT. *Id.* Wollman did not ask because Nomura's internal profit was not material to his investment decision.

*   *   *

Not a single government witness testified with actual knowledge or independent recollection of any trade at issue in the case. Chao conceded that he did not "remember the actual circumstances" of the PPSI trade (charged in Counts Three and Nine), and that he could only guess at Gramins' possible involvement in the trade. Tr. 1711:25-1712:21. In the same trade, there was no evidence that explained how Abbas ultimately agreed to pay 79-02 after telling Chao that "79-00 is the best i can go." *See* GX 26E at NSIUSAO00147350. Without an independent recollection, and no proof of Gramins' participation, Abbas was left to blindly speculate about how the PPSI trade was consummated:

> Q. Do you understand that you were at 79, and then there was 2 ticks here? What's your understanding of why that was?
> A. *So obviously it's five years ago, so I don't know if we had any phone conversation around it,* but my understanding is that the two ticks that he's charging on top of my bid is -- that's the commission he's charging me.

Tr. 1501:24-1502:6 (emphasis added).

Likewise, Dinucci had "no idea what was really going on" in connection with the WAMU 2005-AR15 A1C3 trade. Tr. 338:7-9. Harrison, too, was unable to "put [himself] back in [his] shoes and recreate the decision-making process" that existed during the time of his

15

trades.  Tr. 1028:3-4; *see also* Tr. 1518:25-1519:7, 2183:5-7.  Marks was similarly lacking in recollection.  When Marks was asked what he meant in a particular chat, he responded, "I don't recall specifically what I meant.  I could only try to interpret what I read."  Tr. 2419:18-2420:1.

Although not a single witness could remember a single trade, evidence showed that every "victim" witness executed trades at prices that he found to be acceptable and in the best interests of his investors.  Harrison wrote in a chat that the LXS 2007-8H A1 bond was "easily [his] best print in a long time" and stated that the purchase was "awesome" and "sick" and that he was "loving it."  DX 1216 at 6; GX 15C at NSI00010041.  "If [Wollman] believed that the price [of the JPMAC bond] was not in the best interest of [his] investors [he] would not have paid it."  Tr. 2196:20-25.  And, regardless of any misrepresentations concerning Nomura's acquisition cost or profit, Abbas bought the PPSI bond because he "liked the price and . . . liked the bond."  Tr. 1602:12-14.

The government also failed to show that any trade would have been executed at a different price had Nomura traders not made misrepresentations.  It did not matter to counterparties whether a bid was represented as coming from another buy-side counterparty or as coming from Nomura, as long as the "all-in" price was the same.  Tr. 2353:8-25.  The evidence showed that, even if counterparties knew about Nomura's true acquisition cost rather than the allegedly misrepresented value, they might have still completed the transaction because of any of the following factors or combination of the following factors: (i) certain trades warranted large spreads, (ii) they may have needed the bonds for their inventory or needed to sell the bonds to satisfy liquidation or redemption requests, (iii) they may have been unable to find the bonds somewhere else at a better price, and (iv) there may have been other market participants who would have been willing to pay the "all-in" price at which the bonds were offered.  Tr. 988:5-15,

1013:3-1015:9, 1524:8-1525:3, 2234:11-17.   Moreover, there was no evidence that the counterparties would have declined to transact even if they knew Nomura's actual acquisition cost.  *See* Tr. 2475:8-12; 2478:15-19.  Similarly, there was no evidence that Nomura traders, who were at risk as principals in every trade, would have been willing to buy or sell the bonds at different prices.  *See* Tr. 1657:14-22.

**ARGUMENT**

**POINT ONE**

**GRAMINS SHOULD BE ACQUITTED OF COUNT ONE, CHARGING CONSPIRACY, BECAUSE THE GOVERNMENT FAILED TO PROVE THAT A CONSPIRACY EXISTED OR THAT GRAMINS AGREED WITH ANYONE TO VIOLATE THE LAW**

Gramins' conviction on the conspiracy charged in Count One cannot stand.  The Government failed utterly to prove that a conspiracy existed.  There was no proof at trial that Gramins – or anybody at Nomura – entered into an agreement with others to violate the law, nor any proof that they intended to violate the law, nor a scintilla of evidence that they ever believed their conduct could violate the law.  Without any proof of a conspiracy or any co-conspirators, the Court should enter a judgment of acquittal as to Gramins on Count One.

**A.     Applicable Law**

**1.     Rule 29**

"[I]n our system . . . the application of the beyond-a-reasonable-doubt standard to the evidence is not irretrievably committed to jury discretion."  *Jackson v. Virginia*, 443 U.S. 307, 317 n.10 (1979).  Instead, the Constitution demands that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof."  *Id.* at 316; *see also In re Winship*, 397 U.S. 358, 363-64 (1970).  The Court of Appeals for the Second Circuit recently reaffirmed the role that the reviewing court plays in enforcing the constitutional "beyond a reasonable doubt" standard:

> The deference to the jury's verdict . . . does not mean, however, that we must never deem evidence insufficient.  Nor does it mean that that if there is *any* evidence arguably in support of a verdict, we must affirm.  Of course, the issue is not whether *we* believe the evidence does not prove guilt beyond a reasonable doubt.  *See Jackson,* 443 U.S. at 318-19.  But if we are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine, as *Jackson* instructs, whether a jury could *reasonably* find guilt beyond a reasonable doubt.

*United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014) (footnote omitted).

On a Rule 29 motion, this Court bears the responsibility of reviewing the evidence to ensure that the jury has not erred in convicting a defendant where the evidence does not prove his guilt beyond a reasonable doubt.  *Jackson*, 443 U.S. at 317-18.  This standard does not mean that if there is any evidence that arguably could support a verdict, the Court must deny the motion.  "In any criminal trial there is always some evidence of guilt, otherwise there could not have been a prosecution."  *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015).  Rather, the operative question is whether, based on the evidence presented at trial, a rational juror could conclude that each element of the charged offenses was proven beyond a reasonable doubt.  *Id.* at 517, 522; *see also United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).

When determining whether reasonable doubt exists, "specious inferences are not indulged because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty."  *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (internal quotation marks and alterations omitted).  Indeed, when the evidence "viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."  *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (quoting *Glenn*, 312 F.3d at 70); *accord Valle*, 807 F.3d at 515.  Even "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt."

18

*Jackson*, 443 U.S. at 317.  It is this Court's responsibility to review the evidence and intervene where the proof could not suffice and the jury reached a guilty verdict in error, despite its diligent effort.  *Clark*, 740 F.3d at 811.

### 2.      Conspiracy

To prove a conspiracy beyond a reasonable doubt, "the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent."  *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010).  Not only must an agreement exist, but the agreement "must, of necessity, encompass a crime."  *United States v. Aloi*, 511 F.2d 585, 592 (2d Cir. 1975).  The government must show that the alleged conspirators "entered into an agreement to commit an offense against the United States."  *United States v. Ceballos*, 340 F.3d 115, 123 (2d Cir. 2003); *see also United States v. Maldonado-Rivera*, 922 F.2d 934, 960 (2d Cir. 1990) ("[T]he government must prove that each defendant charged with conspiracy has entered an agreement to violate the law; mere membership in a lawful organization cannot suffice.").  The evidence must establish beyond a reasonable doubt "that there was a conspiracy to commit a particular offense and not merely a vague agreement 'to do something wrong.'"  *United States v. Provenzano*, 615 F.2d 37, 44 (2d Cir. 1980) (quoting *United States v. Rosenblatt*, 554 F.2d 36, 38-40 (2d Cir. 1977)).

The criminal intent necessary to form a conspiracy must be shared by at least the defendant and one co-conspirator: "In each conspiracy, the illicit purpose that gives rise to section 371 violation must be shared by two or more conspirators. . . . [A] conspiracy to defraud requires at least two who share that aim."  *United States v. Goldberg*, 105 F.3d 770, 774 (1st Cir. 1997); *see also United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997) (noting that co-conspirator must have "the criminal intent necessary to render him a bona fide co-conspirator"); *United States v. Bordelon*, 871 F.2d 491, 494 (5th Cir. 1989) ("Where only one party to the

agreement possesses the required criminal intent, there has been no violation of the conspiracy statute.").  As to each co-conspirator, the government "must prove at least the degree of criminal intent necessary for the substantive offense itself."  *Torres*, 604 F.3d at 65 (internal quotation marks omitted); *see also* 16 Am. Jur. 2d Conspiracy § 13.

For example, in *United States v. Valle*, 807 F.3d 508, the Second Circuit affirmed the district court's post-verdict judgment of acquittal because the evidence did not establish beyond a reasonable doubt that the defendant or his unindicted alleged co-conspirator, known as "Moody Blues," acted with the necessary intent to commit the crimes with which the defendant was charged.  The Court held that the evidence did not establish that Moody Blues acted with intent to commit a crime, and therefore he could not form an agreement with the necessary conspiratorial intent with the defendant:

> [O]n the basis of this evidence, it is impossible to determine beyond a reasonable doubt whether Moody Blues—or for that matter any of Valle's other alleged co-conspirators—ever had the specific intent to commit a kidnapping.  We have taken a bilateral approach to the crime of conspiracy: at least two people must agree.  "When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone."  *See United States v. Bicaksiz*, 194 F.3d 390, 398 (2d Cir. 1999).  The only evidence the Government offers to demonstrate Moody Blues's intent is the words he used in the chats. . . .  The conclusion that the chats do not support a finding of Valle's conspiratorial intent applies with equal force to Moody Blues.

*Id.* at 522-23 (internal citation omitted).

In sum, "unless the required criminal intent exists in the minds of at least two parties to the alleged conspiracy, there can be no conspiracy."  16 Am. Jur. 2d Conspiracy § 13 (citing *Goldberg* and *Desimone*).

**B.    Discussion**

**1.    The Government Failed To Prove That There Was An Agreement To Violate The Law**

In six weeks of trial, the government failed to produce even a shred of evidence that Gramins intended to commit securities fraud or wire fraud, or that he conspired with anyone to violate the law.   There was no proof that Gramins knew the trading tactics that were widely employed at Nomura and other dealers were unlawful.   There was no testimony that anyone agreed with Gramins to violate the securities laws or the wire fraud statute, or that any alleged "co-conspirator" knew the negotiating tactics were illegal.   In fact, the government's witnesses clearly and repeatedly stated that they *did not think* their trading practices were illegal.   Because there was no evidence that Gramins or his alleged co-conspirators ever agreed to violate the law, the government failed to prove beyond a reasonable doubt that a conspiracy existed.   *See Maldonado-Rivera*, 922 F.2d at 960.

The evidence at trial demonstrated conclusively that neither Frank Dinucci, Caleb Chao, nor Alejandro Feely believed that they were participating in an agreement to violate the law when they engaged in the types of negotiating tactics at issue in this case.[5]   Dinucci, for his part, never believed his conduct was illegal.   Tr. 343:4-5 ("Q. You didn't think [these tactics] were illegal, right? A. That's correct."); *see also* Tr. 293:22-294:4, 330:15-18.[6]   And he never testified

---

[5] Feely did not work with or report to Gramins and did not testify that he had any interactions with Gramins while at Nomura.  *See* Tr. 1924:21-1925:5.  Additionally, like Chao and Dinucci, Feely testified that he did not believe the negotiation misrepresentations were considered illegal until the *Litvak* indictment was issued.  *See* Tr. 1935:7-9, 2040:5-13.

[6] Prior to testifying, Dinucci entered a plea of guilty to one count of conspiracy stemming from his conduct at Nomura, and agreed to cooperate with the government in this case.  Cooperation Letter, *United States v. Dinucci*, 17 Cr. 69 (RNC) (D. Conn. Apr. 4, 2017), ECF No. 6.  However, Dinucci never stated in any proceeding, including his plea hearing, that he believed his conduct was illegal.  *See* DX 3510X at 47:10-48:12.  In any event, Dinucci's guilty plea is irrelevant to whether he was a co-conspirator with Gramins because his plea cannot be the basis of finding guilt as to Gramins.  *See United States v. Prawl*, 168 F.3d 622, 627 (2d Cir. 1999) ("[T]he jury may never consider [co-defendant's] guilty plea as evidence of [defendant's] guilt"); *United States v. Crosby*, 294 F.2d 928, 948 (2d Cir. 1961) ("Certainly the guilty plea cannot be used as evidence against the remaining defendants."); *see also United*

21

that he agreed with Gramins to violate the law.  Indeed, the evidence showed that Dinucci used the same negotiating tactics at his next job – independent of Gramins and Nomura.[7] Chao also testified that he did not think his conduct at Nomura was wrong or illegal.  Tr. 1777:20-1778:8; 1830:4-12.

In addition to Chao's and Dinucci's testimony that they never thought their conduct was unlawful, the conduct of traders and salespeople on the Nomura RMBS desk, nearly all of whom had prior trading experience, demonstrated conclusively that neither Gramins nor anybody else at Nomura entered into an agreement to commit securities fraud or wire fraud:

- Trading was conducted openly and there was no effort to conceal, *see* Tr. 287:14-23;

- Trading practices were openly discussed with junior and senior traders and salespeople, *see* Tr. 1889:1-8;

- Trading was conducted openly on systems that preserved the chats, were monitored by compliance, and were made available to regulators, *see* Tr. 286:14-16, 683:14-18, 1784:2-1787:7;

- Bond purchase and sale prices were immediately and accurately recorded in a "trade blotter" at Nomura that was accessible to anyone at the firm, *see* Tr. 1854:8-11;

- Compliance personnel repeatedly reminded traders that it was monitoring chats and watching for instances of misconduct, but never identified as problematic the type of alleged misrepresentations at issue in this case, *see* Tr. 286:17-287:13, 287:24-288:7;

---

*States v. Radomski*, 473 F.3d 728, 730-31 (7th Cir. 2007) (affirming a judgment of acquittal where there was insufficient evidence of a conspiratorial agreement and noting that "to allow a coconspirator's guilty plea in evidence might make the jury think the trial a formality, since if one coconspirator is guilty, so must the others be."). Notably, all three defendants were acquitted of the substantive count associated with the overt act to which Dinucci pleaded guilty. *See* Information ¶ 20(a)-(b), *United States v. Dinucci*, 17 Cr. 69 (RNC) (D. Conn. Apr. 4, 2017), ECF No. 1.

[7] Although Dinucci originally lied and told the government that he never made misrepresentations to counterparties after leaving Nomura, these lies were uncovered when he was called to testify before the Financial Industry Regulatory Authority ("FINRA") in September 2016 about his trading activity at Auriga.  *See* Tr. 327:17-23; 326:4-327:16.  Despite this brazen violation of his non-prosecution agreement, Dinucci was not indicted in this District until April 2017, when he was also indicted for four completely unrelated felonies in the Southern District of New York.  *See* Tr. 301:25-303:10.

- Prior to the *Litvak* indictment, compliance personnel held regular mandatory training presentations but never provided traders with training regarding negotiating tactics, *see* Tr. 357:25-358:5, 1784:9-14;

- No traders ever "blew the whistle" on these practices, despite the fact that they were widely used and discussed at Nomura and throughout the market, *see* Tr. 333:2-6, 345:6-17, 1778:9-1779:17, 1780:9-15; and

- Nomura itself did not condemn the tactics. *See* Tr. 1859:5-1860:6. Several months after Nomura discovered that Caleb Chao was seeking other employment, it sought to convince him to remain at Nomura despite the fact that Nomura knew he made misrepresentations concerning acquisition price and profit. Tr. 1859:5-1860:6. Furthermore, Conor O'Callaghan, a salesperson at Nomura who used many of the same negotiating tactics as Gramins and was named by the government as an unindicted co-conspirator, remains a Nomura employee to this day. Tr. 614:15-20.

The conspiracy conviction cannot stand when there simply was no evidence that anyone at Nomura thought the trading practices at issue violated the law. Evidence that traders shared negotiating strategies with each other or kept each other abreast of the status of negotiations when one trader was away from the trading the desk is hardly the stuff of a criminal conspiracy. At best, the evidence showed a group of traders and salespeople working together, sharing accepted strategies or advising each other on how to deliver a common message to customers. Such conduct occurs in virtually every business and falls miles short of an agreement to violate the law.

Because no rational juror could conclude beyond a reasonable doubt that Gramins entered into an agreement to violate the law, the Court should enter a judgment of acquittal as to Gramins on Count One.[8]

---

[8] As set forth *infra*, the government also failed to prove that Gramins and at least one co-conspirator believed their alleged false statements were material. This failure means the government did not prove beyond a reasonable doubt that there was an agreement to accomplish the unlawful objects of the alleged conspiracy, namely, violations of the securities and wire fraud statutes, which both require material false statements. For this reason too, a judgment of acquittal should issue as to Gramins on Count One.

### 2.      The Government Failed to Establish the Existence of Any Co-Conspirators

To prove a conspiracy, courts in the Second Circuit have repeatedly held that the government must prove beyond a reasonable doubt the criminal intent of both the defendant *and* anyone with whom he is accused of conspiring.  *Valle*, 807 F.3d at 522-23; *Desimone*, 119 F.3d at 223.  In this case, the government failed to prove that any person acted with the criminal intent to enter into a criminal conspiracy with Gramins.  Accordingly, the verdict on Count One must be set aside and a judgment of acquittal entered.

i.      <u>The Government Failed to Prove That Frank Dinucci Or Caleb Chao Were Co-Conspirators</u>

As discussed above, Dinucci and Chao testified that they never believed that their conduct at Nomura violated the law.  Without any evidence that Dinucci or Chao thought their conduct was unlawful, neither trader could be a co-conspirator of Gramins.  Analogy can be found in *United States v. Valle*, 807 F.3d 508,  in which the Second Circuit vacated a guilty verdict because there was insufficient evidence that the alleged co-conspirator acted with the necessary conspiratorial intent to commit a crime.  *See id.* at 522-23 ("[O]n the basis of this evidence, it is impossible to determine beyond a reasonable doubt whether Moody Blues – or for that matter any of [the defendant's] other alleged co-conspirators – ever had the specific intent to commit a kidnapping.").

Dinucci and Chao could not possibly have been co-conspirators.  *See Valle*, 807 F.3d at 522-23; *see also Goldberg*, 105 F.3d at 774; *Desimone*, 119 F.3d at 223.  Each testified that he did not believe his conduct was improper or illegal and therefore neither could have conspired with Gramins.

ii.     The Government Failed To Prove That Ross Shapiro Or Tyler Peters Were Co-Conspirators

No rational juror could or did conclude that either Ross Shapiro or Tyler Peters had criminal intent or that they conspired with Gramins. The jury's verdict on Count One, acquitting Peters and failing to reach a verdict as to Shapiro, underscores the lack of evidence that either Shapiro or Peters could have conspired with Gramins.

The government did not come close to meeting its burden of proving that Shapiro or Peters acted with criminal intent to enter into a criminal conspiracy. The government failed to adduce during the trial that Shapiro or Peters thought their conduct was unlawful. Put simply, the evidence at trial fell woefully short of proving beyond a reasonable doubt that Shapiro or Peters acted with the necessary criminal intent to conspire with Gramins.

Moreover, the evidence did not prove beyond a reasonable doubt that Shapiro or Peters entered into an agreement with Gramins to commit one of the purported illegal objects of the alleged conspiracy. *See United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004) ("The agreement between the party charged and his co-conspirators is the gist of the crime of conspiracy."). There was no testimony at trial about *any* agreements between Gramins and either Shapiro or Peters, much less an agreement to violate the federal securities or wire fraud statutes. Before the *Litvak* indictment, any common understanding to use sharp negotiation tactics could not have been a willful agreement to violate the law.[9] The chats introduced at trial showed that Shapiro, Peters, and Gramins used some of the same trading techniques in certain instances – but so too did "[e]very trader on wall street" because these techniques were "industry practice." *See* Tr. 341:20-342:1, 1830:9-17. Such evidence is not enough to prove beyond a reasonable doubt

---

[9] After the *Litvak* indictment, there was no evidence elicited during the trial that Peters or Shapiro engaged in any allegedly unlawful negotiation tactics. Accordingly, even if Gramins arguably had engaged in any allegedly improper negotiation conduct after the *Litvak* indictment – which he did not – there was no evidence adduced during trial that such conduct was part of an agreement with Shapiro or Peters to violate the law.

that Gramins joined with Shapiro or Peters in "an agreement to commit an offense against the United States." *Ceballos*, 340 F.3d at 123.

iii.    <u>The Government Failed to Prove That Michael Romanelli Was A Co-Conspirator</u>

Michael Romanelli was a salesperson on the RMBS desk at Nomura, who was senior to Gramins.  Tr. 2187:6-23.  The government did not call Romanelli to testify.[10]  Any attempt by the government to characterize Romanelli as a co-conspirator must fail.  First, as noted above, Gramins did not act with any intent to violate the law.  Second, there was not an iota of proof that Romanelli knew the conduct violated the law or was unlawful, nor that he agreed with Gramins or anyone else to violate the law.

The government offered no evidence at trial that would tend to show that Romanelli believed he was acting wrongfully or illegally at any time during the alleged conspiracy period.  Caleb Chao "discussed the use of price-negotiation tactics with the sales-team members," including Romanelli, *see* Tr. 1873:23-1874:8, but never testified about what "price-negotiation tactics" he discussed with Romanelli, or Romanelli's views on those tactics.  The only reasonable inference from the evidence is that Romanelli joined his colleagues in thinking that their negotiating tactics were "industry practice," Tr. 1829:4-12, but the reality is that the evidence says little about Romanelli at all.  The lack of any proof regarding Romanelli's criminal intent fatally undermines the argument that he was a knowing participant in any agreement to violate the law.

The post-*Litvak* phone call between Gramins and Romanelli during the sale of the JPMAC 2006-WMC1 A4 bond to QVT,  *see* GX 29F,  is woefully insufficient to prove that

---

[10] In fact, the government did not call a single salesperson to testify, despite the government's contention that several salespeople were unindicted co-conspirators of the defendants.  *See* Government Letter to Defendants, dated April 27, 2017 (Exh. A).

26

Romanelli was a co-conspirator.  On the call, which *the defense* played for the jury several times, Gramins and Romanelli discussed how to complete the negotiations with Wollman, including how to phrase Nomura's offer while remaining faithful to Nomura's post-*Litvak* instructions.  *Id.* Romanelli told Gramins to say "80 and a half is the best I can get them *to you*," and that if Gramins was asked to disclose Nomura's acquisition cost, he should give a vague but truthful answer rather than misrepresent a price.  *Id.*

The negotiation language that Romanelli and Gramins discussed was then conveyed nearly verbatim to Wollman – and it was precisely the language that they had been instructed to use by Nomura's compliance department after the *Litvak* indictment.  *Compare* GX 29F (Gramins and Romanelli discuss price being phrased "*to you*" six times), *and* GX 29D at NSIUSAO00147493 (Gramins phrasing price to QVT being "*to you*"), *with* Tr. 1846:23-1847:4 ("Q. And isn't it a fact that one thing [compliance personnel] made clear to you at that time was that it's an acceptable practice in your negotiations with counterparties to say, 'This is the price *to you*,' this is the price *to you*, the counterparty, without misrepresenting what Nomura's acquisition costs was?  A. Yes, she did.); Tr. at 1847:18-23; Tr. at 1906:15-20. Gramins' and Romanelli's decision not to reveal their internal profit to Wollman complied with Nomura's post-*Litvak* instructions.  *See* Tr. 605:25-611:19.

A belief by Romanelli that Wollman might get "suspicious" if Romanelli joined the negotiation is also insufficient to prove beyond a reasonable doubt that Romanelli was knowingly and willfully engaging in a criminal conspiracy with Gramins.  Romanelli simply informed Gramins that Wollman might get "suspicious" if Romanelli entered into the negotiation at the last minute to try to convince Wollman to pay a particular price for the bond.  Instead, Romanelli encouraged Gramins to continue to negotiate with Wollman on his own via

Bloomberg chat.  The comment cannot establish Romanelli's participation in a conspiracy beyond a reasonable doubt.

There was nothing conspiratorial about the fact that Gramins discussed how to approach a customer with a more senior member of the desk, especially given the uncertain environment in the market after the *Litvak* indictment.  Nor was Romanelli's consultation with Gramins, a more junior colleague, in any way nefarious.  To the contrary, the recording captures Romanelli and Gramins trying to determine how best to present Nomura's offer to QVT while adhering to the post-*Litvak* directives of Nomura's compliance department not to misstate acquisition cost.  Tr. 1846:23-1847:4.  Thus, the conversation between Gramins and Romanelli falls well short of proving beyond a reasonable doubt that Romanelli knowingly and willfully participated in a conspiracy.

When the evidence "viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."  *Cassese*, 428 F.3d at 99; *see also Valle*, 807 F.3d at 515; *Lorenzo*, 534 F.3d at 162; *United States v. Nusraty*, 867 F.2d 759, 765 (2d Cir. 1989).  Like the proof that was ultimately insufficient in *Cassese*, the evidence that Gramins entered into a conspiratorial agreement with Romanelli is, at most, "characterized by modest evidentiary showings, equivocal or attenuated evidence of guilt or a combination of the three."  *Cassese*, 428 F.3d at 103.  The proof is insufficient to establish beyond a reasonable doubt that Gramins illegally conspired with Romanelli.

      iv.      <u>The Government Failed To Prove That Any Other Member Of The RMBS Desk Was A Co-Conspirator</u>

Prior to trial, the Court ordered the government to identify the alleged unindicted co-conspirators.  Order, dated April 24, 2017 (ECF No. 365).  The government pointed to four other

members of the RMBS desk, aside from those discussed above:  John Fleisher, Eric Horowitz, Conor O'Callaghan, and Lewis Meyers.  *See* Government Letter to Defendants, dated April 27, 2017 (Exh. A).  There was insufficient evidence at trial to establish beyond a reasonable doubt that any of these individuals engaged in a criminal conspiracy with Gramins.

Meyers' name was not mentioned a single time during trial.  As for Horowitz, the evidence at trial established little more than that he was a junior trader on the RMBS desk who worked with Ross Shapiro and Tyler Peters – not Gramins – and traded prime and Alt-A bonds. *See* Tr. 600:19-22, 1893:12-17, 1929:24-1930:10.  The only evidence concerning O'Callaghan relating to the conduct charged in the Indictment was regarding the AAA 2005-1A 1A3B trade, in which O'Callaghan briefly participated in a chat with a trader from HBK and agreed to purchase that bond for Nomura at a price of 62-00 (the same exact price at which HBK had initially offered the bond to Nomura).  *See* GX 25A at NSIUSAO00147298-00147299.  There was no proof that Gramins had any involvement in this interaction.

The evidence was similarly lacking as to Fleisher.  Not a single witness testified that Fleisher believed he was engaging in wrongful or illegal conduct.[11]  There was no evidence that Fleisher agreed with others to violate the law.  Dinucci had no recollection as to whether Fleisher ever engaged in the conduct at issue in the Indictment.  *See* Tr. 167:18-168:2.  Chao stated little more than Fleisher sat next to him and that Chao would sometimes "ask John Fleisher very basic, you know, technical concepts." *See* Tr. 1677:20-24.  Fleisher also participated in the post-*Litvak*

---

[11] Fleisher would have given testimony consistent with Chao, Dinucci, and Feely, *i.e.*, that he did not believe that his trading practices violated the law.  *See* DX 3516T at 42:1-2 (Fleisher grand jury testimony) ("Certainly I didn't think it was a crime at the time."); *id.* at 58:10-17 ("Q. What was your reaction when you found out about Jesse Litvak having been indicted by the government? A. Extreme shock and concern. Q. Why were you concerned? A. Up to that point I had no idea what we were doing could have been considered securities fraud."); *id.* at 60:14-17 ("I was concerned about it [the Litvak indictment] because up to that point I didn't think there was any chance anything we were doing could have been remotely conceived as criminal."); DX 3516A at 6 (notes from government interview of April 30, 2015) ("FLEISHER was shocked to hear about the details of the Litvak case in or around January of 2013, because it didn't register that Litvak's conduct was remotely illegal."); *see also* DX 3516C at 4.

"huddle" meeting with Gramins in which Gramins instructed the traders **not** to make misrepresentations regarding Nomura's acquisition price.  *See* Tr. 1756:23-1757:25.  The only charged trade involving Fleisher was the pre-*Litvak* sale of WAMU 05-AR11 A1B2 bonds to Zachary Harrison at Putnam.  The evidence showed that Gramins was not involved in this negotiation, which occurred in a private Bloomberg chat room between Fleisher and Harrison.  *See* GX 27B.[12]  Not surprisingly, the government declined to call Fleisher to testify.

In sum, no rational juror could find beyond a reasonable doubt that Gramins entered into any conspiracy or that any of Gramins' alleged co-conspirators were knowing and willful participants in any alleged conspiracy to violate the federal securities or wire fraud statutes.  Accordingly, Gramins should be acquitted of Count One of the Indictment.

## POINT TWO

### THE GOVERNMENT'S USE OF THE *LITVAK* INDICTMENT AND ITS OUTRAGEOUS STATEMENTS IN REBUTTAL SUMMATION WARRANT A NEW TRIAL UNDER RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

### A.     Applicable Law

Under Rule 33 of the Federal Rules of Criminal Procedure, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  The relevant test is "whether it would be a manifest injustice to let the guilty verdict stand."  *United States v. James*, 712 F.3d 79, 107 (2d Cir. 2013) (internal quotation marks omitted).

Where the prosecution makes several different missteps, a court should consider those acts together to determine whether the defendant has been prejudiced, and therefore whether a

---

[12] The only link between Gramins and Fleisher's conduct during this trade is that Fleisher, *after* he made an alleged misrepresentation to Harrison in the chat, sent a Bloomberg message to Ross Shapiro (copying Gramins) in which Fleisher copied and pasted the contents of his chat with Harrison.  *See* GX 27C.  Then, in a separate chat between Harrison and Gramins, Gramins acknowledged that there was some type of situation occurring between Harrison and Fleisher, but stated that he "[hadn't] been following too closely" and was "kinda jammed though."  *See* GX 27D at NSIUSAO00147412-00147413.  These few exhibits are insufficient to establish beyond a reasonable doubt that Fleisher was a participant in a criminal conspiracy with Gramins.

new trial is warranted.  *E.g.*, *United States v. Certified Envtl. Servs.*, *Inc.*, 753 F.3d 72, 96 (2d

Cir. 2014) ("[W]e would hesitate to vacate and remand this case for a new trial based on any one

of the errors discussed above in isolation, or perhaps even any one category of those errors.  But

considering the record as a whole, we are compelled to conclude a new trial is warranted."); 

*Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir. 1990) ("[I]mproper comments in a prosecutor's

summation were so numerous and, in combination, so prejudicial that a new trial [was]

required."); *United States v. Washington*, 263 F. Supp. 2d 413, 439 (D. Conn. 2003) (granting a

new trial due to "the volume and magnitude of improper conduct by the Government").

## B.    Discussion

### 1.    The *Litvak* Indictment's Only Use Was To Prejudice Gramins

In pre-trial litigation, the government claimed that evidence of the *Litvak* indictment

should be admitted for two reasons.  First, it argued that the *Litvak* indictment was relevant to the

testimony that Michael Canter would give at trial.  Government's Omnibus Trial Memorandum

And Supplemental Submission Regarding Motions *In Limine*, ECF No. 329 at 23 (Mar. 29,

2017) ("Gov't Trial Memo.").  Canter was a buy-side customer of Jesse Litvak's who learned of

Litvak's misrepresentations in a particular trade concerning acquisition cost and internal profit.

*Id.* at 9-10.   The government claimed, bizarrely, that Canter's reaction regarding Litvak's

misrepresentations showed materiality *in Gramins' case*.  *Id.* at 10-11.  Second, the government

pointed to the Nomura RMBS desk's supposed shift from negotiating trades by electronic chat

(before *Litvak*) to doing so using the telephone (after *Litvak*) as proof that traders had a guilty

state of mind *both before and after the Litvak indictment*.  Telephonic Status Conference of April

24, 2017 Tr. at 60:10-61:2 ("Tr. of Apr. 24, 2017"); *see also* Gov't Trial Memo. at 23-25.[13]

---

[13] The government also argued that evidence of the *Litvak* indictment should be admitted to provide "context" and to explain another trader's comment ("don't litvak me!").  Gov't Trial Memo. at 23-24.  Like the government's other

The government did not use evidence of the *Litvak* indictment in the manner it proffered to the Court as late as the week before jury selection.  The government did not even call Michael Canter at this trial.  Nor did it introduce evidence of his interaction with Litvak, or his reaction after learning about Litvak's alleged misrepresentations.  It nonetheless succeeded in getting the *Litvak* indictment, and all its negative implications and associations, before the jury.

The government also failed to prove that the *Litvak* indictment caused a shift on the trading desk from electronic chats to telephones that was somehow probative of the defendants' guilt from 2009 to 2013.  Although Chao testified that Gramins instructed him to use the phones more frequently after Litvak was indicted, Chao also testified that he was *not* suggesting that Gramins told him to do so in order to avoid getting caught committing crimes.  Tr. 1782:24-1783:12.  To the contrary, Chao explained that Gramins promptly instructed him to *stop* making misrepresentations after news of Litvak's indictment broke.   Tr. 1783:13-16.   Nomura's compliance department also told Chao to use the phone more frequently after Litvak was indicted.  Tr. 1783:17-1784:1.  And, even before the *Litvak* indictment, traders were encouraged to use the phone for entirely innocuous reasons, including improving client relations.  Tr. 1783:17-1784:1, 1787:8-25; *see also* GX 107.  Although Chao testified about a vague recollection that he once heard Gramins relay an inaccurate price over Nomura's internal intercom after Litvak was indicted, he could not remember a single detail surrounding this event. Tr. 1758:1-1759:11.

The government's unrealized theories of admissibility were further undermined when the lone post-*Litvak* trade introduced at trial showed Gramins and Romanelli agree that it would be best to negotiate with a counterparty *via chat* as opposed to via phone.  *See* GX 29F.  The call

---

proposed grounds for admitting the *Litvak* indictment, these bases for admission fall flat because the government failed to adduce evidence to support them.

itself showed nothing more than Romanelli and Gramins complying with the post-*Litvak* guidelines. *Id.* The government never showed that Gramins' behavior after the *Litvak* indictment was "reflective of the idea that [he] had intended to do wrong the entire time." Tr. of Apr. 24, 2017 at 60:13-14. The inescapable conclusion is that this too was a manufactured excuse to use the *Litvak* indictment to inflame the jurors.

Evidence of the *Litvak* indictment was ultimately far more prejudicial than probative, and was particularly inflammatory for Gramins, who was the only defendant tied to a post-*Litvak* trade. The government's plan to create spillover from *Litvak* was most obvious when prosecutors asked Wollman numerous impermissible questions concerning *Litvak* aimed at inflaming the jury. *See* Tr. 2143:4-21 (repeatedly attempting to ask Wollman about his impressions of the *Litvak* indictment); Tr. 2143:23-2144:4 (asking Wollman about a private investigator who came to his house to discuss *Litvak*, which prompted a defense objection that was sustained).

The government's clever maneuvering to justify admission of the *Litvak* indictment, followed by its failure to use the evidence in the ways it proffered, compels an obvious conclusion: the government simply wished to use the indictment as a toxin in the jury box to "criminalize" the conduct and not for any legitimate purpose. This caused a manifest injustice to Gramins that warrants a new trial.

### 2. The Government's Outrageous Comments During Its Rebuttal Summation Prejudiced Gramins And Warrant a New Trial

The government's misuse of the *Litvak* indictment against Gramins was compounded by its outrageous statements during rebuttal summation. In a rebuttal, the government is permitted "fair comment on the evidence at trial and reasonable inference therefrom" and "fair response to remarks made by defense counsel during summation." *Ogletree v. Graham*, 559 F. Supp. 2d

250, 260 (N.D.N.Y. 2008) (internal quotation marks omitted).   Improper statements by prosecutors in principal or rebuttal summation can constitute grounds for a new trial where the statements cause prejudice to the defendant.   *E.g.*, *Certified Envtl. Servs.*, 753 F.3d at 95; *Floyd*, 907 F.2d at 355; *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990); *United States v. Richter*, 826 F.2d 206, 209 (2d Cir. 1987).

To determine whether a prosecutor's remarks constitute "substantial prejudice" sufficient to warrant a new trial, courts consider "[1] the severity of the misconduct; [2] the measures adopted to cure the misconduct; [3] and the certainty of conviction absent the improper statements."   *Floyd*, 907 F.2d at 355 (quoting *United States v. Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981)); *accord Certified Envtl. Servs.*, *Inc.*, 753 F.3d at 95.

The first element of the "substantial prejudice" test is easily satisfied here.   The misconduct was severe.   The government veered into foul territory when it exhorted the jury that Gramins and his co-defendants were responsible for many additional unlawful trades that were not introduced in evidence.   The government stated in its rebuttal summation:

> *And remember, that these are a selection of the trades.   That we could be here for six months if we bring you every trade.*   Dinucci told you that these tactics would occur almost daily and Feely told you that the defendants would engage in these tactics at every opportunity, which he also estimated would be daily.

Tr. 2945:19-25 (emphasis added).

The government's comment regarding proof outside the record drew contemporaneous objections from the defense and was acknowledged by the Court as a "strong" and improper statement.   Tr. 2983:22-24.

> "[W]hat happened here should not have happened. . . .   For the government to proceed as it did without giving notice to me is, in my opinion, well short of the optimal way to proceed in a case of this nature."

*Id.* 2983:7-12.   The government's statement was egregious.   Such a statement − essentially telling the jury, "we're the government, trust us, back at the office we have a lot more proof of wrongdoing that we could show you" − violated the Sixth Amendment and every fundamental rule of trial practice, criminal procedure, and evidence.   *See Crawford v. Washington*, 541 U.S. 36, 42 (2004) ("The Sixth Amendment's Confrontation Clause provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him.") (internal quotations omitted); *United States v. Toscano*, 166 F.2d 524, 526-27 (2d. Cir. 1948) (reversal of conviction based on improper statement by prosecutor during summation that package might have had defendant's fingerprints, despite no evidence of fingerprints admitted at trial); *United States v. Spinelli*, 551 F.3d 159, 168-69 (2d Cir. 2008) (improper for prosecutor in rebuttal summation to refer to matters outside the record and imply the existence of extraneous proof); *United States v. Biasucci*, 786 F.2d 504, 514 (2d Cir. 1986) (finding that a "prosecutor's comment about being able to prolong the trial for three months" was improper); *see also United States v. Teffera*, 985 F.2d 1082, 1089 n.6 (D.C. Cir. 1993) (finding that it was reversible error when the government referred to evidence not adduced at trial during summation because  "the improper remarks may very well have tipped the scales for the jury against [the defendant]" given that "[t]he prosecutor referred repeatedly to this phantom evidence, it was a key part of his closing remarks, and the government's other evidence was weak"); *United States v. Grossman*, 400 F.2d 951, 956 (4th Cir. 1968) ("The prejudice to a defendant of inviting conviction on facts − if they be such − dehors the record is counter to the basic concept of fairness.   From the representative of the United States, a sovereign whose duty it is to govern impartially, and a person in whom the average jury has confidence that he will faithfully observe his trust, the thrust of the statements, in the context made, destroyed fairness and equal justice."); *Hutchins v.*

*Wainwright*, 715 F.2d 512, 515 (11th Cir. 1983) (government violated defendant's Sixth Amendment rights during summation when it made implications about a witness who did not testify and referred to the trial evidence as the "tip of the iceberg").

The inappropriate remark was particularly inflammatory to Gramins.  Gramins was involved in six trades listed in the Indictment that were proven at trial, including the only post-*Litvak* trade.  In contrast, Shapiro and Peters each had direct involvement in only one of these trades.  Because Gramins had direct involvement in a larger proportion of the trades presented at trial than Mr. Shapiro and Mr. Peters, it would be natural for the jury to conclude that most of the government's secret stash of "six months" of other trades were also executed by Gramins.  The jury would likely have reached the same conclusion about post-*Litvak* trades because Gramins was the only defendant with any charged trades after *Litvak*.

The measures adopted to cure the misconduct were laudable, but were insufficient to cure misconduct of this level.  The Court provided a curative instruction to the jury.  *See* Tr. 3011:2-3011:8 ("I instruct you that you are to consider the trades that were charged in the indictment that have been the subject of the evidence presented during the trial. . . .  You are not to speculate about what might or might not have happened with regard to other trades, trades that have not been the subject of the evidence here.").  The curative instruction, however, could never erase from the minds of the jurors what it had just heard: that the government allegedly possessed much more evidence against the defendants than what it had presented in court and that the volume was so large, it would take half a year to present it all to the jurors.

The prosecutor's comment was improper not only because it referred to evidence outside the record, but also because it breached a pre-trial stipulation between the parties regarding how the parties would refer at trial to the thousands of Nomura RMBS trades that were not charged or

mentioned in the Indictment (the "uncharged trades").  Following substantial pre-trial debate, the government agreed not to argue that uncharged Nomura RMBS trades were unlawful, and the defendants agreed not to argue that they were lawful.  Tr. of Apr. 24, 2017 at 66:20-67:11.  The prosecutor's remark was a willful breach of that agreement and it left Gramins with no way to respond.

The third and final element of the "substantial prejudice" test asks the court to consider the "certainty of conviction absent the improper statements."  *Floyd*, 907 F.2d at 355 (internal quotation marks omitted).  There can be little doubt that the evidence in this case was, at most, razor thin.  The jury in this case deliberated for seven days and sent back several notes asking for more information.  *See* Court Exhs. 5-8, 10-12.  But most telling is the fact that the jury acquitted the defendants on twenty-three out of twenty-seven counts and was hopelessly deadlocked on three counts, which should alone be enough to satisfy the Court that the government's improper references likely tipped the balance of the case on Count One against Gramins.

Other ways in which the government egregiously ran afoul during its final jury address included:

- Contrary to the Court's jury charge, the government informed the jury erroneously that it did *not* need to find that defendants knew their conduct was illegal: "The jury instructions do not say you have to know it's illegal.  They don't say that.  You have to consciously know you're doing wrong.  Conscious wrongdoing."  Tr. 2941:7-10.  The government also indicated that a defendant acts "willfully" when he doesn't act by accident, and implied that the jury need only find that the defendants lied in order to take money.  Tr. 2961:5-11.  This concept was repeated numerous times throughout the rebuttal summation, including in reference to the conspiracy charge.  Tr. 2942:15-17.

- The government improperly tried to lower its burden to prove all the elements of each crime by arguing, erroneously, that the jury could convict based on the answer to a single, simplistic question: "*Did the defendants lie to take money?*"  *See* Tr. 2941:14-20.  The prosecutor repeated this incorrect legal standard throughout the rebuttal.  *See* Tr. 2941:23-24, 2942:5-6, 2942:10-11, 2942:12-14, 2942:15-17, 2967:20-22.  In addition to misstating the law, the

government displayed a slide[14] to the jury throughout its summation that read, "Did Defendants Lie to Make More Money?"

In addition to the improper statements discussed in this Memorandum of Law, Gramins noted in prior filings additional instances of government misconduct in rebuttal summation, and incorporates those by reference here. *See* Defendant's Letter to the Court, dated June 5, 2017 (ECF No. 419); Defendant's Letter to the Court, dated June 6, 2017 (ECF No. 421); Defendant's Letter to the Court, dated June 8, 2017 (ECF No. 425).

*    *    *

When the spillover repercussions of the toxic *Litvak* indictment and the prosecution's repeatedly improper rebuttal are viewed together, it is beyond dispute that Gramins' rights were prejudiced. *See Floyd*, 907 F.2d at 353 (vacating conviction "based on the cumulative effect of the three alleged categories of [prosecutor's] improper remarks"). The Court should therefore grant a new trial on Count One.

## POINT THREE

## GRAMINS SHOULD BE ACQUITTED ON COUNT THREE, CHARGING SECURITIES FRAUD, BECAUSE NO RATIONAL JUROR COULD FIND THAT HE WAS INVOLVED IN MAKING A MATERIAL FALSE STATEMENT

Count Three charged Gramins with securities fraud based on an allegedly false statement made by Caleb Chao to Aadil Abbas during Chao's negotiation of the sale of the PPSI 2004-WWF1 M3 to HIMCO on May 1, 2012. Chao allegedly misrepresented to Abbas that a party offered to sell the bonds to Nomura at 80-16 when, in fact, the seller offered to sell to Nomura at 78-16. GX 26D at NSIUSAO00147346; GX 26E at NSIUSAO00147349. Because the

---

[14] The government did not provide its demonstrative slides to defendants before its principal or rebuttal summations. After trial, counsel for Gramins requested copies of the slide presentations used by the government during its principal and rebuttal summations. Counsel requested the slides for the purposes of evaluating possible arguments for this post-trial motion and maintaining an accurate and complete record. The government has unfairly ignored Gramins' request.

government failed to prove that Gramins was involved in making the false statement or that the alleged misstatement was material, a judgment of acquittal should be entered as to Gramins on Count Three.[15]

## A.      Applicable Law

To sustain a securities fraud conviction, the government must prove beyond a reasonable doubt that:

> [1] the defendant did any one or more of the following: [a] employed a device, scheme or artifice to defraud, or [b] obtained money or property by means of untrue statements of material facts or failure to state material facts that made what was said, under the circumstances, misleading, or [c] engaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchaser; [2] that the defendant acted knowingly, willfully and with the intent to defraud; and [3] that the defendant used, or caused to be used, the mails, or any means or instruments of transportation or communication in interstate commerce, in furtherance of the scheme.

Leonard B. Sand et al., Modern Federal Jury Instructions – Criminal, Instr. 57-14 (2015); *see* 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5.

The government bears the burden of proving beyond a reasonable doubt that the defendant's alleged false statements were material. A statement is material if there is "a

---

[15] The alleged misstatements in this case, including the misstatement alleged in Count Three, are also immaterial as a matter of law. This Court and others have made clear that a material fact is one that goes to the value of the security being purchased or sold. *See Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 888 (2d Cir. 1972); *see also Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1171 (2d Cir. 1970); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc); *List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965). The securities fraud statute's focus on the value of a security prompted Judge Friendly to remark that purpose of Section 10(b) and Rule 10b-5 is "to protect persons who are deceived in securities transactions – to make sure that buyers of securities get what they think they are getting." *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984); *e.g.*, *Steiner v. Hughes*, 44 P.2d 857, 860 (Okla. 1935) (holding that the misstatements in the case were immaterial because "the identical thing promised [was] delivered, at the price agreed"); *McCaw v. O'Malley*, 249 S.W. 41, 45 (Mo. 1923) (noting that a "mere statement by the vendor of what an article cost him would not be regarded as a matter on which a vendee should rely"); *Ripy v. Cronan*, 115 S.W. 791, 793-794 (Ky. 1909) (holding that a misstatement of a party's reserve price was not material and noting that "[i]n every transaction some allowance must be made for what is called 'trade talk'"). Whether misrepresentations like the ones in this case are material is currently *sub judice* before the Second Circuit in *United States v. Litvak*, No. 17-1464 (2d Cir.).

Moreover, as described with respect to Count One, *supra*, there was no evidence that Gramins or Chao believed that their conduct was illegal, and accordingly, no rational juror could have found criminal intent.

substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988)).

A "reasonable investor" is not any retail investor, but the type of professional investor who invests in the non-agency RMBS market.  In *United States v. Litvak*, 808 F.3d 160, 185 (2d Cir. 2015), the Second Circuit held that expert testimony about what "mattered to sophisticated investors" was "relevant to the element of materiality."  *Id.* at 185.  The Court added that "the *sophistication of the investor* is relevant both to the adequacy of the defendant's disclosure, and to the extent of the investor's reliance on any alleged misrepresentations."  *Id.* (internal quotation marks and alterations omitted) (emphasis added); *see also id.* at 183.[16]

For the government to sustain a conviction for aiding and abetting a violation of the securities fraud laws, the government must prove beyond a reasonable doubt that a primary violation occurred, that the defendant had "general awareness that his role was part of an overall activity that is improper," and that he "knowingly" and "substantially assisted" the violation.

---

[16] Other cases confirm that the "reasonable investor" is drawn from the only group of investors capable of being deceived: those buying and selling the securities.  *E.g., SEC v. Rorech*, 720 F. Supp. 2d 367, 372 (S.D.N.Y. 2010) ("SEC has failed to prove that either piece of alleged information was material" because "these two pieces of information were not considered material to *reasonable investors in VNU CDSs*," whom the court noted were "sophisticated high yield bond buyers.") (emphasis added); *Basso Sec. Ltd. v. Interstate Bakeries Corp.*, No. 01-CV-575 (PCD), 2002 WL 32255352, at *4 n.3 (D. Conn. Jan. 18, 2002) ("Plaintiff [in a Rule 10b-5 case] would also appear to face a formidable obstacle in alleging that the misstatement in the IBC press release was material" because "[t]he notion that a *sophisticated plaintiff* would rely on a summary of a shareholder agreement appearing within a press release without referring to the document to which it refers is a dubious proposition.") (emphasis added); *see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003) ("In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them."); *McCormick v. Fund American Co., Inc.*, 26 F.3d 869, 879-80 (9th Cir. 1994) (holding that an investor's sophistication can show that lack of disclosure was not misleading); *Quintel Corp. N.V. v. Citibank, N.A.*, 596 F. Supp. 797, 802 (S.D.N.Y. 1984) (holding that the investor's sophistication "is relevant to the adequacy of disclosure"); *cf. Weimert*, 819 F.3d at 358 ("[N]egotiating parties, and certainly the sophisticated businessmen in this case, do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior.  Deception about negotiating positions—about reserve prices and other terms and their relative importance—should not be considered material for purposes of mail and wire fraud statutes.").

*United States v. Fulkenberry*, 614 F.3d 573, 583-84 (6th Cir. 2010); *United States v. Kessi*, 868 F.2d 1097, 1104 (9th Cir. 1989); *see also United States v. Corbin*, 729 F. Supp. 2d 607, 620 (S.D.N.Y. 2010).

**B.    Discussion**

### 1.    No Rational Juror Could Conclude That Gramins Made Material Misrepresentations In Connection With The Sale Of The PPSI Bond

A judgment of acquittal should be entered because the government failed to prove Gramins was involved in making the false statement alleged in Count Three. Chao, the Nomura trader who made the alleged misstatement, had no independent recollection of the trade. Tr. 1711:25-1712:1. The best he could do was guess that Gramins *might* have instructed him to make the false statements:

> Q. Do you know how you knew to say low 80s here?
> A. *I believe* I was told by Gramins here.
> * * *
> THE COURT:  So the basis for Mr. Chao's belief?
> BY MR. NOVICK:
> Q. Go ahead.
> A. *I believe* that given the complexity of this trade, it was not a straightforward, you know, showing a higher offer to a client. *I thought* that given that there were two potential buyers, one that wanted to buy just a small piece at a higher price, and another client that wanted to buy at the same price, I just would not have known how to sort of parcel out the offer to two different clients. It just would have been beyond my scope of knowing what to do.
> THE COURT:  So how confident are you in your belief that Gramins told you what to say?
> THE WITNESS:  *I believe* that he told me what to say because he was in the other chat with Mr. Sunshine.
> MR. MUKASEY:  That's not responsive.
> THE COURT:  Are you saying you're pretty sure or you're very sure?
> THE WITNESS:  *I don't remember the actual circumstance, but I think, in general,* I would ask Gramins for advice on what I should be doing.
> THE COURT:  I asked Mr. Chao to tell us how confident he is in his belief, and I think we need to explore that.
> * * *
> Q. Let me ask you this:  Do you believe, based on your practice back then, that you would have known what to say, absent Gramins telling you, in the context of this chat?

A. ***I don't believe*** I would have known what to say without discussing with Gramins.

Tr. 1709:12, 1711:6-1712:5; 1712:16-21 (emphasis added).[17]

The government failed to prove that Gramins himself had any direct involvement in the PPSI trade, or that he aided and abetted Chao's alleged violation, because it did not prove that Gramins "knowingly" gave Chao "substantial assistance," as required for aiding and abetting liability. *See Fulkenberry*, 614 F.3d at 583-84; *Kessi*, 868 F.2d at 1104; *see also Corbin*, 729 F. Supp. 2d at 620. Chao's speculative and equivocal testimony cannot possibly be sufficient to prove beyond a reasonable doubt that Gramins instructed Chao to make the allegedly false statement at issue in Count Three, or consequently that Gramins could be criminally liable for this statement.

## 2. No Rational Juror Could Conclude That The Alleged False Statement In Count Three Was Material

Nor could a rational juror find that the statement was material. The government sought to establish the materiality of the statement in Count Three almost entirely through Abbas's testimony that knowing Nomura's actual acquisition price, 78-16, would have been "important" to him. Tr. 1510:3-13. The Second Circuit has made clear that "while importance is undoubtedly a necessary element of materiality, importance and materiality are not synonymous." *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). The critical inquiry is not whether the actual acquisition cost would have been "important," but rather whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having

---

[17] Chao's uncertainty over whether Gramins instructed him to misrepresent Nomura's acquisition cost in this trade is only one element of the haziness surrounding this trade. Abbas could not remember why he wrote that 79-00 was his best offer but Chao later confirmed that the trade was complete at 79-02. *See* 26E at NSIUSAO00147350; Tr. 1501:24-1502:9.

significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38 (internal quotation marks omitted).  On that inquiry, the evidence leads to the conclusion that Nomura's acquisition cost was not material – and that no rational juror could find otherwise. Several features of the RMBS market, and Abbas's own testimony, demonstrate the immateriality of Chao's alleged misstatement.

*First*, the counterparties invested significant resources into building, maintaining, and updating tremendously complex computer models because they wanted to rely on reliable, verifiable data – not the unverified word of an opponent in an arms-length, principal-to-principal negotiation.  Only massive, "highly sophisticated" financial giants could buy and sell RMBS from Nomura in this market, and every one of Nomura's counterparties was a QIB.  Tr. 517:21-518:4.  Nomura's exceptionally sophisticated counterparties invested heavily in models that priced every RMBS the counterparty was evaluating, and a dealer's acquisition price was *not* one of the many data points analyzed by the models.  *See, e.g.*, DX 6 (Ellington model); DX 25, 29 (HIMCO model); DX 1661 (Putnam model).  Counterparties took pride in having the most sophisticated modeling, and felt that the lack of transparency in the market could benefit them because their modeling capabilities were better than their competitors' capabilities.  Tr. 2378:3-13, 2379:9-13.  Abbas helped to design his company's proprietary model, which analyzed data on every loan underlying a given bond, including the 3,300 loans underlying the PPSI bond.  Tr. 1526:6-9, 1559:25-1560:11.  Abbas testified that during his negotiations with dealers he was "guided, very much so, by [his] model in terms of how much [he was] willing to pay or not willing to pay for a bond."  Tr. 1549:5-14.  Abbas was also scheduled to meet with eleven colleagues from HIMCO on the morning he bought the PPSI bond to discuss whether the bond was an attractive investment – all before ever talking to Nomura about its acquisition cost.  *See*

DX 26 at 1; Tr. 1609:14-1611:20.   Verifiable data and analytics were significant in RMBS investment decisions; unverified sales chatter was not.

*Second*, statements about dealer acquisition price were discounted by counterparties and were sometimes ignored altogether.   Counterparties were "inherently skeptical" when "approaching negotiations in the RMBS market," and knew parties in the RMBS market were "not always being completely truthful."   Tr. 2220:4-11.   Another counterparty "understood . . . that market participants may not be truthful all the time" since he started trading in 2008, and added that "[his] supervisor was always warning [him] that people might say anything to convince you to pay more for a bond than you really should be."   Tr. 2375:4-9.   Yet another counterparty wrote in a chat, "what's new . . someone lying right to my face is like [an] hourly occurrence now," DX 544 at 24, and testified that he received "misstatements or inaccurate information" from dealers like Nomura "[m]ultiple times per week," Tr. 1081:22-1082:7; *see also* DX 954 at 11 (Harrison laughing when a market participant commented that another dealer had twenty traders and therefore "20 liars").   Because counterparties so frequently saw false information in the market, they were naturally "on guard" about information that was given to them and disregarded it in making investment decisions.   Tr. 2225:3-12.

*Third*, counterparties regularly transacted without ever knowing a dealer's acquisition cost.   Abbas, for example, "often [made] decisions to buy an RMBS without even knowing how much the dealer paid."   Tr. 1531:6-9; *see also* Tr. 2429:8-17.   In some instances, even after Nomura disclosed its acquisition price – which should have induced the counterparty to pay some higher price, according to the government's view – the counterparty would still bid below that price because its internal analytics dictated that a lower price was more appropriate.   *See* Tr.

1891:1-5.  That fact alone demonstrates that counterparties relied on their internal analytics, not statements about Nomura's acquisition cost, when deciding whether to buy or sell RMBS.

Unlike a dealer's acquisition cost, counterparties would not even bid on bonds if data about the underlying collateral was unavailable.  For example, one counterparty told a dealer that if combined loan-to-value data – one of many datapoints that goes into a model – was not available, he could not bid on a bond.  DX 959 at 3.[18]

All of these features of the RMBS market combine to show that the misstatement alleged in Count Three was not material.  The alleged misstatement did not "significantly alter the total mix of information," *see Matrixx*, 563 U.S. at 38 (internal quotation marks omitted), because the sophisticated counterparties in this market were inherently skeptical and chose to rely on the complex proprietary models they had invested in, developed, and maintained.  Abbas was no exception, and his reliance on his model meant that he "often" transacted without ever knowing a dealer's acquisition cost.  Tr. 1531:6-24, 1549:5-14.  He could do that because a dealer's acquisition cost was not material to him when deciding whether to buy or sell, or at what price.

Even if the Court finds that the evidence "viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," the government has not met its burden because in that situation "a reasonable jury must necessarily entertain a reasonable doubt."  *Cassese*, 428 F.3d at 99 (quoting *Glenn*, 312 F.3d at 70).  Because no rational juror could find that the evidence established beyond a

---

[18] Because the counterparties had highly sophisticated models, the counterparty witnesses could testify confidently that, *even in hindsight*, they received favorable prices in the trades where a dealer allegedly misrepresented its acquisition cost.  Tr. 1602:20-24, 1173:23-1174:2, 2196:20-25.

reasonable doubt that the statements in Count Three were material, a judgment of acquittal should be entered on Count Three.

## POINT FOUR

**GRAMINS SHOULD BE ACQUITTED ON COUNT NINE, CHARGING WIRE FRAUD, BECAUSE NO RATIONAL JUROR COULD FIND THAT HE ACTED WITH INTENT TO HARM OR THAT THE WIRES WERE USED IN FURTHERANCE OF A FRAUDULENT SCHEME**

Count Nine relates to the same RMBS transaction as Count Three, the sale of PPSI bonds to HIMCO on May 1, 2012.  That count, however, charged wire fraud based on a "trade ticket" that Christopher Del Col, a salesperson at Nomura, sent to Abbas confirming that the PPSI trade was completed.  *See* GX 26H.  The trade ticket confirmed, among other things, the sales price, the face value of the bond, and a unique alphanumeric identifier of the bond known as a CUSIP.

Critical to proving wire fraud beyond a reasonable doubt is proof that the defendant intended to cause actual harm and that the wires were used in furtherance of a fraudulent scheme. As to Count Nine, the government's proof was an epic failure.  First, there was no proof at trial that Gramins was involved in, or knew anything about, the trade ticket that Chao sent to Abbas. Second, even if there were proof of Gramins' involvement, the government failed entirely to prove that Gramins acted with intent to harm or that the trade ticket that is the subject of Count Nine was sent in furtherance of a fraudulent scheme.  As a result of these serious deficiencies in proof, no rational juror could ever conclude that Gramins committed wire fraud beyond a reasonable doubt.  The Court should enter a judgment of acquittal as to Gramins on Count Nine.[19]

_____

[19] In addition, for the reasons articulated above, the government failed to prove beyond a reasonable doubt (1) that the alleged false statements at the heart of this case were material, s*ee Weimert*, 819 F.3d at 358 ("Deception about negotiating positions—about reserve prices and other terms and their relative importance—should not be considered material for purposes of mail and wire fraud statutes."); *see also Davis*, 2017 WL 3328240, at *15-16; and (2) that Gramins was involved in any way with sending the wire communication charged in Count Nine, *see* GX 26H (trade ticket confirming PPSI trade sent from Chris del Col to Aadil Abbas).

A.       **Applicable Law**

To sustain a wire fraud conviction, the government must prove beyond a reasonable doubt each of the following elements: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (internal quotation marks omitted).

To prove that a scheme to defraud existed, the government must show that the defendant acted with intent to harm. *See United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987). "Although the government is not required to prove actual injury, it must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims. Only a showing of intended harm will satisfy the element of fraudulent intent." *Id.* (citing *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970).

The "intent to harm" or "actual harm" requirement means that the government must show something more than misrepresentations attendant to the bargain. Misrepresentations that are "collateral to the sale and [do] not concern the quality or nature of the goods being sold . . . [do] not go to the basis of the customers' bargain with the salesmen." *Id.*; *see also United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438, 474 (S.D.N.Y. 2013) ("The customer generally has no interest in what profits the Bank actually made so long as it received what was agreed."). In such circumstances, the customers receive "exactly what they paid for" and even though the defendant may have acted with intent to deceive, "absent any evidence of an intent to harm the victims," the evidence is "insufficient to demonstrate a fraudulent intent." *Starr*, 816 F.2d at 98; *Bank of New York Mellon*, 941 F. Supp. 2d at 474. Accordingly, "misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." *Starr*, 816 F.2d at 98. "Instead, the deceit must be coupled with a contemplated harm to the victim. Moreover, the harm contemplated must affect the very nature of the bargain itself." *Id.* Harm, as contemplated

47

by the wire fraud statute, occurs "where there exists a 'discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.'" *Id.*

The Second Circuit has made clear that intent to harm does not exist where a counterparty receives the benefit of the bargain. In *Regent Office Supply*, the court reversed the convictions of defendants charged with using aggressive sales tactics to sell office products, which included misrepresentations that the salesman had been referred by a friend of the customer or that the salesman had a large inventory due to a death. 421 F.2d at 1176. The Court of Appeals held that even though the defendants undoubtedly "intended to deceive their customers," they did not intend to defraud their customers. *Id.* at 1182. The statements, in which "[t]here was no substitution of merchandise contrary to the customer's understanding of the offer," did not show intent to harm because they were "not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him." *Id.*[20]

---

[20] Likewise, in *Starr*, the Court of Appeals reversed the conviction of two individuals who provided mailing services and misstated that certain fees would go to postage when, in fact, the defendants perpetrated a scheme to mix higher-rate postage with lower-rate postage, thereby paying the lower rate for all mailings, and kept the difference. 816 F.2d at 95-97. "Clearly, their . . . customers were deceived." *Id.* at 99. Yet, the court reversed the convictions, holding that "the evidence does not identify what harm, if any, the Starrs intended to inflict on their customers." *Id.* The court noted that the defendants delivered exactly the bargain they promised:

> The [defendants] did in fact mail their customers' brochures promptly as promised and caused them to arrive at the correct destination. The agreement for the timely shipment and handling of bulk mail was the basis of the bargain between the [defendants] and their customers. The [defendants] in no way misrepresented to their customers the nature or quality of the service they were providing. Indeed, satisfied customers were a necessary ingredient in the successful operation of their business. Therefore, because . . . customers received exactly what they paid for, there was no discrepancy between benefits "reasonably anticipated" and actual benefits received. An intent to defraud the . . . customers was not demonstrated either directly or circumstantially.

*Id.* In *United States v. Novak*, 443 F.3d 150 (2d Cir. 2006), the Second Circuit reversed the defendant's conviction on one count of mail fraud, in which the government alleged that the defendant, a union leader, submitted time sheets to an employer with overstated hours in return for forgiving the employer's violations of the collective bargaining agreement. *Id.* at 153-54. The government alleged wire fraud in the defendant's scheme to receive kickbacks from the union members for whom he submitted inflated time sheets. *Id.* at 156. In reversing the

Just this month, the Honorable Loretta A. Preska of the United States District Court for Southern District of New York granted a judgment of acquittal in *United States v. Davis*, No. 13 Cr. 923 (LAP), 2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017), and applied the holdings from *Regent Office Supply, Starr*, and *Novak*, to overturn a jury verdict where the proof showed that both sides in a negotiation received the benefit of the bargain.  In that case, a jury convicted the defendants of falsely certifying that subcontractors were minority-owned businesses, as required in the contract.  The district court found that even undisputed misrepresentations regarding minority-owned business provisions did not deprive the building owners from the benefit of the bargain – a properly constructed building meeting all the specifications of the agreement.  *Id.* at 42-45.[21]

To prove that a communication was "in furtherance of" the scheme alleged, the government must show that the communication occurred "for the purpose of executing" the scheme or "incident to an essential part of the scheme."  *See United States v. Altman*, 48 F.3d 96,

---

conviction on the mail fraud count, the court rejected the argument that the employer was defrauded simply because, in the government's view, it "would not have paid for the no-show hours had they been aware that [the defendant] would receive a portion of the money."  *Id.* at 159.  There was no intent to harm because the employers "received all they bargained for, and Novak's conduct did not affect an essential element of those bargains."  *Id.*

[21] In denying the defendants' motion to dismiss the Indictment, the Court recognized that the government's "marginally sufficient" allegations might not be enough to withstand a motion addressing the insufficiency of the evidence:

> With regard to the motion to dismiss, ECF Number 110, I'm denying that motion.  I think that the defense has made a decent argument, and I don't want to imply that I'm fully satisfied that the government is going to be able to prove the requisite intent to harm, but having thought about it some more, I think that I need to give the government an opportunity to present its case and hear what these victims have to say about the nature of the bargain.
>
> I think the allegations of the indictment are at least marginally sufficient and I think I need to hold off until I hear from the victims.  It may be that after we have heard from the victims, I will want to hear further from you by way of a motion that challenges the sufficiency of the evidence.

Status Conference of July 1, 2016, Tr. at 22:18-23:7.

101 (2d Cir. 1995).  Critically, the Supreme Court has held that not all wire communications bearing a tangential relationship to a fraudulent scheme are "in furtherance of" that scheme; a wire will not be "in furtherance of" the scheme if "there is no indication that the success of [the] scheme depended" on the wire.  *United States v. Maze*, 414 U.S. 395, 402 (1974).  Nor will a wire be considered to be "in furtherance of" an alleged scheme if that scheme "reached fruition" before the wire was sent.  *Id.* at 402; *accord Kann v. United States*, 323 U.S. 88, 94 (1944); *see also Faryniarz v. Ramirez*, No. 13-CV-01064 (CSH), 2015 WL 6872439, at *10 (D. Conn. Nov. 9, 2015).

**B.    Discussion**

**1.    No Rational Juror Could Conclude, Based On The Evidence, That Gramins Acted With Intent To Harm**

Just as the evidence in *Regent Office Supply*, *Starr*, *Novak*, and *Davis* was insufficient to support convictions in those cases, the evidence in this case is devoid of any intent to harm and cannot establish guilt beyond a reasonable doubt.  The sales tactics in this case, like those in *Regent Office Supply* and the scheme in *Starr*, did absolutely nothing to change the fundamental bargain between Nomura and its counterparties.  The alleged "victim" in Count Nine, Aadil Abbas of HIMCO, actually admitted that he got the bond he wanted at a price that was acceptable.  Ironically, he agreed that "what we're really talking about [in this case] is not that [he] didn't get a good price but that [he] didn't know the slice of the price that went to Nomura was larger than [he] thought." Tr. 1602:15-19.[22]  There is no more damning illustration of the fundamental flaws in the government's theory.

---

[22] Furthermore, the fact that Abbas continues to trade with Chao to this very day undermines the government's claim that Abbas was victimized in the PPSI trade (or  that Chao was a co-conspirator). Tr. 1919:8-12.

As in *Novak*, the intent to harm requirement was not satisfied by merely hypothesizing that the victims would not have purchased the bonds if they had known about Nomura's profit. First, that notion is contradicted by the witnesses' own testimony.  For Abbas, there was a "non-zero probability [he] could have still bought [the bonds]" if he had known Nomura's true acquisition cost.  Tr. 1524:8-1525:3.  Second and more importantly, hypothetical, hindsight testimony that an alleged victim would not have purchased goods or services had they known about a defendant's true profit is legally insufficient to prove intent to harm.  *Novak*, 443 F.3d at 159; *see also United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015) ("It is not sufficient . . . to show merely that the victim would not have entered into a discretionary economic transaction but for the defendant's misrepresentations.").

Because the government could not establish that Gramins acted with intent to harm, no rational juror could conclude beyond a reasonable doubt there was a scheme to defraud.

### 2.     No Rational Juror Could Conclude, Based On The Evidence, That The "Trade Ticket" Forming The Basis of Count Nine Was In Furtherance Of Any Fraudulent Scheme

Gramins should be acquitted on Count Nine for the additional reason that the trade ticket did not contain any false statements and was not "in furtherance of" the alleged fraudulent scheme.

It is undisputed that the trade ticket that Chao sent did not contain any false statements. *See* GX 26H.  It accurately stated, among other things, the name, CUSIP, original face value, and current face value of the bond purchased, as well as the total price that was paid for the bond. None of the statements contained in the trade ticket itself could form the basis for a wire fraud conviction.

In addition, the trade ticket cannot satisfy the "in furtherance" element, because it was sent *after* the fraudulent scheme had "reached fruition."  *Maze*, 414 U.S. at 402; *see also Kann*,

323 U.S. at 94; *Faryniarz*, 2015 WL 6872439, at *10.  It is clear from the testimony that Chao

and Abbas agreed on the terms of the trade *prior* to the transmission of the trade ticket, and thus

the ticket was not "in furtherance of" the alleged scheme:

> Q. Now, when a trade is agreed to by chat or phone, is the word 'done' sometimes
> used to signify that the parties have reached agreement?
> A. Yes, 'done' has to be used to confirm a trade.
> Q. Have you also seen the words, 'print it,' as a way of confirming?
> A. Yes.
> Q. Have you also seen the words, 'send a ticket'?
> A. Yes.
> Q. Have you seen the words, 'shoot over a ticket'?
> A. Yes.
> Q. And all the terms I've just used are terms that signify that the parties have
> reached agreement on the essential terms of the trade, correct?
> A. That's right."

Tr. 1872:8-22.  Thus, Chao had already made the allegedly false statements, and Abbas had

already agreed to purchase the PPSI bonds.  *Maze*, 414 U.S. at 402.  The wire transmission of the

trade ticket occurred later and did not "further" the supposed fraud.  Because the trade ticket was

sent after the trade was completed and the alleged scheme was completed, the wire

communication charged in Count Nine cannot satisfy the "in furtherance" element of the wire

fraud statute and a judgment of acquittal should be entered.

## POINT FIVE

## GRAMINS SHOULD BE ACQUITTED UNDER THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT BECAUSE HE LACKED FAIR NOTICE THAT HIS CONDUCT WAS PROHIBITED

Gramins did not have fair notice that his trading tactics, which the evidence showed were

ordinary and industry-wide practice, *e.g.*, Tr. 341:20-24, 1891:12-14, were prohibited by the

federal securities, wire fraud, or conspiracy statutes.  Without such notice, the government's

regulation-by-indictment in this case violates the Due Process Clause of the Fifth Amendment.

Gramins previously moved to dismiss the Indictment under the Due Process Clause.  *See*

Memorandum of Law in Support of Defendants' Motion to Dismiss the Indictment on Due Process Grounds (ECF No. 400).  That motion is pending and the government has not yet filed a response.  Gramins renews the motion and supplements it as set forth herein.  Because the federal securities, wire fraud, and conspiracy statutes are vague as-applied to him under the facts of this case, the Court should enter a judgment of acquittal as to Gramins on Counts One, Three, and Nine.

## A.    Applicable Law

The Due Process Clause dictates that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (internal quotation marks omitted).  Courts considering as-applied challenges utilize a two-prong test: "A court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it."  *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir. 1999) (internal quotation marks omitted).

A court must first determine whether fair notice has been given and may consider both the language of the statute and judicial decisions interpreting the statute in answering this question.  *See United States v. Lanier*, 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.").  The second prong of the as-applied due process test asks "whether the law provides explicit standards for those who apply it."  *Chatlin*, 186 F.3d at 87.  An as-applied challenge under the Due Process Clause "must

consider the context in which the regulation was enforced, *i.e.*, it must evaluate the underlying conduct by reference to the norms of the subject community." *Inturri v. City of Hartford, Conn.*, 365 F. Supp. 2d 240, 254-55 (D. Conn. 2005) (collecting cases).

In *Adams v. Gunnell*, 729 F.2d 362 (5th Cir. 1984), the Fifth Circuit held that disciplinary action against prisoners for signing a petition violated their Due Process rights because they did not have adequate notice that their conduct would result in disciplinary action. *Id.* at 369-71. The court explained the prisoners could not have known that their conduct was prohibited:

> There is no evidence that any inmate had ever before been punished in connection with a petition; quite to the contrary, Dancy testified that he had signed two petitions before at Texarkana without sanction or other adverse consequence. At least as far as Dancy was concerned, then, his conduct in connection with this petition was virtually identical to conduct previously tolerated.

*Id.* at 369 (footnote and quotation omitted).

In *Upton v. SEC*, 75 F.3d 92 (2d Cir. 1996), the Second Circuit held that the SEC could not censure a trader for failure to supervise a subordinate employee who aided and abetted a violation of Rule 15c3-3(e), when the trader did not have notice that his subordinate's conduct violated the SEC rule. "Although the Commission's construction of its own regulations is entitled to substantial deference," the court could not "defer to the Commission's interpretation of its rules if doing so would penalize an individual who has not received fair notice of a regulatory violation." *Id.* at 98; *see also United States v. Giffen*, 326 F. Supp. 2d 497, 506 (S.D.N.Y. 2004) (holding that prosecution for honest services fraud was unconstitutional as applied to defendant convicted of bribery scheme based on vagueness in statutory text, silent legislative history and lack of legal decisions addressing government's novel theory of criminality).

## B.      Discussion

As applied here, the federal securities and wire fraud statutes did not provide fair notice to Gramins that his trading practices could subject him to criminal punishment.[23]  Prior to the *Litvak* indictment in January 2013, "the person of ordinary intelligence" would have no fair notice that the negotiating tactics at issue in this case were prohibited by the federal criminal laws.  *Chatin*, 186 F.3d at 87.  Until *Litvak*, no criminal or regulatory authority had ever charged violations of law arising from negotiations between sophisticated parties, in which no misrepresentations were made concerning the fundamental elements of the bargain at issue, and where the alleged counterparty "victims" had as much or more information as the defendants.[24] The decision to criminalize common negotiating practices was "shocking"; it had never occurred to any of the Nomura traders that they could be committing a crime by engaging in negotiation tactics that were widespread at both Nomura and in the RMBS market at large.  Tr. 1777:20-1778:8, 1894:14-18.

The conduct at the heart of this criminal prosecution was innocuous and ordinary.  In *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), the Seventh Circuit held that statements in bilateral price negotiations between sophisticated parties were not material as a matter of law:

> Buyers and sellers negotiate prices and other terms.  To state the obvious, they will often try to mislead the other party about the prices and terms they are willing to accept.  Such deceptions are not criminal.

---

[23] The Court correctly identified the potential due process concerns in this case before trial even started.  *See* Telephone Conference of Aug. 2, 2016, Tr. 12:2-5 ("What is it about this that makes it wreak of criminal culpability? Why is this a criminal case rather than simply a civil case?"); Tr. 275:4-14 ("[D]ue process doesn't allow you to use the criminal justice system to draw lines.  The lines have to be clear. . . .  We're talking about the line that separates criminal from non-criminal.  It has to be clear.  You can't use the criminal law to establish it.  It's got to be there beforehand."); *see also* Tr. 274:20-22.

[24] *See, e.g.*, Tr. 1072:11-1073:8 (counterparty practice of "checking away" with other dealers); Tr. 1070:6-9 (counterparty practice of using multiple dealers to gather information); DX 957 at 11 (counterparty correcting a dealer's model, saying "the input you are using is wrong trust me").

* * *

> [N]egotiating parties, and certainly the sophisticated businessmen in this case, do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior. Deception about negotiating positions—about reserve prices and other terms and their relative importance—should not be considered material for purposes of mail and wire fraud statutes.

819 F.3d at 357-58; *see also id.* at 354, 370.[25]

Even in 2017 it is unclear whether the statements at issue in this case are unlawful. *See, e.g.*, *Davis*, 2017 WL 3328240 (granting post-conviction judgment of acquittal where the defendants made misrepresentations but the government failed to prove intent to harm). While the government is entitled to regulate the securities markets, it may not conduct rulemaking by criminal prosecution.[26] Moreover, as the record shows, several individuals similarly situated to Gramins throughout the industry have been investigated post-*Litvak*. Most have received no civil or criminal punishment whatsoever, while a few have entered civil regulatory settlements with FINRA or the SEC.[27] Accordingly, the counts against Gramins must be dismissed as a violation of the Due Process Clause of the Fifth Amendment of the United States Constitution.

---

[25] It is common practice to make misrepresentations about one's profit margin during the course of commercial negotiations. "To conceal one's true position, to mislead an opponent about one's true settling point, is the essence of negotiation." James J. White, *Machiavelli and the Bar: Ethical Limitations on Lying in Negotiation*, 1980 Am. B. Found. Res. J. 926, 928 (1980); *see also* Robert H. Frank, Passions Within Reason 165 (1988). Even lawyers are permitted to conceal their true bottom-line price in arm's length negotiations because that tactic does not involve a "statement[] of material fact." Model Rule of Professional Conduct 4.1 cmt. 2 (Am. Bar Ass'n 1983); Scott R. Peppet, *Can Saints Negotiate? A Brief Introduction to the Problems of Perfect Ethics in Bargaining*, 7 Harv. Negot. L. Rev. 83, 94 (2002).

[26] Michael Osnato Jr., formerly the head of the SEC's Complex Financial Instruments Unit, who investigated this very case, recently noted the unusual nature of cases like this one, where a criminal prosecution forges ahead without the benefit of a careful regulatory investigation. Michael Osnato Jr. & Meaghan Kelly, *SEC's Emerging Enforcement Priorities In The Bond Markets*, Law360 (July 18, 2017), https://www.law360.com/articles/944550.

[27] *See, e.g.*, Order Instituting Proceedings, *In the Matter of Nicholas M. Bonacci*, Exchange Act Release No. 78932, 2016 WL 5369311 (Sept. 26, 2016); Order Instituting Proceedings, *In the Matter of Edwin K. Chin*, Exchange Act Release No. 78585, 2016 WL 4363882 (Aug. 16, 2016); Order Instituting Proceedings, *In the Matter of Yoon Seok Lee*, Exchange Act Release No. 80561, 2017 WL 1548263 (May 1, 2017); *In re Kevin J. Blaney*, FINRA Letter of Acceptance, Waiver and Consent, No. 20160499622-01, dated September 1, 2016 (imposing $30,000 fine and three-month FINRA suspension on former Jefferies RMBS supervisor due to similar conduct) (available at http://disciplinaryactions.finra.org/Search/ViewDocument/66541); *In re Simon Xi*, FINRA Letter of Acceptance,

**CONCLUSION**

For the reasons set forth above, defendant Michael Gramins respectfully submits that the Court set aside the guilty verdict returned against him on Count One of the Indictment or, in the alternative, grant Gramins a new trial on Count One pursuant to Rule 33 of the Federal Rules of Criminal Procedure.  The Court should enter a judgment of acquittal on that count and Counts Three and Nine, as to which the jury was unable to reach a verdict.

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: /s/ Marc L. Mukasey
Marc L. Mukasey (CT29885)
Jeffrey B. Sklaroff (PHV08423)
Robert S. Frenchman (PHV08424)
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: mukaseym@gtlaw.com
*Attorneys for Michael Gramins*

---

Waiver and Consent, No. 20150462885-01, dated August 26, 2015 (barring former Bedrok Securities RMBS trader from associating with any FINRA member due to similar conduct) (available at http://disciplinaryactions.finra.org/Search/ViewDocument/63412).  Even traders accused of similar conduct in similar markets working at the same bank received disparate treatment from the government.  *See* Complaint, *SEC v. Kee Chan*, No. 17 Civ. 3605, 2017 WL 2062861 (S.D.N.Y. May 15, 2017); Complaint, *SEC v. James H. Im*, No. 17 Civ. 3613, 2017 WL 2062863 (S.D.N.Y. May 15, 2017).

## **CERTIFICATION OF SERVICE**

I hereby certify that on August 28, 2017, a copy of the foregoing Defendant Michael Gramins' Renewed Motion for Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Dated:  New York, New York
    August 28, 2017


       /s/ Marc L. Mukasey
      Marc L. Mukasey
      GREENBERG TRAURIG, LLP
      200 Park Avenue
      New York, New York 10166
      Telephone: (212) 801-9200
      Facsimile: (212) 801-6400
      Email: mukaseym@gtlaw.com