UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ROSS SHAPIRO and<br>MICHAEL GRAMINS,<br><br>Defendants. | S3 15-cr-00155 (RNC)<br><br>May 7, 2018 |

**SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANT MICHAEL GRAMINS' POST-TRIAL MOTION
PURSUANT TO RULE 33 OF THE
FEDERAL RULES OF CRIMINAL PROCEDURE**

GREENBERG TRAURIG, LLP
Marc L. Mukasey (CT29885)
Jeffrey B. Sklaroff (PHV08423)
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Email: mukaseym@gtlaw.com
*Attorneys for Michael Gramins*

Defendant Michael Gramins, by his counsel, respectfully submits this Supplemental Memorandum of Law in further support of his motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

## PRELIMINARY STATEMENT

The government's RMBS prosecutions have been unsound and misguided. Appellate judges, trial judges, juries and commentators have condemned the government's effort to criminalize statements made during principal-to-principal negotiations between sophisticated professionals. To wit:

- The United States Court of Appeals for the Second Circuit has twice reversed Jesse Litvak's convictions and he has been wrongfully imprisoned;

- A jury acquitted David Demos on all five counts against him;

- A jury acquitted Tyler Peters on all nine counts filed against him;

- A jury declined to convict Ross Shapiro on any of the nine counts filed against him; and

- A jury declined to convict Michael Gramins on all but one of the nine counts filed against him.

In sum, only one conviction out of the last forty-two counts of alleged RMBS fraud prosecuted by the government remains standing – that of Mr. Gramins. Now, that conviction too must fall. Based on the Second Circuit's recent decision in *Litvak II*, Mr. Gramins' conviction is legally flawed. Like Litvak, Demos, Peters and Shapiro, he is not guilty of any crime. His conviction must be overturned.

On May 3, 2018, the Second Circuit Court of Appeals issued its decision in *United States v. Litvak*, No. 17-1464, 2018 WL 2049677 (2d. Cir. May 3, 2018) ("*Litvak II*"). The Court vacated Litvak's lone conviction on one count of securities fraud, finding that the district court had improperly admitted irrelevant and unfairly prejudicial evidence from a counterparty witness

who testified that he perceived Litvak to be acting as his agent or broker.  Mr. Gramins' trial was infected by the same improper testimony.  Throughout the trial, the government actively cultivated and promoted the misimpression that he and the Nomura RMBS traders were in an agency, broker, or trusting relationship with their counterparties.  Guided at the time by the prior evidentiary decisions of Judge Hall in the second *Litvak* trial, this Court permitted the government to offer such testimony over defense objection.  However, the Second Circuit has now made clear that a counterparty witness's "idiosyncratic and unreasonable viewpoint is not [] probative of the views of a reasonable, objective investor," and its admission "requires a vacatur" of the conviction.  *Litvak II*, at *10, *13.

The severity of this prejudice and the terminal implications it had for Mr. Gramins' defense are demonstrated by the recent acquittal of David Demos, a former RMBS trader at Cantor Fitzgerald, who was charged with conduct nearly identical to that charged against Mr. Gramins.  In the *Demos* case, recently tried to acquittal before the Honorable Alvin W. Thompson and a jury, the government acknowledged the danger of offering the fallacious testimony that any of the alleged victims perceived Demos to be acting as an agent or fiduciary and *agreed* not to offer such testimony.  Judge Thompson also precluded government counsel from using the agency-related concepts of "broker" or "commissions" in framing their questions. *See United States v. Demos*, No. 16-cr-00220 (AWT) (D. Conn. Mar. 20, 2018), ECF No. 258 at 4.  This decision prevented the government from creating the false impression that there was an agency or fiduciary relationship between the defendant and his alleged victims.  Without the government exploiting this harmful misimpression, *Demos* was acquitted on all five counts against him.  This is powerful evidence that the improper testimony admitted at Mr. Gramins'

trial was harmful and toxic.  For this reason, in addition to those previously raised in our post-trial moving papers, the Court should vacate Mr. Gramins' conviction and grant a new trial.

## FACTUAL BACKGROUND

Prior to the trial of this matter, on July 8, 2016, the defense filed a joint Motion in Limine to Exclude Evidence That Defendants Acted as "Agents" or "Brokers" or Owed Any Agency Duties to Counterparties.  ECF No. 164 (the "Motion").  In that Motion, the defendants argued that any testimony that they were acting as agents for their trading counterparties should be precluded.  *See* ECF No. 164-1 at 5-6.  The Motion further sought to preclude any evidence or argument that any counterparty incorrectly *perceived* the defendants as agents, because any such evidence was "irrelevant, as that relationship is defined as a matter of law," and "suggesting an agency relationship would confuse the jury, and prejudice Defendants by intimating – incorrectly – that Defendants . . . breach[ed] a fiduciary relationship or relationship of trust that Defendants also owed to their counterparties."  *Id.* at 8.  Finally, the Motion sought to preclude the government's use of related terms that improperly created the misimpression of an agency relationship, such as "broker" or "commissions," because those terms would be similarly irrelevant, confusing, and unfairly prejudicial.  *Id.* at 9-11.

In opposition to the Motion, the government conceded that the defendants never acted as agents or fiduciaries to their trading counterparties.  *See* ECF No. 183 at 1 ("There has never been any dispute that, as a technical matter, firms like Nomura are 'dealers' engaged in 'principal' trades that have no fiduciary duties to their counter-parties.").  Nevertheless, the government argued that it should be able to elicit testimony about the counterparties' "*view* of their relationship with the defendants—not the legal relationship, but the relationship based on the factual conduct of the defendants."  *Id.* at 3-4 (emphasis added).  The government contended that such testimony was relevant not only to the issue of materiality, but also to defendants'

alleged fraudulent intent.  *Id.* at 4.  Notably, in its opposition, the government relied upon the decision of Judge Hall in the *Litvak II* trial, the very same decision that was subsequently the basis of the Second Circuit's reversal of Litvak's conviction.  *Id.* at 5 (arguing that "Judge Hall found . . . such testimony 'could plausibly be part of the government's efforts to establish the materiality of information Litvak misrepresented and could likewise contribute to the inference that Litvak act[ed] with fraudulent intent.'"); *see also United States v. Litvak*, No. 13-cr-00019 (JCH), ECF No. 432 at 4-7 (denying in part Litvak's motion in limine and permitting counterparty witnesses to "testify to their understanding that Litvak was working on their behalf during the trades at issue . . .").

This Court accepted the government's argument regarding the relevance of the counterparties' perceptions of an agency or broker relationship.  In doing so, this Court also specifically noted and relied upon the decision of Judge Hall to permit similar evidence in the *Litvak II* case.

> THE COURT: . . . The motion to exclude evidence that the defendants acted as agents or brokers or owed any agency duties to counterparties, ECF-164, I believe we resolved that at that court session. There isn't going to be any suggestion by the government that the defendants owed fiduciary duties to the counterparties, and so that motion can be granted.
>
> MR. NOVICK: I'm sorry, Your Honor, from the government's perspective there was another part of that, I think.  We obviously concede that we're not going to suggest that there's an agency relationship as a matter of law, but I think the defendants were also looking to preclude the testimony of the witnesses that they perceived one and that they were made believed [sic] by the defendants that there was one.  And I believe my recollection, it's been a long time, Your Honor, that the Court was inclined to permit the witnesses to testify in that manner.
>
> THE COURT: Yes, yes.  I see that Judge Hall dealt with that in her recent ruling on the motion for judgment of acquittal of a new trial.  She described that testimony in great detail.  I think that if we have a witness who wants to say that he thought that the defendant was acting as his agent, he could be cross-examined on that.

4

MR. NOVICK: Thank you, Your Honor.

April 24, 2017 Conf. Tr. at 65:3-66:4.[1]

During the trial of this case, the government took that ruling and exploited it at every opportunity.  In its opening statement, the government repeatedly referenced the existence of a "broker" relationship between the counterparties and the defendants.  *See* Trial Tr. 46:9-13 ("Riskless trades are trades in which they line up a buyer and seller at the same time and they broker a deal . . . .  Most of the evidence we're going to see at trial is going to be about these riskless trades."); 45:13-14 (" . . . brokering these trades for their customers . . ."); 56:18-20 (". . . was engaged in brokering a bond for Mr. Harrison . . .").  And the government repeatedly elicited testimony that the alleged "victim" counterparties perceived the defendants to be acting as their agents, brokers, or fiduciaries.  For example, Joel Wollman testified:

> Q. When Mr. Gramins told you that he says 47 is best best, did you believe him?
> A. Yes.
> Q. Why did you believe him?
> A. Because he told me, *and he's acting as a broker in this capacity*, and it's an objective fact, so I thought he was telling me the truth.
> Q. So let's dig into that. First, you said he was acting as a broker in this transaction; what do you mean by that?
> A. Meaning that he's not selling bonds from his inventory -- or sorry -- rather, buying bonds for his inventory. *He's acting on behalf of another counterparty. He's facilitating a trade between me and that other counterparty.* And in that context, I expect that facts that he tells me are truthful.
>
> \* \* \* \*
>
> Q. Stepping back for a moment in this trade, what was your understanding of the role that Mr. Gramins was playing in this transaction?
> A. *He was brokering a trade between me and another counterparty.*

---

[1] At a previous conference, the Court had given its preliminary thoughts on the Motion.  *See* Sept. 2, 2016 Conf. Tr. at 41:16-22; 46:6-47:6.  There, the Court had stated more narrowly that "if the testimony is that they were misled to believe that the defendants' interests were aligned with their own and that the defendants were truthfully telling them what was going on and that they relied on that in consummating the transactions, I think that's fair game." *Id.* at 46:23-47:2.  However, as discussed above, when the Court actually ruled on the Motion, it followed Judge Hall's decision in *Litvak II* to allow a counterparty witness "to say that he thought that the defendant was acting as his agent . . . ."  Apr. 24, 2017 Conf. Tr. at 66:1-2.

\* \* \* \*

Q. And just to be clear for the jury, what do you mean by "brokering"?
A. Meaning that they aren't his bonds, he is -- *his role in this is to match together a seller of bonds and a buyer of bonds* -- two other counterparties, not him -- and he's facilitating that transaction.

\* \* \* \*

[Q.] In the first trade, the AHMA bond, what did you think Nomura's role was? Did you think you were sitting across the table from them?
A. *I think they were brokering a trade for me.  So they were acting as a broker, a facilitator.*
Q. And in the INDX bond, did you think you were sitting across the table from them?
A. *The INDX bond I was just submitting a bid.  It wasn't even a -- that was almost more clerical, administrative than be anything else.*
Q. And in the JPMAC transaction, did you think you were sitting across the table from Mr. Gramins?
A. *No. Again, that was a broker trade.*  There was a seller and a buyer.

Trial Tr. 2113:19-2114:9, 2181:6-10, 2181:16-21, 2271:4-17 (emphases added).

The government also emphasized this testimony in its summation, and argued several times that, although the defendants may have been principals, the counterparty witnesses perceived them to be acting as brokers.  *See* Trial Tr. 2683:16-18 ("Mr. Wollman told you, I think they were brokering a trade for me, so they were acting as a broker, a facilitator."); 2684:10-12 ("[H]e doesn't say, I'm purely looking to act as a principal.  He says, I am purely looking to broker."); 2700:2-7 ("We're going to look at a few more later, but for this . . . trade between TCW, Harrison Choi . . . and Mr. Wollman at QVT, brokered, facilitated, by Mr. Gramins."); 2703:13-19 ("Trade 26, this was a trade between the seller, Mr. Sunshine from Bracebridge hedge fund, and Aadil Abbas, who came and testified to you from the Hartford Management Company.  And it was facilitated jointly, brokered jointly, by Mr. Chao and Mr. Gramins . . . .").

Finally, during rebuttal summation, the government argued that even though the defendants were not agents, they were still acting purely as brokers:

> The defendants want you to believe that because they weren't the agents of their customers, they didn't actually broker transactions. They want you to think Nomura bought the bond and they're just hanging out with the bond and then they decide to sell the bond to someone else. But that's not what the facts are.

Trial Tr. 2954:22-2955:2.[2]

In addition to eliciting testimony regarding certain counterparties' mistaken beliefs that defendants were effectively acting as their agents, the government reinforced and compounded this error by eliciting closely related testimony regarding the relationship of "trust" that these witnesses perceived between themselves and the defendants. Again, Joel Wollman testified about this concept:

> Q. And then you also mentioned trust as a factor?
> A. Yes.
> Q. What do you mean by that?
> A. Just generally, there's -- when interacting with broker-dealers, I'm talking about my positions at times, I'm talking about strategies, potentially, what I'm trying to accomplish, so I have a -- I seek those who I feel are most trustworthy as I'm communicating information that could be sensitive to me.
>
> * * * *
>
> Q. And does trust vary by the types of information that you're receiving or dealing with?
> A. Well, depending upon the circumstance, there's – I recognize the relationship between me and the broker-dealer can vary so, as a result, I'll take that into account in what I'm saying and how I'm processing what I'm being told.
> Q. What do you mean by that?

---

[2] The government also introduced evidence of a portion of the evaluation of Tyler Peters where he referenced "agented" transactions: "We have increased trading in the FHA/VA sector, both in agented roles and by taking position risk." Trial Tr. 486:7-8. The government highlighted this evidence in summation, again to improperly argue that defendants were essentially acting as agents in certain transactions at issue at trial. *Id.* at 2720:20-24 ("And Mr. Peters' evaluation as well. Talks about trading both in agented roles, his word and not mine, and by taking position risk. Two different roles they played in the market. These were important things, this was a way they made money."). Even in its post-trial briefing, the government only begrudgingly refers to these transactions as "so-called principal-to-principal transaction[s]." ECF No. 482 at 35.

A. There are just different types of – there are just different types of interactions. So in a situation where I'm participating in a BWIC, for example, and I'm submitting a bid, there I'm literally just submitting a bid, and I expect the broker is just doing what I'm telling them to do.  On the other extreme, if it's inventory trade, and I'm buying or selling a bond from a dealer, I recognize that it's a different situation. There, it's more me on one side and the dealer on the other side.

Trial Tr. 2086:21-2087:4, 2088:7-2088:24.

Another counterparty witness, Zachary Harrison, also provided extensive testimony that the statements of the traders at Nomura were somehow more important and material because of his relationship of "trust" with those traders.

Q. And then you mentioned trust, Mr. Harrison. What do you mean by trust with the different broker-dealers?
A. I think business and personal relationships have an element of trust. And in these business relationships, I viewed how much I trusted the people I was doing business with was an important factor in doing a business with them.

* * * *

Q. How would you have ranked these individuals in terms of the broker-dealers that you dealt with?
A. In a general sense, amongst my more trusted individuals I dealt with, and two of them are on a list I had which I considered to be the three most trusted people I dealt with.
Q. Who were those two, Mr. Harrison?
A. Ross Shapiro and Tyler Peters.
Q. And how did Mr. Gramins compare to them?
A. Very trustworthy but not on that list of three people.

* * * *

[Q.] Did you ever discuss the issue of trust with Mr. Gramins?
A. I believe so.
Q. What did you explain to him?
A. I think all the people I was doing business with understood that trust was very important to me.
Q. How so; can you explain that to them?
A. I made direct statements in person and on the phone, and do Bloomberg chats, making my views about trustworthiness clear.

* * * *

8

Q. And what was the importance -- what were the benefits to your clients of dealing with dealers you could trust?
A. I would be more comfortable that I was getting the trading levels that I thought I was getting and getting to see the bond offers that I wanted to see. I would be able to do a better job for my clients if I felt that I was doing business with people who were trustworthy.

* * * *

Q. And how about the trust relationship between those different categories? How would you compare those?
A. I had more trust in my business with Nomura than with Credit Suisse.

Trial Tr. 703:23-704:5, 709:19-710:4, 731:2-11, 805:10-16, 831:15-18.

## ARGUMENT

**I.    THE COURT ERRED WHEN IT PERMITTED TESTIMONY THAT COUNTERPARTY WITNESSES PERCIEVED AN AGENCY OR  "BROKER" RELATIONSHIP OR A RELATIONSHIP OF "TRUST" WITH THE NOMURA TRADERS**

A.  The *Litvak II* Decision

In *Litvak II*, an appeal that the government acknowledges involved an "unusually close fact pattern" to this case, *see* ECF No. 490 at 5, the Court of Appeals vacated the conviction of Jesse Litvak, a former RMBS trader at Jefferies.  The Court did so due to testimony at trial from two counterparty witnesses – including Joel Wollman – that they "trusted" Litvak and viewed him as their "broker" or "agent."  Brian Norris, a trader from Invesco, testified that he believed Litvak was acting on Invesco's behalf when he negotiated transactions for non-agency RMBS bonds:

Q. So in this type of trade in this type of transaction, is Jefferies taking a position on the same bond?
A. No. They serve -- on a bid list, the broker-dealer will just serve as an intermediary between two sellers. Because the two sellers -- I'm sorry. The two parties that are selling and buying the bond don't know who is doing the selling and buying, so we use a broker-dealer to serve as an agent in between.
Q. So how would you describe Mr. Litvak's role?
A. As an agent. Agency trade.

*Litvak II* Trial Tr. 748:3-12.  Wollman also testified that he believed Litvak was a mere "broker," who was "facilitating the trade," and an "agent":

> Q. What was your understanding of Mr. Litvak's relationship to you in this trade?
> A. He relationship to me, he was my broker in the trade.
> Q. Just like the last one we saw?
> A. He was acting as my agent.
> Q. He's -- intermediary was another word you used?
> A. Facilitating the trade, yes.

*Litvak II* Trial Tr. 859:15-22.

The Second Circuit held that testimony of Norris' and Wollman's "idiosyncratic and erroneous belief" that Litvak was their representative should have been precluded under Rule 403, and allowing this testimony warranted reversal of the lone count of conviction in that case. Writing for the Court, Judge Winter began by noting that the standard for materiality is an objective one, and that a reasonable investor in the market for non-agency RMBS bonds would have "no legitimate expectation" that a broker-dealer would conduct a purchase and sale at the same price.  *Litvak II*, 2018 WL 2049677, at *3.  The Court also acknowledged the undisputed fact that parties in this market always conducted their negotiations at arms-length and traded as principals.  *Id.* at *5, *9.  Accordingly, the Court held that testimony of the counterparties' mistaken belief that Litvak was acting on their behalf was confusing and misleading, and should have been precluded under Rule 403:

> At best, Norris's testimony about the supposed agency relationship had a high probability of confusing the jury by asking it to consider as relevant the perception of a counterparty representative that was entirely wrong. At worst, Norris's testimony on an agency relationship would mislead the jury based on the government's argument that a perceived relationship of trust showed materiality. This argument itself is flawed because it equates an indisputably incorrect personal belief with an objective test of materiality.

*Id.* at *10.

The Court of Appeals further found that testimony by Norris and Wollman – the "purported victims" in the words of the Court – that they "trusted" Litvak, as well as argument that Litvak tried to create a "relationship of trust," was similarly prejudicial and simply a "back door" to evidence of an agency relationship:

> The government's concept of subjective trust as evidence of materiality became a back door for the jury to apply the heightened expectations of trust that an agency relationship carries.  The government's argument similarly ignores the settled law that those at either end of an arms-length transaction are acting only in their own self-interest. *See In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 130 (2d Cir. 2002) ("[W]hen parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances.") (quoting *Pan Am. Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 511 (S.D.N.Y. 1994)) (alteration in original).

*Litvak II*, 2018 WL 2049677, at *7, *11.  Ultimately, the Court vacated Litvak's lone count of conviction because it could not "conclude with fair assurance that the jury would have convicted [Litvak] absent such evidence."  *Id.* at *1.

Notably, this was the second time that the Court of Appeals found error in the district court's evidentiary rulings regarding the principal-to-principal relationship between Litvak and his counterparties.  In *Litvak I*, the Court similarly stressed the importance of presenting the jury with an accurate view of this relationship.  *See Litvak I*, 808 F.3d 160, 187-88 (2d Cir. 2015) (finding the district court "exceeded its allowable discretion" in excluding expert testimony regarding the principal-to-principal relationship).  As the Court of Appeals stated there:

> In determining whether a reasonable investor would have found Litvak's misstatements important in the course of a transaction, a jury might construe such statements as having great import to a reasonable investor if coming from the investor's agent.  If, on the other hand, Litvak was acting on his own behalf (*i.e.*, as a *principal*), and not as the purported victims' agent, a jury may well construe that relationship as providing a distance between Litvak and a reasonable investor, which may tend to show that his statements could not have been reasonably viewed as important in the course of a transaction.

*Id.* at 187 (internal citations omitted) (emphasis in original).

11

B.  Counterparty Testimony That Mr. Gramins Was Their "Broker" or That There Was a
Relationship of "Trust" Warrants A New Trial

The testimony of Joel Wollman in this case was nearly identical to the testimony that the

Court of Appeals found objectionable and warranted reversal in *Litvak II*.  Wollman testified at

trial that he believed Mr. Gramins was "brokering a trade between me and another counterparty,"

"facilitating a trade," and "acting on behalf of [a] counterparty."  Trial Tr. 2114:1-9, 2181:6-10.

That testimony by itself, like the testimony underlying the *Litvak II* reversal, is misleading and

unfairly prejudicial in regard to a central question for the jury, and warrants a new trial.[3]

As the Court of Appeals noted in *Litvak II*, the standard for materiality is an objective one

that "centers on the views of a hypothetical, reasonable investor in the market." *Litvak II*, 2018

WL 2049677, at *10.  Therefore, testimony about Wollman's subjective erroneous and

unreasonable belief that Mr. Gramins was acting on his behalf because Wollman "trusted" him

was irrelevant to the jury's determination of materiality. *See id.* Wollman's testimony risked

misleading the jury about how a reasonable investor would view his or her relationship with a

dealer in the non-agency RMBS market.  *See id.*  To make matters worse, the government

deliberately and repeatedly emphasized that Mr. Gramins was Wollman's "broker," – a thinly

veiled substitute for the erroneous agency concept.[4]

---

[3] As discussed above, Defendants' Motion *in Limine* sought to preclude not only evidence that the defendants actually acted as "agents" or "brokers," but also evidence and argument that the counterparties perceived such a relationship, or the use of terminology that would insinuate the existence of a fiduciary relationship or relationship of trust.  *See* Motion at 6-11.  The Court ultimately ruled on the record, denying the Motion in relevant part. Accordingly, pursuant to Rule 103(b) of the Federal Rules of Evidence, Mr. Gramins has preserved this issue for post-trial motions and appeal.  *See* Fed. R. Evid. 103(b) ("Once the court rules definitively on the record – either before or at trial – a party need not renew an objection or offer of proof to preserve a claim of error for appeal."); *see also* Fed. R. Evid. 103(b) advisory committee's note to 2000 amendment ("The amendment applies to all rulings on evidence whether they occur at or before trial, including so-called '*in limine*' rulings"); *Nimely v. City of New York*, 414 F.3d 381, 397 n.12 (2d Cir. 2005); *Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511, 543 & n.220 (S.D.N.Y. 2013).

[4] To the extent the government argues that Mr. Gramins created a misimpression of an agency relationship with his counterparties, somehow warranting the government's decision to elicit testimony about the counterparties' perceptions of their relationship, the Second Circuit flatly rejected this argument in *Litvak II*.  First, because the

Furthermore, Wollman's testimony about his "trust" in Nomura was calculated to persuade the jury, incorrectly, that "a perceived relationship of trust showed materiality." *Id.* at *10; *see, e.g.*, Trial Tr. 2088:7-24. The same is true of Harrison's testimony regarding the purported relationship of trust between himself and the traders at Nomura. *See* Trial Tr. 710:2-4; 731:2-7; 831:15-18 (Harrison testimony that Mr. Gramins was "very trustworthy," that he knew "that trust was very important to [Harrison]," and that Harrison had "more trust in my business with Nomura" than other banks.).

The Court of Appeals expressly condemned this kind of testimony in *Litvak II,* "because it equates an indisputably incorrect personal belief with an objective test of materiality." *Litvak II*, 2018 WL 2049677, at *10. As in *Litvak II*, the government used the concept of "subjective trust" in Mr. Gramins' trial as a "back door for the jury to apply the heightened expectations of trust that an agency relationship carries." *Id.* at *11.[5]

---

standard for materiality is objective and it is undisputed that the parties negotiated arms-length transactions as principals, Wollman's erroneous subjective belief has no probative value and carried significant risk of confusing or misleading the jury. *See Litvak II*, 2018 WL 2049677, at *11. Second, "[a]n investor may be deceived into believing that an arms-length relationship is one of special trust, *but the means of deception must be of a character that would deceive an objectively reasonable investor, i.e., more than a salesman's banter*." *Id.* at *11 n.13 (emphasis added). In this case, any evidence that even arguably tended to show the creation of a relationship of trust was nothing more than "salesman's banter." In addition, the document most frequently referenced by the government in its attempts to support this incorrect assertion – GX11B, in which Mr. Gramins stated that he was "purely looking to broker" – did not even involve Mr. Wollman or any other counterparty witness who testified at trial.

[5] The Court of Appeals acknowledged that counterparties could testify about what they independently believed was significant in a negotiation as probative of what an objective "reasonable investor" would consider material. *See Litvak II*, 2018 WL 2049677, at *7. However, the Court also recognized that the testimony had to be in some way tethered to "mainstream thinking of investors in that market":

> To prove materiality, the government relied heavily on the testimony of counterparty traders – purported victims – that they considered appellant's misstatements to be an important factor, among others, in their investment decisions . . . . This approach is permissible in a case like this, but only so long as the testimony about the significance of the content of a defendant's misstatements and each trader's "own point of view" is shown to be within the parameters of the thinking of reasonable investors in the particular market at issue. In other words, there must be evidence of a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market. Materiality cannot be proven by the mistaken beliefs of the worst informed trader in a market.

The prejudice from Wollman's and Harrison's testimony was compounded when the government repeatedly made reference to it during summation and rebuttal. *See, e.g.*, Trial Tr. 2683:16-18 (summation) ("Mr. Wollman told you, I think they were brokering a trade for me, so they were acting as a broker, a facilitator."). In its summation, the government told the jury dozens of times that Mr. Gramins was "brokering" trades, the opposite of acting as a principal. *See, e.g.*, Trial Tr. 2684:10-12 ("[Gramins] doesn't say [in GX 11B], I'm purely looking to act as a principal. He says, I am purely looking to broker."); 2687:3-8 (stating that "the difference between the buy and the sell price" is "the commission, that's what Nomura earns for brokering these transactions"); 2688:18-19 ("Mr. Gramins was the facilitator, he brokered this transaction between [QVT and GSAM]."). The government repeated the same argument in its rebuttal summation:

> The defendants want you to believe that because they weren't the agents of their customers, they didn't actually broker transactions. They want you to think Nomura bought the bond and they're just hanging out with the bond and then they decide to sell the bond to someone else. But that's not what the facts are. . . . Buy side accounts buy and sell to each other through the broker-dealer. The broker-dealers broker the transactions.

Trial Tr. 2954:22-2955:2; 2955:7-9.

The counterparties' erroneous and unreasonable view that Mr. Gramins was merely "brokering" trades and acting on the counterparties' behalf, Trial Tr. 2114:1-9, 2181:6-10, was highly prejudicial, and this Court cannot "conclude with fair assurance" that it did not "substantially influence the jury" in convicting Mr. Gramins on Count One. *United States v. Rosemond*, 841 F.3d 95, 112 (2d Cir. 2016); *see also Litvak II*, 2018 WL 2049677, at *13

---

*Id.* at *7. In this case, Wollman's erroneous testimony had no "nexus" to "the mainstream thinking of investors in [the] market," where trades were always conducted as arms-length, principal-to-principal transactions between sophisticated professionals. Therefore, the testimony had no probative value to the jury in deciding what would be material to the objective reasonable investor in the non-agency RMBS market and, instead, risked substantial prejudice and confusion.

(quoting *Rosemond*).  Notably, all three trades that Wollman testified about at trial involved Mr. Gramins. In addition, Wollman was the only counterparty who testified about the trade for the JPMAC 2006-WMC1 A4 ("JPMAC") bonds on November 22, 2013, the only trade in this case that occurred after the *Litvak* indictment, and which involved only Mr. Gramins among the defendants.  The audio recordings that the government introduced at trial also related to the JPMAC trade, and one such recording that the government played during Wollman's direct testimony and again during rebuttal summation involved Mr. Gramins and a salesperson discussing how to communicate with Wollman.  Wollman's erroneous views that there existed the functional equivalent of an agency relationship between him and Mr. Gramins permeated his testimony, and the harm from that testimony was multiplied every time the government told the jury to rely on Wollman's testimony about "brokering" and "trust."

## II.   THE TESTIMONY AND ARGUMENT WAS UNFAIRLY PREJUDICIAL AND NOT HARMLESS ERROR

The Second Circuit made clear in *Litvak II* that accurately "understanding the RMBS market is critical" to understanding cases like this one.  *Litvak II*, 2018 WL 2049677, at *2.  As it did in the *Litvak* trial, the improper testimony from counterparties about their perceived broker relationship or relationship of trust with Mr. Gramins distorted the jury's understanding of the RMBS market, was not harmless, and warrants reversal.

Courts analyze four factors in determining whether the admission of improper evidence was harmless: "(1) the overall strength of the prosecutor's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." *Id.* at *11 (quoting *United States v. McGinn*, 787 F.3d 116, 127-28 (2d Cir. 2015)).  The Court of Appeals in *Litvak II* concluded that all four factors weighed in favor of finding that Norris'

testimony was not harmless because "the government's case on materiality was not overwhelming and was vigorously contested," the government proffered the improper testimony and further argued to the jury that a "relationship of trust" existed, the error was significant in light of the jury's verdict, and the testimony was "not cumulative of properly admitted testimony." *Id.*

The exact same analysis applies here.  First, the government's evidence concerning materiality was far from overwhelming given the significant amount of evidence concerning the sophistication of the "victim" counterparties and their models, the massive amounts of data that counterparties considered when buying and selling RMBS, and the norms and expectations that existed in the RMBS market during the pertinent time period.  Moreover, as discussed above, the government further compounded the counterparties' improper testimony by arguing in summation that the defendants brokered transactions, and that Mr. Gramins gave the impression that he was acting as a broker rather than a principal.

The prejudice from the counterparties' testimony was significant and was not curable by instruction.[6]  As in *Litvak II*, this erroneous testimony also cannot be viewed as harmless in light of the jury's verdict.  Of the twenty-seven counts charged against the defendants, the sole count of conviction was against Mr. Gramins.  Notably, Mr. Gramins was the entire focus of Wollman's testimony.  Tyler Peters' name only came up a single time during Wollman's testimony, when Wollman simply stated that "I traded with [Peters] on occasion, but I certainly

---

[6] Just as this Court did at trial, the district court instructed the jury in *Litvak II* that Jesse Litvak was not an agent of his counterparties.  *Litvak II* Trial Tr. 1488:20-1489:3 ("In the law, a person is an agent if he's authorized to act on behalf of another known as a principal. An agent owes certain duties to his principal.  In the transactions at issue in this case, Mr. Litvak was not the agent of the buyers or sellers of the RMBS residential mortgage-backed securities.  In other words, when he bought an RMBS from another person, he was not an agent of that seller.  And further, when he sold an RMBS to another person, he was not the agent of that buyer.").  The Court of Appeals held that, even though an instruction was given to the jury and the government conceded in summation that Litvak was not the counterparties' agent, the testimony was nevertheless prejudicial and required reversal.  *Litvak II*, 2018 WL 2049677, at *9, *13.

didn't interact with him or know him as well as the other two." Trial Tr. 2093:11-14. Further, while Wollman testified generally about his relationship with Shapiro, the government did not introduce any trades that were executed between the two. Indeed, Shapiro's name was ultimately stricken from any overt acts concerning Wollman. *See* ECF No. 408. In contrast, Wollman testified at length about the three trades he executed with Mr. Gramins as well as his erroneous belief that Mr. Gramins was acting as a broker or agent on his behalf. Moreover, Mr. Gramins' conviction was on Count One – where all three of Wollman's trades were labeled as overt acts and one of them, the JPMAC trade, was the lone trade in this case that took place after the *Litvak* indictment. Thus, this Court cannot "conclude with fair assurance," that the counterparties' testimony, and Wollman's in particular, did not "substantially influence the jury" in convicting Mr. Gramins. *Rosemond*, 841 F.3d 95 at 112; *see also Litvak II*, 2018 WL 2049677, at *13 (quoting *Rosemond*).

To further demonstrate the clear harm that results from admission of improper perception testimony, one need look no further than the recent acquittal in *United States v. Demos*, No. 16-cr-00220 (AWT). In *Demos*, the government stipulated not to offer testimony from any counterparty witnesses about their perceptions of Demos as an agent or fiduciary. *See* Demos ECF No. 184 at 3 ("[T]he Government has no present intention to introduce victim testimony that they perceived Demos to be functioning in the capacity of an agent or fiduciary. Thus, this portion of Demos's motion is moot."). In addition, Judge Thompson precluded government counsel from utilizing similar agency-related terms like "broker" and "commissions" in framing its questions. Judge Thompson found:

> While it appears to be true that at least some people in the industry use the term "broker" when the accurate term is "dealer" or "trader," and use the term "commissions" when the accurate term is "profit" or "spread," the court concludes that there is a risk of unfair prejudice to the defendant if counsel and

expert witnesses use terminology that is not accurate. Jurors may be familiar with brokers and the concept of commissions in their own affairs and associate those terms with an agency relationship, and the court sees no utility in allowing counsel and expert witnesses to use inaccurate terminology and then trying to remedy that situation by giving the jurors an instruction. Therefore, counsel and expert witnesses will not be permitted to use the terms "broker" and "commission" when discussing the defendant's trading activity.

This order is not being extended to non-expert witnesses, however, because the court concludes it would be too difficult for them to alter their natural testimony, given the usage of these terms in the industry and, it appears, in documentary evidence. *However, the court will rely on counsel to frame questions properly and to develop testimony so that the jury is not misled.*

*Demos* ECF No. 258 at 4 (emphasis added).

The result in *Demos* – an acquittal on all five counts of securities fraud – demonstrates that the improper testimony elicited by the government in Mr. Gramins' trial was not harmless. Unlike in *Demos*, where the government was ordered to carefully avoid creating the misimpression that the defendant was acting as an agent, the prosecution here actively cultivated and reinforced that misimpression throughout trial. It did so during its opening, through the testimony of multiple witnesses, and during both its summation and rebuttal arguments. This was not harmless error; it was severely and unfairly prejudicial and is grounds for a new trial.

## CONCLUSION

For the reasons set forth above, as well as those previously set forth in Mr. Gramins' opening and reply briefs, the Court should vacate Mr. Gramins' conviction and grant a new trial.

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: /s/ Marc L. Mukasey
    Marc L. Mukasey (CT29885)
    Jeffrey B. Sklaroff (PHV08423)
    Robert S. Frenchman (CT30437)
    200 Park Avenue
    New York, New York 10166
    Telephone: (212) 801-9200

Facsimile: (212) 801-6400
Email: mukaseym@gtlaw.com
*Attorneys for Michael Gramins*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on May 7, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Dated:          New York, New York
                May 7, 2018


                              /s/ Marc L. Mukasey
                              Marc L. Mukasey
                              GREENBERG TRAURIG, LLP
                              200 Park Avenue
                              New York, New York 10166
                              Telephone: (212) 801-9200
                              Facsimile: (212) 801-6400
                              Email: mukaseym@gtlaw.com