UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:15CR155 (RNC) |
| | : | |
| v. | : | |
| | : | |
| ROSS SHAPIRO and | : | |
| MICHAEL GRAMINS | : | May 18, 2018 |

**GOVERNMENT'S SUPPLEMENTAL OPPOSITION TO**
**DEFENDANT GRAMINS' MOTION FOR A NEW TRIAL**

Defendant Michael Gramins' supplemental memorandum in support of his motion for a new trial misreads and misapplies the Second Circuit's recent decision in *United States v. Litvak*, No. 17-1464, 2018 WL 2049677 (2d Cir. May 3, 2018) ("*Litvak II*").  Litvak's conviction was vacated because the court found that the district court had improperly allowed testimony about a victim's mistaken belief that Litvak was his agent and was acting in his best interest, as a fiduciary. Unlike in *Litvak II*, however, here no victim testified that he believed the defendants were his agents or owed him a fiduciary obligation, but only that the defendants' role in the charged trades was to broker, or facilitate, the trading of a bond between two counterparties.  The record in this case thus suggests no error and no risk of jury confusion.  Moreover, *Litvak II* did not prohibit evidence of the relationship between defendant and victim, just the suggestion of a non-existent fiduciary obligation.  The evidence in this case offered no such suggestion, but instead showed that the past experiences of victims with their broker-dealers provide critical context in the assessment of whether a reasonable investor would credit the defendants' statements.  Finally, even if there was error in admitting trust or broker-related testimony (which there was not), it was harmless.

## I.      The *Litvak II* Decision

In *Litvak II*, 2018 WL 2049677 at \*7-\*8, the Second Circuit first reaffirmed its earlier holding that a rational jury could find Litvak's lies about purchase and/or sale price to be material, and that there was sufficient evidence for the jury to find that his lies to the victim in the count of conviction, Brian Norris, were material.

The court nonetheless vacated Litvak's conviction because of an evidentiary error.  In the *Litvak* re-trial, two victims—Norris and Joel Wollman—testified that they believed Litvak was acting as an "agent."  *See Litvak II*, 2018 WL 2049677 at \*5 (citing *Litvak II* Tr. at 748, 859). Wollman had testified similarly in the first trial.  *See United States v. Litvak*, 808 F.3d 160, 186-

87 (2d Cir. 2015) ("*Litvak I*").  In the first appeal, the Second Circuit did not suggest that this testimony should have been precluded.  Rather, the court held that the defendant's remedy should have come in the form of permission to rebut that testimony with expert testimony to the contrary. *Id*. at 187 ("Without the aid of Menchel's testimony, the jury might easily have misconstrued the nature of the transactions at issue, believing (mistakenly, according to Menchel) that Jefferies's profits were commission paid for Litvak's facilitation of the transactions, rather than ordinary profits earned in a standard buyer-seller context.").

At the re-trial, Norris and Wollman again testified that they believed that Litvak acted as their agent.  *See Litvak II*, 2018 WL 2049677 at *5.[1]  However, in accordance with the Second Circuit's ruling, this time Litvak was permitted two avenues of response—he called an expert to testify, and the district court gave an unequivocal instruction to the jury on the lack of an agency relationship between Litvak and his counterparties.  *Id.* at *1, *5, *9.[2]

The Second Circuit nonetheless vacated Litvak's conviction, holding that Norris's (and Wollman's) testimony of his misperception of Litvak's agency role was irrelevant and should not have been permitted.  *Litvak II*, 2018 WL 2049677 at *10-*11.  Despite this testimony of Norris and Wollman—two highly successful and experienced traders in the RMBS market—the court ruled that "a reasonable investor would not misperceive the role of a broker-dealer in the RMBS

---

[1] Norris also testified that he relied on Litvak's misstatement, that Litvak was bidding the level that Norris requested, because "he's supposed to be acting in my best interest and, you know, I accept what he tells me in that instance as the truth."  *Litvak II* Tr. at 807.

[2] Defense expert Philip "Buck" Burnaman, in relevant part, testified as follows: "Q. Do you have an opinion about whether or not a reasonable investor in this market would be fooled about the nature of this relationship? A. I do. Q. What is that? A. Reasonable investors understood the difference between principal transactions and agency transactions. Agency transactions disclosed that they were agented. It was a different type of trade."  *Litvak II* Tr. at 1262.  On cross-examination, Burnaman admitted to reviewing only one chat prior to trial, involving Litvak's sale of an SARM bond to Norris in a BWIC (the count of conviction).  Of Litvak's false statement to Norris that he was "using" Norris's bid and that he "bid your level," Burnaman conceded that the latter was not an ambiguous statement. *Id.* at 1284.  Burnaman also conceded that, following Litvak's lie, Norris suggested a 6 tick pay-on-top, which Litvak accepted.  *Id.*  Burnaman's testimony was not referenced by the Second Circuit in *Litvak II*.

market." *Id*. at *10.  In other words, because Norris's belief that Litvak was his agent was legally incorrect, it could have no conceivable bearing on how an objective, reasonable investor would behave.  *Id*.  Although the Government argued that Litvak had fostered and preyed upon Norris's mistaken belief in order to create a "relationship of trust," the court held that the Government could not show that Litvak "was the source of Norris's mistaken belief in an agency relationship or took steps sufficient to cause Norris to disregard the common knowledge of the market, much less the information provided Norris by Invesco's legal and compliance department." *Id*. at *11.  Absent that connection, the court held that the "subjective trust" evidence "became a back door for the jury to apply the heightened expectations of trust that an agency relationship carries." *Id*.

Finally, the Second Circuit held that the error was not harmless, finding that "Norris's testimony about a perceived agency relationship was the only rational reason for the jury to have convicted [Litvak] on that count of securities fraud while acquitting him on all other counts." *Id*.

## II.    *Litvak II* Rejected Gramins' Argument Against Materiality

First, although ignored by Gramins in his supplemental brief, *Litvak II* unambiguously rejected one of Gramins' and Shapiro's core arguments against materiality.  In his opening post-trial brief, Gramins argued that his lies to victims could not have been material because the victims merely testified that the truth would have been "important" to them.  Gramins claimed that, under Second Circuit law, proof of importance is insufficient to carry the Government's burden to show materiality, citing *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).  *See* Gramins Mem. (Doc. 476) at 42; *see also* Shapiro Mem. (Doc. 475) at 32 (same).  The Government in its opening brief, relying on *Litvak I*, argued that "testimony that misrepresentations were 'important' to victims and that victims were 'injured by those misrepresentations … precludes a finding that no reasonable mind could find [the defendant's] statements material.'" Gov't Mem. at 41 (quoting *Litvak I*, 808 F.3d at 176).  To the extent that

Gramins and Shapiro were suggesting that there was a conflict in Second Circuit law, *Litvak II* rejected that suggestion, stating clearly that "[a] misstatement in a securities transaction is material so long as there is 'a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision.'" *Litvak II*, 2018 WL 2049677 at *6 (quoting *United States v. Vilar*, 729 F.3d 62, 89 (2d Cir. 2013)). Here, all the victims testified that they viewed the misrepresented information as important, precluding a finding of insufficiency of the evidence. *See* Gov't Mem. at 41.[3]

## III.    *Litvak II* Does Not Undermine Gramins' Conviction

*Litvak II*'s rejection of Norris's agency-related testimony does nothing to undermine Gramins' conviction, and thus does not support granting him a new trial. First, in this case, there was no evidence that any victim had a mistaken belief that the defendants owed him a fiduciary obligation. In fact, the evidence was just the opposite—that the victims were well aware that there was no such obligation. It was the defendants who raised the concept of fiduciary relationships, arguing that the lack of such a relationship made their misrepresentations immaterial. Second, no victim suggested either explicitly or implicitly that the defendants were acting as their agents. Rather, they described the mechanics of RMBS trading, in which broker-dealers facilitated trades between buyers and sellers, with the broker-dealers taking possession of the bonds for very brief periods of time and without meaningful market risk. Third, evidence related to victims' trust of the defendants was unrelated to any legal duty, and highly probative of materiality and intent. That a particular victim had longstanding business and/or trading relationship with a defendant was

---

[3] *Litvak II* also rejected the defendants' oft-repeated refrain that their lies could not have been material because they did not go to the value of the security, or that investors only cared about all-in price. As to the former, the court reaffirmed its earlier holding that misrepresentations about price can be material, and as to the latter, the court held that "[t]he broker-dealer's profit is part of the price and lies about it can be found by a jury to 'significantly alter[] the 'total mix' of information . . . available.'" *Litvak II*, 2018 WL 2049677 at *8.

entirely relevant as to whether a reasonable investor under those circumstances would credit a defendant's statement.  Fourth, given the lack of any evidence related to fiduciary obligation, the Court's prophylactic instructions were more than sufficient to inoculate the jury against any unintended confusion.  And fifth, any minimal risk of confusion at trial was harmless.

### A.     There Was No Evidence Regarding Victims' Mistaken Belief In A Fiduciary Relationship

The Government did not suggest through argument or evidence that the defendants owed a fiduciary obligation to their trading counterparties.  Every reference to the term "fiduciary," in the context of broker-dealers and their counterparties, came as a result of, or in response to, defendants' questions.  *See* Tr. 297, 510-11, 571-72, 1172-73, 1622-23, 1851, 2238-39.  In fact, the Government objected to the defendants' incessant questioning about the word "fiduciary."  *See* Tr. 511 (following defendants' eliciting of Mr. Raiff's lay definition of the word fiduciary, the Government objected, "Your Honor, I object and move to strike. I'm not sure he's here to offer lay opinions about the definition of 'fiduciary,' *nor is it relevant*.") (emphasis added).

The defendants' injection of the term "fiduciary" into the trial was clearly strategic.  They attempted to paint the lack of a fiduciary obligation as tacit permission to lie, while the Government presented evidence and argument that even non-fiduciaries must follow the law.  *See* Tr. 625 (Raiff: "THE COURT: Okay. To your knowledge, sir, in the pre-Litvak indictment period, was it permissible for a trader to make a misrepresentation in the course of a principal-to-principal transaction such as the one exemplified by this confirmation? Is it possible to -- THE WITNESS: It was not.  MR. NOVICK: That's all I wanted to establish, Your Honor. Thank you."); Tr. 628-29 (Raiff: "Q. . . . Again, you had testified, and I think this went back to the issue of being a fiduciary, you didn't have an obligation to get best execution for your customers in these trades, correct? In the RMBS trades? A. Correct. Q. Does that mean again that -- does the implication of

this passage mean that you're permitted to lie to your customers? A. It does not."); Tr. 2706 (Government summation: "Nobody's claiming here that anybody is a fiduciary. The only person who has mentioned the word 'fiduciary' in this trial is the defendants."); Tr. 2953 (Government rebuttal summation: "the defense's biggest argument here I think, is that they want you to believe that because the defendants were not agents of their clients, that they could get away with this stuff."); Tr. 2955 (Government rebuttal summation: "Just because you're not someone's agent, doesn't mean you get to rip them off.").

The only evidence of a fiduciary duty elicited by the Government concerned the relationship between the victims and their investors.  Tr. 699 (Harrison: "I had what is known in the industry as a fiduciary duty."); Tr. 818 (quoting Shapiro in an e-mail to Harrison: "You have fiduciary responsibility to your investors. We want to help you meet that responsibility as often as we can.").  This evidence was probative of materiality (insofar as it served to corroborate the victims' testimony concerning the importance of the defendants' lies) and intent (insofar as it supported an inference that the defendants were aware that their conduct was harming the victims' investors and was therefore wrongful).

### B.      The Concept of Agency Was Entirely Absent From the Evidence

Unlike in *Litvak II*, no witness in this case, including Mr. Wollman, testified that there was an agency relationship between the defendants and their counterparties such that the defendants owed a duty to their victims.[4]  *Contra* Gramins Supp. Mem. at 12 (claiming that Wollman's testimony was "nearly identical" to the objectionable testimony in *Litvak II*).  In fact, the word "agent" was never used by a testifying victim in that context.  Rather, the testimony from all witnesses was that one of Nomura's core functions was to facilitate trades between counterparties

---

[4] While the Government received permission to do so, *see* April 24, 2017 Conf. Tr. at 65-55, the Government opted not to pursue such a strategy.

by buying from a selling counterparty and then selling to a buying counterparty. *See* Tr. 126 (Dinucci: "Our day would, you know, entail trying to facilitate as many trades as we could between clients to create profit for our firm."); Tr. 1404 (Harrison: "Generally speaking, I saw broker-dealers doing two different kinds of activities. You have buying and selling for their own account or facilitating trades between customers."); Tr. 1433 (Abbas: "So sell side is . . . basically helping the buyer and seller transact on certain securities by being the middleman or the market maker."); Tr. 1930 (Feely: "Q. What was your role at Nomura in relation to these customers in the RMBS market? A. My role was to facilitate trading for them. Q. What do you mean by 'facilitate trading'? A. Either provide the community, which means buying bonds for possession for Nomura's book, or try to find -- try to match a buyer and a seller on behalf of the buyer and the seller."); Tr. 1679 (Chao: "Nomura's main, you know, course of business is to be a market maker, and that means buying and selling bonds for clients."); Tr. 2086 (Wollman: "So there would be some broker-dealers in the market who were primarily acting in a broker capacity, so they were more or less matching up buyers and sellers. There were other ones who were willing to make more proprietary investments, so invest for their own account."); Tr. 2300 (Marks: "[Broker-dealers] could either be facilitating transactions with another counterparty or they could take the other side of our trade and commit their capital.").

The witnesses gave several other synonymous labels to Nomura's trade-facilitation function. *See*, *e.g.*, Tr. 137 (riskless trading), 245 (brokering); 372 (riskless trading); 1535 (market making); 2271 (brokering). All witnesses testified that they understood that, as a middleman, Nomura had to take possession of the bond from the seller before it could then resell to the buyer—in other words, that the counterparties could not directly transact with one another. *See*, *e.g.*, Tr. 1535 (Abbas: "Q. The market maker has to take its own money, buy a bond from one party, and

then resell or reoffer that bond to you or another counterparty, correct? A. Yes."); Tr. 336 (Dinucci: "Q. And if you're brokering, as you told Mr. Brennan, you have to buy it from one fund, own it for a minute, and then sell it to another fund, right, that's what you call brokering? A. That's correct."); Tr. 2217-18 (Wollman: "Q. So there's two parts of that transaction: One, Nomura first has to buy the bond from the selling counterparty, correct? A. That's right."). The key element of this type of trade was that Nomura "had the potential buyer and potential seller already matched up at the time of the transaction." Tr. 137 (Dinucci). This virtually eliminated Nomura's "market risk" in a trade. Tr. 372 (Raiff: "And it would also conduct transactions where we were transacting risklessly, meaning the firm was assuming no market risk, so we were matching buyers to sellers."); Tr. 2314 (Marks: "Q. And if he has you on the other side of the transaction, in other words purchasing them, what does that do to the risk in the transaction from Nomura's vantage? A. I would consider that to be a riskless transaction for the broker.").

Even where witnesses used the term "broker," it was clear that they did not intend to imply a fiduciary relationship between Nomura and its counterparties. Wollman, for example, described a broker-dealer's "broker capacity" as "more or less matching up buyers and sellers." Tr. 2086; *see also* Tr. 2181 ("Q. And just to be clear for the jury, what do you mean by 'brokering'? A. Meaning that they aren't his bonds, he is -- his role in this is to match together a seller of bonds and a buyer of bonds -- two other counterparties, not him -- and he's facilitating that transaction."). This was entirely consistent with other evidence about the "broker" designation. *See* Tr. 245 (Dinucci: "Brokering trades is when you have a buyer and a seller matched up on a bond, and you simply play the middleman in that transaction."). Indeed, the evidence showed that is how Gramins himself used the term. In Government Exhibit 11B, Gramins discussed with Jordan Rieger of Monarch what offer Gramins should communicate to a prospective buyer of a particular

8

bond that Monarch owned.  Gramins stated, "i think an offer/trade in 52 or maybe 53 seems in line
. . . but happy to reflect what you like . . . .and i am purely looking to broker."  Gov't Ex. 11B at
3.  Gramins clearly did not intend to suggest by the term "broker" that he owed Rieger a fiduciary
duty, and the Government did not suggest that he had.  Rather, Gramins used the term "broker" to
describe the framework of the trade in which he was engaged—facilitating the purchase and sale
of a bond between two counterparties.  That view is corroborated by what happened in Trade 11,
*i.e.*, the sale of the bond by Monarch and the contemporaneous purchase by DW Investments.  In
that context, Nomura's role was to communicate the bids and offers on behalf of the buyers and
sellers.

Wollman's testimony using the word "broker" did not suggest a heightened duty by the
defendants.  Instead, Wollman testified on what factors influenced his calculus about whether to
believe information communicated by broker-dealers, specifically, the context of the trade and the
type of information.  Wollman explained that "the further away I get from a particular broker
transaction in the transaction details, the more skeptical I'll get, because they're ambiguous
potentially or it's not clear exactly what's going on.  But an objective fact relating to a transaction
is not something that I am skeptical about."  Tr. 2269-70.  This testimony was not related to any
alleged misperception of Nomura's duty (or lack thereof).  Nor was it unique or idiosyncratic.  *See*,
*e.g.*, Tr. 2322 (Marks: "So I only speak through the broker, so I rely on the information they give
to me.").[5]

---

[5] In one exchange cited by Gramins, *see* Gramins Supp. Mem. at 5, 12, Wollman testified that Gramins was acting as
a broker, "meaning that he's not . . . buying bonds for his inventory.  He's acting on behalf of another counterparty.
He's facilitating a trade between me and that other counterparty.  And in that context, I expect that facts that he tells
me are truthful."  Tr. 2113.  Importantly, Wollman did not indicate in any way that his belief that Gramins was telling
him the truth was due to his understanding that they were in a fiduciary relationship.  Gramins now misreads this
testimony to say that Wollman believed Gramins to be his agent and obliged to act in his best interest, but that reading
is contradicted by Wollman's statement that Gramins was "acting on behalf of" the other counterparty against whom
Wollman was negotiating.  In fact, Wollman simply viewed "brokering" as where the broker dealer "match[es]

Gramins nonetheless attempts to suggest that evidence of "brokering" or "facilitating" is the functional equivalent of a victim's belief that Nomura was his agent.  Gramins Supp. Mem. at 5-7, 12, 14.  Gramins misunderstands the Second Circuit's rationale in rejecting Norris' testimony, which is focused specifically on agency and fiduciary obligation.  The Second Circuit did not suggest that evidence of a broker-dealer facilitating or brokering trades was prohibited, absent a belief in some agency duty.  In fact, there is ample evidence in the *Litvak II* trial transcript that RMBS investors other than Norris and Wollman viewed the role of the broker-dealer in that way:

- Michael Canter: "[W]e thought we were negotiating with a seller and Jefferies was intermediary -- intermediating. And so when a broker dealer is intermediating a transaction, their main objective is really that a transaction occurs because that's how they get paid. Whereas, if they own it, every increase in price is more money for them so the interests are aligned differently." *Litvak II* Tr. 289.

- Katherine Corso: "Q. How were you dealing with Jefferies during this trade? A. They were a broker-dealer. Q. What was your understanding of what that meant in this particular trade? A. That he was arranging the trade between buyer and seller." *Litvak II* Tr. 501.

- Vladimir Lemin: "The commission is to compensate Jefferies for doing the work to connect -- to find bonds to connect the buyer and the seller."  *Litvak II* Tr. 645.

In each instance, the witness described the same role—the broker-dealer operating as a facilitator or intermediary between a buyer and a seller.  This type of testimony was distinguished from Norris's mistaken agency testimony in *Litvak II*.  Indeed, even Litvak's expert, Mr. Burnaman, referred to a broker-dealer as an "intermediary."  *Litvak II* Tr. 1259 (for a buy side firm to sell at the highest price possible, "if you are trying to sell something and you want to sell it at 80 and you call up an intermediary and he says, I'll bid you 79 and a half, you can say, no, I'm firm at 80.").

---

together a seller of bonds and a buyer of bonds -- two other counterparties, not him -- and he's facilitating that transaction."  Tr. 2181.

###### C.   *Litvak II* Does Not Bar The "Trust" Evidence Elicited in This Case

The type of "trust" evidence elicited in this case is easily distinguishable from the testimony that caused the Second Circuit concern.   In *Litvak II*, the court found that the Government had argued that Litvak "created the perception of acting as an agent and that he aimed to establish a 'relationship of trust.'"   2018 WL 204697 at \*11.   The court further found that "[t]he government's concept of subjective trust as evidence of materiality became a back door for the jury to apply the heightened expectations of trust that an agency relationship carries." *Id*.   Here, conversely, the Government did not argue or present subjective evidence of trust in that way. Rather, the Government elicited evidence to show how counterparties used all information available to them in order to decide whether a defendant trader was telling them the truth—a determination that was obviously a significant component of materiality.   It is axiomatic that a reasonable investor would consider his or her history and experience with a trader in assessing whether to believe what that trader said, without regard to the legal nature of the relationship.

Indeed, all of the victim witnesses testified that their history and experience with broker-dealers influenced their assessment of whether to believe the brokers-dealers' information.   As Wollman explained: "I mean a broker-dealer that I'm meeting for the first time or don't trade particularly much with, I wouldn't place as much trust in as a broker-dealer that I'd had a relationship with for a longer time and in multiple capacities, different types of trades, different types of situations. So it's just you effectively -- a broker-dealer effectively earns trust over time through their behavior."   Tr. 2087-88.   In this case, Wollman had a longstanding business and social relationship with the defendants, *see* Tr. 2091-93, which a reasonable investor would clearly weigh in assessing credibility.   Wollman did not suggest, however, that the trust was borne of a legal duty, but of his experience with the trader.   Moreover, he listed "trustworthiness" as one of many factors he would consider, including "activity in the market. . . ; willingness and ability to

11

commit capital in the market . . . ; responsiveness, ease of working with them, . . . good market color, good research."  Tr. 2086.

Similarly, Harrison explained that "business and personal relationships have an element of trust. And in these business relationships, I viewed how much I trusted the people I was doing business with was an important factor in doing a business with them."  Tr. 704.  Like Wollman, Harrison did not rely on any legal relationship to assess trust, but rather looked to traditional hallmarks that a person uses in deciding whether to believe another person.  Harrison explained, "the more business interactions I had with individuals and their firms gave me the ability to try to gauge their trust in how honest they were and how trustworthy their statements were."  Tr. 704.  Harrison took that a step further, explaining how he would attempt to ferret out dishonest behavior and use it in deciding whether to trust subsequent representations.  He would "[g]ather more information from as many sources as possible and try to analyze which piece or pieces of information didn't seem to make sense with the rest."  Tr. 727.  Harrison gave examples of his efforts to determine whether he had received bad information, which were corroborated by the documentary evidence.  *See*, *e.g.*, Tr. 735-36 (Harrison describing an incident of dishonesty by a regional broker, following which he announces a "lifetime blacklist.") (citing Gov't Ex. 3Q); Tr. 737 (Harrison commenting on his reaction to someone lying to him, and announcing "we're not doing business again.") (quoting Gov't Ex. 3S).  Harrison's reason for weighing past experiences with broker-dealers was entirely rational—he explained, "I would be able to do a better job for my clients if I felt that I was doing business with people who were trustworthy."  Tr. 805.

Aadil Abbas and Eric Marks both testified consistently with Wollman and Harrison, in that they weighed how broker-dealers behaved in the past in determining whether to believe them. Abbas referred to his "comfort level" with a broker-dealer as influencing his decision to work with

that broker-dealer, and explained how lying would undermine that comfort.  Among other factors, Abbas testified that "[i]f someone is giving me wrong market color and I could find out from someone else that what you just told me five minutes ago is inaccurate, that could also undermine the comfort level."  Tr. 1437.  Likewise, Marks testified that he would weigh in his future negotiations whether a broker-dealer had previously lied to him.  Tr. 2334, 2430-31.

Another distinguishing feature between this case and *Litvak II* is the Second Circuit's view that there was no connection between Litvak and the challenged evidence.  *See Litvak II*, 2018 WL 2049677, at *11 ("But the government points to no evidence that appellant was the source of Norris's mistaken belief in an agency relationship . . . .").  Here (putting aside that no witness testified about a mistaken belief in an agency relationship in this case), in contrast, the evidence showed that the defendants were generally aware of, and in some cases fostered and exploited, the victims' impression that they were honest and trustworthy.  This was particularly true in Shapiro's interactions with Harrison.  In one chat, Harrison was attempting to determine whether he had been lied to by Nomura or another broker-dealer.  *See* Tr. 741-745, Gov't Ex. 3J.  Harrison relayed that his boss "assign[ed] [a] non-zero" chance that Nomura "was the dishonest counterparty."  Tr. 742.  Harrison reported that he told his boss there was no such chance.  *Id*.  Shapiro affirmed that view (that he would not lie), saying "Not my style . . . Not the way I roll."  Tr. 743 (quoting Gov't Ex. 3J at 2).  Shapiro explained to Harrison that he wouldn't lie because "once you start going down that road . . . it is impossible to keep all the stories straight."  Gov't Ex. 3J at 4.  Shapiro further explained, "pure fact is that you are a MUCH more meaningful % of my team's business than you are of theirs [Credit Suisse] . . . and it would be foolish of me to risk that for a couple of trades."  Tr. 745 (quoting Gov't Ex. 3J at 4).  Harrison understood this chat as meaning that "to have good long-term relationships with people and do the best I can for my clients over the long term, the

best way to accomplish that is not to fuck around." Tr. 744-45.  In short, Harrison's positive view of Shapiro's trustworthiness was perpetuated and ultimately exploited by Shapiro.  Further, in the context of materiality, it was entirely reasonable for Harrison to factor this exchange (and other similar exchanges) into his assessment of Shapiro's trustworthiness.

Such evidence of the defendants' statements to, and relationships with, their victims was relevant not just to materiality, but also to fraudulent intent.  As the Court explained to the jury, "[a] person acts with intent to defraud when he deliberately uses deception to induce another to act to his detriment." Tr. 2650.  That the defendants attempted to build credibility with the victims was relevant evidence of their intent when, at other times, they blatantly lied to them.  Whereas Shapiro claimed to Harrison that he was the "honest dealer," Tr. 814 (quoting Gov't Ex. 3E at 11), the evidence showed that he lied to Harrison on many occasions.  *See*, *e.g.*, Gov't Ex. 14C at 8 ("yes . . . we bot 57.5/53.5/62.75 respectively"), Gov't Exs. 14B, 15B (showing true prices paid by Nomura).  Similarly, Gramins' claim to Jordan Rieger that he was "happy to reflect what you like . . . .and i am purely looking to broker," Gov't Ex. 11B at 3, was relevant evidence of his intent to deceive when, in fact, Gramins then misrepresented Rieger's position to the buyer.  *Compare* Gov't Ex. 11B at 4 (Rieger to Gramins: "I would show it 51-28 net to you") with Gov't Ex. 11A at 9 (Gramins to buyer: "my guess is there is a bit more room but has to be a 52h").  Likewise, evidence that people in the market would have been aware of Wollman's expectations that he always paid on top in BWIC trades, *see* Tr. 2140-42, and that Wollman had a longstanding strong relationship with Nomura traders (particularly Shapiro and Gramins), *see* Tr. 2089-93, was strong evidence of Gramins' fraudulent intent when, in Trade 13, he falsely told Wollman that he was "using" his 18-1 bid, *see* Gov't Ex. 13A at 6,[6] thereby inducing Wollman to pay additional money

---

[6] In fact, Gramins directed salesman Michael Romanelli to put in a 17-17 bid.  *See* Gov't Exs. 13F, 13G.

on top, *see* Gov't Ex. 13E at 2.  Because *Litvak II* did not consider the relevance of evidence of the relationship between the defendant and victim to the defendant's intent, that this case is replete with such evidence further distinguishes it.

> ### D.     The Court's Instruction Was An Adequate Prophylactic

Considering that there was no evidence elicited in this case about any mistaken belief in an agency relationship, there was almost no risk of the juror confusion claimed by the court in *Litvak II*.  Nonetheless, even if one were to construe *some* risk from this record, the Court's instructions on the matter were more than sufficient to inoculate the jury against any such mistaken impression. The Court first delivered such an instruction early in the trial, following Mr. Raiff's testimony:

> Generally speaking, the term "fiduciary" is used to refer to relationships of trust and confidence that arise when one party depends on another, the fiduciary, to act on his behalf and for his benefit. Under the law, a fiduciary owes certain duties to the person who is the beneficiary of the fiduciary relationship, including duties of honesty and loyalty. A familiar example of a fiduciary relationship is the relationship between a lawyer and a client. When a client retains a lawyer, the client places trust and confidence in the lawyer, the fiduciary, to act on behalf of the client and in the client's interest, and the lawyer agrees to act on the client's behalf in the client's interest.
>
> The government does not claim that the relationship between Nomura and the counterparties involved in this case, the so-called QIBs, was a fiduciary relationship, nor does the government claim that the individual defendants were in a fiduciary relationship with the counterparties; instead, both sides agree that Nomura and the counterparties acted as principals, meaning that in each instance each one acted in its own interest, thus the trades are referred to as principal-to-principal transactions, signifying that each side acted for its own account and in its own interest.

Tr. 667-68.

Later, during its final instructions to the jury, the very last instruction the Court delivered to the jury before hearing closing arguments again covered the issue of agency:

> A person is an agent if he is authorized to act on behalf of another known as a principal. An agent owes certain duties to his principal. I instruct you that, as a matter of law, the defendants were at all times acting as principals on behalf of Nomura and not as the agent of the counterparties.

> In other words, when a defendant bought an RMBS bond from a counterparty, he
> was not the agent of that seller; and when a defendant sold an RMBS bond to a
> counterparty, he was not the agent of that buyer. As a principal, the defendants
> owed no duty of loyalty to the counterparties and were acting in their own self-
> interest, not the interest of the counterparty.

Tr. 2673.[7]  Collectively, these instructions were more than sufficient to ensure that no juror was

left with the misimpression that the defendants owed a fiduciary obligation to any of the victims.

### E.      Harmless Error

Finally, even if there was error here, Gramins' attempt to shoehorn his conviction into the

harmless error analysis in *Litvak II* is unconvincing.  Central to the Second Circuit's holding that

the admission of Norris's agency-related testimony was not harmless was its finding that "Norris's

testimony about a perceived agency relationship was the only rational reason for the jury to have

convicted [Litvak] on that count of securities fraud while acquitting him on all other counts."

*Litvak II*, 2018 WL 2049677 at *11.  No such argument is available to Gramins here.  In *Litvak II*,

the only count of conviction involved a trade with Mr. Norris.  In this case, Gramins was convicted

of a conspiracy to commit securities fraud and wire fraud that included more than 20 overt acts

and 16 separate trades involving many different counterparties, four of whom testified at trial.  All

of that evidence bore directly on the count of conviction, and it is impossible to isolate one piece

of testimony as singularly responsible for Gramins' conviction.

Similarly, whereas the court in *Litvak II* found the challenged Norris testimony to be unique

and idiosyncratic, here the testimony was universally consistent in describing Nomura's role in

brokering or facilitating trading.  Not only was that the position of all four testifying victims, but

---

[7] The district court in *Litvak II* also delivered an agency instruction: "In the law, a person is an agent if he is authorized to act on behalf of another, known as a principal. An agent owes certain duties to his principal. In the transactions at issue in this case, Mr. Litvak was not the agent of the buyers or sellers of the RMBS. In other words, when he bought an RMBS from another person, he was not an agent of that seller. Further, when he sold an RMBS to another person, he was not the agent of that buyer." *Litvak II* Tr. at 1394.

(unlike in *Litvak II*) the jury could also take into account the testimony of co-conspirators Frank Dinucci, Alejandro Feely, and Caleb Chao, all of whom testified consistently as to Nomura's role as an intermediary in the charged trades. *See*, *e.g.*, Tr. 245 (Dinucci: "Brokering trades is when you have a buyer and a seller matched up on a bond, and you simply play the middleman in that transaction."); Tr. 1930 (Feely: "Q. What was your role at Nomura in relation to these customers in the RMBS market? A. My role was to facilitate trading for them."). In short, the testimony that Gramins now complains about was universal, and thus cannot explain the mixed verdict in this case.

**IV.    Conclusion**

Accordingly, the Government respectfully requests that the Court deny Gramins' motion for a new trial.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

*/s/ David E. Novick*
_____
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. PHV02874

HEATHER L. CHERRY
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. PHV07037

U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3732
David.Novick@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 18, 2018 a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


/s/ *David E. Novick*
_____
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY