UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ROSS SHAPIRO and<br>MICHAEL GRAMINS,<br><br>Defendants. | S3 15-cr-00155 (RNC)<br><br>June 27, 2018 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MICHAEL GRAMINS'
MOTION FOR RECONSIDERATION OF THE COURT'S DENIAL OF HIS MOTION
FOR JUDGMENT OF ACQUITTAL PURSUANT TO FED. R. CRIM. P. 29**

GREENBERG TRAURIG, LLP
Marc L. Mukasey (CT29885)
Jeffrey B. Sklaroff (PHV08423)
Robert S. Frenchman (CT30437)
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Email: mukaseym@gtlaw.com
*Attorneys for Michael Gramins*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND .................................................................................................... 2

LEGAL STANDARDS ........................................................................................... 4

ARGUMENT ........................................................................................................ 6

I.     THIS COURT SHOULD RECONSIDER ITS DENIAL OF GRAMINS' RULE 29 MOTION AND ENTER A JUDGMENT OF ACQUITTAL FOR THE REASONS STATED IN THE SECOND CIRCUIT'S DECISION IN *LITVAK II*.............................. 6

     A.     Testimony Rooted In Witnesses' Erroneous, Irrelevant Beliefs Should Be Given No Weight ................................................................................ 6

     B.     Setting Aside The Erroneous, Irrelevant Evidence, No Reasonable Jury Could Find That Gramins' Statements Were Material .................................................. 12

          1.     Reasonable Investors Discounted Unverified Information from Dealers . 12

          2.     Reasonable Investors Regularly Deceived Their Counterparties In Negotiations ............................................................................................. 14

II.     GRAMINS SHOULD BE ACQUITTED ON COUNT ONE BECAUSE THE GOVERNMENT FAILED TO PROVE THAT A CONSPIRACY EXISTED OR THAT GRAMINS AGREED WITH ANYONE TO VIOLATE THE LAW .................. 17

CONCLUSION ..................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Lauria v. United States,*
    No. 01-cv-1893 (PCD), 2007 WL 1064319 (D. Conn. Apr. 5, 2007) ............................4, 5

*Rich v. State,*
    294 F.Supp.3d 266 (D.N.J. 2018) ......................................................................................5

*Thorsen v. Sons of Norway,*
    996 F.Supp.2d 143 (E.D.N.Y. 2014) .................................................................................5

*United States v. Barfield,*
    999 F.2d 1520 (11th Cir. 1993) ........................................................................................5

*United States v. Blaszczak,*
    No. 17-cr-357 (LAK) (S.D.N.Y.) ...................................................................................11

*United States v. Colon-Rodriguez,*
    696 F.3d 102 (1st Cir. 2012) .......................................................................................5, 12

*United States v. Davis,*
    No. 13-CR-923 (LAP), 2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017) ..........................5, 12

*United States v. Glenn,*
    312 F.3d 58 (2d Cir. 2002) ...............................................................................................5

*United States v. Kohlmann,*
    491 F.2d 1250 (5th Cir. 1974) ..........................................................................................5

*United States v. Litvak,*
    889 F.3d 56 (2d Cir. 2018) ...................................................................................... *passim*

*United States v. Martoma,*
    993 F.Supp.2d 452 (S.D.N.Y. 2014) ..............................................................................10

*United States v. Ozsusamlar,*
    No. 05-cr-1077, 2007 WL 2826601 (S.D.N.Y. Sept. 20, 2007) ........................................5

*United States v. Pappas,*
    No. 01-cv-1893 (RNC), 2017 6606858 (D. Conn. Dec. 27, 2017) ....................................4

*United States v. Reyes,*
    577 F.3d 1069 (9th Cir. 2009) ........................................................................................11

*United States v. Valle,*
    807 F.3d 508 (2d Cir. 2015)...............................................................................................5

**Rules**

Local Civ. R. 7(c).............................................................................................................................4

Defendant Michael Gramins, by his counsel, respectfully submits this Memorandum of Law in support of his Motion for Reconsideration of the Court's Ruling and Order denying his Motion for Judgment of Acquittal. ECF No. 504 (the "Order").

## PRELIMINARY STATEMENT

On June 5, 2018, this Court entered an Order denying defendants Ross Shapiro's and Michael Gramins' motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, but granting Gramins' motion for a new trial on Count One, pursuant to Fed. R. Crim. P. 33. Order at 20.

On June 7, 2018, at a status conference, this Court indicated that it would accept motions to reconsider its decision denying the defendants' Rule 29 motions for judgments of acquittal. The Court noted that Judge Winter's opinion in *Litvak II* "certainly bears careful study," and that, upon reconsideration, the Court "could be persuaded" that its earlier ruling denying Gramins' and Shapiro's Rule 29 motions was "incorrect." Status Conference, Tr. 27:18-28:1. Specifically, the Court observed that *Litvak II* "tells us that this is a very unusual animal, the RMBS market, and the views of traders in that market may not themselves account for a lot." *Id.* at 28:7-10. Recognizing that a nexus between the views of an individual trader and the views of an objective, reasonable investor was required to show materiality in *Litvak II*, the Court noted that "[a witness's subjective] testimony that he feels cheated I think is not itself sufficient, but I'm not positive." *Id.* at 29:22-24.

As set forth below, the Second Circuit's reasoning in *Litvak II* fatally undermines the government's case against Gramins. No nexus between the views of the individual trader witnesses and the views of an objective, reasonable RMBS investor could be shown. Accordingly, the Court

should grant Gramins' Motion for Reconsideration and enter judgments of acquittal on all remaining counts in the Indictment.[1]

## BACKGROUND

On May 3, 2018, in *United States v. Litvak* ("*Litvak II*"), 889 F.3d 56 (2d Cir. 2018), the United States Court of Appeals for the Second Circuit vacated for the second time the conviction of RMBS trader Jesse Litvak because the district court improperly admitted testimony from two witnesses – one of whom also testified in Gramins' case – that led to Litvak's conviction.

The *Litvak II* court recognized that "RMBS are marketed to large, sophisticated financial institutions" that "use computer models to establish the highest amount at which they would be willing to buy or sell a particular RMBS." 889 F.3d at 60. The "complex" computerized analysis of RMBS requires consideration of numerous factors including, among other things, "the priority level of the bond, the likely number of individuals that will prepay their mortgages, the likely number of mortgage defaults, the potential severity of the loss on a defaulted mortgage, the locations of the real property mortgaged, unemployment rates in those locations, the effectiveness of the home loan servicer in receiving payments, and the credit scores of individual homeowners." *Id.*

The *Litvak II* court recognized that "an essential feature" of all trades in the RMBS market is that they are arms-length transactions conducted between highly sophisticated principals with directly conflicting interests:

> An essential feature of all of these trades . . . is that the broker-dealer acts solely in
> its own interest as a principal. The broker-dealer continually tracks potential buyers
> and sellers, their interests in particular kinds of RMBS, and their ongoing
> acceptable price ranges. It seeks to profit from transactions in the securities by

---

[1] Should this Court grant Gramins' motion for a judgment of acquittal, litigation will not be over for Gramins. He still faces an SEC lawsuit – stayed during the pendency of this criminal case – based on the instant conduct in the Southern District of New York. *See SEC v Gramins*, No. 15-cv-7045 (RMB) (S.D.N.Y.).

buying low and selling high. The size of the year-end discretionary bonus given to each broker-dealer's trader is largely based on the profitability of the individual's trades.[2] The broker-dealer assumes the risk of buying the bond, and an institutional investor can refuse to purchase a bond held by the broker-dealer even when the investor caused the broker-dealer to purchase it by an expression of interest, *i.e.*, in an order or BWIC trade. Such an investor may also have no investment purpose but may intend to resell the bond immediately, and at a higher price, to another institution it knows to be interested.

A broker-dealer is not, therefore, an agent for its counterparties in these trades and owes them no special or fiduciary duty. In a sale by a counterparty to a broker-dealer, the counterparty has no legitimate expectation that the broker-dealer will resell the bond at the price paid to the counterparty. Similarly, in a purchase, the counterparty has no legitimate expectation of purchasing a bond at the price paid by the broker-dealer. Rather, the broker-dealer and counterparty each have their own price ranges in which they will consummate their ends of the transactions. The final price is determined in an arms-length negotiation and, if agreed upon, will be somewhere in the overlap of price ranges.

*Id.* at 61 (footnote omitted).

Critically, because it is "undisputed" that all trades in the RMBS market are principal-to-principal, "a *reasonable investor* would not misperceive the role of a broker-dealer in the RMBS market." *Id.* at 68-69 (emphasis added); *see also id.* at 69 (labeling Norris' perception of an agency relationship "entirely wrong"); *id.* at 68 (noting that it was "now undisputed" that broker-dealers did not act as agents for counterparties buying and selling RMBS); *id.* at 63 ("Certainly, by the end of the second trial, if not much earlier, it was clear that appellant had never been Norris's (or Wollman's) agent, and an agency relationship did not exist in such transactions.").

The Second Circuit also noted that it was "permissible" for the government to elicit testimony from individual counterparties concerning their "own point of view" about what information was important to the investment decision, "but only so long as the testimony about the

---

[2] While the record in *Litvak* showed that the defendant's compensation was based on his trading profits, there was no such testimony here. To the contrary, even if the Nomura RMBS desk increased its profits by several million dollars, that would not impact the compensation Nomura paid to traders. Tr. 541:5-9. Indeed, in some years, Nomura traders, including Gramins, were paid a fixed contractual amount. Tr. 472:18-473:17; *see also* Tr. 1676:23-1677:10.

significance of the content of a defendant's misstatements and each trader's 'own point of view' is shown to be within the parameters of the thinking of reasonable investors in the particular market at issue." *Id.* at 65. "In other words," the court held, "there must be evidence of a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market. Materiality cannot be proven by the mistaken beliefs of the worst informed trader in a market." *Id.* A "nexus" is required because "[i]t can hardly be the law that the 'point of view' of an investor who is admitted to be wrong—the government, in putting the best face on it, describes Norris as 'confused' and 'incorrect'—is relevant to prove what a reasonable investor, neither confused nor incorrect, would have deemed important." *Id.* at 69 (internal citation omitted).

Against this backdrop, the Second Circuit affirmed the district court's denial of Litvak's motion for judgment of acquittal, but reversed the district court's denial of his motion for a new trial. The Court of Appeals held that the district court erred in allowing counterparty Brian Norris to testify that he "trusted" Jesse Litvak and believed Litvak was acting as his "agent." *Id.* at 67-72. Accordingly, Norris' "idiosyncratic and erroneous belief" that Litvak was his agent should have been precluded under Rules 401 and 403. *Id.* at 68-69. The court vacated Litvak's lone count of conviction because it could not "conclude with fair assurance that the jury would have convicted [Litvak] absent such evidence." *Id.* at 59.

## LEGAL STANDARDS

Reconsideration should be granted when a party "can point to controlling decisions or data that the court overlooked . . . matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Lauria v. United States*, No. 01-cv-1893 (PCD), 2007 WL 1064319, at *2 (D. Conn. Apr. 5, 2007) (internal quotation marks omitted); *see also* Local Civ. R. 7(c). The grounds "justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."

*United States v. Pappas*, No. 01-cv-1893 (RNC), 2017 WL 6606858, at *2 (D. Conn. Dec. 27, 2017) (internal quotation marks omitted). A court may also grant reconsideration where it "overlooked some dispositive factual or legal matter that was presented to it." *Rich v. State*, 294 F. Supp. 3d 266, 272-73 (D.N.J. 2018); *see also Thorsen v. Sons of Norway*, 996 F. Supp. 2d 143, 169 (E.D.N.Y. 2014) ("A motion for reconsideration is the proper vehicle for bringing to the Court's attention matters it may have overlooked in its initial ruling or order."). "Ultimately, . . . the question [of whether to grant reconsideration] is a discretionary one and the court is not limited in its ability to reconsider its own decisions prior to final judgment." *Lauria*, 2007 WL 1064319, at *2.

On a challenge to the sufficiency of the evidence, the operative question is whether, based on the evidence presented at trial, a rational juror could conclude that each element of the charged offenses was proven beyond a reasonable doubt. *United States v. Valle*, 807 F.3d 508, 522 (2d Cir. 2015); *see also Litvak II*, 889 F.3d at 65; *United States v. Glenn*, 312 F.3d 58, 63-64 (2d Cir. 2002). The Court must determine whether "a reasonable-minded jury could accept the *relevant and admissible* evidence" as sufficient to prove each element beyond a reasonable doubt. *United States v. Kohlmann*, 491 F.2d 1250, 1253 (5th Cir. 1974) (emphasis added); *see also United States v. Colon-Rodriguez*, 696 F.3d 102, 104 (1st Cir. 2012); *United States v. Barfield*, 999 F.2d 1520, 1522 (11th Cir. 1993); *United States v. Ozsusamlar*, No. 05-cr-1077, 2007 WL 2826601, at *7 (S.D.N.Y. Sept. 20, 2007) (citing *United States v. Mariani*, 725 F.2d 862, 866 (2d Cir. 1984)). For example, in *United States v. Davis*, No. 13-CR-923 (LAP), 2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017), the district court granted defendant's Rule 29 motion because "[m]uch of the Government's evidence was legally irrelevant," and the relevant evidence was insufficient to support a conviction. *Id.* at *22.

As set forth below, in the Gramins case, the government failed wholly to establish that the testimony of its victim witnesses about the role played by Nomura was "within the parameters of the thinking of reasonable investors" in the RMBS market. Accordingly, the government could not establish that Gramins' statements were material and a judgment of acquittal should be entered on all open counts.

## ARGUMENT

I. **THIS COURT SHOULD RECONSIDER ITS DENIAL OF GRAMINS' RULE 29 MOTION AND ENTER A JUDGMENT OF ACQUITTAL FOR THE REASONS STATED IN THE SECOND CIRCUIT'S DECISION IN** *LITVAK II*

A. **Testimony Rooted In Witnesses' Erroneous, Irrelevant Beliefs Should Be Given No Weight**

In this Court's ruling on Gramins' Motion for Judgment of Acquittal, the Court correctly identified the government's principal proof of materiality: "[T]estimony by counterparty representatives that misrepresentations about price were important to them." Order at 2. At trial, so-called "victim" counterparties testified that because they "trusted" Gramins, or because he was "brokering" trades on their behalf, his statements about Nomura's acquisition cost were "important" to them. *See, e.g.*, Tr. 2179:15-19, 2181:6-21. That testimony was the cornerstone of the government's proof of materiality. Yet the government could not offer proof that the testimony of its carefully selected "victim counterparties" was probative of what an objective, reasonable investor in the RMBS market would find material.

Put another way, the government failed to establish – as it must – that the personal, point-of-view testimony of the counterparty witnesses – that they "trusted" the defendants or that they viewed the defendants as "brokers" – was within the mainstream thinking of a reasonable investor in the RMBS market and not the ill-informed, incorrect view of traders who were outside of the mainstream. The government therefore failed to prove the "nexus," required by the Second Circuit,

between the mistaken beliefs of its "victims" and the views of the objective, reasonable investor. For example, Joel Wollman testified repeatedly that he believed Gramins was merely a "broker" and that he was merely "brokering" trades. Tr. 2113:19-2114:9, 2181:6-10, 2181:16-21, 2271:4-17. Zach Harrison, meanwhile, testified that he believed he had a "trust relationship" with Gramins and other Nomura traders. Trial Tr. 703:23-704:5, 709:19-710:4, 731:2-11, 805:10-16, 831:15-18. Under *Litvak II*, all this incorrect and misguided testimony was irrelevant and should not have been considered by the jury.

Not only did the government fail to establish that the personal views of Wollman, Harrison and other counterparty witnesses were within the mainstream of the RMBS market, it exacerbated the problem by aggressively exploiting this testimony as the very foundation of its proof of materiality. The government elicited "erroneous" and "entirely wrong" testimony, *Litvak II*, 889 F.3d at 64, 69, that counterparties believed Gramins' statements about dealer acquisition cost were "important." For example, after Wollman testified that he believed Gramins was acting as a "broker" in the trade for AHMA bonds, the government asked Wollman whether it would have "mattered to [him]" if he knew the price where Nomura could sell AHMA bonds. Tr. 2114:2-21. Based on his incorrect belief about the relationship between Nomura and his firm, Wollman responded "yes." Trial Tr. 2114:19-21. In addition, Wollman testified that Gramins was "brokering" and "facilitating" the JPMAC trade, and that it would have been "important" for him to know the price at which a third party was offering to sell the bonds to Nomura. Tr. 2179:15-19; 2181:6-21.[3]

---

[3] In *Litvak II*, the Second Circuit found that Wollman's credibility was "severely weakened" because, among other things, he "concealed relevant information" from Litvak, viewed negotiations with broker dealers, including Litvak, with "skepticism" and "suspicion," and "engaged in other deceptive practices" that were "likely criminal acts under the government's theory of the case." 889 F.3d at 71-72.

Likewise, Zach Harrison had an ultra-skeptical view of the RMBS market. The record is clear that Harrison knew lying was rampant in the market, but he nevertheless testified that he believed the traders at Nomura treated him differently. *E.g.*, Tr. 709:19-710:4. Harrison testified that he had personal relationships with all three Nomura defendants and viewed them as the most trustworthy dealers. Tr. 706:10-707:4; 709:19-710:4. However, Harrison's personal feelings about which dealers were, in his view, the most trustworthy were irrelevant to whether a reasonable, objective investor in the RMBS market would have relied on statements that the defendants made about their acquisition prices. In *Litvak II*, the Second Circuit found that similar testimony about a counterparty's trust in Jesse Litvak was "admittedly personal" and did not alter the fundamental principal-to-principal relationship between dealers and counterparties. *See Litvak II*, 889 F.3d at 71.

Harrison also suffered from the same frailties that doomed the Litvak witnesses. Harrison blatantly ignored his own supervisor's advice to be skeptical of the information that Nomura traders gave him. Tr. 741:12-742:16; *see Litvak II*, 889 F.3d at 69 (finding that Norris was "unreasonable" for ignoring advice from his compliance department). Harrison also admitted that he consummated a transaction with Nomura even though he believed that a Nomura trader may have been lying to him during negotiations, Tr. 1168:1-13, and conceded that he had in fact provided Peters with false or "bs" color about the price at which a bond had traded. Tr. 1291:15-20; *see Litvak II*, 889 F.3d at 71 (holding that Wollman's credibility was "severely weakened" due to the extensive proof of his skepticism and his own wrongdoing). Further, Harrison repeatedly stated that he found information from Nomura to be important because he thought – incorrectly – that Nomura was simply acting as a middleman through which he was negotiating with another account. *See, e.g.*, Tr. 769:7-9 ("In this kind of negotiation with another end account where

8

Nomura was the middleman, accurately relaying information back and forth would have been important . . . ."); *see also* Tr. 753-17:24, 787:19-25, 790:20-791:8, 801:1-9, 847:17-848:4. However, it was undisputed that dealers like Nomura consummate trades as principals – by buying bonds from one counterparty, holding them and assuming risk, and then selling them to another counterparty. *Litvak II*, 889 F.3d at 68.[4] Thus, Harrison was never "negotiati[ng] with another end account" through Nomura – he was simply negotiating against Nomura. Harrison's testimony – like that of Wollman – was the "mistaken belief of the worst informed trader" and thus far outside the mainstream. *See id.* at 65. His testimony about the importance of Gramins' statements would therefore be given no weight by a reasonable jury because it lacked a nexus to the reasonable investor and was erroneous, irrelevant, and prejudicial.

Aadil Abbas, another counterparty witness, also provided personal, point-of-view testimony that was similarly untethered to the views of the reasonable investor. When asked whether it would have been important to him to know that a seller had offered to sell Nomura bonds at 78-16 rather than 80-16, Abbas responded, "Yeah, it's important because I could have bought it at 78 and 22, which is cheaper than what I eventually ended up paying." Tr. 1510:3-13. However, Abbas conceded, as he must, that Nomura may not have been willing to sell the bonds to him at 78-22, or at *any* price other than the one he actually paid. *See* Tr. 1523:14-20; 1657:14-22; *see also Litvak II*, 889 F.3d at 68 ("The transaction was at arms-length, and appellant owed no fiduciary duties to the buyer. As the owner of the bond, Jefferies did not have to convey the bond to [the buyer] . . . ."); *see also id.* at 61 ("[T]he broker-dealer and counterparty each have their own price ranges in which they will consummate their ends of the transactions. The final price is

---

[4] This is why all of the 10b-10 confirmations in this case reflect transactions between Nomura and the counterparty from which it bought, or the counterparty to which it sold, and all reflect that Nomura acted in a "principal" capacity. *See, e.g.*, DX 1125, 1126.

determined in an arms-length negotiation . . . ."). Abbas' testimony on this point, too, would be given no weight by a reasonable jury because the government failed to show that it had a nexus to the views of the reasonable investor.

The only counterparty witness seemingly in the mainstream was Eric Marks, who stated that accurate information about counterparties' bids and offers was important because it may have caused him to negotiate differently. Tr. 2333:7-14; 2334:7-13.[5] But Marks did not testify about any transactions that he executed with Gramins. In any event, a rational jury would not have equated Marks' speculation that he may have negotiated differently with a finding of materiality given that he also provided ample testimony indicating that statements about dealer profit did not "significantly alter" his total mix of information. *See, e.g.*, Tr. 2358:18-24; 2360:21-2361:19; 2375:4-9. Indeed, Peters, the only defendant who was the subject of Marks' testimony, was acquitted on all counts.[6]

Despite the *Litvak I* decision that focused on the importance of expert testimony on materiality, and despite extensive pre-trial motion practice in Gramins' case relating to expert testimony, the government in this case chose not to call an expert to establish what a reasonable investor in this unusual, sophisticated market would view as important. The government regularly calls expert witnesses to testify about the materiality of alleged misstatements in securities fraud cases. *See United States v. Martoma*, 993 F. Supp. 2d 452, 457 (S.D.N.Y. 2014) ("Expert testimony

---

[5] Marks did not testify that he would not have paid the price he negotiated for the bonds he wanted, but rather that he *might* have tried to negotiate for a better price. Tr. 2333:7-14 ("I would probably negotiate differently."). There was, of course, no assurance at all that such negotiations would have been successful. Regardless, this testimony says nothing about the materiality of Nomura's acquisition price in Marks' investment decision.

[6] Ellington was also the "victim" in three of the five counts charged in *United States v. Demos*, and Marks provided similar testimony at the trial in that matter. As the Court is aware, Mr. Demos was acquitted of all charges against him.

concerning materiality is often introduced in cases involving allegations that a company misrepresented or wrongfully withheld information from investors."); *e.g.*, *United States v. Reyes*, 577 F.3d 1069, 1075 (9th Cir. 2009) (noting that the government did not call any witnesses who traded with the defendant, and instead called three expert witnesses to testify about materiality); *United States v. Blaszczak*, No. 17-cr-357 (LAK) (S.D.N.Y. 2018) (recent securities fraud case where the government called multiple expert witnesses). Expert testimony in this case might have established the required "nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market." *Litvak II*, 889 F.3d at 65. The only reasonable conclusion is that, rather than call a market expert, the government relied on its cherry-picked, atypical, outlier "victims" to testify about their own "indisputably incorrect personal belief[s]." *Id.* at 70 (referring to Norris' testimony).[7]

In sum, the government failed to prove that testimony from Wollman, Harrison, and Abbas about their personal (and mistaken) belief about Nomura's role and their related testimony about the "importance" of certain information in a negotiation for RMBS bonds had any "nexus" to the views of the objective, reasonable investor. In *Litvak II*, the Second Circuit held that without the required nexus, such mistaken, irrelevant testimony from Norris and Wollman should have been excluded. *Id.* at 65. While market participants may testify about their "own point of view" on materiality, they may do so "only so long as" their point of view "is shown to be within the parameters of the thinking of reasonable investors in the particular market at issue." *Id.* The required nexus is lacking in Gramins' case.

---

[7] Notably, the government did not even call all of the witnesses to whom Nomura allegedly made misrepresentations. At trial, the government called only four out of the eight counterparty "victims."

Because the testimony that the government offered was irrelevant, a reasonable jury could not rely on it in determining whether Gramins' statements were material. Accordingly, it should be disregarded for the purposes of evaluating the sufficiency of the evidence on Gramins' motion for a judgment of acquittal. *See Davis*, 2017 WL 3328240, at *22; *see also Colon-Rodriguez*, 696 F.3d at 104; *Kohlmann*, 491 F.2d at 1253.

### B. Setting Aside The Erroneous, Irrelevant Evidence, No Reasonable Jury Could Find That Gramins' Statements Were Material

In *Litvak II*, the Second Circuit held that the trial record contained "substantial evidence that investment managers view with suspicion statements by broker-dealers in the context of arms-length transactions." 889 F.3d at 71. In Gramins' case, there was even more forceful and undisputed evidence on this point. First, there was a greater body of uncontested evidence at Gramins' trial that the market at large – not only the testifying counterparties – discounted unverifiable information from dealers in RMBS transactions. Second, there was much stronger evidence that buy-side investors – *i.e.*, the alleged "victims" of the RMBS market's opaque structure – engaged in their own deceptive practices in order to maximize profits. Thus, objective, "reasonable" buy-side investors could not have found Gramins' statements to be material.

#### 1. Reasonable Investors Discounted Unverified Information from Dealers

The record in *Litvak II* made clear that reasonable investors in the RMBS market discounted unverified information that they received from dealers, who were their negotiating opponents. Counterparties testified that they viewed volunteered information with skepticism and understood that dealers were not always truthful during negotiations. *See* 889 F.3d at 71. Wollman admitted flat-out that he viewed Litvak's statements with suspicion. *See id.*

Gramins' case demonstrated to an even greater degree than *Litvak* that the entire RMBS market shared the same skepticism as the testifying counterparties. Every counterparty witness in

Gramins' case conceded that he knew dealers made misrepresentations about their internal profits. *See, e.g.*, Tr. 1081:22-1082:7, 1600:24-1601:10, 2225:3-6, 2375:4-9. Echoing Wollman's testimony in *Litvak II*, Zach Harrison acknowledged in Gramins' trial that his supervisor at Putnam warned him to be cautious of statements made by Nomura. Tr. 741:12-742:16. Harrison also described an instance in which he thought a Nomura trader may have been lying to him during a negotiation, yet he went ahead and executed the transaction nonetheless, discounting the misrepresentation. *See* Tr. 1168:1-13. And Harrison actually created animated videos that were widely circulated throughout the market in which he parodied instances where he thought dealers were providing information that was "very likely dishonest or improbable." Tr. 817:8-15. Similarly, Eric Marks testified that he was taught by a supervisor to discount as immaterial dealer statements about acquisition price and internal profit. *See* Tr. 2375:4-9. ("My supervisor was always warning me that people might say anything to convince you to pay more for a bond than you really should be.").

There was also much more evidence in Gramins' trial than in Litvak's that sharp negotiating tactics were used by all participants in the RMBS market. Frank Dinucci testified that "every trader on Wall Street" used deceptive negotiating tactics, and that he continued to employ them at Auriga, the dealer he worked for when he left Nomura. Tr. 328:5-7, 341:20-24. Alejandro Feely also continued to use deceptive negotiating tactics when left left Nomura for Morgan Stanley, as did other Morgan Stanley traders. *See* Tr. 1991:12-16, 2008:10-21; 2011:23-2013:5. In fact, when asked if he knew that one of these traders had been under investigation, Feely responded, "My understanding is everybody was under investigation." Tr. 2048:12-18. And Zach Harrison's testimony contained numerous examples of assorted dealers acting dishonestly, and made clear that price misrepresentations in the RMBS market were not the exception, but the norm.

*See, e.g.*, Tr. 1176:19-1177:3 (complaining about a dealer who characterized 44.50 as "low forties"); Tr. 735:21-736:4 (discussing a situation where a regional broker-dealer had "acted inappropriately" by "being dishonest and using business practices that were not consistent with an upfront business relationship"); Tr. 831:3-9 (Harrison had "rough patches of incidents where [he] thought [Credit Suisse] might be doing something inappropriate"); DX 954 at 11 (Harrison laughing with a Barclays trader about Credit Suisse having "20 liars" rather than "20 traders"); Tr. 1081:22-1082:5 (Harrison believed that dealers lied to him "multiple times per week"); DX 544 at 24 ("someone lying to my face is like [an] hourly occurrence"). Of course, it was also clear that Litvak used these tactics at Jefferies. *See, e.g.*, Tr. 432:6-18.

### 2. Reasonable Investors Regularly Deceived Their Counterparties In Negotiations

The record in this case demonstrates that reasonable investors and buy-side traders like the counterparty witnesses at trial regularly engaged in their own deceptive negotiating tactics. Accordingly, the government cannot establish that a reasonable, objective investor in this unusual market could find that Gramins' statements were material. Here again, the record in this case is even more persuasive than the trial record in *Litvak II*.

In *Litvak II*, the Second Circuit found that Wollman's credibility was "severely weakened" when the defense introduced evidence that he withheld relevant information from Litvak and engaged in his own deceptive trading practices. 889 F.3d at 71-72. However, the regularity of deceptive buy-side negotiating tactics was not otherwise a major focus of the *Litvak II* trial. But in Gramins' case, there was overwhelming evidence that buy-side market participants constantly used deceptive negotiating tactics in order to maximize their own profits.

Indeed, the government's own witnesses acknowledged that counterparties routinely lied to dealers. Frank Dinucci agreed that counterparties lied "all day" when conducting BWICs, and

Caleb Chao testified that counterparties would disseminate fake "cover" prices and would sometimes ask dealers to submit artificial bids so that they could relay a more favorable cover to the trader who ultimately bought the bonds. Tr. 357:22-24; 1830:20-1831:25. Chao also explained that several experienced Nomura salespeople warned him that counterparties were not always truthful. Tr. 1889:15-1890:7.

Harrison's testimony also provided abundant evidence that buy-side investors were frequently dishonest during negotiations. *See* Tr. 810:18-21 ("[B]uy side accounts were also engaging in bad protocol.); Tr. 834:14-22 ("I was trying to figure out which market participant [was lying], which may have been a . . . buy side investor."); Tr. 1179:9-11 ("Not clear if [the dealer] lied to me *or the account lied to him* [about the cover price]"); Tr. 1180:7-9 ("Wonder if [the seller's cover is] legit."); Tr. 1185:19-21, 1186:3-5 ("I am doubtful of [the seller's] color. . . . seriously I think they are lying to you"); Tr. 1085:25-1086:4 ("This seller is shady . . . ."); Tr. 1088:1-3 (complaining that a seller had "given [him] bold faced lies repeatedly. Like 100 percent false information."). In fact, the inspiration for one of Harrison's videos was the lies that one of the largest asset managers in the world would spread when running BWICs. Tr. 930:2-25.

It is unsurprising that Harrison was skeptical of information offered by buy-side investors, as Harrison admitted to engaging in a number of deceptive practices himself. Among other things, he:

- "Shopped" bids for certain dealers, even though he generally viewed this as "obnoxious protocol." *See* Tr. 1275:1-4, 1276:6-7;

- Spread "BS color" to the market, *including to Peters*, about the price at which a bond had traded. *See* Tr. 1289:22-1290:10, 1291:15-20;

- "Shaded" color in order to obtain favorable prices on future transactions. *See* Tr. 1295:8-20;

- Asked dealers not to outbid him on BWICs, even though he knew that sellers "would prefer that other market participants not do that." *See* Tr. 1238:1-7, 1251:3-8;

15

- With encouragement from his boss, made $1.2 million on a trade by pretending that his boss was angry with Feely in order to pressure Feely into paying more for a bond. *See* Tr. 1305:21-25, 1319:16-17;

- "[P]oint-blank lied" to dealers. Tr. 1204:24-25;

- Lied during negotiations when he thought it was in the best interest of his clients. Tr. 1219:5-13;

- Offered to "fabricate color" for Shapiro. Tr. 1091:11-15;

- Lied to counterparties about whether he owned certain bonds. Tr. 1094:16-18.[8]

Indeed, Harrison was ultimately terminated for cause for engaging in trading activity that Putnam concluded was improper. Tr. 769:24-770:11.

Finally, all outgoing emails from Monarch, a "victim" institution from which the government declined to call a witness, included a disclaimer that alerted recipients *not to rely on* statements made in connection with bids and offer. *See* DX 913 ("Nothing discussed in connection with this or any other bid placed may be relied upon or taken as a representation of fact or intent. . . . Nothing discussed in connection with this request for bids should be relied upon or taken as a representation of fact or intent. . . ."). At Gramins' trial, the government fought vigorously to keep this disclaimer from the jury because it demonstrated plainly that any reasonable market participant who read it would not rely on statements Monarch made during negotiations.

In *Litvak II*, the Second Circuit held that, based on the record in that case, "there was sufficient evidence for a rational jury to find appellant's misstatements material beyond a

---

[8] When the government attempted to block the defendants from obtaining documents from Putnam that revealed Harrison's own deceptive tactics, *see* ECF No. 309, this Court commented on the paradox between the way the government viewed the defendants' conduct as criminal while it repeatedly tried to shield the jury from learning about its own witness' similar behavior. Pre-trial Conference (Apr. 13, 2017), Tr. 55:4-14; 55:16-56:1.

reasonable doubt . . . ." *Litvak* II, 889 F.3d at 66. By contrast, the powerful, overwhelming evidence in this case about the skepticism and sophistication of the "reasonable investor" – the likes of which was not present in the *Litvak II* record – compels a different result. The Second Circuit's reasoning in *Litvak II*, when applied to the record in this case, warrants a judgment of acquittal for Gramins on Counts One, Three, and Nine.

## II.   GRAMINS SHOULD BE ACQUITTED ON COUNT ONE BECAUSE THE GOVERNMENT FAILED TO PROVE THAT A CONSPIRACY EXISTED OR THAT GRAMINS AGREED WITH ANYONE TO VIOLATE THE LAW

Principally for the reasons stated in the Memorandum of Law In Support of Defendant Michael Gramins' Motion For A Judgment of Acquittal Pursuant To Rule 29 Of The Federal Rules Of Criminal Procedure, Or Alternatively For A New Trial Pursuant to Rule 33 Of The Federal Rules Of Criminal Procedure at 17-30 (ECF No. 476), no reasonable jury could find that the government proved the existence of a conspiracy beyond a reasonable doubt. First, the government failed to prove that there was any agreement to violate the law. *Id.* at 21-23. Second, the government failed to prove the existence of any co-conspirators. *Id.* at 24-30.

The Court did not address either basis for entering a judgment of acquittal on Count One. Gramins seeks reconsideration of the Court's June 5, 2018, ruling in this regard. A judgment of acquittal should be entered because the government did not prove beyond a reasonable doubt that Gramins and one or more individuals entered into the agreement to violate the law, as alleged in Count One.[9]

---

[9] Gramins also joins in and incorporates by reference the arguments made in Shapiro's motion for reconsideration, including the argument that the Court should reconsider its prior ruling on the Due Process claims and that the case should be dismissed on those grounds.

## CONCLUSION

For the reasons set forth above, as well as those previously set forth in Mr. Gramins' post-trial briefs, the Court should reconsider its July 5, 2018 ruling and enter a judgment of acquittal on Counts One, Three, and Nine against Michael Gramins.

Respectfully submitted,

GREENBERG TRAURIG, LLP

By: /s/ Marc L. Mukasey
Marc L. Mukasey (CT29885)
Jeffrey B. Sklaroff (PHV08423)
Robert S. Frenchman (CT30437)
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400
Email: mukaseym@gtlaw.com
*Attorneys for Michael Gramins*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on June 27, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated:      New York, New York
             June 27, 2018

                             /s/ Marc L. Mukasey
                             Marc L. Mukasey
                             GREENBERG TRAURIG, LLP
                             200 Park Avenue
                             New York, New York 10166
                             Telephone: (212) 801-9200
                             Facsimile: (212) 801-6400
                             Email: mukaseym@gtlaw.com