IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br><br>          Plaintiff,<br><br>   v.<br><br>ROBERT BOGUCKI,<br><br>          Defendant. | Case No. 18-cr-00021-CRB-1<br><br>**ORDER GRANTING DEFENDANT'S RULE 29 MOTION** |

On Thursday, February 28, 2019, after the Government rested, Defendant Robert Bogucki orally moved for relief under Federal Rule of Criminal Procedure 29 as to all counts in the superseding indictment against him. Minute Order (Dkt. 213). The parties have filed subsequent written filings on this motion. U.S. Response to Def.'s Mot. for Judgment of Acquittal (Dkt. 214); Def. Response to U.S.'s Opp. to Rule 29 Mot. (Dkt. 216). For the reasons that follow, the Court GRANTS that Motion and enters a judgment of acquittal as to all counts.

I.     **BACKGROUND**

Defendant is charged with one count of conspiracy to commit wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1349, and six counts of wire fraud affecting a financial institution, in violation of 18 U.S.C. §§ 1343 and 2, and associated forfeiture allegations. Superseding Indictment (Dkt. 54).

The parties agree that the charges of wire fraud affecting a financial institution requires the Government to prove five elements. United States Proposed Jury Instructions at 16 (Dkt. 162); Defendant Proposed Jury Instructions at 39 (Dkt. 164); see 18 U.S.C.

§ 1343; Ninth Circuit Model Jury Instruction 8.124. First, the defendant must have knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises or omitted facts; second, the statements made or facts omitted as part of the scheme were material; third, the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; fourth, the defendant used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme; fifth, the scheme affected a financial institution. See United States Proposed Jury Instructions at 16; Defendant Proposed Jury Instructions at 39; see 18 U.S.C. § 1343; Ninth Circuit Model Jury Instruction 8.124.

The parties stipulated prior to trial that the alleged affected a financial institution. Stipulation as to Scheme "Affecting" a Financial Institution (Dkt. 191). Nor is there any dispute that the alleged scheme involved the use of an interstate wire communication. Stipulation Regarding Interstate Wire Communications (Dkt. 174). The parties do dispute the other elements of Defendant's wire fraud and conspiracy to commit wire fraud charges. Specifically, Defendant has argued that there is insufficient evidence to permit a reasonable jury to find that the Government has met its burden on the first, second, or third elements.

## II. LEGAL STANDARD

To evaluate a motion under Federal Rule of Criminal Procedure 29, the Court "must determine whether, viewing the evidence in the light most favorable to the government, the jury could reasonably find the defendant guilty beyond a reasonable doubt." United States v. Merriweather, 777 F.2d 503, 507 (9th Cir. 1985) (quoting United States v. Hazeem, 679 F.2d 770, 772 (9th Cir.), cert. denied, 459 U.S. 848 (1982)); see also Fed. R. Crim. P. 29.

The Court is primarily concerned with Defendant's argument that the Government has not satisfied the second element of wire fraud, which requires the Government to prove that the statements Defendant made to Hewlett-Packard ("HP") were "material." See Ninth Circuit Model Jury Instruction 8.124; 18 U.S.C. § 1343.

Under <u>United States v. Lindsey</u>, 850 F.3d 1009 (9th Cir. 2017), a false statement satisfies the materiality element of wire fraud "if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." <u>Id.</u> at 1013; see also <u>Neder v. United States</u>, 527 U.S. 1, 16 (1999). It need not actually have influenced a decisionmaker. <u>Id.</u> Whether or not a statement is so capable is evaluated objectively. <u>Id.</u> In addition, materiality must be assessed in the context in which the communications occurred; in consequence, industry practices, agreements between the parties, and other information known to the parties at the time of the allegedly false statements are relevant to assessing those statements' materiality. See <u>United States v. Green</u>, 698 F. App'x 879, 880 (9th Cir. 2017).

## III. DISCUSSION

Here, there are two pieces of evidence that are crucial to understand the context in which the allegedly materially false statements that Defendant provided to HP occurred: an International Swaps Dealers Association agreement between HP and Barclays, also known as an "ISDA," Trial Transcript at 481:6-8, and the generally-understood industry practice of "pre-positioning."

The ISDA between HP and Barclays expressly stated that both HP and Barclays entered into "each Transaction as principal (and not as agent or in another capacity, fiduciary or otherwise)." Trial Exh. 149 at 28. It further stated that:

> This agreement and each transaction have been entered into by each party in reliance only upon its judgment in order to accomplish legitimate business needs. Neither party holds itself out as advising, or any of its employees or agents as having any authority to advise, the other party as to whether or not it should enter into this agreement or any transaction. Neither party is receiving any compensation from the other party for providing advice in respect of this agreement or any transaction, and any such advice provided to such other party will not form the primary basis for the investment decision of such other party.

<u>Id.</u>; Trial Transcript at 483:10-23. Put simply, the ISDA establishes that the backdrop of the unwind was that HP and Barclays were engaged as principals at opposite sides of an arms-length transaction.

3

In his testimony, Zac Nesper, an HP employee who during the relevant period was the manager of HP's foreign exchange team and was the primary point of contact between HP and Barclays, Trial Transcript at 238:19-23, reinforced this understanding. He agreed that the ISDA was the "master agreement" governing transactions between HP and Barclays. Id.; Trial Exh. 149; Trial Transcript at 481:9-13. Nesper also stated that he was aware that the ISDA governed HP's relationship with Barclays in 2011 when the events at issue in this trial occurred. Trial Transcript at 522:21-523:5. Most relevantly, he confirmed that the ISDA "accurately describe[d] [his] own thinking about [his] relationship with Barclays when it came to the unwind," stating that he "was making [his] own decision about what was best for HP." Trial Transcript at 483:24-484:4. Indeed, Nesper acknowledged that he "bluffed" or was "BS-ing" Barclays during the parties' interactions—that is, he was not entirely truthful with Barclays—about the prices Nesper was seeing from other banks. Trial Transcript at 452:2-455:16, 455:17-457:20. He also indicated that he understood some of what Barclays told him to be "posturing," rather than entirely honest. Trial Transcript at 375:1-3; 451:11.

The ISDA, HP's corresponding understanding of the relationship between HP and Barclays and HP's own dishonesty are not the only background conditions in place at the time that are necessary to understand whether Defendant's allegedly false statements were capable of influencing an entity in HP's position to part with money or property. As the Ninth Circuit has instructed, the "standards generally applied in the lending industry at the time" are relevant to the materiality inquiry. Green, 698 F. App'x at 880.

Here, the Government's expert testified that banks like Barclays engage in "pre-positioning," also known as "hedging," wherein the bank changes its position prior to taking on an asset. Trial Transcript at 181:11-14. Such "pre-positioning" could "[p]otentially" mean that "the bank would act in advance of a transaction," that is, "place trades in advance of that transaction." Trial Transcript at 181:15-20. Indeed, Barclays' compliance manual expressly distinguishes between impermissible "frontrunning" and permissible "bona fide hedges." Trial Exh. 195 at 8. That compliance goes on to state that "[p]ositions may be established that are bona fide hedges (opposite side of the market) of either proprietary positions or the risk that is assumed or agree to be assumed in facilitating

4

the execution of a related transaction." Id. at 8. The parties agree that there are no rules or regulations, beyond banks' internal policies and any agreement that may be formed between two particular parties, that regulate pre-positioning, pre-hedging, or front-running of the type at issue here. Trial Transcript at 1020:19-23. So, evening assuming that FX options trading falls within the gambit of conduct prohibited by the rule against frontrunning—and the Government has offered no evidence for its intent-based reading of "bona fide," see U.S. Response to Defendant's Motion for a Judgment of Acquittal (Dkt. 214) at 7 n.3—there are undisputedly some types of pre-positioning that are permitted.[1]

All of this matters because someone in Nesper's position would evaluate the statements Bogucki made to him against this backdrop. And so the statements the Government argues satisfy the materiality element must also be evaluated in this context. The Court must thus determine whether, taking the facts in the light most favorable to the Government, a reasonable jury could conclude beyond a reasonable doubt that the statements the Government alleges were false or misleading would have been objectively capable of influencing someone in Nesper's position to part with money or property.

The Government has presented two alternative theories of guilt. It contends that Defendant committed wire fraud by either misappropriating confidential information, in violation of a duty of trust and confidence, or that he deprived HP of its property through material misrepresentations and half-truths. See, e.g., U.S. Proposed Jury Instructions at 41. The crux of the Government's first theory is that Barclays received confidential information about HP's plan to unwind its options that was not revealed to other banks, and the sharing of that information created a duty of trust and confidence.

The Court is unpersuaded that a reasonable jury could find that Defendant had a duty of trust and confidence from the evidence the Government has provided. There is nothing in the record to suggest that the mere fact that HP shared information with Barclays was sufficient to create such a duty of trust and confidence. And the cases that the

---

[1] The Government's expert's, William Martin, did not testify to the contrary. He specifically testified that he was unfamiliar with the Barclays' code of conduct, which, as discussed, did permit some forms of pre-hedging. See Trial Transcript at 859:1-13. There is thus no dispute that Defendant was, at the time, permitted to engage in at least some pre-positioning or pre-hedging.

5

Government relied on in the Rule 29 hearing for that position in fact proves the opposite.

In <u>United States v. Johnson</u>, Judge Garaufis permitted a case involving wire fraud allegations arising from an FX transaction to go to a jury on a misappropriation theory. 2017 WL 5125770, at *3-*4 (E.D.N.Y. Sept. 21, 2017). That decision, crucially, turned on the fact that the parties to the FX transaction at issue had entered into a variety of written agreements, including a non-disclosure agreement and a request for proposal. <u>Id.</u> at *1. So too with the cases that the Government relies on in its most recent filing. In <u>Carpenter v. United States</u>, 484 U.S. 19 (1987), the defendant violated an official newspaper policy and practice, <u>id.</u> at 2; <u>see</u> U.S. Response to Defendant's Motion for a Judgment of Acquittal at 18, and in <u>United States v. Hedaithy</u>, 392 F.3d 580 (3d Cir. 2004), the test-takers were required to sign a confidentiality statement, which they then violated, <u>id.</u> at 595.

There are no analogous documents here. In fact, the only written agreement governing this deal was the ISDA, which expressly stated that each party acted as a "principal (and not as agent or in another capacity, fiduciary or otherwise)." Trial Exh. 149 at 28. In other words, the terms of the contract here are precisely the opposite of the contracts that applied in <u>Johnson</u> and <u>Hediathy</u>. Moreover, in contrast to the cases on which the Government relies, Nesper testified that he understood part of what Bogucki told him to be "posturing," that is, not truthful. Trial Transcript at 458:17-459:11. The only possible understanding of that statement is that Nesper, and by extension HP, did not expect Barclays to be entirely forthright and honest. The evidence presented in this case has shown that, far from a fiduciary-like relationship, HP and Barclays operated as arms-length principals engaged in interactions for their own mutual benefit. Thus, no reasonable jury could conclude that Barclays, or Defendant, had acquired a duty of trust or confidence with HP.

As to the Government's second theory, that Defendant obtained HP's money or property via material misrepresentations and half-truths, the Government argues that the evidence shows that several statements Bogucki provided to Nesper "were lies" and that those lies were material. Trial Transcript at 1015:8-11. At the Rule 29 hearing and in its briefing on the issue, the Government pointed to five pieces of evidence of discussions between Bogucki and HP that, it argues, satisfy the element of materiality on this theory of

6

guilt.

The first is a chat transcript between Defendant and Nesper on the day after HP sold Barclays the first tranche, September 29, 2011. Trial Transcript at 1015:13; Trial Exh. 125. In that chat, Nesper observed that the volatility was "down pretty big this morning" which he "assum[ed] was [Barclays]." Trial Exh. 125 at 1. In the ensuing conversation, Bogucki told Nesper that "[w]e are still long a little bit of vega." Id. The Government further points to a phone call Bogucki participated in with another Barclays employee, Gugesh Guganeswaran, at the same time as the chat between Nesper and Bogucki. In that phone call, Guganeswaran told Bogucki that Barclays was, at that point, in fact "short." Trial Transcript at 568:9-15; Trial Exh. 124 at 2.

The parties dispute whether Guganeswaran was referring in his statement to Barclays' overall book or only to only to cable, see Trial Transcript at 1015:3-15, but even assuming favorably to the Government that both Guganeswaran and Defendant were referring specifically to cable in their statements—thus making Bogucki's statement to Nesper at odds with Guganeswaran's statement to Bogucki—Bogucki's statement to Nesper did not objectively have the capability of influencing Nesper, and by extension HP. The Government has offered no evidence, and indeed no explanation, of why someone in Nesper's position, who was himself engaged in "bluffing" and "BS-ing" Barclays, would have had reason to believe that Bogucki was, unlike Nesper himself, being truthful about Barclays' position in the context of their arms-length negotiations. And so there is no evidence to support the Government's theory that this statement was capable of influencing HP. As a result, this statement is insufficient to permit a reasonable jury to conclude beyond a reasonable doubt that Bogucki's statement that Barclays was "short"— even if false—would have been objectively material to a person in Nesper's position in persuading him to part with his money or property. That is, Nesper's own dishonesty and understanding that Barclays was at times "posturing," coupled with the lack of any evidence that Nesper or HP had reason to believe that Bogucki or Barclays were not engaging in their own, corollary, dishonesty, would prevent any reasonable jury from concluding that the statement that Barclays was "long" was material for the purposes of a criminal wire fraud prosecution.

7

Second, the Government points to a phone call between Bogucki, Nesper, and several others, prior to the unwind of the first tranche. In that phone call, Bogucki told Nesper that his "guys are not touching the market. They're not doing anything." Trial Exh. 115 at 23; Trial Transcript at 1025:10-13. But the Government's own expert testified that Bogucki's statement that they were "not touching the market" should not be interpreted to mean that Barclays was not engaging in any trading, because Barclays was a market maker, meaning that Barclays' "business is to make markets; and when customers come in, they want—part of their job is to offer offers, places where customers can buy, and offer bids or places where customers can come and sell cable options." Trial Transcript at 868:25-869:6. That is, Barclays' business model required it to touch the market, a fact of which Nesper was well aware. And, as with the first piece of evidence the Government points to, Nesper admitted that he was "generally bluffing" about prices he was receiving from other banks—information that was central to his negotiations with Barclays, in this specific conversation. Trial Transcript at 451:5, 451:24-452:20. Strikingly, Nesper recounted that he viewed other statements that Bogucki made in that very conversation as "posturing," Trial Transcript at 459:11, indicating that he did not take Bogucki's statements to be truthful or completely honest. Given Nesper's lack of honesty with Barclays, the evidence that Nesper believed that Barclays was likewise not being fully honest in its negotiations, and the lack of any evidence that Nesper would have had reason to believe that Barclays was not engaging in the market making which was part of its business, no reasonable jury could conclude that the statements contained in exhibit 115 were objectively capable of influencing HP or Nesper.

Third, the Government points to the transcript of a phone call on September 30 between Bogucki, Nesper, and another Barclays employee. Trial Exh. 139; Trial Transcript at 1025:14-18. The Government characterizes this exhibit as Bogucki telling Nesper that if HP determined that it did not want to unwind the second tranche with Barclays, none of Barclays' traders would "go near the market." Trial Transcript at 1025:14-18. But even on the Government's interpretation of that exhibit, the alleged misrepresentation is only a conditional: Barclays was telling HP that if HP went elsewhere, then Barclays would take, or not take, certain action. But HP did not go elsewhere. It unwound the second tranche

8

with Barclays. And the Government has offered no evidence or caselaw to support the argument that a conditional statement about a series of events that did not come to pass could permit a reasonable jury to conclude that, as a matter of criminal law, that conditional statement was materially false. A hypothetical is a thin reed indeed on which to hang criminal charges.

Fourth, the Government points a PowerPoint presentation that the Government claims Barclays showed to HP prior to either tranche of the unwind. Trial Transcript at 1025:19-24; Trial Exh. 112-B; <u>see also</u> Trial Exh. 112-A; Trial Transcript at 143:1-144:13. The first slide of that presentation contained a bullet point that stated that "[t]he benefit of confidentiality should, in [HP's] opinion, outweigh the effect of including multiple dealers. At a minimum, this confidentiality will be critical when executing the implied volatility component of the options." Trial Exh. 112-B at 1. This is an even shakier foundation for the Government's case. Not only is it unclear how that statement is false—after all, it merely offers Barclays' "opinion" and does not on its face make any promise or representation—to the extent that the Government is arguing that it was not only false but materially so, it is itself cabined by a statement on a later page in that presentation that Barclays is "not [HP's] advisor or fiduciary with respect to FX hedges contemplated." Trial Exh. 112-B at 11. It also warned HP that in any resulting FX transaction, Barclays "would act as a principal." Trial Exh. 112-B at 11. Put simply, giving this evidence the view most favorable to the Government, the presentation simply opines that confidentiality is important and then cautions that Barclays would continue to pursue its own interest. No reasonable jury could conclude that an isolated statement in a PowerPoint presentation, particularly when cabined by the disclaimer here, is objectively capable of materially misleading someone to part with money or property.

Fifth and finally, the Government points to a presentation sent to Barclays on September 6. U.S. Response to Defendant's Motion for a Judgment of Acquittal at 10-11; Trial Exh. 173-B; Trial Transcript at 137:21-144:14. In that presentation, Barclays recommended that HP unwind its options in three to four tranches and execute a "quiet execution." Trial Exh. 173-B. The Government argues that this advice could reasonably have led HP to infer that Defendant was promising not to drive down the market. U.S.

9

Response to Defendant's Motion for a Judgment of Acquittal at 10. But, that presentation also warned HP that it should "[p]rovide knowledge of the unwind to banks on a need-to-know basis and only the banks, such as Barclays, that are capable of being aggressive in size." Trial Exh. 173-B; Trial Transcript at 142:5-7. In other words, Barclays was warning HP that it was capable of doing the very thing that the Government alleges it did here: being "aggressive." And the presentation expressly alerted HP to that possibility and cautioned HP against sharing information unnecessarily. Nor does the presentation exclude Barclays from that warning—it warns HP about "banks"—not "other banks." Trial Exh. 173-B. No reasonable jury could find that such a warning could have materially misled HP.

So where does that leave the Court? None of the five pieces of evidence the Government has produced in its case in chief can sustain a finding that a reasonable jury could conclude beyond a reasonable doubt that Defendant made false statements or material omissions that were capable of influencing a person in Nesper or HP's position to part with money or property. None of these facts, thus, can satisfy the materiality requirement for the charges of wire fraud and conspiracy to commit wire fraud.

Nor does any of the other evidence on which the Government bases its case satisfy the materiality requirement of wire fraud. The Government has introduced evidence of phone calls between Defendant and Nesper on the morning of September 28, exhibit 119, and October 3, exhibit 140, and a chat between Bogucki and Nesper on October 4, Trial Exh. 145, which, the Government argues, contained material half-truths because Defendant attributed the drop in volatility to the external forces rather than to any action by Barclays. The Government further argues that these exhibits contained misleading statements about what actions Barclays was taking in the market between the first and second tranche. Trial Exh. 119; Trial Transcript at 72:17-274:11; see also Trial Exh. 140; Trial Exh. 145. But any half-truths in these statements were not material. Again, Nesper expected Barclays to be engaged in some trading, and took no actions to expressly limit what trading Barclays could take. Indeed, Nesper never even asked Barclays what its position was or attempted to impose any limits on how Barclays could position itself during this period. See Trial Transcript at 508:10-509:21. Nor was there any expectation of full disclosure between the

10

parties, as evidenced by Nesper's own lies to Barclays, his disbelief as to portions of what Barclays was telling him, and the terms of the ISDA that governed this transaction. Indeed, all of the chat transcripts between Bogucki and Nesper on which the Government relies contained a form disclaimer that Barclays was "a market participant acting in several capacities which may adversely affect any product's performance." See Trial Exh. 145 at 1; Trial Exh. 125 at 1. No reasonable jury could conclude beyond a reasonable doubt that, in this context, these half-truths could, objectively, have induced a person in Nesper's or HP's position to part with money or property.

Undeterred, the Government also contends that even if no individual piece of evidence meets the materiality standard, "[t]hat entire course of dealing and all of those communications can be fairly read by a jury to be a suggestion and representation by Mr. Bogucki to Mr. Nesper that 'We are not going to trade on this information in a way that is going to disadvantage you.'" Trial Transcript at 1027:6-10. But the Government's holistic analysis fails for precisely the same reason its piecemeal analysis does. Viewing the evidence in the light most favorable to the Government, there is simply no evidence in the record that, in the context of an arms-length transaction in which the parties bluffed and "BS-[ed]" each other, operated as principals, looked out for their own interests, and understood the other party to be "posturing," rather than providing strictly true information, someone in HP's position could, objectively, be induced by the statements in this case to part with money or property.

Nor does Nesper's subjective belief alter this conclusion. Trial Transcript at 335:15-24. As the Government has repeatedly pointed out to the Court, under Lindsey, the standard for materiality is objective.[2] Whether Nesper or HP were gullible, guileless, naïve, or actually took Defendant to be representing that Barclays would not take action that undermined the value of HP's options, in light of the relationship of the parties, the agreement governing their interactions, industry practice, HP's own dishonesty, and

---

[2] Even if Nesper's subjective intent were central to the materiality inquiry—which under Neder, it is not, see 527 U.S. at 16—Nesper did not testify that the allegedly false statements were material. Rather, he testified that if he had learned that Barclays was short when he believed it to be long, he "didn't even know what [he] would have done," and that it was "hard to speculate" on whether he would have behaved differently. Trial Transcript 282:1-14.

11

Nesper's expectations as to Barclays' dishonesty, no reasonable jury could conclude beyond a reasonable doubt that it was objectively reasonable for HP to be influenced by the statements the Government has identified.

The Government argues that whether or not Nesper was bluffing is irrelevant to whether the contested statements were material. It points to a case in which the victims of a fraud were themselves attempting to defraud the defendant, and the Court nevertheless affirmed the defendant's convictions for wire and mail fraud. U.S. Response to Defendant's Motion for a Judgment of Acquittal at 20; United States v. Brugnara, 2015 WL 5915567, at *12 (N.D. Cal. Oct. 9, 2015), aff'd, 856 F.3d 1198 (9th Cir. 2017). But the import of Nesper's own dishonesty and expectations regarding Barclays' honesty is not that it shows HP to have been attempting to defraud Barclays—and to be perfectly clear, the Court does not hold the view that HP was attempting to defraud Barclays—but rather that it shows what expectations the parties had for one another, and thus whether even false statements had the capability of influencing HP's decision-making. And for the reasons this Court has already described, nothing in the evidence suggests that HP was capable of being influenced to part with money or property by any the statements the Government has identified.

A touchstone of our criminal law is that no person "shall be held criminally responsible for conduct which he could not reasonably [have] understand to be proscribed." United States v. Lanier, 520 U.S. 259, 265 (1997). Here, the Government has pursued a criminal prosecution on the basis of conduct that violated no clear rule or regulation, was not prohibited by the agreements between the parties, and indeed was consistent with the parties' understanding of the arms-length relationship in which they operated. The Court cannot permit this case to go to the jury on such a basis.

## IV. CONCLUSION

For the foregoing reasons, The Court therefore concludes that, pursuant to Federal Rule of Criminal Procedure 29, no jury could reasonably find that Defendant Robert Bogucki made material false or fraudulent pretenses, representations, or promises. As a

result, the Court GRANTS the Defendant's Rule 29 Motion as to all counts in the superseding indictment and enters a judgment of acquittal as to all counts.

**IT IS SO ORDERED.**

Dated: March 4, 2019



CHARLES R. BREYER
United States District Judge

13