UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

v.

ROSS SHAPIRO and
MICHAEL GRAMINS,

Defendants.

S3 15-cr-00155 (RNC)

April 17, 2020

**MEMORANDUM OF LAW IN REPLY TO THE GOVERNMENT'S
RESPONSE TO DEFENDANTS' POST-APPEAL SUPPLEMENTAL
MEMORANDA IN SUPPORT OF RECONSIDERATION**

Mukasey Frenchman & Sklaroff LLP
2 Grand Central Tower
140 E. 45th St., 17th Floor
New York, New York
Tel (212) 466-6400

*Attorneys for Michael Gramins*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................2

ARGUMENT ..........................................................................................................................4

I.   The Court Should Grant Gramins' Motion for Reconsideration .............................................. 4

   A.   The Second Circuit's Decision Does Not Foreclose Gramins' Rule 29 Argument ......... 4

   B.   The Government Did Not Establish A "Nexus" Between its Counterparty Witnesses and the Mainstream Thinking Of Investors in the RMBS Market.................................. 6

II.  The Court Should Enter a Judgment of Acquittal Because Gramins' Due Process Rights Were Violated.................................................................................................................................9

   A.   Neither *Gramins* nor *Johnson* Foreclose Gramins' Due Process Arguments ............... 10

   B.   *Bogucki* Warrants Reconsideration of the Court's Due Process Decision..................... 14

   C.   Gramins' Due Process Rights Were Violated in This Case ........................................... 16

CONCLUSION.......................................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Chatin v. Coombe*,
　　561 U.S. 1 (2010)..................................................................................................... 10

*Holder v. Humanitarian Law Project*,
　　186 F.3d 82 (2d Cir. 1999)........................................................................................ 10

*Inturri v. City of Hartford, Conn.*,
　　365 F. Supp. 2d 240 (D. Conn. 2005)....................................................................... 10

*United States v. Litvak*,
　　808 F.3d 160 (2d Cir. 2015).................................................................................. 5, 19

*United States v. Bogucki*,
　　No. 18-CR-00021, 2019 WL 1024959 (N.D. Cal. Mar. 4, 2019)........................... passim

*United States v. Gramins*,
　　939 F.3d 429 (2d. Cir. 2019).................................................................................. passim

*United States v. Jabar*,
　　No. 09-CR-170, 2017 WL 4276652 (W.D.N.Y. Sept. 27, 2017) ...................................... 13

*United States v. Johnson*,
　　945 F.3d 606 (2d Cir. 2019).................................................................................. passim

*United States v. Lanier*,
　　520 U.S. 259 (1997)............................................................................................ 10, 18

*United States v. Litvak*,
　　889 F.3d 56 (2d Cir. 2018)................................................................................... 2, 5, 6

*United States v. O'Garro*,
　　700 F. App'x 52 (2d Cir. 2017) ...................................................................................... 13

*United States v. Saathoff*,
　　708 F. Supp. 2d 1020 (S.D. Cal. 2010)......................................................................... 18

*United States v. Shapiro*,
　　No. 3:15-cr-155, 2018 WL 2694440 (D. Conn. June 5, 2018)......................................... 2

**Other**

U.S. Const. amend. V........................................................................................................... 9

Defendant Michael Gramins, by his counsel, respectfully submits this Memorandum of Law in reply to the Government's Response to Defendants' Post-Appeal Supplemental Memoranda in Support of Reconsideration.

## PRELIMINARY STATEMENT

In its most recent submission, the government continues to distort the Second Circuit's decision in *United States v. Gramins*, 939 F.3d 429 (2d. Cir. 2019) (the "Appellate Decision"), and to stretch the Court's holding far beyond its scope.  The government erroneously claims that the Appellate Decision forecloses Gramins' ability to argue that the government failed to establish a "nexus" between its counterparty witnesses and the mainstream thinking in the RMBS market, and inaccurately maintains that the Appellate Decision resolves the serious due process concerns underlying this case.

The Second Circuit did not opine on the sufficiency of the government's "nexus" evidence, nor did its decision have any bearing on the question of whether Gramins' due process rights have been violated.  Instead, the Second Circuit ruled on a single, discrete issue – whether this Court abused its discretion in granting Gramins' motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure.  The government's attempt to improperly capitalize on cherry-picked language to extend the Court's decision beyond the issue presented should be rejected.

The trial evidence, even viewed in the light most favorable to the government, failed to establish the requisite "nexus" between the government's counterparty "victims" and the RMBS market at large.  To the contrary, the record in this case is replete with powerful proof that deceptive negotiating tactics were so rampantly used by both broker-dealers and buy-side counterparties that no reasonable investor in this market would have found misstatements about Nomura's acquisition costs to be material.  Accordingly, under the Second Circuit's holding in *United States v. Litvak* ("*Litvak II*"), 889 F.3d 56 (2d Cir. 2018)*,* the single count of conviction in

this case cannot stand. And nothing the Court said in the Appellate Decision forecloses this Court from entering a judgment of acquittal under Rule 29.

Moreover, the due process problems with this case – about which the Court has expressed concern since day one – have only grown stronger with time.  The trial evidence makes it abundantly clear that Gramins could not have been on notice of the illegality of his conduct, and the government's utterly arbitrary approach to addressing identical conduct – ranging from FINRA proceedings, to SEC civil actions, to criminal prosecutions, to no regulatory, civil or criminal response at all – makes clear that Gramins' due process rights have been violated.

The Court should grant Gramins' motion for reconsideration.

## BACKGROUND

On June 15, 2017, a jury convicted Gramins of Count One of the Third Superseding Indictment (conspiracy), acquitted him on Counts Two, Four, Five, Six, Seven, and Eight, and was unable to reach a verdict on Counts Three (securities fraud) and Nine (wire fraud).  Gramins thereafter filed a motion for a judgment of acquittal on Counts One, Three, and Nine pursuant to Rule 29 of the Federal Rules of Criminal Procedure, and a motion for a new trial on Count One pursuant to Rule 33.  ECF No. 476.

On June 5, 2018, this Court entered an order denying Gramins' Rule 29 motion but granting his Rule 33 motion.  *See United States v. Shapiro*, No. 3:15-cr-155, 2018 WL 2694440 (D. Conn. June 5, 2018).  On June 27, 2018 – at the Court's suggestion – Gramins filed a motion for reconsideration of the Court's Rule 29 decision in which he argued that the government failed to establish at trial, as required by the Second Circuit's decision in *Litvak II*, a "nexus" between the testimony of its counterparty witnesses and reasonable investors in the RMBS market.  ECF No.

520 (the "MFR").  Gramins also argued that the Court should reconsider its prior ruling on Gramins' due process claims.  The MFR remains *sub judice*.

On March 12, 2019, while the government's appeal of this Court's Rule 33 decision was pending, Shapiro and Gramins filed a supplemental brief in support of their respective MFRs, arguing that the Northern District of California's decision in *United States v. Bogucki*, No. 18-CR-00021, 2019 WL 1024959 (N.D. Cal. Mar. 4, 2019) provides further support for their materiality and due process arguments.  ECF No. 539.

On December 19, 2019, after Gramins' conviction was reinstated by the Second Circuit, the government filed a supplemental opposition to Gramins' MFR, arguing that it should be denied in light of both the Appellate Decision and the Second Circuit's decision in *United States v. Johnson*, 945 F.3d 606 (2d Cir. 2019).  ECF No. 542.  Gramins filed a response to the government's supplemental opposition on January 6, 2020.  ECF No. 544 (the "Post-Appeal Brief").

On March 4, 2020, the Court held a telephonic status conference during which it advised the parties that "it would be in everybody's interest if I asked you to provide me with some additional help with regard to [the defendants' motions for reconsideration]."  Status Conference of March 4, 2020, Tr. 4:3-5 (ECF No. 551).  Specifically, the Court stated:

> In [their post-Appellate Decision] memos, both Mr. Gramins and Mr. Shapiro take the position that [the Appellate Decision] does not foreclose relief on the due process claim that they lacked fair notice that their conduct was criminal. In addition, Mr. Gramins argues that the Second Circuit's opinion does not foreclose relief on the ground that the evidence submitted at the trial was insufficient to establish a nexus between the testimony of the counterparties concerning the significance they attached to the misstatements on the one hand and, on the other, mainstream thinking of investors in the market. Mr. Gramins reminds us that dishonesty in the RMBS market was rampant and counterparties not only knew to be wary of statements made by broker/dealers in negotiations, but engaged in misrepresentations themselves.
>
> I think no matter what happens with this case, it will be helpful to have the government respond to these arguments pointing out why the defendants are wrong in believing that they can still get out from under the case, notwithstanding the

Court of Appeals opinion. I think it would be helpful if the defendants were to have the final word.

*Id.* at Tr. 4:18-5:15.

On April 3, 2020, the government filed a Response to Defendants' Post-Appeal Supplemental Memoranda in Support of Reconsideration, arguing that the Appellate Decision forecloses reconsideration of the Court's denial of the defendants' Rule 29 motions, and that the Court should not reconsider its denial of the defendants' due process arguments.  ECF No. 553 ("Gov. Br.").

This submission follows.

## ARGUMENT

### I.  The Court Should Grant Gramins' Motion for Reconsideration

### A.  The Second Circuit's Decision Does Not Foreclose Gramins' Rule 29 Argument

The government maintains that the relief sought in Gramins' MFR is "foreclosed" by the Appellate Decision, arguing that "the Court of Appeals explicitly endorsed this Court's rejection of the Rule 29 motion."  Gov. Br. at 1.  This is an incorrect and overbroad reading of the Appellate Decision.

The sole issue before the Second Circuit was whether this Court abused its discretion in granting Gramins' motion for a new trial pursuant to Rule 33.  *See Gramins*, 939 F.3d at 447 ("The question before us today is . . . not whether the government introduced evidence sufficient to support the jury's conviction of Gramins on its theory of materiality, but whether the presentation of that evidence at trial gave the government an unfair advantage in pressing that theory to the jury.").  The question of whether the evidence was sufficient to sustain Gramins' conviction under Rule 29 was, by the Second Circuit's own explicit framing, not before the Court, and its opinion therefore cannot have resolved that issue.

Notwithstanding the narrow nature of the issue on appeal, the government broadly claims that the Second Circuit made a "rare mid-case ratification of the Court's Rule 29 decision" when it stated that "[t]he district court . . . properly applied our holdings in [*Litvak I* and *Litvak II*] in denying Gramins's motion for judgment of acquittal."  Gov. Br. at 2 (citing *Gramins*, 939 F.3d at 447).  Given the Court's own view regarding the limited scope of its opinion, its reference to its prior holdings in *Litvak I* and *II* – namely, that counterparty testimony regarding the importance of a defendant's misrepresentations *can* support a securities fraud conviction – simply cannot be read as foreclosing this Court's authority to dismiss the conviction in this case.  No matter how much the government twists the Second Circuit's holding, nothing the Court said renders the misstatements in this case material *as a matter of law*.  *Cf. Litvak I*, 808 F.3d at 177-78; *Litvak II*, 889 F.3d at 67.  Thus, nothing in the Appellate Decision precludes this Court from reconsidering and granting Gramins' Rule 29 motion.

The government further distorts the Appellate Decision by claiming that the Second Circuit "had to . . . conclude (*under Litvak II*) that Wollman's testimony . . . was not idiosyncratic, *i.e.*, was in line with others in the market."  Gov. Br. at 3 (citing *Gramins*, 939 F.3d at 449-50).  Nowhere in its decision did the Court broadly opine that the entirety of Wollman's testimony paralleled the mainstream thinking of the RMBS market.  Instead, in order to resolve the discrete issue on appeal, the Second Circuit narrowly held that Wollman's use of terms like "brokering" and "facilitating" did "not contain erroneous statements of agency law" and was in line with the way that other counterparty witnesses described the role of broker-dealers in the RMBS market. *See Gramins*, 939 F.3d at 449-50; *see also id.* at 454 n.14 ("Unlike the testimony that concerned us in *Litvak II*, Wollman's testimony was within 'mainstream thinking of investors in that market,'

and did not suggest that reasonable investors in the RMBS market might have considered Gramins their agent." (internal citation omitted)).

The Appellate Decision, therefore, does not foreclose this Court from granting Gramins' MFR.

### B.   The Government Did Not Establish A "Nexus" Between its Counterparty Witnesses and the Mainstream Thinking Of Investors in the RMBS Market

At trial, the government made no attempt to establish a link between the viewpoints of its counterparty witnesses and the mainstream thinking of the RMBS market.  This alone is fatal to the government's case.  *See Litvak II*, 889 F.3d at 65 (it is the government's burden to set forth evidence of a "nexus").[1]  However, not only did the government fail to meet its burden, but the trial record in this case affirmatively demonstrates that no such "nexus" exists.

As set forth in great detail in the MFR and the Post-Appeal Brief, it is undisputed that (i) lying was rampant in the RMBS market, (ii) virtually every broker-dealer was using deceptive negotiating tactics, and (iii) counterparties were well-aware of this conduct and therefore routinely discounted unverifiable information about broker-dealers' acquisition costs.  *See* MFR at 12-14 (detailing the prevalence of the tactics in the RMBS market and testimony from the counterparty witnesses about their skepticism); *see also, e.g.*, Tr. 1279:16-22 (Harrison "approach[ed] trading" as a "pessimist" and a "skeptic"); Tr. 2225:3-6; Tr. 2220:12-17 (Wollman knew to be "on [his] guard" during negotiations and that broker-dealers sometimes "spin" and "shade" information). Indeed, "every trader on Wall Street" used the tactics.  Tr. 341:20-24.

---

[1] In fact, the government seemingly went out of its way to avoid painting a broad picture of the RMBS market by declining to call a single expert witness or any fact witnesses from four out of the eight "victim" institutions named in the indictment.  Even worse, based on the interview notes that the government turned over to the defense, the government has never even *spoken* to three of the eight "victims" about the allegations in this case.

It was also clear at trial that buy-side investors regularly made misstatements during negotiations in order to maximize profits. *See* MFR at 14-16 (describing the array of dishonest tactics used by the buy-side); *see also, e.g.*, Tr. 1291:15-20 ("Q. Do you [Zach Harrison] agree with me that you were giving Mr. Peters the color . . . that you in the last chat described as BS? A. Yes."); Tr. 1305:3-1307:9 (Harrison working in tandem with his boss to deceive Feely in order to execute a trade at a favorable price); Tr. 2389:18-2390:25 (Marks deployed a number of negotiating tactics, including indicating to dealers that he valued bonds at lower prices than the ones actually reflected in his model). Nor was the evidence concerning buy-side deception confined to the examples set forth during the testimony of the counterparty witnesses; the Nomura witnesses readily confirmed that the buy-side at large regularly attempted to deceive broker-dealers. *See, e.g.*, Tr. 357:22-24 (counterparties lied "all day" to Dinucci); Tr. 1889:15-1890:7 (experienced salespeople at Nomura warned Chao of the tactics used by the buy-side).[2] In fact, even Zach Harrison's testimony was replete with complaints about buy-side misconduct. *See, e.g.*, Tr. 810:20-21 ("[B]uy side accounts were also engaging in bad protocol."); Tr. 1179:9-11 ("Not clear if [the dealer] lied to me or the account lied to him[.]").

Against this backdrop, it is impossible to sync the counterparties' testimony about the "importance" of Gramins' misstatements with the viewpoints of objective, reasonable investors in the RMBS market. *See, e.g.*, *Bogucki*, 2019 WL 1024959, at *6 (granting a Rule 29 motion because the government failed to prove materiality "in the context of an arms-length transaction in which the parties bluffed and 'BS-[ed]' each other, operated as principals, looked out for their

---

[2] The testimony from the Nomura witnesses – that essentially everyone in the RMBS market engaged in the same conduct – provides a critical distinction between the record in this case and that in *Litvak II*, where no Jefferies traders were called as witnesses. That testimony paints a much more realistic and complete picture of the RMBS market as a whole and makes clear that the few counterparty witnesses called by the government were well-outside the mainstream thinking of objective, reasonable investors in this market when they testified about the "importance" of accurate information concerning Nomura's acquisition costs.

own interests, and understood the other party to be 'posturing'").  In fact, Zach Harrison effectively drew a divide between himself and an objective, reasonable investor when he testified that he disregarded advice from his boss – an experienced industry vet who had previously worked as a trader at Lehman Brothers – concerning the likelihood that Nomura was being dishonest in a certain transaction.  *See* Tr. at 741:15-742:16; Tr. 1128:8-11; *see also* Tr. 2375:7-9 (Marks: "My supervisor was always warning me that people might say anything to convince you to pay more for a bond than you really should be.").[3]

Finally, even if the government had established at trial that an objective, reasonable investor would have provided comparable testimony about the "importance" of Gramins' misstatements – which it never did – the counterparties' use of the word "important" cannot be viewed in a vacuum.  Indeed, while counterparties claimed that information about Nomura's acquisition costs was "important" to them, they "very often" bought RMBS without knowing, considering, or caring about this data point. *See* Tr. 1525:8-12; *see also* Tr. 939:18-23.  Nor did counterparties ever ask for written documentation to confirm this supposedly "important" information.  *See, e.g.*, Tr. 1531:25-1532:8*;* Tr. 934:14-20; *cf. United States v. Bogucki*, No. 3:18-cr-00021 (N.D.N.Y.), Feb 28, 2018 Hearing Tr. at 1014:9-10 (ECF No. 226) (the Court: "[I]f this were so important to [the victim], why didn't he put it in writing?").  In fact, when looking at the trial record as a whole, it is clear that *any* additional information about a transaction would have been welcomed as "important" to the counterparties.  *See, e.g.*, Tr. 1522:17-19 (Abbas wanted "whatever information [he could] get [his] hands on"); Tr. 2334:11-13 (Marks testified that "*every*

---

[3] Curiously, in a separate transaction, Harrison suspected that a Nomura trader might have been lying to him but decided to purchase the bonds anyway.  *See* Tr. 1168:1-13.  In that regard, it is difficult to square Harrison's viewpoints with the RMBS market at large when even his own opinions do not have a nexus to one another.  *Compare also* Tr. 769:5-13 (it would have been "important" for Harrison to know the price at which Nomura purchased bonds); *with* Tr. 1143:11-22 ("cost basis," meaning the price at which he or another party previously purchased a bond, was not relevant to Harrison "in the vast majority of instances").

additional piece of information would be important to me and could affect my future negotiations")
(emphasis added).

This testimony dilutes the meaning of the word "important" as it relates to the definition
of materiality.  *See* Tr. 2647:4-7 (the Court instructing the jury that "[t]o be material, a false
statement of fact must be *of such importance* that it could reasonably be expected to cause a
reasonable investor to act or not act in some way with respect to the transaction at issue")
(emphasis added); *see also id.* at 2647:15-23 ("[T]he government must prove beyond a reasonable
doubt that there was a substantial likelihood a reasonable investor in the non-agency RMBS market
would view the misstated fact as one that *significantly altered the total mix of information* available
to the investor.") (emphasis added); *compare* Tr. 825:24-826:1 (Harrison describing information
about Nomura's acquisition cost as "helpful").  In other words, based on the record in this case,
the fact that counterparties testified that Gramins' misstatements were "important" does not
necessitate a conclusion that a reasonable investor in the RMBS market would have found
Gramins' misstatements to be *material* to their investment decisions.

The government has therefore woefully failed to establish that a reasonable investor in
the RMBS market would have found Gramins' misstatements to be material.

## II.  The Court Should Enter a Judgment of Acquittal Because Gramins' Due Process Rights Were Violated

The Court should enter a judgment of acquittal for the additional reason that Gramins' due
process rights were violated by the indictment in this case.

The Due Process Clause dictates that "[n]o person shall be . . . deprived of life, liberty, or
property, without due process of law."  U.S. Const. amend. V.  "A conviction fails to comport with
due process if the statute under which it is obtained fails to provide a person of ordinary
intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages

seriously discriminatory enforcement." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (citation omitted).  Courts considering as-applied challenges utilize a two-prong test: "A court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Chatin v. Coombe*, 186 F.3d 82, 87 (2d Cir. 1999) (citation omitted).

In this case, it is clear that a "person of ordinary intelligence" would have had no reason to believe that engaging in commonplace negotiating tactics in the RMBS market was unlawful.

### A.      Neither *Gramins* nor *Johnson* Foreclose Gramins' Due Process Arguments

The government claims that the Appellate Decision somehow "undermines" Gramins' due process arguments because the Second Circuit stated that misrepresentations about a counterparty's bids or offers *can be* material.  Gov. Br. at 6-8.  The government is wrong,

The Appellate Decision, which resolved a discrete Rule 33 dispute, did not even address the sufficiency of the evidence underlying Gramins' conviction, much less answer the question of whether Gramins' due process rights have been violated by the charges in this case.  And, even if the Second Circuit did rule on the sufficiency of the evidence against Gramins – which it clearly did not – the government fails to explain how a 2019 opinion has any bearing on whether Gramins was on fair notice of the illegality of conduct in which he engaged from 2010 to 2013, the time period at issue in this case.  Indeed, the Second Circuit itself commented on the "novel form of prosecution" and the many "issues of first impression" it raised.  *Gramins*, 939 F.3d at 454.   The Court's inquiry here must focus on the legal landscape that existed *at the time* that Gramins engaged in the charged conduct.  *See United States v. Lanier*, 520 U.S. 259, 267 (1997) ("[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear *at the relevant time* that the defendant's conduct was criminal." (emphasis added)); *see also Inturri*

*v. City of Hartford, Conn.*, 365 F. Supp. 2d 240, 254-55 (D. Conn. 2005) ("[W]hen considering an "as-applied" [due process] challenge, a court must consider the context in which the regulation was enforced, *i.e.*, it must evaluate the underlying conduct by reference to the norms of the subject community." (collecting cases)).

The government further argues that Gramins' due process argument is undermined by the Second Circuit's decision in *United States v. Johnson*, 945 F.3d 606 (2d Cir. 2019).  Gov. Br. at 8-12.  The government is again misguided.

In *Johnson*, a former HSBC trader was convicted of wire fraud and conspiracy after he misrepresented to a counterparty that HSBC would not "ramp the fix" – *i.e.*, trade currency in such a way as to artificially increase the currency's fix price – in advance of converting a large volume of U.S. dollars to British pounds for the counterparty at a publicly available fix rate.  *Id.* at 1609-10.  On appeal, Johnson set forth two arguments as to why his due process rights were violated: (i) that there is "no rule prohibiting trading ahead of a fix," which is commonly known in the industry as "front-running," and (ii)  that he was convicted of a "standardless crime" because the government "is unable to explain when a fix transaction becomes criminal wire fraud."  *Id.* at 615.

The Second Circuit quickly disposed of Johnson's first argument because "Johnson was not convicted of frontrunning. He was convicted of making material misrepresentations to [the counterparty] about *how* HSBC would trade ahead of the fix and the price would be determined." *Id.*  As for Johnson's second argument, the Second Circuit held: "[T]he standard is clear: A defendant who executes a fixing transaction engages in criminal fraud if he intentionally misrepresents to the victim how he will trade ahead of the fix, thereby deceiving the victim as to how the price of the transaction will be determined." *Id.* at 616.  Accordingly, Johnson's judgment of conviction was affirmed.

In his Post-Appeal Brief, Gramins explained that *Johnson* is readily distinguishable from this case for several reasons. *See* Post-Appeal Brief at 11-12. First, Johnson's primary due process argument was rejected because the conduct that he claimed was acceptable in the industry was *different* from the conduct underlying his conviction, whereas, in this case, Gramins was indicted for the exact same conduct that occurred regularly in the RMBS market and that no one thought was illegal. Additionally, unlike in *Johnson*, no "clear" standard governed Gramins' conduct, nor did Gramins deceive any counterparties "as to how the price" of RMBS bonds "[would] be determined." *See Johnson*, 945 F.3d at 616. Instead, the trades in this case were executed at agreed-upon, "all-in" prices, and the only conceivable deception pertained to the portion of the all-in price that Nomura kept as a spread.

In response, the government contends that Gramins has "conflate[d] due process and willfulness" because "[w]hether or not Gramins's co-conspirators believed in the illegality of their own actions" has no bearing on whether Gramins' due process rights were violated. Gov. Br. at 12. This misconstrues Gramins' position. Gramins did not highlight the prevalence of the negotiating tactics in order to make arguments concerning willfulness, but rather to emphasize that, unlike in *Johnson,* there is no dichotomy between the conduct for which Gramins was convicted and the conduct that he argues was so commonplace during the relevant time period that he was not on fair notice of its illegality. *Compare Johnson*, 945 F.3d at 615-16 ("Johnson was not convicted of frontrunning. . . . So we need not express an opinion on the law relating to frontrunning in 2011.").

The government further argues that *Johnson* undermines Gramins' due process argument because: "The core principle in *Johnson* – articulated notwithstanding the absence of an applicable regulation in that case – is that where 'misrepresentations affected [a victim]'s decisionmaking

and deprived it of the right to control its assets,' a prosecution does not offend due process." Gov. Br. at 12 (citing *Johnson*, 945 F.3d at 615-16). This argument can be easily rejected, as the government is attempting to rely on a legal theory that is not at issue in this case.

The "right to control" theory is a recognized "property" interest under the mail and wire fraud statutes, which "prohibit 'any scheme or artifice to defraud, or for obtaining money *or property* by means of false or fraudulent pretenses, representations, or promises' through mail or interstate wire transmission." *United States v. O'Garro*, 700 F. App'x 52, 53 (2d Cir. 2017) (citing 18 U.S.C. §§ 1341, 1343) (emphasis added). Under the "right to control" theory, "the withholding or inaccurate reporting of information that could impact on economic decisions can provide the basis for a mail [or wire] fraud prosecution." *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 1991); *see also Johnson*, 945 F.3d at 612 (upholding Johnson's conviction because "the evidence was sufficient to convict Johnson of wire fraud and conspiracy to commit wire fraud for depriving [the counterparty] of the 'right to control' its assets").

The government, however, did not advance the "right to control" theory at the trial in this case, and language addressing this theory was therefore not included in the jury instructions. *Cf. United States v. Jabar*, No. 09-CR-170, 2017 WL 4276652, at *8 (W.D.N.Y. Sept. 27, 2017) (government could not assert the "right to control" theory in its opposition to a Rule 29 motion when it "did not pursue such a theory at trial" and the court "did not charge the jury on this theory"). Thus, it is the height of irony for the government to argue that Gramins was on fair notice of the illegality of his conduct based on a legal theory that even the government did not think was worth pursuing at trial.

## B.     *Bogucki* Warrants Reconsideration of the Court's Due Process Decision

The *Bogucki* decision has far greater relevance to Gramins' due process argument than the

Appellate Decision (an opinion that has absolutely nothing to do with due process), and is far more

factually similar to this case than *Johnson*.

In *Bogucki*, in addition to holding that no reasonable juror could find that the defendant's

misstatements were material, the court noted that the case raised due process concerns because

"the Government has pursued a criminal prosecution on the basis of conduct that violated no clear

rule or regulation, was not prohibited by the agreements between the parties, and indeed was

consistent with the parties' understanding of the arms-length relationship in which they operated."

2019 WL 1024959, at *7.  Accordingly, the court decided that it "cannot permit this case to go to

the jury on such a basis."  *Id.*

As described further below, the same logic in *Bogucki* applies to the government's case

against Gramins.  In fact, comments made by United States District Court Judge Charles Breyer,

who presided over the *Bogucki* trial, on the issue of due process are strikingly similar to comments

that the Court has made in this case:

| Judge Chatigny | Judge Breyer |
|---|---|
| "[I]t would be helpful to me, from a big picture standpoint, to have a better understanding of why this is a criminal case. . . . What makes this a criminal case as opposed to a civil case? . . . Why not leave it to [the victims] to bring a civil action if that's in fact what happened? What is it about this that makes it wreak of criminal culpability? Why is this a criminal case rather than simply a civil case?"<br><br>Aug. 2, 2016 Hearing Tr. at 10:15-24; 11:25-12:5 (ECF No. 212) | "[The case is] a massive due process problem. . . . I think [the government] should address the fact that this is a criminal prosecution. . . . There may very well be a theory of civil liability. But this is a criminal case. This is a criminal case. You have to show intent. You have to show -- you have to show notice. You have to do a lot of things to comport with due process."<br><br>*United States v. Bogucki*, No. 3:18-cr-00021 (N.D.N.Y.), Feb 28, 2018 Hearing Tr. at 1013:9-16; 1014:22-1015:1 (ECF No. 226) |
| "The lines have to be clear. . . .  We're talking about the line that separates criminal from | "[T]he rules have to be very clear. Notice has to be very clear. Lines have to be very clear, |

| Judge Chatigny | Judge Breyer |
|---|---|
| non-criminal. It has to be clear. You can't use the criminal law to establish it. It's got to be there beforehand."<br><br>Trial Tr. at 275:7-14 | because when somebody crosses a line and is likely to end up in jail, you want that line to be clear."<br><br>*Id.* at 1013:18-21 |
| "[I]t's not a question of what was in the mind of a committee at Nomura that sat down to put together an aspirational statement that might appeal to customers."<br><br>*Id.* at 275:8-10 | "I don't know that somebody goes to jail by virtue of the fact that he didn't follow company policy."<br><br>*Id.* at 1021:4-7 |
| "No one had ever been charged with doing this, even though everybody did it, and certainly nobody had ever been convicted of doing it. They thought that it was okay, and the government has decided to use the criminal law as a means of educating the people in this industry about where the line is. Do we have a precedent for that? Is there any other area of securities regulation where the government proceeded by way of indictment rather than some lesser means?"<br><br>Apr. 24, 2017 Hearing Tr. at 62:6-15 (ECF No. 372) | "[Y]ou can't you take a business and then, after the fact, you impose a set of rules on them or views as to what they do and then prosecute them for having done it before they even know what the rules were. I mean, that is the essence of an improper prosecution as far as the Court is concerned."<br><br>*Id.* at 1031:2-6 |
| "If the regulators believe that an area needs to be better regulated, the way to do that is to publish regulations for comment and get feedback and give people notice. The way not to do that is to say, 'Well, let's pick a couple of people and prosecute them, and then everybody will know where the line is if we win, if we win.' That's something that's very much in my mind as I think about this case."<br><br>Trial Tr. at 276:10-18 | "It is wrong . . . and where I find fault with the Government, that they should assume the role of nanny of the FX options market. We're not here -- neither the Government, in its prosecutions, nor the Court -- to try to create a web of procedures and policies that -- from, perhaps, a moral or an ethical system -- makes some sense. . . . it's not up to the Courts and not up to the Executive Branch to create laws."<br><br>March 4, 2019 Hearing Tr. at 1039:20-10:40:3 (*Bogucki* ECF No. 227) |

It is clear that the Court's due process concerns here mirrored almost to a tee those expressed by the court in *Bogucki*.  This Court should therefore ignore the government's misplaced

reliance on the Appellate Decision and *Johnson* and instead look to *Bogucki* as further support for granting the Rule 29 motion on due process grounds.[4]

### C.    Gramins' Due Process Rights Were Violated in This Case

Remarkably, the government claims that there was nothing "new or surprising" about the prosecution in this case.  Gov Br. at 8.  The overwhelming evidence at trial, however, demonstrates just the opposite.

Not a single Nomura witnesses had any idea that using misleading negotiating tactics was unlawful.  *See, e.g.*, Tr. 343:4-5 (Dinucci "didn't think [the tactics] were illegal"); Tr. 1777:25-1778:2 (Chao "didn't think that using those kinds of negotiating tactics was wrong").[5]  As a result, the indictment of Jesse Litvak was a "major development" in the RMBS industry that "received a significant amount of attention."   Tr. 1777:9-19; *see also* Tr. 561:17 (RMBS traders were "obviously surprised" at the news of the *Litvak* indictment).   In fact, this novel theory of prosecution was so shocking that upper management at Nomura seemingly questioned the illegality of the conduct even *after* Litvak was indicted; not only did Nomura try to convince Caleb Chao to remain at the bank after discovering that he made misrepresentations to counterparties, *see* Tr. 1859:5-1860:6, but Conor O'Callaghan, a former Nomura salesperson and unindicted co-

---

[4] Judge Breyer's comments on materiality are also similar to statements that have been made by this Court.  *Compare Bogucki* Feb 28, 2018 Hearing Tr. at 1026:7-16 ("The last thing I would say was the [alleged victim] is a particularly gullible person. . . . He was lying to these people. He was puffing. He was being crafty . . . He was trying to work them into a better deal."); *with* Trial Tr. at 2986:22-2987:23 (this case it not about "widows and orphans," but about "sophisticated institutional investors that control billions of dollars" who "make huge sums of money on trades exploiting the lack of information about the price they paid").

[5] When questioned by the government, the Nomura witnesses all awkwardly testified that they never thought about the relationship between their conduct and the law.  *See* Tr. 1691:10-11 (Chao: "I wasn't thinking about it in legal terms"); Tr. 1935:7-9 ("Q. Now, Mr. Feely, did you ever think about this practice in legal terms? A. No, I did not."); Tr. 176:5-7 (Dinucci: "I didn't think about the legality behind it when we were actually doing it.").  That questions of legality never crossed their minds supports Gramins' position on notice, as the practice apparently did not strike any of the traders as close enough to the line to suggest such concerns.

conspirator in this case, continued working at Nomura long after Gramins was indicted. *See* Tr. 614:15-20.[6]

Because no one thought that the conduct at issue was illegal, neither the Nomura RMBS desk nor the market at large reacted to the negotiating tactics in a manner that would normally be expected when felonious conduct is at play. There was no effort on the Nomura RMBS desk to conceal the tactics; to the contrary, the tactics were openly discussed among junior and senior traders and salespeople. *See* Tr. 287:14-23; 1889:1-8. Before *Litvak*, Nomura traders thought that the biggest consequence they might face from using the tactics was a customer relations issue that could result in getting put in the "penalty box," a well-known practice where a counterparty would stop sending orders to a broker-dealer for a period of time because the counterparty was displeased with the dealer's conduct. Tr. 168:25-169:5; 289:6-14; 348:17-20. However, even the penalty box was of limited significance, as counterparties would typically resume engaging with the dealer once "they deemed that [the dealer] had been punished well enough," Tr. 169:3-5, and would sometimes forgo the use of "the box" entirely if the economic value of trading with the dealer

---

[6] The viewpoints of the Nomura witnesses whom the government did *not* call to testify at trial further demonstrate that this prosecution was indeed both new and surprising, and refutes the government's claims to the contrary. As the government is well-aware, these witnesses too had no idea that they could be prosecuted for using commonplace negotiating tactics:

- Nomura trader Jonathan Fleisher's reaction to the Litvak indictment was "[e]xtreme shock and concern" because "[u]p to that point [he] had no idea what we were doing could have been considered securities fraud." DX 3516T at 58:10-17 (Jonathan Fleisher grand jury testimony); *see also* DX 3516A at 6 (notes from government interview of April 30, 2015) ("FLEISHER was shocked to hear about the details of the Litvak case in or around January of 2013, because it didn't register that Litvak's conduct was remotely illegal.");

- Nomura salesperson Conor O'Callaghan thought that the *Litvak* indictment was "big news" and "game changing." DX3507D at 4 (notes from government interview of May 28, 2015);

- Nomura trader Eric Horowitz stated that "Nomura was 'loose' without rules before the Litvak case" and that "'shading the market' was a method of salesmanship." DX3531B at 6 (notes from government interview of March 12, 2015); *see also* DX3531A (notes from government interview of February 19, 2015) (Horowitz's attorney "did not think that Horowitz believed, prior to the *Litvak* indictment, that he was engaged in criminal activity").

outweighed the remedial benefits of imposing the temporary punishment.  Tr. 1096:25-1097:7.

Indeed, counterparties even recognized the humor in the fact that everyone in the market was

bluffing one another.  *See, e.g.*, Tr. 816:6-817:15 (Zach Harrison created widely circulated

animated videos that depicted humorous interactions in which dealers were "very likely dishonest"

with him, as well as deception used by the buy-side).  This backdrop is impossible to square with

the government's contention that "a person of ordinary intelligence" would have known that

Gramins' negotiating tactics were illegal.  *See* Gov. Br. at 12.[7]

Given the undisputedly widespread and common use of the trading tactics at issue, the

government's wildly arbitrary approach to regulating this conduct further supports Gramins' due

process claims.  *See* Post-Appeal Brief at 9-11 (detailing the inconsistency of the government's

enforcement).  This has ranged from no consequences at all, to FINRA inquiries, to SEC civil

actions, to criminal prosecutions.  It is hard to imagine how Gramins could have been on fair notice

that he was committing a crime when even the government cannot decide on the appropriate

punishment for the conduct.[8]

Finally, as Gramins argued in his Post-Appeal Brief, it is simply not credible that dozens

of RMBS traders from major Wall Street banks all decided that engaging in negotiating tactics

---

[7] The Court should also ignore the government's argument that "*Johnson* reminds us that fraud statutes are more than sufficiently clear to a person of ordinary intelligence."  Gov. Br. at 12.  Gramins is clearly not arguing that the securities and wire fraud statutes are unconstitutionally vague; he is arguing that the application of these statutes to his conduct is unconstitutional.  *See Lanier*, 520 U.S. at 266 ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."); *see also United States v. Saathoff*, 708 F. Supp. 2d 1020, 1035 (S.D. Cal. 2010) ("Although the honest services statute is not unconstitutionally vague on its face . . . it is vague *as applied* to these defendants.").

[8] For the reasons set forth in his initial Rule 29 motion, Gramins maintains that his only "post-*Litvak*" trade introduced at trial was carefully conducted in accordance with the guidance that Nomura's compliance department provided to traders after Litvak was indicted.  *See* ECF No. 476 at 13-15, 26-28.  In short, Gramins and a senior salesperson decided that Gramins should tell Wollman that "80-and-a-half is the best I can get them to you," and that, if asked, Gramins should neither reveal nor misrepresent Nomura's spread. *See* GX 29F.  This language adhered to the instructions that Gramins had received from Nomura compliance personnel – *i.e.*, that he could give counterparties the price "to you" without saying more and avoid any misrepresentations. *See* Tr. 1846:23-1847:4.

was worth the risk of felony convictions and jail time. Nor would it make any sense whatsoever that the counterparties, who owed fiduciary dues to their clients, would have reacted to being criminally defrauded by simply putting broker-dealers "in the box" (so long as they would not miss out on profitable trades) and creating cartoon videos. None asserted civil claims. In fact, even after learning that the *government* believes that Nomura traders acted unlawfully, counterparties did not hesitate to do business with them. *See, e.g.*, Tr. 1886:2-7 (Abbas was still trading with Caleb Chao at the time of trial); Tr. 2430:11-13 (Marks would still trade with Peters if he could).

The only logical and fair conclusion is that no trader in the RMBS market – Gramins included – had notice that the conduct at issue in this case could result in a criminal indictment.[9] The Court should therefore vacate Gramins' conviction and dismiss the outstanding charges against him.

---

[9] The driving force behind the first *Litvak* indictment was not that a counterparty had been victimized, but that Litvak's misstatements defrauded the Department of Treasury ("Treasury") because some of his "victim" counterparties traded RMBS through funds that were established under the Public-Private Investment Program ("PPIP") created by the Treasury during the financial crisis. *See* Jan. 28, 2013 DOJ Press Release, *available at* https://www.justice.gov/usao-ct/pr/connecticut-rmbs-trader-charged-securities-fraud-defrauding-tarp-program ("As most Americans tried to keep their heads above water during the financial crisis, Jesse Litvak is charged with trying to profit from the taxpayer-funded bailout known as TARP. . . .The charges paint a picture of Litvak shamelessly lying to dupe the Government into overpaying for mortgage securities with bailout funds.").

This same theory was initially pursued against Gramins in the original indictment returned in this case. *See* ECF No. 2 at ¶ 25; *see also* Sept. 8, 2015 DOJ Press Release, *available at* https://www.justice.gov/usao-ct/pr/indictment-charges-3-former-nomura-rmbs-traders-multiple-fraud-and-conspiracy-offenses ("The victims of this alleged conspiracy include . . taxpayer-provided bailout funds that helped our nation to recover from the 2008 financial crisis. The Government bought [RMBS] through TARP's [PPIP] to unlock frozen credit markets during the financial crisis, not to become a victim of this criminal scheme by these Nomura traders, and to overpay for securities."). However, after the Second Circuit in *Litvak I* rejected the government's theory that Litvak's misstatements were capable of influencing the Treasury, *see* 808 F.3d at 172-74, a grand jury returned the first superseding indictment in this case, which removed all references to the Treasury's PPIP program. *See* ECF No. 115.

It is clear that the government's theory of prosecution has been flawed since day one, and thus highly questionable whether the *Litvak* line of cases would have ever been pursued had the government not overreached in the first instance by seeking to criminalize common negotiating tactics in the RMBS market as somehow constituting a fraud on the Treasury.

*****

As this Court has opined, this case has always been better suited for – at most – a civil lawsuit.  While neither Gramins nor Nomura has been sued by any of the "victim" counterparties, the SEC has asserted claims against Gramins, and that case remains pending.  *See SEC v. Shapiro*, No. 15-cv-7045 (S.D.N.Y).[10]  Those claims have serious potential consequences.  Simply put, Gramins has already suffered, and will continue to suffer long into the future, professionally, psychologically, and financially as a result of the charges in this case.

Gramins was placed on leave by Nomura in 2014 and, since that time, has endured the shame of a criminal indictment, the overwhelming stress of preparing for a criminal trial, the devastation of a felony conviction, and the complete heartbreak of the Second Circuit's reversal of this Court's Rule 33 decision.  Throughout this time, Gramins has watched his family suffer, his finances deplete, and his professional opportunities vanish.  After nearly six years of turmoil, Gramins still has no clarity as to what his future holds.  Instead, he has had no choice but to sit and wait while others implicated by these cases have moved on with their lives.  Indeed, even the government – which devoted so much time and effort to this series of RMBS prosecutions, and which has sustained only a single count of conviction among a total of 57 counts that were submitted to juries in a total of four trials, has declared victory and moved on.[11]

There is no question that Gramins' world has already been turned upside down by this prosecution.  In fact, just last month – in the midst of trying to remain safe during the COVID-19

---

[10] Although the SEC dismissed its case against Tyler Peters in its entirety, it has declined to afford the same treatment to Gramins.

[11] Several weeks after this Court vacated Gramins' conviction, the former U.S. Attorney for the District of Connecticut announced that, despite the government's dismal track record, it nonetheless achieved its goal of "deterrence."  *See* Jack Newsham, Former Conn. US Atty Deirdre Daly Joins Finn Dixon, Law360 (June 27, 2018), *available at* https://www.law360.com/articles/1058033/former-conn-us-atty-deirdre-daly-joins-finn-dixon.

pandemic – Gramins and his family were forced to move from New York to North Carolina because they are no longer able to afford New York's high cost of living.  Gramins' career in the financial services industry is over, and no matter the final outcome of this case, the stigma of his criminal and civil charges means that he faces an uphill battle for the rest of his life both professionally and personally.

In short, enough is enough.  Gramins has already been disproportionately punished for engaging in conduct which was common and widespread, and which neither he nor anyone else in the RMBS market believed to be criminal.  Rule 29, the United States Constitution, and fundamental notions of fairness require that his conviction be vacated.

## CONCLUSION

For the reasons set forth above, as well as those previously set forth in Gramins' prior briefings, the Court should grant his Motion for Reconsideration of the Court's Ruling and Order denying his Motion for a Judgment of Acquittal, and grant such other relief as the Court deems just.

Respectfully submitted,

Mukasey Frenchman & Sklaroff LLP

By:  /s/ Marc L. Mukasey
    Marc L. Mukasey (CT29885)
    Jeffrey B. Sklaroff (PHV08423)
    Robert S. Frenchman (CT30437)
    2 Grand Central Tower
    140 East 45th Street, 17th Floor
    New York, NY 10017
    Tel (212) 466-6400

    *Attorneys for Michael Gramins*

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that on April 17, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
      April 17, 2020

                                       /s/ Marc L. Mukasey
                                       Marc L. Mukasey
                                       Mukasey Frenchman & Sklaroff LLP
                                       2 Grand Central Tower
                                       140 E. 45th St., 17th Floor
                                       New York, New York
                                       Tel (212) 466-6400