# EXHIBIT A

## EXHIBIT A

Immediate Family

A-1.      Letter from Natalie Gramins
A-2.      Letter from ████████
A-3.      Letter from Mary Gramins
A-4.      Letter from Thomas Gramins
A-5.      Letter from Margaret (Meg) Gramins
A-6.      Letter from Dr. Robert Gramins
A-7.      Letter from Timothy Gramins
A-8.      Letter from Dr. Daniel Gramins
A-9.      Letter from Monica Fairman
A-10.    Letter from John Gramins

Nomura's Counterparties

A-11.    Letter from Keri Findley
A-12.    Letter from David Rosenblum
A-13.    Letter from Michael DePietro
A-14.    Letter from Brian Loo
A-15.    Letter from Ben Hunsaker
A-16.    Letter from Ronald Mass
A-17.    Letter from Aaron Malik
A-18.    Letter from Peter Howard
A-19.    Letter from Anthony Contessa
A-20.    Letter from Jaime Arouh
A-21.    Letter from Jeff Katz
A-22.    Letter from Greg Handler

Extended Family, Friends, Colleagues, Etc.

A-23.    Letter from Kerry and Cheryl Carrington
A-24.    Letter from Dr. Nathan Carrington, Ph.D.
A-25.    Letter from Tyler Peters
A-26.    Letter from Julianne Peters
A-27.    Letter from Jesse Litvak
A-28.    Letter from Roberto Finzi, Esq.
A-29.    Letter from Robert Bogucki
A-30.    Letter from Father Kevin Wildes, S.J., Ph.D.
A-31.    Letter from Father Otto Hentz, S.J., Ph.D.
A-32.    Letter from John McNiff
A-33.    Letter from Steven Mayer
A-34.    Letter from Mark Ruddy, Esq.
A-35.    Letter from Brendan McNamara
A-36.    Letter from James Whitticom

A-37.        Letter from Michael Murray
A-38.        Letter from Jonathan Jason, Esq.
A-39.        Letter from ████████████
A-40.        Letter from Kaitlin Gramins
A-41.        Letter from Patrick Anderson
A-42.        Letter from Travis Skelly
A-43.        Letter from Marian Skelly
A-44.        Letter from Timothy Taylor
A-45.        Letter from Adam McBride
A-46.        Letter from Mike Shuler
A-47.        Letter from Maureen Shuler
A-48.        Letter from Dr. Shields Callahan
A-49.        Letter from Amanda Corey
A-50.        Letter from George Corey
A-51.        Letter from Timmy Albin
A-52.        Letter from Jay Evans
A-53.        Letter from Jeremy Bohrer, Esq.
A-54.        Letter from Ted Clark
A-55.        Letter from Katharine Baisley
A-56.        Letter from Ryan Craft
A-57.        Letter from Megan Philbin
A-58.        Letter from Brian Lafferty
A-59.        Letter from William Drew
A-60.        Letter from Brendan Dalton
A-61.        Letter from Mary Dalton
A-62.        Letter from Eliza McGrath
A-63.        Letter from Keenan McGrath
A-64.        Letter from Dave Staley
A-65.        Letter from Lois Peters
A-66.        Letter from Louis Annunziata
A-67.        Letter from PJ Collins
A-68.        Letter from Thomas Suehr
A-69.        Letter from Clayton Pope
A-70.        Letter from James Farrah, Esq.
A-71.        Letter from Matthew Daly, Esq.
A-72.        Letter from Michael Dolan
A-73.        Letter from Arthur Tergesen, Esq.
A-74.        Letter from Brendan Walsh
A-75.        Letter from Abigail Walsh
A-76.        Letter from Mary Ann Salemi
A-77.        Letter from Linda Warren
A-78.        Letter from Daniel Brupbacher
A-79.        Letter from Daniel DeYoe
A-80.        Letter from Lewis Meyers

A-81.      Letter from Matthew Gramins
A-82.      Letter from Lauren Troxler
A-83.      Letter from Craig Thessin
A-84.      Letter from Heather Lemarier
A-85.      Letter from Timothy Machir
A-86.      Letter from William Swayne
A-87.      Letter from Father Scott Pilarz, S.J., Ph.D.
A-88.      Letter from Kelsey Gramins
A-89.      Letter from James Gramins
A-90.      Letter from Kai Peters
A-91.      Letter from Colette Gramins
A-92.      Letter from Dr. Michael Graham
A-93.      Letter from Jim Fairman
A-94.      Letter from Katherine and Jennifer Fairman
A-95.      Letter from ███████████
A-96.      Letter from Karen Tognarelli, Esq.
A-97.      Letter from Maegan Boger
A-98.      Letter from Jacqueline Kort, Esq.
A-99.      Letter from Hayden Lockaby
A-100.     Letter from Kathleen Long
A-101.     Letter from Marsha Marko
A-102.     Letter from Robert and Kay Sladky
A-103.     Letter from Cheryl Gramins
A-104.     Letter from Rose Thessin
A-105.     Letter from Rhoda Maletta
A-106.     Letter from Bobbie Norris
A-107.     Letter from Michael Monteith, Esq.
A-108.     Letter from Hadley Schafer
A-109.     Letter from Michael Neumann
A-110.     Letter from Lauren O'Rourke, Esq.
A-111.     Letter from Claire Thingvold
A-112.     Letter from Jane Valley
A-113.     Letter from Kathleen Ralston
A-114.     Letter from Rory Shaw
A-115.     Letter from Peter Kirn
A-116.     Letter from Ellen Gaglione
A-117.     Letter from Sarah Hargadon, Esq. and Tim Hargadon, Esq.
A-118.     Letter from Virginia Cornyn
A-119.     Letter from Nora Andrews
A-120.     Letter from Keira Schuler
A-121.     Letter from Sarah Cockerill
A-122.     Letter from Rachel Cleaver
A-123.     Letter from Ryan Shuler
A-124.     Letter from Lucas Shuler

A-125.   Letter from Thomas Shuler
A-126.   Letter from Jamie Shuler
A-127.   Letter from Christine O'Neill
A-128.   Letter from James O'Brien
A-129.   Letter from Dennis Adams
A-130.   Letter from Kevin Shooshan
A-131.   Letter from Gene Miles
A-132.   Letter from Marcia and Tim McBride, Esq.

November 4, 2020

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103

Dear Judge Chatigny,

My name is Natalie Carrington Gramins, and I am married to Michael Gramins.  I have known Mike for 15 years, which seems like a lifetime because I can barely recall my life without him.  We have been married for almost 8.5 years, and I've watched Mike grow and mature from a confident 23-year old with the world at his fingertips, to a 38-year old who is a humble, kind and gentle husband and father.  Mike is not only my world, but he is the center of our children's universe.  They adore their daddy.  He views every day with them as a gift.

Mike and I met on the mortgage trading desk at Lehman Brothers in 2005.  He was a young, ambitious, over-achieving trader, and I was a new salesperson in the group after having transferred there from another part of the bank.  Our initial interactions were friendly, and he was very helpful whenever I had questions about the bonds he traded or the overall RMBS market.  I could tell that he was not only smart, but also motivated to excel in his role while supporting others on the team.  He was the epitome of a team-player, always staying late to learn from his superiors and to educate peers who needed extra guidance.  I was drawn to his personality, his ambition, and his smile.  That said, he was 23 at the time; I was 26, and I was not interested in dating someone at work.  Over the next year, Mike was persistent in growing our friendship, patiently awaiting the day when I would accept his offer to have dinner.  I finally thought to myself, "Why not go out with a guy who is nice, normal, funny and driven, versus going on blind dates or meeting people out at bars?"  I knew we could both be professional at work while exploring a romantic relationship, and I'd learned over the past year that, although Mike was young, he was much more mature than guys 10 years older than him.  Being the youngest of seven and coming from such a solid family really made him wise beyond his years.  So, the next time Mike asked me out, I decided to say yes, and we began dating in the Fall of 2006.

Over the next 5 years, Mike and I dated, and we went through some challenging times, such as the collapse of Lehman.  It was amazing how everyone came together during that period; Mike was particularly strong and optimistic, assuring me that we would both find jobs at Barclays and perhaps even better opportunities elsewhere.  When we saw the senior people from our groups at Lehman leaving to join Nomura, we were excited about the opportunity to build a business, to continue learning from people we respected, all while gaining valuable experience.  Watching Mike help to build the team at Nomura was exciting for me, as I knew how hard he worked and how much he cared about the overall organization.  He truly wanted to build a fantastic business and admired Charlie Spero a lot, given he was now co-Head of Fixed Income, a huge promotion from his role at Lehman and an important position overall in the financial business.  Mike's passion for trading, but also for his teammates, made me love him even more.  The drive and determination that he had during those first few years at Nomura was invigorating.  It made everyone around him want to work harder and perform at the top of their potential.  He is a born leader, and his charm and charisma make people excited to work with and

for him.  I was extremely proud to see how he poured his heart and soul into the business plan that Charlie and others had set for his group.

Mike was not only admired by colleagues, but he also developed amazing relationships with his clients. Many absolutely loved trading with him, and valued spending time with him both during and outside trading hours.  He was constantly in demand for dinners and social outings, often taking trips to see them on a moment's notice.  When we got married in 2012, and again when our son ▮ was born in 2014, we received a large number of gifts and cards from his clients.  We exchanged Christmas cards with a number of them, and I know that if he hadn't been in this situation for the last 5 years, they would still be very close.

You can imagine how difficult it has been for Mike to have all this taken from him.  He woke up every day excited to go to work, because it truly was a job he loved with people he enjoyed.  He is brilliant and could have chosen a number of careers.  After having an internship at Lehman, he knew that this was what he wanted to do.  We are both extreme extroverts.  The excitement we get from the energy of the trading floor or from talking to a variety of people each day drives our success.  It has been so difficult to see that environment taken from him, being forced to be at home, unable to go into an office and to work in a job that is somehow related to the markets.  He now has to live vicariously through me and his peers, and yet somehow, he still remains positive and upbeat.  He was taken out of his role at the prime of his career and at the prime of his life.  He's had five years (and counting) where he has been forced to find another path, to explore other ways to provide for our family and to also stay intellectually stimulated.

Initially, I saw Mike suffer under the weight of being indicted.  We couldn't fathom how this was happening, and yet, we had to stay positive and focus on the things we could control.  As such, Mike poured himself into his defense, working endlessly with his legal team, researching documents and explaining the markets since this was unknown territory to them.  Our son ▮ was a little over a year old, and a silver-lining was that Mike was at home more often to see him grow.  He cherished the extra time since he wasn't out at work dinners or on the road traveling, and we tried to make the most of what we had hoped would be an elongated "pause" in his career.

We also really struggled with the timing of when to try to grow our family.  We knew that we wanted a second child, and we were so fortunate that ▮ was a happy and healthy toddler.  We also knew that the trial would be approaching, yet the dates kept changing.  The uncertainty of our future weighed on us as a young couple and as new parents.  We finally resolved that we couldn't put our family plans on hold, as so much had already been taken from us.  We simply had to trust that if we were supposed to have another baby, the timing would work out somehow.  Thankfully, we were blessed with little ▮▮▮▮▮ who was born March 28, 2017, six weeks before Mike's trial.  As such, we spent the time when I was on maternity leave, a crucial period to be bonding with a new baby, in Hartford living out of the Residence Inn, instead of in our home.  I was so upset that we had to uproot our family during what is typically a nurturing time with a newborn.  I felt that I was robbed of that precious time with not only ▮▮▮▮▮ and ▮, but also with Mike. However, Mike approached this situation with optimism, being dedicated to the case and helping his lawyers prepare for each day in court, but also coming "home" to our hotel room each night to spend time with his family. You may even remember seeing me in your courtroom 3.5 years ago.  I was there every day, sometimes with ▮▮▮▮▮ strapped to my chest in a carrier.  I couldn't fathom missing those moments with her when she was so young, so we did what we could and made the best of the situation.  Looking back, I honestly have no idea how Mike did it.  He was focused

both on the case and on our children, making the most of every minute in the day and somehow waking up each morning with a positive attitude.

On that devastating day when we learned of the one count of conviction from the jury, I felt my entire body go numb. It was as though I was looking down on the courtroom, unable to imagine how this could possibly be happening. Mike and I cried together a lot that afternoon, realizing that the uncertainty would continue for much longer than we'd originally hoped. I couldn't bring myself to think about the next year and what the future might hold, because we were now facing an even longer road ahead. We took that afternoon to be sad, angry and frustrated, but then we snapped back to reality and knew that we had to stay focused on the positive things for our children. Despite living in Hartford for 6 weeks, they remained oblivious to the situation, and that is how it has remained to this day. ▮ still asks when we can go back to Connecticut so we can go to the Science Museum again. They love Mike so much, and we've felt that it has been imperative to shelter them from the weight of this case.

In the three years since the trial, Mike found a way to start a new role helping to build a business again. While he did a fantastic job for this firm, it was not his passion, which was evident to me every day. While I no longer see the same excitement in his face, I do see the continued determination. He found a way to continue helping to support our family despite the circumstances. That said, we quickly realized that we were not going to be able to sustain our life in New York City if there was no resolution to his conviction. However, when you granted Mike's motion for a new trial in 2018, we found new hope. We thought that perhaps we could stay in NYC, where we've lived our entire adult lives, and that we could possibly find a way to make it work. Then, in 2019, our hopes were crushed when we received the reversal of your decision from the 2nd Circuit, and it was now time for us to consider how to shift our lives to provide the best opportunities for our children given the limitations Mike is facing in pivoting his career and starting fresh.

Thankfully, I was able to find a new job in Chapel Hill, NC, and we moved here in March 2020. It was another very challenging time in our marriage, as Mike had to put his goals and aspirations aside, as well as his love of living in NYC and all our friends there, to focus on what was best for our family. We had to leave the neighborhood where we've raised our children since birth, separating them from their closest friends. We also have no choice but to sell our home on Long Island. This is a house that we built together as a newlywed couple, where we envisioned not only raising our children, but also hosting our grandchildren one day. This house is in the town where we got engaged, where we have more memories than I can possibly count. The thought of having to leave this town permanently has been heartbreaking. You can imagine that over the last five years, we have lost so many things. I have witnessed Mike lose the ability to communicate with so many friends and practically his entire network due to this case. Mike has sacrificed everything as a result of this conviction, and yet he is constantly upbeat and positive. He is always lifting me up, as I am overly stressed with all the weight on my shoulders of moving our family to a new town and starting a new job. He is a fantastic partner and wonderful father and has really embraced the role of being the rock in our family. We would be absolutely devastated and unable to function if he was not here.

Before concluding, I'd like to take a moment to describe Mike as a father. He was ecstatic when we found out we were pregnant with our first child. We decided that we would wait to find out the gender and wanted to be surprised in the delivery room. When that moment arrived, it is hard to describe the look of sheer joy on his face as the doctor announced that we had a healthy baby boy. She placed ▮ in Mike's arms and he had tears in his eyes as he brought the baby over to me. In looking at Mike early that morning with our son in his arms, I knew that the love I'd always felt for him could only continue to

grow as we raised a family together.  He is the most loving father and I am constantly reminded of that day when I see him with our kids.  They look up to him, seeing his positive attitude and constant determination.  He is a wonderful role model for them and some day, when they are old enough to understand the complexity and severity of our current situation, I know they will love him even more because he has remained a constant strength in their lives while sheltering them from the weight of this ordeal.

In addition, Mike has done his best to keep life fun and exciting for me and the kids.  Every Sunday this summer, we had family barbeque night, where Mike would grill burgers and hot dogs while the kids would help prepare the meal and shuck the corn with him.  Those simple cookouts are some of my fondest memories from this summer in our new home, as they just loved spending time with him.  We also spent afternoons at the local pool, where Mike focused on continuing ▓'s swim lessons (Mike was a lifeguard/swim instructor in high school and college), and the big accomplishment was getting ▓ to go off the diving board before summer's end.  Mike was so proud and took no less than 30 videos over the course of that hour when ▓ was diving into the deep end.  ▓▓▓▓▓ is completely a Daddy's girl, and her face lights up when he picks her up from school or when he comes in the door after running an errand.  He constantly has the kids outside in the yard, playing football, shooting basketball, or teaching them to ride bikes.  He even asked for a bike for his birthday this year so that he could ride around the neighborhood with them.  Finally, the relationship I have with Mike has continued to grow and strengthen throughout the last three years.  We are absolute partners in everything; his strengths play to my weaknesses and vice versa.  He continues to put me and the kids above all else and yet he still finds time to enjoy and celebrate the little things, bringing me flowers to brighten my mood or embracing me when I just don't know if I can power through another day.

This is all to say that Mike is our world, our everything, our eternal optimist.  The way he has grown over the last 15 years has been astounding to me, especially given all the adversity he has faced since being indicted.  So many men would have given up, turned to despair and depression, locked themselves away from the world and said, "poor me."  Mike has done the exact opposite.  When I am mad at the world for everything, he helps me find the silver-linings.  He helps me stay focused and optimistic and is my daily support from the weight of all of this.  I know that I should be the one supporting him, and yet, he is so strong that he does it for both of us.

I hope this gives you an idea of who Mike Gramins truly is, how he does everything for our family, and how much he has suffered since that Fall day in 2015 when his world was turned upside down.  He is a good man, a supportive husband, a loving father and he is our rock.  We appreciate the care you've taken in this case to examine every angle, and I hope this letter gives you a better view into his character, why I love him so much, and why it would be devastating if he is removed from our family.


Sincerely,

*Natalie C. Gramins*

Natalie C. Gramins



Dear Judge Chatigny
I am thankful
for DADDY because
he plays football
with me. He helps me
Jump off the
Divingboard and he
helps me read at
bedtime.
I love LOVE
DADDY SO much!

Exh. A-2



November 1, 2020

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street – Room 228
Hartford, Connecticut 06103


Dear Judge Chatigny:

This feels like a complete reversal.  People are always telling me what a wonderful person Michael is. Now the tables are turned and I will tell you about him.  Michael (Mike), is the youngest of our seven children. He was born nine months after the death of my father and five months before the death of my mother from the effects of a major stroke.  I was the primary care giver of both of my dying parents, as well as Baby Michael's mother.  How I cherished the joy of cradling this precious new baby in my arms after I had spent time earlier in the day caressing my mother's head and watching as she faded.  From the beginning, he was my treasure, my source of hope and promise in the midst of sadness and loss. Michael and I have been through a lot together.  I loved him intensely then, and my love and admiration of him has grown exponentially.

It's apparent that Michael embodies the love that was lavished on him by our entire family.  He is one of the most caring, openminded, bright, passionate, curious, honest, solid, and inclusive people I have ever met. He is a dedicated son, husband and father, brother, friend, neighbor, leader and citizen. Like my father, after whom he is named, Michael has a genuine interest in everyone he meets.  When he is with a person, he is able to draw them out and learn about them and their interests, always gifting them with his full attention.

Michael is also resilient, a gift cultivated during difficult times. As a child he was plagued with allergies and digestive issues; so many foods like cookies and milk, ice cream and bread were off limits. By the time he was two, going to the Deerfield depot to watch freight trains or driving downtown to the Shedd Aquarium proved to be great diversions on days when food limitations were bothersome. Before he was three, he would delight in naming every possible kind of freight car and identifying every railroad's logo.  At the aquarium he learned the name of every fish in the big tank, loved watching the scuba divers and became a lifelong devotee of Jacque Cousteau.  In time, he outgrew this health condition, but the <u>resilience</u> he developed because of it is very much a part of him.

**Ex. A-3**

This ability to persist would serve him well when he was as senior at Georgetown University. Mike was an excellent student majoring in Government in the College. As part of the Government Honors program, each candidate was required to write a thesis. The topic he tackled, *The Selection and Appointment Process for Federal Reserve Governors and Bank Presidents*, was ambitious in scope, probably better left for a dissertation. He was curious to learn how people who were appointed as governors of the Federal Reserve Banks neutralized their political affiliations as they stepped forward to guide our nation's fiscal policy. As a 22-year-old, Mike had the courage to make appointments with about a dozen of the governors including Ben Bernanke.  Each one he contacted agreed to be interviewed either in person in Washington, DC or Chicago or on the phone. He garnered large quantities of information from them. Next, he had to determine how to best organize it.  When he called his advisor to confer with him he discovered the professor was no longer on the faculty at Georgetown.

So, Mike set out on his own to organize the massive amount of valuable material and began writing, virtually around the clock.  About two weeks before it was due, Mike came to a seeming dead end and was so disheartened. But he pushed on and completed it. At his Georgetown Commencement, in addition to graduating *Magna Cum Laude*, he was awarded the prize for the top thesis within his program. But the story doesn't end there. In mid-summer, Michael and Georgetown received word that his thesis was awarded the prize for the Top Undergraduate Thesis in the United States by Pi Sigma Alpha, Political Science Honor Society. His vision, resilience, and persistence had paid off.

More recently, after he became one of the traders charged by the government in the RMBS affair, Michael decided that, rather than sit idly by, he would offer his services as a volunteer at the Jesuit elementary school, St. Aloysius, in Harlem.  The school had received a onetime grant that was about to expire and suddenly they faced an overwhelming shortage of funds.  For two years, Michael helped them organize fund-raising events in an effort to draw in enough money to stay open. Unfortunately, he was unable to contact any of his business friends with deep pockets because of the pending trial. Although they worked hard, the money they raised was insufficient to sustain the school and it was forced to close.  He was deeply disappointed because he knew that the quality of this Jesuit education would make a huge difference in the lives of its young students. But he tried.

Following the court case in Hartford, Michael again persisted. A friend of his was interested in forming a boutique law firm.  Mike agreed to help and became his chief operating officer handling a variety of duties: hiring staff, finding office space, developing clients, selecting computer platforms and employee benefits, – all the activities needed to help the firm thrive. After three years, the firm grew to five lawyers and a complementary support staff. Once again, Mike

refused to give in to self-pity. It quickly became apparent that Mike was capable of assisting the lawyers in a variety of ways, enjoying and mastering a goodly amount of challenging legal material; but any dream of law school must be on hold.

Stories about Michael's kindness, care, and service are legendary.  He has always loved to chat with people of all ages. When he was in junior high, Mike noticed that the elderly widow who lived next-door seemed to be growing confused.  Her son, who was handicapped by a palsy, lived with her.  He was becoming increasingly unable to do the chores. On his own volition, Mike decided that he would take over her grass-cutting and snow blowing.  He even dug out the invasive Buckthorn that was growing in her backyard and pruned dead branches from her trees. The help he gave her continued until he left for college. There was no charge.

Another of Mike's older neighborhood friends was a woman who had a Ph.D. in Botany. She volunteered her time as an expert at the Heller Nature Center, a land acquisition that Lake County and the City of Highland Park were transforming back into a genuine Illinois prairie.  She was shunned by most of the neighbors as she was a bit eccentric and she had indigenous prairie plants in dozens of red, tin coffee cans all over her front yard in our neighborhood of carefully tended lawns. As fall approached, she would cover the cans with assorted colors of netting to catch their seeds. As a young kid, Mike didn't mind what others deemed an eyesore; he'd walk down to her house and help. From her, he learned about the immense harm that invasive species can cause to native plants by crowding them out and usurping their water supply.  This friendship would eventually add resolve to Mike's Eagle Scout project.

Like his four older brothers, Mike joined Cub Scouts and, like them, he continued in scouting through his senior year in high school. His leadership skills emerged quickly and through the years he regularly served as a patrol leader.  At summer camp in northern Wisconsin, Mike acquired a host of new skills like canoeing, archery, and axemanship that we couldn't teach him at home. They camped outdoors all year long and worked on merit badges. At seventeen, Mike committed to working on his Eagle Scout Award.  Desiring to improve the environment, he went over to Heller Nature Center to see if they might need help on a project. Paradoxically, there was an infestation of Buckthorn in the woods that surrounded the prairie land that needed to be cleared, a concern he clearly understood. After consulting with their experts and receiving pointers about forest management, Mike designed a plan and began training the younger scouts in axemanship and tool safety. He taught them to identify and tag Buckthorn.  On a pleasant Saturday in May, Mike assembled about 25 scouts, 10 leaders and parents, and an array of tools.  The team worked for about seven hours, chopping down trees and hauling them to

an open field. As the day progressed, the pile of trees grew to be about as wide as your courtroom and well over your head.  For his contribution, Mike received a commendation plaque from the City of Highland Park and a coveted Eagle Scout Award from the Boy Scouts of America.

In addition to his regular troop, Mike joined an Explorer Scuba Diving Post. The boys went to classes for several months to achieve certification. Once completed, they began diving in small local lakes, always doing a mandatory, safety check of their equipment. Next, they dove in Lake Michigan, exploring submerged wrecks of ore freighters off our shore.  Eventually the lure of the coral reefs and the marine life that inhabited them called out to these scuba adventurers.  But diving trips to Cancun and the Florida Keys are expensive and we had collegians to underwrite.  So, Mike paid for his own trips by setting up his own snow blowing business.  In Deerfield almost no teens hire out to do menial work. Many residents have professional services, but Mike found a niche of clients. He was blessed with two extremely snowy winters in a row. School was canceled, and along with a fellow scuba-diving scout friend, they cleared snow from the crack of dawn until long after sunset. If they were serving a widow, they decided to charge a discounted price of ten dollars.  They both earned enough money to pay for their entire trips and equipment rental. They even crafted refrigerator magnets to help their clients remember their "business phone number" (home).

Loved by kids, Mike also became about the only "boy babysitter" that I knew of in Deerfield.  He took the Red Cross babysitting course and specialized in households inhabited only by little boys.  Before he left to babysit, he would select age-appropriate games and stories he thought the kids would enjoy from our considerable collection.  His charges were always elated to see him and the adventures they had were robust, but safe. After all that excitement, I wondered if he'd ever get them to fall asleep.

Although he did not have time to work during the school year, Mike completed the Red Cross courses and the safety courses to qualify as a life guard and instructor during summer at Deerfield's pool. Because he is so good with children and at encouraging them to try new things, he frequently was assigned to teach the "Guppies", "Minnows" and the "Parents and Tot" classes as well as more advanced levels. (In college, his lifeguarding certification would prove helpful as he worked as a guard at Georgetown's Yates Field House.)

His record of achievement in grade and high school was noteworthy.  Most important to me - he LOVED to LEARN. Everything was of interest to him. The library considered him a top client. He regularly achieved First Honors and, in high school, he was invited into the Dumbach Society which had programs and field trips that appealed to an elite group of students. But he was also in the

Torch Club which was geared toward community service and popularity.  In eighth grade he was class president; at Loyola Academy he was the Vice President of the Student Council of the 2000-member student community. He was a faithful participant in our parish youth group and was committed to their service trips to a grade school on Chicago's near west side and attended one of their Habitat Service trips to Baldwin, Michigan. While at Georgetown, he was involved in a weekly program to read books to underserved children.

When it came to sports, Michael was an agile, competitive team player, who was noted for his ability to grasp the game plan, practice his skills, motivate his teammates, and think fast on his feet. He played many sports well, including baseball and soccer in local leagues. At Loyola Academy, he was a first-string, varsity player and team captain in football and in lacrosse. He played to win. Every coach he ever had praised him for his athleticism, his drive, his team spirit and his ability to comprehend and implement directions plus the enjoyment he derived from playing.  Without a doubt, I think that what he learned from athletics transferred over to his work as a young trader on Wall Street.  His desire for excellence, his fair-mindedness and his team spirit drew the admiration and respect of his clients; word spread and the Nomura "desk" grew rapidly.

I chose these stories explicitly to show you the *modus operandi* that is baked into Michael Gramins. There are so many more pertinent examples I could share, each one of them about a kid and subsequently, a young man that you would love to have as a neighbor.  As a teacher of Ethics, I know that the most difficult aspect of judging the good or evil of a deed is assessing the intent. Throughout Michael's life, past and present, his **intent** has been and is a **consistent pattern of dedication to excellence, a genuine concern for and interest in others, and a deep sense of service to family and community.** I have **never** seen him deliberately harm another person.

Undoubtedly many letters will tell you about what a beautiful, talented and loving couple Mike and Natalie are. In spite of the ongoing stresses these two have endured since 2014, beginning only two years after they were married, they have a loving, supportive marriage. Everyone has rallied behind them during this surreal experience. The four parents and Michael and Natalie's siblings, all of whom have been blessed with a high degree of intelligence, goodness and leadership ability, are in regular contact and are deeply concerned about righteousness. Mike and Natalie have a wide circle of long-time friends who are there for them

As parents, Mike and Natalie are "off the charts" as I observe them interact with ▮▮▮▮▮, "▮▮", age 6, and ▮▮▮▮▮▮, age 3 and with one another. It warms my heart to watch as Michael reads his favorite stories from childhood

**Ex. A-3**

to his own children or observe him teaching them how to swim.  I have seen Mike playing with Tonka trucks in the mud with ██ and coaching him in sports. He loves taking both of them to aquariums and teaching them the names of all the fish.  They have a Lionel freight train to watch in the basement and ██ and ███████ have learned to name the kinds of car and their logos.  As I watch, I often think, '*If every child in America was blessed with the level of love, care, interest, and intellectual stimulation that these two youngsters enjoy, our society would be so wholesome and filled with Renaissance men and women dedicated to helping others.*'

When my husband and I began our family, my husband's income made it possible for me to stop working so I could be a full-time wife and mother. I had the immense joy of teaching and enriching our seven wonderful children, all of whom have made remarkable contributions to their families, their churches, their cities and their country. Early on, Natalie talked about wanting to be at home with her young children but that is now an impossibility. She too was raised in a loving, nourishing two-parent home and wants to replicate that for ██ and ███████. An extremely precocious little fellow, ██ adores his father and loves to tag along with him to do tasks or run errands. ███████ is a precious, strong-willed redhead and Mike and Natalie take turns channeling her latest "idea" and her abundant energy.

As a young teacher at the poorest, most challenging high school Milwaukee, I interacted with many students whose fathers or mothers were incarcerated.  I saw first-hand the hurt, anger, behavior issues and deprivation this caused.  Upon returning to teaching, I taught Christian Scriptures, Social Justice and Ethics for 22 years on the secondary level at Woodlands Academy of the Sacred Heart in Lake Forest, an all-girls school run by the Religious of the Sacred Heart. In Social Justice class, we studied the ballooning rates of incarceration in our country.  We also examined its impact on families. Unless the parent is an abuser, there are absolutely no benefits to the children to incarcerate a parent.  Only a very few of my Woodland's students had experienced the incarceration of a parent.  The difference between them and my earlier encounters was that these young women had diminished self-esteem, were insecure and carried a burden of shame and sorrow.

I honestly think there has been enough ulcerating stress, enough pain, enough sadness, enough loss of income and licenses, enough loss of status, enough damage to his career, his dreams, and his once promising future.  I ask that you show mercy toward my son, Michael Gramins, and grant him probation.

Sincerely,

Mary R. Gramins



Gramins Family

November 1, 2020

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street – Room 228
Hartford, Connecticut 06103

Dear Judge Chatigny:

The purpose of my letter is to request clemency of behalf of my son, Michael Gramins.  As you arrive at your sentencing decision, I hope that you will carefully consider the insights that I provide, as well as the information and perspectives that you obtain from additional letters sent by people who know Michael well.

Family Background

Mary and I have been married 57 plus years

We have seven children and 16 grandchildren.

Both of us retired three years ago.

> Mary taught for 22 years at Woodlands Academy in Lake Forest, IL, where she chaired the Theology Department and served as Campus Minister. Among the subjects she taught were Ethics, Social Justice and Christian Scriptures. In her earlier career she taught at North Division High School in Milwaukee and Calvin Coolidge High School in Washington DC.

> I retired as a CPA/Personal Financial Specialist.

> I also held Securities licenses, Numbers 7, 24, 63, & 65 and "Life and Health Insurance" licenses.

> My career included Vice President positions with two major banks, and a large regional securities firm, President of a trust company and pivotal financial positions with smaller companies.

> I began my professional life as a U.S. Navy Supply Corps Officer, serving for five years of active duty (1960-1965), followed by 21 years in the Naval Reserve.

As noted above, we have seven children – two girls and five boys:

Monica, our oldest child, teaches English (28 years) at Deerfield High School. She holds a Master's Degree plus 60 in English/Education.

Our oldest son, CAPT Daniel L Gramins, MC, US Navy, (RET) is a cardio-thoracic and vascular surgeon who served in the Navy for 25 years as a flight surgeon on carriers, and as a heart surgeon at Bethesda Naval Hospital and Balboa Naval Hospital in San Diego. He had tours in Iraq and Afghanistan. Currently he serves as a surgeon with the Billings Clinic in Montana and as an associate professor at University of California in San Diego.

Timothy, our third child, is a Commander on the Skokie, IL, Police Department.  Skokie numbers 70,000 people. Tim was named a national TOP Cop in 2009 by NAPO for taking down a fleeing bank robber in a neighborhood where children were playing.  He was honored at the White House in 2010 for this distinction.

Robert, our fourth child, is an oral maxillofacial surgeon practicing in La Jolla and Poway, CA. He served four years in the US Navy practicing dentistry and oral surgery.  He is a Fellow of the American Association of Oral and Maxillofacial Surgeons and sits on the Cosmetic Surgery Credentialing Board for the State of California.

John, our fifth child, is a managing director at BTIG, LLC, specializing in sales of high yield bonds and loans. He has been involved in several charitable activities at the Brick Church and St. David's School in New York City.

Margaret, our sixth child, is making a career change from working as an Executive Director at J.P. Morgan Chase – Private Client Group to Public Health. Meg sits on the boards of two community health organizations in Harlem/New York City. She obtained a second Master's Degree in Public Health from Columbia University.



Finally, there is Michael, our seventh child.  Michael and his wife, Natalie, have a son, ███, ███, , ██, and a daughter, █████████ who was born during the course of Michael's legal proceedings.

My hope is that these brief biographical sketches will give you the definitive impression that our family takes the responsibilities of integrity, honesty, family values, and service to the country, church and community seriously.

With that background, I will now describe the several qualities which distinguish Michael as an exceptional person.

<u>Insights about Michael</u>

In his childhood as the youngest of seven, Michael quickly mastered the skills of resourcefulness and cooperation.  In his grade school years, he took pleasure in visiting with our neighbors and learning about them. Often, he would be found down the street discussing Chicago sports teams and local events with our neighbor, the Deerfield Bank President. In junior high just before November 11, he had an assignment to interview a veteran.  Michael chose Dr. John Zaroslinski, Ph.D., a WWII veteran and a retired pharmacologist who lived across the street. One salient fact which Michael unearthed in the

course of the interview was that John was a part of the US Army forces that liberated Dachau. John never had told his family about those shocking experiences.

Michael's Boy Scout experience demonstrated his leadership and resourcefulness as he attained the rank of Eagle Scout. His Eagle Project entailed clearing the Buckthorn in the springtime from woods in the Heller Nature Center in the City of Highland Park. Michael assembled a group of twenty plus Scouts armed with tree-cutting tools and did mortal damage to the Buckthorn.  In Autumn, a celebratory bonfire climaxed the project. For his efforts, Michael received a commendation from the City of Highland Park.

Additionally, Michael participated in an Explorer Scout Post specializing in scuba diving. To finance equipment rentals, purchases and a trip to Florida and the Caribbean, Michael and another Scout operated a snow removal business. They offered a tiered pricing system – charging lower prices to widows and the elderly and premium pricing to the other customers who could afford more for their services.

At Loyola Academy, a Jesuit College Prep High School, Michael continued to develop his scholarship skills and qualities. He was a Dumbach scholar, an academic program limited to the upper echelon of his class. His student government activities culminated in his election as Vice President of the Student Council and he was noted for being the Council's mover and shaker.

Athletically, Michael played lacrosse each spring for three years. He was a member of the State Championship Team in his junior year and team captain on the State Quarter-Final Team in his senior year. Football was his autumn sport – he played strong safety and was selected co-captain of the team in his senior year.  In every sport, Michael shined as a fierce competitor who always played by the rules and kept his head in the game.

One testimony to Michael's integrity and honesty occurred the evening he received a call from the Amherst College football coach. Michael had visited the school the previous week and was impressed by the campus. The conversation focused on admission to the school and a promised position on the football team. "Is Amherst your top choice?", the coach asked. Michael responded that, while he liked the school, Amherst was his second choice; Georgetown was his first choice. His mother and I initially were astounded. However, Michael reminded us that "You taught me to be straight forward."

Georgetown proved to be an ideal experience for Michael, as it had for his two siblings, Daniel and Margaret. From move-in day, when he assembled a dorm mate's computer and made it operative, (the dorm mate now is a life-long friend) to graduation day (Magna Cum Laude – Government Major-Business Minor), Michael immersed himself in Georgetown's resources/opportunities and challenges. For example, every time there was a prominent speaker on campus, like President Bill Clinton or Secretary of State, Madeleine Albright, Michael would wait in line to get one of the coveted tickets ahead of the event so he could attend. He participated actively in Sursum Corda, a tutoring program for under-privileged

students in DC, was a lector at masses, and served on the freshman and senior class committees.  He contributed to his college costs by working all four years at Yates, the athletic center, as a lifeguard. From sophomore through senior year, Michael worked part-time at the Ruddy Law Firm, doing research and handling a variety of administrative functions.  (I refer you to Mark Ruddy's letter for further details.) Athletically, he played on the Georgetown Club Lacrosse team.

On the lighter side, Michael was an official dogwalker for Jack, the Georgetown University bulldog mascot. Coincidently, Jack came to the university five years earlier when his sister Meg and a group of friends, obtained him for the teams' mascot. Unfortunately, Jack, not the most ambitious dog, liked to go out for a walk, but he didn't like to walk back home, so Michael often had to carry him.

In the summer between junior and senior year, Michael obtained an internship with Lehman Brothers, a once prominent New York City securities firm.

Perhaps Michael's most significant Georgetown challenge was his senior Honors Thesis which won first place in a national contest. (His mother's letter will describe the details.) My most amazing recollection of his research was a half-hour conversation with Ben Bernanke, who became Chairman of the Federal Reserve Bank.

My hope is that this portion of the letter has conclusively demonstrated the underlying impeccable character of Michael which he certainly has carried forward into his adult life.

After his indictment, his generosity was evident in his determined attempts to save St Aloysius Grade School, a Jesuit elementary school in Harlem. From 2014 through 2016, Michael volunteered and played a significant role in organizing fund- raising efforts until the school regrettably had to close in 2016. Also, he has been a generous donor to Loyola Academy and Georgetown University, as well as several other organizations supported by his family and friends.

Early in 2018, Michael took over the complex task of figuring out what dates and locations would work for a Family Reunion involving eight different households whose locations range from the Atlantic to the Pacific Coasts and cities in between.  In addition; it required juggling the summer schedules of our 16 grandchildren and the multiple professional schedules of our sons and daughters so we could unite.  With considerable artistry and dedication, he succeeded in accomplishing a three-day gathering for a wide variety of age groups (80 years to 1 year) with far ranging interests and diverse menu preferences. At that point in time, Michaels's conviction had been vacated; our family rejoiced with him and thought that he would be able to move on with his life. We also cheered his phenomenal dedication in making the reunion a reality – a Herculean, but much appreciated effort.

It is quite probable that you will read these stories and character traits in the letters of others who have known Michael to be a talented, caring, resourceful person of integrity. Noting

that, I will now offer some observations of the circumstances he and Natalie, his wife, have encountered since the indictment.

<u>Deprivations</u>

My choice of the word, "Deprivation" encapsulates my view of the results of the process in the criminal justice world. The guilty party is deprived of many things the common citizen takes for granted. I offer a litany of the deprivations Michael and Natalie have experienced since the charges were filed in 2014. Let us acknowledge that at that time Michael was approaching the prime of his career in the securities industry.

Termination of his position at Nomura and cessation of all compensation.

Absolute destruction of his career in the securities industry and loss of his professional certifications and licenses.  Having held several of the same licenses, I can assure you of a considerable investment of time and effort to obtain and retain them.

Prohibition of any opportunity to communicate with his fellow defendants, other professional associates and friends in the industry.

Personal banking and credit related challenges:
   Closing of his bank and credit card accounts and the issues of conducting
    personal business in today's digital, cashless society.

Loss of his ability to refinance his home.

Relocation. The weight of the above deprivations forced Michael, Natalie and their children to leave New York City which they had thoroughly embraced and move to Chapel Hill, NC where Natalie took a position as now the primary financial provider of the family.

Loss of his right to vote.

<u>Conclusion</u>

Given the "deprivations" Michael and Natalie have already suffered, I earnestly ask that incarceration not be considered. In the last six years, Michael and Natalie have been raising two fine children who would be devastated by the absence of their father. That loss would have a lasting and deleterious impact on their young lives. In contrast to what the government might propose, I earnestly request that this possibility not be considered. Michael already has served six years of emotional, social and financial incarceration!

Respectfully,


Thomas R. Gramins, CPA

November 5, 2020

The Honorable Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, CT 06103

Re: Character Reference for Michael Gramins

Dear Judge Chatigny:

My name is Margaret (Meg) Gramins, and I am writing on behalf of my brother, Michael Gramins. I was in your courtroom throughout the six weeks of the trial and for most of the jury's deliberations. In addition to providing support to Michael, his wife Natalie, and my parents, my unofficial role was that of court reporter, taking notes every day and providing updates to our family and friends on what was happening. I certainly wish I had Darlene's tools and typing speed – it was a challenge to keep up with just a pen and notebook.

I thought it might be helpful if I provided you with a brief overview of my background. I graduated *cum laude* from Georgetown University in 1999, majoring in American Studies, and returned to Chicago to join a management training program at Bank One and complete my MBA at Northwestern University's Kellogg School of Management. I worked in Corporate Strategy in Chicago and New York with the bank. In 2007 I took a role in the Private Bank at J.P. Morgan, becoming an Executive Director in our Global Client Service organization managing over 50 people.

Several years ago, I obtained a Master in Public Health degree from Columbia University's Mailman School of Public Health from 2014 – 2016 while continuing to work full-time at J.P. Morgan. After 20 years at J.P. Morgan, I left the firm in July 2019 and am looking for opportunities in healthcare so that I can make more of a difference in the world through my work. I am currently a member of the Board of Directors at Ryan Health, a Federally Qualified Health Center that provide integrated healthcare to 50,000 patients from underserved communities in Manhattan. For six years, I was a member of the Board of Trustees for the Baker Scholars Program at Georgetown University, a scholarship program that I was a part of as an undergrad, which seeks to develop business leaders with a social conscience.

I've known Michael ever since he was born – he is the youngest of the seven Gramins siblings, and we're five years apart.   One way I describe our family to others is that there were two different childhood experiences: the first five siblings, who were each two years apart and largely grew up in Wisconsin, and then the childhood experience for Michael and me, which was largely defined by growing up in Deerfield, IL and attending a lot of our older siblings' events before becoming busy with our own. Much of our childhood was spent looking out the rear window of the family station wagon as we went to our siblings' soccer, football, basketball, or baseball games, cross-country meets, or other extracurricular activities. I consider Michael to be my best friend and the sibling that I am closest to (although I do love all of my siblings!).

To get a better sense of our family's values, let me start with the two people who are the anchors of this family – our parents Thomas (Tom) and Mary. They were in your courtroom every day during the trial,

1

**Ex. A-5**

including when the verdict was reached. Our parents were born and raised in Milwaukee, WI, growing up in similar working-class families. My dad's father was a tool & die maker; his mother was a book-keeper, and they raised four children. My mom's father was a police officer & dispatcher in Milwaukee; her mother was a teacher before focusing on raising two children. Both of our parents grew up Catholic and attended Catholic schools in Milwaukee from grade school through college, traditions that they were committed to continuing with their own children. They both worked while in high school and college, and part of the way my father financed his college education at Marquette University was through Navy ROTC.

I share these details in order to set the table on the values that shaped our upbringing and that continue to be reinforced and modeled in our family. First is the importance of faith and religious traditions in our lives. We were raised in the Catholic tradition, and as long as you lived at home, you were expected to attend mass every Sunday. Every child attended Catholic school for grade school and high school, and six of us attended Jesuit universities for our undergraduate education (the 7th went to a state school and feels that he doesn't get enough credit for pursuing an affordable option).

Closely connected to our faith is our belief in service, which was engrained from a young age. In our family, that took on the shape of both service to our country, as my father and two brothers served in the US Navy, while another brother is currently a police commander, as well as service to others – in the words of the Jesuits, being "men and women for others." There was and is an expectation that we engage and share our resources, whether that be time, talent, and/or treasure, in order to help others. This was done as a family, as well as individually. For Michael, this has been done throughout his life, whether it be tutoring children in high school and college, clearing brush in a forest preserve as his Eagle Scout project, building homes with Habitat for Humanity, or raising funds for a Jesuit grade school in Harlem to try to prevent its closure.

A strong work ethic is another key value within our family, and that can be traced back to each generation engaging in hard work and making sacrifices in order to provide for their family. As children, we were all expected to help out around the home, do well in school, and work - starting in grade school - in order to earn and save money. For most of us, including Michael, this meant waking up early in winter to fire up the snowblower to clear our neighbors' driveways; mowing lawns in summer; caddying; babysitting; and getting a work permit in 8th grade so that we could teach swim lessons and work concessions or the front desk at the local public pool, eventually becoming lifeguards once we were old enough.

Our family also stressed the importance of education, and this is where our parents directed a significant portion of their financial resources. Every child's report card was hung on the refrigerator for everyone to see, and everyone took a spot around the dining room or kitchen table to do their homework and type out research papers (which, for everyone except Michael, was done on a typewriter, not a computer). College was a non-negotiable, and that meant that each of us hustled for scholarships, used our savings from summer, and took on student loans and work-study jobs in order to bridge the gap between what our parents could contribute and what the university chipped in for financial aid.

Our parents also encouraged us to pursue our passions. There was no expectation of what type of career we should pursue – only that we find something that we really enjoyed doing. From a professional standpoint, I joke that my siblings could be a Sesame Street placemat of jobs. We've got a teacher; doctors (cardio-thoracic surgeon and oral & maxillofacial surgeon); police officer; and bankers

2

**Ex. A-5**

(or at least three of us who worked at banks doing different things). When we were growing up, this also meant supporting our interests and hobbies, and for Michael, that resulted in a progression of interests from astronauts & rockets; Jacques Cousteau & scuba diving; "Top Gun" & fighter jets; Lionel trains; and pretty much every sport.

Surrounding all of this was love – we grew up in a home where we were unconditionally loved by our parents, and who have modeled their love for one another in over 50 years of marriage. There have been ups and downs over the years for each of us, but the love and support of our family has been steadfast and unconditional.

This was the environment that shaped Michael into who he is today. While some might (accurately) conclude that Michael's arrival in this world was a surprise, he'd like to say that they saved the best for last. In many ways, that is true. Over the years I've witnessed Michael's evolution from a cute, dimpled, energetic young boy into someone who has become a wonderful friend to many, displaying incredible loyalty and serving as a supportive presence in the lives of his family and friends. His deep curiosity has led to a diverse set of interests, and his strong work ethic and intellect resulted in success in academics and his career. He also remains a very friendly, approachable person – there's still a bit of those Midwestern roots that enable him to help put others at ease, take interest in what they're doing, and develop real relationships with people.

Perhaps those are some of the qualities that resonated with Natalie when she met Michael working at Lehman Brothers. She was pretty adamant that she did not want to date anyone at work, but Michael was eventually able to convince her to join her for a concert (going to live music being another one of his passions). The two hit it off, and just as importantly, Natalie was not overwhelmed by the prospect of dating and eventually meeting his six siblings and their families. Their wedding in Natalie's hometown of Charlotte, NC was memorable not just for the hot weather, but the beautiful way they included everyone in their families in the celebration – even Michael's 14 nieces and nephews! The Carrington family shares many of the same values as our family, and the in-laws hit it off immediately, as if they'd known each other for years. As a couple, Natalie and Michael support one another and their partner's interests. How else can you explain why Natalie took up scuba diving and agreed to go diving with sharks during her honeymoon, while Michael willingly went to see ballet at the Met on more than one occasion! They have been incredibly committed to their family and friends, whether that be visiting with Natalie's elderly grandmother in the nursing home (when that was permitted), to supporting friends during their fights against cancer or addiction, to being there for important moments like dance recitals, sporting events, and concerts. They are wonderful hosts – they love to entertain, and to borrow the lyrics of a song from The Highwomen, nothing brings them more joy than a "house with a crowded table, and a place by the fire for everyone." This is what you find in the home they built in Quogue, and it has served as the setting for many wonderful celebrations over the years with family and friends.

This includes their own family – son ███████████ (██) is 6 and ████████ is 3. You may have noticed ████████ in your courtroom during the trial: she was nestled in her mother's arms, and the court was kind enough to set up a private space where Natalie could go and feed her (then two months old). I'm not sure if you've had the privilege of seeing someone close to you undergo the transformation to parent, but it is quite a remarkable and beautiful thing to behold. Michael used to be scared of babies – he'd only want to babysit kids once they were in grade school, and with his own nieces and nephews, he'd really only feel comfortable with them once they got past three years old. Then you go and visit these new parents with their child, and there is just this wonderful glow and awe that comes over them – even through the sleepless nights and uncertainty of what they're supposed to do with these little

3

people. Suddenly they become adept at things they didn't know how to do – like change diapers and give baths – and start imparting the values and traditions that they want to have in their own families.

██ is Michael's "mini me" – he is an active, inquisitive, loving, well-behaved little boy. Similar to Michael, he has an incredible curiosity and wants to learn about all sorts of things like spaceships, magic tricks, trains, and sharks; he enjoys sports – whether as a player or a fan; and he loves music, starting guitar lessons at age 5. He's also been a wonderful big brother to ████████, who is on the feisty or "independent" side as described by her preschool teacher. ████████ is also Daddy's girl; she and Michael have a special bond, and he knows how to calm her down or take her aside when things escalate. Natalie and Michael are excellent parents (and I've seen quite a few in my days) – they are both active, engaged parents who surround their children with love, as well as the appropriate values and discipline that result in ██ and ████████ being delightful children. With two young children, Michael and Natalie went from zone to man-to-man defense (to borrow a sports analogy), and I can't imagine trying to raise two wonderful children without this model in place.

This leads me to the decision before you: Michael's fate. In observing your approach throughout the past five years, and seeing you firsthand in the courtroom, I imagine that this is not a decision that you take lightly. You have impressed me as a judge who is fair and cognizant of the gravity of the cases before you, including the humanity of the people who come before you. You also are a keen observer of broader macro-issues at play – in this case, I heard that in your remarks about the inequity you've seen in defense representation (after having to manage this case with three expansive teams of defense lawyers), to your comments about whether participants in the RMBS market knew that their actions could be criminal, to your discussion of behavioral science in the last hearing. With that in mind, I'd like to share my observations on the impact of this case – past, present, and future – and ask for leniency as you consider Michael's sentencing.

During this trial, we learned a lot about the RMBS market (perhaps more than we ever anticipated), including the "penalty box" when one party in an RMBS trade took issue with the behavior of another and wouldn't trade with them for a short period of time as punishment. Michael's first day in the "penalty box" was over six years ago. To take the "penalty box" concept further, he's already been ejected from the game and been given a lifetime ban in this "sport" regardless of what comes next. Keep in mind that we're talking about someone who was in his early 30s and just starting to ascend in his career when this trial started. He's been sidelined during the prime of his productive work years, which has economic repercussions for years to come, not to mention the emotional toll this trial has taken on Michael.

Punishment from this case has taken on several different forms. After the conviction in June 2017, Chase Bank (my employer at the time) closed Michael's banking accounts – even though Michael was still fighting his conviction. Michael and Natalie have also had to make the difficult decision to relocate to North Carolina (while a pandemic was starting), partly because of the lower cost of living that it provides compared to New York. Their dream home in Quogue, site of so many special memories, is currently on the market.

Furthermore, the punishment is still ongoing. The impact of a felony conviction has severe consequences for his future job prospects; in many cases, it's a non-starter when applying for jobs. Michael's reputation has been shot – this trial will be the first thing that will appear the minute someone looks up his name online. In addition to this criminal case, there is still the potential for punishment in the civil case with the SEC. And with this being an election year, Michael was unable to participate in this

key aspect of our democracy by voting, impacting his ability to advocate for matters that affect him at the local, state, and federal level.

The punishment is not limited to Michael – this impacts his family and our family. According to The Sentencing Project, 63% of people in federal prisons in 2004 were parents of minor children. In 2007, 1.7 million children in the US had a parent in prison on any given day. I am heartbroken to think that █ and ██████████ could become part of this statistic. They are 6 and 3 years old – there is not a way to explain what has been happening with Michael's trial over the past five years to them, and I cannot bear to think about the impact of not having their father with them during these formative years. I also fear the impact this continues to have on my parents, who are 82 and 80 years old, and who have not been able to have in-person visits with four of their children (including Michael) for months due to the Covid-19 pandemic. While I certainly hope that they will continue to live long, healthy lives, I would not want them to suffer over the fate of their youngest child in the final years of their lives.

As you determine Michael's future, please consider his family, the price they have already paid and what further justice would be served by the additional devastation of imprisonment. I pray that you will continue to be guided by wisdom and mercy as you reach this decision.

Sincerely,

Margaret Gramins

Margaret Gramins

Robert T. Gramins DDS OMFS

LaJolla, CA █████

November 20, 2020

Honorable Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, CT 06103

Re: Sentencing of Michael Gramins

Dear Judge Chatigny:

This is honestly probably the most difficult letter I have ever been asked to write in my entire life.  I never in my wildest dreams ever thought anyone in my family would be facing sentencing for a felony conviction.  Especially my baby brother Michael.  He was the youngest of seven children, born into a hard working devout Catholic family, where doing the right thing all the time wasn't just expected, it was required.

Mike was the little brother we were all proud of and he had huge shoes to follow and fill.  He didn't just do that, he beat us all.  He was not just a Boy Scout, he was an Eagle Scout.  He wasn't just a two sport athlete, he was a star athlete.  He didn't just go to school, he graduated with honors. That is just who Mike is and who he became.  As Mike continued on at Georgetown he not only graduated Magna Cum Laude, he received the Pi Sigma Alpha senior thesis award for best thesis in the country.

After college, Mike followed our brother John to New York and began working at Lehman Brothers.  They both did well but as we know, Lehman Brothers did not.  Mike then transitioned to Nomura and his desk was consistently rated in the top three on Wall Street. And then I learned more about Residential Backed Securities than I ever would have thought.  Through the last five years I've watched my brother endure a trial, appeals, motions, dismissals, and reinstatements.  All the while being a husband, a father, attempting to work and live under a huge cloud.

As an Oral and Maxillofacial Surgeon I take great satisfaction in relieving pain, restoring facial esthetics and function and treating diseases.  As a Judge I'm sure there is satisfaction in jailing certain defendants.  Knowing that you are protecting society from evil has to be rewarding.  Mike is not one of those defendants.  The jury acquitted twenty six of twenty seven charges.  His life has been destroyed, guilty or not.  He can never again be licensed in the security industry.  Incarceration would only seem to destroy his family life with █ and ████████ and his marriage to his beautiful wife Natalie.

In my life I have been a Naval Officer, a Doctor, a Philanthropist, a Member on licensing boards and corporate boards. I understand right from wrong and the need to enforce it. It is my view that my brother Mike also understands the difference between right and wrong. I simply ask that you take all mitigating circumstances into consideration during the sentencing hearing for my little brother Mike.

Ex. A-6

With all due respect,


Robert T. Gramins DDS OMFS
Partner/Surgeon,  La Jolla Oral and Facial Surgery, Boulder OMS, San Diego, CA
Dental Board of California, President, Elective Facial Cosmetic Surgery Committee
Ronald McDonald House, Rady Children's Hospital, Benefactor
Lieutenant, Dental Corps, U.S. Navy (Honorable Discharge)
La Jolla CC, Board of Directors

Hon. Robert N. Chatigny

United States District Court

District of Connecticut

Abraham Ribicoff Federal Building

450 Main Street – Room 228

Hartford, Connecticut 06103


Dear Judge Chatigny

First and foremost, I would like to thank you for your calling and dedication to the service of justice as an integral part of the justice system. Secondly, I would like to convey the appreciation to the jurors for their service in the trial of my younger brother, Michael Gramins. As a law enforcement officer for the last 25 years, including serving as Detective of Financial crimes for four years, I took an incredible interest in the case. I read every motion and every transcript, and it is my hope that this case will come back in front of you as rulings and holdings have significant impact upon us. Throughout all my readings, your consistency, fairness and dedication to your calling as a judge were incredibly evident.

I would like to take a moment to talk about foundation, not the objection and establishment kind, but the character kind. As an older brother, I can not express how incredibly proud I am of Michael. Tom and Mary definitely saved the best for last with the birth of their seventh child. I would like to think that having six incredibly diverse and talented older siblings helped. Monica, the eldest, is a high school English teacher, Dan, a 26-year career naval officer (ret) and cardio thoracic surgeon, Bob, also a naval officer (ret) and oral surgeon, John, a career banker, Meg, a career banker, and myself, currently a commander.

All of us were fortunate enough to work very hard in school to better ourselves. The importance of education was instilled in us from Mary, an educator and incredible mother. The value of hard work was always on display from Mary raising seven children and from my father, Thomas, also a career naval officer and CPA who worked incredibly hard to support us all while leading by example. Michael took the education aspect to another level as it was his goal to graduate with a higher GPA at Georgetown University than Dan and Meg, both of whom graduated cum laude. Well he achieved it with magna cum laude. If Michael tells you he is going to get something done, he does. If he tells you he is going to help you, he will. If you make an agreement with him, he honors it. As children, we were taught the value of education and each one of us realized the value and paid for our own college education due to our respect earning and achieving things on one's own.

We all attended catholic schools from grade through high school. The boys in the family all attended Loyola Academy. A Jesuit high school with the mantra of "Men for Others", we all were involved in service and Michael was no exception. Michael was also able to develop his skills as a leader and was a captain of the state champion football and lacrosse teams. He was, and still is, incredibly well respected by his former classmates.

All the boys also were involved in the Boy Scouts of America. Michael again was incredibly dedicated to scouting and its core values and achieved the rank of Eagle Scout.

Moving forward, Michael met and married Natalie, an absolute wonderful sister-in-law. Together they have two delightful children. This brings me to wanting to address the topic of intent, not the criminal kind, the human decency kind that Michael displays constantly. Michael's intentions are always of goodness, kindness, concern, empathy, understanding, equality, and fairness. As I type this, I am getting emotional as I truly can not think of any individual in my life that has better intentions than my youngest brother Michael. These values are also displayed by his lovely wife, Natalie. With certainty, these values will be passed on to their two children. Natalie is continuing with her career as well as being an incredible mother. Michael's presence as a father is incredibly important in raising their two beautiful children, ▮ and ▮▮▮▮▮.

Finally, I would like to address the current climate with the justice system. I am incredibly aware of what is going on with jails and prisons amid the COVID situation. I comparatively think my brother Michael would be one of the best candidates for a sentence of probation and be allowed to remain in the community.

Respectfully,

Timothy A. Gramins

Daniel L. Gramins MD
████████████████
Billings, MT ████

November 16, 2020

Honorable Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103

Re:  Sentencing of Michael Gramins

Dear Judge Chatigny:

My name is Daniel Gramins, and I am a cardiothoracic surgeon in Montana.  I am writing on behalf of my brother, Michael Gramins, to request that he receives probation at his sentencing hearing on December 17, 2020.

Michael is the youngest of seven children from a middle class family in the Chicago suburbs, raised by parents who taught all of their children to be winners, but grounded in the social justice doctrine of a Catholic education from first through twelfth grade.  He was an altar boy, choir boy, Eagle Scout, swimming instructor, lifeguard, and anything else our mother "voluntold" him to do.  At Loyola Academy, like his four brothers before him, he was a two sport varsity athlete and an honors graduate; unlike his brothers, he never sat in detention, got benched for fighting, racked up speeding tickets, or violated any local ordinances in the surrounding suburbs.  His legacy at Georgetown, and later in the corporate world was one of intelligence, hard work, and generosity to family and friends.

When Michael was indicted, he was terminated by his employer.  Natalie, his wife, became the primary breadwinner for the family.  Michael was able to secure some work, but his options for long term meaningful employment were limited with the uncertainty of the trial outcome.  While for some people, this life disruption would cause significant psychological trauma; for Michael, he turned to his children, ██ and ██████████, and focused on being a great dad with the extra time at home his new life situation provided.

Incarceration would punish Natalie, ██, and ██████████, much more than it would affect Michael.  My military career provided an in depth exposure to the human cost of family separation.  As a Navy surgeon, I deployed to Iraq when my sons were 3 and 4, and later Afghanistan when they were 8 and 9.  I served, but my wife and sons paid, since for them that was time without a husband and father which can never be replaced.  At least for my boys, when they had to explain their father's absence to classmates or friends, the usual response was affirmation; for ██ and ██████████, it will be at best, awkward silence, and at worst, condemnation.  Michael's punishment will continue long after his sentence; every time he applies for a job or volunteers to coach his child's team, he will have to answer that inevitable question on the bottom of the application and be judged, once again.

Thank you for your consideration in this matter.

Respectfully,



Daniel L. Gramins MD FACS
Captain, Medical Corps, U.S. Navy (Retired)
Chairman, Department of Cardiac and Thoracic Surgery, Billings Clinic
Associate Clinical Professor of Surgery, University of California, San Diego
Staff Cardiothoracic and Vascular Surgeon, Veterans Affairs San Diego Healthcare System

**Ex. A-8**

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103

November 25, 2020

Dear Judge Chatigny:

Michael Gramins is my youngest brother. My name is Monica Fairman, and I am the eldest of the seven Gramins siblings, and Mike is the youngest.   It is probably obvious that I have known Mike my entire life. In fact, I believe that I am the same generation as you, Judge Chatigny,  and  more like another parent to Mike due to the 17 ½ years age differential between us. For an image, when Mike was a toddler and I would take him along with me on various errands etc, universally the question I would get was whether he was my son. As an 18 or 19 year old, I would look at the person asking and say,  somewhat aghast, "NO, you've got to be kidding!"

Largely because I am quite a bit older than Mike, I have not needed to rely on Mike for anything or ask him to help me with any illness or financial hardship or favor or anything of that sort, and for this I am grateful. I am even more grateful for all the ways in which Mike and Natalie have, without ever being asked, given so much of themselves to my three daughters. (You've heard from two of them, Katie (21) and Jenny (19) Fairman, and my youngest daughter is a minor). Before Mike met Natalie, he was that "cool uncle" to my girls. He would entertain them whenever we had family gatherings, make Christmas cookies with them, play endless goofy games with them, run the Lionel train around the Christmas tree for what seemed like an eternity; my kids loved every moment of hanging out with Uncle Mike. When Mike and Natalie met and began a serious relationship and then married, this inclusiveness of their nieces became even stronger. For their wedding, the bridal party was ALL the nieces and nephews! The kids' ages ranged from gawky teenagers to little tikes who couldn't even toddle down the aisle, but Mike and Natalie included every single one of them (I'm guessing there were 14 of them at that point, so you can only imagine…) and let me tell you, Judge, how special my girls felt because Mike and Natalie made them feel so important. At their wedding reception, my three girls and Kelsey (age 19 now, another niece), choreographed a dance and performed it at the reception as a wedding gift. Mike and Natalie graciously included the girls in this way too. As time went on, Mike and Natalie went above and beyond to make my daughters feel loved and special. They gave my daughters autographed pointe shoes (all my girls are dancers) from ballerinas with the NYC Ballet, they took my girls along for window shopping excursions on Long Island (a totally new experience for my kids), and they graciously hosted our family at their home in Quogue. A couple of years ago, when my husband, Jim, was laid off from his job, Natalie and Mike gave my oldest daughter, Katie, an iphone when funds at our house were tight and her phone was broken. As my own kids have gotten older, Mike has given them really sound advice about college classes, ideas to consider relative to their dance and communication majors, and possible career ideas. This is a snapshot of Mike - and Natalie's - characters. Generous, giving, inclusive, family centered.

**Ex. A-9**

As the eldest daughter in a family of seven children (including five brothers), a wife and mom to three girls, and a high school English teacher for three decades, I strive to give clear and direct feedback, and I value demonstrated commitment and sound judgement. In my professional life, a significant portion of my students are kids with IEP's and profound learning needs; my instruction and interactions with them must be very clear and direct, and I am very committed to the idea that every student can be successful. Mike has shown commitment to his family, and I trust him with giving my own children sound advice. He's a person who wants to do the right thing, and when he knows the rules, he absolutely will follow them. Mike's case has been on your docket for several years, likely consuming a significant portion of your time and resources. Please imagine how this has upended Mike and Natalie's lives too as they have paid their dues in myriad ways with the sacrifices that they have had to make. Mike has had the blessing of Natalie's love and commitment over this period of years; Natalie is an incredibly strong woman and has had to support their household and their two young children and Michael for this challenging period of time. Judge Chatigny, if you have strong women in your own life, you know that they are the backbone of society and families, and it is true for Mike and Natalie too. Your background in Jesuit academia qualifies you as a "man (person) for others" and I imagine that *cura personalis* is relevant in your legal philosophy as well, and therefore you examine what is right for others. I share my thoughts with you as a strong woman myself who knows the importance of commitment and sound judgement; I respectfully ask you to consider this feedback from my perspective.

With regards -

Monica M. Fairman

November 1, 2020

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103

Dear Judge Chatigny,

I know this is a difficult case that you are overseeing and I want to thank you for the time and energy you have spent.  I know that this has been a time consuming and difficult exercise for all parties involved, including yourself, so thank you.

My name is John Gramins, I am one of Michael's older brothers. I am his only brother that happens to be in the securities business. I am a series 7, 24, 55, and 63 registered representative. I am currently a Managing Director at BTIG, LLC. and work in the high yield space. I was a trader from 2000-2018 trading a variety of loans and bonds. Currently I am now a salesperson covering about 60 accounts or so that trade leveraged loans and bonds.  Although the high yield market and RMBS market by nature are different, as you can imagine there are some similarities too.

My brother is a good person and I am sure you will get many letters stating as such.  He recently moved away from us here in New York State to North Carolina.  My wife Ashley and our three kids currently live in Bronxville and cherished the time we got to spend with his wife Natalie and their kids' ▮ and ▮▮▮▮.  He is an excellent father who is dedicated to his wife and kids first and foremost.  My hope is that he can continue to spend time with his family while he tries to clear his name. I know he has to be sentenced to move onto the appeals process.  I am hopeful that since the last 5 years or so have been spent on this trial, he can be able to continue living his life and try to move on.  The past five years as his brother have been difficult for me to watch him. Although he has handled it like a true professional, he has lost 5 of his most valuable earning years of his life.  He has had to deal with massive stress while working on clearing his name.

In conclusion, if the court could find some way to give him credit for his past 5 years as being some type of punishment and sentence him to probation, that in my view would be an ideal outcome.  My brother does know the mortgage market quite well, maybe he could do community service helping first time home buyers with mortgage advice or maybe he could tutor kids in math in North Carolina so he can continue to make the world a better place.  If he truly made a mistake, there doesn't seem to be any kind of pattern to his mistake and he will never be able to get a job in the finance industry again as his career in our space has been ruined.  Thank you so much for your consideration and your time.

Ex. A-10

Sincerely,

John Gramins

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103

Dear Judge Chatigny,

Mike and I crossed paths for the first time when I was in college.  I received my first internship offer at Lehman Brothers while Mike was an analyst.  He was the only trader that took the time to correct me and to help me learn during my internship. He probably doesn't even remember it, but he was also the only face that smiled and welcomed me when I walked near his desk. I benefited more from his kindness at that time than he could even know.  It was getting to know Mike and a few others that showed there were some kind people in finance that I decided to make it my career.

I believe I was named  a "victim" in this case.  Mike and I had been trading partners for five years.  Not for one moment do I believe I was victimized in this case or any other, not for one moment do I believe I was misled into buying a bond I didn't understand, and not for one moment do I believe that ever deviated from my goal of building Third Point's investors, who entrusted me with their money, the best portfolio I could find.  I did not rely on any sell side trader's cost basis, when I analyzed a bond, only if it was the best bond to fit into my portfolio at that time.  The only victims I see in this case are Mike, Ross and Tyler.  They are all men of strong character and all people I'm honored to call my friends.

Mike always conducted himself in a professional manner, was fair, just and kind and I would not have been able to build my business as successfully without him.  He never gave into the temptation to keep the business a "boys club" and he was always fair.   I always had the option to vote with my feet and take my business to the place it was best served and time after time, I always came back to Mike.

Thank you for your consideration.

Keri Findley

November 23, 2020

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street – Room 226
Hartford, CT  06103

Dear Judge Chatigny,

My name is David Rosenblum.  I am 49 years old and live in Westchester, New York.  I have been employed in the mortgage securities industry for more than 28 years.

I am writing this letter to you in support of Michael Gramins, ahead of his upcoming sentencing proceedings.

I have known Mike since 2009, dating back to when I took a new job at a growing asset management firm as an investor in mortgage-backed securities.  In that capacity, over the years, I bought and sold many mortgage-backed securities from/to Mike Gramins, who was employed as mortgage-backed securities trader at Nomura Securities during that time.

It has been commonly understood for many decades that, in the over-the-counter secondary market for mortgage securities, Wall Street traders do not owe their clients a fiduciary obligation when it comes to prices.  In fact, when I first started in the business back in the early 90's, it was considered "very bad form" for a customer to even ASK a Wall Street trader about prices paid or sold.  Sophisticated institutional clients are expected to do their own analysis on the bonds and make their own decisions as to whether to transact based on the merits of the security and the price available.  Again, this is common knowledge in the over-the-counter RMBS market.

In my own dealings with Mike, I found him to be upstanding and honorable.  He always played by the rules and never sought to advantage himself at the expense of me, a customer and counterparty.  I am confident that my own dealings with Mike are consistent with others — our niche in the financial markets is small and we all get to know one another.  Bad reputations follow people around.  In fact, in a field of about a dozen Wall Street counterparties I could choose from, Mike was one of only three traders with whom I routinely transacted because I had a strong belief he would always put the customer first.

I was shocked to learn about his indictment, relieved when the verdict was vacated, and then crestfallen when it was reinstated.  I wish he was still in a trading seat so that I could continue to rely upon his acumen for guidance and market knowledge.

It was always my feeling that Mike genuinely cared for me, both as a client and a friend, and that belief remains unshaken to this day.

Mike Gramins is a good man. I imagine that the toll on himself, his family, and personal financial circumstance has been devastating.  He can no longer earn a living in his chosen area of expertise.  Not only has he lost his career, he has been in social isolation six years — and now has a felony conviction on his record for life.

I implore you to grant him leniency.

Sincerely,

Ex. A-12

Michael DePietro
Mikedepietro44@gmail.com
11/18/2020


Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Ribicoff Federal Building
450 Main Street – Room 228
Hartford, CT 06193


Dear  Judge Chatigny:

I spent over twelve years trading in the mortgage industry both on the sell-side, Head of US Non-Agency Trading at Morgan Stanley, and on the buy-side as a Portfolio Manager at various prominent hedge funds. During this time, I was fortunate enough to meet many "good actors." Michael Gramins is one of them and, to say the least, I was shocked when I heard about his indictment. I've had the pleasure of knowing Michael for the last fifteen years as a friend, a colleague, and a client. As a friend, he has always gone above and beyond to help in times of need. As a colleague, he was always mindful of other individuals' views, willing to share his thoughts and insights, and revered as a trader who operated with his clients' interests at heart. As a client, I was treated with the utmost respect and integrity. I thoroughly enjoyed doing business with Michael.

<u>Additional Background</u>

Throughout the last few years, I've found it interesting to hear colleagues remark about their reliance on dealers' opinions about the fundamental valuation and market risk of mortgage bonds. When I transitioned to the buy-side and became a client, I was enamored by the wealth of information at my fingertips. In almost every trading situation, the client has more perfect information than any dealer with regard to the market risk of any security. Each day, the client is inundated with hundreds of pricing quotes for bonds going to auction, hundreds of bids, offers, or markets from over twenty different dealers, and public quotes on indices which they use in their advanced quantitative models to benchmark their view on the pricing for each of the hundreds of bond quotes they receive. With regard to fundamental valuation, the client, in almost every situation, will have performed more rigorous analysis on the bond than the dealer given they have the luxury of not trading on any given day and are not overwhelmed by customer inquiry throughout each day. They simply have the time. The client, in almost every trading situation, has near perfect information about the market risk and fundamental risk of a bond. The main reason a

Judge Chatigny
11/18/2020
Page 2

client executes a trade with a specific dealer, outside of any special situations such as an exclusive portfolio trade, is they cannot find better pricing from another dealer. The dealer is there to do one thing – provide liquidity. Does it really matter if a dealer could have sold the bond cheaper to the client or should the client just be happy that they received the best execution available to them when they decided to execute the trade?

Moreover, I find it interesting how most of the "client-dealer" relationships are represented as collegial and benevolent. Having sat in both roles, I can tell you they are not. Most conversations start off with a nice greeting, maybe an anecdote from a previous conversation, then turn into mental warfare with each participant attempting to get better pricing for themselves while both use elements of their respective analysis and/or spin to defend their own position. Half of the time the negotiation ends with the client offering their next trade to this dealer if they come closer to the client's price to which the dealer ultimately agrees.

Back to Michael

The above depicts what Michael did every day for almost 10 years of his life.  He did it with a high level of integrity and was successful in adding a collegial element to the relationships in which he formed.  I find it laughable to be considered a victim, as I never felt, thought, or experienced that I was being robbed, threatened or harmed by Michael. It was quite the opposite. I never relied on Michael to perform the analysis on a given security, though I respected his opinion given his experience and intuition, and I always understood that, as a dealer, he needed to be paid for providing liquidity.

Again, I can't say enough in this letter to describe the respect I have for Michael as a friend and a professional. I can only imagine the amount of stress he and his family have endured both personally and financially. I would ask that you consider leniency for Michael with regard to his sentence. Thank you for your time.

Best regards,

Michael DePietro

**Ex. A-13**