# EXHIBIT A

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street – Room 228
Hartford, Connecticut 06103

October 30, 2020

Dear Judge Chatigny,

Thank you for your willingness to read and consider this letter concerning Mike Gramins.

I am a fixed-income portfolio manager and have been on the buy side now for 25 years. Markets, asset classes and economies regularly change, and one of the keys to efficiently adapt to them is to ensure that your sell side contacts are on point, dependable and informed. For the 10 years that Mike was a counterparty, he was a standout example of all of those. I believe that so strongly that I flew to Hartford to be available as a defense witness in May of 2017.

I had been trading structured products/non-agency RMBS for a few years when Mike started with the Lehman team in 2004. While my relationship with Lehman's desk was already in solid shape, Mike easily complemented and deepened it, so much so that he became one of my daily contacts for trading strategy and color. I always knew that when Mike shared market color, thoughts on trading activity, positioning and otherwise it would be comprehensive and insightful. I did not do every trade with Mike, I did not win every bond I bid through him, and I did not achieve the target price on every bond I sold to him, but I would be more scared if I did: there are plenty of short-sighted traders on Wall Street who will burn bridges just to get a transaction, and the fact that Mike and I were able to maintain both a solid trading relationship as well as develop a personal friendship is testament to his character and conduct.

The Great Financial Crisis brought depth of relationship to bear like no other time on Wall Street, as the dislocation led to losses, turmoil and uncertainty. Mike brought tireless effort to this situation, as trading desks were trimmed and balance sheets curtailed, so being able to work with someone dependable was paramount. Mike being there to help me with trades, analysis and insight allowed me, and more importantly, my clients' portfolios, to thrive despite everything occurring in the broader market. There is no question that Mike's relationship saved many millions of dollars for the pensions, endowments, and similar for which my firm managed accounts.

Finally, my willingness to fly to Hartford during the trial proceedings was simple because in short, I would be happy to tell the truth on anybody's behalf, and that much more so for a good person who is a good friend. I was shocked that Mike was found guilty of any charges: he always spoke the language of the market, he did things the right way, and in no uncertain terms, my clients' investments were better because of all the ways they benefitted from Mike.

Sincerely,

Brian Loo

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103

November 7, 2020

Dear Judge Chatigny,

I write to you with the greatest respect for the process and government prosecution efforts that lead to this sentencing. With such a complex case that has spanned over such a long period, there are likely human aspects of Mikes character that get lost between the nuances of ticks, BWICs, and yield tables in the mortgage backed security universe.

I first met Mike in person when he worked at Lehman Brother's in the throes of the financial crisis in 2008. He had come to Los Angeles with his then girlfriend Natalie, and somehow had been roped into making his personal trip a service to the local Lehman salesperson by having dinner with clients. I had known Mike as a fair but intelligent counterparty on a professional level from the time that I began trading bonds. On a personal level, the person I met was completely different; he was obviously dedicated to Natalie and openly discussed looking forward to having kids and a family.  Rather than talk about fast cars or fancy watches--as was the wont for Wall Street bond traders at the time--Mike talked about public affairs, he displayed a genuine concern for social justices issue, and he showed interest in the non-profit Uncommon Good, which we talked about at length.

In the subsequent 6+ years, I got to know Mike as a person better. He relished the long weekends he would get to spend with Natalie to the extent that his peers would poke fun at him about Memorial Day to Labor Day being his Family Vacation. From a personal character perspective, I knew Mike to be loyal to his wife and family in many ways that are uncommon of men in that profession, and led me to respect him beyond his ability to create bond market liquidity.  Due to the circumstances around Mike's case, I have not been able to speak with him since just after ▮ was born, but when he and Natalie had their first child you could tell that they would be great parents in ways that are not a given in this day and age.

I would implore you to consider probation in this sentencing, not just on the basis of his character, but out of consideration for Natalie and their children. ▮ and ▮▮▮▮▮ have seen their Father weather 6 years of strain and emotional punishment that would have destroyed most families. They deserve to have him in person during these formative years.

Sincerely,

Ben Hunsaker

**Ex. A-15**

almitas capital

November 21, 2020

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103

Dear Magistrate Judge Chatigny,

I am writing to you regarding Michael "Mike" Gramins. I have known Mike for 15 years, from his early days at Lehman Brothers, then Barclays and Nomura. Before starting my own firm, I was a senior portfolio manager at Western Asset Management, one of the largest institutional fixed income asset managers in the United States. In my role as head of the Asset Backed and Mortgage Backed Investment Teams for over 20 years from 1991 - 2012, I was responsible for managing close to $100 billion of the $500 billion in client assets. During the Great Financial Crisis of 2008 – 2009, I ran the Western Asset Public – Private Investment Partnership, among the top performing of the eight such funds managed for the US Treasury Department.

In my role at Western Asset in Pasadena, California, I interacted frequently with Mike over the phone, in person on my business trips to New York, at conferences, and on his visits to Southern California. I and my team transacted billions of dollars in Mortgage Backed Securities with him and his trading desk and we found Mike and his colleagues to be highly professional. I have always found Mike to be ethical, fair, and honest. While we always performed our own analysis and due diligence when investing, as any institutional investment manager should, I would often reach out to Mike for his opinion on various mortgage bonds. He was always helpful and willing to share his views.  He was willing to spend the time to educate us on the nuances of many bond structures, making us more knowledgeable and better investors.

I would be happy to work with Mike in the future should our business paths cross again. I hope you will take my experience with Mike into consideration and please do not hesitate should you have any questions.

Sincerely,

Ron Mass

Ex. A-16

16th of November 2020

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103


Dear Judge Chatigny,

My name is Aaron Malik.  Up until September this year I worked at CQS, a London based hedge fund as a Senior Portfolio Manager and Partner.  Most recently, I have consulted for a number of companies on Data Analytics within the Medical profession as well as advised as a member of Investment Committees for a number of Charitable causes.

I am writing to you today in light of recent developments in Michael Gramins' case and would wholeheartedly would appreciate if you were able to take my below comments into consideration in your decision on Michael's sentencing.

Firstly, I would like to just to express my sincere sadness when I learnt of the Second Circuit Court's decision to reverse your decision to grant Michael a new trial.

I have known Michael for eleven years since when he first joined Nomura Securities.  In the period up to his departure from Nomura Securities, Michael and I formed a very strong professional and personal relationship.  Michael and I are of similar ages and both started within the industry at similar times.  Being based in London, over 3000 miles away, I believe was one of the reasons why the relationship I share with Michael was stronger than my relationships with other Senior Traders in the US: Michael felt a duty to help rectify any perceived disadvantage I may have had making investment decisions in a market that is so heavily dominated by US investors.

Michael and I spent much time exchanging investment ideas.  While, we agreed on most, we disagreed on many which led to many lengthy conversations, often resulting in involving others to 'chip-in' with their insights.  While conversations would be combative, there was always a significant appreciation of each other's views: Michael has on many occasions respectfully humbled me with his deep knowledge of the asset class and I have very much appreciated the significant amount of time that Michael has spared to educate me.

It was this level of professionalism that I believe set Michael apart from others that I have traded with in New York and it was for this reason I made an effort to get to know Michael personally.  I was thrilled when I learnt he was able to come to London as part of a business trip, giving me the opportunity to further develop our personal as well as professional relationship.

In the time that I have known Michael, I would categorise Michael as one who has always treated me with a lot of respect, given me unquestionable support when I have needed it, educated me without an ego and it saddens me to hear that despite Michael having done everything within his power to live a normal life for himself as well as his young family, that he is still unable to put the legal issues that he has behind him.

**Ex. A-17**

In closing, I would like to thank you for your attention to this letter and hope that it will be taken into consideration.  I am available should you have any questions of me.

Respectfully Submitted

Aaron Malik

London

United Kingdom
+447823883317
Aaron_malik@hotmail.com

**Ex. A-17**

November 20, 2020

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103

Dear Judge Chatigny,

I have known Michael Gramins for over fifteen years and have done hundreds, perhaps thousands, of trades with him over that time from my seat at a bank (Dresdner), a hedge fund (Peloton Partners) and two broker-dealers (CrossPoint Capital and Braver Stern).

The number of traders I have trusted implicitly over my nearly two decades in the business can be counted on one hand.  Mike and his colleagues were, and still are, firmly on that one hand.

Our business relationship began as early as 2005 and was predicated on his knowledge of the market and his ability to get my firm best execution.  Michael's market share grew as he developed trust throughout his customer base and ultimately Lehman Brothers was our most consistent counterparty on CDS trades for my hedge fund from 2006 through to February 2008.  Simply put, he got us the best price, and the best opportunity set more often than any other broker dealers.  On numerous occasions we were willing to pay more and he refused to accept it.  With us, I never had a doubt as to his intentions or integrity.

Despite initial success and this fabulous opportunity set my hedge fund got into trouble in February 2008 and ultimately we failed. It took over a year to work out the various counterparty and dissolution issues and when I returned to the market it was at a small broker-dealer and with a black mark on my resume. I'll be forever grateful that Micheal, along with Ross and Tyler, treated me with the same respect as they did when I was running a $2 billion hedge fund. I'll also be forever impressed how they built a non-agency residential MBS desk almost from scratch on the back of their hard work, acumen and trustworthiness.

As SEC deputy Reid Muoio correctly pointed out at the time, establishing a fictional backstory for a bond or a price was indeed "fairly commonplace, fairly widespread" during the period on which this case focuses.  I am sure Michael regrets the behavior that led to the trial, just as I am sure he was absolutely nowhere near the worst offender.

When I attended the trial in June of 2017 I felt that eradicating this widespread, commonplace practice many years after the fact through the scapegoating of a few traders seemed perverse and patently unfair.  I understand the deterrent value, and bringing the cases immediately effected the changes the prosecution wanted to bring about.

**Ex. A-18**

I remain convinced that over 5 years of this has been gratuitously cruel to a devoted father and husband. Michael has already been humbled, fired from his job and pilloried in the press. I respectfully ask that you weigh all of what I have written about my good friend, and good person, into account when deciding the appropriate sentence.

Respectfully,

Peter Howard

Ridgewood, NJ

Anthony Contessa

New York, NY ███

November 11, 2020

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street – Room 228
Hartford, CT 06103

Dear Judge Chatigny:

I am writing you in support of my friend Michael Gramins. I have known Mike personally and
professionally for over 15 years. Most of our interactions were on a professional basis in the years
leading up to and directly following the 2008 financial crisis. During that period, I worked for Swiss Re's
Financial Products Group (SRFP). Initially as an ABS and RMBS trader and then in 2008 I was promoted to
co-Head of SRFP's Securitized Products Group where I supervised 7 traders and analysts. Currently, I am
a portfolio manager at A-CAP Holdings, an insurance company asset manager, where I focus on
commercial real estate and CMBS. Altogether I have 25 years of experience analyzing, trading and
managing securitized assets.

I estimate that from 2006 -2012, our trading desk executed between 50-100 trades with Mike (first
when he was at Lehman and then Nomura). These trades totaled approximately $1 B in market value. In
the direct aftermath of the financial crisis Nomura was a preferred counterparty for our desk. We found
dealing with Nomura's non-agency mortgage trading desk more straight-forward and less conflicted
than dealing with many of the other Wall St firms. We conducted due diligence on most of the non-
agency desks that were active at the time. Many of them had significant conflicts. For example, several
trading desks provided their larger institutional clients with advantages related to information and
liquidity while other desks were in the process of creating their own in-house funds or loan originators.
While not conflict free, Nomura had fewer entanglements and proved they could consistently execute
trades that had our firm's best interests in mind. As we did more business together, Mike consistently
proved himself trustworthy and that led to a strong working relationship. Many of the trades we
executed with Mike were profitable for SRFP – several of them were very profitable.

The financial crisis was a difficult and stressful time on Wall St. I didn't enjoy this period, neither did
Mike.  During this period, Mike moved from Lehman to Barclays to Nomura. Many of our friends lost
their jobs and never returned to Wall St.  Mike and I spoke a lot about these events, adopting a gallows
humor to lighten up the mood and keep us focused on our jobs. We spoke on a variety of market topics
as well. These conversations focused predominantly on the performance of individual credits (individual
non-agency bonds) and their associated mortgage originators. We had differing opinions on many bonds
– in general (and unsurprisingly), I thought the bonds my firm owned were worth more, he would often
disagree and promote the positions he owned. When we agreed on value we traded, when we didn't,
we would debate and then likely move on. I remember one insured, non-agency bond (a bond that had
its principal interest guaranteed by a third-party insurance company) was the source of a particularly

**Ex. A-19**

long, drawn out debate. When there was good news about the bond's insurer and the insurer's stock price was higher, I would call Mike and argue for an improved bid, when the stock price sank, he would call and claim his lower bid was validated. This went on for months – eventually we agreed on a price and traded. For a while afterward we would laugh about that trade, how long it took to execute, revisit our arguments under the market's current circumstances and say I told you so. I guess the point here is that we were on different sides of the trade, both trying to maximize value for our firm in volatile and inefficient markets where exact prices on many non-agency mortgage bonds were difficult to determine. One of us might get the better of the other on one trade, but that would likely reverse in a subsequent trade or over time. I can't think of an instance when after a trade there was information that came to light that made me feel I had been duped or lied to.

I hope that I have given you some additional insight into Mike's character and how he conducted himself professionally. I have to say I was surprised that he was singled out for prosecution, obviously not my place to comment on fairness – suffice to say that I've run into some real scoundrels in my Wall St days and Mike is nowhere near that category. I have always found him to be an honest and forthright individual. I would gladly do business with him again – on Wall St or anywhere else.

Sincerely,

Anthony T. Contessa

Ex. A-19

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103

November 17th, 2020

Dear Judge Chatigny,

My name is Jaime Arouh. For the past 5 years I have been the head of capital markets at LendingOne, a mortgage loan originator. Over my 20 year career in the mortgage industry, I have held several senior trading positions at both banks and buy-side firms. I started my career in 2001 at Lehman Brothers and met Mike in 2004 when we were both just starting out as junior traders. We worked together through 2008 and continued to trade with each other until I left bond trading in 2013.

Throughout the 9 years that I either worked with Mike or traded with him as a "client", I never witnessed nor experienced any type of misconduct whatsoever.  I have always known Mike to be a stand-up guy and conduct his business with integrity. Our business is very competitive, and our clients were the most sophisticated money managers in the world. They purchased bonds by relying on very complicated models, very little stock was put on anything a trader may communicate to them - they simply established a price they were willing to buy at and would do their best to purchase the bond at or below their specified price.  While the concept of winning or losing on a trade certainly existed, I do not believe Mike ever traded maliciously or with any intent to defraud a buyer.

While the charges Mike has been convicted of are very serious, I ask of you to be lenient in his sentencing. These matters have been a major stress point for Mike and his family over the past 5 years, and I know he is looking to put this behind him. I hope that you will take this letter into consideration when deciding on the appropriate sentence.

Sincerely,

Jaime Arouh

November 17th, 2020

Hon. Robert N. Chatigny

United States District Court

District of Connecticut

Abraham Ribicoff Federal Building

450 Main Street – Room 228

Hartford, Connecticut 06103

Dear Judge Chatigny,

My name is Jeff Katz and I am writing on behalf of Michael (Mike) Gramins. I have known Mike for over a decade and consider him a close friend and colleague. I currently work at Trust Company of the West (TCW) as a Managing Director: however, I previously worked at Western Asset Management Company (WAMCO) as a Portfolio Manager from June 1998 to June 2011. My statements in this letter are my personal views only, and do not reflect the views of anyone at TCW or WAMCO. While at WAMCO I met Mike, and subsequently did a great deal of business with him over the years.

My dealings with Mike go back to when he was a junior employee at Lehman Brothers and subsequently at Barclays and Nomura. In my dealings with Mike over the years I always found him to be thoughtful and considerate of client needs and concerns. In trading you find yourself gravitating towards a select group of counterparties you feel you can trust and Mike was at the top of my list. I was surprised to learn of the allegations against Mike and I am certain Mike feels remorse to the extent he violated anyone's trust. That being said, given the nature of our business it is my belief that any and every investor should invest on the merits of the security not based on information provided by third parties or counterparties.

In addition, to knowing Mike form a work perspective I was privileged to get to know his wife Natalie and family outside of our work confines. Mike is a family first person which I've witnessed first-hand. Mike has always been kind, loving and considerate of not only his family but others who cross his path.

Mike has two young children and a lovely wife that he cares for tremendously. I feel that it would be detrimental to society if a kind, thoughtful, loving person such as Mike were to be incarcerated for a non-violent crime. Though Mike is a friend of mine, I am aware that everyone makes mistakes. Knowing Mike for as long as I have I am certain he is deeply remorseful and hurt that he faces the possibility of being separated from his family.

I believe it is important to weigh the financial cost of housing a prisoner who possesses no violent tendencies to society versus Mike's ability to repay society through probation or community service. I believe this will have a greater impact for the betterment of society if Mike could contribute in a positive fashion as opposed to being housed behind bars.

Ex. A-21

Thank you for your consideration,


Sincerely,


Jeff Katz

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103

November 30, 2020

Dear Judge Chatigny,

It is with great respect that I ask for you to have leniency on Mike Gramins.  He and I began in the industry together around the same time.  I was a client of his, and he always treated me with respect and friendship.  We got to know each other and develop our understanding of the market together.  He assisted in providing market opportunities and trade ideas, as well as sharing information.  I cannot condone what was done but I never experienced that behavior when dealing with him for over a decade.  I know that he and his family have already suffered from the long process, and would ask that you could allow the healing to begin.

Thank you for your time and consideration,
Greg Handler, CFA
Co-Head of Structured Products at Western Asset Management

**Ex. A-22**

November 1, 2020

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Connecticut 06103

Dear Judge Chatigny:

Our names are Kerry and Cheryl Carrington. We have lived in Charlotte, NC for 35 years. Kerry is retired from the steel industry and Cheryl is retired from teaching. Michael Gramins is our son-in-law and we have known him for 13 years.

We were thrilled when Michael started dating our daughter, Natalie. It was soon apparent that Mike was a very honorable man; a man of deep religious convictions who always tried to do what was right. When he came to us and asked for our daughter's hand in marriage, we couldn't have been happier for him to be a part of our family.  Mike has always been concerned about others. Over the years he has always made time to visit us. Whenever he visits, he makes a special effort to see Cheryl's mother who is in a nursing home. For our 40th Wedding Anniversary, Mike helped to plan a memorable time for our whole family to come together to celebrate in Bluffton, SC.  As you can see, family is very important to him!

Mike has always been an extremely hard worker. He worked hard in the financial industry but made sure he left his work at the office when he came home. When Mike was indicted in 2015, he could no longer work in the profession he loves. Rather than wallow in a state of depression, Mike applied himself and found a job so that he could provide for his family. We really admire the positive attitude that he has taken over the last five years. Frankly, we aren't sure how he has been able to endure it all but Mike is determined to make the best of the situation he has been put in.

Although Mike always tries to maintain a positive attitude, the last five years have taken a toll on him and his family. Most young families can look forward to the

many possibilities the future brings. For Mike and his family there is nothing but uncertainty. The stress is always there. During the trial was an especially difficult time for Mike and Natalie. They had a 6 week old daughter and a young 3 year old son at the time. They had to relocate their family to the Residence Inn in Hartford, CT for 6 weeks. So that Mike and Natalie could attend court together, Cheryl flew to CT to help with the grandchildren. The days were long and very trying on both of them as you can well imagine.  We can see that stress whenever we get together. We all feel so helpless that such a good man has had to endure this for five years.

Mike has also been a great father to our two grandchildren. He participates in all aspects of their lives. It is so cute to see him say prayers with them when they go to bed at night. We have seen how Mike has taught them to ride bikes & scooters, throw a football, play soccer, and learn to be a team player. They've enjoyed making  their own traditions together at the pumpkin patch, summer vacations, and picking and decorating their Christmas Tree. Mike's father instilled in him a passion for Lionel trains and Mike has passed down this passion to his son. They spend hours setting up trains and getting them to work. Mike even took it upon himself to get a train engine repaired that belonged to Cheryl's father. Now when they come at Christmas, the kids enjoy running their Great Grandfather's train around the Christmas tree.

Our grandchildren, ██ and ███████, are now 6 and 3. We believe that the role of the father in the home is critical so that our grandchildren can have the proper upbringing. We pray that Mike will always be there for them.


Sincerely,



*Kerry and Cheryl Carrington*

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street – Room 228
Hartford Connecticut 06103

25 October 2020

Dear Judge Chatigny,

I am reaching out to you concerning Michael (Mike) Gramins, who is currently undergoing the sentencing phase of his trial.  I am Mike's brother-in-law and godfather to his son ▇▇▇▇▇▇ (▇).  I currently reside in Fishers, Indiana with my wife and daughter and work as Head of Digital Health and Innovation for Roche Diagnostics' Global Regulatory Policy and Intelligence team.  Roche Diagnostics has been at the forefront of responding to the COVID-19 pandemic, bringing to market important tests to help detect and prevent the spread of this debilitating disease.

I have known Mike ever since he started dating my sister, Natalie, many years ago.  I have always been very protective of my sister, but Mike was different from her previous boyfriends; he was caring, always took a deep interest in getting to know my family, and always went out of his way to make people feel welcome.  Shortly after they started dating, I had a job interview in New York, and Mike drove me all around the city, showing me the sites and explaining key locations.  Although I ultimately turned down the position, Mike's willingness to show a relative stranger around the city was a brief glimpse into the kind of person he is.

Of course, since that time, I have gotten to know Mike much better.  We have spent holidays together, we have gone on vacation together, and I have seen he and my sister's love for each other grow, both emotionally and physically with the expansion of their family.  Mike has been an excellent husband to my sister from day one, always putting her needs above his own.  And, he has been an excellent father.  His children, ▇ and ▇▇▇▇▇▇▇, adore him, and he always makes time for them, whether it be teaching ▇ how to ride his bike or reading stories to ▇▇▇▇▇▇.  He is slow to anger, abounding in love, and a model for other fathers.

Mike truly cares about those around him and has been a source of constant support for his extended family.  In 2013, I was at a rather low point in my life, as my first wife had recently left me and I was quite depressed.  Without prompting, Mike flew out to Indiana to spend time with and encourage me.  He wanted to be there for me as a sounding board while I worked through my doubts and fears, and he reminded me of the importance of focusing on the positive aspects of life.  Mike was right, as I eventually made it through that dark period and have never been happier, but I will never forget our discussions during that time or how much his visit meant to me.

Ex. A-24

The past several years have been very challenging for Mike and his family.  Since 2015, he has been coping with the difficulties associated with his current situation, and his career and life have been turned upside down.  Most people in such situations would succumb to fear and doubt.  Yet, Mike has remained extremely positive and upbeat.  He has remained an excellent husband to my sister and an exceptional father to my niece and nephew.  He has continued to work to provide for his family despite his challenging circumstances.  And he has continued to act with integrity despite it being questioned.

Judge Chatigny, I implore that you impose upon Mike the minimum sentence of Probation.  Mike and his family have suffered much over the past five years, and such a sentence would be commensurate with the crime for which he has been convicted.  Mike has and will continue to be a positive member of society.  He has contributed and will continue to contribute a meaningful impact to lives of the people with whom he comes into contact.  I would greatly appreciate if you could take these factors into account during you deliberations.

With Highest Regards,

Nathan A. Carrington

Nathan A. Carrington, Ph.D.
████████████████
Fishers, IN ███
Cell Phone:  (865) 300-8139

**Ex. A-24**

November 7, 2020


Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103


Dear Judge Chatigny,

I have known Michael Gramins as a friend and colleague for the past 16 years.  Mike was only one year ahead of me in the Lehman Brothers analyst class, and I can still remember, in my first months on the job, admiring how successful and well-liked he was on the trading floor even at a young age.  During my first three years at Lehman, I was on a different trading desk than Mike, but I still looked up to him immensely.  In 2008, I joined Mike's desk, and I immediately took every opportunity to ask him questions and learn from him whenever I could.

One thing I learned early on is that even though Mike and I grew up in different parts of the country, we had similar backgrounds and were raised with similar values.  We were both from hard-working, middle-class families.  We both worked as hard as we could our entire lives to create opportunities for ourselves.  We both got into great colleges, but neither of us had the ivy league pedigree that so many of our peers had at Lehman Brothers.  What we lacked in connections and status, we made up for in hard work and determination.  We were always two of the last people on the trading floor, not because anyone told us we had to be there, but because it was natural for us.  Mike's success as a trader and his willingness to help other young traders helped me grow in my career, and it was a huge part of my decision to stay with the team that moved from Lehman to Barclays, and later to Nomura.

Unfortunately, Mike and I were ensnared in an investigation that spanned our entire industry, but ultimately focused on our small trading desk at Nomura.  Throughout the six-year ordeal, there were countless times when I would ask the question, "Why is this happening to me?"  I felt as though I had always lived my life trying to do the right thing, just as my parents had taught me to do.  I had never been in trouble in my life, yet I found myself accused of federal crimes that, statistically speaking, were almost certain to brand me as a felon for the rest of my life and possibly send me to prison.  It was no secret that the things I was accused of doing had been commonplace in our industry for decades, and I felt as though I was being singled out and made an example of.  The emotional burden of feeling isolated, afraid, and helpless was constant and overwhelming.  One thing that always got me through the darkest of times was knowing that I had a friend, one who also lived his life always trying to do the right thing, who was going through the same exact thing I was.  I wasn't able to speak to Mike very much between the time we were indicted and our trial, but every time I did, his positivity and determination helped me keep my head up and continue working to get my life back.

Still, as positive as Mike's attitude has been, it is difficult to emphasize how horrible the past six years have been for us.  We lost our careers at the exact time we had started to build our families.  We lost countless friendships and professional relationships, many of which were over a decade old.  Even though I was acquitted, the toll this case took on me, my livelihood, and my family is incalculable.  When the investigation was bearing down on us, my wife and I made the difficult decision to put our plans of having children on hold.  I admire that Mike continued to grow his family, but I can't imagine how difficult the past several years have been for him. Mike's son █ is 6 years old.  Mike was put on leave just after █ was born, and Mike has had to raise him while dealing with the stress of the case and the fear that he would be taken away from his son.  Mike's daughter ███████ was only weeks old during our trial.  I thought going through a criminal trial was the most difficult thing I'd ever have to do; I'll never understand how Mike and Natalie did it while caring for a newborn.

Despite all of things that I lost during this case, I was always most terrified of one thing: being taken away from my family.  Judge Chatigny, I implore you, please do not separate Mike from his wife, Natalie, and his children, █ and ███████.  I humbly offer that it would not serve any good to society to incarcerate Mike.  It would not only harm his wife, his children, and his family, but it would hurt everyone else who Mike could otherwise have an impact on through his character, positivity, and work ethic.

Incarcerating Mike would also do nothing to further deter the type of behavior in the marketplace that this case was about.  That end was reached long ago when we were charged criminally in the first place.  Mike has been out of the industry for six years now, and he will never be able to go back.  He has already been stripped of his job and his ability to make a career that looks anything like the one he worked his whole life to achieve.  To sentence him to a prison term at this point would only serve to punish his family and his children by taking him away from them.

Sentencing Mike to prison would also put an immeasurable burden on his wife, Natalie. Like Mike, I have also known Natalie for nearly 15 years.  She is outgoing, kind, successful, and humble.  It is incredible how she has managed to build a wonderful family and a successful career throughout this extremely difficult time.  Natalie has always been successful professionally, but in the past several years she has taken on the role of providing the vast majority of the family's income.  To make her a single parent for any length of time would no doubt place an even greater burden on her than she already faces.  It would jeopardize her ability to sustain her career, which is more important for her children now than ever.

I know first-hand the punishment and suffering that Mike and his family have already gone through over the past six years.  Despite being acquitted in the case, I lost more than I could ever regain.  I feel as though my sentence started the day I was made a target in this investigation, and it will continue to hang over my head for the rest of my life.  The one positive that I've been able to take away from my experience over the past few years is having time to spend with my young daughter, who was born in 2019.  If I were facing the prospect of being separated from her, it would be impossible to think about anything else.  Mike has already lost even more than I have – to separate him from his family for any amount of time after all he has been through would be an unbearable burden, even for people as strong as Mike and Natalie.  I

ask you to please consider this when contemplating Mike's sentence, and I thank you for your fairness and thoughtfulness in all aspects of this case over the past five years.

Respectfully,

Tyler Peters

November 11, 2020

Hon. Robert N. Chatigny
United States District Court
District of Connecticut
Abraham Ribicoff Federal Building
450 Main Street - Room 228
Hartford, Connecticut 06103

Dear Judge Chatigny,

I have known Mike Gramins for over 10 years.  We met through my sister, Renee, and now
husband, Tyler, both of whom worked with Mike for many years before and after we met.  My
sister is good friends with Mike's wife, Natalie, who also worked at Lehman Brothers, Barclays,
and Nomura with Mike, Renee, and Tyler.  Natalie worked very closely with my brother-in-law,
another Mike, in mortgage sales.  Needless to say, we had a lot of connections that preceded our
relationship, and many occasions to spend time together over the past ten years.

Mike and Natalie were actually present for Tyler and my first date in 2009.  It was one of the
first occasions for Mike and me to socialize.  The first thing I remember learning about Mike was
that he came from a big family and was very close with them.  Hearing him talk about his
siblings reminded me of the relationship I have with my own sisters, and I immediately felt a
connection to him.  I had the opportunity to meet some of his family and friends over the years at
birthday parties, weddings and work events, and I always felt like I was among my own family.
One memory of Mike that will always stick with me occurred at a more somber event.  My
mother passed away in February of 2015, and I'll always remember Mike and Natalie with their
son █, who was just a baby at the time, walking in to greet my family and me at her wake.  It
meant so much to me that they made the trip to support us, and on one of the worst days of my
life, he provided a brief moment of comfort.

The situation Mike faces now is nothing I could have ever imagined happening to him.  I have
always known Mike to be a loyal, compassionate, and honest person.  I cannot imagine what he
and his family are going through right now, and yet I do have a very unique understanding of
what it's like to have something of this gravity hanging over your head.  When this ordeal began
for Tyler and me almost exactly six years ago, it immediately felt preposterous, like it was
happening to someone else.  The shock, confusion and fear kept me up most nights for the years
leading up to and during the trial.  As scared as I was thinking of the "worst case scenario", the
anxiety of waiting for a resolution and the helplessness I felt were the worst type of punishment I
can imagine.  It infected my every thought and clouded any happy moment or occasion.  There
was no distraction or moment of solace.  Tyler and I were able to get some closure on June 15,
2017.  When I think that Mike and his family have endured three and a half more years in limbo,
it makes me sick to my stomach.  I can say with certainty that the six years of waiting, agonizing

and preparing for the outcome that Mike is now facing is a sentence already served.  Even if this ordeal finally ended for Mike today, he would still face an uphill battle for the rest of his life.  Despite the closure that Tyler and I have had, we still contend with the fact that he lost his career and can never get it back.  He lost his livelihood, and many friends.  There is a black mark against him in any professional endeavor he attempts.  This will always be something he has to explain, and he will never fully be rid of it.

A year and a half after the trial concluded for Tyler, we welcomed our first child.  Being a mother now has only amplified the sorrow and disbelief I feel for Mike's current situation.  I find myself thinking of his own mother, and how despite the fact that he's grown, her job of loving, caring and worrying about him is never over.  I think about how excruciating it would be to be separated from my daughter for even one day, and how confused she would be if I were gone.  I implore you to consider how devastating a sentence of incarceration would be for Mike and his family who have already suffered and lost so much.

Thank you very much for your time and consideration.


Respectfully,

*Julianne Peters*

Julianne Peters

Ex. A-26

Hon. Robert N. Chatigny
District of Connecticut
Abraham Ribicoff Federal Building
United States Courthouse
450 Main Street - Room 228
Hartford, Connecticut 06103.
Re: USA v. Shapiro et al.

12/17/2020

Dear Judge Chatigny:

I am not only writing this letter in support of my friend Michael Gramins, but also to offer my unique perspective on the challenges that I know you both are facing today.

You only know me as a case name (USA v. *Litvak, Litvak I, Litvak II*).  I must have read my name in the transcript of this case a thousand times. Although my conviction was ultimately vacated, I served 226 days in prison.

What I am hoping to convey here in this letter is how traumatic the incarceration of 226 days was to me and my loved ones.  I remember the day I had to say goodbye to my wife and kids, and it will be etched in my brain forever.  I do not wish those indelible memories on my worst enemy.  There is no such thing as one individual serving the sentence imposed on him/her.  There are husbands, wives, children, brothers, sisters, aunts, uncles, grandparents, friends and countless others who become part of this frightening journey. There are so many stages of grief as this process unfolds, but I think the hardest thing for me was the unknown.  The unknown is a scary place for human beings.  As evidenced by the current state of the world, with COVID-19 overpowering our daily lives, the uncertainty of what tomorrow may bring is a hard concept to grasp.  At some level, I think after today's sentence, Michael and his family can begin to put this trauma behind them.  That is my hope. But it has been a trauma.  I know it all too well.

Michael and his family have been involved in the prosecution of this case and the "unknown" for the better part of 5+ years now.  The mental and financial stress of those years have been devastating.  It has been a punishment that cannot be escaped.

For each of my 226 days at FPC Pensacola, all I could think about was getting back to my family and loved ones.  I was grateful to be at a facility that was safe.  But 226 days was 226 days too many for me and my family.  The government has clearly changed the RMBS industry.  Please allow my 226 days to be the only days of incarceration that come from this prosecution.  I was the first one to be charged, and I want to be the only one that went to prison.  No one else should have to endure that.

**Ex. A-27**

I believe something other than incarceration would serve as a more meaningful and productive use of Michael's time. At FPC Pensacola, I encountered first time offenders, multiple offenders, and men who had transitioned all the way from a penitentiary.  Most of the men I spent time with were sorry for what they had done, and wanted nothing more than to get back on their feet and be a productive member of society.  I became a resource and a person that these men felt comfortable in talking to or looking to for advice. I have taken it upon myself to get involved in the Criminal Justice Reform movement, and am working to make a difference for others who are faced with some of the same challenges that I had been faced with.

It is my hope that Michael can become a lightning rod to help effect positive change.   I think imposing a sentence of mandatory community service, so that Michael can help others as well, could serve as a meaningful sentence. I am happy to provide the court with a brief summary of some of the organizations that I have become close with and to help and support Michael in this process.


Respectfully,

Jesse Litvak

Ex. A-27