# EXHIBIT B

HB87BLOS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                          16 Cr. 595 (JPO)

5   BRIAN BLOCK,

6               Defendant.

7   ------------------------------x
                                        New York, N.Y.
8                                       November 8, 2017
                                        2:30 p.m.
9

10  Before:

11                  HON. J. PAUL OETKEN
                                    District Judge
12

13                      APPEARANCES

14  JOON H. KIM
         Acting United States Attorney for the
15       Southern District of New York
    BY:  BRIAN BLAIS
16       Assistant United States Attorney

17  STEPTOE & JOHNSON LLP
         Attorney for Defendant
18  BY:  REID WEINGARTEN
         MICHAEL MILLER
19       MICHAEL SCAVELLI

20  ALSO PRESENT:  ANTONIA APPS,
                    Attorney for Interested Party Vereit
21

22

23

24

25

HB87BLOS

1              (Case called)

2              (In open court)

3              MR. BLAIS:  Good afternoon, your Honor.  Brian Blais

4     and Daniel Tehrani for the government.

5              THE COURT:  Good afternoon.

6              MR. WEINGARTEN:  Good afternoon, your Honor.  Reid

7     Weingarten and Michael Miller, Michael Scavelli and my client

8     Brian Block.

9              THE COURT:  Good afternoon.

10             We're here for sentencing in this case.  As you know,

11    Mr. Block was found guilty following a jury trial in June of

12    this year on six counts:  One count of securities fraud, four

13    counts of false statements and false certifications filed with

14    the SEC, and one count of conspiracy to commit securities fraud

15    and the other crimes.

16             I want to start by making sure I have reviewed all the

17    documents I should have.  I have reviewed the presentence

18    report by probation with an addendum and sentencing

19    recommendation dated October 12; a submission by defense

20    counsel, dated October 19, which attaches a report from Dr.

21    Richard Bergen on calculation of loss; and numerous letters

22    from family members and friends of Mr. Block, all of which I've

23    read.  And I received a submission by the government dated

24    October 26, and a reply submission by defense counsel from

25    November 3, with an additional report from Dr. Bergen.

HB87BLOS

1              Do I have everything I should have?

2              MR. BLAIS:  I believe that's everything, your Honor.

3              MR. WEINGARTEN:  Yes, your Honor.

4              THE COURT:  OK.  Let me ask you, Mr. Weingarten if you

5    have read the presentence report and discussed it with your

6    client.

7              MR. WEINGARTEN:  Yes, your Honor.

8              THE COURT:  And, Mr. Block, have you had a chance to

9    read the presentence report and discuss it with your lawyers?

10             THE DEFENDANT:  I have, your Honor.

11             THE COURT:  And, Mr. Blais and Mr. Tehrani, have you

12   also read the presentence report?

13             MR. BLAIS:  We have.

14             THE COURT:  OK.  I want to start with -- I think I'm

15   going to do this in two different parts.  As you know, the

16   sentencing decision starts with a guideline calculation.  In

17   this case there is no statutory mandatory minimum, but there

18   are disputes about the guideline calculation and other

19   objections in the presentence report.  So, I want to start with

20   any objections to both the guideline calculation, and then

21   anything else in the presentence report, because I have to

22   resolve those.  Then after that I will give all of you a chance

23   to speak about any other issues after we have determined what I

24   find to be the appropriate guideline calculation.

25             So let's start with any objections that people want to

HB87BLOS

1    put on the record with respect to any of the factual recitation

2    in the presentence report, and then we will talk about the

3    guidelines issues.

4          MR. MILLER:  I think it's fair to say we take issue

5    with the government's characterization of the evidence adduced

6    at trial, but to the extent testimony is actually quoted or

7    documents were specifically referenced we do not take issue

8    with those.  We have had a fulsome dialog with probation, and

9    our substantive comments on the sequence of events and our view

10   of the facts as they came out at trial have been I think fully

11   expressed in that correspondence, which I believe the court has

12   had an opportunity to review.

13         THE COURT:  OK, thank you.  Is there anything you

14   would like to add on that?

15         MR. BLAIS:  Judge, obviously we agree with the

16   recitation of the facts in the presentence report, and we

17   disagree with many of the characterizations in defense

18   counsel's letter to probation.  But we think that the

19   presentence report as drafted is accurate.  We have no

20   objections to it being adopted by the court.

21         THE COURT:  OK.  Well, having reviewed all the

22   objections and all of the facts set forth in the presentence

23   report, I am going to adopt the facts as set forth in the

24   presentence report, largely for the reasons stated in my

25   opinion denying the motion for judgment notwithstanding the

Case 3:15-cr-00155-RNC   Document 585-8   Filed 12/03/20   Page 6 of 78

Case 1:16-cr-00595-JPO   Document 169   Filed 12/04/17   Page 5 of 77          5

HB87BLOS

1    verdict.  I think this is an accurate recitation of the facts.

2    So, I'm going to overrule the objections insofar as they go to

3    the factual recitation.  We will talk about the separate

4    guidelines issues in a minute, including in particular the loss

5    amount, which I think is one of the hotly contested issues with

6    respect to the guideline calculation.  But as to the factual

7    recitation, I do adopt the facts set forth as my findings of

8    fact, based on a preponderance of the evidence, for purposes of

9    sentencing.

10          Now, as I said, the court is not required to follow

11   the sentencing guidelines; they are advisory, but they are a

12   starting point, and they provide a benchmark in any sentencing

13   decision.  And I believe we will be talking a lot about

14   different aspects of the guidelines.

15          To go through the basic issues on the sentencing

16   guidelines in this case, the first thing I want to say is that

17   I have used the sentencing guidelines in effect as of November

18   1, 2016.  It's now the point in November when the new

19   guidelines would come into effect, but there were no changes to

20   the guidelines and, therefore, the same version is in effect as

21   of today.

22          Counts One through Six for purposes of the guidelines

23   are grouped together in this case under Section 3D1.2.  The

24   base offense level for these offenses is 7 under 2B1.1, and

25   then there is essentially three issues that the parties

HB87BLOS

1    dispute.  The first and most significant for purposes of the

2    calculation is the loss amount, and related to that the ten

3    victim enhancement, whether there is an enhancement for ten or

4    more victims.  The second issue is the leader or organizer

5    enhancement.  And the third issue is obstruction of justice.

6    Those are the three issues on which there is dispute.

7              I have read all the parties' submissions, and I think

8    you've argued in full all of those issues.  The one issue I

9    would like to hear a little bit more on -- and you are welcome

10   to put anything else on the other issues on the record -- is

11   the loss amount issue.  And I want to start with the

12   government.  Since the last thing that was submitted was from

13   defendant, I want to see if you have any response on the loss

14   amount issue, and also anything you would like to say on the

15   other issue.

16             MR. BLAIS:  Your Honor, with the court's permission,

17   Mr. Tehrani is going to address the guidelines issues, and I

18   will address the 3553(a) factors later in the sentencing.

19             THE COURT:  Sure, OK.  Mr. Tehrani?

20             MR. TEHRANI:  Sure, your Honor.  So on loss, I just

21   want to start at first principle, which is the objective here

22   is to arrive at a reasonable estimation of the loss

23   attributable to the defendants.  It doesn't have to be a

24   precise calculation, it doesn't have to be the only methodology

25   to calculate loss; it simply needs to be a reasonable estimate

HB87BLOS

1    of the loss.

2            Another objective though is that the court should make

3    an effort not to provide the defendant with a windfall in a

4    circumstance such as this where loss might be difficult to

5    calculate.  And the Second Circuit has been clear on that, that

6    an effort has to be made to make an estimate of loss.

7            So what do we know in this case?  We know that after

8    the defendant's fraud was disclosed shareholders of ARCP lost

9    over $3 billion.  We also know -- and this is basically from

10   every witness at trial -- we know that AFFO per share was the

11   single most important financial metric at ARCP and to ARCP's

12   investors.  So to conclude that zero dollars of a $3 billion

13   loss is attributable to the CFO of the company's fraudulent

14   misrepresentation of the single most important financial metric

15   of the company would be a windfall, and it would be a windfall

16   that should be avoided.

17           So, that gets to the analysis that we have proposed,

18   which is a multiple valuation analysis.  And it's really pretty

19   straightforward.  Basically what we've done is we have provided

20   the court with analyst reports.  The purpose of that is a

21   couple fold -- I will get to some of the purposes later -- but

22   it's primarily to provide a consensus estimate for 2014 AFFO

23   per share.  And defense in its reply has suggested that a

24   consensus is this kind of novel concept.  It's actually not.

25   Government Exhibit 1021 at trial was an e-mail with Mr. Block,

HB87BLOS

1    Ms. McAllister and others discussing -- seeking out the

2    consensus AFFO per share estimate, discussing it.  It's a

3    straightforward concept; it's just the average of what analysts

4    are predicting for whatever metric you're looking for.  So,

5    that's what we have provided.  As of the date the fraud was

6    announced, that was the consensus 2014 AFFO per share.

7         And then looking at the stock price -- which was

8    $12.38, I believe, on the day before the fraud was disclosed --

9    you arrive just through the operation of simple math at the

10   implied multiple to AFFO per share.

11        So a couple points on this.  This analysis is strictly

12   descriptive.  It's not intended to be an analysis of what ARCP

13   should be valued at; it's not an analysis of what we think

14   analysts valued ARCP at; and it's not an analysis of what we

15   are saying how analysts would have reacted to the disclosure of

16   the fraud.  It is strictly descriptive.  It is how was the

17   market on October 28, 2014 valuing AFFO per share.

18        And this is important because their reply dealt a lot

19   with this is an unreliable method to calculate how analysts

20   viewed ARCP.  That's irrelevant.  We're not talking about how

21   analysts viewed ARCP.  What we are talking about is how the

22   market valued ARCP and in particular how the market valued

23   ARCP, in particular how the market valued ARCP in connection

24   with 2014 AFFO per share.

25        THE COURT:  But it seemed to me that your analysis

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

HB87BLOS

1    assumes rather than establishing part of what needs to be

2    proven, which is that AFFO per share when it moves, when it

3    goes down three cents, then the stock price will go down in a

4    kind of linear way or in a correlative way.

5              MR. TEHRANI:  Well, again, a couple things on that.

6              So, I don't think it's our burden to establish that

7    there is some sort of linear correlation.  Again, I think what

8    we're talking about here is a situation where we have a $3.3

9    billion loss.  What we are trying to do is come up with a

10   reasonable estimate for the portion of that loss that we can

11   say is attributable to the defendant's manipulation of AFFO per

12   share.  So, one way of doing that is just looking at the total

13   loss and saying, OK, how much did the market value each penny

14   of AFFO per share, so that we can come up with a conservative

15   and reasonable estimate for the portion of the $3 billion that

16   is attributable to the defendant's conduct.

17             So, in that regard that's the other purposes of the

18   analyst reports that we provided with our submission.  Again,

19   purpose one was just to establish what the consensus estimate

20   was.  The other purpose was to establish that the market cared

21   about this multiple.  So, it's not some obscure financial

22   metric that you wouldn't expect the market to care about.

23   We're not talking about shares or share price to loans payable.

24   We are talking about a metric that, one, the analysts cared

25   enough about to publish on the front page of the reports and,

HB87BLOS

1    two, certain of the analysts specifically used the multiple as

2    a way to value ARCP.

3              THE COURT:  And some did not.

4              MR. TEHRANI:  Some did not, agreed.  And so I think we

5    can lump the analysts into two different categories.  Some,

6    such as JMP -- which I know is a little bit confusing because

7    they also have JPM -- but the JMP, as the defendant's reply

8    recognized, exclusively relied on multiple valuation.  Others

9    in the middle relied on multiple valuation among other

10   valuations, such as discounted cash flow valuation, net asset

11   value valuation.  And some didn't rely on multiple analysis at

12   all.

13             Again, the burden here is not to establish how all of

14   the analysts would have done something or whether there are

15   other ways of calculating the value of the loss; it's whether

16   this is a reasonable estimate.

17             And in a situation where you have all of the analysts

18   reporting the multiple, certain of the analysts using the

19   multiple, and investors who testified at trial also talking

20   about the multiple and something that they looked at, that

21   certainly gets to a point where you can now use that

22   multiple -- it's something that's in the marketplace, it's

23   something that is talked about, it's something that gets

24   reported about, certain analysts are exclusively using it -- as

25   a way to calculate the portion of the $3 billion that is

HB87BLOS

1    attributable to the defendant's manipulation of AFFO per share.

2              And I would also like to talk for a second about JP

3    Morgan report, because that's the defendant's favorite report;

4    they offered it at trial; their reply relies exclusively on it.

5    The reason that they care about it is because I believe it's

6    the only analyst who didn't factor in the particular line item

7    that the defendant fudged, which is the amortization of

8    deferred financing costs into its model for valuing ARCP.

9              And the defendant's conclusion and defense expert

10   conclusion is, therefore, that analyst doesn't care at all

11   about this fraud, that analyst would have valued this fraud at

12   zero dollars and therefore the market value of this fraud at

13   zero dollars.

14             But if you actually look at what that analyst did --

15   and so he published a report on October 30 -- I'm sorry,

16   October 29, 2014.  And if your Honor doesn't have it, I have a

17   copy of it.  But that analyst reduced his target share price

18   for ARCP from $15 to $10, a third.  That $5 reduction in value

19   well exceeds $3 billion.

20             THE COURT:  After the disclosure.

21             MR. TEHRANI:  After the disclosure.  And the reason

22   for that reduction was because of his anticipation of the

23   market's lost confidence in ARCP's management.  And so the idea

24   is that when the CFO of a company is monkeying around with the

25   single most important financial metric of a company, the market

HB87BLOS

1    loses confidence in management and in the company, they have

2    less access to the capital markets, their access to the debt

3    and equity becomes more expensive, their growth is hampered,

4    etc.  There is a lot of fall-out from management's lost

5    credibility.

6          Those costs, which JP Morgan -- this is the

7    defendant's analyst -- those costs are appropriately considered

8    in the defendant's loss calculation.  We cited the case in our

9    initial submission on this as United States v. Kumar, which is

10   that costs associated with management's lost credibility

11   because of a fraud are costs that could be included in a loss

12   valuation.

13         THE COURT:  Yes, I know Ebbers and Kumar say that, but

14   here is my question about that:  The problem is in this case

15   they are so entangled, the curative disclosure that came out

16   it's almost like the $13 million AFFO fudging was almost like

17   the tail that wagged the dog.  I mean the disclosure said you

18   can't trust either five or six quarters of our disclosures, we

19   have accounting problems, and it really emphasized the hybrid

20   versus net versus gross issue, and that's what it's all about.

21   And this trial was not about that.  This trial was about the

22   specific plug issue.  And, you know, I think it's not totally

23   implausible to say that the vast majority of the stock loss

24   came from the hybrid issue, which was not the fraud, which was

25   an accounting problem, but that coupled with admittedly the

HB87BLOS

1    loss of confidence.  But how do you disentangle the loss of

2    confidence about the hybrid issue from the loss of confidence

3    about the particular fraud?

4         MR. TEHRANI:  I hear your Honor, and that's why we're

5    having this discussion in the first place, because we have a

6    disclosure that included multiple other disclosures other than

7    just the fraud.

8         But if you look at the report -- again, this is not

9    what we're relying on.  The purpose of this is just to show the

10   reasonableness of our calculation and the conservative nature

11   of our calculation, because we're not including any of these

12   costs.

13        But if you look at the JP Morgan report on October 29,

14   2014, the things that are motivating the analysts are, first,

15   according to the audit report filings the errors were

16   intentionally made; second, ARCP's credibility is likely

17   impugned for some period of time as a result of this matter;

18   Third -- and it goes on to explain the consequences of the fact

19   that the credibility of management has been impugned because of

20   the intentional nature of the misrepresentations.  And that

21   analyst calculated the value of that at well over $3 billion.

22        If you look at just the difference between the stock

23   price at the time, $12.38, and the new target stock price,

24   which is $10 per share, and look at that delta, that $2 and

25   change, you are looking at something at something that's like

HB87BLOS

1     $2 billion that the JP Morgan analyst is using to value the

2     cost of management's lost credibility.

3            Again, we're not asking the court to find a $2 billion

4     loss.  All we're doing is saying that even their analyst isn't

5     valuing this loss associated with the intentional

6     misrepresentation of the single most important financial metric

7     at zero dollars.

8            It also goes to show that our analysis -- which simply

9     tries to calculate what the market was valuing AFFO per share

10    as of the day before the fraud was disclosed is a reasonable

11    and conservative calculation of the portion of the $3 billion

12    that can be attributable to the defendant's fraud.

13           THE COURT:  OK, thank you.

14           Mr. Miller?

15           MR. MILLER:  Thank you, your Honor.

16           Let me just start out by saying I think the case law

17    obviously references the fact that the court needs to make a

18    reasonable estimate, but particularly in the context of this

19    kind of conundrum, the courts are very clear that the

20    government has the burden of establishing a but for proximate

21    cause causal link between the misconduct and a specific amount

22    of loss that has been established by the government.

23           And the Cuti case is a good example where the court

24    basically said this is too difficult, the government hasn't

25    really carried their burden.  And despite a request very

HB87BLOS

1    similar to the request in this case for a very substantial loss

2    calculation, the court came back and said, look, you know,

3    you're not entitled to an adjustment just because there is a

4    stock drop; you have to establish the linkage between the

5    specific misconduct and the movement in the stock.  And they

6    didn't do that.

7              So, there is precedent for the notion that a reasoned

8    sentencing process results in a zero loss calculation even when

9    there is a substantial stock drop.

10             Let me step back a little bit, your Honor, and just

11   sort of walk us up to where we are right now.

12             It's worth pointing out that the theory that the

13   government has just articulated to you was not the theory that

14   is articulated to probation.  It was not the theory that's

15   contained in the presentence report.  It is not a theory that

16   they shared with anybody until they submitted their sentencing

17   memo.  Presumably they got probation focused on the larger

18   stock drop theory.  We then responded I think with a very

19   persuasive brief arguing that the stock drop analysis was just

20   too much of a blunt instrument.

21             Our brief has five pages of confounding factors not

22   only in the October 2014 press release but, remember, they had

23   to look at -- the government had to look at the subsequent 90

24   days; that's what is required in the application note.  And all

25   kinds of stuff happened during that 90 day window.

HB87BLOS

1           And when all was said and done, the government, I

2    think -- in its papers and by the way it's handled itself

3    today -- has conceded that that is just an untenable theory to

4    go forward on.  But that's what they presented to probation,

5    that's what is in the PSR, and only in their sentencing memo

6    for the very first time do they bring out this new theory.

7           It's worth also pointing out that the Dura

8    Pharmaceutical case and the cases that follow it speak to the

9    value of getting expert opinions on this specific issue.  Now

10   obviously you have seen two opinions that we submitted from Dr.

11   Richard Bergen.  We know the government has retained and sought

12   advice from experts.  If you look at footnote five in their

13   sentencing memo, in footnote five of their sentencing memo they

14   basically say that their expert told them in effect, hey, the

15   theory you ran by probation doesn't stand up; we can't do the

16   kind of analysis that will support your theory.  Take a look at

17   footnote five.  It couldn't be clearer that they have an expert

18   advising them on all of this.

19          So, I query why is it that we're here at sentencing

20   with this novel theory that no one has ever heard of before, no

21   case has been cited by the prosecution where this particular

22   theory, this specific a way of thinking about the loss

23   calculation, has been accepted by a court.  And there is no

24   expert report.  It would have taken nothing for the government

25   to have their own expert draft a two or ten or 20 page report

HB87BLOS

 1       supporting this theory, but they haven't done it.

 2                THE COURT:  But it is a plausible way of zeroing in on

 3       what we learned at trial is kind of the key metric for earnings

 4       for a REIT, in that it does focus on -- you know, it kind of

 5       gives you a number that if you accept the premise that that is

 6       correlated with stock price, it gives you a number focused on

 7       the exact misstatement, the three cent misstatement.

 8                MR. MILLER:  Except I don't think it does.  And I

 9       think if you parse what the government has presented to you, it

10       doesn't get you there.

11                I think one place to start is to look on page 13 of

12       the sentencing memo the government talks about the testimony

13       offered by Richard Fitzgerald.  And in that testimony cited by

14       the government Richard Fitzgerald testified, "So, as an

15       investor, that chart where you compare the price to AFFO

16       multiples, part of the reason that chart makes any sense to

17       begin with is because the underlying, you sort of assume or

18       believe that the AFFO methodology going into those ratios, you

19       know, are substantially similar if not identical to each

20       other."

21                So, let's start with that assumption.  There is

22       nowhere in the government's brief where they have given you

23       anything to hang your hat on that that assumption actually is

24       supported by any of the analyst reports that they looked at.

25       That would have been a great topic for an expert report.

1    Frankly, it would have been a great topic for the government to

2    specifically address.  And they did not.  So the bedrock

3    assumption of their approach to sentencing, to the loss

4    calculation, is nowhere to be found in the sentencing memo.

5          And what does Mr. Fitzgerald say if that assumption is

6    not true?  In that very same sentence he continues, "Because if

7    they wouldn't be" -- meaning similar -- "if they wouldn't be,

8    making a comparison of those ratios wouldn't tell you

9    anything."  That's kind of stunning.  So his assumption, he

10   says, look, this is only useful if my assumption is correct.

11   And the government's sentencing memo is utterly silent as to

12   whether that assumption actually has any weight in our

13   particular case.  And it doesn't.  And I think our expert has

14   spoken to that looking at the same reports that they have

15   relied on, and that assumption does not stand up.

16         If you look at the very next sentence, the government

17   tries to cherry pick some testimony through the trial.  These

18   are the best things they could find.  And so you've got Anthony

19   Inguagiado quoted on page 13 saying, "Often public market

20   investors will internalize the per share guidance that

21   management gives on a future basis and then capitalize that at

22   a multiple in order to impute a stock price."

23         Nowhere in this brief do they explain what "often"

24   means relative to "all" or "none."  Nowhere do they explain

25   what it means to internalize the per share guidance.  Nowhere

HB87BLOS

1    do they explain what it means to capitalize this information.

2    And nowhere does it say what they mean to impute a stock price.

3    I suppose they touch on that point, in all fairness.  But the

4    first three they don't even touch on at all, your Honor.  And

5    those are the best quotes they can pick out of the entire trial

6    to support their theory.

7         I'd like to point out that the government is relying

8    on six analyst reports, whatever those analyst reports say,

9    whatever correlation they bear to one to the other.  But, your

10   Honor, there were ten different analysts covering ARCP at the

11   time.  What happened to the other four?  How come Bank of

12   America, James Montgomery Scott, Robert Baird, Stifel Nicholas,

13   how come they didn't make the cut?  What was it about them that

14   didn't belong in this analysis?  Why were these six picked?

15   Why were the others excluded?  How do they conclude that that

16   represents the market?  I mean this is the sort of stuff

17   experts weigh in on all the time.  And there is no explanation

18   anywhere in the government's brief.

19        Your Honor, the theory that the -- and I apologize for

20   taking so much time with this, but this is the driver of the

21   sentencing.  The government is looking for I think a 30 level

22   enhancement based on this theory, and so apologies for taking

23   time, but it's important.

24        Unanswered questions in the government's filing:  Does

25   AFFO and share price move together?  You asked the government

HB87BLOS

that question.  I asked the same question.  There is nothing in
the sentencing memo that speaks to that issue.  Doctor Bergen,
however, went back and looked at the correlation between
changes in AFFO and share price and found that there is no
discernible pattern.  And he did that with a high degree of
specificity.  I encourage the court to look again at Dr.
Bergen's report.  Remember that there was a three cent miss in
the first quarter of 2014 with almost no discernible movement
in market price.

Another question:  Did the market factor year-to-date
numbers into its AFFO estimates?  Remember that the fraud here
is essentially -- the alleged fraud, the fraud at trial -- was
about the numbers that worked their way into the year-to-date
calculation of AFFO and AFFO per share.

Your Honor, our expert went through every single
report.  Most of the analysts looked at 2015 numbers.  Most of
the analysts look at quarterly numbers.  I don't think we found
one -- I may be wrong, maybe we found one -- I don't think we
found any reports though that relied on year-to-date numbers.
That's not what the analysts looked at.

So did the market in any way, shape or form react to
AFFO and AFFO per share movement in year-to-date numbers?
There is nothing to support that assumption.

Did the market factor 2014 numbers into its AFFO
estimates?  That's another fair question.  Because the fraud

HB87BLOS

1   that we went to trial on occurred in 2014.  The reality is,

2   your Honor, most of the analysts looked at 2015 projections,

3   not at 2014 numbers.

4          Did the government show any connection between this

5   multiplier theory and any actual specific loss?  And I think

6   the answer is no.

7          Did the government show any loss -- any loss --

8   actually calculable, flowing from the analysis that they are

9   resting on?  And the answer is, no, there is nothing in the

10  sentencing memo that links this analysis to any concrete loss.

11         You know, has the government proven that Mr. Block's

12  conduct was the proximate cause of any loss in theory related

13  to this loss analysis that they have spoken about?  And I think

14  the answer there is no as well.

15         And here is the greatest irony, if I could, your

16  Honor.  The greatest irony about the analysis that you're being

17  asked to consider is that if Brian Block had prepared AFFO and

18  AFFO per share in Q2 2014 exactly the way the government wanted

19  him to, said he should have, well, then ARCP would have

20  experienced that three cent shortfall in the second quarter of

21  2014.  So at best they're pointing to a valuation that's a

22  function of timing and nothing else.  It isn't a loss.  It

23  couldn't be a loss.  It never would be a loss for ARCP, because

24  ARCP would have incurred the same economic consequence -- if

25  there actually is any -- in the second quarter of 2014 as

HB87BLOS

1   opposed to October of 2014.

2          THE COURT:  Well, that's true in any stock drop case,

3   isn't it?

4          MR. MILLER:  I don't think -- no.  Particularly in the

5   context of the analysis that they're doing, where they are just

6   trying to come up with a value for a penny of AFFO, what's the

7   value of it.  I guess what I'm saying is if that's the way you

8   are approaching it, because confounding factors eliminate

9   really looking at the stock drop, then that is a value -- if

10  it's even credible -- that's a value that would have played out

11  in the ordinary course back at the end of the second quarter of

12  2014, and there really is no loss; it's just the way it would

13  have played out.

14         THE COURT:  I think I understand your argument about

15  the loss amount.

16         MR. MILLER:  Just a couple of quick wrap-ups.

17         So, there is a lot of talk about windfalls.  Judge

18  Posner in the Seventh Circuit spoke to that issue.  I don't

19  have the case name at the tip of my fingers, but I will I

20  suspect before I am done.  But he spoke to that issue.  To

21  paraphrase Judge Posner, no one is entitled -- no prosecutor is

22  entitled to an enhancement based on a stock drop.  They have to

23  establish but for causation, proximate causation, a linkage

24  between the conduct and a specific loss.  And they haven't done

25  that here.  And Judge Posner would say -- just like the judge

HB87BLOS

1    who presided over the Cuti case said -- if you haven't

2    established it, you are not entitled to it.  It's not a

3    windfall to the defendant.  It's simply the government didn't

4    carry its burden.

5         Your Honor, I guess in closing on the loss analysis

6    issue I would simply say, you know, we're not here to suggest

7    that this process has to be perfect MIT science -- or Harvard

8    science, given all the witnesses.  Well, I don't know, there

9    were a lot of Harvard witnesses at this trial, but Yale is

10   fine.  This doesn't have to be perfect Yale science, but there

11   has to be some science there.  There has to be some process

12   there.  That's why courts say let's get expert witnesses.

13   That's why courts say let's see something substantial; let's

14   find somebody else who has done this; let's find some

15   precedent.  None of that is before you.  And it really has the

16   feel of a theory that was picked out over breakfast while the

17   sentencing memo was being put together.  There is nothing

18   supporting it, and I urge the court not to embrace any of that

19   loss analysis.  And the right outcome is a zero loss

20   calculation.

21        I do have comments on the other enhancement issues if

22   you want to hear from me now on those, or --

23        THE COURT:  Yes, you can.  I mean the other ones are

24   leader organizer and obstruction, I believe, right?

25        MR. MILLER:  Yes, yes.  And let me start with

HB87BLOS

1    obstruction, because I think that's probably more factually

2    sort of a dispute issue.

3        So, the government has cited a handful of instances in

4    Mr. Block's testimony that they believe constituted perjury.

5    One is his testimony that Grant Thornton approved of the

6    blended methodology.

7        Look, one thing that came out of this trial beyond any

8    shadow of a doubt is that Grant Thornton, like the SEC, like

9    analysts, like other accountants, like counterparties and

10   transactions, like lawyers, like everybody who worked at ARCP,

11   everybody saw what the methodology was and saw that basically

12   it was a net star and gross add backs that began as of year end

13   2012, it continued through the first three quarters of 2013, it

14   was included in the year end 2013 10K, it was in the first

15   quarter of 2014.  Everybody saw that.

16       The government makes a point, well, hey, the share

17   count wasn't visible and all of that.  And the government is

18   right in the sense that that wasn't Grant Thornton's express

19   mission to look at the share count.  But you don't need to look

20   at the share count to see that it's a blended methodology, to

21   see that it's hybrid.  It was hybrid from day one, and

22   everybody could see that.

23       And so when Mr. Block testified that he believed Grant

24   Thornton had approved of, was comfortable with, the hybrid

25   methodology, he had some basis for that.

HB87BLOS

1          You also heard testimony about comfort letters, and

2     that's where Grant Thornton went one step farther and really

3     ticked and tied all of the numbers that show up in ARCP's AFFO

4     calculations.  They looked to tie each one of those numbers

5     back to the financial statements of the company, and they were

6     satisfied.  And, again, that process revealed a net star with

7     gross add-backs.

8          So, again, when he raised his hand and testified under

9     oath that Grant Thornton was comfortable with this approach,

10    that made a lot of sense.

11         Last point on that.  The week before Q2 close, Grant

12    Thornton received I believe at least two and maybe three

13    versions of the draft financial statements for the second

14    quarter of 2014.  And you may recall, your Honor, Q1 was

15    presented hybrid, Q2 was presented net, and year-to-date was

16    presented as a total mash-up.  And Grant Thornton signed off on

17    that.

18         And I'm not saying that they had the per share piece

19    of it.  I guess it would be nice for this conversation if they

20    did.  But to see, and to know, and to fundamentally approve of

21    a hybrid methodology, all they needed to know is where AFFO

22    started and there was a net star with gross add-backs.

23         The second issue that the government has taken issue

24    with is Brian's testimony about whether he had the defeasance

25    theory in mind on July 28, 2014.  Now, we presented the court

HB87BLOS

1    with a lot of I think very compelling case law that just

2    because Mr. Block was convicted, just because other witnesses

3    brought on by the government contradicted his testimony,

4    doesn't mean that he testified falsely.

5           What we do know from the record is that Mr. Block had

6    the raw data in hand that could be used to calculate the

7    defeasement add-back.  We know from Richard LeFuer, the head

8    Grant Thornton accountant, that reasonable minds could differ

9    about whether that was a legitimate add-back but basically

10   allowed for the potential that it could be.

11          You will recall that we had a lot of back and forth

12   about potentially cross-examining Ryan Steel about a 302, an

13   F.B.I. report that reflected an interview with Mr. Steel where

14   he said that on the morning of July 29 he ran into Simon

15   Misselbrook, and he told the F.B.I. -- and it's there in black

16   and white, 3508-10 -- he told the F.B.I. that the changes in

17   the second quarter of 2014 were possibly related to defeasance.

18   And he tasked Simon to quote unquote scrub the mortgage list.

19          You know, one may quarrel about, well, what was the

20   larger context of that conversation, but it is clear that the

21   concept of defeasement was in play even with the government's

22   witness according to the F.B.I.'s report.

23          I think the jury could have believed -- your Honor,

24   the jury could have believed Mr. Block when he said he had this

25   theory in mind.  Remember, we don't know exactly what they

HB87BLOS

1    seized on when they returned their verdict, but the jury could

2    very well have concluded that he had the defeasement idea in

3    mind, but they decided it was a nonsense theory, that he had

4    the defeasement theory in mind but maybe he added back too

5    much, that he had the defeasement theory in mind but the

6    positions where he physically placed the stuff didn't make

7    sense.

8            There are a lot of different ways that that jury

9    verdict could have been parsing Mr. Block's testimony on the

10   defeasance issue, and I think when all is said and done the

11   government hasn't carried its burden in proving that that

12   testimony was false.

13          There are a couple of other smaller points on the

14   Audrain building.  He testified that ARCP paid for over $9

15   million of the refurbishing on the Audrain building for use by

16   ARCP.  AR Capital paid for other stuff, but ARCP paid about $9

17   million and change for fixing up the space that would

18   ultimately be occupied by ARCP people, and he testified to

19   that.  You know, and to the extent that he may have

20   misunderstood a question, or maybe didn't get it completely

21   right the first time, he got it right in the same sitting, and

22   no one is refuting the accuracy of his testimony at the end of

23   the day.

24          I think those are the main obstruction points.  I'm

25   happy to address any others.

1          On the role enhancement issue, your Honor, I think

2     there it really boils down to a fundamental double counting

3     issue.

4          We acknowledge that the right analysis here is a seven

5     level start because of the nature of the fraud.  We acknowledge

6     there should be a four level enhancement because Mr. Block was

7     the CFO of ARCP.  And I think from our perspective, your Honor,

8     that's the right sentencing guideline calculation.

9          But the enhancement that he is getting because he was

10    a CFO, in our view, they would be double counting if in

11    addition to that there was a leadership role attached to it.

12    Probation feels the same way.  I don't know if you've noticed

13    that, but probation actually agrees with us on that, and we are

14    grateful for that.

15         But I think probation is right, and I think we're

16    right on that point.  And one of the really interesting things

17    that probation -- I think what probation picked out --

18    actually, that's right, I'm sorry, this is in the

19    government's -- I want to say this is in the government's

20    sentencing memo, footnote 6, I believe it has a quote from the

21    government's summation.  I'm sorry, it's in our reply brief,

22    your Honor, footnote 6, "Mr. Block as CFO in his trusted role

23    lied to investors and he betrayed that role."  That's right out

24    of the government's summation.

25         So, to the extent that there was any ambiguity about

HB87BLOS

1    whether his quote unquote leadership role related to his status

2    as CFO, the government made that clear in its own summation.

3    They're clearly double counting.

4          As a secondary point, your Honor, there were three

5    people in the room, they all contributed to the process.  You

6    know, you can argue that they had different titles and

7    different hierarchal power within ARCP, but every one of them

8    contributed to the process, particularly Ryan Steel.  You know,

9    he fed numbers to Brian Block; he's the one that suggested

10   changing the share count from year to date; he's the one who

11   after all of the other tinkering with this particular

12   spreadsheet that we heard so much about at trial, when he went

13   back to his office he made additional changes to the second

14   quarter of 2014 and a bunch of other things.

15         Everybody was kind of doing their own thing and

16   participating in this process, and I think the case law is

17   pretty clear that the leadership role enhancement isn't

18   appropriate under those circumstances.

19         This is my last point, and I thank you for being

20   patient with me, because I know we're covering a lot of ground.

21         The victim enhancement, your Honor, I think the case

22   law in the Second Circuit is completely clear.  The Skys case,

23   the Aviadon case, you have to prove ten specific victims, you

24   have to prove their individualized specific loss.  You can't

25   simply intuit or assume that because people are part of a

HB87BLOS

1       larger organization, a larger financial institution, that they

2       all suffered losses and that those losses were all of a

3       specific amount.

4               The Skys case dealt with exactly with that situation

5       where there were multiple investors who were part of a

6       financial institution, and the court there in the Second

7       Circuit said, no, that's not enough; I mean you may be right,

8       that might be a good assumption, but you've got to do more than

9       that to meet the threshold for victim enhancement.  And in this

10      particular case the government has made no effort whatsoever to

11      identify specific victims or to quantify their losses.

12              I am happy to discuss any and all of this in whatever

13      additional detail the court would like, but that's essentially

14      what I've showed up prepared to talk about.

15              THE COURT:  That's helpful.  Thank you.

16              Did you want to reply to any of those issues?  I think

17      you've adequately covered them in the briefing, but if there is

18      anything in particular you wanted to, you may.

19              MR. TEHRANI:  Yes, your Honor, just a couple things.

20      One is on loss -- just getting back to loss for a second.  I

21      think another way that the government's calculation is

22      particularly conservative is that we have only assumed that the

23      fraud is 3 cents per share.  The fraud was designed to cover up

24      the prior miscalculation of the AFFO.  That prior

25      miscalculation had been used historically and had been used to

HB87BLOS

1    project future earnings.  It is entirely reasonable to conclude

2    that the market would have seen 3 cents in the first half of

3    the year, 6 cents for the full year.  That is not something we

4    have included in our calculation.  The reason I bring it up

5    though is because I don't think it's fair to say that the

6    market viewed it as a one-time-only event.

7            So, again if you look at another analyst report, which

8    is the October 30 Oppenheimer report, Oppenheimer concluded,

9    well, we're going to carry this misstatement from the first

10   half of 2014 all the way through 2015.  And so if you'd like to

11   take defense counsel up on their offer to value the

12   misstatement as of 2015 AFFO -- which you can do using the same

13   reports that we provided -- and I have done it -- it's a $300

14   million loss.  So, if you wanted to say that, well, the market

15   was looking at that point in 2015, not 2014, the same

16   principles apply.  Again, it just goes to show that this is a

17   straight forward reasonable calculation.

18           With respect to obstruction, again this is not a case

19   where the defendant gave vague testimony, it's unclear what the

20   jury found with respect to that vague testimony in reaching its

21   verdict.

22           The defendant spun a tale that was very specific, that

23   the jury had to reject in order to convict him.  The jury had

24   to reject that there was no basis in fact for what the

25   defendant did.  And the testimony was directly contradicted by

HB87BLOS

1    Steel.  We laid out all of the ways that it was.  I think the

2    primary way, the one that shows clearly that what the defendant

3    did was perjure himself on the stand, is that he did not know

4    what the reason was for the adjustment.  He asked Steel what is

5    the reason for this adjustment that we made.  That testimony

6    alone is sufficient to demonstrate that the defendant did not

7    tell the truth.  The jury's verdict necessarily found that he

8    had no basis in fact for his adjustment.

9            I think that's largely it.  I mean on the

10   leadership -- actually I think this is somewhat important.

11   Defense counsel has been arguing about double counting.  It's

12   pretty clear under Second Circuit law -- it is clear under

13   Second Circuit law -- that double counting is permissible under

14   the guidelines so long as the guidelines are addressed to

15   either different components of the defendant's conduct or to

16   different harms.

17           It is also I think pretty clear that these two

18   particular guidelines are directed towards different harms.

19   The harm of committing this conduct while being an officer of

20   the company or being the CFO of the company is specific to this

21   context.  It does not matter whether he is working with anybody

22   else or directing anybody else.  The leadership enhancement

23   applies because the guidelines believe rightfully that conduct

24   is more severe or someone is more culpable when they act in a

25   leadership role regardless of their title at a particular

HB87BLOS

 1   company.

 2              THE COURT:  Thank you.

 3              MR. MILLER:  Briefly?

 4              THE COURT:  Yes.

 5              MR. MILLER:  You know, the prosecution says that

 6   they're being conservative by saying this was a 3 cent case.

 7   That was their case.  That's what they went to the trial on.

 8   They didn't go to trial on a 6 cent case; they didn't go to

 9   trial on a theory that earlier quarters were calculated in a

10   way that was fraudulent.  So, it's not conservative; it's just

11   what their case was.  It's just that the analysis they are then

12   use isn't supported by any sort of methodology that would pass

13   muster in any -- it just doesn't pass muster.

14              I just want to point out that in our brief, in our

15   reply memorandum at page 8, we cite a couple of cases that I

16   think are really apposite to the discussion that we've just

17   been having.  Admittedly, they're out of the Seventh and the

18   Fifth, but in the Seventh Circuit in the Glickenhaus case, the

19   court there recognized that proven loss causation requires

20   "sophisticated expert testimony" and added that "analyst

21   reports and stock prices are insufficient."

22              That's kind of what we got here today, your Honor.

23   We've got analyst reports and stock prices.  And the Seventh

24   Circuit has said absolutely clearly that's not enough.

25              The Fifth Circuit in the Fenner case, "Although

HB87BLOS

analyst reports and stock prices are helpful in an inquiry, the

testimony of an expert, along with some kind of analytical

research or event study, is required to show the loss

causation."

          That's really sensible, and particularly given on what

is on the line here today with Mr. Block and the extraordinary

adjustment that they're looking for based on loss.

          Quickly on the obstruction point, your Honor.  The

government cites Ryan Steel's testimony about a conversation

with Mr. Block that he was looking for a rationale to explain

the adjustment.  So you have that testimony, and then you've

got a 302 where he tells the F.B.I. -- long before he testified

at trial -- that he had a conversation with Simon Misselbrook

the very next day, July 29, and told him that it was possibly

related to the feasance.

          I think when you've got Ryan Steel alone, to some

extent -- to a great extent or small extent -- in conflict with

himself over that issue, I respectfully submit that's not

sufficient for an obstruction finding, and I ask the court not

to impose that.

          I think on the leadership point, I think our basic

point is it doesn't matter what people's titles are; it's what

they were doing in the room.  And I think the factual record

shows that all three people were contributing to the process

that got us to the end of the day.

HB87BLOS

1          Thank you, your Honor.

2          THE COURT:  Thank you.  I'd like to go through the

3   sentencing guideline calculation and make my findings as to

4   that, because that's legally necessary before you can consider

5   the correct guideline calculation.  And then we will talk about

6   the Section 3553(a) factors, which include the sentencing

7   guidelines but include many other important things.

8          And as you all probably know, in a case like this I'm

9   not bound by the guideline calculation.  I'm not hesitant to

10  find that it is perhaps greater than necessary to serve the

11  purposes in the statute, but we will get to that in a minute.

12  And this is somewhat complicated, so I'm going to explain the

13  loss amount issue first, which is hotly contested and I will

14  say argued very well by the parties.

15         The guidelines in short say that in securities

16  inflation cases like this -- or securities deflation fraud

17  cases -- the court may use any method that is appropriate and

18  practical under the circumstances.  It then provides one method

19  that the court may consider, which is the average price of a

20  security during the fraud and average price of the security

21  during the 90 days after the fraud was disclosed to the market,

22  and multiplying that by the number of shares.  And that results

23  in the PSR's determination of a little over $3 billion, which

24  is taking the $12.62 average before versus the $8.90 during the

25  90 days after the October 29, 2014 disclosure, and multiplying

HB87BLOS

1    by the number of shares, $3 billion plus inflicted on thousands

2    of victims.

3            And because the $3 billion is over the highest

4    guideline threshold of $550 million loss, the PSR adds a 30

5    level enhancement.  However, the guidelines also say in the

6    note that the court may consider among other factors the extent

7    to which the amount so determined includes significant changes

8    in value not resulting from the offense, e.g., changes caused

9    by external market forces such as changed economic

10   circumstances, etc., etc.  And, indeed, the Second Circuit has

11   made clear in U.S. v. Rutkoske that such confounding causal

12   factors must be excluded from the loss calculation.

13           Based on that principle, the government has proposed

14   an alternative approach in its submission that purports to more

15   closely tie the analysis to the fraud itself and not to the

16   confounding factors that contributed to the $3 billion stock

17   drop.

18           The government proposes an AFFO multiple valuation

19   methodology, that is, using a multiple valuation, the ratio of

20   share price to AFFO for 2014, and then the government purports

21   to infer how much value the market was ascribing to each cent

22   of expected AFFO.  And it determines based on a consensus of

23   six analysts that they were ascribing 11.6 cents of value per

24   share to each one cent of AFFO for the company.  And based on

25   that, the government argues the defendant's fabricated

HB87BLOS

1    inflation of 3 cents of AFFO is equivalent to a market

2    valuation of three times 11.6 cents for 34.7 cents per share.

3    And when you multiply that by the number of shares, you get

4    $350 million in loss to shareholders, which is their number.

5           This is a more reliable method of estimating loss than

6    the guidelines or PSR method in this case, because it does seek

7    to isolate the loss to the misstatement in AFFO specifically,

8    and thereby it weeds out or attempts to weed out the

9    confounding factors, in particular the major confounding factor

10   of six quarters being restated as a result of an incorrect

11   method, the hybrid method, being used to calculate AFFO, as

12   revealed in the disclosure.  However, I do believe there are

13   problems with it.

14          First, it does assume one of the things that need to

15   be proven, that there is essentially a direct relationship

16   between AFFO and share price.  To be sure, there was testimony

17   at trial that AFFO was important and material to investors and

18   analysts, and many analysts certainly treat AFFO as one of the

19   key, if not the key earnings related metrics for a REIT like

20   ARCP, however, it does not necessarily follow that one can

21   assume a direct correlation between an AFFO decrease and stock

22   price decrease.

23          As defendant's expert points out, some analysts did

24   not use AFFO in their valuation models, and many of those who

25   did combined AFFO with other metrics.  And there is at least

1    one example in the recent past where AFFO missed analyst

2    consensus by three cents and yet analysts made no change to

3    their price targets at the time.

4         Ideally the confounding factors would be controlled

5    for it here through an events study, but the government's

6    expert determined, according to the government, that that would

7    not be feasible given the timing of disclosures here.  It is

8    also noteworthy that what it calls the most comprehensive model

9    of an analyst valuation of ARCP, JP Morgan's model, did not

10   factor into its analysis the AFFO line item that was central to

11   the fraud here.

12        At the end of the day two things are clear to me:

13   First, the fraud committed by Mr. Block directly caused a

14   significant amount of actual loss to ARCP shareholders as that

15   term is defined by the guidelines, surely in the millions of

16   dollars.  The fact that the misstatement was intentional and

17   that that fact was disclosed to the market in October certainly

18   caused a significant loss of confidence in ARCP's accounting

19   and disclosures, which no doubt itself caused a significant

20   amount of loss, and that portion of the loss is attributable to

21   the defendant under Second Circuit case law.

22        The second thing that's clear to me, however, is that

23   the confounding factors in this case are themselves significant

24   and essentially impossible to untangle, because the fraud was

25   interwoven with problematic accounting issues that were not

HB87BLOS

1    part of the charged fraud in this case.

2           Indeed, the corrective disclosure in October 2014 was

3    remarkable in that it stated that investors should not rely on

4    six quarters of filings.  But that was essentially about the

5    hybrid method used by ARCP, which was not itself the fraud in

6    this case.

7           The truth is that I suspect and believe that the

8    government's estimate of actual loss to shareholders

9    attributable to the defendant's fraud, $300 some million --

10   which is about 10 percent of the overall loss following the

11   disclosure -- is probably about right.  However, even for me to

12   determine that would ultimately require a degree of speculation

13   and assumption on my part.  I do not believe I have before me

14   sufficient reliable evidence to quantify that calculation by a

15   preponderance of the evidence, given the significant

16   confounding factors.  Therefore, I will not add a loss

17   enhancement under 2B1.1.

18          I also conclude that under the Skys case and the

19   Abioden case, that the ten or more victims enhancement does not

20   apply because the way the guidelines work is that there is no

21   quantifiable actual loss to victims and therefore no victim

22   enhancement.

23          Let me turn to the other guidelines issues.  That's

24   the loss amount.  Next is the officer enhancement.  There is a

25   four point adjustment under 2B1.1 because the defendant was CFO

HB87BLOS

1    of a public company, so he was an officer.  And that

2    enhancement really goes to the nature of his role, the public

3    trust, the company's trust in him.

4          The next role enhancement is for leader or organizer

5    of the fraud.  I believe that enhancement also applies.  I'm

6    not persuaded by the argument that it's double counting,

7    because that enhancement under 3B1.1 relates to whether the

8    defendant was the leader, organizer, manager or supervisor of

9    the fraudulent conduct.  It's not relating to his particular

10   role at the company.  There are issues that certainly are

11   overlapping in a case like this, but they essentially are on

12   different axes; they go to different points.  And the fact is,

13   as the jury found -- and I think is true certainly by a

14   preponderance -- the defendant was the leader and organizer of

15   this particular fraud.  He was the mastermind; he's the one who

16   did it.  The fact that others helped him was essential to

17   making it succeed insofar as it did, but the fact is that he

18   was the leader.

19         I also applied the two points for obstruction of

20   justice.  It is true that the mere fact that the defendant

21   testified at trial and was found guilty is not sufficient to

22   establish obstruction by itself.

23         I do find, however -- accepting the jury's verdict as

24   true, and based on my own view of the testimony -- that the

25   defendant did testify falsely at trial concerning material

HB87BLOS

1   matters, with the intent to provide false testimony, and not

2   because of confusion, or mistake, or loss of memory.

3        In particular I believe that he falsely testified that

4   the AFFO plug number was based on a defeasance add-back that he

5   had calculated on or before July 28, 2014.  The jury determined

6   that this was false, and I find that it was an after-the-fact

7   attempt to justify numbers that were made up with fraudulent

8   intent.

9        Therefore, with a base offense level of seven, four

10  points for being an officer, two points for being a leader or

11  organizer, and two points for obstruction, the total offense

12  level is 15.  The defendant has no prior criminal history, so

13  he is in Criminal History Category I.  That results in a

14  sentencing guideline range of 18 to 24 months.

15       MR. BLAIS:  Your Honor, just so the appellate record

16  is clear, we object to the court's finding on the loss amount.

17       THE COURT:  OK, the objection is noted.

18       MR. MILLER:  Your Honor, we very much appreciate the

19  decision, but just note our objection to the two points where

20  the court disagreed with our position.

21       THE COURT:  Yes.

22       I'd now like to turn -- now that we have the guideline

23  calculation that I intend to apply -- I would like to turn to

24  all the factors under the statute, including the purposes of

25  sentencing, and give you a chance to speak about those.

HB87BLOS

1            I have read all of your submissions, so you don't need

2     to repeat anything, but anything that you would like to focus

3     on today, you may.

4            Mr. Weingarten?

5            MR. WEINGARTEN:  Your Honor, with the court's

6     permission, there are a number of people here who would like to

7     briefly address the court.  Many of them have supplied letters.

8     We assume you have meticulously gone through the letters, so

9     they won't repeat that, but they would like to supplement, and

10    there are three or four people I'd would like to come to the

11    podium and briefly address their relationship with Mr. Block.

12           THE COURT:  OK.

13           MS. SHOEMAKER:  Good afternoon, your Honor.  Thank you

14    for allowing me to speak today on behalf of Brian Block, who is

15    my youngest brother.  Being here today and writing the letter

16    that I wrote to you a while back were some of the most

17    difficult things I have ever had to do.

18           I do want to start off and let you know that Brian was

19    not brought up in any type of a privileged home.  Our childhood

20    had a lot of instability.  Both of our parents had some mental

21    health issues, especially our dad.  And from an early age on I

22    always looked out for him, felt responsible for him, and we

23    took care of each other.  Actually, all of our siblings took

24    care of each other.

25           Back when Brian was in fourth grade our father, he was

HB87BLOS

1    sent to prison, and my mother, having four small children, did

2    everything she could to keep our lives normal.

3           When Brian was in ninth grade we actually lost our

4    home due to financial issues that mainly stemmed from our

5    father's depression.  And prior to losing our home he actually

6    tried committing suicide.  It was myself, my older brother who

7    is here today, Todd, and my mother that found him, but it was

8    me who explained what had happened to my younger siblings, to

9    Brian.

10          You know, again it was a horrible thing to have to go

11   through, but we stuck together as siblings because it's not

12   something you talk to your friends about those types of things.

13          During Brian's junior and senior years of high school

14   he lived with friends because we were homeless.  A lot of the

15   times the family was living with friends or cousins, and during

16   that whole time and into college Brian still played varsity

17   sports, he worked almost full-time, and he had great grades.

18   He did all of these things because he had an end game in mind,

19   and his end game was to be what his father wasn't.  He wanted

20   to be stable, financially sound and a good father and husband.

21   And I have the opinion that he has succeeded in doing that.

22          He helps take care of our mother who has leukemia.

23   She is actively going through chemotherapy.  He is essential in

24   some of her caregiving, getting her to and from appointments.

25          He is also a role model for my son Jared, who just

HB87BLOS

1    started his freshman year in college, and probably wouldn't be

2    in college had uncle Brian not set his mind straight.

3           He is a fantastic uncle to his other niece and nephew.

4    He helped me out during the divorce that I went through.  He

5    was that call in the middle of the night when you needed

6    somebody.  He was always there for me.

7           Most importantly, when you are making your decision,

8    he has three small children:  Samantha, who is 14; Adam, 12;

9    and Benjamin who is five.  I am very close to all of them, and

10   I spoke to Samantha that last night, who understands the

11   magnitude of the situation, as she cried to me about what was

12   going on.  They are at such a pivotal time in their life, and

13   obviously all children love their father.

14          Adam is turning into a young man who needs a male's

15   influence there day to day.  Samantha is looking forward to

16   driving and dances and all the things that she wants to be able

17   to share with her father.  And I would just like you to please

18   take that into consideration when you make your decision today.

19   Thank you.

20          THE COURT:  Thank you.

21          MR. WEINGARTEN:  Laura?

22          MS. SISK:   Good afternoon, your Honor.  My name is

23   Laura Sisk.  From March 2013 to October 2014 I was employed as

24   Brian Block's executive assistant first at American Realty

25   Capital and then with the public company American Realty

HB87BLOS

1    Capital Properties.  I spent at least 40 hours a week with him

2    and often more.

3            During my time as his assistant Brian acted as both

4    supervisor and a mentor to me.  He encouraged me to pursue my

5    professional interests and to grow in my role at ARCP, and he

6    assigned me tasks that were in line with those interests.

7            Brian allowed me the flexibility in my schedule to

8    attend classes at New York University in marketing and finance,

9    and incentivized me to complete the full program by agreeing to

10   reimburse me for the cost of those classes.

11           During ARCP's acquisition of Cole Real Estate

12   Investment, Brian was often the last person to leave the office

13   at night and usually the first executive to recognize the

14   junior employees for our hard work.  His words of gratitude, as

15   well as his general considerate demeanor, made him one of the

16   most well-liked and well-respected executives in the company.

17           I am currently employed as a compliance analyst at a

18   financial consulting firm, which requires me to use many of the

19   skills I learned at Brian's urging.  I continue to work in the

20   financial services industry because he took the time and effort

21   to help me understand this industry.

22           Although my responsibilities usually focused on

23   supporting Brian's professional endeavors, I also came to know

24   his family well.  In keeping his meeting calendar, he made sure

25   that his custody schedule for his two older children, Samantha

HB87BLOS

1   and Adam, was prioritized over many other obligations.  In

2   2013, despite being in the middle of merger negotiations, Brian

3   carefully managed his schedule so that he and his wife Caroline

4   could attend appointments at preschools they were considering

5   for their son Benjamin.

6          Brian's commitment to his work and his family is

7   evident to anyone who knows him, and in the time I worked for

8   Brian I found him to be both respectful and deserving of my

9   respect.

10          Brian's faith in my abilities has led me to my current

11   professional success, and I ask that you have faith in him now.

12          THE COURT:  Thank you.

13          MR. WEINGARTEN:  Chris?

14          MR. DOERR:  First I would like to thank the court for

15   providing with the opportunity to speak on Brian's behalf.

16          My name is Christopher Doerr, and I have been friends

17   with Brian for almost 30 years.  Brian and I met during our

18   freshman year at Albright College.  I honestly struggle to

19   remember a time when we weren't friends.  During the time I

20   have known Brian, he has become integrally more than a friend

21   to my family and I.  Brian, Caroline and their family are part

22   of my family.  He is uncle Brian to my two sons, and is my

23   oldest son's godfather.

24          Brian was always someone I admired and respected.  He

25   seemed to have a level of maturity, integrity and a sense

HB87BLOS

1    responsibility that most others do not possess.  Brian put

2    himself through a liberal arts college by working one or two

3    jobs throughout the school year and breaking his back

4    installing fences each summer.  Despite this, our perhaps

5    because of this, Brian was able to consistently achieve deans

6    list semester after semester.  His ability to lead was obvious.

7    He was responsible for coordinating the philanthropic efforts

8    of our fraternity, including an annual blood drive.  However,

9    it was never just about work or school; he was always there as

10   a friend.

11          Not surprisingly, as Brian graduated and began his

12   career, his integrity and work ethic carried into his

13   professional life, but family always came first.  This still

14   holds true today and is not limited to his immediate family.

15          Brian's influence on his nephew Jared is remarkable.

16   Jared was and is raised by Brian's sister, and Brian has served

17   as a mentor, uncle, friend and father figure to Jared.  Brian's

18   influence and guidance has ensured that Jared pursues college

19   and prepared for many successes after college.  I can only hope

20   that I am as influential to my own sons as Brian has been to

21   Jared.

22          I witnessed firsthand Brian's commitment to his family

23   more times than I can count, be it vacations with our young

24   babies to Delaware Beach, birthday parties or backyard

25   barbecues.  It was and always is about family and being

HB87BLOS

```
1   together.  He was never too busy when it came to being present

2   with his family.

3           I can't put into words what Brian's friendship has

4   come to mean to me after all these years.  He has always been

5   there for me.  It did not matter if it was personal or

6   professional, or what I had going, or what he had going on.  If

7   I needed an ear to bend, advice, guidance, or someone to lean

8   on, Brian was always my first call.  There is no one who I

9   trust more.  Brian was there for me through my parents'

10  divorce, break-ups with girlfriends, career decisions, and

11  anything else I ever needed big or small.

12          I hope by being here today I'm able to reciprocate

13  everything he has done for me in some small way.

14          I hope you consider how much Brian means and the

15  positive influence he has had on so many people when rendering

16  your final decision.  His sense of purpose and role as a

17  father, son, brother, husband, uncle, and my best friend, are

18  only outweighed by his character.  Thanks.

19          THE COURT:  Thank you.

20          MR. WEINGARTEN:  One more, your Honor, if I may.

21  Captain Young, please.

22          CAPT. YOUNG:  Your Honor, good afternoon.  I am

23  Matthew Young, brother-in-law to Brian and brother to his wife

24  Caroline.  I have known Brian for many years.  I welcomed him

25  to my family without any reservation, assessing his character
```

HB87BLOS

1    and values and then ranking them in the highest regard.

2           As part of my profession as an active duty officer in

3    the United States Army, I have routinely assessed and evaluated

4    individuals based upon their presence, their character, their

5    values and abilities.  Brian exceeds standards in every facet.

6    I ask you to consider my assessment.  I ask that you consider

7    leniency today.

8           Brian is a father dedicated to the upbringing of his

9    three children.  His continued presence is paramount to ensure

10   his children will be instilled with the correct values to

11   succeed, the correct values to lead, the core principles that

12   allow you to spur intellectual growth and ultimately translate

13   that intellectual growth into innovation.

14          Innovation is a true product of parenting.  The

15   benefit is reaped by the world, not by the parent.  Society

16   receives the products years after the parent has laid their

17   hard work.  I implore you to allow Brian to invest in our

18   future, allowing his presence with his children, my nephews and

19   niece.

20          The application of lessons learned in life, coupled

21   with continued and steadfast mentorship enables the best

22   outcome for society as a whole.  Too often fatherhood is

23   abandoned; therefore, it is a tragedy when forcibly deprived.

24          I ask you to consider my humble assessment.  I ask you

25   to consider leniency in his sentencing.  Thank you for

HB87BLOS

1    considering the perspective of involved parenting to preserve

2    the fading strategic resource of innovation.  Thank you.

3              MR. WEINGARTEN:  Your Honor, obviously the purpose of;

4    3553 is to ensure that any punishment imposed fits the offender

5    and not merely the crime.  Our challenge is making best efforts

6    to get you to see and know the Brian that we see and know.  We

7    are not just mailing this in; we are true Brian believers, and

8    we think Brian is one of the good ones in the world, and the

9    challenge, of course, is how do you communicate that in this

10   short period of time.

11             I should say that virtually everybody in the audience

12   requested the opportunity to be heard.  Almost everybody here

13   has submitted a letter, and again I am certain the court has

14   meticulously gone through those letters.

15             And what I would like to do is just observe generally

16   about the 50 or so letters.  I have been in the game a long

17   time, and I think they were extraordinary.  I can't read them

18   without a tear coming to my eye on many occasions.  If I could

19   sum them up I would do it this way:  Number one, Brian was not

20   born with a silver spoon in his mouth.  At a.  He had a very,

21   very difficult upbringing.  You know from his sister two

22   minutes ago and from the letters what happened with his dad,

23   issues with his mom.  I mean when he was in high school he was

24   homeless, and he eventually ended up with friends, and he

25   worked while in high school almost full-time, and every

HB87BLOS

1     Wednesday night as a high school student he would take his mom

2     out to dinner.  That's a lot.  He doesn't get a pass because on

3     Wednesdays when he was in high school he had to take his mom

4     out to dinner, but that's a good place to start.

5              Number two, his work ethic.  Extraordinary from the

6     time he was 11 forward.  Irrelevant to this case.  You heard

7     evidence I believe at trial, and certainly you have read

8     letters saying it's not atypical for him to be at his desk for

9     24 straight hours.  The night in question, July 28 -- I know

10    you know this; you followed the evidence meticulously -- he had

11    any number of incredibly difficult issues staring him in the

12    face and needing resolution before he attended to the

13    adjustment in question.

14             Number three, his utter and complete commitment to his

15    family.  I think that was pervasive in any letter.  I think

16    it's not unique, and certainly he doesn't get a pass because he

17    is completely committed to his family, but there is one

18    anecdote I would like to emphasize, and that was when he is

19    living in New York, working incredibly long hours, his daughter

20    had a dance, he surprised her with a daddy daughter dinner,

21    hustled back to New York to put his youngest to bed and then

22    worked all night.  Again, you don't get a pass for that, but

23    this is the man we are talking about, and it's good to bear in

24    mind.  I am certain the court read the letter from the exwife.

25    I mean the fact that the exwife supports him so I think

HB87BLOS

1    reflects extremely well on him.

2           You heard from his sister two minutes ago about his

3    support for her son, a critical support that he immediately

4    jumped into the fray when there were family issues with her,

5    and he has been incredibly supportive of this young man.

6           What it comes down to is on top of the family thing,

7    he is just a good guy, and that is pervasive in the letters.

8    He is kind, he is respectful, he cares about others, he is

9    charitable.

10          Obviously, he's fortunate he has come upon a situation

11   in life where he has a lot of money, and he is surrounded by

12   people who don't have a lot of money, and consistently has been

13   charitable in his relationships.  And he is also sort of a

14   warm, down-to-earth guy, not a bully.  And this is actually

15   relevant to the trial.  Obviously the events of July 28, you

16   heard two government cooperators who said, oh, my God, the

17   fraud of the century, we hated this conduct.  There was never

18   any indication at trial from them or anyone else that you

19   couldn't say, Brian, no, this is not the thing to do.  There

20   was no bullying, there was no pushing.  He was respectful and

21   kind at all times to all people at this company.  One of the

22   world's good guys.

23          And last but certainly not least there are

24   extraordinary numbers of letters from lawyers, and

25   extraordinary numbers of letters from accounting types, who

HB87BLOS

1    have worked with Brian for years, and consistent in their

2    reports is that Brian is honest, he is a conservative

3    accountant, one story after another of how he pulled back, how

4    he calmed everybody down, and he did the honest conservative

5    thing at the workplace.

6         And who amongst us -- I don't think if heaven forbid I

7    was in the situation, and I am 20 years older than Brian, that

8    I would have that list of letters.  I mean who amongst us

9    would?  He is one of the world's good people, and he needs to

10   get credit for that, because if he doesn't get credit for his

11   good life that he has led today, when will he?

12        So the question is -- we were convicted; the jury came

13   back and convicted us -- so in truth and in fact why, why would

14   Brian do this?  I mean what is the story here?  What is the

15   motive for the crimes charged and the conviction?

16        We look at the presentence report, and it's obviously

17   critical important, and I will read it:  "We have found no

18   other explanation for the defendant's commission of the offense

19   than avarice.  So, they're basically saying this was motivated

20   by greed.  And I respectfully suggest there was not a shred of

21   evidence at trial to support that the conclusion that Brian

22   made his decision on July 28 because he is a greedy SOB and he

23   wanted to line his pockets.

24        I'm certainly not going to go through the evidence at

25   trial, but I think some things stand out.  Let's just focus on

HB87BLOS

1    July 28 for two seconds.  We know that Ryan Steel had gone to

2    Brian before and said hybrids, not so good, and got no

3    pushback.  Ryan Steel didn't like hybrids, Ryan Steel

4    recommended a change and, OK, fine, a change would be made,

5    even though it would affect the bottom line of the company in

6    an adverse way.

7         And then we have the events in Brian's office on July

8    28.  They could not have been more open.  He could not have

9    been more open in his conduct.  And if we're talking about a

10   nasty conspiracy, he would had to have concluded that Ryan

11   Steel was a nasty coconspirator in advance, and Lisa

12   McAllister, the chief accounting officer, the same.  And there

13   is absolutely no reason in the world based on prior conduct for

14   that conclusion to have been reached.

15        And then even more than that, to me, a profoundly

16   compelling point when assessing whether or not this man is

17   motivated by avarice, is that there was never an occasion on

18   July 28 during the critical moments or immediately thereafter

19   where Brian said to his alleged coconspirators whatever you do,

20   don't tell the auditors, whatever you do, don't tell the

21   lawyers, whatever you do, keep this quiet.  This is utterly

22   inconsistent with a person who is motivated by greed to line

23   his own pockets based on an adjustment on July 28.

24        I respectfully suggest that the motivation here

25   ascribed to Brian by the presentence report is just a guess,

HB87BLOS

1    utterly without support, and utterly inconsistent with the

2    evidence that was before you.

3          Now, I do think in all candor that money actually had

4    a huge effect at trial, and I think in truth when the jury

5    heard how much money he made and what his bonus might be, the

6    air went out of the courtroom, and I do think that that one

7    percent argument that so concerned us throughout had an

8    important effect.

9          But in truth and fact on the evidence, the bonus --

10   which we argued until we were blue in the face -- also had not

11   one thing to do with the decisions Brian made on July 28

12   because, as you know, as we argued, it was perhaps seven

13   percent as you analyze the factors that went into his potential

14   bonus, it was miniscule, the AFFO calculation in issue.

15         So another issue that I would like to address that

16   flows right out of this is whether or not what we are talking

17   about today, the conduct you are about to sentence, represents

18   aberrant behavior.  And as the court certainly knows, the

19   guidelines permit a departure for aberrant behavior.  The court

20   obviously knows this.  I think for purposes of 3553 the issue

21   is whether or not in truth and in fact the conviction

22   standing -- as it must for purposes of this sentence -- whether

23   or not this is aberrant behavior.

24         And consistent with every letter that was submitted to

25   the court, consistent with everything the court knows about

HB87BLOS

1       him, I respectfully suggest there is no chance in the world

2       that any kind of conduct similar to this would be repeated in

3       the future.  There is absolutely no evidence in the record that

4       there is conduct like this in the past.

5              Brian was responsible for over 100 public filings.

6       Certainly if these incredible capable prosecutors had other

7       instances of fooling around with material numbers, different

8       public filings, different conduct, you would have heard about

9       it.

10             So, I think he should get credit in terms of the

11      court's assessment of what the appropriate punishment should

12      be, with the clear, clear established fact that this is a

13      one-off.

14             One other subject I would like to address is this

15      notion of relative justice.  I think it's an important part of

16      the sentencing calculation, the idea being people who commit

17      similar crimes should be treated similarly.

18             We listed a bunch of cases in our briefs about other

19      securities fraud cases in the Southern District where the

20      sentences were obviously completely different than what the

21      government is recommending.  I think every case is different,

22      so I'm not going to dwell on those.

23             I think for purposes of this case, I mean to be sure

24      there is evidence in the record -- and I am guessing when the

25      prosecutors are alone in their office there is an absolute

HB87BLOS

1   belief that whatever Brian knew and did, his boss Nick Schorse

2   knew and was responsible for.  Obviously, he is not in court.

3        In terms of chief accounting officer Lisa McAllister

4   and Ryan Steel, these were grown-ups.  Ryan Steel has spent ten

5   years, as I recall, at Deloitte.  Lisa McAllister worked for

6   the most sophisticated financial institutions in the land.

7   They were the enablers; they were the people who actually

8   executed.  They did the work that needed to be done for this

9   adjustment to be put in place.  Now, obviously, they

10  cooperated, and I understand there is a difference.  But the

11  idea of burying Brian Block alone, when no one else is going to

12  be responsible in any way, shape or form for this conduct in

13  connection --

14       Obviously, I know Lisa McAllister is going to be

15  sentenced.  We wish her no ill.  I don't know if the court is

16  familiar with this or not, but she has dreadful personal

17  circumstances, and we wish her well.  We have no hostility or

18  animus.  But to be sure there were a lot of people involved in

19  this particular adjustment, and Lisa and Ryan were the

20  enablers, Lisa and Ryan were the people who executed the acts

21  that needed to be done to make this possible.

22       Undoubtedly the prosecutor will get up and say we need

23  to send a signal, we need to send a signal that securities

24  fraud won't be tolerated; coming up with plugged numbers and

25  throwing them in public filings is no good, you can't do that.

HB87BLOS

1    And of course that's correct.  And I think that's one of the

2    important purposes of prosecutors bringing cases.  I certainly

3    felt that way for the many years when I was a prosecutor.

4            But I also think that what also needs to be evaluated

5    is that crushing Brian Block is not necessary to make that

6    point.  Let's just say hypothetically that the court finds a

7    noncustodial sentence the right result in this case.  Brian has

8    a felony conviction.  There will never be an occasion when he

9    has a similar position that he had before.  He faces many, many

10   civil lawsuits.  The SEC is on his tail.  No one in the

11   community believes that the Southern District of New York, U.S.

12   Attorney's Office goes soft on CFOs.  I don't think there is

13   any belief about that.  And anybody who is familiar with what

14   has happened to Brian Block to date would not think that

15   anybody is giving him a kiss on the cheek no matter what result

16   comes out of today's sentence.

17           And finally I would say, your Honor, what do we say is

18   the right sentence?  I know this, and I know at a moment like

19   this I'm very glad I am not a judge, and I'm not sitting in

20   your chair.  It's probably the most difficult thing a judge can

21   do.  I would also say that Brian is a strong guy, he is a solid

22   citizen, and there will be another good chapter in Brian

23   Block's life.  He has many responsibilities.  I would finally

24   implore the court to let him get back to that or let him start

25   that second chapter as soon as possible.  Thank you.

HB87BLOS

```
1              THE COURT:  Thank you.

2              MR. WEINGARTEN:  And Brian would like to say a few

3      words to you as well.  Would you like that now or after?

4              THE COURT:  Whatever you prefer.

5              Mr. Block, you can go ahead.

6              THE DEFENDANT:  Thank you, your Honor.  I appreciate

7      you allowing me to say a few words here.  Your Honor, words

8      can't describe how I feel right now facing the possibility of

9      being separated for even a day from my wife and my children.

10     Please bear with me as I share a few thoughts with you.

11             I would like to first thank you and your clerks for

12     your time and attention during these proceedings.  This is a

13     complex case, and I appreciate you taking the time to

14     understand it and allowing me to present my defense.

15             I would next like to express my regrets to many seated

16     in this courtroom today.  The pain and heartache that my trial

17     and conviction has had on my family and friends will be a

18     burden that I must carry for the rest of my life.

19             Your Honor, as you can see, I am truly blessed to have

20     the support of so many people that believe in me, that know me,

21     that know my character, that know how I conduct myself both in

22     my private life and professionally.  They have written letters

23     and traveled distances to be here today.  I am humbled and

24     overwhelmed by their support.

25             Your Honor, as you probably saw in some of the
```

1    letters, I did not have a conventional upbringing.  I struggled

2    and persevered in no small part because of some of the people

3    sitting here today that helped me.  But as I look back, I am

4    grateful for the experiences, as they molded me into the man I

5    am today, someone who holds himself to a high ethical and moral

6    standards, someone who works hard and sacrifices to give his

7    children the childhoods they deserve.

8            Regarding the events of July 28, 2014, your Honor, you

9    have heard a great deal, a great number of prospectives on what

10   happened that night.  You have seen the arguments my lawyers

11   have made on my behalf in the sentencing briefs.  I will not

12   rehash them.  But please understand that I have tried my entire

13   life to do what is right.  That is why it is unbelievable to me

14   today that I am here.  My conviction is so at odds with the

15   life I have led and who I have tried to be.  But that being

16   said, I understand and respect that your Honor's duty is to

17   sentence me based on the jury's verdict in this case.

18           Your Honor, in closing, I humbly request leniency in

19   imposing sentence.  I have been and will continue to be

20   tormented by the pain that I have caused my wife Caroline and

21   our three children Samantha, Adam and Benjamin.  They have

22   suffered through the shock of my arrest, and have endured too

23   many nights not knowing what would become of their father.  I

24   know this pain all too well.

25           Judge, please let me be with them.  I humbly ask for

HB87BLOS

1    your compassion to not separate me from my family who rely on

2    me greatly and whom I love so much.  Thank you for listening to

3    me.

4              THE COURT:  Thank you.

5              Mr. Blais?

6              MR. BLAIS:  Thank you, your Honor.  Your Honor,

7    although we respectfully disagree with the court's guidelines

8    calculation, in many respects the sentence that we requested

9    was not driven by the guidelines calculation here but instead

10   driven by an appropriate and a rigorous analysis of the 3553(a)

11   factors, which is ultimately what drives the sentence.

12   Certainly the guidelines are one of them, but they are not the

13   only point or the end point of that particular analysis.

14             And, really, regardless of the guidelines range that

15   was ultimately found here, we nonetheless believe that a

16   sentence at the level we requested of at least 84 months

17   remains appropriate regardless of the guidelines finding.  And

18   in any respect, we believe that a guidelines range of 18 to 24

19   months in this case substantially understates the seriousness

20   of the conduct here.

21             And let there be no doubt that the conduct here was

22   particularly serious.  There is no dispute that on the day that

23   the fraud was announced to the market there was ultimately a $3

24   billion loss in the value of ARCP stock.  That's not a

25   hypothetical loss; that's not a theoretical loss; that's not an

HB87BLOS

1    intended loss; that is actual dollars out of investors'

2    pockets.  $3 billion.

3            Now, the court has found that the government hasn't

4    proven how much of that loss was ultimately attributable to

5    Mr. Block's fraudulent conduct, but certainly some portion of

6    it was, and with a $3 billion loss, even a small portion of it,

7    10 percent or so, is a substantial loss that is quite

8    significant and serious.  And so that kind of conduct certainly

9    calls for a substantial and appropriate penalty, particularly

10   in light of the actual conduct here.

11           If your Honor will recall from the evidence at trial,

12   what happened here.  I mean Mr. Block is the chief financial

13   officer of a multi-billion dollar company, the person

14   ultimately responsible to safeguard the interests of the

15   shareholders and to appropriately ensure that ARCP's filings

16   with the SEC were appropriate and proper in all respects.  And

17   what did the testimony at trial show?  On the night before the

18   filing three people got together in a room and essentially made

19   up a number and evaded all of the safeguards that were in place

20   to ensure that those filings were appropriate.  It was made

21   after the audit committee had signed off on those numbers, no

22   report back to the audit committee that the numbers had

23   changed.  It was made essentially after the auditors had signed

24   off on the numbers.  And while the numbers were provided to the

25   auditors, the testimony at trial indicated that there was

HB87BLOS

1   nothing provided to the auditors about why those numbers had

2   changed or the fact that there was no support for it.

3          So, those mechanisms that were in place to prevent

4   this from happening, to make sure that things like this didn't

5   happen, to make sure that chief financial officers of public

6   companies can't just make up numbers, or make numbers, shave

7   numbers to meet particular targets, can't happen, those utterly

8   failed here, and the result was a substantial market loss.

9          That is serious conduct, and it's conduct that frankly

10  and unfortunately is not unique in the world.  Right?  The

11  court is obviously familiar with past circumstances of

12  accounting fraud -- Enron, Tyco, WorldCom and the like -- and

13  in the wake of those incidents, Congress put mechanisms in

14  place again to try to root out these kinds of fraud.  The

15  Sarbanes-Oxley Act required certifications from the very

16  individual who is here today, and that individual again evaded

17  those requirements to ultimately safeguard the number.  So, you

18  know, this is serious conduct, and it is conduct that calls for

19  a substantial sentence.

20         Now, Mr. Weingarten was correct that I am going to

21  stand up and say that general deterrence is important here,

22  because it is.  This is a case that has been followed by the

23  investing world, by the financial press, by the real estate

24  sector, and it is important that a message go out to people

25  similarly situated to this defendant that fraud, making up

HB87BLOS

1  numbers, is not allowable; it will result in substantial

2  consequences.

3          We pointed out in our papers -- and this case may be

4  unique in certain respects because it involves a non-GAAP

5  metric -- we pointed out some of the press and the other

6  publications about this issue showing the growing importance,

7  the growing prevalence of non-GAAP metrics, the general views

8  and the commentary that non-GAAP numbers -- I think it's

9  obvious because there often aren't prescriptive rules about how

10 specifically they should be calculated -- are more open to

11 manipulation than GAAP metrics.  So, I do think a sentence

12 here -- a substantial and appropriate sentence -- will send a

13 general deterrent message, particularly regarding the

14 circumstances of non-GAAP metrics, these other potentially

15 pliable metrics, that there may be more of an incentive or more

16 of a temptation to manipulate because there is potentially less

17 regulation, less certitude about how they should be

18 appropriately calculated.  And so I do think a substantial

19 sentence is appropriate from a general deterrence standpoint.

20         Now, Mr. Weingarten made the argument -- and it's one

21 that is in the defendant's papers as well -- that this was, you

22 know, aberrant conduct.  Look, we don't dispute -- I mean it's

23 certainly a factor that the court should consider at sentencing

24 that there are good aspects to Mr. Block's life, that he has

25 been a good father to his children.  We don't dispute any of

HB87BLOS

1    that, and that's obviously a relevant factor for the court to

2    consider at sentencing.  But this wasn't a crime that happened

3    in the course of a mere few hours, particularly coupled with

4    the court's finding here today that Mr. Block took the stand at

5    his trial and lied to the jury, lied to the court, about what

6    happened on the night of July 28.  So his conduct, his cover-up

7    of this particular situation, if you will, didn't occur simply

8    in the course of the few hours on the night of July 28.

9              There was testimony at trial that obviously this was a

10   situation Mr. Block had been aware of for several weeks leading

11   up to July 28, and there was further testimony at trial from

12   Mr. Steel that there was an effort during the audit committee

13   investigation of this very manipulation, an effort by Mr. Block

14   to cover it up, an effort that we would argue continued through

15   his false and perjurious testimony during the trial.  And

16   certainly in light of that fact, in light of the fact that the

17   court has found that there was an effort at an obstruction of

18   justice in this case, certainly a noncustodial sentence would

19   be inappropriate.

20             There needs to be a message that that kind of

21   conduct -- covering up fraudulent behavior, attempting to put

22   one over, pull the wool over the eyes of the jury -- is not

23   conduct that should be rewarded; it is conduct that should be

24   punished in an appropriate fashion.  It is conduct that should

25   be deterred, and it is conduct that this court should send a

HB87BLOS

1    message is not appropriate for one who has been confronted with

2    or accused of criminal behavior; and in that circumstance a

3    substantial and appropriate sentence is required here.

4            And lastly I'd just like to note there is some talk

5    here about disparities.  Obviously, this is a circumstance

6    where there was a three-person-in-the-room crime.  Two others

7    who were in the room cooperated with the government, admitted

8    their culpability, one pled to several crimes.  It is

9    appropriate obviously in that circumstance where individuals

10   have accepted their culpability, have cooperated with the

11   government, provided what we will certainly argue was truthful

12   testimony to the fact finders, it is appropriate that there be

13   a disparate sentence in this matter between those individuals.

14           And certainly we would argue -- and I think we did in

15   our papers -- that Mr. Steel obviously, based on the testimony

16   of others, felt great regret about this and was ultimately the

17   person who led to this situation becoming known by the

18   auditors, the audit committee and others.

19           So, certainly the culpability differs.  And there are

20   the positional differences.  Mr. Block was ultimately these

21   individuals' bosses; the buck stopped with him.  The

22   culpability is differential, and it is appropriate in that

23   circumstance that sentences be disparate.

24           So, for those reasons, and for the reasons that we

25   articulated in our sentencing submission, we continue to

HB87BLOS

1    believe that a sentence at or above the level recommended by

2    probation of 84 months is appropriate and required in this

3    circumstance under the factors set forth in 3553(a), and would

4    be sufficient but not greater than necessary to serve those

5    purposes of sentencing.  Thank you.

6             THE COURT:  Thank you.

7             Is there any there any reason why sentence should not

8    be imposed at this time?

9             MR. BLAIS:  No, your Honor.

10            THE COURT:  In preparing to sentence the defendant, I

11   have considered the presentence report, the recommendation of

12   probation, the written and oral statements of defense counsel

13   and the defendant and the government, as well as each of the

14   letters submitted on behalf of the defendant, and those who

15   have spoken here today.

16            My decision is ultimately guided by factors in the

17   statute, Section 3553(a), which I considered.  Whether I talk

18   about them or not, I have considered all of them.  Those

19   include the sentencing guidelines and policy statements.  As I

20   said, I have determined that the guidelines call for a sentence

21   of 18 to 24 months.  They also require that I consider the

22   nature and circumstances of the offense, the defendant's

23   history and characteristics, and the purposes of sentencing,

24   the need to provide just punishment, the need to afford

25   adequate deterrence to criminal conduct, both specific

HB87BLOS

1    deterrence -- that is, deterrence as to the particular

2    defendant -- and general deterrence -- the need to send a

3    message to deter criminal activity of others -- and to protect

4    the public from additional crimes.  I am required to impose a

5    sentence that is sufficient but not greater than necessary to

6    comply with these purposes.

7         Mr. Block was the chief financial officer of a public

8    company that was a real estate investment trust, or REIT, then

9    knows as ARCP.  In July of 2014, just before the filing of the

10   company's second quarter 10Q, Mr. Block participated in a

11   scheme to manipulate the financial results of the company by

12   inflating a key non-GAAP metric used by investors to evaluate

13   REITs, adjusted funds from operations, or AFFO, by what

14   amounted to approximately $13 million in the first six months

15   of 2014.  The jury found, and I agree, that he did so brazenly

16   by simply making up numbers to plug a gap that resulted from

17   what would have been a proper calculation of the company's

18   numbers, a gap that would have highlighted problems in the

19   company's past disclosures, and would have caused the company

20   to fall short of investors' expectations for the period.

21        It's not exactly clear why he did it.  It may have

22   been out of greed.  It may have about out of the company's

23   aggressive focus on growing at all costs and meeting earnings

24   at all costs.  What is clear is that he knew better.  As an

25   experienced account and CFO, he should have known better, and I

HB87BLOS

1   think he did know better.  He certified to the SEC and to

2   investors that the financial results were accurate when they

3   were not, and I believe he knew they were not.

4          It's a serious set of crimes.  Shareholders of a

5   company rely on the integrity of their corporate officers to

6   tell the truth.  The financial markets overall rely on

7   compliance with the law and financial disclosures, and without

8   that compliance our financial system and economy would lose the

9   confidence that makes them as strong as they are in this

10  country.

11         At the same time, I acknowledge that there are a

12  number of factors both about the criminal conduct here and

13  about the defendant that are mitigating.

14         First, Mr. Block has no criminal conduct in his past.

15  He has led a law abiding life in general, so this conduct is a

16  deviation from his personal history.  In fact, he has been a

17  good father and a good family member and friend, who has had a

18  genuinely positive effect on many people in his life, as the

19  letters and the testimony here today testify.

20         Second, while the criminal conduct was indeed serious,

21  as I've said, it is also appropriate to note certain aspects of

22  it to put it in context.

23         First, it did not fundamentally involve long-term

24  fraudulent conduct over periods of years or many months, as

25  many of the other notorious accounting cases have, such as

HB87BLOS

1    Enron and WorldCom.  Rather, it fundamentally involved

2    fraudulent conduct that took place late one night before the

3    filing of a particular 10Q, although it did involve some

4    cover-up that followed.

5           Second, AFFO is, as defendant points out, a non-GAAP

6    metric.  While the ambiguous regulatory environment around that

7    fact does not create a license to make material misstatements,

8    and in no way detracts from the defendant's guilt, it is also

9    true that the lack of direct GAAP guidance on the particular

10   metric may have led to an assumption on the defendant's part of

11   more leeway in reporting numbers and may to some degree

12   diminish the degree of culpability.

13          It is also true that the fact of a felony conviction

14   and the presumed inability of the defendant to maintain his

15   profession is significant punishment in itself, punishment, by

16   the way, that I believe is warranted.

17          I do not think the need for specific deterrence or

18   protecting the public call for a lengthy sentence here, as I

19   think it is unlikely that Mr. Block will engage in criminal

20   conduct such as this in the future.  However, the need for just

21   punishment and in particular the need for general deterrence do

22   call for a real sentence here, a significant sentence.

23          I am of course required to consider the sentencing

24   guideline as a benchmark.  And, as I said, based on my

25   calculation, I believe the range is 18 to 24 months.  That is

HB87BLOS

1    because I do not believe that I can reliably quantify the

2    actual loss amount attributable to the defendant's fraud.

3         I note as a parenthetical that even if I could

4    quantify that loss, and assuming the government's figure were

5    correct, the guidelines range would be life imprisonment, which

6    would become the statutory cap of 105 years under the

7    guidelines.  The idea that this criminal conduct warrants life

8    or 105 years is absurd and simply highlights how broken the

9    guidelines are with respect to being arbitrarily driven by

10   factors that happen to be quantifiable:  Loss amount in

11   financial cases or drug amounts in narcotics cases, to the

12   exclusion of considerations that actually go to a defendant's

13   culpability.

14        I will say the government and probation recognize this

15   and they recommend a sentence of seven years.  The government

16   asks for at least seven years.  In my view that too is

17   excessive from the standpoint of the considerations in the

18   statute, including the purpose of general deterrence.

19        The fact is with respect to crimes like this people

20   don't think they're going to get caught, and a sentence of

21   seven years versus two years versus three years does not make a

22   huge difference in general deterrence.

23        The sentence that I believe is sufficient but not

24   greater than necessary does include a sentence of real

25   incarceration, however.  In my view, the sentence that is

HB87BLOS

 1   sufficient but not greater than necessary is a sentence that is
 2   18 months' incarceration.  I believe that is the amount that
 3   will send the message that needs to be sent for purposes of
 4   general deterrence, but it doesn't overstate the culpability
 5   and seriousness of the offense.
 6          Therefore, I intend to sentence the defendant to
 7   incarceration for a period of 18 months.  This is a variance
 8   from the guidelines based on Section 3553(a).
 9          I also intend to impose a fine of $100,000 and a term
10   of supervised release of three years.
11          Other than the objections that have already been made
12   with respect to the guidelines, let me ask if counsel would
13   like to put on the record any other objection or any legal
14   reason why that sentence may not be imposed.
15          MR. BLAIS:  No, your Honor.
16          MR. WEINGARTEN:  No, your Honor.
17          THE COURT:  Mr. Block, would you please stand.
18          It is the judgment of this court that you be committed
19   to the custody of the Bureau of Prisons for a period of 18
20   months.  Following release, you will be placed on supervised
21   release for a period of three years with the following
22   conditions:  You will not commit another federal, state or
23   local crime; you will not possess an illegal controlled
24   substance; you will not possess a firearm or destructive
25   device; you will not use any illegal controlled substances; and

HB87BLOS

1    you will submit to one drug testing within 15 days of placement

2    on supervised release, and at least two drug tests thereafter

3    as directed by probation.  You will cooperate in the collection

4    of DNA.

5             The standard conditions are imposed with the following

6    special conditions:  You will provide probation with access to

7    any requested financial information.  You will not incur any

8    new credit charges or open additional lines of credit without

9    the approval of probation; and you will report to the nearest

10   probation office within 72 hours of release.

11            You will be supervised by the district of your

12   residence.

13            A fine in the amount of $100,000 is hereby imposed.

14   And a special assessment of $600 is due immediately, and that

15   is a mandatory special assessment.

16            I am going to set a surrender date of January 2, 2018.

17   You will surrender at that time to the facility designated by

18   the Bureau of Prisons before 2 p.m.

19            Mr. Block, you have the right to appeal from your

20   conviction and sentence.  If you are unable to pay the costs of

21   an appeal, you may apply for leave to appeal in forma pauperis.

22   Any appeal must be filed within 14 days of the filing of the

23   judgment of conviction.  And I will direct that a complete copy

24   of the presentence report be provided to the BOP and the

25   Sentencing Commission, and counsel on appeal will have access

HB87BLOS

 1    to the report.

 2              The clerk will prepare the judgment and see to it that

 3    required documentation is sent to the Sentencing Commission.

 4              Forfeiture is not being sought in this case, correct?

 5              MR. BLAIS:  That's correct, your Honor.

 6              THE COURT:  And the government has 90 days, as I

 7    understand it, to address any issues of restitution?

 8              MR. BLAIS:  Yes, your Honor.  And I think this is

 9    reflected in the presentence report.  There has been a claim by

10    Vereit, the new name for ARCP, for costs associated with their

11    assistance in the government's investigation of this matter.

12    What we would like is if the court would set -- and we would

13    like to brief the issue of whether we believe that Vereit in

14    this circumstance is a cognizable victim, and we would like to

15    set a briefing schedule on that issue, if possible.

16              THE COURT:  OK.  And counsel is here representing

17    Vereit; is that right?

18              MS. APPS:  Yes, your Honor, Antonia Apps from Milbank

19    on behalf of Vereit, Inc., formerly ARCP.  I simply wanted to

20    state on the record that Vereit represents that it is a victim

21    under the Mandatory Victims Restitution Act, or the Victim and

22    Witness Protection Act, and would respectfully request it be

23    given an opportunity to participate in the briefing that your

24    Honor sets going forward.

25              THE COURT:  OK.  Do you have an idea for the briefing

HB87BLOS

1    schedule?

2           MR. MILLER:  We have not discussed that.  I think we

3    can work that out.

4           MR. BLAIS:  Yes.  If your Honor would give us an

5    opportunity to confer with defense counsel, we can submit a

6    letter with a proposed briefing schedule.

7           THE COURT:  OK, that's fine.  And I think I have 90

8    days within which to enter a restitution order.

9           MR. BLAIS:  That's correct, 3664(d)(5) believe says

10   that restitution issues must be resolved within 90 days,

11   although I would note that there are Second Circuit cases that

12   say that exceeding the 90 days is generally harmless unless

13   there is prejudice to the defendant.  Nonetheless, we will

14   certainly endeavor and have every expectation that it can be

15   resolved within the 90 day period.

16          THE COURT:  That's fine.  So you will submit a

17   proposed briefing schedule on that.  Can you do that within ten

18   days?

19          MR. BLAIS:  Yes, your Honor, I think we can likely get

20   you something early next week.

21          THE COURT:  OK.  Let me correct one thing I said.

22   When I was talking about the guidelines, I went through the

23   guideline calculation and imposed 18 months, and then I said it

24   was outside the guidelines.  That's actually a guideline

25   sentence.  It's at the bottom of the guidelines, to clarify the

HB87BLOS

 1    record.

 2             MR. BLAIS:  Just one other point for clarification,

 3    just so that it's clear.  Is it your Honor's intention to

 4    impose the 18 month sentence on each count with it all to run

 5    concurrently?

 6             THE COURT:  Yes, on all six counts to run concurrent.

 7    And the same with supervised release, concurrent.

 8             MR. BLAIS:  Thank you.

 9             THE COURT:  And the same with the fine.

10             Anything else?

11             MR. MILLER:  Yes, your Honor.  Just a couple of quick

12    points.  One is -- and I know this is not binding on the Bureau

13    of Prisons, but we would ask that the court recommend that

14    Mr. Block serve his term of incarceration at the minimum

15    security camp at Lewisberg in Lewisberg, Pennsylvania.

16             THE COURT:  I will make that recommendation in the

17    judgment.

18             MR. MILLER:  Thank you, your Honor.  That actually

19    puts him very close to home, so we are very grateful for that.

20             The second request is whether it's at all possible to

21    extend the surrender date by a week or two.  There is obviously

22    the holidays coming up, Thanksgiving, Christmas, New Year's,

23    but there is a lot to be done to get his personal effects in

24    order, and some place middle of January, late January, would

25    make that easier, if the court could see fit to do that.

HB87BLOS

1              THE COURT:  January 9?  Tuesday, January 9?

2              MR. MILLER:  Fine, your Honor.  Thank you.

3              THE COURT:  Surrender date is January 9 before 2:30

4    p.m.

5              MR. MILLER:  Your Honor, I think the last issue is we

6    would like an opportunity to brief for the court the issue of

7    bail pending appeal.  And perhaps if the court is amenable to

8    that, we could work out briefing dates with the government at

9    the same time we are talking about restitution issues.

10             MR. BLAIS:  That's fine.

11             THE COURT:  OK.  If you set a briefing schedule for

12   that as well, that's fine.

13             MR. MILLER:  Thank you, your Honor, very much.

14             THE COURT:  Anything further?

15             MR. BLAIS:  Nothing from the government, your Honor.

16             MR. MILLER:  Nothing from the defense.

17                             – – –

18

19

20

21

22

23

24

25