# EXHIBIT D

D7nWgha1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        10 Cr. 1217 (KMW)

5   PETER GHAVAMI, GARY HEINZ,
    MICHAEL WELTY,
6
                   Defendants.
7
    ------------------------------x
8
                                        New York, N.Y.
9                                       July 23, 2013
                                        10:30 a.m.
10
    Before:
11
                      HON. KIMBA M. WOOD
12
                                        District Judge
13
                          APPEARANCES
14
    U.S. DEPARTMENT OF JUSTICE
15  ANTITRUST DIVISION
    BY:  KALINA M. TULLEY
16       JOHN W. VAN LONKHUYZEN
         JENNIFER M. DIXTON
17
    BALLARD SPAHR STILLMAN & FRIEDMAN LLP
18       Attorneys for Defendant Ghavami
    BY:  CHARLES A. STILLMAN
19       JAMES A. MITCHELL
         ERIK M. ZISSU
20

21

22

23

24

25
```

D7nWgha1

1                             APPEARANCES (CONT'D)

2     BRACEWELL & GIULIANI LLP
           Attorneys for Defendant Heinz
3     BY:  MARC L. MUKASEY
           JONATHAN N. HALPERN
4          PHILIP J. BEZANSON

5     POE & BURTON PLLC
           Attorneys for Defendant Welty
6     BY:  GREGORY L. POE
           PRESTON BURTON
7          RACHEL S. LI-WAI-SUEN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7nWgha1

1

2              (Case called)

3              THE COURT:  Good morning.  Please have a seat.

4         We are here for the sentencing of Mr. Ghavami and

5    Mr. Heinz and Mr. Welty.  By agreement of the parties, we will

6    be addressing today only the issues that are common to all

7    three defendants.  As I understand it, the issues that are

8    common are the calculation of loss amount -- that is, how one

9    should calculate it; whether there are over ten victims,

10   whether the crimes involved sophisticated means, was there an

11   abuse of private trust when the defendants acted as brokers for

12   the issuers, and restitution.

13             Is there any other common issue in counsels' view?

14             MR. HALPERN:  Material role, your Honor.

15             THE COURT:  Oh, yes.  That's individual, I believe.

16             MR. HALPERN:  It had been assessed across the board

17   maybe in different ways, but I think that was an enhancement of

18   the probation officer.

19             THE COURT:  I'm treating it as individual, so I'll

20   deal with it tomorrow.

21             Anything else?

22             MR. MITCHELL:  The other issue, your Honor, is the

23   disparity issue with 3553.  Is that something that could be

24   treated tomorrow as well with the other cases?

25             THE COURT:  I would be glad to hear anything that you

D7nWgha1

1    wish to say with respect to disparity.  I do not know the

2    individual circumstances of the individuals who were sentenced

3    by Judge Baer.

4             MR. MITCHELL:  My only point, your Honor, is I do

5    there are individual things we would want to say on behalf of

6    our clients.  So it would be preferred if we could do that

7    tomorrow is all I'm saying, your Honor.

8             THE COURT:  I think tomorrow is probably best.

9             MR. MITCHELL:  Thank you.

10            THE COURT:  I have a few questions for counsel which

11   I'll reserve to the end.  These are questions that I'd like to

12   know the answer to before tomorrow.  They deal largely with the

13   financial circumstances of two of the defendants and what

14   institutions you would like to have the Court recommend for

15   each client in terms of custody.

16            I need to begin by asking counsel, have each of you

17   had an adequate opportunity to discuss and review the

18   presentence report with your clients and consider any changes

19   you wish made to it.  For each of my questions that go to all

20   of you, I'll hear first from Mr. Ghavami's counsel, then

21   Mr. Heinz's, and then Mr. Welty's.

22            MR. MITCHELL:  Thank you, Judge.

23            THE COURT:  Could counsel use the podium, please, for

24   the court reporter's sake.

25            MR. MITCHELL:  Your Honor, we had made objections to

D7nWgha1

1    the PSR that were largely incorporated by the probation

2    officer.  I've gone over them with Mr. Ghavami at length.  We

3    don't have anything additional we would like to put in the PSR

4    at the moment.  Basically, as I understand it, you took our

5    objections and interspersed them in the language of the PSR, so

6    currently I have nothing else to add.  And I have gone over it

7    with Mr. Ghavami.

8            THE COURT:  Very good.  Thank you.

9            MR. MUKASEY:  Judge, we have had an adequate

10   opportunity to go over the PSR with Mr. Heinz.  We've

11   registered our objections with the probation officer.  They are

12   incorporated in the report, and we're satisfied with that

13   practice.

14           THE COURT:  Very good.

15           MR. POE:  Your Honor, on behalf of Mr. Welty, the

16   answer is the same as the answer Mr. Mukasey gave to the Court.

17           THE COURT:  I will move then to the common issues.

18   The most important issue with respect to the calculation of the

19   advisory sentencing guideline levels is the calculation of

20   economic loss to the issuers caused by the defendants'

21   collusive, anticompetitive actions.  Before explaining my

22   calculation of the loss amounts, I think it is important to

23   note that the Sentencing Guidelines do not make any meaningful

24   distinction between losses incurred in, for example, a Ponzi

25   scheme, where defendants personally receive the money that

D7nWgha1

 1    their victims lose and victims are rarely, if ever, made whole,

 2    and a case like this.

 3            In addition, although the Sentencing Guidelines view

 4    intended loss and actual loss as similar, I think it should be

 5    taken into account in sentencing whether the victims have been

 6    made whole.  After all, in sentencing, a judge attempts to

 7    measure, among other things, societal harm caused by crime.

 8    Thus, in a case where victims have been or will be made whole

 9    and, in some instances here, may have received even more money

10    than was needed to make them whole, I believe the loss amount

11    should have less of an impact on sentencing.  What matters more

12    than the precise amount of money initially lost by the

13    issuers -- and I should say this relates also to a 3553 factor,

14    seriousness of the offense, which is largely common to all

15    three defendants -- is that defendants participated in a

16    wide-ranging scheme, for years, to systematically deprive the

17    public of the benefit of competition and did so to enrich their

18    employers, which enrichment was reflected to some degree in the

19    salaries/bonuses of each defendant.  It is this corrupt conduct

20    for which defendants should be sentenced, which is less tied to

21    loss amounts than is the case in many other frauds.

22            In recognition of the requirement that I calculate the

23    advisory sentencing guideline total offense level and take it

24    into account at sentencing, and in recognition of the fact that

25    the parties here have devoted vast amounts of time and money on

D7nWgha1

1    the issue of loss amount, I have reviewed all of the

2    submissions on loss amount, and I will summarize my findings

3    now.

4          I note that I've prepared a chart giving more detail

5    with respect to which calculations I adopt and which I do not.

6    The chart will be Court Exhibit 1 to the transcript of the

7    sentencings and will be given out to you after the morning

8    break or perhaps after the lunch break.

9          With respect to loss calculation, Section 2B1.1(b)(1)

10   of the guidelines provides for enhancements that are keyed to

11   how much loss victims incurred as a result of the defendants'

12   offense conduct.  Application note 3(B) explains that, "If

13   there is a loss, but it cannot reasonably be quantified," the

14   Court "shall use the gain that resulted from the offense as an

15   alternative measure of loss."  Sentencing Guidelines Section

16   2B1.1, comment note 3(B).

17         The government, after calculating the losses to

18   victims for some transactions and the gains to UBS for others,

19   contends that the conspiracy has caused more than $9-1/2

20   million of loss.  The government argues that this amount

21   justifies the imposition of a 20-level enhancement to each

22   defendant's advisory sentencing guideline total offense level.

23         After considering the government's calculations and

24   the parties' submissions, I do not accept all of the elements

25   included in the government's loss estimate.  I agree that there

D7nWgha1

1    is some evidence to support a finding that defendants'

2    conspiracy caused a loss both to the municipal issuers and to

3    the Treasury.  However, my task here is not to assess whether

4    the victims have sustained a theoretical general loss but

5    rather to analyze on a transaction-by-transaction basis whether

6    a preponderance of the evidence shows a specific loss to a

7    specific victim.  For the transactions in which the government

8    suggests I use gain as a proxy for loss, the government must

9    show by a preponderance of the evidence, one, that there was a

10   loss, and, two, that such a loss cannot be quantified, and,

11   three, that the resulting gain is a reasonable alternative

12   measure of the loss.

13          In light of these principles, I have accepted some

14   portions and rejected other portions of the government's

15   proposed loss calculations.  Although some of the government's

16   claimed losses are supported by the record, for others, the

17   government has not been able to show that the claimed losses

18   are anything more than theoretical.  Although my rulings are

19   based on an examination of the entire record, the chart that I

20   will mark as Court Exhibit 1 includes record citations only

21   where specific testimony or documentary evidence is especially

22   relevant to a particular finding.

23          The government contends that the loss incurred on the

24   escrow transactions referenced in counts one, two, and three is

25   impossible to calculate.  The government instead measures loss

D7nWgha1

1    on these transactions by measuring the gain to UBS in the form

2    of increased profits UBS earned on the rigged deals.  Although

3    I agree with the government that UBS profited at the expense of

4    the victims, I reject the majority of the government's

5    calculations with respect to the escrows because there is

6    insufficient evidence to show the existence of a tangible loss

7    on these transactions.  Before I may look to defendants' gain

8    as an alternative measure of loss, the government must have

9    shown by a preponderance of the evidence that "there is a loss,

10   but it reasonably cannot be determined."

11       I recognize that financial institutions implicated in

12   the fraud have paid millions of dollars in compensation to the

13   victims of defendants' conspiracy.  These payments do, of

14   course, suggest that both the municipal issuers and the

15   Treasury sustained a loss -- indeed, quite substantial

16   losses -- and that defendants and UBS profited at the expense

17   of these victims.  However, for purposes of sentencing, my

18   analysis is confined to the evidence before me, and I must

19   determine the actual loss caused by defendants based on the

20   testimony and exhibits presented at trial.  Here, with two

21   exceptions, that evidence fails to show that an actual loss was

22   incurred in the escrow transactions at issue, either by the

23   Treasury or the municipal issuers.

24       For the 13 escrow transactions at issue, UBS

25   manipulated the bidding process so that UBS's bid would be the

D7nWgha1

1  winning bid.  According to the government, this anticompetitive

2  conduct caused municipal issuers to lose money because they did

3  not get the highest price possible for the escrows.  It also

4  allegedly resulted in a loss to the Treasury because where the

5  bidding was based on the termination date of the escrow, the

6  Treasury was deprived of the use of excess profits on the

7  escrows that it otherwise would have had.

8        I agree that defendants' fraudulent manipulation of

9  the market may have caused municipal issuers to receive less

10 than they otherwise would have received and that the Treasury

11 may have been deprived of the use of some money.  The fact that

12 there may have been losses, however, is insufficient to meet

13 the government's burden to show that the victims did sustain a

14 loss.  It is possible that this bidding process, although

15 anticompetitive, had the same result as it would have absent

16 the defendants' fraud.  Faced, as I am, with competing

17 inferences and lacking any affirmative evidence either way, I

18 cannot conclude that the victims sustained a loss on the escrow

19 transactions, on most of them.  Absent such a finding, I must

20 also reject the government's regression analysis that attempts

21 to calculate gain to UBS as a proxy for any loss.

22        For two transactions, however, a finding of loss is

23 supported by specific evidence in the record.  First, for the

24 Rhode Island Tobacco transaction, testimony established that

25 Bank of America would have put in a competitive bid but decided

D7nWgha1

1    not to when UBS promised to pay Bank of America the profits it

2    would otherwise have earned.  This payment is directly tied to

3    a loss to the municipal issuer, and I accordingly include it in

4    my loss calculation with respect to Count One.  Likewise, with

5    respect to Count Three, testimony from Mr. Zaino specifically

6    discussed UBS's excess profits on the Commonwealth of

7    Massachusetts transaction and links those profits to the

8    issuer.  This figure is also included in my loss calculation

9    with respect to Count Three.

10          For the remainder of the escrow transactions at issue,

11   however, I reject the government's proposed loss calculation.

12          Let me note, as I should have initially, that although

13   counsel have given me extensive, very extensive, submissions, I

14   will hear you after I give you what are in fact these tentative

15   calculations.  I'll hear you on objections to them that you

16   think I have not taken into account appropriately.

17          Moving to the fraudulent interest rates, with respect

18   to Counts Four and Five, I accept the government's loss

19   calculations based on fraudulently lowered interest rates.  I

20   find the evidence sufficient to establish that the conduct

21   charged in those counts permitted coconspirators Peter Grimm

22   and Alex Wright to lower their interest rate bids, thereby

23   causing loss to the municipality.  I find that the evidence at

24   trial firmly established that the initial interest rates that

25   the coconspirators quoted to one another, even where they were

D7nWgha1

1    referred to as "indications," are a reasonable starting point

2    to measure the fraudulent change in interest rates.  I

3    reference the transcript at pages 1118 to '19 and 1158 to '60

4    and 1231.

5         I also reject defendants' arguments relying on

6    application note 3D1 to Sentencing Guidelines Section 2B1.1

7    that losses arising from fraudulently manipulated interest

8    rates may not be included in the Court's loss calculation.  The

9    application note cited by defendants states that "loss shall

10   not include ... interest of any kind, finance charges, late

11   fees, penalties, amounts based on an agreed-upon return or rate

12   of return, or other similar costs."  That note was not intended

13   to bar consideration of interest as a loss in a case like this

14   where the competitive bidding process centered on the interest

15   payments that providers would offer municipal bond issuers.  I

16   rely upon United States v. Nolan, 136 F.3d 265, 273 (2d Cir.

17   1998), which states, "It is true, as Mezzetta contends, that a

18   sentencing court should not add to the loss amount its estimate

19   of the interest or other investment return the victim might

20   have earned had the money not been taken from him ... The

21   district court considered the guidelines notes but concluded

22   that they did not apply where, as here, the money stolen

23   included both principal and agreed upon interest.  Like the

24   district court, we find these authorities persuasive and we

25   reject Mezzetta's claim of error."

D7nWgha1

1          Moving to broker fees, I reject the government's

2    request to include broker fees as part of the loss calculation.

3    I agree with the government that the evidence supports the

4    position that the municipalities paid broker fees in exchange

5    for a competitive bidding process, which they expected would

6    result in the best deal for them and also comply with the

7    I.R.S. safe harbor regulations.  The problem with including the

8    entire broker fee as a loss to a municipality is that, as the

9    government itself notes in its sentencing memorandum, the

10   brokers did provide the municipalities with some services.  For

11   this reason, it would not be appropriate to consider the entire

12   broker fee to be lost.  See United States v. Canova, 412 F.3d

13   331, 353 (2d Cir. 2005), which notes that where a defendant

14   fraudulently misrepresents that he has performed a contract to

15   its specifications, the victim has sustained a loss, but the

16   loss is not necessarily the full contract price.  Nor is it the

17   case that the municipalities actually went through the process

18   of rebidding the bond issues in which case they may have been

19   required to pay an additional broker fee.  In this case, the

20   UBS settlement with the I.R.S. preserved the tax-exempt status

21   of the underlying bonds.

22          Because the Court is unable to ascribe a certain

23   proportion of the broker fees to the competitiveness of the

24   bidding process, I find it inappropriate to view the entire

25   broker fee as part of the loss calculation.  Rather, I will

D7nWgha1

1      consider these facts within the context of the factors listed

2      in 18 U.S. Code Section 1353.

3              With respect to swap fees, with one exception, I

4      reject the government's inclusion of swap fees in the loss

5      calculation for the transactions in Count Two.  These fees were

6      paid by UBS to CDR and trial testimony from Mr. Goldberg

7      supports the government's position that CDR did nothing to earn

8      these fees.  Transcript pages 2985 to 2995.  However, for the

9      majority of the transactions on which UBS paid a swap fee,

10     there is no evidence to support the government's contention

11     that these fees would otherwise have gone to the municipalities

12     or to the Treasury in the form of more favorable interest rates

13     or otherwise competitive bids.  This theoretical inference is

14     insufficient to support a finding of loss; absent testimony or

15     other evidence, I reject the government's inclusion of these

16     swap fees and the loss amounts.

17             However, for the $65,000 swap fee associated with the

18     Centinela transaction, Mr. Goldberg testified that if UBS had

19     not paid the swap fee, the "I.R.S. would have gotten more

20     proceeds" from the transaction.  Given this testimony, tying

21     the swap fee to a loss to the Treasury, I accept the $65,000

22     swap fee as a loss.

23             With respect to kickbacks, I accept the losses that

24     the government deems kickbacks but only with respect to the

25     Commonwealth of Puerto Rico transactions in Counts Two and

D7nWgha1

1    Four.  With respect to these transactions, I find that the

2    government has carried its burden of establishing $535,000 in

3    total losses, $200,000 with respect to Count Two, and $335,000

4    with respect to Count Four.

5            With respect to Count Four, I note that the government

6    presented evidence that Peter Grimm of GE was able to lower his

7    bid by virtue of defendants' conduct.  I reference pages 1045

8    and 1811 of the trial transcript.  The government also

9    presented evidence that UBS entered into interest rate swaps

10   with GE related to the Puerto Rico transaction.  These swaps

11   led to a profit of over $1.3 million.  Testimony from

12   defendants' coconspirator established that on these types of

13   transactions, profits were typically "a half basis point,

14   sometimes less, up to one, two basis points."  Transcript page

15   1064 from the trial.  Taking even the conservative end of that

16   range, I find sufficient evidence that $335,000 of UBS's

17   profits were attributable to the conspiracy.

18           With respect to Count Two, I conclude that the

19   $200,000 payment from UBS to CDR -- $50,000 of which went

20   directly to CDR brokers and 150,000 of which funded CDR's share

21   of the Las Vegas conference -- qualifies as a loss to the

22   municipality.  The record evidence established that although

23   CDR was not a necessary party to the transaction, it was

24   brought in for an agreed-upon fee.  I conclude that this fee

25   represents potential savings that would otherwise have been

D7nWgha1

1    passed on to the municipalities or the Treasury.  This leads me

2    to the following total loss calculations.

3           I find that Mr. Ghavami is responsible for a loss of

4    $2,990,000, justifying an 18-level enhancement under the

5    advisory Sentencing Guidelines.  Mr. Heinz is responsible for

6    losses of $3,337,945.31, justifying an 18-level enhancement.

7    Mr. Welty is responsible for losses of $1,363,345.31,

8    justifying a 16-level enhancement.

9           At this point, I would be glad to hear anything

10   counsel wish to say with respect to my loss conclusions.

11          I think it might be a good idea to take a break and.

12          MR. MITCHELL:  Could we coordinate amongst ourselves,

13   your Honor?

14          THE COURT:  I'm sorry?  We'll take a 15-minute break.

15   You're free to discuss this among yourselves and I'll be glad

16   to hear you on loss amount.  After that, I will move to number

17   of victims, and so forth.

18          My law clerk points out that it may help you to have

19   my tentative chart, Court Exhibit 1, so we'll pass that out and

20   you can look at it during the break.  Is 15 minutes enough?

21   Yes?  Does anyone say no?

22          We'll reconvene at 11:15.

23          (Recess)

24

25

D7N8GHA2

1          THE COURT:  Before hearing counsel on loss amount, I

2     think it would be good for me to pose the questions I have so

3     that you will have time to get the answers by the afternoon, if

4     you can.

5          I think it also would be helpful for me to hear

6     counsel on comparisons with the defendants sentenced by Judge

7     Baer.  I can hear you again tomorrow on particulars, but if

8     there are general points, I would like to be able to think

9     about them this evening.

10          I view the fines in this case to be an important part

11     of the 3553 factor of punishment, given that this was a

12     financial crime.  And to the extent that a fine punishes a

13     defendant, I think it is reasonable to lessen the time in

14     custody to some extent.

15          I give you that preface because I am going to ask some

16     questions about two of the defendants' finances so that I will

17     know what their ability is to pay a fine.

18          I think it's quite clear that Mr. Ghavami can pay a

19     fine.

20          My questions for Mr. Heinz will be:

21          Who owes him the $246,500 referenced at paragraph 138

22     of the presentence report?

23          With respect to Mr. Ghavami's $500,000 loan to him,

24     have he and Mr. Ghavami talked about this loan in the past

25     couple of years?  Has there been any talk between them about

D7N8GHA2

1   Mr. Ghavami for giving part or all of it?

2          With respect to Mr. Welty, counsel has submitted

3   "updated" information on his assets.  I am wondering why his

4   assets were diminished by $33,305.  He received $59,120 in

5   reimbursement from insurance claims with respect to storm

6   damage to his house.  I don't know if that's been factored in

7   to his assets.  And there is another $86,000 remaining in

8   "escrow."  What will determine whether he receives that money?

9          The fair market value of his home was over $500,000

10  and it seems unreasonable not to factor that into the

11  calculation, perhaps not at $500,000 but at something.

12          Those are my only questions that relate to a

13  defendant's ability to pay a fine.

14          I note that one of the objections to the presentence

15  report calculation of a fine is that the amount recommended by

16  probation was higher than the sentencing guideline maximum

17  would cause a court to impose.  But I want to note for counsel

18  that the sentencing guideline maximum does not govern where the

19  statute of conviction provides for a higher fine.  So I am

20  considering fines substantially higher than the sentencing

21  guideline maximums in light of these defendants' ability to pay

22  fines.

23          The only other question I have is one I alluded to at

24  the beginning today.  I will be asking each lawyer what

25  facility do you expect to recommend for your client.  I take

D7N8GHA2

1    that into account, in part, in view of the arguments made on

2    behalf of Mr. Ghavami that he will not be eligible to go to a

3    camp, and it's true that he will not be eligible to go to a

4    camp.  He will be in a private contracting facility.  And I

5    note counsel's argument that time spent there would be harder

6    time than time spent in a federal facility.

7            All right.  I will be glad to hear counsel now on loss

8    amount.

9            MR. MITCHELL:  May I go first?

10           THE COURT:  Yes.

11           MR. MITCHELL:  I would just like to address Count

12   Three, the Massachusetts transaction.  And what your Honor said

13   in your remarks was that likewise, with respect to Count Three,

14   testimony from Mr. Zaino specifically discussed UBS's excess

15   profits on the Commonwealth transaction and links those profits

16   to the issuer.

17           So if I understood what your Honor was, I think,

18   saying is in that instance, you were finding that the

19   municipality, Commonwealth of Massachusetts, was the victim or

20   injured in that case.  I may have misinterpreted you, but it

21   seemed like that.  And my first response to that is that that

22   Massachusetts deal is one of the perfect escrow deals that we

23   have talked about and obviously briefed extensively.  Indeed,

24   it's one where four entities, who were not identified as

25   conspirators, all bid the perfect cost, and thus the

D7N8GHA2

1     transaction was won or decided on a roll-back date, a

2     termination date.

3              So I think it's something that we all probably can

4     agree on at this point, which is that where you have that

5     perfect escrow situation, the issuer, Massachusetts, is not

6     harmed.  Indeed, Mr. St. Onge, who was the lawyer called, and I

7     believe the bond counsel for Commonwealth of Massachusetts, at

8     trial, when I asked him if he was indifferent between the

9     various bids that were made at the perfect loss, he response

10    was, yes, they all reflected the best price we could have

11    gotten for the escrow.

12             So in that environment, it seems to me, I submit to

13    the Court, that Massachusetts itself can't be a victim.  I am

14    reacting to your Honor's remarks about it being tied to the

15    issuer, who I viewed as the victim.

16             If your Honor on the other side is considering that

17    there is a victim in the form of the Treasury on the

18    Massachusetts deal, what I can say to that is something we have

19    said already a little bit, but I will repeat it for your

20    benefit.  That is the situation where the escrow was supposed

21    to have terminated back in 2010, I believe April 1st was the

22    date.  We even asked Mr. St. Onge about that at trial, and did

23    he even know if it had terminated?  And his answer was, I don't

24    know.  And there is nothing in the record that establishes any

25    of the necessary components about how that bidding went down on

D7N8GHA2

1    the Massachusetts deal to create a record to determine how if

2    there is any loss to the Treasury in that environment.

3          So I understand, your Honor, that there is probably

4    some testimony in the record from Doug Campbell saying we made

5    a little more, we made more on this deal than we otherwise

6    would have, but in the face of what is pretty clear evidence

7    that it's a perfect escrow, the municipality can't be hurt, and

8    there is just zero record evidence about what happened at the

9    bidding.  As to driving the termination date one way or the

10   other, that there is no record.  It's comparable to the same

11   thing we have said with respect to the other escrows.  So I

12   would submit that that should be excised from the loss

13   calculation.

14          I am happy to answer any other questions, your Honor.

15          THE COURT:  I don't have any.  I am going to take that

16   into account.

17          MR. MITCHELL:  Thank you.

18          THE COURT:  All right.

19          MS. DIXTON:  May we respond to that argument?

20          THE COURT:  Yes, you may.

21          MS. DIXTON:  Your Honor, as you found, there was

22   testimony in the record with regard to the excess profit that

23   was made on the Commonwealth of Massachusetts transaction.  And

24   Mr. Mitchell is correct that the person who identified the

25   profit was Mr. Campbell, and that profit did go to Bank of

D7N8GHA2

1    America.  But there is no reason to exclude that profit amount

2    from the loss calculation.

3          As you found, the Treasury can be a victim of the

4    fraud the defendants committed, and it's clear that in this

5    case the Treasury suffered a loss, but we cannot determine what

6    that loss was.  We did learn from Mr. Campbell very clearly

7    that Bank of America made in excess of $2.25 million from that

8    transaction and that excess profit must have come from

9    somewhere.  And there was clear testimony in the record that

10   the way that the Treasury suffers a loss is by manipulation of

11   the roll-back date, by the change in the roll-back date.  We

12   don't know what the change in that roll-back date was, but we

13   do know that there was a $2.25 million profit amount that Bank

14   of America would not have if the transaction was not written.

15         So that translates to a loss that should be included

16   in your Honor's calculation.

17         THE COURT:  Thank you.

18         MR. MITCHELL:  May I respond?

19         Just to respond to what Ms. Dixton said, I grant you

20   Doug Campbell said what he said at the trial.  It was his

21   opinion, his view, whatever it was, as to what the profit Bank

22   of America made on the transaction.  But I find it interesting,

23   and I will point it out to the Court, that he can be so certain

24   as to what the excess profit made by the bank was, yet nowhere

25   in his testimony, in his hundreds of debriefings, in his prep,

D7N8GHA2

1    in the period before the sentencing, has he been able to tell

2    anybody what happened in the bidding process such that you can

3    read the record and say, oh, I bid April 1st, I would have bid

4    January had I not had this information.  Seemingly, he had no

5    recollection of that.  There is no evidence of it in the

6    record.  And I would submit that it seems a little odd that he

7    can tell us he definitely made money, but not tell us how.

8    That's why I think it should be excised.

9              THE COURT:  Thank you.

10             MR. HALPERN:  On behalf Mr. Heinz, we would agree and

11   adopt Mr. Mitchell's arguments, and I would just say, if I may

12   respond to the government just briefly, the government doesn't

13   get to advance to the gain issue unless it has credibly

14   established the existence of a loss.  It has failed to do so

15   for the reasons that Mr. Mitchell has cited.

16             THE COURT:  Thank you.

17             MS. DIXTON:  May I just say briefly, the government

18   presented extensive testimony on how the bidding process was

19   rigged, and Mr. Campbell testified about how Mr. Zaino during

20   the course of the week provided him information about what

21   bidders would be on the transaction and was provided some bid

22   specifications throughout the week, and he was providing that

23   to his top trader Mr. Zwerner, who was then taking that

24   information into account.

25             Certainly, Mr. Campbell then said they did not have to

D7N8GHA2

1    be competitive on the deal because they had all of this

2    information; they learned from Mr. Zaino; they didn't need to

3    compete on it.  So it's clear that that 2.25 million went

4    straight to the rigging, went to Bank of America's profit

5    margins, and there is no reason to exclude it because there was

6    ample evidence that the transaction was rigged and the rigging

7    resulted in $2.25 million in profits.

8              THE COURT:  Thank you.

9              Is there anything further on behalf of Mr. Heinz?

10             MR. HALPERN:  Not with respect to loss, your Honor.

11             THE COURT:  Mr. Welty.

12             MR. POE:  First, with respect to the Rhode Island

13   Tobacco determination the Court made in its tentative ruling,

14   we have briefed this, as your Honor noted, extensively so I

15   will try to be actually brief in this proceeding.

16             The $725,000 doesn't take into account that some other

17   source of securities, other than Bank of America, would have

18   had to exist for that transaction to go forward if UBS hadn't

19   had the understanding about the source of securities from Bank

20   of America.  So, essentially, what the loss calculation does

21   with the $725,000 is it fails to take into account the debit

22   size of the equation.  The issuer would have been in the same

23   position with any other source of securities.  There is trial

24   evidence that HSBC, there is a document in evidence, I recall

25   asking Mr. Zaino questions on this issue, that HSBC was a

D7N8GHA2

1    competitive source of securities and a good source of

2    securities for UBS.  And that if BofA hadn't provided

3    securities, HSBC would.  And our position is that the trial

4    evidence does not show that the result would not have been

5    identical if HSBC had in fact supplied the securities.  And

6    that the reason BofA did what it did is it was afraid of losing

7    altogether.  So it was a half of loaf sort of situation where

8    Mr. Saunders did not submit a bid.

9              So we briefed it.  I don't have anything to add this

10   morning, but we would ask your Honor to consider our position

11   that the $725,000 overstates the loss on that particular

12   transaction based on the evidence before the Court.  That's

13   number one.

14             Number two, the Court has made its tentative

15   determination concerning fraudulently lower interest rates on

16   Count Four.  We briefed that, I think, as extensively as we

17   can.  The one thing I want to note here, your Honor, is

18   Mr. Zaino himself said two different things about indications

19   in bids.  He said, when he was testifying about what Mr. Grimm

20   and Mr. Welty were discussing on the tapes that were introduced

21   into evidence, he referred to Mr. Grimm's numbers as bids.

22   Later on, outside of the context of tapes, when he was

23   confronted with testimony from the Carollo trial, he referred

24   to pricing earlier in a discussion as indication.  We only ask

25   your Honor to take into account when determining whether in

D7N8GHA2

1    fact the government's calculation overstates the loss because

2    it's unknown what Mr. Grimm actually would have bid if Mr.

3    Welty had not spoken first.  That's the second point we wish

4    the Court to consider further.

5           The last one, your Honor, relates to Mr. Welty, the

6    $200,000 kickback on Count Two the Court has determined as to

7    the Commonwealth of Puerto Rico and the $335,000 number on

8    Count Four.  Commonwealth of Puerto Rico was the first

9    transaction chronologically in this case.  It was the beginning

10   of the conspiracy from the evidence point of view.  And there

11   is no evidence in the record that Mr. Welty knew about any sort

12   of conference payment as to Count Two or any sort of swap

13   arrangements as to Count Four on the Commonwealth of Puerto

14   Rico transaction.  So our position as to Mr. Welty on those two

15   payments is that, based on the evidence at trial and the

16   evidence before the Court at sentencing, it wasn't reasonably

17   foreseeable to him even if it's a correct loss calculation.

18          I have nothing further.

19          THE COURT:  Thank you.

20          Would the government like to be heard on any other

21   aspect of loss calculation?

22          MS. DIXTON:  Your Honor, I would just like to briefly

23   address the Rhode Island Tobacco transaction.  There was clear

24   testimony in the record about how Mr. Welty and Mr. Campbell

25   decided to divide the profit on that deal and that each made

D7N8GHA2

1    approximately $700,000.  And I will just cite a transcript

2    portion from Mr. Campbell's testimony.  He said, "We talked

3    about" -- and he was referring to Welty -- "told me

4    approximately how much profit they wanted to make," which was

5    UBS, "in terms of marking up the deal" -- then I think there is

6    a missing "to" there -- "to the issuer."

7            So it's clear that there was a loss there, that the

8    loss resulted in approximately $700,000 in excess profit to

9    UBS, and we submit that that is a proper way to calculate the

10   loss to the issuer in this case.

11           THE COURT:  Thank you.

12           Go ahead.

13           MR. VAN LONKHUYZEN:  We provided some of these issues.

14           If I might briefly, your Honor, as to Mr. Poe's

15   argument about the Count Four reduced interest rates, I think

16   the testimony was quite clear from Mr. Zaino that in those

17   particular calls it was a bid, not an indication, even if he

18   later on cross-examination did admit that at an earlier

19   circumstance at an earlier time it could be just an indication.

20   Secondly, Mr. Welty was certainly aware of and involved in

21   using hedge fees and other forms of kickbacks.  He is on a

22   number of calls discussing with Peter Grimm setting up, backing

23   interest rate swaps on the Catholic Health initiative deal,

24   MEFA and the Rhode Island Housing deals, and he was informed

25   about the use of them in the CDR conspiracy as well.  So he did

D7N8GHA2

1    have direct knowledge, and he should be held responsible for

2    those losses.

3         In particular, as to the two particular transactions,

4    or I guess first one particular transaction, on the Rhode

5    Island Housing and MEFA transactions in Count Four, the

6    government would ask you to reconsider your exclusion of the

7    $140,000 kickback.  There was direct evidence, audio evidence

8    played at the trial through GX 11944 and GX 11954, in which Mr.

9    Welty discusses with Grimm shifting the profit from the MEFA

10   swap to the Rhode Island Housing swap and on the back end.

11        So there is explicit discussion in the record that

12   goes something like, the better I can do on that one, the more

13   there is on the other.  I can't hedge this one.  I can hedge

14   that one.  There was an explicit record evidence of the

15   movement of a loss, taking money away, by reduced interest

16   rates, from the municipality and being paid as a kickback

17   profits on the related hedge.  The government would ask you to

18   consider including that in your loss calculations.

19        There is also call 605, 607, in which Mr. Heinz

20   discusses making in Chambers, putting Chambers CDR's profits

21   into the underlying transactions so that they can be then paid

22   the swap broker fee that was being utilized as a kickback in

23   those transactions.

24        The government believes that there is sufficient

25   evidence to include Rhode Island Housing and MEFA 140,000

D7N8GHA2

1    kickbacks, and, similarly, the series of FSA/UBS swaps in which

2    a broker fee was paid to CDR.

3              THE COURT:  Thank you.

4              Mr. Poe.

5              MR. POE:  I will respond briefly, if I may.

6              I think Mr. Bezanson may have some response based on

7    what Mr. Van Lonkhuyzen said as well.

8              With respect to the Commonwealth of Puerto Rico, the

9    argument that I have made on the 200,000 Count Two and 335,000

10   Count Four loss determinations, Mr. Van Lonkhuyzen refers to

11   the three transactions:  Catholic Health, MEFA and Rhode Island

12   Housing.  Those were all in 2002.  The Commonwealth of Puerto

13   Rico transaction was in 2001.  So those wouldn't be probative

14   at all.  So that's the first point.

15             The second is Mr. Van Lonkhuyzen did refer to

16   Mr. Zaino admitting on cross-examination what an indication

17   was.  As a general proposition, the government's position is

18   apparently on those specific calls Mr. Grimm is giving bids.  I

19   just simply want to note that on those transactions Mr. Zaino

20   was not involved in the bidding out of the transaction, and he

21   was not involved in the factual circumstances surrounding the

22   transaction, and we have no basis to know that it was a bid.

23             That's all I have, your Honor.

24             MR. BEZANSON:  Good morning, your Honor.

25             I would like to address the $140,000 swap that Mr. Van

D7N8GHA2

1     Lonkhuyzen mentioned related to the MEFA and the Rhode Island

2     Housing deals.  For those two deals that are in Count Four, the

3     government has already asserted loss to the municipalities

4     based on the fraudulently lowered interest rate theory, that we

5     have the initial offer bid and we have the final number and he

6     is taking the delta in between as the loss.

7            The $140,000 swap fee paid by GE to UBS to hedge the

8     risk on those deals is really just money paid under the

9     government's own explanation out of the loss that's already

10    been assessed.  So that $140,000 is pure double counting and

11    shouldn't be included in the loss, which I believe your Honor

12    correctly decided.

13           One quick word on the FSA swaps that were also just

14    mentioned which your Honor also properly excluded.  Those

15    swaps, and the government put in almost no evidence at all for

16    the underlying deals that were brokered by CDR and one by FSA

17    on those swaps, I think because of that as an outset, we don't

18    have loss so we can't get to any gain on the swaps.

19           The second piece to that is that those really are just

20    private transactions.  However improper the Court thinks they

21    might be, there isn't an actual victim that can be tied to

22    those the swap fees paid by UBS to CDR.

23           That's all I have, unless the Court has any questions.

24           THE COURT:  Thank you.  No questions.

25           If there is nothing else, I will move to sophisticated

D7N8GHA2

1   means enhancement.

2           The government requests a two level enhancement for

3   all three defendants because their scheme, according to the

4   government, involved "sophisticated means" under Section

5   2B1.1(b)(10)(C).  The guidelines define "sophisticated means"

6   as "especially complex or especially intricate offense conduct

7   pertaining to the execution or concealment of an offense."

8           The guidelines provide examples of sophisticated

9   means, such as "hiding assets or transactions or both through

10  the use of fictitious entities, corporate shells or offshore

11  financial accounts."

12          Although the defendants' fraud related to complex and

13  high valued municipal bond transactions, I find that the

14  defendants' actual conduct was not "especially complex or

15  especially intricate."

16          The scheme was relatively simple.  The conspirators

17  sought to rig the bidding for various contracts by providing

18  one another with inside information, by falsely certifying that

19  they had not done so, and then by paying fees to

20  co-conspirators as compensation.  If this scheme had occurred

21  outside of the context of yield restricted municipal bond

22  escrows, or guaranteed investment contracts, I expect there

23  would be little argument that the scheme was especially complex

24  or intricate.  The fact that the defendants used third parties

25  to pay some of their kickbacks does not change this analysis.

D7N8GHA2

         1              In sum, although the underlying transactions were high

         2      in value and complex in structure, the defendants' conduct was

         3      simple.  They manipulated the bidding process and lied about

         4      doing so.  Accordingly, I reject the proposed enhancement for

         5      sophisticated means.

         6              Would anyone like to be heard with respect to that

         7      proposed finding?

         8              MS. TULLEY:  Yes, your Honor.

         9              Your Honor, although the application note lays out

        10      certain examples of how schemes could be sophisticated with

        11      shells or fictitious entities, there is no requirement that

        12      such devices be used in order to warrant the application of the

        13      sophisticated means.

        14              In this instance, the way in which the kickbacks were

        15      paid was done intentionally to conceal them from the

        16      municipalities or the Treasury or anyone else ever discovering

        17      that these kickbacks were connected.  And this occurred on

        18      several different instances in multiple counts of the

        19      indictment.

        20              On the Centinela transaction, the kickback was paid

        21      from another trading desk in another office, in other

        22      geographic location.  The paperwork had an unrelated deal.

        23      Whether that deal was fictitious or actual is unknown.  But it

        24      was an unrelated deal on there.  There was no way for anyone,

        25      other than the insiders that cooperated with the government, to

D7N8GHA2

1      trace how these kickbacks were in fact connected, and that was

2      done intentionally to conceal what the defendants were doing.

3              This happened again with the swap fees, in even a more

4      complex manner, where CDR was steering transactions to FSA, and

5      FSA then engaged in a swap transaction with UBS, and UBS then

6      took part of the money that it received from FSA to give to CDR

7      as a kickback for CDR steering transactions to FSA.  UBS had

8      absolutely no involvement in these transactions that were

9      rigged between CDR and FSA other than to step in as a conduit

10     to pay kickbacks, and it was doing that as a quid pro quo for

11     CDR steering other unrelated deals to UBS in Count Two.  And

12     the government submits that that is an especially complex and

13     sophisticated means of executing this fraud.  It's not a simple

14     bid rigging.  There was a very complicated quid pro quo that

15     they agreed to, and the quid pro quo itself was done so that

16     CDR and FSA could conceal the fraud that they were doing, which

17     was unrelated to the fraud that UBS was committing.

18             On the Commonwealth of Massachusetts transaction,

19     there were multiple kickbacks paid in separate transactions,

20     each of them unrelated to the fraud that was committed upon the

21     Commonwealth of Massachusetts.  And Mr. Campbell testified

22     about each of those unrelated transactions.  Again, this is

23     done to conceal what they are doing, and without the help of

24     insiders who are cooperating, there is no way for the entities

25     to unravel what has been done in this case.

D7N8GHA2

1          In Count Four transactions as well, the inflated swap

2     fees hid the kickbacks that were being paid for Mr. Welty and

3     Mr. Heinz steering transactions to Grimm.  And all of this was

4     done, again, to conceal it so that it would not be unraveled by

5     either UBS or the victims or GE.

6          In addition to that, they falsified all of the

7     certificates, knowing that these certificates are the only

8     means of reliance that the municipality has, the only means

9     that the Treasury and the IRS has of being convinced that in

10    fact there is a competitive process that is being done, that

11    the regulations are being followed.  And once these

12    certifications are signed, there is no way to go behind that

13    and determine that in fact what they said occurred did occur.

14    In addition to that, there is no way to ever go back and

15    compute the fair market value for these.

16          Taken as a whole, the government submits that this is

17    a complex scheme.  The intricately interwoven quid pro quo that

18    existed amongst these conspirators was in fact complex and

19    intricate, and, specifically, a number of these swaps and

20    kickbacks that they put together to disguise their trail, to

21    make sure that there would not be a connection between the

22    transactions that they rigged and the kickbacks that were paid

23    was complex and sophisticated and the enhancement is warranted.

24          THE COURT:  I think you have made a strong case, and I

25    think it is reasonably viewed as a close question with respect

D7N8GHA2

1      to the complexity you have described.  Almost any fraud

2      involves concealment and that is why I view it as a close

3      question.  I will take your argument into account.

4              Would defense counsel like to respond on this point?

5              MR. HALPERN:  On behalf of Mr. Heinz, I was going to

6      pick up on what your Honor was saying.  Specifically in a fraud

7      case, when there are kickbacks especially, the government would

8      not be arguing that one defendant is going to telegraph the

9      method of the paying of the kickback to a co-conspirator.  In

10     fact, there is nothing sophisticated about, in the government's

11     view here, one co-conspirator saying, I will take care of you

12     later in swap fees or more favorable interest rates or by

13     another method.  I think the Court would be hard-pressed for

14     this kind of fraud, fraudulent scheme, to identify explicit

15     exchanges of kickbacks.

16             A kickback in itself, even if concealed, does not

17     equate to sophistication, nor does the fact that a cooperator

18     explains the payments.  With respect to the Commonwealth of

19     Massachusetts, it was Mr. Zaino who testified that, one, he was

20     the lead broker on this, and Mr. Campbell, who Mr. Zaino

21     identified for the deal, Mr. Campbell said that the only person

22     at the Commonwealth of Massachusetts with whom he spoke about

23     the kickback payments was Mr. Zaino at UBS.

24             There was nothing extraordinary about the vehicles

25     that were used to pay the kickbacks.  There was nothing

D7N8GHA2

1    extraordinary, in fact, it's rather pedestrian for individuals

2    to sign the certificates.  That is an element inherent in the

3    mail fraud misrepresentation argument that the government made.

4    And here, in the government's view, it wasn't as if any

5    co-conspirator fabricated, manufactured any particular

6    representation.  These preprinted forms that were signed was a

7    misrepresentation according to the government.  That's an

8    element of the offense, it's not an enhancement.

9            Finally, it seems that in the government's arguments

10   in its papers almost concede that this is not a sophisticated

11   crime, or the means were not sophisticated.  Rather, it seeks

12   an alternative argument under the *Jackson* case by saying there

13   is one series of interconnected linked steps that when you look

14   at it as a composite makes out a sophisticated scheme.  But

15   that's not what happens here, and I think what the government

16   has done is identified some disparate and disjointed elements,

17   but they don't form a coherent layered approach that the Second

18   Circuit has found was required as an alternative theory of

19   sophisticated means.

20           In *Jackson*, there were layers of sophistication.  Each

21   layer itself was not sophisticated but as a composite was,

22   where the individual first identified, for example, a wealthy

23   individual to be a target as his victim, and built on that in a

24   linear approach, obtained additional information, private

25   information, used that information to make purchases, expensive

D7N8GHA2

1    purchases in that person's name, and then had a courier build

2    upon the information he had to receive the items, and one step

3    after another.  That's not what is going on here.

4         The government said in its opening and its summation

5    that this was not a complicated case, and indeed it wasn't.  It

6    relied principally on the certificates and the kickbacks.

7    There were lies and misrepresentations, and as a sum this is

8    what the fraud was.  If the proponents were in a bag of cash,

9    not a wire transfer, that would be a much clearer case.  But

10   for this particular scheme, this was not sophisticated.

11        Finally, the last point on this, and the government

12   argued this, and it's in the probation report too, that there

13   were complex financial transactions does not convert the matter

14   into a sophisticated scheme.

15        So for all those reasons, I think your Honor was

16   correct in denying the enhancement.

17        MS. TULLEY:  Nothing further, your Honor.

18        THE COURT:  Thank you.

19        I think the only other proposed enhancement that I

20   will deal with before we break for lunch is role in the offense

21   for Mr. Ghavami and Mr. Heinz.

22        The government requests a four level enhancement for

23   Mr. Ghavami for his purported role as an "organizer or leader"

24   of the conspiracy, and a three level enhancement for Mr. Heinz

25   for his role as a "manager or supervisor."

D7N8GHA2

1          I find that a three level enhancement would be

2     appropriate for both Mr. Ghavami and Mr. Heinz as a proposed

3     finding.

4          First, Mr. Ghavami was not the "organizer or leader of

5     one or more other participants" in the conspiracy.  In

6     distinguishing a leadership or organizational role, I have

7     considered the factors laid out in the sentencing guidelines

8     and approved by the Second Circuit in *United States v. Huerta*.

9     These factors include the exercise of decision-making

10    authority, the nature of participation in the commission of the

11    offense, the recruitment of accomplices, the claimed right to a

12    larger share of the fruits of the crime, the degree of

13    participation in planning or organizing the offense, the nature

14    and scope of the illegal activity, and the degree of control

15    and authority exercised over others.

16         I find that Mr. Ghavami's role as head of the MRED

17    desk does not automatically qualify him as an organizer or

18    leader of the conspiracy.

19         I find that the record does establish that Mr. Ghavami

20    played a supervisory role in some respects in organizing

21    meetings with David Rubin at CDR and directing Mark Zaino to

22    rig the Centinela deal.  However, these isolated actions are

23    insufficient to warrant a four level enhancement as an

24    organizer or leader.  Although Mr. Ghavami was the titular

25    leader of some conspiracy participants, testimony establishes

D7N8GHA2

1    that he played no larger a role than other members such as

2    David Rubin.

3          However, a defendant may properly be considered a

4    manager or supervisor, and thus qualify for a three level

5    enhancement, if he exercised some degree of control over others

6    involved in the commission of the offense or played a

7    significant role in the decision to recruit or to supervise

8    lower level participants, following *United States v. Hertular*,

9    562 F.3d 443, 448 (2d Cir. 2000).  Evidence of a defendant's

10   direct and immediate control over at least one other

11   participant provides strong support for the role enhancement.

12   For that I cite *United States v. Diamreyan*, 684 F.3d 305, 309

13   (2d Cir. 2012).

14         I find that the record supports a three level

15   enhancement for both Mr. Ghavami and Mr. Heinz because they

16   exercised control over at least one other participant in the

17   conspiracy.

18         Mr. Ghavami hired Mr. Heinz and Mr. Zaino with

19   knowledge that they would contribute to the conspiracy by

20   running the day-to-day operations of the MRED desk.  Transcript

21   2926.

22         I note that when CDR called to suggest that the

23   Centinela deal be rigged in UBS's favor, Mr. Ghavami directed

24   Mr. Zaino to confirm the deal and make an associated payment.

25   Transcript page 867-868 and 878-880.

D7N8GHA2

1            Similarly, Mr. Zaino testified that Mr. Heinz

2    recruited Mr. Zaino to work for UBS and directly supervised him

3    throughout the duration of the conspiracy, and signed off on

4    fraudulent memos prepared by Mr. Zaino while he worked at UBS.

5    Transcript page 503-506.  Government Exhibit 11-03 and

6    Government Exhibit 11-04.

7            Mr. Zaino also testified that Mr. Heinz directed him

8    to encourage the issuer to hire brokers who were part of the

9    conspiracy, such as CDR.  I note trial transcript page 586,

10   588, 780-781.

11           Alex Wright also testified that Mr. Heinz "pressured"

12   him to make intentionally losing bids.  Transcript page

13   2059-2060.

14           Because the record supports the conclusion that Mr.

15   Ghavami and Mr. Heinz exercised direct and immediate control

16   over at least one other participant in the conspiracy, and

17   recruited co-conspirators, I find that both acted as a manager

18   or supervisor.  Accordingly, I would apply a three level

19   enhancement to both of them.

20           I will be glad to hear counsel on this.

21           Go ahead.

22           MR. MITCHELL:  Your Honor, at the outset, I would

23   thank you for going from the four points to three points, and I

24   would as a preface say I would be suggesting to the Court that

25   not that there be any enhancement, but perhaps the right

D7N8GHA2

1    enhancement for Mr. Ghavami is a two point enhancement under

2    the guideline provision.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7nWgha3

 1          MR. MITCHELL:  Particularly for some of the facts that

 2    are relevant, specifically to Peter, your Honor mentioned

 3    several times the concept of recruiting some people into the

 4    conspiracy and Peter's role as the head of the MRED desk.  I

 5    know I said it repeatedly probably during the trial, but I

 6    can't remember, but I think it is worth repeating to your Honor

 7    now the history of how Peter got to be the head of the MRED

 8    desk, something that he was not in any way interested in or

 9    inclined to do.  He was doing all the swap transactions that

10    related to the other part of the house, called municipal

11    securities group, and a gentleman named Terry Atkinson, who was

12    his immediate supervisor as well as the supervisor of a man

13    named Rhahime Bell, cochaired the group with Peter, kept asking

14    him to take over the MRED group, and Peter didn't want to do it

15    and he, for several years, pushed off that opportunity because

16    he wanted to focus on the swaps that really were where he

17    wanted to spend his time.

18          Ultimately, like a lot of things, I think, in

19    corporate America, that became an option.

20          THE COURT:  Slow down.

21          MR. MITCHELL:  That became an option that he didn't

22    have anymore, which was to stop his supervisor from putting him

23    into that position, and he at least reached something of a

24    compromise, which was if that's going to happen, I don't really

25    want to be running the day-to-day operation.  And that

D7nWgha3

1   ultimately led to his hiring Gary Heinz and the subsequent

2   situation with Mr. Zaino.

3             THE COURT:  I'll ask you to slow down and articulate a

4   bit more.

5             MR. MITCHELL:  Sure, your Honor.  I apologize.

6             My point only is that I think that weighs against the

7   notion of setting up a recruiting structure by Peter Ghavami to

8   create the environment that led to ultimately the conduct that

9   we've come here for.  Particularly, and I also know your Honor

10  mentioned the concept of oversight, I think it's fair to say

11  that this trial record is filled with examples of Mark Zaino

12  doing things on his own.  And although he certainly was

13  supervised in the corporate structure by Peter Ghavami, I think

14  he admitted readily that there were things he did and

15  conversations he had with CDR and others that he did not share

16  or involve Peter Ghavami in.  So I don't want to say that Peter

17  wasn't a supervisor of Mark Zaino, but I think it might be a

18  fairer application to say he shouldn't be treated as a manager,

19  but he should be treated as an organizer, leader, manager, or

20  supervisor in any criminal activity other than the described

21  (a) and (b) of that provision, and that would be a two-point

22  enhancement.

23            THE COURT:  Thank you.

24            MR. MITCHELL:  Thank you.

25            MR. HALPERN:  Your Honor, similarly, 3B1.1(b) refers

D7nWgha3

1    to manager or supervisor in criminal activity involving five or

2    more participants, so Mr. Heinz was not a supervisor or manager

3    of five or more participants as defined in the application note

4    of the guideline.  Participant is a person who is criminally

5    responsible for the commission of the offense.  Your Honor has

6    identified Mr. Zaino and separately Mr. Wright.

7            First, with respect to Mr. Wright and his testimony

8    about feeling pressured, that, we respectfully submit, does not

9    equate to being subjected to being supervised or controlled.

10   Of course, Mr. Wright worked for J.P. Morgan, so Mr. Heinz

11   didn't or couldn't supervise him.  I understand he may be

12   considered a coconspirator, but the government argues that

13   there were various arrangements between the two that benefitted

14   J.P. Morgan, and so that's not the level of control or

15   supervision that this particular sentencing enhancement applies

16   to.

17           With respect to Mr. Zaino, yes, Mr. Zaino was within

18   the MRED desk line of supervisory chain, but it's clear from

19   the record that Mr. Zaino was unsupervisable with respect to

20   his participation in the schemes in which he participated.

21   Mr. Ziglar testified, for example, that Mr. Zaino would

22   repeatedly say, Everything that happens to CDR comes through

23   me.  He said that repeatedly.  There was time after time when

24   Mr. Zaino did an end run around Mr. Heinz to deal with CDR.

25           For example, there was evidence in June of 2001, just

D7nWgha3

1    several months after Mr. Zaino came to work at UBS, that

2    Mr. Heinz, in connection with a potential new deal on behalf of

3    UBS bankers, the Presbyterian homes case, said:  Here, Zaino.

4    This is for you.  It's all yours to deal with UBS, UBS bankers,

5    and the underwriters.  Instead, Mr. Zaino secretly forwarded

6    the e-mail, to his friends at CDR and said:  Here.  This is for

7    you, but whatever you do, don't speak to Gary Heinz about it.

8    Don't speak to the UBS bankers, or PG, for Peter Ghavami.

9              In July of 2001, repeatedly, Mr. Zaino was sending

10   e-mails on his own, one after another, to CDR, about new deals,

11   supporting Mr. Ziglar's testimony and his whole course of

12   conduct throughout the scheme when Mr. Zaino was working at

13   UBS.

14             With respect to Mr. Campbell -- that is, Mr. Zaino's

15   relationship with Mr. Campbell -- that was forged when

16   Mr. Zaino was working at CDR, and this is relevant with respect

17   to Count Three, the Commonwealth of Massachusetts wire fraud

18   count.  It was Mr. Zaino who reached out to Mr. Campbell and

19   suggested meeting with UBS.  It was Mr. Zaino who proposed two

20   separate deals, unrelated to the Commonwealth of Massachusetts.

21   It was Mr. Zaino who had exclusive contact with respect to the

22   payments with Mr. Zaino.

23             There was time after time, even with respect to the

24   forms, the supervisory managerial form, your Honor may recall

25   that Mr. Zaino acknowledged on cross-examination that he had

D7nWgha3

1    prepared some of those unsigned supervisory forms on a separate

2    drive on his computer that was not the standard UBS drive.  So

3    Mr. Zaino was essentially unsupervisable, and he wasn't, by

4    Mr. Heinz.  So with respect, there is no enhancement that

5    applies for aggravating role in this matter.

6            Thank you.

7            THE COURT:  Thank you.

8            Would the government like to be heard?

9            MS. TULLEY:  Yes, your Honor.

10           With respect to the enhancement for defendant Ghavami,

11   the government argues that Mr. Ghavami should be given an

12   enhancement of four levels.  The guidelines do not preclude

13   there from being more than one leader or organizer of the

14   conspiracy.  Mr. Ghavami was on par with David Rubin in his

15   sphere of organizing this conspiracy and what he did at UBS to

16   set up this corrupt conduct, to essentially establish a culture

17   of corruption for the MRED desk and even the wider municipal

18   derivatives group.  He is the one who took the lead in

19   establishing these illegal agreements with Mr. Rubin at CDR,

20   with Mr. MacFaddin at J.P. Morgan.  He's the one that met with

21   them, set the tone, set up the agreements with Mr. Rubin, and

22   agreed to this complicated arrangement of kickbacks where they

23   were going to step in as a conduit for other illegal activities

24   that Mr. Rubin was doing, that they would submit the losing

25   bids, that they would get CDR hired, that they would pay the

D7nWgha3

1    kickbacks.  It was Mr. Ghavami that was driving all of this

2    conduct.

3            As much as counsel has argued that he did not want

4    this job and only reluctantly agreed to it after years and

5    being allowed to hire someone else, I'm not sure how much of

6    that could have come in as testimony or evidence at trial as

7    opposed to the arguments we're hearing now.  But in addition to

8    that, the evidence showed that the hiring of defendant Heinz

9    and Zaino occurred at the time when UBS merged with Paine

10   Webber and there were new opportunities to commit this type of

11   fraudulent activity that didn't previously exist.  And shortly

12   after that merger.

13           THE COURT:  Let me ask you to slow down.

14           MS. TULLEY:  I'm sorry, your Honor.  I'm sorry,

15   Ms. court reporter.

16           When these new opportunities came about, the

17   coconspirator, Doug Goldberg testified he had sent this e-mail,

18   all hail the new king.  Everyone was aware that this merger was

19   going to present defendant Ghavami with more opportunities and

20   expanded opportunities to commit this type of fraud, and he

21   took that opportunity and was involved in hiring two

22   individuals that he knew were already engaged in this activity.

23   This desk that he set up, he's the one that engineered all of

24   the fraud that was occurring there.  Heinz and Zaino didn't

25   work for the desk.  Knowing that these two individuals were

D7nWgha3

1     engaged in this and had the connections to both CDR and J.P.

2     Morgan, he hired them to run the desk and commit this type of

3     activity.

4             Then Ghavami meets with the leaders at other

5     organizations engaged in this fraud, knowing full well exactly

6     what's going on with them, to establish the same activity at

7     UBS where it did not previously exist.

8             As far as directing others, as your Honor pointed out,

9     he directed Mark Zaino to enter into this Centinela transaction

10    and to pay the kickback.  He directed specifically how that

11    kickback was to be made from another trading desk at another

12    location.

13            Mr. Ghavami also met with Doug Campbell regarding the

14    Massachusetts transaction.  He is the one that took the lead in

15    offering to steer that transaction for kickbacks.  He's the one

16    that instructed Mr. Zaino to set up this breakfast meeting so

17    that this could occur.

18            So all of the activity by Mr. Ghavami, especially as a

19    supervisor -- setting the tone, setting up this desk to be a

20    corrupt desk, establishing this culture of corruption --

21    distinguishes him from Heinz, who he hired to facilitate the

22    day-to-day activity.  And for those reasons, the government

23    submits that Mr. Ghavami deserves a four-level enhancement as

24    opposed to the three-level enhancement that goes to defendant

25    Heinz.

D7nWgha3

1              With respect to your Honor's tentative conclusion that

2      a three-point enhancement is warranted for Mr. Heinz, the

3      government agrees with the Court's position on that, for all

4      the reasons that the Court has elaborated.

5              THE COURT:  Thank you.

6              Anything further on this point?

7              Yes.

8              MR. MITCHELL:  Your Honor, the government has

9      referenced many times the point in time when UBS and Paine

10     Webber merged as if that's some watershed point.

11             THE COURT:  You're going to have to articulate.

12             MR. MITCHELL:  The government has pointed up several

13     times where there is a point in time where UBS and Paine Webber

14     merged, and they point to that as a point when Peter Ghavami

15     supposedly came up with --

16             THE COURT:  I'm going to ask you to slow down because

17     some of your words get lost when you speak.

18             MR. MITCHELL:  The government has pointed several

19     times to the point in time when UBS and Paine Webber merged,

20     and they allude to that in a way that I think, in their view,

21     causes them to try to tell the Court --

22             THE COURT:  Please.  I'm sorry.  I think it's

23     difficult for the court reporter.  We lose your voice.

24             MR. MITCHELL:  I'll try to stay a little closer.

25             THE COURT:  If you could slow down, please.

D7nWgha3

1          MR. MITCHELL:  I believe the government would like, is

2     trying to indicate to the Court that that point in time when

3     Peter Ghavami, when UBS and Paine Webber merged and Peter

4     Ghavami was ahead, put into the head of the MRED operation,

5     that that is some watershed where his role as organizer/leader

6     took place or took off in such a way that supports the

7     four-point enhancement that they want to get.

8          There's testimony, for example, in this record by

9     David Rubin who described the meeting that took place in

10    California, first meeting after this merger episode occurred,

11    and it sounds nothing like what the government says it sounds,

12    supposed to sound like.  And I'm going to quote, slowly, from

13    the transcript, 3246 at '47, to '47:  "It was specifically a

14    business meeting for the purpose of UBS and Paine Webber

15    through Peter's vision to let CDR know the plans he had for the

16    organization, the hopes he had for UBS in succeeding as the

17    largest municipal platform in the United States."  And that was

18    David Rubin's description of what he understood to be the

19    conspiratorial meeting that supposedly started that

20    relationship.

21          I would submit, your Honor, there's not record

22    evidence that Peter then went out and recruited others to take

23    over, to create a unit that did this, that did the conduct that

24    the government says underlies the case.  The MRED division was

25    actually there previously, and, as I've said before, Peter took

D7nWgha3

1    over its control and ultimately hired, amongst others, Mark

2    Zaino.  I don't think I have more I want to say on it except

3    that we acknowledge he certainly was a supervisor of that

4    group, but I think the strongest point that I can make is once

5    that group is going and you look to the record evidence in this

6    case, what you see is a lot of Mark Zaino taking steps with

7    people at CDR whom he had the prior relationship in such a way

8    that was not within the purview of Peter Ghavami.  And that is

9    not consistent, in my view, with an organizer/leader four-point

10   enhancement and, as I say, we would support a two-point

11   enhancement.

12              THE COURT:  I'm not sure that the last sentence --

13              MR. MITCHELL:  We would support a two-point

14   enhancement.  I apologize.

15              MR. HALPERN:  Two brief points, your Honor.  One,

16   there's no evidence in the record that the MRED desk was set up

17   to be corrupt.  To the contrary, the government has always said

18   there are only isolated or specific deals that were corrupt.

19              The second point is Gary Heinz did not recruit Mark

20   Zaino to create or promote any corrupt relationship with CDR.

21   It was fully understood that he did have a relationship with

22   CDR -- he worked there -- and that could enhance the business,

23   but it wasn't to promote corrupt deals, and the evidence

24   doesn't speak to that on behalf of Mr. Heinz.

25              THE COURT:  Anything further?

D7nWgha3

1          MS. TULLEY:  Yes, your Honor.  I just wanted to point

2     out some additional cites where David Rubin testified he had

3     conversations with Peter Ghavami about the corrupt activity

4     that Mr. Ghavami agreed to do.  Those conversations took place

5     either at that initial meeting or other conversations.

6          THE COURT:  A little slower.

7          MS. TULLEY:  I'm sorry.  The cites are 3280, 3282 to

8     '92, and there is specific discussion of the corrupt things

9     that Ghavami agreed to do, including, as I indicated,

10    facilitating the kickbacks from the CDR, FSA, UBS transactions,

11    and also submitting losing bids on transactions that UBS could

12    not actually provide the product in question and other

13    information in those specific cites.

14         THE COURT:  I would like to have time to consider two

15    other points over lunch, and so if the court reporter can stick

16    with me, I'll go for about ten minutes.

17         I'm wondering if counsel for Mr. Ghavami is prepared

18    to address the recommended facility.

19         MR. STILLMAN:  We will be this afternoon, your Honor.

20    I mean, I have it in mind now.  I, frankly, planned to address

21    it tomorrow.  But if you could just give me lunchtime, and I'm

22    happy to talk about it.

23         THE COURT:  Certainly.  And the comparisons with the

24    Carollo defendants, I have the sense that they are comparable

25    in terms of general corruption of this market, and I believe

D7nWgha3

1     that I will need to take into account in sentencing the

2     sentences that Judge Baer concluded were appropriate.  I note

3     that the government argues that the defendants here are more

4     culpable than the Carollo defendants, and I need to hear

5     something about that in order to take the government's argument

6     into account.

7               Would you be prepared to address that now, or would

8     you rather address that after lunch?

9               MS. TULLEY:  If your Honor wouldn't mind, we'd like to

10    address it after lunch.

11              THE COURT:  All right.  Can counsel address the

12    financial questions after lunch?

13              MR. MUKASEY:  Yes, your Honor.

14              MR. POE:  I believe we can, your Honor.

15              THE COURT:  Mr. Mukasey.

16              MR. MUKASEY:  Judge, with respect to location of

17    institution for Mr. Heinz, we would prefer greatly to address

18    that tomorrow and perhaps even, depending on where your Honor

19    comes out tomorrow, a day or two after that, by letter.  We

20    need to huddle with Mr. Heinz's family.  It's split between San

21    Antonio and New Jersey.  Depending on where your Honor comes

22    out with sentencing, I think we may ask you, and we'll talk

23    about this tonight, to delay for 24 or 48 hours entry of the

24    official judgment so that we can write a letter after we hear

25    sentence, expressing our preference for location of

D7nWgha3

1    institution.

2            THE COURT:  That's fine.  I have no problem with that.

3    This is most significant with respect to Mr. Ghavami and not to

4    the other defendants.  I assume that Mr. Heinz and Mr. Welty

5    would be in a federal camp.

6            Do you wish to be heard, Mr. Poe?

7            MR. POE:  I'm sorry, your Honor.  I didn't mean to

8    step on anybody.  If we could address the issue at the

9    conclusion of Mr. Welty's sentencing hearing, as we were

10   inclined to do, we would appreciate it.

11           THE COURT:  That's fine.  Mr. Stillman.

12           MR. STILLMAN:  I'm happy to start talking about it

13   today, your Honor, and continue it tomorrow.  I think because

14   your Honor has seen in our written material a reference to it

15   and I have further information and I think it would be helpful

16   for me to give that to you today so that you can be reflecting

17   on it because it is the 3553 factor that is obviously also at

18   stake here.  I would be happy to do that at some convenient

19   time this afternoon.

20           THE COURT:  That's fine.  Let's take a lunch break

21   until 2:00.  It is now 12:30.  Thank you.

22           (Luncheon recess)

23

24

25

D7nWgha3

1                              AFTERNOON SESSION

2                                  2:30 p.m.

3              THE COURT:  Good afternoon.  Please have a seat.

4              Let me tell you the order in which I expect to address

5      what is before us today.  I will give you rulings on what was

6      argued this morning.  Then I will deal with the remaining

7      enhancements, which are over ten victims and abuse of trust,

8      then move to restitution -- that is, if the defendants have

9      anything they wish to say with respect to the government's

10     proposal -- then move to comparison to the Carollo defendants,

11     and then ask if you have answers to the questions I've posed

12     initially.

13             Would you like to add anything else in addition for

14     today?

15             After considering the parties' arguments, I've decided

16     not to modify my findings to the extent that they, first,

17     rejected the sophisticated-means enhancement, and, second,

18     applied a three-level enhancement to Mr. Heinz and Mr. Ghavami

19     for their respective roles in the offense.

20             I note that Mr. Ghavami is not eligible for a

21     two-level enhancement.  The Second Circuit explained in United

22     States v. Cotto, 979 F.2d, 921, 923 (2d Cir. 1992) that

23     two-level enhancements are available only where the conspiracy

24     involved less than five participants.  I have modified my loss

25     calculation in the following respects.

D7nWgha3

1          With respect to Count Three, I accept the argument

2     made by counsel for Mr. Ghavami that the evidence of loss in

3     this transaction is too speculative to justify using UBS's gain

4     as a proxy for loss.  I had initially considered including the

5     Commonwealth of Massachusetts transaction because unlike for

6     the perfect cost deals, there was far more concrete evidence of

7     the illicit gain.  With such evidence gain I felt more

8     comfortable with the government's suggestion that the

9     defendants' bid rigging must have affected the Treasury.

10          Upon reflection, however, I agree with defense counsel

11    that although the evidence of gain may be stronger, the fact

12    remains that the record is very thin regarding Treasury's loss

13    on this deal.  There is no evidence of what the termination

14    dates may have been and no evidence that the escrow actually

15    terminated on the date it was scheduled to.  Absent such

16    evidence and because it remains the government's burden to

17    prove a loss, I will not include the $2 million gain alleged in

18    Count Three of my loss calculation.

19          With respect to Count One, after considering

20    Mr. Welty's argument regarding the Rhode Island Tobacco

21    transaction and reviewing the relevant testimony for

22    Mr. Campbell, I have determined that the government failed to

23    carry its burden to show that the municipalities suffered a

24    loss on this transaction.  Although Mr. Campbell testified at

25    pages 2439 to 2440 and at page 2450 that Bank of America did

D7nWgha3

1    not bid on this transaction so that UBS's bid would be more

2    competitive, his testimony failed to establish that UBS's

3    payment to Bank of America in exchange for securities

4    necessarily resulted in a loss to the municipal issuer or to

5    the Treasury.

6          With respect to Mr. Welty's conduct in Count Four, I

7    do not accept counsel's argument that Mr. Welty should not be

8    held accountable for the Commonwealth of Puerto Rico

9    transaction.  Members of the conspiracy are responsible for all

10   reasonably foreseeable acts and omissions of others in

11   furtherance of jointly undertaken criminal activity.  Indeed,

12   application note 3A to Sentencing Guidelines Section 2B1.1,

13   includes "reasonably foreseeable pecuniary harm that resulted

14   from the offense" in the calculation of loss.  Mr. Welty's lack

15   of involvement with particular kickbacks at the time of the

16   Puerto Rico transaction does not mean that he was not aware of

17   UBS's practice of collusively depriving municipalities of

18   competitive bidding.

19         I reject the government's argument regarding the

20   inclusion of the $140,000 kickback associated with the Rhode

21   Island Housing and MEFA deals.  I have already assessed the

22   loss on these deals based on fraudulently lowered interest

23   rates, and I find that there is sufficient evidence to justify

24   adding the $140,000 to those interest rates.  Based on these

25   changes, the total loss amount for each defendant would be, for

D7nWgha3

1      Mr. Ghavami, $265,000, which would result in a 12-level

2      enhancement.  For Mr. Heinz, $987,945.31, resulting in a

3      14-level enhancement.  And for Mr. Welty, $973,345.31,

4      resulting in a 14-level enhancement.

5              If counsel wish to reargue any point that you feel you

6      haven't argued adequately, I'll hear you on that.

7              MS. DIXTON:  Your Honor, may we respond.

8              THE COURT:  Yes.

9              MS. DIXTON:  Your Honor, I'll address the Commonwealth

10     of Massachusetts transaction first.  For this transaction, the

11     government cannot determine what the competitive termination

12     date would have been because of the defendants' fraud, and we

13     do not believe that this means that the defendants should not

14     be accountable for the loss on this deal because the reason we

15     can't determine the actual loss is because of the defendants'

16     conduct.  The deal is rigged.  There is no reason for

17     Mr. Campbell to try to come up with a competitive termination

18     date on the escrow, and he didn't.

19             Moreover, the loss on this deal -- or the gain to Bank

20     of America on this deal -- directly relates to the money that

21     the Treasury did not have use of for this undetermined period

22     of time.  Basically, instead of this money going to the

23     Treasury at the would-be competitive termination date, Bank of

24     America was allowed to have the money for that time and Bank of

25     America was able to invest it, and, as Mr. Campbell said, he

thought that they made about $2-1/2 million, or $2.25 million

on the transaction because of the rigging.  So basically, the

money, instead of going to the Treasury, whatever money was in

the escrow at the time of this would-be termination date would

have gone to the Treasury.  Instead, that money went to Bank of

America.

It also was not a surprise to the defendants that the

result of this conduct, the result of the rigging, would

somehow hurt the Treasury.  A defendant is presumed to intend

the natural and probable consequences of his or her acts for

purposes of determining loss, and it was common knowledge that

manipulation of the termination date or change in the

termination date would affect the Treasury.  They would either

get the money for more time or less time, when the escrow was

bid to a perfect cost.  So to say that there was no correlation

between the amount of gain that UBS had and the loss, we just

do not agree with that position.  We think that there's a

pretty close correlation, even though we can't determine the

exact amount, there's a correlation between the excess gain to

Bank of America and this undetermined loss, and the defendants

have pretty much made it clear, or their conduct has made it so

we cannot determine what that loss is, and so we're relying on

Mr. Campbell's very clear testimony of the gain on that deal.

We believe that excess profit corresponds to that, to this

undetermined loss.

D7nWgha3

1          With respect to Rhode Island Tobacco, that deal is an

2     example of loss to the issuer.  There was testimony in the

3     record that the issuer was a negative arbitrage.  Ms. Gallogly

4     testified to that at 2820 through '21 of the transcript, and

5     Mr. Campbell also recognized that at 2457, '58 of the

6     transcript, the issuer was in about 200 basis points of

7     negative arbitrage.

8          Now, Mr. Campbell testified that he and Mr. Welty

9     agreed that Bank of America would not bid on the deal when it

10    could have bid, and instead they would do the securities sale.

11    So instead of one of them making a profit of roughly 700,000 to

12    a million dollars, which is what Mr. Campbell testified would

13    probably be the profit on the deal, both conspirators made

14    $700,000 on the deal.

15         We also know from the record that the up-front payment

16    to the issuer on this deal, as they were a negative arbitrage,

17    was not as much as it could have been.  The up-front payment

18    that UBS made to the issuer on the deal was $47 million, when

19    the maximum up-front payment they could have accepted was 69

20    million.  So they received $16 million less from UBS than they

21    could have received, and Ms. Gallogly made clear that because

22    they didn't receive as much money from UBS, then the issuer,

23    Rhode Island, had to put in more money to fund the escrow, and

24    she said this at 2826 of the transcript, when asked about it on

25    cross-examination.  So the 16 million, the government did not

D7nWgha3

1    use that number.  Instead, we used the more direct testimony by

2    Mr. Campbell about how much profit UBS made.

3            So we would submit that that was a direct loss to the

4    issuer on that deal, the 700,000, and ask the Court to include

5    that amount in its loss calculation.

6            THE COURT:  I will consider that.

7            Anyone else?

8            MR. MITCHELL:  May I, your Honor.

9            THE COURT:  Yes.

10           MR. MITCHELL:  Just on the Massachusetts transaction,

11   I don't think Ms. Dixton said anything different than she said

12   this morning.  I will just remark she said that the government,

13   because of the defendants' conduct, can't determine the

14   competitive termination date for that transaction, which is a

15   key date to figure out potentially if there is a harm to the

16   Treasury.  But all we'll point out is the parties to that

17   transaction who negotiated are Doug Campbell, Mark Zaino.  They

18   are cooperators with the government, as interviewed hundreds of

19   times, and if that information was available, it was available

20   from them more than anybody, perhaps only them.

21           Finally, with respect to what happened to the

22   termination, the other witness who appeared was Walter St.

23   Onge, called by the government, and again gave no information

24   about what happened when that escrow terminated back in 2010,

25   or even if it did.  So I don't think it's the defendant that

D7nWgha3

1    has caused that absence of information.  Those witnesses were

2    within the control of the government, and we never heard about

3    it.

4              MS. DIXTON:  Your Honor, if I may just briefly respond

5    to the point about the intended termination date, it's our

6    position that the intended termination date does not matter in

7    this context because at the time of the rigging, Mr. Campbell

8    was quite clear that he was not trying to be competitive on the

9    deal, and whether or not the escrow actually terminated at the

10   date specified, it was the loss that was intended at the time

11   that the Court should look at.  And that loss, while we cannot

12   determine it, it is still clear that he intended to profit on

13   that deal as a result of the defendants helping him win the

14   deal.

15             Thank you.

16             THE COURT:  Mr. Poe.

17             MR. POE:  Briefly on two small things, your Honor.

18   First, the Court's ruling on the Count Four Commonwealth of

19   Puerto Rico payment, did the Court intend to encompass the

20   $200,000 payment on Count Two as well with that ruling?  Not

21   that I'm inviting it.

22             THE COURT:  I don't think so, but I'd have to look at

23   my chart.

24             I am still accepting that as a loss.

25             MR. POE:  Very well, your Honor.

D7nWgha3

1          The only other point I wanted to make was with respect

2     to Ms. Dixton's argument on Rhode Island Tobacco.  The fact

3     that the deal was a negative arbitrage is a function of two

4     things, as the trial testimony showed:  One, the interest rate

5     environment in June 2002; and, second, the fact that tobacco

6     bonds are very risky instruments and that would drive down the

7     price and affect the transaction in that way.  So we don't

8     believe there's any factual basis for the government's

9     position.

10          THE COURT:  Thank you.

11          I'm going to move to the number of victims.

12          Section 2B1.1(b)(2)(A) provides for a two-level

13     enhancement if the offense involved ten or more victims.  A

14     victim is defined in the application notes as "any person who

15     sustained any part of the actual loss determined under (b)(1)."

16     Accordingly, I can consider only those victims who I have

17     determined suffered an actual loss.  As I've explained, there

18     is one victim in Count One, two in Count Two, four in Count

19     Four, and one in Count Five.  That does not total ten, and

20     hence I do not give the enhancement for number of victims.

21          With respect to abuse of trust, I find this a close

22     question.  The government seeks a two-level enhancement for

23     each defendant under Sentencing Guidelines Section 3B1.3, which

24     states, "if the defendant abused a position of public or

25     private trust ... in a manner that significantly facilitated

D7nWgha3

1    the commission or concealment of the offense," it applies.

2    Application note one to that section explains that a "position

3    of public or private trust" is "characterized by professional

4    or managerial discretion; i.e., substantial discretionary

5    judgment that is ordinarily given considerable deference."  The

6    Second Circuit has held that the "applicability of a Section

7    3B1.3 enhancement turns on the extent to which the position

8    provides the freedom to commit a difficult-to-detect wrong."

9    U.S. v. Stewart, 686 F.3d 156, 178 (2d Cir. 2012).  The Second

10   Circuit has also explained in United States v. Roberts, 660

11   F.2d 149, 164 (2d Cir. 2011), that the position of trust "must

12   be entrusted to the defendant by the victim."

13          Although this is a very close question, I find that

14   the enhancement is not warranted.  I note that the defendants

15   were not in a fiduciary relationship with the municipalities.

16   The Second Circuit, in United States v. Barrett, 178 F.3d 643,

17   646 (2d Cir. 1999), explains that a fiduciary relationship is

18   not a prerequisite to the enhancement.  Nonetheless, courts

19   frequently consider the existence of a fiduciary relationship

20   as a strong indicator that the abuse-of-trust enhancement may

21   be warranted.  For example, United States v. Moskowitz, 215

22   F.3d 265, 272 (2d Cir. 2000).

23          Second, I note that the defendants in this case did

24   not have any direct or personal relationship with the victims

25   of their fraud.  Testimony from some municipal representatives

D7nWgha3

1    indicates that they had little communication with the

2    defendants or anyone from the MRED desk at UBS.  This finding,

3    although not decisive, also distinguishes the facts of this

4    case from the typical case where the abuse-of-trust enhancement

5    has been applied.  I note that the Second Circuit in United

6    States v. Hirsch, 239 F.3d 221, 227-28 (2d Cir. 2001)

7    distinguishes cases in which defendants have personal or

8    fiduciary relationships with victims from those in which

9    defendants and victims had arm's length contractual

10   relationships.

11           Finally, although there is evidence that the

12   municipalities permitted the defendants acting as brokers to

13   conduct aspects of the bidding process without supervision, I

14   find that the evidence on the whole suggests that the

15   municipalities did not give the defendants sufficient

16   discretionary authority to warrant application of this

17   enhancement.  The municipalities and their counsel gave strict

18   instructions to defendants to comply with the various

19   contractual and regulatory obligations.  That they breached

20   their contractual and regulatory obligations is not on its own

21   sufficient to establish a breach of trust.  As the Second

22   Circuit noted in Hirsch, 239 F.3d at 227, "an abuse-of-trust

23   enhancement may not be imposed on a defendant convicted of

24   fraud solely because OF A violation of A legal obligation to be

25   truthful and A victim's reliance on a misrepresentation ...

D7nWgha3

1     Every fraud involves these elements."

2          In this case, the issuers provided defendants with

3     general directions on bid specifications, reviewed their bid

4     summaries, and retained the ultimate ability to choose the

5     winning bid.  Some municipalities even retained financial

6     advisors who suggested that defendants add bidders to the bid

7     list.  Other municipalities retained bond counsel to review the

8     various certifications made during the bidding process,

9     including certifications from UBS, and to advise the

10    municipalities regarding the tax-exempt status of the

11    transaction.  Trial transcript at pages 1845, 1861, and 2811.

12         Would counsel like to argue with respect to this

13    proposed finding?

14         MS. TULLEY:  Yes, your Honor.

15         Your Honor, with respect to the enhancement regarding

16    abuse of trust, the government respectfully disagrees with your

17    conclusion that there was not fiduciary or fiduciary-like duty

18    in this context.  The municipalities did not have financial

19    expertise.  The municipalities did not have any understanding

20    or expertise in the Treasury regulations.  They had an

21    obligation to follow those regulations, and they had the desire

22    and need to also get an investment vehicle that gave them the

23    highest yield on investment.  They entrusted these defendants

24    to not only comply with the regulations but to use their

25    financial expertise to find the most competitive bidders, the

D7nWgha3

most appropriate bidders for their investment vehicles to

provide an investment vehicle that would give them the highest

yield, and they trusted the defendants a hundred percent in

that capacity.  They did not put restrictions on which

providers the defendants could put on the bid list, which

providers they could leave off the bid list.  They all

testified that they did not talk to the defendants and the

providers when that selection process was made.  They trusted

the defendants to write the bid specifications and they were

not present during the bidding process.  And so the

municipalities gave the defendants this discretion to use their

expertise in the best interest of the municipalities so that

their obligations with respect to the Treasury regulations

would be met and also to use the financial expertise to get

them the best deal.

        The defendants abused that trust in a way that there

is no way the municipalities could have ever detected because

they used their discretion to leave off the most competitive

bidders, to make special arrangements and quid pro quo

arrangements with certain providers, and the competitive

process was a complete sham, and there was no way for the

municipalities to detect that.

        Hiring bond counsel is no insurance.  There was no way

for bond counsel to detect that wrongdoing.  Bond counsel's

simply trying to make sure that all the paperwork, all the

D7nWgha3

1   correct certifications are there, but there's no way to go

2   behind the lies that the defendants handed to the municipality

3   and bond counsel.  In some of these instances, the defendants

4   had little contact with the municipalities, but that is a

5   function of the large organization that UBS is.  The

6   municipalities hired UBS to carry out this function for them.

7   They knew it was being delegated to brokers within UBS and

8   believed that these brokers were acting in their best interest,

9   and that is not what defendants did.  They abused that position

10  of trust to the detriment of the municipalities.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D7N8GHA4

1          MS. TULLEY:  Even when the municipality hired a

2     financial adviser, such as Karen Baker hired for the Robert

3     Wood Johnson Health Care Corporation deal, and the adviser had

4     tried to make suggestions to defendant Heinz about what

5     providers to include, that financial adviser did not have the

6     same expertise as defendant Heinz to facilitate that process

7     being done, and that financial adviser did not know of the

8     special relationships and the quid pro quo relationships that

9     defendant Heinz had with providers.

10          And the direct contact was there.  Ms. Baker said she

11     had multiple conversations with defendant Heinz, that she and

12     her client were relying upon him to find the most competitive

13     providers and to conduct this process in a way that was going

14     to get them the best deal, and defendant Heinz abused that

15     discretion, having full contact with her and the city

16     municipality abused the discretion that was given to him in

17     conducting a bidding process that was a sham.

18          THE COURT:  I have gone back and forth on this issue

19     because I think the points you have made are strong points.  I

20     find that the arguments are I think in even balance in terms of

21     their probity and worth and under the rule of lenity, I will

22     adopt the defense view, but I acknowledge that your arguments

23     are very strong.

24          MS. DIXTON:  May we be heard on the number of victims

25     very briefly?

D7N8GHA4

1          THE COURT:  Yes.

2          MS. DIXTON:  We understand your ruling with respect to

3   the loss on the escrow transactions, but the scheme, as you

4   acknowledged this morning, was a very wide-ranging scheme, and

5   we believe that the number of victims significantly understates

6   the severity of the defendants' conduct.  And we also want to

7   point out that this morning your Honor discussed broker's fees,

8   and while you did not include the broker's fees in the loss

9   amount because the whole of the broker fee could not be

10  counted, at least a portion of that fee was due to the

11  defendants' fraudulent conduct with the broker CDR.  The issuer

12  had to pay that money in part for a service that they certainly

13  did not want; they wanted a competitive bidding process.

14          So if your Honor would consider adding those issuers

15  to the number that paid this broker fee, with the idea that

16  they would be getting a competitive bidding process, to the

17  number of victims, that would certainly increase the number of

18  victims.  It would add about 17 victims to each of the

19  defendant's calculation.  And we believe that's a fair estimate

20  for purposes of determining the number of victims, because

21  certainly some of these issuers did not get a fair price for

22  their escrow because they did not get the lowest cost for their

23  escrow transaction.  So we can't determine what the fair price

24  was, but certainly counting the fee that they paid for this

25  corrupt process, where they did not get a fair price, would

D7N8GHA4

1    seem to reflect more in line with the defendants' conduct in

2    how many victims they actually touched with their fraudulent

3    conduct.

4            THE COURT:  I will consider that.

5            MS. DIXTON:  Thank you.

6            THE COURT:  Anything else on number of victims?

7            MR. POE:  If I may.  As your Honor noted under the

8    guidelines, actual loss is required to define a victim.  With

9    all respect to Ms. Dixton's argument, the government hasn't

10   established that for the reasons your Honor stated this

11   morning.

12           MR. HALPERN:  I may have misunderstood, but in your

13   review of the identity of the victims, I understood from your

14   Honor's ruling that there was not a loss that your Honor had

15   accepted with respect to Count One for Rhode Island Tobacco, is

16   that correct?

17           THE COURT:  That's correct.

18           MR. HALPERN:  I think there might be one fewer victim.

19           THE COURT:  I see.  I will make sure that's correct.

20           This takes us to the last enhancement, which is

21   obstruction of justice with respect to Mr. Heinz.

22           The government argues for a two level enhancement for

23   Mr. Heinz pursuant to 3C1.1 of the guidelines.  That provides

24   for a two level enhancement where a defendant willfully

25   obstructed or impeded the administration of justice.

D7N8GHA4

1           Unlike many other provisions for enhancements, this

2    provision uses just one number, that is, a two level

3    enhancement to cover a wide range of behavior, including

4    killing a witness and simply urging a witness to testify

5    falsely.

6           The enhancement is warranted when a defendant -- I am

7    now quoting from *United States v. Archer*, 671 F.3d 149, 166 (2d

8    Cir. 2011).  It is "warranted when the defendant threatens,

9    intimidates or otherwise unlawfully induces a potential witness

10   to obstruct justice."  *United States v. Archer* as I said.  The

11   Second Circuit in *Archer* noted that "most cases" applying this

12   enhancement "involve clear and direct threats against a

13   cooperating witness or government agents."

14          The only evidence supporting an obstruction

15   enhancement is Mark Zaino's testimony regarding the so-called

16   Thanksgiving lunch at Bobby Van's.  I find that this testimony

17   on its own does not warrant a two point enhancement for

18   obstruction of justice.  I will, however, take this conduct

19   into account when considering the 3553 factors.

20          Would anyone like to argue with respect to that?

21          MS. TULLEY:  No, your Honor.

22          THE COURT:  With respect to restitution, now that the

23   figure has diminished greatly, do defense counsel wish to

24   oppose the proposed restitution?

25          MR. POE:  May I speak to that, your Honor?

D7N8GHA4

1              THE COURT:  Yes.

2              MR. POE:  As the Court has noted, the numbers

3    diminished are now two deals, a North Carolina Educational

4    Facilities deal and the Stamford deal.

5              With respect to the North Carolina deal, we ask the

6    Court to conclude that restitution is not due for the following

7    reasons.

8              First, the government hasn't proved even by a

9    preponderance that it was a corrupt deal.  The only information

10   before the Court is a document that was submitted in the course

11   of sentencing.  I believe it was a CDR broker deal.  The

12   document reflects nothing more than a bid by Mr. Heinz.  That's

13   not sufficient evidence under any standard to conclude that the

14   deal was somehow corrupt.

15             Second, even if the Court were to conclude that the

16   deal were somehow corrupt, restitution would not be due on that

17   because the claimed restitution is a portion of a broker fee

18   paid on the deal.  The broker fee was apparently $60,000.  The

19   issuer apparently received $26,000 in payments through the

20   course of the settlement process with the institutions.  So

21   that leaves about $34,000.  That's the remainder of a broker

22   fee, but there is absolutely no evidence before the Court that

23   that broker fee was not paid, that the services were not

24   rendered, and for the reasons underlying your Honor's ruling

25   otherwise today with respect to the guidelines, there is no

D7N8GHA4

1    actual out-of-pocket loss to that issuer, which is required of

2    course for a restitution order.

3            With respect to Stamford, the evidence before the

4    Court is insufficient even by a preponderance to show that that

5    was a corrupt deal, number one.

6            Number two, that restitution analysis by the

7    government, even if the Court were to conclude the government

8    had proven that that deal is a corrupt deal, is based on the

9    regression analysis and the gain number that derives from that

10   regression analysis, and for all the reasons, which I won't

11   weight into that we have submitted to the Court before this

12   hearing, that gain analysis is unreliable and it's not a basis

13   for an order of restitution.

14           So we ask the Court to make this simple and simply

15   order as part of the judgment in this case that there is no

16   restitution due.

17           THE COURT:  Does anyone else wish to be heard?

18           MR. BEZANSON:  Yes.  One last point on the

19   restitution.  In connection with the related Carollo

20   proceedings, I think a week or two ago the government submitted

21   a brief and a number of exhibits, including an exhibit that

22   identifies the number of other individuals who may be

23   responsible for portions of restitution for different deals.  I

24   believe for the two deals that remain in our case, some half a

25   dozen other individuals are also associated with those deals.

D7N8GHA4

1      To the extent there is a finding of restitution here, we would

2      submit that your Honor take into consideration all of the

3      people that should be or could be held responsible for that

4      restitution.

5              THE COURT:  I believe that is accounted for on page 3

6      of the government's proposed restitution order, which states

7      that it is the Court's intention to make the liability joint

8      and several with such other defendants before this court or

9      other courts in this district or elsewhere who are ultimately

10     adjudged to be liable for restitution on a particular deal.

11             MR. BEZANSON:  That's correct, your Honor.  I think

12     the further point on that is a number of the responsible

13     individuals haven't been sentenced yet so it might not be ripe

14     yet to make any sort of final determination on restitution.

15             THE COURT:  There may be a way to end the Court's

16     participation in restitution, and, hence, avoid the need for

17     defendants to come back from facilities for me to impose

18     restitution.  I could simply impose the entire amount,

19     indicating that there should be subtracted from the entire

20     amount moneys already paid in restitution and moneys that will

21     be paid by the point 90 days from tomorrow.

22             MR. BEZANSON:  For our purposes, I think we would want

23     to confer with defense counsel with any proposals for how to

24     sort out the restitution responsibility.

25             THE COURT:  You defendants are jointly and severally

D7N8GHA4

1    liable for the entire amount and your clients have benefited

2    greatly by the fact that other government entities have sued

3    and gotten huge amounts of restitution from the victims.  So

4    you will get credit for all of that and credit for anything

5    anyone else pays.  The restitution payments will be made on a

6    schedule.  They should be made in this case on a schedule that

7    would permit you to learn how much others are going to be paid.

8    In other words, I think what you might be asking me is don't

9    require that the restitution be payable immediately, wait a

10   reasonable amount of time until it is determined who else is

11   jointly and severally responsible with your client.

12          MR. BEZANSON:  Certainly.  To the extent restitution

13   is appropriate for our clients, it seems that the most careful

14   approach would be to figure out who is responsible for what or

15   how they should be expected to pay out.

16          THE COURT:  You can cut it up any way you want to

17   among yourselves, but I think what counsel have suggested to me

18   in your papers is that you would like to have finality from the

19   standpoint of the sentence being over so that your clients

20   don't have to come back into court for the restitution phase of

21   the case.  I will let you discuss it among yourselves tonight.

22   We don't have to decide it right now.

23          MR. BEZANSON:  Thank you, your Honor.

24          MR. VAN LONKHUYZEN:  In order to effectuate finality,

25   the Court should order these defendants to pay the $168,000 in

D7N8GHA4

1      restitution in an up-front lump sum payment due within 60 days

2      of sentencing.  It is true that there are a number of other

3      defendants who arguably will be liable for these two deals.

4      They have many, many other deals that we expect that they would

5      be liable for restitution on.  These are two particular victims

6      who have not been made whole and shouldn't need to wait until

7      defendants are sentenced up to a year from now.  One of them is

8      a cooperator; it will probably be a year before he is

9      sentenced.  Most of the others, I think all of the others are

10     in front of different judges of this court.

11          The losses to these two municipalities are losses.

12     For North Carolina, it is a broker fee.  They have been only

13     partially recompensed.  Your Honor has recognized that the

14     broker fee was a loss to the municipality even if it wasn't

15     determined enough to be included in your loss calculation.

16     They have only received less than half of that.  So there is

17     34,000 approximately left.

18          The amount due for City of Stamford, about which there

19     was testimony at the trial about a document saying we expected

20     that to be just as profitable as the city of Bridgeport was

21     because CDR is involved.  As you will remember, the conspiracy

22     was that CDR was setting these up and increasing the profits to

23     UBS on these deals.  The regression analysis shows what that

24     amount is, the excess profit.  This is not a roll-back deal.

25     So that excess profit is an increase in the price of the

1    escrow.  The City of Stamford paid, I think it's $399,000 extra

2    because of the defendants' conduct.

3           Now, due to the settlement, approximately half of that

4    has been paid and the amount now is 133,000, I believe,

5    approximately.

6           THE COURT:  Do you know why they have not been

7    compensated by other settlements?

8           MR. VAN LONKHUYZEN:  The settlements were worked out

9    in the main by the SEC and by the state attorneys general.

10   They were settlements that were worked out to effectuate the

11   regulatory responsibilities of those authorities.  They were

12   not negotiated to recompense directly or solely for the loss at

13   issue in these fraud counts.  So they had to do with other

14   matters.  Those were matters of negotiations between the banks

15   involved and the agencies that were involved.  This team was

16   not involved in that.

17          Certain banks have not settled that has left

18   categories of victims, particularly, FSA did not settle,

19   Societe Generale did not settle.  So deals that were won by

20   those providers, as a generalization, the municipalities were

21   not recompensed.

22          Secondly, each bank, as I understand it, primarily

23   negotiated settlements as to transactions they had won.  So

24   depending on who won and which bank settled, some

25   municipalities received settlement amounts, some did not.

D7N8GHA4

1          There is no reason to think that the state attorneys

2     general working group and the SEC didn't do anything but their

3     best efforts.  I think the idea that it's the prosecution's

4     fault that the money should have been distributed different is

5     silly.  It was negotiated and distributed as best it could by

6     those agencies to effectuate their regulatory policy and to

7     settle those transactions.

8          THE COURT:  You have indicated in your papers that the

9     calculation was not transparent, and I am wondering doesn't the

10    SEC talk to DOJ about how they calculate disgorgement?

11         MR. VAN LONKHUYZEN:  They may.  If they did, we did

12    not receive that information.  It had to do with, among other

13    things, the size of the bond issue.  The regulatory agencies

14    were involved in and it was a matter of negotiation.  It may be

15    that if the bank didn't think that the government had evidence

16    to a particular deal, they weren't willing to pay the

17    appropriate amount on that particular deal.  So I can't speak

18    to that anymore.

19         But I do believe that in order to make these

20    defendants whole, the government submits that the loss to these

21    two municipal issuers has been established.  It was established

22    by the documents that we have submitted.  It's clear that the

23    City of Stamford was a victim of the conspiracy proven in Count

24    Two.  Similarly, North Carolina Educational Facilities Finance

25    Authority, that was a losing bid.  We know that part of the

D7N8GHA4

1    conspiracy was for defendants to put in losing bids on other

2    deals that CDR was setting up for others.

3            So the government believes that the corruption of

4    these deals was established by the evidence and that these two

5    municipal entities should be recompensed, and it should be

6    done, since the amount at issue here is so small in comparison

7    to what will be at issue in the other proceedings with other

8    defendants, that these two municipal issuers should be made

9    whole now.  These three defendants should be ordered to make

10   up-front payment totaling the amount due, to make it within 60

11   days, and be done with it.

12           THE COURT:  Thank you.

13           MR. POE:  Briefly, your Honor.

14           Just one case cite I neglected to give the Court

15   before for a related point.  At page 42 of our brief, the

16   *Zangari* case from the Second Circuit, 677 F.3d 86, at page 92,

17   states, and I quote, "There is no provision in the guidelines

18   or in the MVRA that allows the defendant's gain to be

19   substituted for the victim's loss for purposes of calculating

20   restitution."  So we would ask the Court to consider that as

21   well as the points I made earlier that the government has

22   failure of proof of actual loss and therefore there should be

23   no restitution.

24           THE COURT:  Thank you.

25           Anyone else?

D7N8GHA4

1          All right.  Then we can move to the comparison to the

2     Carollo defendants.  Who would like to speak for the

3     government?

4          MR. VAN LONKHUYZEN:  Thank you, your Honor.

5          The government submits, as we already did in our

6     brief, these defendants, the conduct of these defendants is

7     more egregious than that of the Carollo defendants and they

8     should receive higher sentences.

9          Now, in order to compare them, the simplest and most

10    straightforward way is to use the guidelines for their

11    articulated purpose to compare offenses committed by various

12    defendants in various circumstances.

13         Now, Judge Baer did not do, as far as we can tell, any

14    guidelines analysis.

15         THE COURT:  I saw that.

16         MR. VAN LONKHUYZEN:  This Court has done a guidelines

17    analysis.  The government respectfully doesn't agree with all

18    of it.  However, the government did consistently apply the

19    guidelines in our view to the two cases.  That should be a fair

20    comparison.

21         Each defendant here has a higher guidelines analysis

22    than the comparable Carollo defendant.

23         THE COURT:  Can you give me the total offense level

24    for each.

25         MR. VAN LONKHUYZEN:  The total offense levels.

D7N8GHA4

 1            Mr. Ghavami, 37.  Mr. Heinz, 38.

 2            THE COURT:  I'm sorry.  I am talking about Carollo.

 3            MR. VAN LONKHUYZEN:  Mr. Carollo, 33.  Four levels

 4    less than Mr. Ghavami.

 5            Steven Goldberg, 35.  Three levels less than the

 6    government argued as to Mr. Heinz.

 7            Mr. Grimm, who this Court heard on tape in Count Four,

 8    32.  Less than Mr. Welty's 33.

 9            THE COURT:  And the rationale in general for each?

10            MR. VAN LONKHUYZEN:  I am quoting from document 261 in

11    the docket of the Carollo case, the government's sentencing

12    memoranda.

13            They started out with a level 6 for each.  It was a

14    five year conspiracy, not the level 7 that we started out with

15    in this case.

16            For Mr. Carollo, 6.  An 18 level increase for loss.  A

17    four level increase for 125 victims.  A three level increase

18    manager and supervisor.  Two level sophisticated means for the

19    kickbacks.  And obviously no adjustment for acceptance of

20    responsibility.

21            Steven Goldberg, base offense level 6.  A 20 level

22    increase for loss greater than 7 million, less than 20 million.

23    A four level increase 219 victims.  Three level increase

24    manager and supervisor.  Mr. Goldberg started the trading desk

25    at FSA.  And a two level increase for sophisticated means

D7N8GHA4

1    because they agreed to separate kickback payments similar to

2    what we saw here.

3            Peter Grimm, total level 32.  Starting base level 6.

4    20 level loss, greater than 7 million.  4 level increase 134

5    victims.  Two level increase for sophisticated means for the

6    kickbacks.  Again, no acceptance of responsibility.

7            THE COURT:  Manager, supervisor?

8            MR. VAN LONKHUYZEN:  No, he was not.

9            The loss amounts were approximately 4.9 million for

10   Mr. Carollo, 10 million for Mr. Goldberg, 7.3 million for Mr.

11   Grimm.

12           Now, obviously, some of the components of those are

13   different than some of the components here.  But overall, using

14   the guidelines as they were intended to be used, the offense

15   level is higher for each of these three defendants.

16           THE COURT:  Tell me why it's higher.  I don't know

17   whether your argument is that the Carollo defendants were

18   corrupt for less time.

19           MR. VAN LONKHUYZEN:  The guidelines total is higher is

20   my argument at this point.

21           THE COURT:  I understand.  All right.

22           MR. VAN LONKHUYZEN:  33 versus 37, 35 to 38, 32 to 33.

23           Some of the components here, one of the reasons it's

24   higher here is the government submits that as brokers, these

25   defendants abused positions of trust.  That was one of the

D7N8GHA4

1    reasons they were different.

2            One other reason they were different is that GE

3    recorded its telephone conversations.  UBS did not.  Therefore,

4    the number of deals on the two cases' bills of particulars for

5    that and other reasons were different.  Therefore, the number

6    of victims would be different.

7            What is important is, though, now moving on, first

8    off, the defendants here corrupted all four aspects of UBS's

9    banking business.  UBS was an underwriter of municipal bonds.

10   In that position, these defendants tried to get favored brokers

11   hired.  And the Court saw government Exhibit 39-4, an e-mail

12   that Mr. Heinz sent about trying to get the UBS bankers to hire

13   friendly brokers, such as CDR.  The defendants in Carollo, GE

14   was not an underwriter.  They couldn't do that and they didn't

15   do that.

16           Second, obviously, UBS was a provider, and they

17   entered into corrupt relationships with brokers and with

18   providers.  Third, UBS was a broker.  GE was not a broker.

19   These defendants functioned as brokers.  The Carollo defendants

20   did not.

21           And, finally, UBS functioned as a swap counterpart,

22   and this Court heard testimony about how the inflated profits

23   on the swaps were used to transfer, to divide kickbacks on

24   corrupted deals.  And this Court also heard testimony about how

25   Mr. Ghavami had gotten the swap profits on those to be credited

D7N8GHA4

1      to his desk instead of the usual other part of the bank where

2      those were normally credited.

3            So four areas of the bank that was corrupted, only one

4      of which did the Carollo defendants do.

5            You also heard about Mr. Ghavami's vision for UBS and

6      PaineWebber after the merger.  Basically, a corrupt enterprise.

7      He recognized that the merger provided opportunity.  He met

8      with David Rubin.  We cite at page 82 a transcript cite, and

9      Mr. Rubin testified about Ghavami's statement about his

10     business plan, how they would get CDR hired, how there would be

11     kickbacks, how they would provide intentionally losing bids.

12     He had Zaino hired.  Nothing like that happened at GE.

13           And it turned out that Mr. Ghavami was just as

14     powerful as CDR.  We heard testimony from Mr. Rubin about a

15     conversation with Peter Ghavami, page 82 of our brief.  And we

16     have heard a lot here about how the municipal swaps as opposed

17     to the hedging swaps were Mr. Ghavami's special area of

18     interest that were bigger and more profitable.  And Peter

19     Ghavami told David Rubin, who was thinking of getting CDR into

20     that business, to stay out, that it would compromise the

21     CDR/UBS relationship if CDR entered the municipal swap advisory

22     business.  Transcript 3260-3263.  Nothing like that at GE.

23           As a broker, they were hired to conduct competitive

24     bids.  They signed representations about what they did.  Those

25     representations were false.  And they started off right at the

D7N8GHA4

1  beginning.  This Court heard Government Exhibit 505, 507,

2  Government Exhibit 11906, two audio calls.  Who do you want to

3  go up against?  Welty to Mr. Grimm.  UBS as broker can control

4  who would be on the bid list.  But for that audio, there would

5  be no way for the municipality to know that from the get-go the

6  deal was corrupted.

7          And the competitive, the aggressive providers were

8  left off.  So even if Mr. Grimm's bid was the best, and there

9  were other non-conspirator providers who submitted bids, those

10  were the slowpokes, as it were, the noncompetitive providers

11  who were left on the bidding list.

12          As a broker, they split the profits, we heard, in MEFA

13  and Rhode Island Housing.  And they extorted kickbacks.  This

14  Court heard about how the Massachusetts deal was offered to be

15  steered to the Bank of America in exchange for a payment.  And

16  how when Mr. Campbell wasn't paying, there were calls to Doug

17  Goldberg, how do we get them to pay?  They extorted the

18  kickbacks.

19          THE COURT:  Well, I think I understand the basis for

20  your comparison.

21          MR. VAN LONKHUYZEN:  There is one more, if I could.

22          Going back to being a provider, UBS was a provider.

23  UBS did something that GE as a provider never did.  UBS

24  directly contacted, directly agreed with, and this is Count

25  One, other providers, cut out the broker completely.  It was

D7N8GHA4

1    boss to boss, Peter Ghavami to Douglas MacFaddin of JP Morgan.

2    Direct with Bank of America.  Mr. Wright testified about how he

3    felt pressured.

4            And that highlights the fact that the charges here are

5    in three different kinds.  You have provider to provider, Count

6    One.  Count Two, you have a provider, but it's with CDR, a

7    corrupt broker.  Counts Three, Four and Five are as brokers.

8    In the Carollo case, it's all the same pattern, a provider with

9    a broker.  GE is always just the provider.

10           I will stop there for now.

11           THE COURT:  Thank you.

12           Yes.

13           MR. BEZANSON:  I am just going to address a couple of

14   these briefly because I think each of the individual defendants

15   will probably be addressing some of the differences in more

16   detail in their own presentations tomorrow.  I just want to

17   mention that what we just heard was a basic explanation that

18   two different cases had different facts and circumstances to

19   them.  That's not surprising.  Both trials lasted longer than a

20   month.  So evidence was presented and themes were developed.

21   And, yes, perhaps UBS had certain business lines that were

22   involved in different ways than the municipal bond business,

23   but at least FSA did as well.  I don't know that it was

24   developed much in this case, but FSA was also an insurance

25   provider for municipalities, and I believe there was evidence

D7N8GHA4

1   in the Carollo case related to deals where FSA insurance

2   products were taken into consideration with FSA acting as a

3   provider.  And, again, this is fairly an overview.

4           You heard a suggestion that UBS was unique because UBS

5   was both a provider and was a swap provider.  I believe in our

6   case we heard plenty of evidence about both FSA and GE engaging

7   in swaps with UBS.  So we have FSA and GE and UBS all engaged

8   with providers and all engaged in swaps.

9           One thing that was unusual and different about the

10  Carollo case that we don't have here is Steve Goldberg and

11  Peter Grimm started together, or at least in the narrative of

12  that case started together at FGIC, but then Steve Goldberg

13  picked up and moved his operation to FSA and operated on one

14  track, while Peter Grimm remained at GE and ran his operation

15  on a different track.  So in that case, you have more

16  eggregious conduct of two groups together spreading out and all

17  of a sudden starting two separate hoax perhaps.

18          Also, in that case, we just heard the suggestion that

19  we have fewer deals in our case because of a lack of tapes,

20  because GE and FSA tapes their desks.  We received pages and

21  pages, and the Court has received pages and pages of

22  submissions comparing the statistically corrupt deals in our

23  case, 13 escrows that were statistically corrupt, with over 250

24  benchmark deals that were designated as not corrupt.  So those

25  are the deals to think of as the bulk of what was going on at

D7N8GHA4

1    UBS during 2001 through 2004.  In the example that was given of

2    the tapes and tapes and tapes of FSA and GE, maybe there are

3    tapes of lots of corrupt deals in those cases because there

4    were lots of corrupt deals at FSA and GE, deals that we just

5    don't have in our case.

6            A couple of statistics or numbers to leave the Court

7    with on this point.  The dollar loss assessments by the

8    government in the other case were higher.  The number of deals

9    were substantially higher.  I believe there were rounds of

10   negotiations in that case to get the number of deals reduced

11   from upwards of 300 to roughly 200 to maybe 70 to maybe 30, and

12   I think there was extensive discussion of that.  The number of

13   victims that were just read off to us, 125 victims, 134

14   victims, 219 victims.

15           The last important number to think about is in the

16   Carollo sentencing, the transcript there at page 24, counsel

17   for Mr. Grimm noted that probation had recommended that, in

18   spite of the government's guidelines sentence recommendation,

19   the guidelines calculation by the government, probation in that

20   case at least recommended a 60 month sentence for Peter Grimm,

21   and ultimately the court decided to give him a 36 month

22   sentence, which is a 40 percent reduction on probation's

23   nonguideline sentence recommendation.  So I think that bears

24   consideration here assessing the differences between the two

25   cases.

D7N8GHA4

1          Thank you.

2          MR. STILLMAN:  We have nothing to add to that, your

3     Honor.

4          MR. POE:  Your Honor, I am hesitant to leave overnight

5     some of Mr. Van Lonkhuyzen's statements unresponded to.  I will

6     try to be concise.

7          With respect to the guidelines assessment of course,

8     what the government has done is compared its own guidelines

9     calculations in two cases.  So I'm not sure if that's probative

10    of anything, and of course my position is it isn't.

11         Second, the conduct I believe in the Carollo case

12    spanned a longer period of time.  Therefore, that would

13    suggest, from a comparative perspective, that conduct is more

14    serious given its time span.  And that is why the defendants in

15    that case apparently received the benefit of a starting point

16    of six levels instead of seven because I believe the guidelines

17    manual changed in '01.  So those points.

18         Third, from an individualized perspective, because

19    that's of course what the Court's analysis is in this case, the

20    closest thing Mr. Welty had to a counterpart was Mr. Grimm, who

21    of course the Court heard, and was involved in the Count Four

22    transactions, and there was a similar count in the Carollo

23    case.  Mr. Grimm was involved both in swaps and as a GIC

24    provider, where Mr. Welty bidding out those GICs on behalf of

25    UBS.  So Mr. Grimm played two different roles where Mr. Welty

D7N8GHA4

1    played only one.  Mr. Zaino said Mr. Welty knew about something

2    that was going on and so forth, but he didn't actively

3    participate.

4           The government argued in Carollo that there was audio

5    showing Mr. Grimm urging a counterparty to call an unrecorded

6    line.  There is no such behavior by Mr. Welty in this case, no

7    evidence of it.

8           There is no evidence as to Mr. Welty that he was

9    involved in using cell phones and so forth to talk off the

10   desk, unlike the government's allegations in Carollo.  And the

11   government said in Carollo that there were phony letters used

12   to paper up GE and FSA's files, and there is no such conduct

13   alleged here by Mr. Welty.  That's not a false certification.

14          With respect to the statement, who do you want to go

15   up against and so forth, and the aggressive and competitive

16   bidders were left off, I don't want to take the Court's time

17   arguing trial evidence, but I do want to note on this

18   particular point that the Rhode Island Housing deal, for

19   example, and other deals, AAA providers, it's not as if they

20   were less aggressive.  Mr. Grimm's bid on every single one,

21   what he was awarded at, was more favorable to the issuer than

22   any other bidder in every single deal.  So if the jury

23   concluded that Mr. Welty participated in point-shaving, that's

24   one thing.  But the idea that it stretched to a bid list so Mr.

25   Grimm could win, that's not what the evidence bears out.

D7N8GHA4

 1          So those are just a few of the points I didn't want to

 2    leave sit.  I won't take any more of the Court's time on the

 3    issue today.

 4          THE COURT:  I didn't understand your last point.

 5          MR. POE:  The last point that I was making was the

 6    government said that aggressive and competitive bidders were

 7    left off the bid list.  And my point was, if you look at the

 8    bid results for every one of those Count Four deals that Mr.

 9    Grimm won, the award to him was at a level that was more

10    favorable to the issuer than every other single bid that was

11    received.  These were AAA providers.  These were serious

12    financial institutions.  If the jury concluded that Mr. Welty

13    participated in point-shaving, by which I mean giving Mr. Grimm

14    a number at the end that was better than what Mr. Grimm

15    otherwise would have taken the deal at, my point was, that's

16    one thing, but it is not what the government argued here this

17    afternoon.

18          THE COURT:  Thank you.

19          MR. VAN LONKHUYZEN:  Just two points I think.  The

20    charges were different, and that was the difference why we are

21    starting here at plus seven instead of plus six, not, as far as

22    I am aware, the time of the charges.

23          Also, in terms of the ongoing length of the

24    conspiracy, I believe that it is important to compare not the

25    alleged length of the conspiracy with what deals were

D7N8GHA4

1    presented, but the alleged length of the conspiracies if the

2    Court wants to do that.  We don't think that makes any

3    difference.

4            As to Mr. Poe's last point, yes, of course Mr. Grimm's

5    bid is going to be better than the noncompetitive bidders that

6    were allowed to bid, but they had already excluded the

7    competitive bidders who could have beat him.  That was the

8    whole point of leaving providers off the bid list.  And we

9    invite the Court to read the transcripts or listen to the audio

10   that we cited where you will hear Mr. Grimm being asked who he

11   wants to go up against, and he responds, you mean who I don't

12   want to go up against.  If they are left off, of course it's

13   going to look on the bid results as if Peter Grimm won fairly.

14           THE COURT:  I think what this leaves is answers to my

15   questions, both the financial ones to Mr. Heinz and Mr. Welty,

16   and prison location as to Mr. Ghavami.

17           Who would like to speak for Mr. Heinz?

18           MR. HALPERN:  If I may.  With respect to your Honor's

19   question about the $500,000 loan with respect to Mr. Ghavami,

20   we understand that Mr. Ghavami would be willing to forgive the

21   debt.  However, Mr. Heinz feels the obligation to repay that

22   debt to Mr. Ghavami, and he intends to do so.  He can't do so

23   now, but he intends to do so over time.

24           The second question on finance, I understand it's with

25   respect to paragraph 138 of the presentence investigation

D7N8GHA4

1    report, and to the amount of $246,500, which was extended into

2    three parties in approximately 2006.  There are three parts to

3    this answer as to who the recipients are, the borrowers are.

4    There are two small parts and the third remainder is the

5    largest portion.

6          The two individuals are old-time high school friends

7    or acquaintances of Mr. Heinz's.  With respect to the first

8    one, there was a loan of $1,500 to an old high school friend

9    who I understand was a co-captain on the high school basketball

10   team with Mr. Heinz.  And this individual reached out to

11   Mr. Heinz from a homeless shelter, as he was hopefully being

12   discharged from the homeless shelter, and asked Mr. Heinz to

13   pick him up from the homeless shelter, and Mr. Heinz extended

14   $1500 to him.  He doesn't have an expectation that that money

15   will be repaid to him.

16         The second portion of that, this is the same high

17   school, an acquaintance of Mr. Heinz's, this is someone else

18   from the first one, and this is with respect to a $4500 loan.

19   And that relates to the following.  This individual reached out

20   to Mr. Heinz and advised him that his children were being at

21   risk for not being allowed to continue their education at a

22   parochial school for nonpayment of the school's tuition.  So

23   Mr. Heinz paid $4500 for school tuition at the parochial school

24   so the children can continue to study their education there.

25         The third part and the largest portion that is the

D7N8GHA4

1    remaining, approximately, $240,000 was a loan in early 2006,

2    approximately, to a real estate developer.  Mr. Heinz knew the

3    developer.  And while he harbors no current expectation of

4    repayment, Mr. Heinz has not forgiven that loan.

5         THE COURT:  Why does he harbor no expectation of

6    repayment?

7         MR. HALPERN:  This was made back in 2006.  This was a

8    very short-term period loan and hasn't been paid in the

9    intervening seven years.

10        THE COURT:  Have there been discussions about it being

11   repaid?

12        MR. HALPERN:  I think there have been some over time.

13   My understanding is he is not in the position to repay that

14   loan and it hasn't been repaid.  Just looking forward to

15   pursuing the repayment, but I don't think there is an end date

16   in sight.

17        Finally, with your Honor's permission, if I may hand

18   to your Honor's clerk, with a copy to the government, a copy of

19   Mr. Heinz's personal cash flow statement.

20        THE COURT:  Yes.

21        MR. HALPERN:  This is for tomorrow, but just so the

22   Court has it.

23        THE COURT:  Thank you.

24        With respect to Mr. Welty.

25        MR. POE:  Your Honor's first question related to the

D7N8GHA4

1    diminishment of assets.  I understand there has been an

2    unfortunate large drop in Apple stock, which Mr. Welty was

3    heavily invested in.

4          With respect to the remaining questions the Court had,

5    I have answers for all of them.  They are all a function of the

6    devastation caused by hurricane or super storm Sandy.

7          First, with respect to the Court's question about the

8    $59,120 noted in the PSR, we laid out in our April 12, 2013

9    letter to the probation office commenting on the first

10   disclosure of the PSR, which the government has.  In Exhibit 4

11   of that document, $6400 of that amount was for damaged contents

12   of the home under a flood insurance policy.  $33,860 Mr. Welty

13   replaced his automobiles that had been destroyed by Sandy, and

14   those were not new automobiles he purchased.  He tried to

15   replicate what he previously had.  I believe they are 1995 era

16   vehicles.  Then the third $18,860 was used, I understand, to

17   pay debt relating to reconstruction of the home.  So that's

18   what is constituted by that figure.

19         Your Honor asked about $86,000 in escrow.  My

20   understanding is that that escrow money was released in two

21   separate checks.  One was in the amount of $50,625.31.  That

22   check was signed directly over or made out to, I am not sure

23   which, the contractor who has been reconstructing the home.

24         There is a separate check Mr. Welty received in the

25   amount of $35,375.  $10,000 of that was a payment to the IRS

D7N8GHA4

1    for a 2012 tax liability.  $10,000 was used to pay down a

2    mortgage note that's reflected on page 37 of the PSR.  And the

3    remaining $15,375 was used to pay down a portion of the credit

4    card debt.

5           Your Honor, in addition to what the Court asked, my

6    understanding is there is approximately 60,000, maybe up to

7    $67,000, but that would be the ceiling of potential additional

8    reimbursement from the insurance company for the storm damage.

9           Assuming that Mr. Welty receives those funds, and this

10   is actually something that there is a New Yorker article this

11   week that discusses this, among many other things, but Mr.

12   Welty would be required to raise his house -- it's a bay-front

13   house on a sand bar -- under generally applicable regulations

14   either now or will apply.  And the estimate for that is 55 to

15   60,000 dollars to raise the house, and that would essentially

16   be a wash if that money is received.

17          Finally, the Court asked about the market value of the

18   home.  Exhibit 2 to our April 12 letter --

19          THE COURT:  Is a what?

20          MR. POE:  Exhibit 2 to our April 12 letter to the

21   probation office notes that there were three out of 20 homes in

22   Mr. Welty's immediate neighborhood that were occupied.  There

23   are now four.  Apparently, two knockdowns, three of them are

24   technically abandoned.  While I think it's impossible to

25   determine what the market value of that house is going to be

D7N8GHA4

1    over time, we certainly aren't taking the position it has no

2    market value, but I just think it's real guesswork, your Honor.

3              THE COURT:  Is there any reason to believe it won't be

4    as valuable post-reconstruction as it was pre-reconstruction,

5    perhaps more so because it will be higher?

6              MR. POE:  It was a new house.  It was constructed by

7    Mr. Welty many years ago.  He first started renting on that

8    property, and he eventually bought it, and then that house was

9    torn down and he built a new house.  So what he attempted to do

10   to maintain stability for his family was to replicate what is

11   there.  I think from that perspective, I would have to say it

12   appears it would be identical.  And then the property value is

13   clearly a function of the neighborhood and the town and

14   everything else that surrounds an analysis of property value.

15             THE COURT:  I am asking you to do this assignment.  I

16   can probably do it myself from what you told me, but I am not

17   sure I could.  Can you recalculate your client's assets,

18   liabilities and so forth in a way that would update the

19   presentence report?

20             MR. POE:  We can.  When would you like that?

21             THE COURT:  How soon can you have it?  Could you have

22   it by the end of the day today at some point?

23             MR. POE:  I think so.  If the Court would permit us to

24   e-mail it to your Honor's clerk, sometime before 9 p.m. this

25   evening?  We will try do better than that.

D7N8GHA4

1           THE COURT:  That's fine.

2           Thank you.  That takes us to the facility that should

3      be recommended for Mr. Ghavami.

4           MR. STILLMAN:  Your Honor referenced circumstances of

5      Peter's upcoming confinement.  What we are going to ask your

6      Honor to recommend to the Bureau of Prisons is a place called

7      FSL JESUP.  So Federal Satellite Low, FSL, and J-E-S-U-P.  It's

8      in Georgia.  He is currently living in Atlanta.  It's a trip,

9      but nevertheless it's in Georgia.

10          As your Honor knows from the circumstance in front of

11     you, and we can obviously talk about this tomorrow, Peter is

12     not camp eligible.  This is a federal Bureau of Prisons

13     facility and it is the facility that we are going to urge your

14     Honor to recommend to the Bureau of Prisons as the place at

15     which Peter will be serving his sentence.

16          THE COURT:  I will recommend anything you want me to

17     recommend.  I have been told by regional counsel of the Bureau

18     of Prisons, in no uncertain terms, no matter how strongly I

19     recommend a federal facility, he will be sent to a private

20     contractor facility.

21          MR. STILLMAN:  We understand that --

22          THE COURT:  I should have indicated to you that I had

23     a little more to say.  For that reason, I think you should have

24     a fallback.

25          MR. STILLMAN:  I hear your Honor.  Clearly, it's

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D7N8GHA4

1    something that we have thought about, because one of the things

2    one learns in this business is that in spite of the authority

3    that you have as a United States district judge, those folks

4    are going to do what they want to do, and we have lived that

5    experience in most dramatic ways in the past, but we will have

6    a back-up recommendation.

7          I heard what your Honor said, and we are going to have

8    our fingers crossed, and we will talk a little bit more about

9    this.  There is no question that, apart from the fact that

10   going to the kind of facility that he has to, i.e., not a camp

11   as every other white collar person that violates the law do,

12   it's going to be hard enough if he gets lucky and this regional

13   counsel turns out to be mistaken.  But if he then winds up in

14   one of these private facilities, that is, as my kids would have

15   said when they were smaller, worser.  It's not going to be

16   good.

17          (Continued on next page)

18

19

20

21

22

23

24

25

D7nWgha5

1                THE COURT:  There may be some that are better than

2      others.

3                MR. STILLMAN:  We're focused on it and we're trying to

4      focus on better for Peter and better for the family, quite

5      frankly.

6                THE COURT:  Right.

7                MR. STILLMAN:  It's a tough situation.

8                THE COURT:  Do you have any examples that I could cite

9      to the prison I'm talking to for the proposition that

10     deportable aliens have been housed in federal facilities

11     awaiting deportation?

12               MR. STILLMAN:  I need to talk to someone tonight and I

13     can try to have that information for tomorrow, your Honor, or

14     we could e-mail it tonight.

15               MR. MITCHELL:  I think one of the things we may be

16     asking from the Court tomorrow is not just a recommendation of

17     just the facility, but it seems in our experience to be

18     beneficial to have a recommendation for it not to be a private

19     facility.  And we'll come back with a little more information

20     tomorrow, but those two twin recommendations seem to be

21     beneficial to get you to the low but the lowest federal prison

22     facility.

23               THE COURT:  That has worked in my experience with all

24     kinds of defendants other than deportable defendants.  Are any

25     of your examples deportable defendants?

D7nWgha5

1          MR. MITCHELL:  I don't know, and the resource we're

2    going to speak to tonight, I think we'll be prepared to come

3    back to your Honor with maybe some examples but certainly

4    suggested language for the order.

5          THE COURT:  I will likely put in any language you

6    want.  What I'd like to do is maximize the possibility of

7    achieving what you and your client want.

8          MR. MITCHELL:  Very much appreciate it.

9          MR. STILLMAN:  Thank you.

10          THE COURT:  I think that's all for this evening.

11          MS. TULLEY:  Your Honor.

12          THE COURT:  Yes.  If you've noticed that I haven't

13    required some people to go to the podium, it depends on the

14    clarity and loudness of your voice.  And yours is fine either

15    way.

16          MS. TULLEY:  Thank you.  I will keep that in mind.

17          I just wanted to address briefly two more general

18    themes that your Honor discussed.  At the beginning you were

19    talking about things that you felt were necessary to consider

20    in deciding upon the sentences.  I'd respectfully offer the

21    government's view about those two items as we go forward

22    tomorrow for the sentencing, and the first item that you

23    mentioned was that in this case the victims have received a

24    great deal of compensation and many have been made whole or

25    will be made whole and that perhaps could be a reason for a

D7nWgha5

```
1   lesser sentence, the societal harm is less if they've been made
2   whole.  The government would like to point out that in this
3   case, the compensation did not come from these defendant, from
4   their pockets, but instead from the large institution that they
5   worked for.  So in the government's view, that would not factor
6   in to the defendants receiving a lesser sentence.
7            THE COURT:  I don't mean to interrupt you, but it
8   seems to me that given that it is the institutions that most
9   directly benefitted from wrongdoing by these defendants, it's
10  perfectly appropriate that they pay restitution, and from a
11  societal standpoint, I don't think it matters.  From the
12  standpoint of these institutions, it doesn't matter whether the
13  dollars come from these defendants or from their employers.
14  The societal harm has been recompensed to a great degree.
15           MS. TULLEY:  Yes, your Honor.  To the victims it
16  probably does not matter where they get the money.  I
17  absolutely agree with that.  The government just wishes to
18  point out that it is not something that these defendants have
19  done.  They're not the ones making restitution.  There are
20  other cases where defendants do make restitution on their own,
21  and that's something that should be considered differently when
22  defendants happen to work for a very large corporation with a
23  deep pocket that can make these payments.  And there is a level
24  of disparity then that could be created when defendants happen
25  to work for a corporation with a deep pocket that can pay this
```

D7nWgha5

1    money to make the victims whole versus working for a different

2    company that either, A, doesn't have a deep pocket or, like

3    FSA, has not compensated victims.  Under that rationale, then

4    someone like Steve Goldberg would deserve a higher sentence

5    because his company didn't settle and there's all these victims

6    that haven't received any compensation.  So the government just

7    asks that you consider our position with respect to the

8    compensation issue.

9         Then the other issue that I wanted to address was the

10   Court indicated that it might be considering a substantial

11   fine, something perhaps higher than what probation has

12   recommended, and that if there is a large fine, perhaps -- I'm

13   just paraphrasing; I don't remember the Court's exact words --

14   that might allow for a lower jail sentence.  The government

15   just wants to point out that that really has the potential to

16   create disparity for wealthy, middle-class defendants who have

17   more money to pay fines than defendants who are unable to do

18   such a thing.

19        THE COURT:  I've given a lot of thought to that, and I

20   have some counterthoughts.  If one is trying to promote general

21   deterrence for financial crimes and where the defendant has

22   benefitted financially to some degree from the crimes, to

23   deprive the defendant of the benefit of the crimes is to some

24   extent a punishment and effectuates general deterrence.  I'm

25   also aware that there are authors who write on sentencing who

D7nWgha5

1    say that it's actually prison terms that deter white collar

2    defendants more than any fine.  There are a lot of things to

3    consider.  I do not want to create disparities between

4    defendants in this conspiracy whose employers have not paid

5    restitution, and I do not want to create disparities between

6    rich defendants and poor ones, but there are a lot of other

7    factors.

8             Go ahead.

9             MS. TULLEY:  Thank you, your Honor.

10            THE COURT:  Would anyone like to raise anything else

11   today?

12            MR. STILLMAN:  No, your Honor.

13            THE COURT:  We'll convene in the morning.  How is

14   10:30?

15            MR. STILLMAN:  10:30.

16            THE COURT:  Thank you.  We're adjourned.

17            (Adjourned to July 24, 2013, at 10:30 a.m.)

18

19

20

21

22

23

24

25