# EXHIBIT E

JAO7CONS

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                           16 Cr. 370 (CM)

5    MATTHEW CONNOLLY
     and GAVIN CAMPBELL BLACK,
6
              Defendants.
7
     ------------------------------x
8                                          New York, N.Y.
                                           October 24, 2019
9                                          10:30 a.m.

10

11   Before:

12                    HON. COLLEEN MCMAHON
                                           District Judge
13

14                      APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  MICHAEL KOENIG
17        CHRISTINA BROWN
          ALISON ANDERSON
18        KATHRYN HOLBROOK
          CAROL SIPPERLY
19        Assistant United States Attorneys

20   KENNETH BREEN
     PHARA GUBERMAN
21        Attorneys for Defendant Matthew Connolly

22   SETH LEVINE
     SCOTT KLUGMAN
23   MIRIAM ALINIKOFF
          Attorneys for Defendant Gavin Campbell Black

24

25
```

JAO7CONS

1              (In open court)

2              THE COURT:  Good morning.

3              (Case called)

4              MR. KOENIG:  Good morning, your Honor.  Michael Koenig

5     on behalf of the United States.  With me is Christina Brown,

6     Alison Anderson, Kathryn Holbrook and Carol Sipperly.

7              THE COURT:  Good morning.

8              MR. BREEN:  Good morning, your Honor.  Ken Breen and

9     Phara Guberman on behalf of Matt Connolly, who is with us here

10    in court today.

11             THE COURT:  Good morning.

12             MR. LEVINE:  Good morning, your Honor.  Seth Levine

13    and Scott Klugman and Miriam Alinikoff on behalf of Mr. Black,

14    and Mr. Black is here with us today.

15             THE COURT:  Good morning.

16             This matter is on for sentencing under docket number

17    16 Cr. 370, United States of America v. Matthew Connolly and

18    Gavin Campbell Black, Mr. Connolly having been found guilty of

19    one count of conspiracy to commit wire fraud and bank fraud and

20    two counts of wire fraud, all are class B felonies, carrying

21    statutory maximum penalties of 30 years' imprisonment, five

22    years' supervised release, $1 million fine and a mandatory $100

23    special assessment; Mr. Black having been found guilty of one

24    count of conspiracy to commit wire fraud and one count of wire

25    fraud, those crimes being class B felonies and carrying the

1    same statutory maximum penalties.

2         In connection with today's proceedings I have received

3    and reviewed the following, I have laid it out all very

4    carefully:  Presentence investigation reports prepared by

5    United States Probation Officer Johnny Kim for Mr. Connolly.

6    That's document 438 on the docket, filed on September 24, 2019;

7    and for Mr. Black, document number 437 filed on September 23,

8    2019.

9         In connection with Mr. Connolly, I have a sentencing

10   memorandum on behalf of Mr. Connolly.  Exhibits A through L to

11   that sentencing memorandum are letters from members of his and

12   his wife's family.  Exhibits M and N are letters from the Paul

13   Hastings law firm to Mr. Kim concerning the objections to the

14   PSR, as to which I will rule shortly.

15        I have a sentencing memorandum from the United States

16   regarding defendant Matthew Connolly.  There are as exhibits to

17   that sentencing memorandum Exhibit A, a document authored by

18   Mr. Connolly; Exhibit B, a declaration of Special Agent Michael

19   McGillicuddy, and there is attached to that an exhibit, Exhibit

20   1, which is document 446-2.  I asked for a modification of that

21   exhibit, and I received that, and I'm going to call that

22   Exhibit 1A to Agent McGillicuddy's affidavit, and I have that

23   as well.  Exhibit C is the plea agreement of someone I never

24   heard of until yesterday named Takiyuki Yugami.  Exhibit D are

25   his 80-plus page sentencing minutes before Judge Rakoff.

JAO7CONS

1    Exhibit 5 are the sentencing minutes of Mr. Parietti.

2           In connection with Mr. Black, I have received a number

3    of memoranda:  A sentencing memorandum from the firm of Levine

4    & Lee.  By my count Exhibit 1 consists of 45 letters -- I may

5    have miscounted the number of blue pages -- but at least 45

6    letters, many of them two, three or four pages long from

7    family, friends, coworkers, his parents, his in-laws in New

8    Zealand and his wife.

9           There is also a declaration of Seth Levine in support

10   of Mr. Black's sentencing memorandum, and attach thereto are

11   Exhibits A through Q.

12          In addition, Mr. Levine submitted a submission

13   regarding the applicable sentencing guidelines and a

14   declaration of Mr. Levine in support of that, together with

15   Exhibits A, B, C, D and E.

16          I have a letter received October 22 and filed under

17   seal concerning certain nonpublic matters.

18          I have received in response to my inquiry from the

19   government a letter dated October 21, 2019 and a follow-up

20   e-mail dated October 22, 2019 regarding the prisoner transfer

21   program.  I have also reviewed my own research on the subject,

22   including a document called Guidelines for the Evaluation of

23   Transfer Requests Submitted by Foreign Nationals that we found

24   on the Internet; a transfer inquiry and review document that we

25   found on the Internet; and a document from the law offices of

JAO7CONS

1    Alan Ellis in San Francisco and New York that describes that

2    program.

3            In addition and with respect to both defendants, I

4    have reviewed some rather more salient sentencing minutes from

5    the Rabobank case, Judge Rakoff's sentencing of Messrs. Allen

6    and Conti and Mr. Stewart.  I have rereviewed the presentence

7    report of Mr. Curtler and reviewed for the first time of

8    Mr. Parietti.  I have consulted a number of portions of the

9    transcript and exhibits that were introduced during the course

10   of the trial.

11           Is there anything else I should have received in

12   writing prior to today's proceedings from the government?

13           MR. KOENIG:  No, your Honor.

14           THE COURT:  From Mr. Connolly?

15           MR. BREEN:  No, your Honor.

16           THE COURT:  From Mr. Black?

17           MR. LEVINE:  No.  Thank you, your Honor.

18           THE COURT:  Thank you.

19           Has the government reviewed the presentence report?

20           MR. KOENIG:  We have, your Honor.

21           THE COURT:  Any additions, deletions or corrections?

22           MR. KOENIG:  Yes.  These are in connection to our

23   reducing the number of requests that we originally told

24   probation about.

25           THE COURT:  I'm working with the number 130.

JAO7CONS

1           MR. KOENIG:  Yes, yes, but the number became 130 after

2     the probation --

3           THE COURT:  Yes, I understand that, but I'm working

4     with the number 130.

5           MR. KOENIG:  OK.  And then it changes also the

6     intended loss.

7           THE COURT:  Oh, there are a lot of changes.  Believe

8     me, there are a lot of changes.

9           MR. KOENIG:  That's everything.

10           THE COURT:  OK.  Mr. Breen, have you reviewed the

11     presentence report and gone over it with your client?

12           MR. BREEN:  Yes, your Honor.

13           THE COURT:  I will be hearing argument and will be

14     reviewing the PSR, and I'm obviously going to make rulings on

15     some objections.

16           Same question to you, Mr. Levine.  Have you reviewed

17     it and gone over it with your client?

18           MR. LEVINE:  I have, your Honor.  Thank you.

19           THE COURT:  I have a specific question that I want to

20     ask before we get into this, and that is with respect to Agent

21     McGillicuddy's chart.

22           Am I correct that on page 2 -- by the way, I'm working

23     with the chart that has the numbers I asked to be added to the

24     end.

25           MR. KOENIG:  Yes.

JAO7CONS

1            THE COURT:  Am I correct that the sixth entry on --

2      the fifth and sixth entries actually -- the sixth and seventh

3      entries on this chart relate to Exhibit 7-001 and deal with a

4      count of acquittal as to Mr. Connolly, namely Count Ten?

5            MR. KOENIG:  Yes, your Honor.

6            THE COURT:  Thank you.  Am I correct that the entry on

7      the next page, the third page, the third entry dated 9/26/2007

8      relating to Exhibit 7-001, deals -- I'm sorry -- the first

9      one -- the first one deals with Count Eight; is that correct?

10           MR. KOENIG:  On page 3?

11           THE COURT:  Page 2.  Let's go to page 2.  The entry is

12     dated 9/26/2007.

13           The first page the first entry is 2/21/2005.  The

14     second page the first entry is 8/12/2007.  The third page, the

15     first entry is 10/18/2007.  The third page, the first entry is

16     9/25/2008.

17           Let's just go to the first page.  The first page,

18     about two thirds of the way down there is an entry dated

19     7/20/2006 and the relevant exhibit is 8-001.  Am I correct that

20     that relates to Count Eight, a count of acquittal of

21     Mr. Connolly?

22           MR. KOENIG:  Yes.

23           THE COURT:  And am I correct that the entries dated

24     9/26/2007, Exhibit 7-001, relate to Count Ten, a count of

25     acquittal of Mr. Connolly?

JAO7CONS

 1             MR. KOENIG:  Yes.

 2             THE COURT:  Thank you.  I just wanted to clear that

 3     up.

 4             OK.  So, I think the logical thing to do is to hear

 5     the defendants' objections to the presentence report and to

 6     hear the government's response to that first.  And I will start

 7     with Mr. Connolly and then Mr. Black.

 8             MR. BREEN:  Your Honor, we have a myriad of

 9     objections.

10             THE COURT:  Yes, I know.

11             MR. BREEN:  But I will cut to the chase.  We think

12     that the nature and circumstances of the offense are atypical

13     given that there was open and pervasive conduct, no steps to

14     conceal and no profit demonstrated by Mr. Connolly.

15             THE COURT:  I should say you can rest assured I have

16     been immersed in the arguments that you've made in writing,

17     both of you, just so you know that.  That said, you may say

18     whatever you want.

19             MR. BREEN:  Well, I will reference the discussion we

20     had on the loss amount.  The loss amount is completely

21     incalculable.  It completely ignores how swaps work in the

22     market, how swaps are meant to offset risk, and the zero sum

23     game is just a ridiculously ill-informed way of describing a

24     swap, because most of the market that is in swaps is derisking.

25     And you heard that from every witness who talked about why they

1    hedged, what is hedging the market.  And the simplistic

2    argument that if somebody has hedged, that that loss was passed

3    down the line to somebody else makes no sense and is not

4    something that could be used here, because that victim of

5    somebody down the line, they haven't shown that it wasn't

6    Deutsche Bank who eventually was the one who isn't in a

7    completely hedged position, or any of the other banks that have

8    pled guilty to manipulating LIBOR.  They haven't proved any

9    loss.  The numbers that they prove is a methodology that's

10   completely made up, I mean based on numbers that --

11           THE COURT:  They usually are in these kinds of cases,

12   Mr. Breen.

13           MR. BREEN:  Right.  But usually there is actual data

14   that is trustworthy, that the government didn't say itself that

15   we couldn't use it because it was so not trustworthy, and then

16   they turn around and use it themselves, which is what they did.

17   Usually it's not a situation where there is a presumption that

18   every submission that they say was an ask was moved from a

19   reasonable range or moved from a number that would be a real

20   supportable number to something else.  No testimony at all in

21   the case from any of the cooperators or anybody else whether

22   the submission moved, whether or not the fixing moved.

23           They proved nothing.  They didn't prove victims

24   either, right?  How do you prove -- the victims they presented

25   in the indictment weren't the same victims that they presented

JAO7CONS

1    at trial, aren't the same victims that they presented in

2    sentencing.  Again, you know, presenting victims, they

3    acknowledge at Mr. Parietti's sentencing hearing that in order

4    to determine a real loss or an actual loss you would have to

5    figure out their hedging position.  Well, of course, the whole

6    case has been about that.

7          So, there shouldn't be any ten victims.  They proved

8    zero victims, zero loss.

9          The idea that Matt Connolly is a supervisor and

10   deserves an enhancement for that is preposterous.  First, given

11   the active role he played, supervisor only in name, not

12   supervising to Parietti, who made more money than him always,

13   who was a managing director when Matt wasn't, Matt not even

14   being a trader but in name being on the desk.

15         So, not only that, fact specific to Matt Connolly, but

16   you look at the government's position they took with Curtler,

17   Mr. Curtler was a supervisor of a submissions desk and

18   supervised Mr. King and really was the kingpin of the entire

19   submissions situation that was happening in London.  I mean

20   they can't take a position that is so disparate and say that

21   Mr. Curtler was not a supervisor but Mr. Connolly is.

22         THE COURT:  Well, they can, but I might not find it

23   very appealing.

24         MR. BREEN:  Right.  And because they took that

25   position and that's the sentence, you know, if you were to

JAO7CONS

1   sentence Mr. Connolly with that enhancement, it would be

2   disparate, and that's something that the guidelines seek to

3   avoid.

4          With regard to intended loss, they assume with the

5   loss number that every loss was intended.  But how is the loss

6   intended if you thought the other side was hedged, like 99

7   percent of the marketplace?

8          We didn't present it at trial, but we heard from our

9   expert that 99.9 percent of the risk in the market -- in the

10  spot market -- dissipates by hedges if you take .01 percent.

11         Abuse of trust?  Abuse of truss is not an enhancement

12  that should apply.  I mean that's something that usually

13  applies in the fiduciary context, not in a situation where you

14  have you a counterparty.  I haven't seen any authority that

15  says that they have a fiduciary duty to a counterparty in a

16  trade, to Deutsche Bank?  Abuse of position of trust?  Deutsche

17  Bank pled guilty here -- I'm not sure -- and paid enormous

18  fines.  I'm not sure there is a fiduciary duty to a bank that

19  knew about it, put everything in place, had no rules against

20  it, encouraged the spot desk to sit next to the money market

21  desk.  There is just no enhancement there.

22         Abuse of trust to BBA?  They had no rules until after

23  Matt Connolly left the bank voluntarily.  I'm not sure how that

24  could ever form any kind of relationship -- fiduciary or

25  otherwise -- that could be abused by what happened here.

JAO7CONS

1          None of those enhancements should apply.  There

2      shouldn't be any loss amount that is on top.

3          I missed one:  Activity happened in a foreign

4      jurisdiction.  An enhancement that's based around the idea that

5      when people move their operations offshore to avoid detection,

6      that that's an enhancement at sentencing.  There was no moving

7      anything offshore.  The LIBOR desk was always in London.  You

8      know, that enhancement and several other enhancements are

9      already baked into the base offense, and there can't be

10     enhancement for that reason.

11         Your Honor, you heard all about this case and Matt

12     Connolly's role, three or four e-mails.

13         THE COURT:  Can we limit right now to the objections

14     to the PSR?  Because I want to rule on those.  And then I will

15     give you an opportunity to argue the other stuff on behalf of

16     your client.

17         MR. BREEN:  Just a final point then on loss amount.

18         THE COURT:  Thank you.

19         MR. BREEN:  The jury acquitted on the Parietti-related

20     accounts.

21         THE COURT:  Yes, it did.  Indeed it did.

22         MR. BREEN:  And that was very significant.

23         THE COURT:  It was to me.

24         MR. BREEN:  He had a side agreement.  You know, the

25     government is making an appeal to try to, you know, aggravate

JAO7CONS

1    the Court about Mr. Connolly.  They're taking a position that's

2    not -- on all these issues -- that's inconsistent with

3    Mr. Parietti's and Mr. Curtler's positions, and they shouldn't

4    be allowed to do that.  They told Judge Engelmayer that they

5    wouldn't, but they're doing it anyway.  Thank you.

6              THE COURT:  OK.

7              Mr. Levine, are you arguing for Mr. Black?

8              MR. LEVINE:  Yes, your Honor, thank you.

9              With respect to our objections to the guidelines, we

10   have, as you know from our papers, several primary objections:

11             First, the loss calculation.  The loss calculation, we

12   believe that the government -- the intended loss, I should

13   say -- should be disregarded entirely because it is purely

14   speculative and without basis.

15             We start first with the government's main witness, Mr.

16   Curtler, who said at sentencing, in his submission, that the

17   methodology was "absurd" and ignored -- I'm summarizing -- the

18   realities of the market.  If Mr. Curtler, as he has been, is to

19   be credited, he should be credited here as well because in this

20   matter he is entirely right that this methodology bears no

21   relationship to any kind of reasonable methodology that could

22   achieve a number that's reasonable.

23             Now always in complex cases, complex financial cases,

24   you have to make an analyses which involve all kinds of

25   sophisticated means of looking at data, and estimating, and

JAO7CONS

1    making the best judgment you can make.  Perfection cannot be

2    the enemy of good.  But here, your Honor, you don't have it.

3    What you have is a methodology that literally counts only a

4    counterparty's losses and not their wins.  So, I think what you

5    end up having is not only are you disregarding the hedging but

6    you're also disregarding the realities of that counterparty

7    over these days.

8            We think that this methodology is so flawed that it

9    really has no provenance at all, and I think we're prepared

10   certainly to present on that extensively and go through all of

11   the reasons -- I put them in our brief -- but let me just talk

12   about another piece of it from this chart.  Because what the

13   chart says, your Honor, if you look at it, is that after ten

14   years and dozens of banks paying money, and lots of banks doing

15   whatever the government told them to do, and all of the

16   analysis, after all of this and this trillion dollar scandal

17   that they talked about, their best estimate is $4 million on

18   the intended loss on the whole thing.  But, as the Court knows,

19   the intended loss calculation doesn't work that way; it has to

20   be intended loss of this man.  And if you take their chart and

21   you just break it down, what you find out, your Honor, is that

22   the portion -- there are 16 instances --

23           THE COURT:  I've done the math.

24           MR. LEVINE:  I know you have.  I have a chart I can

25   show to you if you want, but I don't think it was necessary

JAO7CONS

1        because I knew you had done it.

2                What it shows is the $166,000.  So, we stand here

3        today talking about intended loss, and I'm going to say so it's

4        clear from the record, the intended loss calculation here is

5        literally absurd, so as far as I'm concerned I am now through

6        the looking glass.  But even in Wonderland.

7                THE COURT:  Got it.  I've thought you were there for a

8        long time, Mr. Levine.

9                MR. LEVINE:  Yes.  But let's talk about the internal

10       logic of what they've done.  16 instances.  And if you notice,

11       Judge, on their chart, as I know you've seen, there are these

12       dashes sometimes.

13               THE COURT:  I assume that means no intended loss.

14               MR. LEVINE:  Yes.

15               THE COURT:  That's what I assume that means.

16               MR. LEVINE:  I take it that way.  And while we can't

17       know exactly how they did this, based on our efforts I'll tell

18       you that's what it means.

19               What is interesting for Mr. Black -- since we're

20       talking about intended loss -- of the 16 instances, four of

21       them, 25 percent have no loss.  OK?  So if we cherrypick in --

22       they've cherrypicked the ripest cherry possible.  But even if

23       you were going to give them their rate, they have a 25 percent

24       miss rate after ten years.  So 25 percent of them, including

25       exhibits they presented at trial, they cannot show even now

JAO7CONS

1    that there was any intention to create any loss.

2           So, this case is now about $166,000, and 25 percent

3    rate is zero.  OK.  Well, what happens if one looks at the

4    counterparties that are the losses that are represented and

5    just says over the 16 days that they say Mr. Black should be

6    held accountable, what happens if you just take their gains or

7    losses for those 16 days and net them, just the counterparty?

8    We've done just the counterparties who we believe these losses.

9    The number drops to 80,000.

10          Now, they claim that you should assume a one basis

11   point adjustment which translates to an eighth of a basis

12   point.  That's wrong, because again Mr. Curtler didn't testify

13   to that.  He said maybe a half, and there is a question of what

14   happens after the financial crisis.  I will footnote financial

15   crisis for a second because let's forget about that for a

16   second.  And about 125 or so of these are before the crisis.

17   So, it's half a basis point.  Now the 80 is somewhere around

18   $40,000.

19          So, if we're going to take this seriously -- and I

20   don't think you should because I think this is madness -- but

21   that's fine.  If you're going to take them seriously, the

22   intended loss on this chart should be at the most 40 grand.

23   It's still more than it should be, but it's $40,000.

24          Frankly, if you add up all the gains and losses of all

25   the counterparties on Gavin's days, not just the counterparties

JAO7CONS

1    who papered a loss, it gets down to about $25,000, and if you

2    cut that in half it's $12,000.

3            So, my point to you, your Honor, is you have something

4    that is flawed.  But even on the "this is the best they can do"

5    model, what it reflects, I think, is something very profound,

6    that even under the government's best view of this case, after

7    the many miles we've walked together on this, we're talking

8    about a case that's between zero and $166,000; and I without

9    any big math, just looking at what they've done, have it at, to

10   be kind, 40 or less.  Now, that means that were this Court to

11   adopt any of this, the loss amount should be less than in my

12   view $40,000.  So, we object entirely.

13           There is also, your Honor -- and life is short, but

14   there is an affidavit here.

15           THE COURT:  You have all the time you want.

16           MR. LEVINE:  There is an affidavit here, your Honor,

17   from Special Agent McGillicuddy.  Well, that's testimonial.  We

18   received no information, no data where this has been provided.

19   It's testimonial, and you've ruled on that.  Can I have the

20   3500?  They can give it to me right now.

21           THE COURT:  Is there 3500 in connection with Agent

22   McGillicuddy's affidavit?

23           MR. KOENIG:  Not that I know of.

24           THE COURT:  OK, let's keep going.

25           MR. LEVINE:  But my point, your Honor, is I don't

JAO7CONS

1    think this affidavit was written without all kinds of

2    calculations and graphs, so I think Mr. Koenig memory or

3    knowledge might be limited, but on that basis alone you can

4    strike the whole thing.  But if you keep it -- if you keep

5    it -- we're talking about 40 grand or less -- I actually think

6    it's even less than that; I think it's about 12 -- so it

7    actual -- so, actually the enhancement that's being applied by

8    the 18 points does not count at all, and it should be a much,

9    much lower enhancement.

10            THE COURT:  Well, if you were right, and if it were

11   $12,000, the enhancement would be two points?

12            MR. LEVINE:  Yes.  Yes.

13            THE COURT:  If it were 40,000, it would be either four

14   or six points.

15            MR. LEVINE:  And I will say that one thing that's very

16   interesting about this is you then get to -- so basically if

17   that's right -- and that's their best estimate, and I don't

18   think I've done anything here than some math and basically

19   apply the testimony -- I think that is very consistent with the

20   instinct of probation, which looked at these numbers and fairly

21   said, look, this is not for us given the complexity, but just

22   looking at this we think we're over here and nowhere over here.

23   So, I think even if you give the government whatever it's due,

24   we start there.

25            You also note, your Honor, that in one part of the

JAO7CONS

1    affidavit, but there was some estimate of a market impact of

2    $500 million.  There is no calculation for that.

3             THE COURT:  Trust me, Mr. Levine, that is not going to

4    factor into anything I do here today.

5             MR. LEVINE:  So then we get to the last piece of this

6    loss, which is there are now apparently victims that we've

7    never known about before -- which is my second objection, which

8    is about the victims enhancement.  As the Court is aware, the

9    victims enhancement applies only for actual loss.  There is no

10   showing of actual loss in this case.  It is conceded that there

11   is no actual loss, so the victims enhancement does not apply at

12   all.

13            THE COURT:  And the section of the guidelines that so

14   states is?  I'm going to make you sing for your supper,

15   Mr. Levine.

16            MR. LEVINE:  Just give me one second, your Honor.  I

17   believe it's 2B1.1.  And it is also recognized in this Circuit

18   by a case called Skys, 637 F.3d 146.

19            THE COURT:  Can we find it?

20            MR. LEVINE:  Sure.  2B1.1(b)(2)(A)(i) and comment 1.

21            THE COURT:  Which says, "Victim means any person who

22   sustained any part of the actual loss determined under the

23   subsection (b)(1) or any individual who sustained bodily injury

24   as a result of the offense."

25            MR. LEVINE:  So we would argue -- and the comment,

JAO7CONS

 1    your Honor --

 2              THE COURT:  So, it's your position that because the

 3    government admits it can't prove actual loss and has instead

 4    relied on intended loss, that the victim enhancement has to

 5    drop out because victims are only people who suffer actual

 6    loss.

 7              MR. LEVINE:  Correct.  That's correct.

 8              THE COURT:  And your Second Circuit citation for that

 9    is?

10              MR. LEVINE:  It is the Skys case.  It is 637 F.3d 146.

11    The pin cite is 153 to 154.  I would also commend to the

12    Court's attention -- which I know the Court has already seen --

13    we covered this in our brief, on page 15 and 16 of our

14    guidelines brief.

15              So, I think the victims should be out from that alone,

16    however, I then took a look at what Special Agent McGillicuddy

17    says the victims are.  Now, I know that the government put a

18    website out that requested victim impact statements by October

19    1.  We have been provided no statements; I assume that there

20    are no such statements.

21              THE COURT:  Are there any victim impact statements?

22              MR. KOENIG:  Not that I am aware of.

23              THE COURT:  Thank you.

24              MR. LEVINE:  And, your Honor, I don't know whether or

25    not the government had the opportunity to speak to these

JAO7CONS

1   purported victims that we've never heard of before.  Obviously,

2   if they did and they told them that they don't want to be

3   victims, that would be something that would be useful to know

4   right now, but I don't know if there is any contact with these

5   folks at all.  I'm curious.

6          I note that of these victims at least four of them are

7   LIBOR panel members on at least some LIBOR panel, including

8   Bank of Nova Scotia, which not only was a panel member, a bank

9   that actually our expert witness worked at and was prepared to

10  testify that there is no victim there.  So, I don't know what

11  the good faith basis is -- even if there was actual loss -- for

12  putting up any of these folks.

13         I would also note that of three of the victims that

14  are European banks -- Union Credit, ING, Stenzka -- I'm sure I

15  pronounced that incorrectly -- they were members of the Euribor

16  panel.  So, again we have --

17         THE COURT:  Everybody was in the game.

18         MR. LEVINE:  Right.  So, your Honor, I find it to be

19  troubling that we're at sentencing, and in an affidavit that

20  wasn't even provided to probation -- even though this

21  calculation must have been done before Mr. Parietti and Mr.

22  Curtler's sentencings -- why we're now seeing new victims and

23  seeing folks that on their face don't really seem to be

24  consistent with the letter or the spirit of the intended loss

25  guideline, and therefore I think that they are not an

JAO7CONS

1    appropriate basis to issue the victims enhancement, but they

2    are an appropriate basis I think for this Court to again look

3    at the methodology that the government has arrived at to

4    suggest a sentence and for you to arrive at that again

5    undermines the pillars of what the loss could or couldn't be or

6    who was harmed here.

7         I'm not rearguing what is not to be argued.  I'm just

8    saying for the purpose of assessing the loss today and the

9    victims, these guys ain't it, and so I would ask that the

10   victims enhancement not apply.

11        And I will tell you, your Honor, for some of these

12   victims -- for example, they put in Standard Charter and

13   Merrill as one of the victims.  What is really interesting is

14   if you actually take the chart, if you actually take the time

15   and you look at the few trades that Standard Charter was

16   involved in, there are four days in which they have some trade

17   position of the 16 of my client's, they have them netted as I

18   think a $400 loss.  Because if you notice in several of these

19   the loss on the big day is $400, $1500, very small.  We just

20   looked.  What was Standard Charter's experience on the days

21   that they said Mr. Black did something that caused a loss?

22   Just those four days.  It turns out if you net them they made

23   $2700; they didn't lose $400.  And frankly if you do this with

24   some of these other victims like Merrill -- which is also

25   attributed to a day that they want to talk about my client, an

JAO7CONS

1    actual loss -- you find out that the numbers just by looking at

2    that customer and the days they've caught in total go way down.

3           So, again, my concern here is that not only are they

4    wrong on the law but they're presenting facts in a way which do

5    not achieve any ability to make even a reasonable estimate of

6    loss or victimhood.  So, I think that those all should be

7    disregarded.  And I'm happy to show you the charts if you'd

8    like.

9           I think we then get to the third enhancement to which

10   we object, which is sophisticated means.  Here there are a

11   couple of elements.  First is whether there has been a

12   concealment.  The evidence in this trial, as this Court has

13   pointed out -- one thing we didn't have in this trial was

14   concealment; everything was out in the open.  There was never a

15   dispute of what happened in terms of the conversations.  There

16   is a dispute as to characterization but nothing was concealed.

17   So, that doesn't apply.

18          And then we get to the one that I find the most sort

19   of ironic, which is that my client -- who has virtually no

20   experience in the United States, who was sitting on the desk in

21   London trading LIBOR, which is literally the London market

22   rate -- somehow is going to be additionally penalized because

23   he somehow took this outside the United States.  Plainly he did

24   not do that.  He plainly had no intention of concealing

25   something like we see with someone who moves an investment

JAO7CONS

1      scheme offshore to avoid authorities.  So, you see to me the

2      application of that here leads to an absurd result in the sense

3      that it's a London metric, a London trader, a London desk.

4      It's not even U.S. dollar cash market; it's the London market

5      for U.S. cash.

6              So, while that's not an argument about all the

7      jurisdictional issues -- we've never contested that -- it's

8      just not a reasonable thing to do to apply that standard.  It's

9      inconsistent with good sense and the realities.  So I don't

10     think it's applicable.

11             The final specific objection we have is the abuse of

12     trust enhancement.  The abuse of trust enhancement, as my

13     colleague has said, simply doesn't apply, and it doesn't apply

14     because that enhancement is designed to penalize conduct that

15     involves fiduciary duties among the people and counterparties

16     where a person has broken their trust.

17             There is no dispute in this case that every

18     transaction was arms length.  We presented, as you've seen -- I

19     have showed it more than probably you care to see -- the

20     contract is the master agreement, which disclaims reliance,

21     fiduciary duty and all of those things.  I think the law is

22     quite clear that you need to have an abuse of trust.  None of

23     the witnesses we've heard, no one has testified that that's an

24     abuse of trust here.

25             Further, if you wanted to even overlook that fatal

JAO7CONS

1    defect, then you have to ask, well, is this the kind of

2    discretionary activity in which you might still want to apply

3    abuse of trust.  The answer is for Mr. Black he did not have

4    discretion.  We all agree he had no supervisory role, he had no

5    authority over these.  He didn't even have access to the

6    computer to submit these things.  His conduct is entirely based

7    on what communications he had with those folks.  There is no

8    discretion.  So the abuse of trust element is getting at those

9    kinds of relationships.  And, obviously, given that this

10   conduct was throughout not only this bank at Deutsche, but as

11   the government says in their briefs repeatedly all of these

12   other banks, the notion that for this purpose that Mr. Black by

13   following the instructions of his seniors doesn't dismiss the

14   problem that we have, but it does say that that's not an abuse

15   of trust.  And again it's another guideline calculation which

16   the government offered no real justification for.  Probation

17   put it in because they said this is their position.  I will say

18   the probation department footnoted every single one of their

19   enhancements and recalculated each time, and I will say for the

20   record I am very grateful for them for that, because I think

21   they really tried to --

22            THE COURT:  Mr. Kim is an extraordinary officer in

23   cases like this.

24            MR. LEVINE:  Yes.  And I think that he took it not

25   only very seriously, but he gave the Court a report.

JAO7CONS

1          So, I don't know why the government is pushing for

2     these enhancements.  They just don't apply.  This is not a

3     matter of debate.  And obviously under the guidelines, though

4     we submitted a second brief on guidelines, while they're

5     significant, we don't think they are the main story here.

6          THE COURT:  Oh, you are so correct about that.

7          MR. LEVINE:  But again, where we are in a position

8     where we see things that are clear errors of law we are obliged

9     to point them out to this Court.

10          So, if you apply all those objections, then we think

11     exactly what we said in our brief, which is the appropriate

12     guideline calculation here is level 7, which yields a zone A

13     sentencing range of zero to six.

14          Now I will talk later about the factors and things

15     like the Court is more interested in, but the wisdom of the

16     probation report is that whichever way you want to look at it

17     from their perspective we come out the same place, but I do

18     think for purposes of the order, and Rule 32 and the rules,

19     that these enhancements are not established.  And certainly a

20     loss in victimhood we think cannot be applied.  It certainly

21     cannot be applied without a thorough Fatico hearing, which I

22     think would be a thorough waste of the Court's time in light of

23     the record and in light of what the government's position is.

24     So, we would suggest those enhancements should all be struck.

25          Now, I know the Court is aware -- and Mr. Kim

JAO7CONS

1    documented this meticulously -- we made a series of other

2    objections to the report.  You know, many of those things are

3    matters that -- and Mr. Kim actually accepted many of our

4    objections and made modifications, including, for example, that

5    Bank of America is not a victim.  So, when they say Merrill is

6    a victim and, yeah, it was premerger, but the one victim is out

7    who has the successor right to the other victim that they're

8    now asserting, it just sort of gets a little silly.  But what I

9    would say to you is we would stand on the objections that are

10   in our letter.  I don't think ultimately because they're

11   factual matters of which is quite familiar -- I'm happy to go

12   through them, but they really are objecting to the language in

13   various parts of the description of conduct to conform with

14   what we think the evidence showed, but I don't know that the

15   Court is necessarily going to quarrel with any of those.  You

16   may not agree with our characterizations, but that's what they

17   are.  So, I am happy to go through them.  We do stand on them

18   as a matter of law.  So again I would ask you to properly

19   calculate Mr. Black's guidelines as level 7 and zone A.  Thank

20   you, your Honor.

21           MR. BREEN:  Just for completeness before the

22   government goes.

23           THE COURT:  Yes, Mr. Breen.

24           MR. BREEN:  If we applied the methodology that

25   Mr. Levine set forth -- which we think is the applicable

JAO7CONS

1  methodology -- with the six entries on Exhibit 1A that deal

2  with Matt Connolly they add up to $47,000.

3          THE COURT:  I know.

4          MR. BREEN:  With the methodology it's less than

5  $3,000, and it puts it at a level below $6500 where there is no

6  enhancement.

7          THE COURT:  And I think, am I correct that Agent

8  McGillicuddy's chart does not include Count Three, the Count

9  Three communication?

10         MR. KOENIG:  That's correct.

11         MR. BREEN:  And the rest that had to do with Mr.

12  Parietti, it's our position --

13         THE COURT:  Oh, well, we will talk about Mr. Parietti.

14  Don't worry, I have plenty to say about Mr. Parietti.

15         MR. BREEN:  Thank you.

16         MR. LEVINE:  So, your Honor, I haven't gone through

17  today all the details, but our brief goes through

18  systematically all the reasons the loss amount makes no sense.

19  Thank you very much.  I appreciate it.

20         THE COURT:  Mr. Koenig.

21         MR. KOENIG:  Thank you, your Honor.  I would like to

22  address a few points.

23         THE COURT:  Just address the objections to the

24  presentence report.  Don't address any other points.  Address

25  the objections to the presentence report.

1           MR. KOENIG:  OK.  Well, on the loss amount they have a

2    big section in their brief about how the 2015 amendment made it

3    so you can only look as what Gavin Black did himself, or what

4    Matt Connolly did himself, and that is simply not the law in

5    this Circuit.  The 2015 amendment didn't change the law in this

6    Circuit.  In fact, the 2015 amendment adopted the law of this

7    Circuit.

8           And, importantly, I think it's important to point out

9    that the amendment did not change Section 1B1.3, which says

10   that your guideline calculation is made based on your acts and

11   those of your coconspirators.  And the Second Circuit has

12   recognized that, and so I don't think you can just pick out the

13   ones where a defendant is listed as the one who is the

14   requester.

15          As far as the Skys case goes --

16          THE COURT:  You know, "Without any determined amount

17   of actual loss to financial institutions, the District Court

18   inappropriately included the institutions as victims under

19   Section 2B1.1(b)(2)."  That's the Second Circuit.  I'm kind of

20   bound by what they say.

21          MR. KOENIG:  Well, to the extent that they were

22   arguing that because we used intended loss instead of actual

23   loss, I don't think the case stands for the proposition that

24   you can't also look at actual victims.

25          THE COURT:  Yes, but you said to me -- and I believe

JAO7CONS

1    you -- that you can't calculate actual loss.  It's been

2    repeatedly said in this courtroom -- you weren't here -- that

3    you can't calculate actual loss.  So, OK, if the government is

4    now saying but we can calculate actual loss as to Merrill

5    Lynch, I don't buy it.  OK?  I don't believe it.  You can't

6    talk out of both sides of your mouth.

7            MR. KOENIG:  And I don't think we are talking out of

8    both sides of our mouth.

9            THE COURT:  Good.

10           MR. KOENIG:  When we are talking about restitution,

11   for example --

12           THE COURT:  Restitution is not applicable in this

13   case.  Excuse me while I go to Mr. Parietti's sentencing

14   minutes.  Restitution is not applicable in this case.

15           MR. KOENIG:  I understand that, and that is -- I

16   raised it because that's the context in which we made that

17   argument.

18           Let's just take the example of when someone gets their

19   car stolen.  Right?  Your car is stolen, you're still the

20   victim, you don't get restitution in the amount that you're

21   insured for, but the person who steals the car is still tagged

22   with the intended loss of the value of the car.

23           THE COURT:  The District Court -- my friend Judge

24   Pauley, an absolutely brilliant judge in cases like this,

25   rarely makes a mistake.  "The District Court inappropriately

JAO7CONS

1    included the institutions as victim under Section 2B1.1(b)(2)."

2    It's like really plain English.  It's really plain English.

3              MR. KOENIG:  But do you see my point though that you

4    can have loss that's calculable on contracts, but the fact that

5    they're hedged doesn't mean that that's still not a loss.

6              THE COURT:  I'm sorry.  Ms. Sipperly and Ms. Anderson

7    said ad nauseum that you can't calculate the loss in this case.

8    And if you can't, then I'm saying you can't calculate it for

9    any one individual on any one trade.  You can't calculate the

10   loss.  OK?  Let's move on.

11             MR. KOENIG:  All right.  Another thing that I'd like

12   to address is the abuse of trust.  And they're talking about

13   this as though it's just based on your counterparty and arms

14   length transaction, and there has to be --

15             THE COURT:  No, they had an argument about Deutsche

16   Bank.

17             MR. KOENIG:  True.  But the position of trust here was

18   that, you know, the BBA and the marketplace put in them to do a

19   fair and honest --

20             THE COURT:  Excuse me.  There is no evidence in this

21   case -- if you want to have a Fatico hearing on this, I will be

22   happy to.  There is no evidence in this case that the BBA

23   trusted anyone to do anything.  You shied away from it.

24             MR. KOENIG:  OK.  Well, there still was trust --

25             THE COURT:  For good reason.

JAO7CONS

1          MR. KOENIG:  There still was trust placed in them by

2     the marketplace generally, by their employer.

3          THE COURT:  No, no, no, no.  OK.

4          MR. KOENIG:  It's not vis-a-vis the counterparty.  The

5     Barrett case we cited in our brief says you don't have to have

6     a fiduciary relationship.  I mean it's just common sense that

7     when you are charged with submitting numbers to this very

8     important financial benchmark there is an element of trust by

9     the market.  Whoever you want to say it is, they are entrusted

10    to do it.  And in every single case that we have sentenced so

11    far, the abuse of trust enhancement has been given.

12         THE COURT:  Well, I'm not every single judge.  And let

13    me just say one thing right off the bat -- and I will say it

14    again in a few minutes -- the findings I made in cooperator

15    cases with no challenge weren't findings at all; they were an

16    empty exercise.

17         MR. KOENIG:  Understood.  Understood.

18         THE COURT:  In this case the exercise has been

19    anything but empty.

20         MR. KOENIG:  I agree.  I definitely agree.

21         Well, you know, I think for the rest of it we can just

22    rest on our papers; that's pretty much what we have.

23         THE COURT:  Your papers are fairly comprehensive.

24         MR. KOENIG:  Yes.

25         THE COURT:  OK.  I want to take a five minute break,

JAO7CONS

1    because I need a five minute break, and I will be right back.

2            (Recess)

3            THE COURT:  OK.  I've already done this, but I had

4    intended to begin this part of the sentencing with a tender of

5    tremendous thanks to probation officer Johnny Kim.  Mr. Levine

6    gave me an opening.

7            Officer Kim is the probation officer who is assigned

8    to complex financial cases.  He is assigned to those cases for

9    a reason, both because he is willing to undertake an analysis

10   of the complexities and because he candidly and conspicuously

11   points out to judges where the holes might be, and he has done

12   that in spades in connection with these presentence reports,

13   and I simply could not be more grateful to him for all the hard

14   work that he has done.

15           So, I am required to calculate the sentencing

16   guidelines.  Officer Kim has calculated the guidelines using

17   most though not all of the government's suggested enhancements.

18   He has carefully reviewed the defendants' challenges to the use

19   of those enhancements and has in several cases advised me that

20   I should make the final call because he cannot realistically

21   advise on the question.  And that is particularly true as to

22   intended loss amount.  I'm not sure can I do any better than

23   he, but I will do my duty.

24           I wish to emphasize something that I said during the

25   government's presentation.  In each such instance Officer Kim

JAO7CONS

1    reminded the Court that I had made findings consistent with the

2    government's position in connection with the sentencing of

3    those cooperators whom I was permitted to sentence.  That is of

4    no moment to me today.

5          The cooperators did not challenge the government's use

6    of enhancements or its calculation of loss amount except to

7    note for the purposes of the record that loss amount could not

8    be calculated -- a position with which I wholeheartedly agree.

9    Therefore, nothing that was done in connection with the

10   sentencing of the cooperators can be taken as an indication

11   that I have previously considered and rejected the arguments

12   that are being made by Messrs. Connolly and Black, or that I

13   believe myself bound by "findings" made in connection with

14   cooperators' sentencings.  I am not so bound.

15         I begin in exactly the same place that Judge Rakoff

16   began in his sentencing of the Rabobank defendants who went to

17   trial:  The guidelines, no matter how they are calculated, are

18   so fundamentally flawed that they cannot be relied upon to come

19   up with a sentence that is sufficient but not greater than

20   necessary to effectuate the goals of the sentencing statute.

21   That is true no matter how you calculate the intended loss

22   amount.  And because my faith in the guidelines is so

23   attenuated in these sorts of cases, it is really absurd for me

24   to have to go through this exercise.

25         The government and both defendants agree that the base

JAO7CONS

1    offense level for these convictions is 7.

2           The government seeks a two point enhancement to the

3    guidelines for each defendant for use of sophisticated means.

4    And, specifically, as I read in the government's brief filed in

5    connection with Mr. Connolly's sentencing -- portions of which

6    were also deemed applicable to Mr. Black -- it relies on

7    Section 2B1.1(b)(10)(B) of the guidelines, which provides that

8    an enhancement is appropriate if "a substantial part of the

9    fraudulent scheme was committed from outside the United

10   States."  Defendants have argued this morning that this

11   subsection applies when extraterritorial conduct was undertaken

12   for the purpose of concealing the offense, as when operations

13   are moved offshore from the United States with conduct

14   targeting residents of the United States.

15          Now, that caveat does not appear in the language of

16   the statute, and if I may quote Justice Kagan's rather

17   prescient remark from her confirmation hearing, we are all

18   textualists now.

19          The argument propounded by Mr. Levine and Mr. Breen

20   relies on the instruction in Section 6(c)(2) of Public Law

21   105-184, rather than on the text of the law itself; and the

22   argument fails even if one considers the legislative history,

23   because the legislative history directs the Sentencing

24   Commission to "provide an additional appropriate sentencing

25   enhancement if the offense involved a sophisticated means,

1    including but not limited to sophisticated concealment efforts

2    such as perpetrating the offense from outside the United

3    States."  It could not be clearer from that language that

4    sophisticated means enhancement is available for conduct other

5    than sophisticated offshore concealment efforts.  There were no

6    such efforts in this case.

7           The crime was committed abroad.  Nothing about that

8    fact makes this a sophisticated crime.  The London Interbank

9    Rate is -- no surprise here -- set in London, not in the United

10   States.  All the submissions that were used in calculating the

11   various LIBORs were made to an entity called the British

12   Bankers Association which -- no surprise here -- is

13   headquartered in London.  Certainly, at Deutsche Bank the

14   submissions were made from its submitting desk in its offices

15   in London, by an individual who worked in London.  So, the fact

16   that efforts were made to manipulate LIBOR in London just

17   doesn't make it sophisticated.

18          Yet there can be no question that "sophisticated

19   means," as the dictionary and I understand that phrase, were

20   used in the commission of the offense.  The word

21   "sophisticated" is defined in the dictionary as developed to a

22   high degree of complexity.  As far as the Sentencing Commission

23   is concerned, the degree of complexity that's needed to qualify

24   a crime as one using sophisticated means is actually quite low.

25   When an offense is carried out repeatedly over a long period of

JAO7CONS

1      time, when the essence of the offense is lying -- in this case

2      about a submitting bank's anticipating borrowing costs for a

3      particular currency over a particular tenor -- and when a

4      coordination is required to carry the scheme out, courts in

5      this Circuit and elsewhere have readily applied the

6      sophisticated means enhancement -- not the one cited by the

7      government and Mr. Kim but the one in Section 2B1.1(b)(10)(C).

8      The offense otherwise involved sophisticated means and the

9      defendant intentionally engaged in or caused the conduct

10     constituting sophisticated means.

11             Even those factors are the least of the sophistication

12     inherent in this particular crime.  The setting of LIBOR fixes

13     was an inherently sophisticated exercise.  It involved the

14     evaluation by highly educated individuals at 16 different

15     submitting banks of masses of financial, political and economic

16     information and trends, the distillation of that information

17     into an estimate of each submitting bank's borrowing cost in

18     multiple currencies across multiple tenors, five days a week,

19     every single week, and the transmission of that information

20     worldwide.  At times during the relevant period the submissions

21     also involved evaluating rather strange requests made by the

22     Bank of England, which were addressed to the submitting bank in

23     an effort -- whether misguided or not, I cannot say -- to

24     stabilize a crumbling worldwide financial market.  The setting

25     of LIBOR is an intrinsically sophisticated exercise, therefore

JAO7CONS

1    any effort to manipulate LIBOR by introducing forbidden factors

2    into a submitting bank's submission qualifies in my book as

3    using sophisticated means to commit the crime -- far more

4    sophisticated than if they had been running a telemarketing

5    scam from Canada.  The two point enhancement applies.

6           The government seeks the government seeks a two point

7    enhancement as to both defendants for abuse of trust.  The

8    enhancement is most emphatically denied.

9           Abuse of trust, as I understand the term, means

10   putting one over on someone to whom you owe some sort of

11   special duty, if not always a fiduciary duty, then at least

12   some duty recognized at law, some enhanced duty.

13          The defendants owed no special duty whatever to

14   Deutsche Bank's trading counterparties.  They were in the

15   antithesis of a relationship of trust with those

16   counterparties, and the very terms of their arrangement, as set

17   forth in the ISDA agreement among trading institutions makes

18   that crystal clear.  Caveat emptor says that agreement -- let

19   the trader beware.  And traders are indeed distrustful, hence

20   the hedging of bets on all sides.

21          And while defendants may have owed Deutsche Bank a

22   fiduciary duty of acting in their employer's best interest,

23   they can hardly have been said to have abused that trust.

24   Defendants didn't put anything over on Deutsche Bank.  What was

25   going on was no secret, and was -- from all the evidence I have

JAO7CONS

1    seen and heard -- encouraged, if not orchestrated, by senior

2    officials at the bank for the benefit of the bank.  You can't

3    abuse the trust your employer places in you if your employer is

4    fully aware of and actively encourages what you are doing

5    because your employer believes that your actions will, if

6    successful, enhance its interests.  Neither Mr. Connolly nor

7    Mr. Black advanced his own personal interest at the expense of

8    Deutsche Bank.  And before anyone suggests that Deutsche Bank

9    was betrayed because it incurred untold millions of dollars in

10   penalties and legal fees to clear up this mess, I reject the

11   notion that this can or should be laid at the feet of Matt

12   Connolly and Gavin Black.  The very idea of Deutsche Bank as a

13   victim in this scenario is absurd to me.

14           As further proof that the abuse of trust enhancement

15   is not warranted, let us consider that Gavin Black continued to

16   work at Deutsche Bank for seven years after the Wall Street

17   Journal first published rumors about LIBOR manipulation and

18   through five years of intensive investigation by the Paul Weiss

19   law firm.  Moreover, it appears he would have continued to be

20   employed by Deutsche Bank but for the insistence of the New

21   York State Department of Finance that he, specifically, be

22   fired.  If at any time during the course of a five year

23   investigation that was costing it millions of dollars Deutsche

24   Bank felt that Gavin Black had abused its trust, it would

25   hardly have kept him on as an employee.  Financial institutions

JAO7CONS

1   are not eleemosynary in nature.  People who are caught abusing

2   the trust of the institution are cut loose at the earliest

3   opportunity, and the institution does not need to wait for a

4   command from the government to get rid of them.

5          The government also seeks three-point enhancement for

6   Mr. Connolly on the ground that he acted as a manager and

7   supervisor of the criminal activity.  The basis for this

8   request is that Mr. Connolly "set himself apart by explicitly

9   directing his subordinate Mr. Parietti to make manipulation

10  requests on behalf of Deutsche Bank's pool trading desk in New

11  York."

12         Probation declined to apply the enhancement.  I agree

13  wholeheartedly with Officer Kim's assessment of the matter,

14  albeit for somewhat different reasons.

15         I was unable to discharge myself of my opinion about

16  Mr. Parietti at his sentencing.  That's because Judge

17  Engelmayer sentenced Mr. Parietti.  He did so because the

18  government failed to do what has been the practice in this

19  district for longer than I have been on this bench -- it failed

20  to notify both the judge who took Mr. Parietti's plea and the

21  judge who heard the man testify so that they, judge to judge,

22  could decide which judge was better positioned to sentence the

23  cooperator.

24         Judge Engelmayer asked the government about this at

25  Mr. Parietti's sentencing, because he was mystified that no

JAO7CONS

 1    such letter had been sent and that I was unaware that Mr.

 2    Parietti was about to be sentenced -- which I was, totally and

 3    completely unaware.

 4            Ms. Brown, I believe you have never been an assistant

 5    in this district; is that correct?

 6            MS. BROWN:  That is correct, your Honor.

 7            THE COURT:  Ms. Brown stood up and said she thought I

 8    was aware that Judge Engelmayer was going to sentence Mr.

 9    Parietti, and that the team misunderstood my level of

10    understanding about what was going on, and that the government

11    was not engaged in judge shopping.  Ms. Sipperly and

12    Ms. Anderson -- both veteran prosecutors who served as

13    assistant United States Attorneys in this district for many

14    years -- not Ms. Anderson -- Ms. Sipperly.  I apologize.  I

15    apologize, Ms. Anderson -- sat silently and said nothing in

16    response to Judge Engelmayer's question, which, by the way,

17    which was "Why didn't you send Judge McMahon and me a letter?"

18    Not "What was your understanding of Judge McMahon's state of

19    mind?"

20            MS. SIPPERLY:  I was sitting right next --

21            THE COURT:  Sit down, Ms. Sipperly.  My turn.

22            And so we come to the concept of quibbling.  Quibbling

23    is saying something that is less than a lie but not quite the

24    truth.  It is lying by evasion.  It's a concept that would have

25    been quite familiar to Mr. Parietti because he was a West

JAO7CONS

1    Pointer, and quibbling is quite explicitly a violation of the

2    West Point Cadet's Honor Code, in which a cadet promises not to

3    lie, cheat or steal, or tolerate those who do -- something Mr.

4    Parietti did repeatedly for many years.

5          In responding to Judge Engelmayer -- and I put this

6    charitably -- the government at the very least quibbled.  Or,

7    if I may rephrase what I just said in language that's probably

8    more familiar to federal prosecutors, the government in the

9    person of Ms. Brown -- who knew nothing -- omitted to state

10   something necessary to make her response to Judge Engelmayer's

11   question not misleading.  I wish I could say it was the first

12   such instance of, at the very least, quibbling by the

13   government during the course of this case, but the trial record

14   reveals that it was not.

15         In my opinion, Mr. Parietti -- who, per Agent

16   McGillicuddy's intended loss data was the most prolific

17   requester of LIBOR manipulation in all of Deutsche Bank -- 41

18   of the 130 written requests totaling almost $650,000 of the

19   government's calculation of intended loss from those

20   requests -- vastly more -- vastly more than either of the

21   defendants here -- was guilty of at least quibbling and quite

22   possibly outright lying at several points during his testimony.

23   The jurors were free to believe him or to disbelieve him, and

24   on my reading of the verdict sheet they did not believe him.

25   Mr. Connolly was acquitted on Counts Eight and Ten, both of

JAO7CONS

1   which involved submission requests made by Mr. Parietti.  He

2   was even acquitted on a count where the submission request was

3   allegedly made by him.  But he was acquitted in both instances

4   where the submitting conduct was attributable to his so-called

5   subordinate Mr. Parietti.

6          Mr. Connolly was not a manager or a supervisor of the

7   LIBOR manipulation scheme.  The evidence clearly showed that

8   the scheme was run out of London, and Connolly had very little

9   to do with LIBOR as part of his job.  To my ears, after sitting

10  on this case for three years, Matt Connolly was the person who

11  had the least to do with the manipulation of LIBOR in all of

12  Deutsche Bank -- certainly, of all the actors with whom I

13  became acquainted.  The evidence does not support the

14  government's contention that Mr. Connolly was by virtue of his

15  nominal supervision of the trading desk at Deutsche Bank in a

16  position to stop LIBOR manipulation that was taking place out

17  of the London office of Deutsche Bank, where he did not work

18  and did not supervise anyone.  Many persons who were in a

19  position to stop what was going on -- some of whom were deeply

20  involved in the activity while at Deutsche Bank, others who

21  tolerated it -- were not indicted.  The evidence from Mr.

22  Parietti, I believe, was to the effect that senior management

23  at the bank directed this activity.  This part of his testimony

24  I believe.  I don't believe he did what he did because Matt

25  Connolly told him to -- and neither did the jury -- but I do

JAO7CONS

1    believe his testimony that senior management at the bank

2    directed this activity.  And Matt Connolly was not part of the

3    senior management at Deutsche Bank.

4         He was not unaware of what was going on.  He was aware

5    as far back as 2005 of what was going on.  I can cite

6    Government Exhibit 1-023.  And he did participate in the

7    conspiracy to a very limited extent of making a total of six

8    written submissions, but he was anything but a manager or a

9    supervisor.

10        I note that the government did not argue for such an

11   enhancement for Michael Curtler, who actually was a manager or

12   supervisor of the scheme, and who had the undoubted power to

13   stop it just by saying no and refusing to entertain the

14   requests of his coworkers.  Officer Kim rightly picked up on

15   this discrepancy in recommending that I not apply this

16   enhancement.  I will be guided by his advice.  Mr. Connolly

17   will be punished for his conduct and his conduct alone; he will

18   not be punished instead of punishing Mr. Parietti or Mr.

19   Curtler, and he will not be punished for their conduct; and he

20   will not be punished for going to trial, which is what the

21   government seeks by not enhancing the guideline of a cooperator

22   who was manifestly was a manager, but trying to enhance the

23   guidelines of a noncooperator who was not.

24        Now we come to the most ridiculous part of this

25   exercise which was the calculation of the intended loss amount.

JAO7CONS

1              In the real world, which is to say, the pre-guidelines

2      world, the judges would simply recognize what was obvious:  It

3      was the intent of the defendants and their coconspirators it

4      make all the money they possibly could from trading, and that

5      money necessarily had to be made at the expense of the

6      counterparties to their trade.  And while the actual loss in

7      this case cannot possibly be calculated -- it is impossible to

8      calculate -- the government concedes as much -- the effort to

9      swing LIBOR fix in a particular favorable direction went on for

10     years, and there were billions of dollars in trades during that

11     period, and it is inevitable that Deutsche Bank benefited on

12     some of those trades as a result of tainted fixes submitted by

13     its traders that swung LIBOR in a particular direction for a

14     particular tenor on a particular day.  I can't prove which

15     ones, but I can't help but think of this whole endeavor as some

16     financial services version of the so-called infinite monkey

17     theorem:  Hit keys at random long enough and the monkey will

18     eventually recreate the works of Shakespeare.

19             That is the essence of the LIBOR scheme.  It all came

20     out in the wash, because the other submitting banks were doing

21     exactly the same thing to try to benefit their trading

22     positions, including banks that were counterparties to Deutche

23     Bank, and everyone, including people who did not work for the

24     submitter banks, hedged their bets because nobody trusted

25     anybody.  And since many of the other submitting banks were

JAO7CONS

1    doing the same thing that Deutsche Bank was doing -- on some

2    occasions shading a submission -- Deutsche Bank's efforts on

3    behalf of its traders had to have been canceled out in many

4    instances by the efforts of other banks.  But that does not

5    mean that there was no intended loss.

6            I agree with the government's contention that this was

7    not a victimless crime.  Defendants hoped to benefit Deutche

8    Bank's trades to the detriment of its counterparties.  The

9    swaps market is indeed a zero sum market, and if the

10   coconspirators were not trying to win at trades vis a vis

11   counterparties, there would have been no reason for the cash

12   traders to communicate their desires to the LIBOR submitters.

13   Traders do things that they think will in the end make them

14   money.  They do not waste their time doing things they don't

15   believe will make them money.

16           So, while each trade was worth just fractions of

17   pennies, and while it is the net value of the trader's book,

18   not any individual trade, that is ultimately relevant to the

19   bank's and the trader's bottom line, the intended loss -- the

20   amount of the intended loss -- was not zero.

21           A word needs to be said about the trim.  The scheme

22   charged has always struck me as particularly unlikely to

23   achieve tremendous success -- except of the infinite monkey

24   theorem variety -- precisely because the participants had no

25   control over its likelihood of success.  The BBA's formula for

JAO7CONS

1    calculating LIBOR for a particular currency at a particular

2    tenor -- the trim, the averaging of the eight middle

3    submissions out of the 16 total submissions -- was designed to

4    eliminate or minimize the ability of any one submitting bank to

5    manipulate the fix.  There was simply no way for these

6    defendants and their fellow Deutsche Bank employees to

7    guarantee that a particular day's submission would move the fix

8    in a particular direction.

9           But that didn't stop the submitting banks -- including

10   Deutsche Bank -- from trying to move the fix.  The reason they

11   tried to move the fix was to win at trades.  It was a long shot

12   but, who knows, if everything lined up just right it just might

13   help.  I therefore reject the notion that the existence of the

14   trim negates the possibility that the defendants intended any

15   loss.

16          The defense argues that the government has not met its

17   burden to prove the amount of intended loss.  And the defense

18   is correct in the respect that, because of the way the market

19   works, neither the government nor this Court can make an

20   accurate assessment of the amount that's properly attributable

21   to the defendants' scheme.  The government candidly admits that

22   it cannot calculate actual loss; it does not have the

23   information that would be necessary to make such a calculation,

24   which would involve knowing things like the overall exposure of

25   the counterparty to LIBOR on any particular day on which

JAO7CONS

1     Deutsche's Bank's submission of a fix actually ended up moving

2     LIBOR in a particular direction.  The government might have to

3     take into account counterparty hedging in order to calculate

4     actual loss, although it is correct that the defendants don't

5     get to benefit from those hedges, even though their knowledge

6     that everyone was hedging -- just as they were hedging -- is

7     part of any trader's daily calculus.  The government would have

8     to take into account any manipulation of LIBOR by other banks

9     on the same day at the same tenor because only Deutsche Bank's

10    manipulation would matter for these defendants, and as

11    government acknowledged, this practice was widespread.  Indeed,

12    at certain times, such as during the height of the 2008

13    financial crisis, submissions were actually being manipulated

14    at the request of the Bank of England.

15          So the government has come up with a proxy formula for

16    calculating intended loss.  The government's methodology can be

17    attacked as inaccurate for all the reasons proffered by the

18    defendants.  And as will be seen, I actually take issue with

19    some of what the government has done.  But the government does

20    not need to prove intended loss with mathematical precision,

21    and the mere fact that it does not do so does not zero out

22    intended loss.

23          Now, the usual thing that happens in cases like this

24    is that the Court accepts the government's calculation of

25    intended loss amount all the while bemoaning its inadequacy --

JAO7CONS

1    as Judge Rakoff did at the Rabobank sentencing -- and then

2    proceeds to ignore the resulting guideline, which is always

3    astronomically high, and sentences on some far more rational

4    basis.  It's a wonder to me that district judges should be put

5    in this position, but we are.

6         I have looked at the government's calculation.  I have

7    tried to address some things in it that I found troubling.  In

8    so doing I took into account the November 2015 amendment to the

9    guideline.  Mr. Koenig is correct, contrary to the defendants'

10   argument, Section 2B1.1, comment note 3 (A)(ii) did not work a

11   radical change to the intended loss guidelines in the context

12   of conspiracies or limit the intended loss calculation to

13   losses related to the conduct of a particular defendant.  I

14   don't deny that the conduct attributable to a particular

15   defendant is -- and for me always is -- an important factor in

16   the sentence that is imposed, but the amendment in 2015 did not

17   make it impossible to consider the conduct of coconspirators or

18   the actions of coconspirators in doing an intended loss

19   calculation.

20        The amendment clarified that the sentencing court had

21   to make a subjective inquiry into the amount of loss intended

22   by the defendant -- whether through his own acts or the acts of

23   his coconspirators -- rather than relying on some sort of

24   objective test, which had apparently been the law in some

25   circuits.

JAO7CONS

1        That the amendment of Section 2B1.1 did nothing more

2   than what I just said is underscored by the fact that at the

3   very same time the Commission also amended Section 1B1.3 of the

4   guidelines concerning jointly undertaken criminal activity.

5   That amendment stated that a defendant could be held

6   accountable for the conduct of others in a jointly undertaken

7   criminal enterprise if the conduct fell within the scope of the

8   enterprise, the conduct of others was in furtherance of that

9   criminal activity, and the conduct of others was reasonably

10  foreseeable to the defendant.  The Commission specifically

11  noted this amendment was "not intended as a substantive change

12  in policy."  The amendment to Section 2B must be read in the

13  context of this statement made simultaneously by the

14  Commission.

15        Finally, I found no Second Circuit law suggesting that

16  anything changed after November of 2015, which itself suggests

17  that the 2015 amendments were not as portentous as the

18  defendants insist they were.  I know that the Eleventh Circuit

19  has at least on one occasion resisted the siren call of

20  limiting intended loss in connection with jointly undertaken

21  criminal activity to the portion of loss that was caused by the

22  defendant's own actions rather than those of his

23  coconspirators.  That was in United States v. Leyva, 752 Fed.

24  App'x 825, a 2018 case from the Eleventh Circuit.

25        So I cannot agree with the defense that the government

JAO7CONS

1    is not allowed to include the activities of other traders who

2    asked Messrs. King and Curtler to move Deutche Bank's

3    submissions under the Gavin Black intended loss umbrella or the

4    Matt Connolly intended loss umbrella.  All the testimony at

5    trial was to the effect that everyone knew what was going on

6    and everyone to a greater or lesser degree participated -- with

7    many traders making occasional requests and with Mr. Parietti

8    making the most by a wide margin, and not at the direction of

9    Mr. Connolly.  They were all in it together.  Deutsche Bank

10   coconspirators intended to benefit their collective trading

11   positions to the detriment of their counterparties.  Thus, it

12   is entirely reasonable to hold these two defendants responsible

13   for the collective intended loss, and there is no need to

14   resort to some "they wanted to enhance the bonus pool"

15   argument, as to which there is no evidence other than Mr.

16   Parietti's statement, which appears to have been injected into

17   his testimony by the government, and which I don't believe.

18          The government has identified 130 instances starting

19   on February 21, 2005 and ending on March 17, 2010, in which

20   Deutsche Bank traders in the U.S., London and on the Continent

21   made written requests to the Deutsche Bank submitter to skew

22   the USD fix, on dates in which Deutsche Bank's submission was

23   one of the eight submissions that survived the trim.  16 of

24   those written requests, with the government-estimated intended

25   loss amount totaling $166,740.41, were made by Mr. Black; six

JAO7CONS

1    with an intended loss amount of $47,036.39, per the

2    government's formula, were made by Mr. Connolly.  43 of the 130

3    requests occurred after Mr. Connolly left Deutsche Bank.  He

4    withdrew from the conspiracy, and they will not be factored

5    into his intended loss amount.  Additionally, two more which

6    relate to four or five trades of Mr. Parietti's, relate to

7    counts of acquittal, and I don't sentence people for conduct

8    for which they were acquitted, even if it was part of the

9    conspiracy, and those too must be backed out.  All 130 will be

10   factored into Mr. Black's intended loss amount because he at

11   all relevant times worked at Deutsche Bank.

12          Now, there was testimony that requests were

13   occasionally made orally, not by mail.  The government has

14   invented 74 oral requests, of which there are by definition no

15   record -- they cannot be tied to specific dates, they cannot be

16   tied to requesters, or to any certainty that Deutsche Bank was

17   one of the eight submissions surviving the trim.  And the

18   government uses the average of all 130 written requests as a

19   proxy for the amount by which these hypothetical requests led

20   to an intended loss, which is itself problematic as the

21   intended loss numbers assigned to the 130 written requests

22   range from zero on four days attributable to Mr. Black to

23   $261,000, and including the two or three very large intended

24   loss days in the calculation with a whole lot of smaller

25   numbers wildly inflates the bottom line.

JAO7CONS

1          I am unconvinced by the government's presentation.

2    The government is required to prove intended loss by evidence

3    that is reliable and specific, and while it need not be proved

4    with precision, I cannot use the kind of hypothetical numbers

5    relating to hypothetical conversations as a basis on which to

6    sentence these two men.  Moreover, lacking dates, I cannot

7    account for Mr. Connolly's departure from the bank's employ.

8    And as he did not work in London, and there is no evidence that

9    he or anybody else ever made a request by telephone, I can't

10   attribute any of the verbal requests to Mr. Connolly.  I thus

11   decline to rely on any of the 74 verbal requests in calculating

12   intended loss for either defendant.

13          Mr. Black argues that the government cannot even

14   reliably calculate the intended loss to his counterparties

15   because it cannot reliably identify his trades let alone his

16   net position.  To support his argument, he relies on the

17   government's admission that Deutsche Bank's book-to-trader

18   mapping and the corresponding net notional analyses were so

19   imperfect that the government could not rely on them at trial.

20          The government did indeed admit that these analyses

21   "may well be unreasonable and inadmissible," and it is tempting

22   to hoist the government on its own petard.  However, it is the

23   case that intended loss calculation need not rely on evidence

24   that would have been admissible at trial, and that the

25   defendant cannot avoid an intended loss calculation that relies

JAO7CONS

1    on the best data available -- even if the data is incomplete.

2         I equally reject the defense argument that the

3    defendants could have intended no loss because even if an

4    alleged counterparty victim lost a small amount of money on a

5    particular swap as a result of an alleged request, it likely

6    earned offsetting profits on other swaps transactions.

7    Defendants are not entitled to benefit from hedges that

8    counterparties fortuitously happened to have.  Perhaps in an

9    actual loss scenario they might get a credit, but certainly not

10   in an intended loss scenario.

11        So, I will calculate intended loss by applying the

12   government's methodology as set out at pages 15-16 of its

13   sentencing memorandum and in Special Agent McGillicuddy's

14   affirmation to the 130 written requests in the case of

15   Mr. Black and to fewer than 87 of the 130 requests in

16   Mr. Connolly's case, because I have to back out the counts of

17   acquittal.  I acknowledge that the government's formula is far

18   from perfect.  It is a Rube Goldberg sort of algorithm.  But

19   the guidelines do not require accuracy; they require that there

20   be a reason for the algorithm.  And the government has come up

21   with a methodology that works for me, given my conclusion that

22   some loss was intended.

23        The government will no doubt protest that the Court's

24   calculation understates the culpability of these defendants,

25   especially Mr. Black.  Indeed, the government argues

JAO7CONS

1    vociferously that its $4.7 million estimate understates their

2    culpability.   To which I say this on the subject of loss:

3    After hearing all the evidence in this case, my best guess is

4    that Mr. Black and Mr. Connolly, and the whole crew at Deutsche

5    Bank, and at Bank of America, and Rabobank, and at Citibank,

6    and everywhere else, were acting so much at cross purposes that

7    if we could actually reconstruct the losses suffered in

8    connection with trades done by all of the cash traders at

9    submitting banks, they would end up canceling each other out,

10   which means the ultimate actual loss from the scheme would be

11   negligible if it existed at all.

12        This does not excuse or cancel out the misbehavior

13   that was committed here.   It does, however, suggest that the

14   government's $4.7 million intended loss number for these two

15   defendants -- and even the somewhat lower number that I have

16   calculated -- is way out of line with any actual loss that may

17   have been suffered by anyone.

18        The ten victim enhancement will not be imposed.

19   United States v. Skys, the Second Circuit, made it perfectly

20   clear that a victim for purposes of this enhancement must be

21   someone who suffers actual loss.   The government has attempted

22   to prove actual loss for ten people.   I am unconvinced that the

23   government can prove actual loss for anyone in this case in any

24   instance.   I cannot and will not rely on those numbers.

25   Furthermore, since I do not intend to issue a guideline

JAO7CONS

1    sentence in this case, it would be a waste of time to have the

2    Fatico hearing to which Mr. Levine would undoubtedly be

3    entitled if I were to do anything other than decide not to

4    impose that particular enhancement.

5         Mr. Black's guidelines calculation is, therefore as

6    follows:  Base offense level 7, intended loss from the

7    conspiracy totaling $2,613,214, which leads to a 16 point

8    enhancement under the utterly ridiculous fraud guidelines chart

9    at 2B1.1(i), a two point enhancement for sophisticated means,

10   for a total offense level of 25.  His Criminal History Category

11   is I; guideline range 57 to 71 months, much of which is

12   attributable to the fact that the fraud enhancement chart is

13   heavily weighted toward increasing the number of enhancement

14   points at the lower end -- a fact that has been criticized on

15   more than one occasion by this and other courts and has always

16   made me highly skeptical of the chart.

17        I note that the government's estimate of loss -- the

18   government's estimate -- not Mr. Levine's estimate -- but the

19   government's estimate of loss actually attributable to

20   Mr. Black would not add 16 points but would add 12, because it

21   would be under subsection G, and it's just above subsection F

22   which tops out at 150,000, which would add ten points.  This

23   chart is just so ridiculous it's incomprehensible.

24        Probation recommends that Mr. Black serve a period of

25   five months' incarceration followed by two years of supervised

JAO7CONS

1    release, and that he pay a fine of $300,000.

2            I now turn to Mr. Connolly.  The government has

3    behaved throughout this prosecution as though Mr. Connolly and

4    Mr. Black are in exactly same position.  From where I sit

5    they're not.  For one thing, Mr. Connolly left Deutsche Bank in

6    early 2008.  Yet the government inexplicably assigns the exact

7    same loss amount to him as to Mr. Black, who remained employed

8    at Deutsche Bank for another seven years, including the last

9    two years of the alleged scheme.

10           43 of the written requests on the government's chart

11   occurred after Connolly left the bank, and so withdrew from the

12   conspiracy as far as this Court is concerned.  I will not

13   include them in calculating his total intended loss, which

14   deducts $1,128,803.03 from the intended loss amount that was

15   applied to Mr. Black.  And I am also deducting the amounts

16   relating to Counts Eight and Ten, which are the counts of

17   acquittal.  So, the amount comes out to $1,411,733.73.

18           Mr. Connolly's total offense level is calculated as

19   follows:  Seven points for the base offense level, 14 point

20   enhancement for the intended loss of $1.411 million.  His much

21   lesser intended loss amount doesn't give him much credit under

22   the fraud chart, and even that is extraordinarily excessive.  I

23   want to do the same exercise for him that I just did for

24   Mr. Black.  $46,000 is attributable to requests made by him.

25   That's a six point add, not a 14 point add.  A two point

JAO7CONS

1    enhancement for sophisticated means.  Total offense level of

2    23, Criminal History Category I, guidelines 46 to 57 months.

3         Again, probation, treating him in the same way as

4    Mr. Black was treated, recommends a five month sentence

5    followed by two years' supervised release and a $300,000 fine.

6         OK, you all have your exceptions.

7         Seven points for the base offense, 14 point

8    enhancement for 2B1.1(b) for intended loss of $1.411 million,

9    which is much in excess of the six point add-on for what he

10   actually did.  OK?

11        All right.  So, now we've gone through that exercise,

12   and I have told you that I don't intend to give a guideline

13   sentence -- and I don't.  So, I guess I'll hear the government

14   on sentencing.

15        MR. KOENIG:  Thank you, your Honor.  I won't be long.

16   In spite of what the Court said about the difficulty in

17   estimating loss, what the defendants engaged in was a big

18   deal -- it was a really big deal.  They had privileged access

19   to the very, very important financial benchmark, and they

20   abused it.  And this wasn't just slip some money out of the

21   church collection plate.  This was something where the harm

22   went beyond Deutsche Bank and their counterparties.  So, you

23   know, were they the only ones to do it?  No.  But their conduct

24   was significant and it cannot be ignored.  It went on for

25   years, and it went on over and over.  So, a significant period

JAO7CONS

1    of incarceration and a significant fine will send a message

2    that that kind of conduct will not be tolerated, and it also

3    will change the calculus for anybody who is out there who

4    thinks that maybe I should engage in a fraud.

5              THE COURT:  How succinct.

6              MR. KOENIG:  Thank you.

7              THE COURT:  I thank the government.

8              Mr. Breen?

9              MR. BREEN:  Your Honor, as the Court has recognized,

10   the guideline calculation is wildly skewed.

11             THE COURT:  Yes, whatever it is, I'm not applying it,

12   so let's talk about your client.

13             MR. BREEN:  OK.  You saw the letters we submitted on

14   behalf of Mr. Connolly.  You know that he is a loving family

15   person committed to his family, his children, his wife.  He is

16   the backbone of that close-knit family and his extended family

17   as well, his sisters, his brothers, his nieces and nephews.  He

18   is a humble man and has shown that he is not a flashy Wall

19   Street person; he is somebody who went and did his job until he

20   left it.  He is somebody whose family cares for him deeply and

21   who need him around.  I think that should count in your

22   consideration.

23             In terms of the sentence here, the vast number of

24   people who have been sentenced in the LIBOR cases have gotten

25   very little or no time.  And some of those people -- you know,

JAO7CONS

1    the example of the person who received the most as somebody who

2    had -- the spider network guy, the book, had people at

3    different banks, and they were moving rates by working together

4    and colluding and doing all those things, you know, that's not

5    really an example that has any relevance here.

6              Out of all the defendants in all the cases, we

7    struggle to find anybody whose conduct was as narrow as

8    Mr. Connolly's -- you know, people who were actively involved.

9    I think to the extent that Mr. Parietti talked about Matt

10   Connolly being his boss was unbelievable, I think, to the jury.

11             THE COURT:  Well, you you've already heard what I

12   think of it.  And I read into the jury's acquittal on the

13   Parietti counts that the jury didn't believe it either.

14             MR. BREEN:  Because they didn't believe that, I mean

15   what is there to believe about what Matt Connolly did?  It's

16   only his own e-mails, right?

17             THE COURT:  Well, his own e-mails are his own e-mails,

18   you know.

19             MR. BREEN:  And the jury convicted him presumably on

20   his own e-mails, but that's really it.  The rest of the scheme

21   should be viewed as acquitted conduct for that reason.

22             THE COURT:  Well, no, come on, he was convicted of

23   conspiracy.

24             MR. BREEN:  Well, he was.  Technically he was.

25             THE COURT:  He was convicted of conspiracy.

JAO7CONS

1          MR. BREEN:  But he wasn't convicted of anybody else's

2     conduct.

3          THE COURT:  I agree with you that his participation in

4     this conspiracy was -- as far as my reading of the evidence is

5     concerned -- negligible, far smaller than that of anybody else

6     at Deutsche Bank.  And I've kind of scoured the Rabobank stuff,

7     and it appears to be a lot less than anybody at Rabobank.  I

8     haven't kept track of what was going on in the London cases.  I

9     know some people got off, and I know some people got small

10    sentences, and there is some guy who committed obstruction of

11    justice and bribed people, and he got five and a half years

12    apparently.

13         MR. BREEN:  Right.  Of course none of that -- and that

14    was our review too.

15         THE COURT:  And on the great scheme of things if he is

16    like the worst person in the whole thing, Mr. Connolly is down

17    here, I will grant you that.  OK?

18         MR. BREEN:  So, your Honor, we ask that he be

19    sentenced appropriately, given that, and that he be sentenced

20    to a period of nonincarceration and a modest fine.  I think

21    there is eight out of 24 of the defendants who received no time

22    at all, nonincarceratory sentences.  Granted, some of those

23    were cooperators, we understand that, but, you know,

24    cooperators who on that scale are at the highest level

25    receiving no time.  The government's request for a fine of $3

JAO7CONS

1    million is that's just hugely disproportional, and I think the

2    request for any time at all is disproportional.  So, we ask for

3    a nonincarceratory sentence and a modest fine.

4              THE COURT:  Thank you, Mr. Breen.

5              Mr. Levine?

6              MR. LEVINE:  May I speak from here, your Honor.

7              THE COURT:  You always did.

8              MR. LEVINE:  Thank you very much.

9              THE COURT:  I think of that as your spot in my

10   courtroom.

11             MR. LEVINE:  Your Honor, the purpose of today is

12   punishment.  That's what we're here for.  Mr. Black respects

13   this country's legal process, he respects what is going to

14   happen here today, and just as he has years ago since years ago

15   when he agreed to come here and waive extradition --

16             THE COURT:  Mr. Levine, you are going to have to move

17   over there.  Either speak up or use the microphone.  Shout.

18             MR. LEVINE:  What I was saying, your Honor, was

19   that -- I will start again, to make sure you've heard it.

20             THE COURT:  I heard it.

21             MR. LEVINE:  OK.  The point is that Mr. Black has

22   subjected himself to the jurisdiction of this court and

23   respects this process.  I hope given the special health

24   circumstances that Mr. Black is going through that the Court

25   appreciates -- I'm sure you do -- that he has come today, not

JAO7CONS

1   sought an adjournment, and done everything he could to be in

2   this court today.

3          We ask today for only one thing, and that is fair,

4   proportionate and just punishment.  And obviously the standard

5   here is what punishment is sufficient but not greater than

6   necessary to achieve the ends of sentencing.  And our

7   recommendation, the Court knows -- which we spent considerable

8   time on, recognizing the seriousness and the nature of this

9   case -- is that the appropriate sentence that is certainly

10  sufficient would be to sentence Mr. Black to a term of

11  supervised release, with a special condition potentially of

12  home confinement.  And as we outlined to the Court, we have

13  made efforts to ensure that that home confinement can be served

14  on the same terms as served in the United States, including

15  electronic monitoring or any other kind of circumstance the

16  Court deems appropriate to provide Mr. Black an equal

17  opportunity to the same sentences that he would have if he was

18  a United States resident.

19         How do we get there?  Well, we start where I imagine

20  the Court would like to start, the work of the probation

21  department and Mr. Kim.  And obviously there is a wide range

22  here of available sentences, and after thoughtful

23  consideration, professional consideration, you know, Mr. Kim

24  and the probation department as a whole determined that this

25  sentence should fall at the very low end of the range of

JAO7CONS

1    sentences that are available, a short period of incarceration

2    in the United States followed by supervised release and

3    substantial fine.

4         While we agree with probation in terms of where you

5    situate the appropriate place to sentence in this case, we

6    think they have that right, and we think it's based on

7    obviously you have seen the factors included in their

8    recommendation, which includes disparate impact, the conduct

9    and looking at this, stepping become a little bit and looking

10   at this whole picture.

11        And there is a meaningful difference obviously between

12   what we're asking for and what probation recommends, because we

13   are recommending if there is a form of confinement it should be

14   in the United Kingdom where Mr. Black is from.  I recognize

15   there is a difference between that and institutional

16   confinement -- there is no question.  What we think -- and I

17   will talk about it a little today -- that when you factor in

18   all that happened, the punishment that will be meted out by the

19   court, and the other factors, including health factors and

20   issues of non-U.S. resident being incarcerated, the other

21   situations including the complete loss of Mr. Black's career,

22   the public shaming that has occurred, and other factors, that

23   that modest change -- and it is a modest change -- is fully and

24   wholly justified here, because it still provides more than a

25   sufficient sentence.

1          You know, I think, your Honor, that just starting out

2     with going through the factors, there is no dispute here that

3     Mr. Black is a first-time offender.  There is obviously no

4     violence or public threat here.  There is no history of any

5     misconduct.  In fact, the probation department notes -- and I

6     will talk about the letters in a bit -- but you have other

7     evidence that Mr. Black has otherwise lived a well-lived, law

8     abiding, and in many respects very laudable life.  We are not

9     making any excuses today, but I'm simply asking that Mr. Black

10    be sentenced -- as I know the Court will -- based as an entire

11    human being and how he has behaved for the years he has been on

12    this earth, and not just based on the verdict, which is the

13    worst thing he has done.

14          There is clearly no question that Mr. Black is someone

15    who can conform his conduct to the law, which is an important

16    factor here.  He has been on bail now for over three years.

17    Those conditions -- which has been agreed by everyone -- and he

18    has had no issues whatsoever.  And that includes that fact that

19    we've all adjudged he didn't even need to be supervised; he has

20    traveled back and forth to the United States frequently in

21    fact.  He's been here every time.  There is no issue about his

22    conduct or any other reason that there is a concern about

23    antisocial behavior, which obviously this Court has to consider

24    in making a determination.

25          Similarly, the probation department clearly says it

1    believes there is no risk of recidivism here; there is no

2    concern that he needs to be personally deterred.

3          You know, you have already commented on these things,

4    so I'm not going to go through them all, but just looking at

5    the case, we're not offering any excuses today.  We gave you a

6    view of this case but the jury spoke, and we certainly

7    understand that.

8          As you said, Mr. Black behaved within a system of

9    Deutsche Bank, but this conduct was not limited to him; it was

10   obviously part of not only this bank but many, many banks.  It

11   was encouraged, it was not concealed.  And also very

12   importantly, although Mr. Black was in London, he of course was

13   not only a submitter, but he had no ability to control the

14   submissions, he had no ability to input the submissions; those

15   decisions were made by those senior to him, and frankly his

16   requests to be rejected.

17         So, I would say when you look at across the board,

18   Mr. Black's conduct also falls -- you know, of all the people,

19   of all the LIBOR gin joints in this particular case -- and

20   there are dozens and dozens and scores of people that are

21   involved, according to government -- Mr. Black is on the very,

22   very low end, in fact in this case, the very, very bottom of

23   that.

24         The task force has thought about offenders like this.

25   The guideline comment from 2018, we respectfully submit that at

JAO7CONS

1    least with respect to how we think about the loss -- and I'm

2    not challenging the court's ruling -- we think he really is of

3    the type of offender, first time conduct, otherwise no reasons

4    to believe he will reoffend, that should be the kind of person

5    in which a term of nonincarceration should be seriously

6    considered.  I say nonincarceration.  There is no doubt about

7    punishment.  Mr. Black has and will be punished here, punished

8    very severely.  The only question is how much is needed.

9              You commented on this a little, Judge, but I want to

10   talk about one factor that I really think looms incredibly

11   large here, and that is the requirements under 3553 to not

12   impose sentences that have disparate effect.

13             Plainly for Deutsche Bank for this part nobody is

14   suffering a sentence of imprisonment.  The more senior folks,

15   the decision makers, we have Mr. Curtler, he obviously has been

16   sentenced to a nonincarceratory term; Mr. King, who is a

17   decision maker, the recommendation notes Mr. King's role.  It's

18   not a question of imprisonment.  He obviously has not been

19   charged at all.  He hasn't suffered any penalty whatsoever

20   other than the fact that he had to come and testify.  That's

21   very significant because this is a case which is not common

22   where the government cooperated down quite frankly.

23             THE COURT:  You think it's not common?  You should do

24   more drug cases, Mr. Levine.

25             MR. LEVINE:  Well, when I did drug cases, I didn't do

JAO7CONS

1    that.

2             Mr. Parietti also -- who as the Court pointed out had

3    a very robust -- under the government's analysis -- set of

4    requests, he also is facing no time of incarceration.  But that

5    only begins to tell the disparate story.

6             As this Court has noted today, and as the government's

7    own settlement with Deutsche Bank notes -- and frankly as the

8    testimony notes -- this is not about just Mr. Black.  He is a

9    trader on the desk.  You have the senior folks -- including

10   senior folks that are listed on this loss -- Mr. Nichols,

11   Mr. Clody, Mr. Jane, the entire Deutsche Bank organization --

12   that are absolutely responsible, I would argue much more

13   culpable than Mr. Black.

14            I'm not making any excuse today for his conduct, but

15   I'm saying let's look at the context.  Those people, they're

16   not thinking about prison, they're thinking about nothing.

17   There is no sanction to them of a criminal nature at all.  So,

18   Mr. Black is already going to absorb an enormous amount of

19   punishment, while the people that one would think the

20   government would find more culpable are walking away with

21   nothing.

22            Which brings me to the chart we talked about before,

23   the people that you've looked at for loss.  There is a couple

24   of observations I'd like to make, your Honor, because we also

25   know that Deutsche Bank did a massive investigation.  They

JAO7CONS

1    fired lots of people -- not Mr. Black.  He sat on the desk

2    trading for years.  But even if you look at their chart, your

3    Honor, the disparate impact is difficult to not consider.  For

4    example, on the chart we have Ms. Mackler and a man named

5    Pasquele Fluant.  They're not coconspirators.  They're not on

6    the government's list of coconspirators.  But their losses are

7    nonetheless attributed -- not only are they not charged,

8    they're not even conspirators.  And I note that Ms. Mackler has

9    a loss of almost the identical amount as Mr. Black.  OK, we're

10   not talking about the culpability here, we're talking about

11   relative punishment, no charge.

12        Mr. Rickman on the chart, he is a coconspirator,

13   $363,000 of loss, not charged, will face no sanction.

14   Mr. Nichols will face no sanction.  Mr. Pastorella, he was

15   actually someone who shared a trading book with Mr. Black.  He

16   is on this chart, again no sanction whatsoever.

17        So, I'm not here arguing, Judge, or asking do not

18   punish Mr. Black.  You should punish him today under our system

19   and on this stage.  But what I'm saying is basic fairness

20   informs that the way that this is being done is that

21   Mr. Black's culpability is taken into account.  But none of

22   these other folks who the government even says are how you get

23   to this harm.

24        Now, of course our view is that because the different

25   traders didn't know each other's net positions, it's hard to

JAO7CONS

1    say Mr. Black knew anything that should be attributed by these

2    other people, because he doesn't know what their position is,

3    so their requests don't necessarily affect him.  But, fine, all

4    I'm saying is none of these folks are going to get any

5    punishment.

6          If you look at it, 65 percent of the chart is the

7    cooperators.  If you include Mr. King in the noncharged people,

8    that's 36 percent of the charge.  So, you are talking about

9    Mr. Black has six percent of it.  OK.  If you're going to mete

10   out punishment, I'm just saying it needs to be proportionate to

11   that.  Now that also does not take into account.

12          You have seen Rabo.  I'm he happy to talk about Rabo.

13   None of the people that went to trial are going to jail at all.

14   Whether that's right or wrong, that's the fact.  And those

15   people were far more culpable; they were like Curtler and King;

16   they were submitters with decision making authority and

17   everything else.

18          Mr. Thompson who pled guilty, fought extradition up

19   the wazoo, got 60 days in prison after all that, couldn't be

20   tried with the Rabo folks; I don't think he is similarly

21   situated.  The other Rabo people, no jail time, no jail time at

22   all.

23          THE COURT:  Well, two of them because of the Kastigar

24   problem.

25          MR. LEVINE:  But the point is if you're looking at it

JAO7CONS

1  relatively, I'm not here today to ask you not to punish

2  Mr. Black; I'm just asking you for proportional punish.

3         Then we move on to the other issue which the Court has

4  mentioned today:  What about all of these other banks,

5  Barclays, Citibank?  All have these agreements, those

6  agreements all reference numerous individuals -- depending on

7  which agreements you look at, 40 to 100 names.  Not one -- not

8  traders, not senior executives, no one.

9         So, if I take Mr. Koenig's comments, you know, about

10  what we need to do here, there is no sense in which the

11  government's approach suggests that they believe that there is

12  the need for all of this punishment for these two frankly

13  base-level nonsupervisory folks that's going to somehow make

14  things better.  I don't think that general deterrence as we

15  pointed out, and the DOJ said in our research, is achieved when

16  people have an interaction with law enforcement.  The actual

17  punishment is not the key point.  There is none of these

18  people -- I will make a wager, Judge, that if we contacted --

19  if the government contacted all of the banks and said send us

20  to this courtroom right now every single one of those scores of

21  people that have not been prosecuted and asked them would you

22  change places with Mr. Black and Mr. Connolly, I think they're

23  going to say, oh, my God.  I think the conduct has been

24  deterred.

25         Similarly, the government has always tried to suggest

JAO7CONS

1    that this is this very narrow piece of LIBOR conduct.  They

2    don't want to talk about low balling; they want to talk about

3    the Bank of England.  They don't want to talk about the actual

4    events during the crisis, because that leads to a massive

5    inquiry about the things that really did cause an issue for

6    LIBOR.  OK, but you can't have it both ways.  You can't make,

7    as they do in their papers, these guys the face of that, when

8    you recognize that even under their scenario this is not the

9    big case.  This is conduct that should not have happened based

10   on the jury's verdict, but it is not the overall LIBOR story.

11   And that story the government has fought to not tell.  That's

12   fine.  We're still culpable based on the verdict, and we have

13   to answer for it, but let us answer for what we actually did

14   and not all of these other folks who the government decided not

15   to prosecute for conduct which is much more complicated and

16   more serious.

17          It is notable Mr. Black is not a man -- like a lot of

18   people -- he didn't have a lot of jobs; he basically had this

19   job.  He sat on the desk for years.  That career is completely

20   gone.  Effectively he will never work in the financial services

21   industry again.  It's going to be very difficult for him to

22   work.  He hasn't worked since 2015.  That is a very heavy

23   sanction for any person.  It's not the end of it, but it is

24   ironic that Deutsche Bank did a whole investigation -- which

25   the government the Court has found had a hand in, and in their

JAO7CONS

1    judgment, even with all the pressure they were under, of all

2    the people they fired, including getting rid of Curtler and all

3    of these other guys, he is still sitting on his desk.

4          So, all I'm saying is in terms of relative

5    culpability, if you credit what Deutsche did -- because the

6    government sponsored it and they were going to put witnesses on

7    about it -- then credit it.  And their view is of all the

8    people around here we're not going to fire him; we're going to

9    give him a letter.  But who are we punishing?  And how are we

10   punishing?  Again I'm not making excuses; I'm talking about

11   relative culpability.

12         Now let me talk about what I really think come down to

13   the factors that ultimately I hope the Court will allow the

14   adjustment that we're asking for.

15         First, Mr. Black is, as you know, a noncitizen; he is

16   really a stranger in this country.  He knows this country

17   because he has been spending a lot of time on this case.  He

18   will not, based on the policy, be eligible to put in a camp or

19   another institution.  He is going to be designated it appears

20   to a private prison facility.  Obviously, this administration

21   has changed course from the previous administration in deciding

22   that that's something they want to do for noncitizens.  We take

23   the Office of Inspector General's reports very seriously.

24   These places are very harsh.  Mr. Black obviously is going to

25   be put in a facility which is higher security than he would be

JAO7CONS

1    designated simply because he happens to not be from the United

2    States.  And there is more than a reasonable basis to believe

3    that Mr. Black will not obtain proper medical or other care in

4    such a facility.  And we will talk about in a moment that

5    issue.

6              But in terms of disparate impact treatment, that's a

7    very harsh reality -- because of things that have nothing to do

8    other than the fact he was brought here as opposed to the UK --

9    that Mr. Black should suffer an additional heaping of

10   punishment above what others will suffer in places that are

11   really not doing honor to our system.

12             Now, I understand that we have situations here and we

13   have other kinds of offenders that are not here, that are out

14   here, but there are limits to what the Court can do, and there

15   are other considerations -- safety and other things -- where we

16   have to use these kinds of places -- but it's not necessary for

17   Mr. Black, and I think respectfully it's not fair for

18   Mr. Black.

19             Also, there will be then an indeterminate period of

20   detention for removal, which of course is -- Mr. Black only

21   came here because he was asked to come here.

22             THE COURT:  Well, it's actually a question I asked

23   myself.  He is not illegally in the country.

24             MR. LEVINE:  I will tell you there are some things

25   that one just has to sometimes -- I have to accept.  And while

JAO7CONS

1    it makes no sense to me, and we will obviously consent to

2    removal, he is happy to leave now and not come back, but it's a

3    bureaucratic process that is one that is also, in addition to

4    being a difficult one -- right now overburdened in a way that

5    our country's immigration system has never been overburdened,

6    so adding another person who doesn't need to be in it I think

7    not only is harmful to Mr. Black -- because as you have also

8    seen the condition of some of these places is, as has been said

9    by the reports, deplorable, adding another body that doesn't

10   need to be there I think as a matter of social policy is also

11   not necessarily a positive good.

12        And with all of these issues, the other additional

13   heaping of cruelty here is that Mr. Black has nobody here

14   except us.  He has no family here -- they're all overseas --

15   and effectively he will not see them; he have no contact with

16   them.

17        I do thank two of Mr. Black's family members, his

18   sister and brother-in-law have really graced us to come here,

19   and we are really appreciative.  But that's not going to be the

20   case if he is incarcerated, and that isolation is an additional

21   penalty which is over and above what I think is necessary.

22        Now, your Honor, I want to address the medical

23   condition, but I also have privacy concerns so I will do it

24   generally.  I will be happy to answer more specific questions

25   at side bar.

JAO7CONS

1          We have a real problem.  Mr. Black is one of those

2    clients who doesn't like to complain, who doesn't like to

3    necessarily tell us when he doesn't feel good because he feels

4    it's his job to sort of soldier on.  But we have a real

5    problem; he has a serious heart condition.

6          I will tell you we have gone to great efforts to

7    advance appointments, but his current condition -- you've seen

8    the letters -- is not good.  We are hopeful that it can be

9    brought under control.  It's not right now.  The procedures he

10   has had -- he has had two -- he is going to have a much more

11   serious procedure we think in about two months.  That's sort of

12   where we are.

13         But, you know -- and having spoken to his doctors,

14   this is an existential problem.  If not brought under control,

15   or if not given absolutely appropriate adequate care, this will

16   substantially reduce Mr. Black's life expectancy.  One of our

17   biggest concerns here is just the possibility of not adequate

18   care, and there is a real risk of that.

19         Additionally, I will tell you Mr. Black is not the man

20   that we know.  Even now he is walking, takes breaks and he has

21   a problem.  I think it's not being cute to say this case has

22   literally broken his heart.  He is ill; he is also dealing with

23   other nonphysical issues, which while not uncommon here are

24   nonetheless just as real, they're pronounced, and this has been

25   a difficult process.  Therefore, we think our sentence is also

1    fully justified under the factor that allows for

2    rehabilitation -- as medical care is part of that

3    rehabilitation -- but we're asking frankly to not have

4    Mr. Black use resources in a U.S. facility for medical care but

5    he will obtain those resources at home in a way that his

6    doctors think is appropriate.

7         I can't tell you that I'm more concerned about

8    something in part because Mr. Black is not a person that

9    complains, but this is a real problem, and it manifests in a

10   lot of ways.

11        So, I think that those two factors alone, what we're

12   asking for here -- I'm not asking for him not to be punished or

13   pay a fine.  I'm simply saying we can adequately confine him

14   and punish him in a way that is not unnecessarily difficult

15   both on the immigration side and frankly on the medical side.

16        And I think when you look at those factors -- and then

17   there is one other thing.  I haven't said anything about it,

18   and this is really the last point I will make -- then I ask, as

19   I did at the beginning, look at this man as a whole.  A lot of

20   defendants come before you -- I know you get dozens and dozens

21   of submissions -- but I respectfully think Mr. Black has lived

22   otherwise a very good life.  The letters that you have received

23   that span really his whole life from people who have known him

24   for 40, 50 years all the way in time paint a remarkably

25   consistent picture of a man that is humble in the right sense.

JAO7CONS

1   He is caring and thoughtful and forthright with people.

2          And the letters are not, as you often see, a series of

3   platitudes; they are very specific repeated examples over a

4   long life of consistent behavior of frankly true thoughtfulness

5   and concern and doing what you do because it's the right thing,

6   not for praise.  He is actually described by everyone as very

7   self-effacing, there is no bragging in him.  And his dedication

8   to people as a father, as a husband, a son, brother, uncle and

9   as a friend is really I think, your Honor, special here.

10          You know, you see in these letters so many anecdotes

11   that to me it's not the big stuff, it's the little things he

12   does that shows who he is.  He's the man that when your child

13   is having an emergency problem he's the one that's there to

14   help the child and help the parents.  When there is a boy who

15   as a young man there was a young man challenged in the town,

16   he's the young man that brings him to the game to get him

17   involved to change his life.  He's the guy who doesn't forget

18   his old mates in his town just because he is now a banker.  He

19   is there to play with them in part of their crew.  He's the man

20   that close family, distant family, and even new friends, talk

21   about as the man to come to when you have a crisis, when you

22   need help or, more importantly he's the one that checks in and

23   asks how you're doing and is the rare person that genuinely

24   wants to hear the answer; he generally wants to know.

25          And frankly, your Honor, these letters were so

JAO7CONS

1    consistent, and they come from across the world.  You know,

2    these are people that have a very different way of speaking,

3    but they come through in a way that to me at least is

4    incredibly powerful because it's incredibly consistent with who

5    he is.

6              And there is some intangible quality to people, and a

7    lot of different names for people who do something that is good

8    with others.  You can call it the golden rule.  You can call it

9    categorical imperative.  Whatever you call it, these letters

10   are testament to who this man is.

11             You know, you have seen, your Honor, the letter from

12   his wife and the explanation of why she is not here today.  I

13   don't want to go into that.  I just want to say this:

14   Mr. Black has also raised an amazing family.  He has an amazing

15   three young women, his wife, they are glowingly described and

16   not in simple euphemisms about who they are.  And his decision

17   on how to behave today and whether or not to involve them here

18   to me as a father is one of the most fatherly things that I

19   have seen.  And I think there is no question that when you look

20   at what has happened here -- and regardless of the reason,

21   there are consequences -- Mr. Black, as you read in these

22   letters, he has already endured serious punishment in terms of

23   his career, in terms of the emotionally crushing effects this

24   has had on him.  It's not sufficient, but I think if we read

25   these letters of close family and friends, listen to how Mr.

JAO7CONS

1    Black has changed, he's struggling.  Whatever the need is for

2    punishment, that has and will continue to be extracted through

3    that.  There is a torture of this that has occurred that is the

4    outgrowth of the activity, but it's real and it's occurred.

5              So, the question then becomes, Judge, what are we

6    really asking for?  We're simply asking for him to be able to

7    serve a sentence in the UK.  And the Court ordered us to

8    address that in our submissions, and we did.  There is not --

9    we don't think given the probation department's

10   recommendation -- the transfer program doesn't work, and

11   frankly, according to the most recent e-mail, it is impossible

12   to gauge.  We think that a sentence that would even make it

13   relevant would be inappropriate, so I'm not going to bother

14   talking about that, because I think it's not just something we

15   can count on in any way.

16             What we did, your Honor, was we asked the question,

17   OK, let's simply figure out how Mr. Black can receive the same

18   kind of sentence he could receive if he was a U.S. resident.  I

19   don't want special treatment, I just want equally available

20   options.

21             So, what we believe -- because we think home

22   confinement here is an appropriate sentence -- special

23   condition -- is we said how do we do that.  Well, first, given

24   the technological world, if you want to have a similar system

25   to make sure we know where he is and he is confined and he is

JAO7CONS

1    suffering those penalties, that's fine.  I mean the technology

2    is on all of our desktops.  There is GPS, Skype, e-mailing

3    every day.  All of those things are completely available, and

4    they're reliable, and because of the time difference if they

5    want to make sure that Mr. Black is at 9 o'clock is home, the

6    day isn't even over, you can do it that way.  But we didn't

7    think that was a sufficient answer.

8          So, what we did was in the UK any kind of electronic

9    monitoring is actually not done by the UK government; it's

10   contracted out.  So, we got another very reputable firm with

11   major law enforcement credentials, and we said to them we need

12   you to tell us can you confine somebody with electronic

13   monitoring, these are the conditions, and you have to report

14   directly to the Court and the probation department.  And we've

15   given you their report; we've given you their -- they are

16   serious law enforcement people, and they will confine Mr. Black

17   and ensure that he follows whatever conditions this Court

18   orders.

19         Now, I think the record shows that Mr. Black is going

20   to do that anyway.  I don't think any of us have a serious

21   concern about noncompliance.  But to the extent the Court wants

22   a robust additional punishment that sends a clear message under

23   these circumstances, we have provided that option.  We have

24   talked about it with probation; I think that they will be

25   guided by what the Court does.  But there is no technological

JAO7CONS

1    or issue with doing it.  And it's not special.  It's simply the

2    same as Mr. Black has -- it's the same as it would be if

3    Mr. Black was a U.S. citizen or resident.

4           Your Honor, we've traveled a long road here, but I

5    think today, as you've said repeatedly, you need to have

6    punishment but you need to have proportionality, you need to

7    have a sense that Mr. Black is being punished for what he did

8    and not all this other stuff.  You need to look at how this

9    system -- this is not about prosecution, it's about

10   punishment -- is being applied.

11          And, frankly to make these two men the tip of the

12   spear -- given what we know about all these facts -- they

13   should be punished, but they shouldn't be punished more than is

14   necessary.

15          Therefore, this is a humbling day, and with humility I

16   say to you, Judge, I truly submit that the sentence that is

17   sufficient but no greater than necessary is a sentence that

18   allows Mr. Black to be punished but to do it where he belongs,

19   in the UK, because even if you impose a short sentence here

20   it's going to have a scathing set of potential consequences and

21   potential results that are so bad that no one here, a fair

22   minded person, would feel that that is the right thing to have

23   happened.

24          So, I thank the Court for its many courtesies, and I

25   respectfully ask please grant our request.  Thank you for your

JAO7CONS

1    time and attention, your Honor.

2         THE COURT:  Mr. Connolly, do you have anything you

3    want to say?

4         THE DEFENDANT:  No, your Honor.

5         MR. BREEN:  Respectfully, your Honor, because of a

6    appellate issues --

7         THE COURT:  I quite understand.

8         Mr. Black, do you have anything you want to say?

9         DEFENDANT BLACK:  Yes, please, your Honor.

10         Thank you for the opportunity to speak, your Honor.

11    As I believe you are aware, this process has completely

12    shattered me.  I have come to this country voluntarily because

13    I believe in the process and the law, and I would like to thank

14    your Honor.

15         I am devastated by the fact I ended up here before

16    you.  I feel incredible remorse for my involvement in these

17    events and so profoundly for my wife an children and those that

18    rely on me and believe in me.

19         My life will never be the same.  I am committed to my

20    family and all those who supported me over these past many

21    years.  I ask for leniency, your Honor, because I want to be

22    able to spend the rest of my days making it up to them.

23         I would like to take a moment to express my thanks to

24    these people:  I want to thank my attorneys for their skill and

25    the phenomenally hard work over the last few years.  Their

JAO7CONS

1     dedication to my cause is an inspiration.  I also want to thank

2     my sister Lindsay and brother-in-law Douglas for taking the

3     time out of their lives and responsibilities to fly across the

4     ocean and support me here.  And I want to thank my many friends

5     and family who took the time to write on my behalf.  And most

6     importantly, I want to thank my wife and children whose love

7     and support is my entire world.

8              Thank you very much, your Honor.

9              THE COURT:  Okay.  I have to turn to the elephant in

10    the room because it is raised without being named by everyone's

11    presentation.

12              Mr. Connolly -- who is lucky that I don't bear him a

13    grudge for the silly thing he did last summer -- stole my

14    thunder on this one.  He called his self-published screed

15    "Scapegoat."  It is a word that I have thought of often over

16    the past three years.

17              The Levitical scapegoat was a real goat, which was is

18    sent out into the wilderness after the high priest had

19    symbolically laid the sins of the people on its back.

20              We have syncretized this ancient religious image, and

21    today we use it to refer to people who are blamed for the

22    wrongdoings, mistakes and faults of others -- especially for

23    reasons of expediency.

24              Mr. Connolly believes that he and Mr. Black are being

25    made scapegoats here, to which I say:  Yes and no.

JAO7CONS

1          Gavin Black and Matthew Connolly were participants

2    along with many other people, a few of whom have been indicted

3    here and abroad, most of them have not, in a massive effort,

4    one that went on at many if not all of the submitting banks

5    over a course of years to manipulate LIBOR to benefit the

6    banks' trading positions.

7          So, it's not quite fair, gentlemen, to say that you're

8    being blamed for the wrongdoing of others.  The scapegoat was

9    sinless; you are not.  You haven't done nothing wrong.  You

10   were found guilty by a jury of 12, and there is evidence to

11   support their verdict, and you should be sentenced for what you

12   did.

13         But I do think it is fair to say that the government

14   has used Mr. Connolly and Mr. Black, as well as a few other

15   people -- none of whom was at the highest levels -- as proxy

16   wrongdoers, to make them an example for the wrongdoings of

17   those two institutions, Deutsche Bank and Rabobank in this

18   court, and for similar wrongdoing of other unindicted

19   institutions as well.

20         Now, I quite understand that the government could not

21   possibly prosecute all of the people who were involved at any

22   time with attempts to manipulate U.S. dollar LIBOR.  It was

23   expedient for the government to focus on a few people at a

24   limited number of institutions, and the government did so.  But

25   the government -- and to its credit Mr. Koenig has been

JAO7CONS

1   perfectly honest -- now asks the Court to impose excessively

2   large punishments relative to the actual wrongdoing perpetrated

3   by these two individuals on Mr. Connolly and Mr. Black because

4   of a far more widespread problem in which hundreds of other

5   people at Deutsche Bank and elsewhere were also wrongdoers, and

6   the government asks that I do that to make an example of them.

7   The government's really sole basis among the 3553 factors for

8   asking for the sentence it seeks -- it's a guideline

9   sentence -- is general deterrence.  I yet cannot make

10  Mr. Connolly and Mr. Black scapegoats for the sins of the

11  entire industry.  They stand convicted of crimes for which they

12  will be punished, and that is all they will be punished for.

13          Turning specifically to the Section 3553(a) factors:

14  The crime was serious and not victimless, but the defendants,

15  these two men, were very minor participants in that crime.

16  This is especially true of Mr. Connolly, and it's also true of

17  Mr. Black when looked at relative to others.  Mr. Levine is not

18  incorrect when he says that the government cooperated down in

19  this case.

20          The defendants have lived otherwise exemplary lives.

21  The letters that I have received, and I have a read them, are

22  genuinely moving.  They present no risk of recidivism and no

23  danger to the public.

24          Under Section 3553, I must of course consider the

25  sentencing guidelines -- as I have labored to calculate them --

JAO7CONS

1    but I, like probation Officer Kim, find them to be inconsistent

2    with the parsimony principle that governs sentencing.

3          The flaws in the fraud guideline, as articulated by

4    Judge Rakoff in the Rabobank sentencings, and by many other

5    judges of this and other courts -- including me on other

6    occasions -- make a guideline sentence way out of line with

7    respect to these two men, and they would be even more out of

8    line if I had fully accepted the government's calculation of

9    intended loss.

10         The guidelines sentences for these defendants are also

11   out of line with similarly situated defendants who have

12   committed the same crime.  The only fair comparators in my

13   estimation are others who were involved in the similar effort

14   to nudge LIBOR in one direction or the other.  The two Rabobank

15   traders who went to trial before Judge Rakoff, who were much

16   more involved at their bank with this exercise than Messrs.

17   Connolly and Black were at Deutsche Bank, were given relatively

18   modest below guideline sentences, which of course they ended up

19   not serving because of the Kastigar reversal and the vacatur of

20   their convictions.  As far as I know, nobody else has gone to

21   prison, with the exception of this person Mr. Hayes, whom I

22   know nothing about, except what I read in the sentencing

23   transcript for the Rabobank case, and what I read there does

24   not make him anything like a genuine comparator to Mr. Connolly

25   and Mr. Black.  He apparently bribed people, he obstructed

JAO7CONS

1    justice, all way beyond anything that went on here, and he

2    ended up serving -- his sentence was 11 years but he ended up

3    serving in England, so he ended up serving five and a half

4    years.  These defendants were bit players by comparison and

5    would have to be sentenced to significantly less than that for

6    their sentences to be fairly proportional.

7         A guideline sentence is terribly out of whack

8    comparing in particular Mr. Connolly, who made just six

9    documented requests -- and I think there is no real basis on

10   which the government could even allege seriously that he made

11   any other requests -- with Mr. Parietti, who was far more

12   culpable and who got away with not only no jail time but he got

13   to keep his $9 million bonus that was earned during the period

14   of the conspiracy.  I recognize that he was a cooperator but,

15   as I've already said, I personally had some issues with his

16   testimony, and the jury apparently did too since it acquitted

17   Mr. Connolly of the counts involving Mr. Parietti's activity.

18   I prefer to sentence Mr. Connolly for his own proven

19   misconduct, which in this case consists of the six requests

20   that he made.

21        I thus reject a guideline sentence as appropriate for

22   either defendant.

23        The government -- knowing full well that neither of

24   these defendants needs to be punished any more than they

25   already have been in order to fulfill the goal of specific

JAO7CONS

1    deterrence, extols the goal of general deterrence -- extols the

2    goal of general deterrence as justification for imposing a

3    lengthy term of incarceration on these two men.

4            Now, it turns out I've had to think about judicial

5    philosophy recently, both because I was teaching a class and

6    because I was simultaneously working on this sentence, and I

7    realized that I'm not a big fan of general deterrence as a

8    driving factor in punishment.  If you want to refer to the

9    great philosophers of punishment, I'm more a Kantian than

10   Beccarian; I'm more retributivist than utilitarian.  What that

11   means is I'm more interested in punishing someone for what he

12   did than making him an example to others so that they will not

13   do the same.  It's a matter of personal philosophy.

14           But general deterrence is a Section 3553(a) factor,

15   and I do have to consider it, and I have considered it.  And

16   I've considered it in light of everything that you all have

17   said here and that you have written before saying it, and I

18   have considered it in the way that Judge Rakoff considered it

19   at the Rabobank sentencing.  And he is a great scholar in this

20   area, and he is really much more interested in these things as

21   a philosophical matter than I think I am naturally, and he

22   really does read a lot of stuff about this.  And I thought

23   about it also in the context of what I know about the financial

24   services industry and the people who work in it.  And here is

25   what I conclude:

JAO7CONS

1          To the extent that the players in the market are

2     capable of being deterred by what has happened to these two

3     men -- including specifically those players in the market who

4     thank God every night before they go to bed that they got away

5     with what Matt Connolly and Gavin Black were convicted of --

6     and there are quite a few of them out there -- a long period of

7     incarceration for these defendants is simply not needed to

8     accomplish the goal of general deterrence.  The players in the

9     market have witnessed their arrest, the years spent in

10    chancery -- which are not over yet -- the loss of jobs and

11    employability, the financial stress on them and their families,

12    the loss of status in the community, and at least in

13    Mr. Black's case the development of a serious health issue, all

14    collateral consequences that play into general deterrence.

15          All other things being equal, I would sentence

16    Mr. Black to a modest, short term of imprisonment, probably

17    quite in line with probation Officer Kim's recommendation --

18    his very thoughtful recommendation -- and I would sentence

19    Mr. Connolly to a lesser sentence because these two men are not

20    equivalent in the great LIBOR scheme of things.  They're both

21    low on the totem pole, but Connolly is lower than Black.

22          The problem here is that all other things aren't

23    equal.  And I've struggled with this for weeks.  I did my own

24    research.  And Eric Silverberg, my former law clerk, is here

25    today; he worked on this for me.  If there were a way that I

JAO7CONS

```
1    could sentence Mr. Black to serve a term of incarceration in
2    the United Kingdom, I would do it, but there is no way.  There
3    is a procedure for transferring a prisoner from the United
4    States to the United Kingdom.  It is lengthy.  It is
5    cumbersome.  It is uncertain of result.  And it is impossible
6    to invoke it until you are serving a sentence in an institution
7    in the United States.
8              If I could sentence Mr. Black to a term of
9    incarceration -- a brief term of incarceration -- knowing that
10   he would go to a facility appropriate to his criminal conduct,
11   I would do it.  But I know that I can't.  I know that simply
12   because he is a noncitizen -- and I use that term advisedly, he
13   is not an illegal alien -- but because he is a non-citizen, he
14   will not be eligible to serve his sentence in the same way that
15   any American citizen who stood convicted of this crime would
16   serve.  And that's not right.
17             And for reasons that are incomprehensible to me, were
18   I to sentence him to a short term of imprisonment -- which
19   would be served in a private facility and not at some place
20   like FCI Allenwood, or not at a medical facility, which I think
21   I would strongly recommend, given what I know about Mr. Black's
22   medical condition -- for reasons I cannot comprehend, at the
23   end of that term he could not walk out the door and be picked
24   up by Mr. Levine and taken to the airport.  He would be treated
25   like an illegal alien, and he would be released into the
```

JAO7CONS

1    custody of ICE, and at some point long after my intended

2    sentence had expired he would be deported.  And that's not

3    right.

4             I have gone back and forth, and back and forth, and

5    back and forth on this, but when I look at this chart,

6    McGillicuddy Exhibit 1, and look at the number of instances out

7    of 130 in which Gavin Black made a request of a submitter to

8    try to move LIBOR, and the amount of money that the government

9    estimates was intended to be lost -- and I've accepted the

10   government's formula, not without thinking that there is a lot

11   wrong with it -- though I appreciate your effort -- I can't

12   bring myself to impose a sentence of incarceration in the

13   United States for Mr. Black.  And since I can't impose a

14   sentence of incarceration to be served in the United Kingdom on

15   Mr. Black -- which as I said I would do -- I am remitted to

16   sentencing him to some form of home confinement to be served in

17   his native country, and I do that because -- while, Mr. Black,

18   I don't like the way you played the game -- you were really a

19   bit player in this.

20             Mr. Connolly was barely a player at all.  And given

21   what has happened to everybody else in this case, and what has

22   not happened to a lot of people who aren't in this case -- and

23   aren't in other cases -- it would be a travesty to sentence

24   Matt Connolly to a term of incarceration.

25             And certainly if I'm not going to sentence Mr. Black

JAO7CONS

1    to one because of the unusual "all other things are not equal"

2    collateral consequence of his not being a United States

3    citizen, I can't mete out a sentence of imprisonment on

4    Mr. Connolly, who truly -- I have been through this evidence --

5    is the least culpable person I have heard about.

6           So that, I suppose, is the consequence of cooperating

7    down, as Mr. Levine put it.  The real sentence here began three

8    years ago and will last for the rest of your lives.  It will

9    include the payment of a substantial fine -- one that will

10   exceed the dollar amount of intended loss as calculated by the

11   government for which you are personally liable, but which will

12   come nowhere close to the $3 million fine sought by the

13   government -- limit all restrictions on your liberty for a

14   while, and will involve the certain knowledge that nothing can

15   give you back your old lives, that in that sense what you have

16   described to me as a nightmare never ends.

17          I emphasize that for me the proportionality to others

18   involved is a really important consideration in sentencing.  It

19   just is.  I'm always uncomfortable when I'm asked in any

20   context -- it usually happens in the drug context -- to

21   sentence the low man on the totem pole while the big guy goes

22   free.

23          I have reviewed the presentence report.  I'm going to

24   ask Mr. Kim -- who has done such yeoman service -- to revise

25   them to reflect the findings that the Court has placed on the

1    record today.  With those revisions I will accept and adopt

2    them as my findings.  I have already given you the guideline

3    calculations.

4              Mr. Connolly, will you please rise.  Docket number 16

5    Crim. 370.  I hereby sentence you to time served, plus a term

6    of two years' supervised release, to include a term of six

7    months' home confinement.  That's on each count.  The sentence

8    is to run concurrently.  And I sentence you to pay a fine of

9    $100,000.  This fine is payable due and payable immediately,

10   together with the special assessment of $300.  That's $100 per

11   count.

12             During the term of your supervision you must not

13   commit another federal, state or local crime; you must not

14   unlawfully possess a controlled substance; and you must refrain

15   from the unlawful use of a controlled substance, submitting to

16   one drug test within 15 days from your release from

17   imprisonment, and at least two periodic drug tests thereafter

18   as determined by the court.  You must cooperate in the

19   collection of DNA as directed by the probation officer.  You

20   must pay the assessment imposed in accordance with 18 United

21   States Code Section 3013; and you must pay the fine, and the

22   fine is due and payable within 60 days.  You must notify the

23   court of any material change in your economic circumstances

24   that might affect your ability to pay the fine or the special

25   assessment.  And you must comply with the standard conditions

JAO7CONS

1    that have been adopted by this Court, which will be given to

2    you.  You will look at them, and you will sign off on them.

3    And until such time as the fine has been fully paid, you must

4    comply with the special condition of providing your probation

5    officer with access to any financial information that the

6    probation officer requests.

7         Restitution is not an issue in this case.  Forfeiture

8    is not applicable.

9         You may be seated, sir.

10        Mr. Black, under docket number 16 Crim. 370, I hereby

11   sentence you to a term of time served, plus three years of

12   supervision, to include a term of nine months' home confinement

13   to be served in the United Kingdom, under such circumstances

14   and in accordance with such providers as the probation

15   department shall contract with; or, if the probation department

16   deems that to be inappropriate, then from abroad by our

17   probation department.  I don't know really if that's

18   electronically feasible or not, and that's why I have to leave

19   it to probation in the first instance to explore that topic.

20        I should say -- and this applies to both of you --

21   during the period of home confinement you must remain in your

22   residence, and you may not leave -- in your case for six

23   months; in your case for nine months -- for any purpose except

24   the following:  To attend medical appointments, to attend

25   religious services, to attend any further court appearances

1    that may be necessary.  I rather imagine there will be an

2    appeal in this case, so...

3         The idea is you're a prisoner in your own home.  And I

4    assure you that after six months in your case, Mr. Connolly, or

5    nine months in your case Mr. Black -- and I've heard this from

6    people -- you will hate the sight of your own home, and you

7    will be very, very happy to get out.

8         Mr. Black, I impose upon you a fine of $300,000, as

9    recommended by the probation department, and a $200 special

10   assessment.  The fine is due and payable in 60 days.  The

11   special assessment is due and payable immediately.

12        The same conditions of supervision.  You have a nine

13   month period of home confinement, and during that period and

14   for the rest of your term you must not commit another crime,

15   federal, state or local; you must not unlawfully possess a

16   controlled substance; and you must refrain from the unlawful

17   use of controlled substances.  I am suspending the mandatory

18   drug testing condition.  I gather that Mr. Black is going to be

19   under rather constant medical care in the United Kingdom.  You

20   must cooperate in the collection of DNA as directed by the

21   probation officer, pay the assessment imposed in accordance

22   with 18 United States Code, Section 3013, and pay your fine

23   within 60 days, notifying the Court of any material change in

24   your economic circumstances that might affect your ability to

25   do either of those things.  You must comply with the standard

JAO7CONS

1     conditions of supervision, which will be given to you for your

2     review and you will sign off on them.  And you must provide the

3     probation officer with access to any requested financial

4     information while the fine remains unpaid.

5           Restitution is not an issue.  Forfeiture is not being

6     sought.

7           You may be seated.

8           Matthew John Connolly and Gavin Campbell Black, you

9     have the right to take an appeal from the verdict of the jury

10    and from the sentence that has been imposed upon you.  You have

11    a right to counsel in connection with any appeal that you may

12    choose to file, and if you do not have the funds with which to

13    hire an attorney, counsel will be appointed to represent you.

14          Mr. Connolly, do you understand that?

15          DEFENDANT CONNOLLY:  Yes, I do, your Honor.

16          THE COURT:  Mr. Black, do you understand that?

17          DEFENDANT BLACK:  Yes, your Honor.

18          THE COURT:  It is possible given the sentence that I

19    have imposed that the government may decide to take an appeal.

20    If it does, you have the same right to representation and the

21    right to a publicly financed lawyer if you cannot afford to

22    hire private counsel.  Do you understand, sir?

23          DEFENDANT CONNOLLY:  Yes, your Honor.

24          THE COURT:  Do you understand, sir?

25          DEFENDANT BLACK:  Yes, your Honor.

JAO7CONS

```
1              THE COURT:  OK.  What else do we have from the
2    government?
3              MS. ANDERSON:  I just wanted to clarify.  If for some
4    reason probation does not have a set-up to do this and they do
5    go privately, is this going to be a cost -- are you ordering
6    the cost borne by the defendant?
7              THE COURT:  Yes, costs have to be borne by the
8    defendant.
9              Thank you, Ms. Anderson.  Thank you.
10             Anything else from the government?
11             MR. KOENIG:  Nothing further.
12             THE COURT:  Thank you, Mr. Koenig.
13             Mr. Breen, anything else from Mr. Connolly?
14             MR. BREEN:  Your Honor, the issue of bail pending
15   appeal.
16             THE COURT:  Oh, please.  Sentence stayed pending
17   appeal.  I knew I would forget something.  Also for Mr. Black.
18   Anything else from Mr. Black?
19             MR. LEVINE:  No, your Honor.  Thank you very much.
20             THE COURT:  OK.  A difficult case in every respect.
21             These proceedings are closed.
22                           - - -
23
24
25
```