# EXHIBIT J

```
     H5VQLUMs


 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA
 3
              v.                              16 CR 483 (JSR)
 4                                            Sentence
     STEFAN LUMIERE
 5
                  Defendant
 6   ------------------------------x

 7                                            New York, N.Y.
                                              May 31, 2017
 8                                            5:00 p.m.

 9
     Before:
10
                       HON. JED S. RAKOFF
11                                     District Judge

12
                            APPEARANCES
13
     JOON H. KIM
14        Acting United States Attorney for the
          Southern District of New York
15   IAN McGINLEY
     JOSHUA NAFTALIS
16   DAMIAN WILLIAMS
          Assistant United States Attorney
17
     FOLEY & LARDNER LLP
18        Attorneys for Defendant
     JONATHAN HALPERN
19   JONATHAN FRIEDMAN

20


21   -Also Present-

22   Alexander McCabe

23

24

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
```

1                    (In open court; case called)
2              THE DEPUTY CLERK:  Will everyone please be seated and
3    will the parties please identify themselves for the record.
4              MR. McGINLEY:  Good evening, your Honor.  Ian
5    McGinley, Joshua Naftalis and Damian Williams for the United
6    States.
7              THE COURT:  It's late afternoon.
8              MR. HALPERN:  Good afternoon, your Honor.  John
9    Halpern with colleague Jonathan Friedman, and the defendant,
10   Stefan Lumiere.  Good afternoon.
11             THE COURT:  Good afternoon.
12             We are here for a sentence.  The first thing the Court
13   is required to do is calculate the guideline range.  Now, the
14   Court has made clear repeatedly that it has serious problems
15   with the guidelines, problems that cut across all sentences,
16   and that those questions are most prominent when it comes to
17   way the guidelines approach loss calculations in white-collar
18   cases because:  First, the calculation of loss in many, many
19   cases is quite difficult.  And, second, because the approach of
20   the guidelines is to make the loss, if it can be calculated, as
21   much as 60 or 70 percent of the total calculation of the
22   offense level grossly disproportionate to the multifaceted
23   aspect of the crime, let alone of sentencing; and yet the
24   guidelines also take the position that if you can't reasonably
25   calculate the loss, then you should treat it as zero even if

1    common sense would say, well, there was some meaningful loss
2    here.
3             So, as I've said on many occasions, and as I in this
4    case specifically communicated to counsel for both sides in a
5    joint telephone conference, the loss calculation, which must be
6    done and which is not irrelevant, is, nevertheless, of very
7    modest importance to this Court.
8             Counsel for the parties, and particularly defense,
9    responded to that message by devoting the overwhelming bulk of
10   their submissions to the question of loss calculation.  So I
11   now know that it's not just my wife who doesn't listen to the
12   Court.  But what we have to do, we have to calculate the loss.
13   So the government bears the burden here.
14            The problem I see with the government's loss
15   calculation initially -- depending on which approach is
16   taken -- is that it is somewhere between 15 and $23 million,
17   but that doesn't seem to have taken account of the fact that
18   although investors may not have invested but for the fraudulent
19   elevation of the net asset value in which the defendant, in the
20   Court's view, played a very prominent role, nevertheless, what
21   they got was not worthless.
22            So I am not inclined so far to adopt that view, but I
23   want to hear from the government.  If we can't calculate actual
24   loss, and if as the guidelines have now been amended to take a
25   much narrower view of intended loss, that, I think, frankly,

1  was the original intent of the draftsman, but, nevertheless,
2  that's following in the Tenth Circuit's approach, an approach
3  that is probably not applicable here, then we come back to
4  gain.
5       And there, there was flat-out testimony at the trial
6  that the gain was $3,156,109.  That seems to me still to be a
7  reasonably supported position.  The defense argues that it
8  doesn't take account of certain speculative possibilities that
9  might have altered that figure, but I think tentatively that it
10 is still a reasonable approach.  Now, those are all very
11 tentative views.  So let me hear first from the government and
12 then from defense counsel on the loss/gain calculation.
13       MR. McGINLEY:  Thank you, your Honor.
14       Just to narrow the issue, on the government's original
15 proposal, we had been assuming a zero recovery for the
16 investors that invested after the fraud.  This afternoon we
17 were notified by Visium's outside counsel that in fact there
18 had been some recoveries.  So, at this point, given that the
19 government is not a hundred percent confident in those loss
20 numbers, we would rely on the gain calculations.  Just to
21 rehash that for your Honor, that testimony came in through the
22 government's summary witness from the SEC.
23       THE COURT:  It was not contested, which doesn't mean
24 it can't be contested here, but at least it is worth
25 remembering that, as I recall, there was no meaningful

1   challenge to it.

2            MR. McGINLEY:  There was not, your Honor.  He simply
3   calculated the markups that the defendant and his
4   co-conspirators did to the securities, compared that to the
5   publicly available pricing and then compared the difference in
6   performance and in management fees.  That's how he came up with
7   that number that's Government Exhibit 18.

8            THE COURT:  Let me hear from defense counsel.

9            MR. HALPERN:  Thank you, your Honor.

10           Your Honor, in addition to Mr. Jindra's testimony from
11  the SEC -- and I appreciate that there wasn't strong
12  cross-examination by the then trial counsel on these points --
13  the government called two witnesses as representatives of their
14  investment firms:  One on behalf of Morgan Stanley and the
15  other William Blair, and they were asked about losses.

16           They weren't asked, however, and there wasn't any
17  testimony as I can see, about what fees, incentive/performance
18  fees or management fees their firms actually paid.  So there's
19  no evidence before the Court as to what fees actually were
20  paid.  I would take, with respect to your Honor, issue with
21  your Honor's characterization of the phrase "speculative" for
22  the points that I raised with respect to these issues.  I think
23  they are very important, especially if you're talking about
24  actual loss, and I understand the Court needs only to find a
25  reasonable estimate of loss for purposes of --

1     THE COURT:  But now the government is giving up on
2  loss, and we're talking just about gain.
3     MR. HALPERN:  But that's the measure of loss for the
4  guidelines.  I'm using the terms interchangeably, but that's
5  the measure here.
6     To calculate it though, I think a fair question is:
7  (1) whether fees actually were paid, and (2) the questions that
8  I raised.  So, for example, how were carry-forwards treated.
9     THE COURT:  Well, let me read you the testimony.
10     The testimony at trial was:
11  "Q.  Of that $14.88 million, how much in terms of millions of
12  dollars did Visium collect from its investors as a result of
13  these brokers' quotes?
14  "A.  As a result of using the brokers' quotes, they collected
15  $3,156,109."
16     That doesn't sound like simply an arithmetical
17  calculation.  It sounds like he says they got that.
18     MR. HALPERN:  But that's based on the hypothetical
19  models taking the differences between the valuations that were
20  presented and what they say is the actual --
21     THE COURT:  Because that would have been the norm in
22  this situation.
23     MR. HALPERN:  I understand the model, but what I am
24  saying is, your Honor, that -- and that Exhibit 18 was based on
25  a series of other underlying exhibits.

1    However, what's not addressed and, I think needs to be
2    is, how was that calculation performed?  And it should be an
3    individual investor by investor to see what was contributed,
4    what was redeemed, and that has a material difference on the
5    fees' carry-forward.
6         THE COURT:  But my question is the legal question.
7    Let's say we had a case involving 10 million investors.  Is it
8    your position that the government in order to prove gain would
9    have to look at each and every one of those investors?  Or
10   could the government say, well, the norm for these investments
11   overall is X, in my hypothetical, say, two percent, and so
12   we'll apply that and assume that while there may have been some
13   higher, some lower, that's a reasonable assumption.  What's
14   wrong with that?
15        MR. HALPERN:  I think that begs the question.  You say
16   "the norm."  I'm not sure what the norm is.  If it's two and
17   20 percent, for example, just that example, that applies, as I
18   understand it, only to one classification of shares in the
19   credit fund.  There is another percentage that's less than that
20   to a separate share.
21        So a fair question to come to a resolution as to what
22   a reasonable estimate is, what was the methodology that was
23   used?  Did they apply just across the board two and 20 percent
24   or was it 1.5?  Did they bother to divvy up the shares among
25   class?

1           And then you have to look at the carry-forwards.  I
2    mean, even you can do that categorically because that does
3    materially affect the resulting loss.  So, for example, if I
4    can indulge your Honor with just an example.
5           If there was a contribution of $10,000 and in the
6    first year there was a loss of $4,000, there's no incentive fee
7    that's paid then.  And in the subsequent year, if there's a
8    gain of $3,000, there still would not be any fee charged
9    because you're below the high watermark of $10,000.
10          Well, what was done in this case?  And that materially
11   affects the computation of the fees.  And so that does apply to
12   individual investors to know what -- suppose an individual
13   investor redeemed before the fee.  For purposes of the
14   government's calculation, was that fee incorporated?  That
15   would overstate a reasonable estimate of what the fee is.
16   These are kind of just fundamental threshold questions.  We can
17   talk about the specifics, but none of these issues has been
18   addressed, and I think they do need to be before we reach an
19   actual estimate of loss under the circumstances.
20          THE COURT:  All right.  Well, let me interrupt you to
21   say, so, assuming for the sake of argument that I were to find
22   agreement with the argument just made by defense counsel, can
23   the government supply that information?
24          MR. McGINLEY:  I believe we can, your Honor.  I'm
25   trying to just recall the basis for his testimony.  He was

1    summarizing primary documents.

2              THE COURT:  Yes.  But one thing I didn't see was he
3    was not challenged on this at trial, but the motive for
4    challenging now is totally different from the motive at trial.
5    This was not introduced at trial for purposes of calculating
6    sentencing guidelines, but if in fact he has the data or Visium
7    has the data, why shouldn't I put the government to the test of
8    coming up with that data, so we'll have something that is
9    clearly not speculative?

10             MR. McGINLEY:  Your Honor, I would want to take a look
11   at the trial testimony, but I think just on the basis of the
12   exhibit admitted, the government's burden here is just a
13   preponderance, and under the guidelines the Court only needs to
14   make a reasonable estimate of the total gain.

15             THE COURT:  I understand that.  I may be persuaded,
16   but on the other hand, I'm a little surprised.  You guys on
17   both sides have been arguing about this issue for weeks now.
18   And, to be frank, in many situations like this, we have a
19   battle of experts, and the Court has far more detail presented
20   than has been presented here.  And while it may well be that I
21   could forge ahead on the government's basis and make a
22   reasonable calculation, and while I repeat for the umpteenth
23   time that most of this is making a mountain out of a molehill
24   in terms of any sentence this Court is going to impose, but far
25   be it for me to prevent counsel from spinning their wheels.

1    Frankly, I think maybe we will have to do that.

2             The thing that most bothers me about that is I can see
3    we have a courtroom full of good folks who have come here
4    because this is a sentence that is obviously important to them,
5    and I suspect they are mostly people supportive of the
6    defendant, whose opinions are very important to this Court, and
7    I hate to have to ask them to come back; but I am a little
8    surprised that the government hasn't done more here given that
9    the defense really was flagging this issue openly from day one.

10            So let me hear if the government wants to say anything
11   further.

12            MR. McGINLEY:  Your Honor, just briefly, we just got
13   news from Visium that our initial theory --

14            THE COURT:  That's a good example, and I commend the
15   government in adjusting its position as a result.  That's a
16   very good example.  Why weren't you knocking on their door and
17   saying, "Hey, you're front and center in this case.  We want
18   data and we want it now, and we want X, Y and Z, so if the
19   judge has questions, we can respond"?

20            Is there someone here from Visium?  Come forward,
21   please.

22            MR. McCABE:  Alexander McCabe, M-c-C-A-B-E.

23            THE COURT:  Are you a lawyer?

24            MR. McCABE:  I am a lawyer.  I'm a second year
25   associate who was assigned to observe.

|  |  |
|---|---|
| 1 | THE COURT:  That's good enough for me.  So, if we were |
| 2 | to postpone this sentence for a brief period so we can get more |
| 3 | data leading to the calculations, is there any reason why |
| 4 | Visium cannot give that their highest, most prompt attention or |
| 5 | do I need to subpoena your boss? |
| 6 | MR. McCABE:  I'm not well briefed on it enough to be |
| 7 | able to answer that question.  I'm sure that my bosses wouldn't |
| 8 | want me to. |
| 9 | THE COURT:  Well, let me put it this way:  I think I |
| 10 | do need that data.  I absolutely do need it.  I could proceed |
| 11 | today, but I don't think that's the prudent thing to do.  For |
| 12 | whatever reasons the parties seem fixated on this issue, I am |
| 13 | required by law to calculate loss or gain.  It's not an |
| 14 | irrelevancy.  It's just not in my view nearly as relevant as |
| 15 | the guidelines make it out to be, but that doesn't mean it's of |
| 16 | no importance. |
| 17 | So we will set in two seconds a new sentencing date. |
| 18 | I want Visium to give the supplying of any and all |
| 19 | relevant information its number one priority.  I am sure they |
| 20 | will carry out that direction.  If they don't, I will send the |
| 21 | U.S. Marshals over to seize all their papers and emails and |
| 22 | electronic data so we can do the job here, but I know that |
| 23 | won't be necessary. |
| 24 | MR. McCABE:  Yes, your Honor. |
| 25 | THE COURT:  Very good. |

| | |
|---|---|
| 1 | So, how long do the government and how long do the |
| 2 | parties want? |
| 3 | MR. McGINLEY:  Your Honor, whatever defense counsel |
| 4 | wants will be fine with the government. |
| 5 | THE COURT:  Well, the burden is on you.  I want to |
| 6 | know whether that figure is an estimate or is a solid figure. |
| 7 | I want to know if you want to go back to loss, you clearly have |
| 8 | to get different figures than you have now.  I want to know |
| 9 | what is your factual response to the specific issues raised by |
| 10 | the defense.  All of that is available, as far as I can tell, |
| 11 | in the data in the possession of Visium. |
| 12 | MR. McGINLEY:  Two weeks, your Honor? |
| 13 | THE COURT:  OK.  That seems reasonable. |
| 14 | Any problem with that on the defense side? |
| 15 | MR. HALPERN:  No, your Honor. |
| 16 | THE COURT:  So today is May 31.  Let's look at June 14 |
| 17 | in the morning, however. |
| 18 | THE DEPUTY CLERK:  The American Rail Car trial. |
| 19 | THE COURT:  We have a trial.  So why don't we say |
| 20 | 9:00 a.m. on June 14.  June 14 is Flag Day.  Yes?  So this will |
| 21 | be appropriate time for both sides to wave their flags. |
| 22 | So if there is some information that needs to be |
| 23 | exchanged between the parties before then, I will leave it to |
| 24 | counsel to work out among themselves. |
| 25 | I apologize deeply to all you folks who are here.  I |

H5VQLUMs

1    know you came from various places, and I am sorry that we have
2    to postpone this.  I am genuinely sorry.  I hoped that would
3    not be necessary, but you've heard the colloquy of counsel.  I
4    will look forward to seeing as many of you as can attend on
5    June 14.
6              MR. HALPERN:  Your Honor, one housekeeping matter, if
7    I may.  My objections to the PSR served on the government back
8    on April 5, 2017 I thought were fully incorporated with the
9    probation officer's notes.  They aren't.  With the Court's
10   indulgence, I would like to mark this as Defendant's A so it's
11   in the record.
12             THE COURT:  Sure, that's fine.
13             MR. HALPERN:  Thank you.
14             THE COURT:  Do you want to docket it or how do you
15   want to handle that?
16             MR. HALPERN:  I'd be happy to docket it as well.
17             THE COURT:  I will leave it to each side to docket
18   anything they think they want to have there for public domain
19   that related to the submissions and arguments made in
20   connection with any aspect of sentence.
21             MR. HALPERN:  Thank you, your Honor.
22             THE COURT:  Very good.  Thanks very much.
23             (Adjourned to August 14, 2017 at 9:00 a.m.)
24
25