# EXHIBIT L

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 12-CR-00265(ENV)
                               :
                               :
                               :
        -against-              : United States Courthouse
                               : Brooklyn, New York
                               :
                               :
MAIR FAIBISH,                  : Thursday, March 10, 2016
                               : 2:30 p.m.
        Defendant.             :
                               :
                               :
                               :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE ERIC N. VITALIANO
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

For the Government: ROBERT L. CAPERS, ESQ.
                    United States Attorney
                    Eastern District of New York
                    271 Cadman Plaza East
                    Brooklyn, New York 11201
                BY: SYLVIA SHWEDER, ESQ.
                    Assistant United States Attorney


For the Defendant:  SIMON & PARTNERS LLP
                    30 Rockefeller Plaza
                    42nd Floor
                    New York, New York 10112
                BY: BRADLEY DREW SIMON, ESQ.

Court Reporter:     VICTORIA A. TORRES BUTLER, CRR
                    225 Cadman Plaza East/Brooklyn, NY 11201
                    VButlerRPR@aol.com

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Aided Transcription.

VB        OCR        CRR

```
                    Proceedings                        2

1              (In open court.)

2              (Judge ERIC N. VITALIANO enters the courtroom.)

3         THE COURTROOM DEPUTY:  All rise.

4         Court is now open.  The Honorable Eric N. Vitaliano

5    is presiding.

6              Case on the calendar is United States versus

7    Faibish, Case No. 12-CR-265 on for sentencing.

8              Will the attorneys please note their appearance

9    beginning with Government Counsel.

10        MS. SHWEDER:  Sylvia Shweder for the United States.

11   Good afternoon, Your Honor.

12        THE COURT:  Good afternoon, Ms. Shweder.

13        USPO HAASNOOT:  Sindee Haasnoot from Probation.

14   Good afternoon, Your Honor.

15        THE COURT:  Ms. Haasnoot, good to see you.

16        MR. SIMON:  Good afternoon, Your Honor.

17   Brad Simon, counsel for Mair Faibish.

18        THE COURT:  Welcome, Mr. Simon.

19        THE COURTROOM DEPUTY:  Counsel for both sides are

20   present, including the defendant.

21        THE COURT:  Mr. Simon, is Mr. Faibish ready for

22   sentencing?

23        MR. SIMON:  He is, Your Honor.

24        THE COURT:  Let me begin first with the Government.

25             Ms. Shweder, has the United States complied with its
```

```
                        Proceedings                        3
```

1    obligations under the Crime Victims Rights Act?

2             MS. SHWEDER:  Yes, it has, Your Honor.

3             THE COURT:  Does any victim wish to be heard at this

4    sentencing hearing?

5             MS. SHWEDER:  Yes, Your Honor.

6             THE COURT:  All right.

7             MR. SIMON:  Your Honor, there is a victim who would

8    like to speak on behalf of Mr. Faibish, who is here today.

9             THE COURT:  A victim?

10            MR. SIMON:  A victim.

11            THE COURT:  A victim is a victim.  I will hear all

12   victims in whatever order you want to arrange them.

13            How many do you have, Ms. Shweder?

14            MS. SHWEDER:  Just one, Your Honor.

15            THE COURT:  Just one?

16            MS. SHWEDER:  As far as I know, just one.

17            THE COURT:  All right.  Let us know who it is.

18            I normally, so that everyone understands and I

19   follow the practice here, the first order of business, as far

20   as I am concerned at a sentencing, are the victims.  So I hear

21   the victims before we do anything.  So those participating in

22   the hearing will take whatever actions they believe are

23   appropriate for their respective sides, but having had the

24   benefit of listening to those who have been victimized by the

25   crime, and thought it important enough for them to appear in

Proceedings                            4

1   court, and to make their positions known.

2           So, Ms. Shweder, who is this victim that we are

3   calling?

4           MS. SHWEDER:  Sal Trifiletti from Signature Bank.

5           THE COURT:  The record will also reflect there are,

6   obviously, a series of letters and submissions made by victims

7   that has been twice already reviewed in connection with

8   sentence.  None of them are under oath, nor will the victims

9   who appear here be asked to swear an oath as well, but we will

10  hear you, Mr. Trifiletti.

11          MR. TRIFILETTI:  Thank you, Your Honor.

12          Your Honor, my name is Salvatore Trifiletti.  I am a

13  senior vice president of Signature Bank and I've been employed

14  by Signature for nearly eight years as the head of special

15  assets.

16          My main responsibilities include working with

17  distressed borrowers in order to maximize recovery.  Of that

18  risk loans and other obligations owed to the bank.  In other

19  words, I am in charge of collections and loan work-outs.  I

20  have over 37 years of experience in the commercial banking

21  industry in nearly every phase of what commercial banks do.

22          Signature Bank is a New York State chartered

23  commercial bank based in New York City.  It is a young bank,

24  as it was founded in 2001.  We have been in business for only

25  15 years.

Proceedings                                          5

1        In addition, Signature is a relatively small bank

2   when compared to the mega banks like Citi, Chase and

3   Wells Fargo.  Their assets and deposits number in the

4   trillions of dollars.  Signature's main mission was, and

5   continues to be, providing financial services to smaller

6   commercial enterprises and their owners in and around

7   New York City's metropolitan area.

8        Signature, at the time of the fraud perpetrated by

9   Mr. Faibish, was a bank with assets totaling $9.15 billion and

10   a capital base of 800 million.  It is true that Signature was

11   and continues to be a successful venture, however, the loss

12   the bank took in 2010, totaling some 21 to $23 million, was a

13   major trauma to the bank, its depositors and its investors,

14   inasmuch as it represented over 2.6 percent of the total

15   capital of the bank at the time.

16        Mr. Faibish's crimes are not victimless.  When a

17   bank is harmed in the manner Signature was harmed, its

18   shareholders are harmed, and its thousands of clients and

19   deposit with which they entrust us are put at risk.  In

20   addition, the bank's approximately 800 employees were also put

21   at risk.

22        It must also be said that the crimes committed by

23   Mr. Faibish caused serious upheaval in the bank, which forced

24   Signature to commit massive amounts of time and resources in

25   order to recover from the trauma.  Some five years after the

```
                           Proceedings                    6
 1    fraud was uncovered, we are still involved in litigation and
 2    are seeking to find and recover the lost money.
 3               In nearly 15 years of its existence, this has been,
 4    without a doubt, the most serious and damaging event we have
 5    ever been forced to deal with.  One of the most disturbing
 6    issues in this process has been that, in the bank's view,
 7    Faibish has not remotely accepted responsibility at all for
 8    the crimes for which he has been convicted.
 9               He claims that he brought the fraud to our
10    attention, which is simply untrue.  He lied us at the time
11    about reasons for the multitude of bounced checks.  He
12    attacked us saying we were at fault for the losses we
13    incurred.
14               The bank had extremely important decisions to make
15    in 2009 about how best to protect the bank, and he
16    intentionally misled us.  He caused us to enter into notes
17    that was then not paid.
18               In addition, throughout the process, his attorneys
19    have attacked the bank claiming we engaged in wrongdoing.
20    Most importantly, he could have assisted the bank in
21    recovering the money.  He still can do that, but he has
22    refused to do so, and instead, blames the bank and others and
23    claims that he has no knowledge of the whereabouts of the
24    money.
25               In a nutshell, his strategy has been to blame the
```

```
                          Proceedings                          7
```

1    victim and withhold information about the location of the

2    money, rather than accept responsibility.

3              Thank you.

4              THE COURT:  Thank you, Mr. Trifiletti.

5              (Mr. Trifiletti excused.)

6              MR. SIMON:  Your Honor, if I may just say,

7    Mr. Faibish has repeatedly --

8              THE COURT:  I do not want to hear it now, Mr. Simon.

9              MR. SIMON:  Okay.  All right.

10             THE COURT:  This is the time for the victims.

11             MR. SIMON:  Okay.  That's fine.

12             THE COURT:  Any other victim wish to be heard?

13             MR. SIMON:  Yes, Mr. Henry Bobek.

14             (Mr. Bobek takes stand.)

15             THE COURTROOM DEPUTY:  State your name for the

16   record and spell your last name for the court reporter.

17             MR. BOBEK:  Henry Bobek, B, as in boy, O-B-E-K.

18             THE COURT:  Mr. Bobek.

19             MR. BOBEK:  Good afternoon, Your Honor.  My name is

20   Henry Bobek.  I have traveled here from Sharon, Massachusetts.

21   I have been a common shareholder since 2002 and a preferred

22   shareholder since 2004.

23             THE COURT:  Of which company?

24             THE DEFENDANT:  Of Synergy Brands.

25             THE COURT:  Synergy Brands.

```
                          Proceedings                        8

 1          THE DEFENDANT:  I continue to be a common and

 2   preferred shareholder.

 3          I'm here today to testify that I don't feel

 4   victimized by Mair Faibish.  In fact, I greatly admire how he

 5   built up the company; how when other CEOs paid themselves high

 6   salaries, he did not; how other CEOs hired friends and family

 7   to surround themselves, he did not.  It seems that every move

 8   made was always for the best interest of the company, not to

 9   enrich himself.

10          He may have been foolish regarding the actions that

11   that have brought him here, but he ran a very lean and smartly

12   streamlined operation in a very low margin, complex,

13   competitive business.

14          In all my years involved as a shareholder, I have

15   never doubted his integrity or his intentions.  The stock --

16   every time that I had any questions regarding the stock or

17   company, he has always answered my questions honestly.

18          Thank you.

19          THE COURT:  Thank you, Mr. Bobek.

20          Any other victim present in court wish to be heard

21   in connect with sentencing?

22          MR. SIMON:  Your Honor, I have two letters from

23   victims.  I think you have them as well.

24          THE COURT:  Anything that has been submitted in

25   writing I have.
```

```
                        Proceedings                        9

 1          MR. SIMON:  You've read them, okay.

 2          There is one other individual, Ms. Christina Norris,

 3   who is a Government witness, who came and asked to speak to

 4   the Court.  I don't know that she's technically a victim, but

 5   she has asked to be heard.

 6          THE COURT:  She is not a victim, I am not hearing

 7   her.

 8          MR. SIMON:  Okay.  All right.

 9          THE COURT:  Hearing nothing further from the

10   audience or counsel, all victims who wish to have been heard

11   have been identified and have now spoken to the Court, and

12   then we will now continue with the sentencing hearing.

13          The next inquiry I make on the record, and to some

14   extent it is a moot point because I would just recite it.

15   Defendant had requested a Fatico hearing in connection with

16   sentencing.  The Court has already reviewed that issue and has

17   denied that motion.

18          The record will reflect that the Court has received

19   the PSR and an addendum to it.  I now inquire as to whether

20   both sides have received the PSR and the addendum, and most

21   importantly, you, Mr. Simon, have had a full and fair

22   opportunity to review those documents with Mr. Faibish.

23          MR. SIMON:  Your Honor, I've certainly seen the PSR.

24   I'm not sure what addendum you are referring to, or whether

25   I've seen that or not.
```

```
                          Proceedings                         10
```

 1          THE COURT:  On an objection, I believe, or did I

 2   just label that an addendum?

 3          In my mind, it was an addendum.

 4          MS. SHWEDER:  There were two, Your Honor.

 5          THE COURT:  Was there?

 6          MS. SHWEDER:  Yes.

 7          MR. SIMON:  You know, I had not seen these, but they

 8   appear to be statements from various individuals who were

 9   quoted by Ms. Shweder in one of her submissions, so I don't

10   think it's necessary to hold up the proceedings for me to read

11   this.

12          THE COURT:  Fine.

13          The record will further reflect that Probation has

14   not made available to the Court any confidential information

15   about either Mr. Faibish or the offenses of conviction that

16   have not been shared with both sides, so therefore, for

17   purposes of sentencing, we are now working off the same

18   record.

19          I do take objections and exceptions to that record

20   in three parts.  The first area of inquiry are those

21   paragraphs of the PSR that relate to the detailing of the

22   offenses of conviction and the personal characteristics and

23   history of the defendant.

24          Any objections or exceptions to those particular

25   paragraphs?

```
                         Proceedings                          11
```

1          MS. SHWEDER:  Your Honor, I just want to point out a

2     few things regarding restitution and if now is not an

3     appropriate time to do so, they relate to the PSR, but I can

4     always --

5          THE COURT:  Which section of the PSR?

6          MS. SHWEDER:  That second that Your Honor is

7     describing right now, the offense conduct.

8          THE COURT:  All right.

9          MS. SHWEDER:  There was --

10         THE COURT:  Okay.  Then it is an appropriate time.

11         MS. SHWEDER:  There was a footnote number two that

12    said on page 8 that the Government believed that there were

13    two victims that the Probation Department felt were not

14    victims, and I do like to say I concur with the

15    Probation Department that I don't believe that either the

16    estate, the bankruptcy estate of Synergy or the Sterling

17    National Bank that had leased equipment to Synergy are

18    victims.  So the Government concurs with Probation on those

19    two points.

20         And further, the Government noted that there was not

21    a full accounting from the addendum and the original PSR to

22    show exactly what the total restitution amount was, so if it

23    would be helpful to Your Honor, I have given it to your

24    courtroom deputy, to Probation and to the defense attorney

25    prior to sentencing, the accounting that I have.  I'm happy to

```
                            Proceedings                    12
```

1   read that for the court reporter.

2           THE COURT:  Is it an amount or --

3           MS. SHWEDER:  Or do you prefer just to read the

4   total amount?

5           THE COURT:  Why don't you read the total amount and

6   if there is no objection by any party as to that number --

7           MS. SHWEDER:  Okay.

8           THE COURT:  -- then I am sure that there will be no

9   objection to the details of how you got to it.

10          MS. SHWEDER:  Okay.  So the total restitution amount

11  that the Government came up with is $44,265,394.91.

12          MR. SIMON:  Your Honor, I'm not in a position to

13  really object.  This was just handed to me, so I haven't been

14  able to look at these numbers to see how they got there or --

15  so I...

16          MS. SHWEDER:  Actually, Your Honor, every single one

17  of those numbers comes directly from the PSR, so there is

18  nothing new in it.  The only new amount is that Signature Bank

19  said that it was in excess of $21 million.  Every other number

20  comes from the PSR.

21          When I spoke with a representative of Signature

22  Bank, I got that the exact amount from Signature Bank was

23  actually $21,431,890 and so the only difference is that in

24  excess of 21 million was detailed.

25          THE COURT:  Right.  And the other 23 or so came

```
                          Proceedings                    13
```

1   from?

2            MS. SHWEDER:  From individual victims who prefer not

3   to be named out loud, I believe.

4            THE COURT:  Right.  But in what sense, though?

5            MS. SHWEDER:  Oh.

6            THE COURT:  Shareholders?

7            MS. SHWEDER:  Shareholders.  Exactly.  Shareholders

8   or one is a person who contributed a large amount of money and

9   was on the board, I believe, of Synergy Brands and other

10  people were smaller shareholders.  I guess I could say

11  including the victim who spoke earlier, Henry Bobek, who is

12  now saying that he wasn't victimized, but did put in an

13  affidavit claiming $100,000 in restitution.

14           THE COURT:  Mr. Simon.

15           MR. SIMON:  Your Honor, since I just got this, I

16  haven't been able to compare it to the PSR.  So I'm not really

17  in a position to comment on this.

18           THE COURT:  Why don't we do this.  Restitution can

19  be an after-sentencing proposition, to the extent that Counsel

20  want to be first heard in writing, and we can resolve it in

21  writing before we finalize the J and C.  We can do it that

22  way.  If there is a need for a further hearing following

23  sentencing, we can do it that way as well.

24           MR. SIMON:  Okay.  Thank you, Your Honor.

25           THE COURT:  So, why don't Counsel gather with each

```
              Proceedings                        14
```

1    other after sentencing and decide how we go forward on some

2    sort of orderly schedule.

3            MS. SHWEDER:  Okay, Your Honor.

4            THE COURT:  All right.

5            Any other, with respect to those paragraphs, any

6    other objections, exceptions or suggestions?

7            Okay.  So they are adopted with all those caveats.

8            Now, with respect to the offense level computation,

9    there clearly are significant objections from the defense and

10   I think the best way to do this is to essentially go line by

11   line with respect to the, from the PSR with respect to the

12   various enhancements or mitigating factors that either appear,

13   or Counsel believes should appear, or do appear, and Counsel

14   believe should not appear, and we will reconstruct, to the

15   extent we need to, based on the arguments that we hear now.

16           Obviously, as we all know, the first step in the

17   sentencing process is for the Court to correctly, accurately

18   compute the guidelines in accordance with the existing Algebra

19   guidelines, whether we agree with what the Algebra, various

20   components the Algebra require, but there is an Algebra to it

21   and we have to follow that and compute it before we can take

22   the next step.

23           So let us go over the list together.

24           In the old days I would have a cheat-sheet, but

25   since I cannot read them anymore, I have a cheat law clerk so

```
              Proceedings                    15
```

1   she will step up here and we will go over that as well.

2          Officer Haasnoot, why don't you lead us through it

3   and then we will, with each, beginning with base level seven

4   and we will go from there.  I assume there is no objection to

5   base level seven.

6          MR. SIMON:  No.

7          THE COURT:  Everyone agrees that that is where we

8   start.

9          USPO HAASNOOT:  Okay.

10         The next would be specific offense characteristics.

11  The report has a paragraph 42.  The defendant is accountable

12  for a total loss of $32,344,094.11.  And in the Pre-Sentence

13  Report, 22 levels were added for that.

14         THE COURT:  All right.  And that would be triggered

15  by any amount, as I recall, over 20 million.

16         USPO HAASNOOT:  Correct, Your Honor.

17         THE COURT:  Any objection, again, without prejudice

18  to the 3553 arguments that are to come?  Any objection the

19  Algebra of the guidelines requires me to add 22 levels?

20         MR. SIMON:  Well, Your Honor, I understand we need

21  to go through this exercise because it's mandated, but I did

22  read your decision on the Fatico motion, which I thought was a

23  very well-reasoned decision, so I am not -- I am not -- I

24  don't know that -- I had already stated my objections in a

25  letter so, I don't know --

```
                         Proceedings                       16

 1            THE COURT:  Well, I think for purposes of -- it is

 2   going to be easier for us in the long run.

 3            So I am taking it, you do not disagree that the

 4   guidelines require me to add 22 levels?

 5            MR. SIMON:  Correct.

 6            MS. SHWEDER:  Your Honor, I would just like to note

 7   that with the new guidelines that were revised on November 1,

 8   2015, it is now 25 million, is the cap.

 9            MR. SIMON:  But the offense was before that, so it's

10   not really relevant.

11            THE COURT:  Well, you would get the benefit of

12   anything that knocks it down.

13            MR. SIMON:  Right.

14            THE COURT:  But we are over 30.

15            MS. SHWEDER:  Yes, I just wanted to point it out for

16   the record.

17            THE COURT:  Okay.  So it is still 22, either way.

18   They did not drop the 22, did they?

19            MS. SHWEDER:  No, Your Honor.

20            THE COURT:  Okay.

21            Next item, Officer.

22            USPO HAASNOOT:  Okay.  The next item is

23   paragraph 43.  Probation applied a six-level enhancement for

24   there being more than 250 victims affected by the instant

25   offense.
```

```
                      Proceedings                    17
```

1      THE COURT:  And the Court concurs with Probation's

2  analysis on that item.

3      MR. SIMON:  Well, we had earlier, and I think it was

4  predecessor counsel to Mr. Faibish, had argued that there were

5  far fewer and in your decision you had rejected that argument,

6  so...

7      THE COURT:  Essentially.

8      MR. SIMON:  Right.

9      THE COURT:  I left open, until the careful reading

10  of that decision, so that I was carefully leaving everything

11  open until this moment.

12      One of the issues, the Fatico hearing was really

13  addressed, in principle part, to whether or not the Fatico

14  hearing was required and in some of these items, given what

15  the Court was likely to do at the end of computation, Fatico

16  hearing was not going to be required regardless.

17      MR. SIMON:  Right.  And even though, I guess I lost

18  because you denied my motion, I thought it was a very

19  well-reasoned decision and when I read it, I said, you know

20  what, I think Your Honor is right.  So...

21      THE COURT:  Okay.  Well, we are adding six.

22      MR. SIMON:  Okay.  All right.

23      THE COURT:  The next item, Officer Haasnoot.

24      USPO HAASNOOT:  Paragraph 44.  The instant offense

25  involves sophisticated means in that the check kiting scheme

```
                    Proceedings                    18
```

1   was extremely complex and involved many domestic and Canadian

2   bank accounts, and two levels were added for the sophisticated

3   means.

4           THE COURT:  The Court disagrees with that item.

5   This is a fairly standard run-of-the-mill check kiting.  I do

6   not see how sophisticated it was.  It was drawing down on

7   checks for which there was no money currently in the account

8   at the time that the checks were drawn, so the Court disallows

9   the --

10          MS. SHWEDER:  May the Government be heard on it,

11  Your Honor?

12          THE COURT:  Sure.

13          MS. SHWEDER:  And I understand that Your Honor's

14  already come to a decision, but if I may be heard.

15          I think that part of the problem here is that it

16  took so long to uncover the fraud because of all of the bank

17  accounts and the several shell companies.

18          THE COURT:  It took so long, Ms. Shweder, because,

19  for God knows what reason, there was a 14-day float.

20          MS. SHWEDER:  Well, yes, but, Your Honor, it was

21  also because of all the shell companies that were established

22  to be able to Move the money around.

23          THE COURT:  It was a 14-day float.  That is why the

24  check kiting happened.  You can even build Donald Trump's wall

25  in 14 days.

Proceedings                                          19

1          I am going disallow the two levels.

2          Next item.

3          USPO HAASNOOT:  Paragraph 45, as the instant offense

4   substantially endangered the solvency or financial security of

5   an organization that at any time during the offense was a

6   publicly-traded company, four levels are added.

7          THE COURT:  And as we reviewed in the Fatico

8   hearing, that certainly was previewed there.  I did listen

9   attentively to Mr. Trifiletti's oral testimony here at the

10  sentencing hearing with respect to the impacts on Signature,

11  and I can understand very well what kind of real-world impacts

12  there were based on the filings and the understanding, no, it

13  is not JPMorgan Chase, but it is a very large financial

14  institution and its financial security was not threatened, in

15  the Court's view, by this scheme.  So that enhancement is

16  disallowed as well.

17         MS. SHWEDER:  May the Government be heard, Your

18  Honor?

19         THE COURT:  Surely.

20         MS. SHWEDER:  Again, at this time, the Government

21  didn't understand that it was Signature Bank's, that

22  insolvency was being caused by this, but Synergy Brands, and

23  Synergy Brands did become insolvent and it was a cause.

24         THE COURT:  I believe it is the financial

25  institution, is it not, Officer Haasnoot?

```
                        Proceedings                    20

 1          USPO HAASNOOT:  No, just the organization,

 2    Your Honor.  It was for Synergy that the enhancement was

 3    given.

 4          THE COURT:  It was given to, I was under the

 5    impression it was for Signature.

 6          MR. SIMON:  That's how I read it as well.  It was a

 7    financial -- my understanding that enhancement applies to a

 8    financial institution.

 9          MS. SHWEDER:  No, it's a publicly-traded company and

10    paragraph 16 of the PSR and 33 of the PSR describe that.

11          USPO HAASNOOT:  The guideline says that apply if the

12    offense substantially jeopardized the safety and soundness of

13    a financial institution or substantially endangered the

14    solvency or financial security of an organization, that at any

15    time during the offense was a publicly-traded company or had

16    1,000 or more employees.

17          THE COURT:  Yes.

18          I am going to still deny the enhancement.  There is

19    the -- clearly, it did not impact Signature.

20          With respect to Synergy Brands and the like, I think

21    you can get into a good dosey-doe as to the viability of the

22    company without the scheme, and whether or not the scheme only

23    prolonged the inevitable, and therefore, the insolvency.

24    There was a root problem with Synergy and Quality Foods, and

25    which would have led to a chapter proceeding without the
```

```
                            Proceedings                    21

 1   scheme.

 2           So the Court is going to disallow the enhancement.

 3           Anything else?

 4           MS. SHWEDER:  No, Your Honor.

 5           THE COURT:  That ends your --

 6           MS. SHWEDER:  Yes.

 7           THE COURT:  Does anyone think something that is not

 8   there should be there?

 9           Okay.

10           USPO HAASNOOT:  We have one more specific offense

11   characteristic, Your Honor.

12           THE COURT:  Okay.

13           USPO HAASNOOT:  Paragraph 46, as the instant offense

14   involved the violation of Securities law, and at the time of

15   the offense the defendant was an officer of a publicly-traded

16   company, a four-level enhancement was applied.

17           THE COURT:  Yes.  I have no issue with that.  I do

18   not think do you either.

19           MR. SIMON:  No, Your Honor.

20           THE COURT:  And that brings us to -- we have our

21   cheat-sheet has a commutation here.  I do not know if it is

22   going to agree with yours.

23           USPO HAASNOOT:  Your Honor, do you want to do role

24   in the offense, or do you want to wait?

25           THE COURT:  No, do the total offense level.
```

```
                        Proceedings                      22

 1          USPO HAASNOOT:  Okay.  So paragraph 48 has the

 2  leader and organizer of the instant offense which involved

 3  five or more participants, a four-level aggravating role

 4  enhancement was applied.

 5          THE COURT:  And we sustained that.

 6          Any objections to that?

 7          Anything else on your --

 8          USPO HAASNOOT:  That's it, Your Honor.

 9          THE COURT:  And that brought you to a --

10          USPO HAASNOOT:  Well, in the report --  you want me

11  to --

12          THE COURT:  No, what is the new --

13          USPO HAASNOOT:  The new one?

14          You took out six points, so 43, Your Honor.

15          THE COURT:  Any other enhancements or mitigating

16  factors Counsel believe should be included?

17          MS. SHWEDER:  No, Your Honor.

18          MR. SIMON:  No, Your Honor.

19          THE COURT:  All right.

20          So the Court is requesting, and I understand from

21  Officer Haasnoot, that Probation will agree to amend the

22  report to reflect the determination the Court has made here at

23  the sentencing hearing; is that correct?

24          USPO HAASNOOT:  Yes, Your Honor.

25          THE COURT:  All right.
```

```
                        Proceedings                      23
```

 1          All right.  There is certainly no secret, as well,

 2     that I subscribe to the views of a whole host of judges who

 3     have said so publicly and scores of others who have bumbled

 4     and grumbled about it privately, that the guidelines, even

 5     with its slight revisions, are just mindlessly accelerated

 6     once you have numbers of any size added in the loss or gain

 7     table.

 8          It just -- it is the tail of the dog wags everything

 9     else.  This mindless acceleration essentially makes the

10     guideline for economic crimes, in my view, almost useless when

11     you get into -- unless you are dealing with a far less

12     significant kind of crime than the one that we have here.

13          Various efforts have been made to suggest revisions

14     to the guidelines for economic crimes.  The American Bar

15     Association has launched the criminal justice section and

16     launched a task force to look into the concerns of pension bar

17     alike.  That task force has made a report.  The Court has

18     reviewed it, listened to it.  Again, my vision does not allow

19     me to read them, and persuades the Court that while the

20     current guidelines system does not provide a reasonable way to

21     achieve the kind of sentencing objectives the guidelines are

22     supposed to achieve, and to try to provide fair and just

23     punishment, and not a punishment that is not disproportionate,

24     more uniform, that the ABA task force guidelines certainly

25     significantly move in that direction.  So that the Court finds

Proceedings                    24

1    those recommendations usable.

2           So for the edification of Counsel, this may shape

3    what you wish to tell me when we reach the 3553(a) portion of

4    this hearing.  I will give you the benefit of what I like to

5    think of as the shadow guidelines that control in this case.

6           The first -- and it begins with a base under the

7    task force guidelines, the base remains a seven.

8           The ABA guidelines do not have as many -- much

9    stratification with respect to the value in play, so that it

10   de-emphasizes, as the Court thinks it should be de-emphasized,

11   this equation, or this equivalency that the official

12   guidelines seem to embrace of the equivalency between economic

13   value and moral turpitude.  The Court does not share that

14   view.  The ABA guidelines recognize the need to move in that,

15   reform in that direction.

16          So based on our computations of the economic

17   characteristic, instead of an addition of 22 levels, the ABA

18   guideline would add 12 levels.

19          The task force guidelines also deals with victims

20   and other impacts in a different way, sets forth an analysis

21   for victim impact, which can range on the scale from 0 to 6.

22   The Court finds that in this case, looking both at Signature

23   Bank and the impacts on the shareholders of Synergy Brands,

24   that the, that this is a moderate kind of -- it is not

25   minimal.  It is certainly not five on the Richter scale, but

Proceedings                                                    25

1    it is significant and it should, and it falls in the

2    mid-range, so the Court, under the shadow guidelines, would

3    add three levels for victim impact.

4            We have reviewed a whole list of them, which I can

5    remember parts of them, but the ABA task force groups them as

6    culpability factors.  So things like, we believe things like

7    role.  How far up were you on the chain?  What was the

8    motivation?  Was this a scam from the start, or was it in the

9    context of an ongoing company?  What was the motivation?  Was

10   it to try to advance the interests of the company?  What was

11   the gain to the individuals, compared to the loss of the

12   victims?  And so it creates a scale there as well.

13           This one has a very broad and very unusual, given

14   that the subject area.  It has, zero is the middle.  You can

15   take away as many as ten levels, and you can add up to ten

16   levels, depending on the assessment of these various items

17   that relate to the culpability of this defendant in the

18   overall context of this crime.

19           So, given the context here of Mr. Faibish trying to

20   keep his company going and manipulating these accounts for

21   that purpose, and also recognizing that he, whether he

22   recognizes it publicly or not, that he is responsible for

23   significant criminal activity in the course of trying to

24   achieve that objective, and that he was a leader, he and

25   Mr. Gatti were close partners in this scheme, that is for the

```
               Proceedings                    26
```

1    Court's analysis of where on the scale Mr. Faibish's

2    culpability level fell.

3             So when you add those -- Ms. Atkinson is quickly

4    adding them up.  And if you add those various levels up, it

5    comes to a total of 26, which on the -- we did not get to the

6    Criminal History Category, but I assume no one objects to

7    Criminal History Category I being those paragraphs that relate

8    to it being accurate.

9             MR. SIMON:  Yes.

10            THE COURT:  And so that Criminal History Category I

11   is adopted as the Criminal History Category here.

12            And so for the record, Officer Haasnoot, please

13   recite for us where, under the official guidelines, the

14   sentencing range would be for Criminal History Category I and

15   offense level 43.

16            USPO HAASNOOT:  For offense level 43, Your Honor,

17   Criminal History Category I, the guideline is life.

18            THE COURT:  And with respect to Criminal History

19   Category XXVI?

20            USPO HAASNOOT:  The total offense level 26, Your

21   Honor?

22            THE COURT:  Yes, in Criminal History Category I.

23            USPO HAASNOOT:  In Criminal History Category I is 63

24   to 78 months.

25            THE COURT:  Okay.

```
                       Proceedings                      27
```

1          MS. SHWEDER:  And for the record, the Government

2   would object to using the shadow guidelines.

3          THE COURT:  Yes, I assumed you would.  And you will

4   be heard.

5          Just I point out to you, Ms. Shweder, when it comes

6   to the 3553(a) factors, that is where you make your objection

7   to whatever you want to object to, including my considering

8   shadow guidelines, all right?

9          MS. SHWEDER:  Yes, Your Honor.

10         THE COURT:  Now, with respect to the record, we have

11  indicated some of these items that the Court has had and

12  viewed them.

13         The Court has had the PSR, the two addenda to the

14  PSR, reviewed those.  The Court has reviewed the ABA task

15  force and the shadow guidelines they recommend.

16         The Court has reviewed the extensive filings by

17  various defense counsel over the course of this criminal

18  prosecution, both in connection specifically with the

19  sentencing and all of the attached letters to it, but also in

20  connection with the motions with respect to Fatico hearing and

21  post-trial motions.

22         The Court has also reviewed all of the Government's

23  filings with respect to sentencing, reviewed all of the

24  victims' statements that were provided and all of the

25  attachments to the defense letters.

```
                          Proceedings                    28
```

1           If there is some sort of category that I have left

2      out that you think you sent me something in writing covering

3      that category, please let me know and I will endeavor to

4      double-check.

5           Hearing none, I assume I touched all the bases

6      there.

7           That being case --

8           MR. SIMON:  Your Honor, there was -- after we

9      submitted our sentencing submission, there was a back and

10     forth between myself and the Government with some letters.  I

11     assume you read those as well.

12          THE COURT:  If I was copied on them, I read them, or

13     listened to them, as the case may be.

14          Thinking else?

15          MR. SIMON:  No.

16          THE COURT:  All right.  That means that we are, to

17     you, Mr. Simon, for your remarks on behalf of Mr. Faibish.

18          MR. SIMON:  Yes.  Thank you, Your Honor.

19          In going over the shadow guidelines, you touched on

20     some points that I wanted to address and I don't really know

21     where to begin.

22          This is -- I started out as Mr. Faibish's counsel

23     before his indictment and immediately after his indictment,

24     and then I rejoined the case for sentencing.  So in reading

25     some of Your Honor's decisions and post-trial motions and

Proceedings                              29

1   whatnot, and entering the trial, I want to correct an

2   impression that I think the Court has of Mr. Faibish of not

3   accepting responsibility, because I know during a trial,

4   especially if the defendant doesn't testify, the Court hears

5   day after day evidence of wrongdoing by the defendant, and

6   other than with defense counsel's summation, you never really

7   get to hear from the defendant until now.

8            So I want -- if there is an impression by the Court

9   that Mr. Faibish has not accepted responsibility, I want to --

10           THE COURT:  Is he accepting responsibility that he

11  committed a crime?

12           MR. SIMON:  Absolutely.  Absolutely.

13           THE COURT:  That he knowingly committed a crime?

14           MR. SIMON:  Yes, absolutely.

15           And that is why I feel it's so important.  I somehow

16  got the impression --

17           THE COURT:  Because there was a defense case.  There

18  was an effort to establish that he did not commit a crime.

19           MR. SIMON:  Well, I understand that.

20           THE COURT:  He did not testify nor was he required

21  to testify.

22           MR. SIMON:  Right.

23           THE COURT:  But there was a defense case that all of

24  this conduct was totally noncriminal.

25           MR. SIMON:  Well, let me back up and get to that a

```
                          Proceedings                    30
```

1    little bit.

2             Mr. Faibish never, ever wanted to go to trial.

3    Because I can state, having been his attorney early on, he

4    wanted to accept responsibility and get this behind him.  I

5    couldn't get the Government to really negotiate with me, other

6    than to, was told at the time that he had to plead to the

7    indictment.  And I believe Mr. Ryan, who succeeded me, had the

8    same experience.

9             So Mr. Faibish has felt remorse and really horror

10   over what he did, from the beginning.  I can attest to that.

11   I've now known him for six years and he knows the havoc that

12   he brought, wreaked, wrought, on a company that he loved, that

13   he founded in 1989.  And until this parade of, I don't know

14   what to call it, but absolutely conduct of the utmost

15   stupidity occurred, he led this company for 21 years and

16   without a blemish.

17            And it was his life and soul, and he loved it.

18   Unfortunately, because he was trying to keep the company

19   afloat, and you referenced this just a few minutes ago, he

20   engaged in this craziness, really for lack of a better word.

21   Utter craziness, stupidity.

22            But what makes this incredibly sad for me, having

23   known him now for six years, is he's not -- and my occupation

24   is to defend people in white collar cases -- but unlike

25   virtually all the others who put money in their pocket, this

```
                   VB      OCR      CRR
```

Proceedings                    31

1  case is extraordinary because it's not that.  Mr. Faibish --

2  Mr. Bobek referenced it.  He always acted for the good of the

3  company until this parade of horrors that took place and this

4  incredible acts of stupidity.

5            He's never enriched himself.  He's, as all the

6  letters attest, he's a man of his community, a family man.

7  He's raised three daughters, two of them graduates of the

8  University of Michigan, now working as engineers in the

9  engineering field.

10           The third daughter, Alana is a business and music

11 student at NYU at the Stern School.  His beloved wife has been

12 a math teacher her whole life.

13           These are not people who have, you know, sought to

14 live the grand life.  He just -- and so, and quite frankly,

15 and I want to say something, because I was really somewhat

16 taken aback by Ms. Shweder's letter, I believe.  It's dated

17 August 17th, in response to our sentencing papers.

18           And several times she referred to monies that

19 Mr. Faibish stole.  She used the word stole, and Mr. Faibish

20 -- if she has any evidence that he stole money and put it in

21 his pocket, I ask her to come forward and tell us about that

22 evidence, because I've reviewed this trial record and I don't

23 see any evidence of him stealing money and putting it in his

24 pocket.

25           And, in fact, she made a reference to Mr. Faibish

Proceedings                    32

1   stealing money to pay for his daughters' education, which to

2   me, I have to say, was outrageous, because all three daughters

3   are college graduates and are paying back, two of them who are

4   finished with college, are paying back their student loans and

5   are responsible, young, professional women.  So, you know,

6   there's not, as I can see, a scintilla of evidence anywhere

7   that he put money in his pocket and he never did, which is why

8   this case is so incredibly different from every other white

9   collar case that I've been involved in, both as an Assistant

10  U.S. Attorney and as a defense lawyer.

11          And did Mr. Faibish wreak havoc on Signature Bank?

12  Absolutely.  And on Synergy?  And he's been full of anguish

13  every day since this happened, and he realizes now he lost

14  control of his senses, I guess, to engage in utter, scheme

15  that was utter folly.

16          But it was not -- the important point, Your Honor,

17  it was not venal.  And this is a man who has worked hard all

18  his life and continues to live, you know, for his daughters,

19  his family, his community.  He doesn't live a lavish

20  lifestyle, never did, never wanted to.

21          So that's why I say to you this is, to me, having

22  known him as long as I have, incredibly sad situation.  Sad

23  for him, for his family, for all the havoc that this crazy

24  scheme, acts of check kiting wrought, but it was not, it was

25  not for any other purpose other than to keep, to try to keep

VB        OCR        CRR

Proceedings                          33

1    this company afloat.

2          And you will hear from him, Your Honor.  He will

3    stand before you and tell you how incredibly remorseful he

4    feels for the havoc that he wrought, but I would ask

5    Your Honor to keep this case in perspective and I think, you

6    know, by even reciting the shadow guidelines that you did, I

7    think you, you do put this in perspective, notwithstanding the

8    Government's request for life and all that.

9          So, I'd like for Mr. Faibish to address you,

10   Your Honor, and I did want to add, even though I tried to do

11   it earlier, he did make many overtures to Signature to try to

12   help them in any way he can, and he was rebuffed.  So he's

13   always tried to make amends for this, for lack of a better

14   word, the craziness that he and Mr. Gatti engaged in.

15         But it was not venality, Your Honor.  He loved this

16   company.  It was his whole life.  He started it and it meant

17   everything to him.

18         So I ask Your Honor to think about that in imposing

19   sentence on Mr. Faibish.  He's not a bad person by any stretch

20   of the imagination.  In fact, he's a very, very good man.  And

21   if -- with your indulgence, Your Honor, Mr. Faibish would like

22   to address the Court.

23         THE COURT:  Yes, Mr. Faibish.  I always will just

24   tell you first, that Mr. Simon's talents, but you do have a

25   personal right to speak to the sentencing court before the

Proceedings                        34

1   Court imposes sentence.  But I will also tell you that you

2   have the right not to speak as well.  It is up to you.

3              If you do choose to exercise your right of

4   statement, now is your opportunity.

5              THE DEFENDANT:  Thank you, Your Honor.

6              I stand before you shameful, regretful and contrite,

7   full of deep sadness and disappointment for my family,

8   friends, shareholders and this Court.  I was born in Israel

9   and lived there throughout my young childhood to the age of

10  12.  In Israel, my father was a successful master chef and my

11  mother was a homemaker.  We had a good life in Israel.

12             We moved to New York in 1972 and my parents relied

13  on me for their assimilation to the United States.  They did

14  not know the English language, how to apply for a job, how to

15  open up a bank account, how to file taxes, and how to become

16  legal citizens.

17             Since coming to America, I was always depended upon

18  by my family.  The pressure was consuming.  As I matured and

19  had my own family, my parents' continued dependance created

20  conflicts that made me distant and emotionally drained.

21             My parents instilled in me the value of honesty,

22  loyalty and the importance of good deeds, charity, family

23  values, and most of all, a strong faith in God.  I took care

24  of my parents for 42 years.  I still take care of my mother

25  after my father's death two years ago.  I just wish I could do

VB       OCR       CRR

```
                          Proceedings                      35
```

1   more and have my mother still believe she can depend on me.

2          In 2007, I strayed from my path and lost my way.

3   I'm very, very sorry for the poor choices I have made.  I

4   caused so much pain to those I love so dearly and would love

5   me.  I feel their pain and now I've disappointed them.

6          This case has been my life.  It has consumed me and

7   my family for the last six years, and the stress and despair

8   has been unbearable.  I have always aimed to provide for my

9   family, friends and community.

10         After graduating Columbia University in 1983, and

11  working as a project manager for five years, I co-founded and

12  worked for Synergy Brands for 21 years until 2010.  My

13  employees and shareholders became my business family.  Even

14  during this most stressful part of my life, I helped every

15  single former Synergy employee get a job.

16         My sins were not for greed or personal gain, but to

17  sustain the growth of Synergy Brands in a new challenging

18  business, Quality Food Brands.  My very poor judgment caused

19  financial harm to Signature Bank and my shareholders, and for

20  that, I seek their forgiveness.

21         I still love Synergy Brands.  I am still a

22  shareholder and I want the best for Signature Bank and my

23  shareholders.

24         I ask for Your Honor to see the man that I am and

25  not the man I have been portrayed to be.  I have made serious

```
                            Proceedings                    36
```

 1   mistakes for which I'm deeply sorry.  I plead with Your Honor

 2   to have mercy and compassion.  I only want the opportunity to

 3   live the rest of my life with honesty and integrity.

 4            I have fallen from success to the abyss and I pray

 5   that I will have the opportunity to redeem my family's good

 6   name, and once again become a productive member of society.

 7            Thank you, Your Honor.

 8            THE COURT:  Thank you, Mr. Faibish.

 9            All right.  Ms. Shweder, do you wish to be heard on

10   behalf of the United States?

11            MS. SHWEDER:  I do, Your Honor, but I believe that

12   Ms. Haasnoot wanted to be heard as well.

13            USPO HAASNOOT:  Before the Government speaks,

14   Your Honor, Mr. Bobek had given Probation a victim statement

15   in which he reported he's a victim of the instant offense and

16   lost an estimated $100,000, yet today, Your Honor, he came up

17   before you and said that he's not a victim of the instant

18   offense and he came to speak in support of Mr. Faibish.

19            So, it that respect, Your Honor, Probation would say

20   that his $100,000 claim should be subtracted from any amount

21   of restitution that you're going to order the defendant to

22   pay.

23            THE COURT:  All right.

24            MR. O'BRIEN:  Your Honor?

25            THE COURT:  Is this, Mr. Bobek?

```
                        Proceedings                    37
```

1          MR. O'BRIEN:  I would like to, on behalf of

2     Signature Bank, respond to a point that was made by Mr. Simon

3     about the assistance that was supposedly provided to Signature

4     Bank about recovery.

5          THE COURT:  I am not going to hear you, Mr. O'Brien.

6     The victims' piece was at the beginning of the hearing.

7          Ms. Shweder is here to represent, with respect to

8     argument, Ms. Shweder has the responsibility to respond, if

9     she so desires, to any argument that was made by her

10    adversary.

11         MR. BOBEK:  Thank you.

12         MS. SHWEDER:  So, is it my turn, Your Honor?

13         MR. BOBEK:  Your Honor?

14         THE COURT:  Mr. Bobek.

15         MR. BOBEK:  The Government just said that I don't --

16         THE COURT:  You will have you to come up.

17         MR. BOBEK:  May I come up?

18         THE COURT:  Yes, surely, because otherwise it's hard

19    for the reporter.

20         (Mr. Bobek takes stand.)

21         THE COURT:  The record will also reflect that we

22    have already agreed that restitution will be handled

23    post-sentencing on papers, unless we need to have a further

24    hearing.

25         Mr. Bobek, you wish to clarify something?

```
                          Proceedings                        38

 1          MR. BOBEK:  Yes, Your Honor.

 2          In my statement I said that I did not say that I

 3   felt to be a -- I said that I did not feel victimized by Mair

 4   Faibish.  I did not state that I don't feel that I am a victim

 5   of this whole incident.  And for clarification, I think that

 6   there's a distinction between the two.

 7          THE COURT:  Let's see if I can tell you how I am

 8   understanding you.

 9          You say you have been, you are a victim and that as

10   a result of whoever's responsible for these various and sundry

11   acts that led to the demise of Synergy, that you are out

12   $100,000 on an investment you made?

13          MR. BOBEK:  Yes.

14          THE COURT:  And you personally don't hold

15   Mr. Faibish responsible for that loss.

16          MR. BOBEK:  I do not hold Mr. Faibish personally --

17          THE COURT:  But the acts that are before the Court,

18   you claim, did harm you.  These transactions, for which

19   Mr. Faibish is legally responsible, they did cause you harm,

20   correct?

21          MR. BOBEK:  Yes.  Okay.  Thank you for clarifying

22   that.

23          THE COURT:  Do you agree?

24          MR. BOBEK:  I agree, you are correct, Your Honor.

25   Thank you.  I take away what I have just said.
```

Proceedings                                    39

1          THE COURT:  Thank you, Mr. Bobek.

2          (Mr. Bobek excused.)

3          THE COURT:  Three is the charm, Ms. Shweder.

4          MS. SHWEDER:  The Government is hearing for the very

5    first time today that, from Brad Simon actually and not from

6    the defendant himself, that the defendant is accepting that he

7    did commit a crime.  And I take issue with his lawyer's

8    insinuation that the Government, for some reason, just wanted

9    to go to trial and refused to negotiate.

10         I know that is not true at all.  The Government

11   provided Joe Ryan with a plea agreement and in court, we

12   raised it in court that we provided Joe Ryan with a plea

13   agreement, and Joe Ryan rambunctiously said that he refused

14   the Government's offer, and he refused to negotiate with the

15   Government, and that he "would be vindicated at trial."

16         And I think there may even be a letter somewhere

17   about how he would be vindicated at trial, and it was not the

18   Government who didn't want to negotiate with the defendant.

19   It was the defendant, through Joe Ryan, who did not want to

20   negotiate with the Government.

21         The Government has no interest in needlessly using

22   up resources and going trial in a case that is not necessary.

23   We have never once heard that the defendant wanted to plead

24   guilty.  So that's just disingenuous.

25         MR. SIMON:  I will respond to that after she's

```
                       Proceedings                      40
```

1    finished.

2              THE COURT:  I will give you an opportunity.

3              MR. SIMON:  All right.

4              MS. SHWEDER:  And to say that there's no evidence

5    that the defendant stole money is also disingenuous.

6    Signature Bank was out $26 million.  While a couple million

7    dollars was paid back subsequently, that money was real money

8    that Signature Bank was out.

9              The Government never said that the money was

10   definitely used to pay the defendant's children's fund.  The

11   Government said that the Government did not know where the

12   money had gone.  The Government specifically said we have not

13   been able to find, we've never been able to prove, where the

14   money had gone, and I said whether it was used to pay the

15   funds for education doesn't matter.

16             My point was only that no hatter how it was used is

17   irrelevant.

18             THE COURT:  You are saying, so I can understand it,

19   that the Government does not have admissible proof that would

20   suggest that the money that disappeared from Signature was

21   used personally by Mr. Faibish, or whether it was plowed back

22   into the business itself.

23             MS. SHWEDER:  Exactly, Your Honor.  And we have

24   always said we never knew where the money had gone.

25             And, in fact, that leads me to Signature Bank as

```
                          Proceedings                    41
```

1    well.  Shawn O'Brien, the lawyer for Signature Bank who tried

2    to speak earlier, he has been in communication with the

3    Government, and I know that he has told me that he has been

4    rebuffed several times by the defendant, not the other way

5    around.

6              In no way ever was Signature Bank refusing the

7    defendant's help in trying to locate the money.  That would

8    just not be in Signature Bank's best interest.

9              THE COURT:  Well, the statement that was made in

10   connection to that, as I recall, was by Mr. Simon that the

11   Government instructed Signature Bank not to seek Mr. Faibish's

12   cooperation.

13             MS. SHWEDER:  That's not true.

14             THE COURT:  Well, it's how I understood it.

15             MR. SIMON:  Well --

16             MS. SHWEDER:  I think it's my turn to talk, but it's

17   just not true.  It's absolutely not true.

18             THE COURT:  I'm going to give you a chance,

19   Mr. Simon.

20             MR. SIMON:  Okay.

21             MS. SHWEDER:  And I think it would make sense to

22   hear from Shawn O'Brien, but my understanding --

23             THE COURT:  I believe you are accurately reflecting

24   what Mr. O'Brien wanted to say.

25             MR. O'BRIEN:  That is correct, Your Honor.

```
                        Proceedings                    42

 1        MS. SHWEDER:  And that Shawn O'Brien, the lawyer for

 2   Signature Bank, they were waiting for the defendant's help

 3   and, in fact, called and reached out to the defendant's

 4   lawyer.  I think actually, Brad Simon, but maybe also a

 5   previous lawyer, lawyer Dilimetin, too, from what I remember

 6   Mr. O'Brien telling me earlier and then never got a return

 7   call.

 8        So even though there was some vague, supposed

 9   interest in helping the bank find the money, when the bank

10   tried to call back to get Mr. Faibish's help, was rebuffed and

11   just completely ignored.  The phone calls were not returned.

12   And Signature Bank still would love to know where the money

13   is, would absolutely love to help in finding out where the

14   money is but has never, never been helped in finding that

15   money.

16        And a point about whether the money was just being

17   used to keep the company afloat.  In fact, it may have, in

18   part, been used the keep the company afloat.  Like I said, I

19   don't know where it was used, but if the money was being used

20   just to keep the company afloat, why then did Mr. Faibish cook

21   the books on the sales figures?  Why make it look like the

22   company's doing better than it actually is?

23        That's just a way it dupe investors.  And when you

24   lie in the financial statements, those are additional,

25   unnecessary lies that have nothing to do with just keeping the
```

Proceedings                                    43

1    company afloat.

2            So even if the money were being put back into

3    keeping the company afloat, there was no reason for these

4    additional lies.

5            And then just as to the shadow guideline,

6    Your Honor, and I understand Your Honor's point about wanting

7    to use other guidelines.  But the Government's perspective is

8    that the guidelines were revised on November 1st, 2015 and had

9    taken in account, the sentencing commission had taken into

10   account the ABA's task force, their recommendations when they

11   did evaluate and issue the new set of guidelines, which was in

12   favor of defendants in white collar cases in many respects.

13           THE COURT:  The Court understands that and the

14   revision adopted is woefully inadequate and does not come

15   anywhere close to addressing the concerns of bench and bar

16   that prompted the inquiry in the first place.

17           MS. SHWEDER:  In addition, Your Honor, I would like

18   to repeat what Sal Trifiletti said in that the defendant has

19   never, up until this moment, this is the first time I've heard

20   of any kind of remorse or of him accepting any kind of

21   responsibility.  Never in this case have I heard any remorse

22   out of this defendant, any acceptance of responsibility, any

23   attempt to help the Government in any way, or any attempt to

24   help Signature Bank in any way recover the funds.

25           And I just -- all I've heard was blaming Signature

```
                            Proceedings                    44
```

1   Bank for things as well.

2          And those essentially conclude the Government's

3   remarks, Your Honor.

4          THE COURT:  Mr. Simon, you requested some time to

5   respond.

6          MR. SIMON:  Yes.

7          Ms. Shweder just finished with all I've heard is

8   blaming Signature Bank and whatnot.  I assume she's talking

9   about the arguments made by Mr. Faibish's counsel at trial,

10  because Mr. Faibish has never had an opportunity to express

11  remorse until today.  But I can represent to the Court that as

12  long as I've known him, since 2010, he has felt nothing but

13  remorse.

14         And I can tell you emphatically that when I

15  represented him in round one, I guess he had four lawyers, I'm

16  one and four, there were two in between, in round one.

17         THE COURT:  We've lost track.

18         MR. SIMON:  Yes.

19         I contacted then Assistant United States Attorney

20  Ilene Jaroslaw multiple times and asked to come down.  She

21  refused to meet with me and her response was plead to the

22  indictment.

23         And if Mr. Ryan said what Ms. Shweder claims he

24  said, then shame on him, because I can tell you if he was full

25  of bravado and wanted to go to trial, I can tell you that that

```
                    VB       OCR       CRR
```

Proceedings                                    45

1    was never what Mr. Faibish wanted, because from the day I knew

2    him, he wanted me to get this resolved.  And they wouldn't

3    meet with me or Ms. Jaroslaw wouldn't meet with me.  And that

4    was my response.  Plead to the indictment.  Which, you know,

5    was quite -- I found quite extraordinary that she was

6    insisting on a plea to the indictment as opposed to a plea

7    agreement.

8            But I know that as far as cooperating with Signature

9    Bank, that's what Mr. Faibish has wanted to do, and if there's

10   any misunderstanding, we can set an appointment today and I'm

11   not posturing, regardless of what sentence you give him, he

12   will be at the Signature office on Monday at 9:00 o'clock to

13   work with them because he's wanted to do that forever.

14           But there have been lawyers Stanley Arkin and

15   whatnot, who have made it difficult for him.  So -- but he, I

16   can assure you, if Mr. O'Brien wants to have an appointment

17   with Mr. Faibish, he will be there, regardless of what

18   sentence you impose.

19           And once again, Ms. Shweder didn't really claim --

20   you know, I still haven't heard her say, when she talks about

21   him stealing money, check kiting and stealing money, I

22   interpret stealing money as putting money in your pocket and

23   using it for personal use.  And she said -- she uses that word

24   repeatedly.  I've given her an opportunity to say where is the

25   evidence of money that he stole --

```
                           Proceedings                    46
```

1    THE COURT:  She told you, Mr. Simon -- and I don't

2  want to belabor it -- she doesn't know where it went.  She's

3  not saying that it definitely was diverted into a pocket, a

4  personal pocket of Mr. Faibish.  She says she doesn't know.

5    MR. SIMON:  Okay.  But I also submit, Your Honor,

6  there isn't a scintilla of evidence anywhere, nor does any

7  agent of the Government have any evidence that he stole money

8  for personal use.  He never has and he never will.

9    THE COURT:  What is before the Court is that the

10  money is gone.  What is before the Court is that the money is

11  gone as a result of an act taken by Mr. Faibish.  And by

12  Mr. Gatti.

13    MR. SIMON:  An act of stupidity.

14    THE COURT:  Well, it is an act, but that is a

15  conduit.  That is where the evidentiary trail ends.

16    MR. SIMON:  Can I have a minute with Mr. Faibish?

17    THE COURT:  Sure.

18    (Pause in the proceedings.)

19    MR. SIMON:  With some trepidation, Your Honor,

20  Mr. Faibish has asked to say something in connection with

21  where the money went.  I haven't had a chance to really vet

22  this, but he's anxious to speak, so I'm going let him.

23    THE COURT:  Go ahead, Mr. Faibish.

24    THE DEFENDANT:  In trial, if you will remember, we

25  showed that the $26 million of checks that were returned, that

```
                   VB        OCR        CRR
```

```
                            Proceedings                       47
```

1  were honored, and then subsequently returned by Laurentian

2  Bank and Bank of Montreal, all $26 million in those bank

3  statements showed that the money went to Laurentian Bank and

4  Bank of Montreal.

5            Signature Bank, to date, has still not sued Joseph

6  Gatti, or Laurentian Bank.  I hired a Canadian lawyer with

7  Signature's lawyer to sue Laurentian Bank and recover that

8  money before Gatti gets ahold of that money and, basically, as

9  you know from the record, Gatti just settled a $5 million

10  claim with Bank of Montreal for a second fraud and somehow was

11  able to make good on it.

12            MR. SIMON:  All right, all right.

13            THE DEFENDANT:  So, I'm certain that the money trail

14  is very clear.  You said in the beginning that this case is

15  very simple, and it is.  Because you look at a bank statement

16  for October 26th, and it shows exactly every dime of money

17  going.  Signature Bank has a record of every dime of that in

18  their own spreadsheets, and it's very easy to follow the

19  money.

20            Now, I'm willing, at any cost, to help Shawn O'Brien

21  recover the money, but to date, for whatever reason, even

22  though Bank of Montreal sued Joe Gatti and recovered the money

23  that they lost, for whatever reason, Signature Bank has not

24  sued Joe Gatti for the money, or Laurentian Bank, and all that

25  evidence of the bank account was in trial.

```
                          Proceedings                    48
```

1       So, that's just, you know, the icing on the cake.

2  And obviously, it takes a lot more than just my words to prove

3  this.  But I can tell you that this is what I've been trying

4  to do from day one.

5       I paid Signature Bank $2 million the first year,

6  2010, under the loan agreement.  And when Ilene Jaroslaw

7  decided to pursue me, the Board fired me and stopped all

8  payment to Signature Bank.  I still had a good relationship

9  with Signature Bank after that, but at some point, Signature

10 Bank just refused talk to me when Jonathan Schlesinger and

11 Stan Arkin was held in the case.

12      As far as Mr. O'Brien, I don't really know much

13 about him, because he came on later on.

14      But I tell you, that if you look at the record, I

15 made sure, number one, that the loss of Signature Bank was not

16 $51 million initially, but only 26.  And then paid another

17 $8 million until the Board terminated my employment.

18      Thank you, Your Honor.

19      THE COURT:  Thank you, Mr. Faibish.

20      MS. SHWEDER:  All right.  Your Honor, indeed it does

21 take a lot more than just Mr. Faibish's words to try to show

22 that the $26 million went to Laurentian Bank and Bank of

23 Montreal because he did not show that at trial and it's simply

24 not true that the money is at Laurentian Bank or BMO.  And his

25 insinuation that Gatti settled $5 million in a different fraud

Proceedings                              49

1   with BMO is also not true.  As the copious submission showed,

2   Gatti was, first of all, not even the person who took out the

3   loan.  It was his boss who took out the loan and it was his

4   boss who settled with the bank to just simply repay the loan

5   that was taken out, the operating loan.  It had nothing

6   actually to do with Gatti.

7          So I don't know why that's even relevant, but I just

8   thought it was important to point out that it's just also

9   inaccurate.

10          MR. SIMON:  I don't think it's relevant either, but

11  if you look at the submissions from the Bank of Montreal, the

12  notion that Ms. Shweder asserted to the Court that his role

13  was limited to giving tours is just ludicrous, because if you

14  look at the bank pleadings, he is the lead defendant and he is

15  the one who is interfacing with the BMO officer to get the

16  loans.  So that's been litigated.  We don't need to go there

17  again.

18          MS. SHWEDER:  And it's not true --

19          MR. SIMON:  Well --

20          MS. SHWEDER:  -- the allegation --

21          THE COURT:  I do not want it hear anymore.  We have

22  reviewed enough of that and the immediately prior motion, and

23  for those of you on the criminal side, on the civil side, lots

24  of things are said in complaints.  Lots of things are said in

25  complaints.

VB        OCR        CRR

```
                            Proceedings                        50

 1          All right.  That brings us to the end of the

 2  argument and now to me to proceed with the sentencing process.

 3          In my sentencing process, and probably given the

 4  peculiarities, the unusual nature of some of the things that

 5  we have heard at this sentencing hearing, it probably makes

 6  even more sense than usual, and that is simply this.  I

 7  announce my intended sentence, and the reasons for it, and

 8  give Counsel an opportunity to point out any legal error that

 9  I may be verging on in the sentence, if the sentence might

10  itself, as I am thinking it out, is unlawful, gives me a

11  chance to avoid the error and make the change, if I concur

12  with Counsel.

13          It is not an opportunity for Counsel to relitigate

14  things that they are not happy about, but recognize that they

15  will, within my lawful authority, to make that determination.

16          The record will also reflect that advisory, though

17  they are, perhaps should underscore that a couple of times,

18  the Court has reviewed the official Sentencing Guidelines

19  promulgated by the United States Sentencing Commission that

20  are relevant to this case.  The Court has indicated it has

21  also reviewed and has decided to follow the shadow guidelines

22  promulgated by the task force appointed by the criminal

23  justice section of the American Bar Association.

24          The Court has fully reviewed the PSR, the two

25  addendums to it, the very fulsome sentencing submissions that
```

Proceedings                              51

1    have been made both by the defendant and the Government.  The

2    Court has considered the testimony of the victims who have

3    testified here in the course of the sentencing hearing.

4            The Court has considered the arguments of Counsel at

5    the sentencing hearing and the words of statement that

6    Mr. Faibish has made at the time of sentencing, and this is

7    the Court's intended sentence and the reasons for it.

8            I am not going to belabor this analysis because we

9    have had a chance to share many thoughts in the course of

10   discussing the shadow guidelines.  There is, for all the

11   simplicity, Mr. Faibish, and Mr. Simon, this is a serious,

12   very serious economic crime.  There was certainly, while it

13   was not threatening their financial security, it certainly was

14   a very significant impact on the Signature Bank.

15           Obviously, the funny money that infused operations

16   and this phony movement of various raw materials and finished

17   product between Canada and the United States that eventually

18   take down the public company, Synergy Brands, jeopardizing

19   shareholders, employees and the like, it is a very serious

20   offense.  Under the guidelines, of course, the United States

21   criminal justice system, jurisprudence, follows a fairly

22   standard jurisprudence, which is the more serious the crime,

23   the more serious the punishment.

24           So there has to be a coordination between the two

25   that is necessary to promote justice, and show respect for the

Proceedings                                              52

1    law, and for issues of deterrence and specifically so that

2    what seems to be a first-time offense by Mr. Faibish, is never

3    repeated, and that there is sufficient general deterrence in

4    how the Court treats this kind of offense so that others will

5    not try to manipulate the banking system here.

6           A lot of trust was breached here, not only the trust

7    between the public company and it is represented by its

8    management and the shareholders, many of whom put significant

9    chunks of their life savings and making investments such as

10   these, and to see them go down the drain.  That is a very --

11   the Court takes that very seriously, particularly against the

12   current backdrop where our capital system seems to be breaking

13   down or under attack, certainly during this period in which

14   these offenses took place.

15          Another breach of trust between banker and customer.

16   None of this could have really happened except for the

17   generosity of the banking system to allow a float of the

18   length of time that was allowed here.

19

20          (Continued on following page.)

21

22

23

24

25

53

1          THE COURT:  (Continuing.)

2          International banking relation, to some extent, mind

3    boggling.  There was evidence certainly surfaced during the

4    course of the trial that when all the balls are in the air and

5    this game of musical chairs called check kiting, that when

6    somebody along the way drops the ball, then everything

7    implodes.  That is what happened here.  It happened with very

8    serious results.

9          I have no reason to disbelieve Mr. Faibish, that the

10   rest of your life you have been a morally upright person, no

11   reason to disbelieve that.  Obviously, family and friends have

12   spoken on your behalf.

13         Everyone in the courtroom could see how conflicted

14   Mr. Bobek was, recognizing that as a result of these acts, he

15   was out a lot of money by his reckoning and, at the same time,

16   appreciated your business style, that he thought that the way

17   you approached your leadership synergy was the way that

18   companies should be managed.

19         There was a lot to be said about you and for you.  I

20   am not the ultimate judge of the character of your soul.

21   That's a judge far more important than I am.  But I have to

22   make an assessment as to what we do when you stand convicted

23   of the kinds of crimes that a jury found you guilty of after a

24   considerable trial.  That is my job.  That is my

25   responsibility.

54

1          We labored hard, as you probably suspect, in working

2     with the shadow guidelines.  I think it's fairly reflective

3     what a court is required to do under Section 3553(a).  It

4     provides the kind of balance between punishment on the one

5     hand, and the nature of the crime on the other hand, the

6     motivation of the defendant, whether it is aberrational, is he

7     going to be rehabilitated, was it for a good objective gone

8     bad.  All of those things, all of those inquiries are

9     inquiries that get prompted by these guidelines.

10          The Court is of the view that to follow them in your

11    case is what is most reasonable here, for the fraud and also

12    for the false reporting, which tries to provide the shield for

13    all the antecedent, all the wrongful conduct that precedes it.

14          So for all of those reasons, it is the intended

15    sentence of the Court with respect to each of the three counts

16    of the indictment upon which you were found guilty by the jury

17    to impose a custodial sentence of 63 months, all to run

18    concurrently with each other, and with respect to each, to

19    impose a period of three years of supervised release.

20          With respect to each it would be the intention of

21    the Court to impose a $100 special statutory assessment for a

22    total of $300.

23          We will enter an order of restitution.  We have

24    discussed that earlier.  We can't say in what amount that is,

25    but we will be entertaining at least on paper the submissions

55

1   of counsel so we can determine that.

2              Refresh me, Officer, the restitution takes

3   precedence over any fine?

4              MS. HAASNOOT:  Yes, Your Honor.

5              THE COURT:  The Court does thought intend to impose

6   a fine.

7              Was there a forfeiture agreement?

8              MS. SHWEDER:  Yes, Your Honor.

9              You signed an order that was filed Docket Number 215

10  on 11/4/14.  You signed a forfeiture order.

11             THE COURT:  The amount was?

12             MS. SHWEDER:  I think it was $51,166,000,

13  November 4, 2014, if that can be pronounced and attached to

14  the judgment.

15             MR. SIMON:  I assume prior counsel had an

16  opportunity to be heard on that?  I wasn't here at that time.

17             THE COURT:  They were submitted.  I don't think

18  there was any opposition to it.

19             MS. SHWEDER:  There was not opposition.

20             MR. SIMON:  There should have been.

21             THE COURT:  It has been entered previously.  It will

22  become part of the sentence.

23             The deputy clerk will read into the record the other

24  conditions of the three years of supervised release.

25             THE CLERK:  The defendant shall maintain full-time

56

1   verifiable employment as approved by the Probation Department.

2          The defendant shall comply with the restitution

3   order.

4          The defendant shall provide full financial

5   disclosure to the Probation Department.

6          And the defendant shall not possess a firearm,

7   ammunition or destructive device.

8          THE COURT:  That is the intended sentence of the

9   Court, the reasons for it.

10          Does any side take any legal objection or exception

11   to it?

12          MS. SHWEDER:  No, Your Honor.

13          MR. SIMON:  No, Your Honor.

14          THE COURT:  There being no legal objection or

15   exception, the sentence of the Court as announced is adopted

16   and incorporated as the sentence of the Court imposed for the

17   reasons stated.  The reasons of the Court for the intended

18   sentence are adopted and incorporated as the reasons for the

19   sentence I have imposed.

20          Mr. Faibish, please take notice that you have a

21   right to appeal your conviction and sentence and if you

22   do wish to file an appeal and cannot afford to do so, you may

23   notify the Clerk of Court of that fact and the Clerk of Court

24   will prepare and file a notice of appeal in forma pauperis at

25   your request.  Please take further notice that any notice of

57

1    appeal ordinarily must be filed in the Clerk's office within
2    14 days of the entry in that office of the order or the
3    judgment to appeal.
4            Are there any requests?
5            MR. SIMON:  Yes, Your Honor.
6            I understand that it's -- that you don't have --
7    that it is only advisory, but for religious reasons,
8    Mr. Faibish is requesting if you could recommend the Bureau of
9    Prisons that he be designated to Otisville Correctional
10   Institution.
11           THE COURT:  There are facilities there?
12           MR. SIMON:  Yes.  There are orthodox facilities
13   there.
14           THE COURT:  Anything further?
15           MR. SIMON:  And he would ask perhaps a surrender
16   date of 90 days, which would give him an opportunity to be
17   designated prior to surrender.
18           THE COURT:  Officer Haasnoot, what are we doing?
19           MS. HAASNOOT:  Usually 60 days, Your Honor.
20           THE COURT:  That's at least eight weeks.  Let's do
21   it this way.  We will make it 60 days for now, with the
22   understanding, Mr. Simon, that to the extent that for whatever
23   reason Mr. Faibish is not designated by then, that you will
24   advise us of that fact and we will extend it accordingly.  So
25   that's 60 days from today, William, is what?

58

1      THE CLERK:  The 9th or the 16th.  That's a Monday.

2      MR. SIMON:  Of May?

3      THE CLERK:  Of May.  I'm sorry.

4      THE COURT:  The 16th of May, at 2:00 o'clock, at the

5   place of designation, with the understanding that you will let

6   us know, Mr. Simon, if Mr. Faibish has not been designated.

7   We will entertain that request.

8      MR. SIMON:  Thank you, Your Honor.

9      THE COURT:  All right.  We will look forward to

10  counsel working out some sort of scheduling for a submission

11  on restitution.  In the best of you will all worlds, you would

12  agree to the amount.  Keeping in mind that -- Officer

13  Haasnoot, correct me, I have a 90-day window there?

14     MS. HAASNOOT:  Yes, Your Honor.

15     THE COURT:  For getting that done.  We will look

16  forward to getting that done in advance of that.

17     Anything further?

18     MR. SIMON:  No, Your Honor.

19     MS. SHWEDER:  No, Your Honor.

20     THE COURT:  All right.  Mr. Faibish, we wish you the

21  best and your family the best.  I think you know more than

22  anyone that the only victims that we haven't talked about are

23  the ones you love the most, which is your family.  To them,

24  they rightfully supported you, and it is your job to make it

25  all work out.

59

1          Good luck to you.

2          THE DEFENDANT:  Thank you.

3          THE COURT:  You are welcome.

4          (Matter concludes.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25