# EXHIBIT M

1

```
 1                 UNITED STATES DISTRICT COURT

 2                   DISTRICT OF CONNECTICUT

 3   _____
     United States of America    )July 23, 2014
 4                 Government     )10:00 a.m.
     v.                           )
 5   Jesse C. Litvak              )3:13cr19(JCH)
                   Defendant.     )
 6   _____)

 7
                             141 Church Street
 8                           New Haven, Connecticut

 9              SENTENCING HEARING

10
     B E F O R E:
11                   THE HONORABLE JANET C. HALL, U.S.D.J.

12

13   A P P E A R A N C E S:

14   For The Government  :     Jonathan N. Francis
                               Christopher Mattei
15                             U.S. Attorney's Office-NH
                               157 Church St., 23rd floor
16                             New Haven, CT 06510

17
     For the Defendant   :
18                             Patrick Smith
                               John Michael Hillebrecht
19                             DLA Piper US LLP-NY
                               1251 Avenue of the Americas,
20                             27th Floor
                               New York, NY 10020-1104
21
                               Ross Garber
22                             Shipman & Goodwin
                               One Constitution Plaza
23                             Hartford, CT  06103-1919

24

25
```

1              THE COURT:  Good morning.  Give me one second,

2     please, to get organized.

3              Good morning again to everyone.  We're here this

4     morning in the matter of the United States of America vs.

5     Jesse C. Litvak, Docket Number 3:13-CR-19.

6              If I could have appearances, please.

7              MR. FRANCIS:  Good morning, your Honor.  For the

8     government, Jonathan Francis and Christopher Mattei.  Also

9     with us at counsel table is SigTarp Special Agent James

10    O'Connor and Senior Investigator Robert Marston.

11             THE COURT:  Good morning to all of you.

12             MR. SMITH:  Good morning, your Honor.  Patrick Smith

13    for Mr. Litvak.  Also representing Mr. Litvak is my partner,

14    John Hillebrecht and Ross Garber.

15             Mr. Litvak is present in court.

16             THE COURT:  Yes.  Good morning to all of you.

17             As I said when I began, that we're here today in

18    connection with the sentencing of Mr. Litvak following his

19    conviction on a number of counts by a jury several months

20    ago.

21             I will just state for the record that I have

22    reviewed the PSR, the addendum, the second addendum including

23    the correspondence with counsel, which itself included

24    attachments.  I reviewed all of that.  I reviewed the

25    government and the defendant's sentencing memorandums and

1    their replies thereto to each other's, including all of the

2    attachments.

3         I, of course, have observed the trial evidence,

4    testimony by witnesses, cross-examination thereto, and I have

5    gone back in preparation for the sentencing and reviewed some

6    of that testimony.  I have not reviewed all of it, but I have

7    reviewed some of it to refresh my recollection.  Also,

8    obviously, counsel have cited me to various cases and to

9    articles.  I've reviewed those as well.

10        Is there anything else that I should have reviewed

11   that I haven't generally referred to as having reviewed?  Is

12   there something I've missed?

13        MR. SMITH:  We had a motion to supplement the

14   record.

15        THE COURT:  Yes, I was going to deal with that in a

16   second.  I have reviewed those attachments already, and I

17   granted it, but I don't think it's been docketed.  I assume

18   there's no objection.

19        MR. FRANCIS:  There is no objection, and there's

20   nothing further from the government.

21        THE COURT:  All right.  Then that takes us to the

22   issue of sentencing, which I will just state briefly that

23   it's my obligation here today, Mr. Litvak, to impose a

24   sentence upon you, after considering all of the factors that

25   are set forth by law in a section of the law known as

1    3553(a), and it is my intention to do that today.  I may not

2    specifically refer to every one of them.  I am mindful of

3    them all, but if I don't, it is because I considered it, and

4    I don't find it particularly significant, I guess I will say.

5    However, I will spend quite a bit of time on the ones that I

6    do, which are the nature and circumstance of the offense,

7    your history and characteristics and then the need for the

8    sentence.  Of course, the guidelines are also very important

9    and I need to start with those.

10            Before I turn to the guidelines, I want to be sure,

11   Mr. Litvak, that you had the opportunity to read what is

12   called the Presentence Report prepared by Officer Lopez and

13   had an opportunity to discuss it with counsel before today.

14            THE DEFENDANT:  Yes, your Honor, I have.

15            THE COURT:  All right.  And counsel was able to

16   answer any questions you had about it?

17            THE DEFENDANT:  Yes.

18            THE COURT:  All right.  Thank you very much.

19            I think we'll start with the PSR so that we can then

20   get to the guidelines and then to the other factors.  With

21   respect to the PSR, does the government have any objections

22   to the PSR to the extent it sets forth facts which could be

23   relevant to the sentencing?

24            MR. FRANCIS:  No objection, your Honor.

25            THE COURT:  How about from defense?

1              MR. SMITH:  We do, your Honor.

2              THE COURT:  Yes.

3              MR. SMITH:  And they are set forth in our June 10th

4   letter.

5              THE COURT:  Well, let's just go through, if you

6   would, as to which ones -- assuming you press them all, we'll

7   go through all of them.  But if we could go by paragraph so I

8   can hear argument and then rule on them.

9              MR. SMITH:  With respect to the Paragraph 8, your

10  Honor, we'd ask --

11             THE COURT:  Yes.

12             MR. SMITH:  -- the term "toxic" be stricken from the

13  Presentence Report.   It is inappropriate under the

14  circumstances in this case.   In particular, given the nature

15  of the securities, how they perform, toxic refers in the

16  context of the credit crisis to essentially securities that

17  went to zero, and the securities performed.   All of them

18  performed.

19             THE COURT:  I think the probation officer had

20  reported that he had not responded to your objection in the

21  sense of altering the PSR.  Does the government have an

22  objection to altering the language?

23             THE PROBATION OFFICER:  To assist in this analysis

24  of the PSR, I would just refer the parties and the court to

25  the second addendum to the PSR, and in the third paragraph,

1     the second addendum, I tried to adequately outline Mr.

2     Litvak's objections paragraph by paragraph.

3              THE COURT:  Yeah.  Okay.  But you --

4              THE PROBATION OFFICER:  But I have not made any

5     revisions to the PSR.

6              THE COURT:  Does the government object to the

7     deletion of the word "toxic"?

8              MR. FRANCIS:  I don't think it is that significant,

9     Judge, taking out the word "toxic," because then the sentence

10    doesn't make any sense.  But you could make a deletion of the

11    end part of that sentence.

12             THE COURT:  Right, beginning with "that"?

13             MR. FRANCIS:  That's correct, your Honor.

14             THE COURT:  Ray, why don't we do that.

15             Your next one, sir?

16             MR. SMITH:  Well, Paragraph 9, your Honor, we just

17    want to supplement the offense conduct description with the

18    information we set forth in Paragraph 9 that describes the

19    relationship between the Treasury, the PPIPs and the PPIP

20    managers.

21             THE COURT:  I don't know that that's particularly

22    pertinent to my -- to sentencing facts.  I mean, facts that

23    would be pertinent or important to me in sentencing.  I'm

24    aware of the information you set forth.  It is attached as an

25    addendum.  I'm not inclined to adopt it.

```
 1            MR. SMITH:  We had the same issue on Paragraph 10,
 2     your Honor.
 3            THE COURT:  Yes.
 4            MR. SMITH:  I guess what I'd do then is move on to
 5     Paragraph 11, which I do think is substantive --
 6            THE COURT:  Okay.
 7            MR. SMITH:  -- with respect to the issue of loss,
 8     which is really where we're getting to.
 9            THE COURT:  Yes.  Well, yeah, we're going to get to
10     the guideline calculation, I guess, sort of a legal argument.
11     You object, though, to the characterizations?
12            MR. SMITH:  Well, I think in particular the
13     statement in the second line in our objection to Paragraph 11
14     which argues that the victims' investments were less
15     profitable.  We don't think that statement is correct.  And
16     again, this will just dovetail into the loss arguments.
17            THE COURT:  Yes.  I guess, Ray, in your addendum --
18            THE PROBATION OFFICER:  Excuse me, Judge.
19            THE COURT:  Go ahead.
20            THE PROBATION OFFICER:  So in the addendum, I do
21     actually reference Paragraph 11.
22            THE COURT:  Right.
23            THE PROBATION OFFICER:  And I understand the
24     objection to be to the characterization or the numerous
25     characterizations derived from the conduct, and defendant'S
```

1    objection letter is attached to the PSR in which he is

2    offering his --

3              THE COURT:  Right.  I guess I will reserve on 11

4    because it is really going to go to loss arguments.  So I

5    shouldn't decide it until I hear from counsel.  So let's --

6    we'll reserve on 11.

7              MR. SMITH:  And your Honor may wish to do the same

8    with respect to Paragraph 13, which is -- it goes to what the

9    impact was on the counterparties and whether the transactions

10   were more profitable or not.  It does have this issue in here

11   which the government features in their submissions, however,

12   by citing back to the PSR on the cost plus, which again we'll

13   get to.  We don't --

14             THE COURT:  Yeah, I think we'll reserve on that for

15   now.  It is going to get resolved when I decide about loss.

16             Anything else that you press?

17             MR. SMITH:  Well, just move right to 19 and 20, your

18   Honor, which goes to the economic harm issues.

19             THE COURT:  Yes.

20             MR. SMITH:  And whether or not there was a

21   reasonably foreseeable pecuniary loss or harm to the

22   counterparties, to the victims.  We don't think the evidence

23   fairly shows that.  We think that Paragraphs 19 and 20 more

24   accurately depict the economics of the transactions between

25   the parties, namely this was a scheme as proved by the

1   government that masked Jefferies' profits on the transaction,

2   but didn't otherwise create any harm or economic loss for the

3   counterparties.

4           THE COURT:  Let's reserve on that.

5           Anything else you press?

6           MR. SMITH:  Again, all in the same categories, 21,

7   22 and 23, which go to loss calculations.  I do think

8   Paragraph 23 does have the loss issue set forth in it,

9   namely, you know, that's where we find the loss

10  calculation.

11          THE COURT:  All right.  I will reserve on those.

12          Anything else?

13          26 is acceptance issue, I guess, which we'll need to

14  argue about as well.  So I will reserve on that.

15          MR. SMITH:  And 30, these are all guidelines

16  calculations.

17          THE COURT:  Yeah, don't tell me an objection to

18  guideline.  I'm just asking about the facts that are set

19  forth right now.

20          MR. SMITH:  We wanted to -- and I think this may be

21  picked up by the second addendum, supplement the information

22  with respect to Mr. Litvak's son XXXXX.

23          THE COURT:  Was that incorporated, Ray, or not?

24          THE PROBATION OFFICER:  Yes.

25          MR. SMITH:  I mean, that information has been

1  conveyed to your Honor.

2          THE COURT:  Yes, I reviewed the various reports.  I

3  think -- what do you say?  Ray, do you say you make it?

4          THE PROBATION OFFICER:  Your Honor, it is lengthy,

5  it is helpful and it is incorporated by way of attachment to

6  the PSR.

7          THE COURT:  Okay.  I will adopt the additional

8  information in your 55, but I think that's what Ray has done

9  in his addendum.

10          MR. SMITH:  So I think the last factual issue then

11 before we get into the guidelines analysis and

12 recommendations is Paragraph 63.  It has to do with ability

13 to pay and Mr. Litvak's net worth.

14          THE COURT:  Yes.

15          MR. SMITH:  The PSR incorrectly assigns Mr. Litvak

16 certain assets that belong to his wife, Dr. Renee Litvak.

17 One is the Charles Schwab account, which was listed as part

18 of Mr. Litvak's net worth as an individual asset.

19          THE COURT:  Is that the fourth item on Paragraph 63?

20 That one, or the fifth?

21          MR. SMITH:  I'll tell you, it's the amount of

22 $533,000 approximately as of the time --

23          THE COURT:  How is the ownership of that account?

24          MR. SMITH:  That is an individual account in

25 Dr. Litvak's -- Dr. Renee Litvak's name.  Mr. Litvak has no

1   ownership interest in that account.

2         THE COURT:   And how long has that been -- has that

3   always been the case since the account was opened?

4         MR. SMITH:   That's been the case since the account

5   was opened.   And Mr. Litvak's name was not removed from it at

6   any time.

7         THE COURT:   The source of the amounts in that

8   account were not from Mr. Litvak?

9         MR. SMITH:   Some of the -- well, Dr. Litvak earns a

10  livelihood.   She's a dentist.   And my understanding is the

11  money came from Dr. Litvak.   I can't say with certainty that

12  no money Mr. Litvak brought into the household was never

13  transferred into there, but it's my understanding that's Dr.

14  Litvak's account.

15        THE COURT:   Okay.   Actually, that was the technical

16  issues I had within your financial statement in which -- I

17  think it is called a short form.   I could have that wrong.

18  The item for spouse's wages is zero, but the line above

19  that's called gratuities seems to be an income number.

20        MR. SMITH:   Those were reversed.

21        THE COURT:   What other adjustments do you suggest or

22  correct on the Paragraph 63?

23        MR. SMITH:   Well, Paragraph 63 lists the apartment

24  on East 78th Street as an asset owned by Mr. Litvak.   What

25  happened in 2011, before November, before the issue of

1    AllianceBernstein first came to light, purely for estate

2    planning purposes, a trust was set up.  It's the Renee Litvak

3    Living Trust, and Renee Litvak is the sole beneficiary of

4    that trust.  Jesse Litvak had no ownership interest in the

5    property on East 78th Street.  That was done for estate

6    planning purposes back in 2011.

7              THE COURT:  I'm puzzled how Mr. Litvak earned -- I

8    don't know -- multiples of what I think his wife earns, and

9    yet the house was transferred?  I guess it is a nontax event

10   because it is below the spousal exemption?

11             MR. SMITH:  I'm not saying that Mr. Litvak didn't

12   pay for it.

13             THE COURT:  Oh, I am saying he probably was the

14   source of the payment.

15             MR. SMITH:  I think it is quite common to avoid --

16   and lawfully avoid state tax as part of estate planning to

17   place a primary residence in the trust and have the primary

18   wage earner not be a beneficiary of the trust.  That was done

19   in a way that many others do it.  Those were the purposes.

20   It had nothing to do with any future law enforcement issues

21   or potential creditors down the road.  It was done for estate

22   planning purposes.  So it is not a marital asset.  It is an

23   asset that's owned by the trust with Dr. Litvak as

24   beneficiary.  That's just factually the way it is set up.

25             THE COURT:  Go ahead.

1              MR. SMITH:  Just an update on the residence in

2     Quogue, your Honor.  That residence was, in fact, sold.  The

3     mortgage was paid off.  The mortgage was approximately

4     $770,000.  The proceeds on the sale after the mortgage payoff

5     were split up equally between Dr. Litvak and Mr. Litvak, and

6     approximately $1.3 million was wired at closing to their

7     respective accounts.  So now the update would be that

8     Dr. Litvak's -- I think it is her Schwab account now has that

9     higher balance reflected in it.  And Mr. Litvak is in

10    possession of the 50 percent of the net proceeds from the

11    sale of the Quogue house, that's $1.3 million.  That's

12    Paragraph 63, your Honor.

13             THE COURT:  And so is it your position that his net

14    worth currently is approximately $1.6 million?

15             MR. SMITH:  No, your Honor, it is about 3 million.

16    He has these other assets that are largely 401K assets and

17    life insurance policies.  So if you look at --

18             THE COURT:  So if I took out 3 million and a half a

19    million of that Dr. Litvak's sole owner and I took out half

20    the net value of the Quogue house, that seems to add up to

21    4.9.  And Ray only had it 6.5.  So I got 1.6.  I don't know

22    how you got 3 million.

23             MR. SMITH:  If you take the residence out, the

24    $3 million there.

25             THE COURT:  Oh, that's the mortgage with the

1   residence also.  I forgot.  So that's a net of 1.9.  Okay.

2           MR. SMITH:  Just in terms of the significant assets

3   that are in Mr. Litvak's name, which I think is the relevant

4   factor here.  You have the -- in Paragraph 63, the third item

5   under other asset type, the Fidelity investments $732,000.

6   That's a Roth IRA.  So Mr. Litvak paid the tax to convert a

7   traditional IRA to a Roth IRA some years ago.  That's his.

8   And then there's -- these life insurance policies, if you go

9   to the actual financial statement, you see that some of these

10  life insurance policies are actually Dr. Litvak, Dr. Renee

11  Litvak policies.  But this larger one of $543,000, that's a

12  Jesse Litvak life insurance policy with a cash surrender

13  value there of $543,000.  And then the 1.3 million

14  approximately from the proceeds on the Quogue house.  So

15  those are the significant assets plus, you know, some of the

16  property and other things that they own.  So it comes out to

17  about roughly $3 million.

18          THE COURT:  All right.  Attorney Francis, any

19  comment?

20          MR. FRANCIS:  Yes, your Honor.  With respect to the

21  Schwab accounts, I think your Honor touched on with some of

22  your questions.  I think one thing that would be important

23  to know is when these accounts were opened.  And we don't

24  have that information.  If all Mr. Litvak is doing is just

25  taking money out of his right pocket and putting in his left

1   pocket, that's not meaningful, regardless of whose name is on

2   the account.

3        With respect to the house or the apartment on East

4   78th Street on the upper east side, our information is that

5   that quote unquote estate planning transfer was done after

6   Mr. Cantor discovered Mr. Litvak's fraud and told him he's

7   going to have to report him to Treasury.  If that's true,

8   then it would appear there were some badges of fraudulent

9   transfer here.  And I think those would need to be further

10  explored.  But on its face, it's problematic, that around the

11  same time he's being discovered, he's transferring his

12  largest asset, or his second largest asset, to his wife's

13  trust supposedly for estate planning purposes.

14       And with respect to selling the mansion in the

15  Hamptons, that's great that they were able to liquidate it.

16  However, just because you own a house with your wife doesn't

17  mean you split the proceeds of that.  They're joint tenants.

18  The entire -- the entirety of that is his money.  It is an

19  asset they called jointly.  And so the 11.3 number seems to

20  be 50 percent of what the actual value to him was as 2.6.

21  And the fact that he put half of it in his wife's account and

22  half of it in his account is -- once again, that's just

23  putting -- just taking two $10 bills and putting one in your

24  right hand pocket and putting one in your left hand pocket.

25  That's all it is.

1          So although if it is true that there are -- some of

2      these life insurance policies, for instance, are property of

3      his wife's, this number may need to be adjusted slightly.

4      The millions of dollars of deductions that Mr. Smith

5      advocates for are unwarranted.  His net worth, by my

6      calculations, is in the neighborhood of $8 million.

7          THE COURT:  How do you get to eight?  I'm at 6.5.

8          MR. FRANCIS:  I'm sorry.  The assets.  The assets is

9      in the neighborhood of $8 million.  So once you deduct the

10     liabilities, his net worth is in the neighborhood of $6

11     million.

12         THE PROBATION OFFICER:  Just to be clear, your

13     Honor.  In examination of the financial statement that Mr.

14     Litvak is required to complete directs that -- it is a total

15     joint marital analysis.  So whether an asset is in his wife's

16     name or his name isn't dispositive, he's required to report

17     total.

18         THE COURT:  Right.  But as to this part of the PSR

19     which is titled ability to pay --

20         THE PROBATION OFFICER:  But I think the analysis of

21     his ability to pay includes the joint marital assets.

22         THE COURT:  I guess the question I would raise --

23     first question, Attorney Smith, is what was the date of the

24     trust that now holds the New York residence for the benefit

25     of his wife?

```
 1              MR. SMITH:  I don't have the exact date, your Honor.
 2      I know the planning process was --
 3              THE COURT:  You don't have a copy in your files?
 4      Your client doesn't remember?
 5              MR. SMITH:  My clients do remember, and they
 6      remember with certainty that the trust was concluded prior to
 7      November 2011.
 8              THE COURT:  What was the intention when they -- when
 9      this was transferred, who had the mortgage obligation to pay
10      $11,000 a month for this property?  Was the mortgage -- was
11      the note a joint note?  Did Mr. Litvak's 5 million plus
12      income per year go towards paying that mortgage, or was that
13      paid by the $18,000 per month income of Dr. Litvak?
14              MR. SMITH:  It was paid out of marital assets that's
15      now Mr. Litvak's income.  And --
16              THE COURT:  And I guess -- go ahead.
17              MR. SMITH:  The estate planning idea is that, you
18      know, were Mr. Litvak to die unexpectedly, that the apartment
19      would not pass through Mr. Litvak's estate.
20              THE COURT:  No, I understand that.  I understand
21      that.  But I guess -- I think I'm in agreement with the
22      probation officer that I should consider marital assets.  It
23      doesn't mean I'm going to view it as every dime available and
24      deciding that's the fine I'll impose.  But I don't think it's
25      a -- particularly given the disparity in income historically
```

1    between the two of them in terms of gathering these assets.

2              I guess the only question remaining is when did the

3    assets go into the Schwab account.  Were those in the time

4    period, for example, that Mr. Litvak was at Jefferies?

5              MR. SMITH:  I do believe that's the case, your

6    Honor.  We'll have an issue we'll discuss later whether any

7    of the money that he earned at Jefferies is fairly traceable

8    to the offense conduct.

9              THE COURT:  That's a different question.

10              MR. SMITH:  In terms of the ability to pay, I think

11    what we're looking at is when your Honor gets down later in

12    the proceeding to come up with a number, I think what

13    Mr. Litvak has available to him will be the assets that are

14    in his name.

15              THE COURT:  That may be, but then the government may

16    wish to proceed with a fraudulent transfer action if it were

17    to get a copy of the trust agreement, which we don't have,

18    and to align it with the dates of the discovery, it may

19    decide that was a fraudulent transfer.  If it wasn't, then I

20    guess Mr. Litvak won't be paying the fine.  He won't have the

21    assets.  The government can't proceed against him.

22              MR. SMITH:  I just think that's an issue for another

23    day.  We just wanted to bring this up for the PSR to fairly

24    state what assets are in whose name and --

25              THE COURT:  That's fine.  When was the Quogue house

1   purchased?

2          MR. SMITH:  The Quogue house was purchased in 2009,

3   I believe, and it was certainly purchased with, you know,

4   funds that Mr. Litvak earned in large part -- let's just

5   assume the entirety of it, in terms of the down payment.

6   There was a substantial mortgage on it.  With funds that

7   Mr. Litvak earned at Jefferies.

8          THE COURT:  I'm not going to change what the officer

9   has reported here in 65, which, as he says, it calls for

10  marital assets.  I will, Ray, ask you to add at the end --

11  you can add an indication that the first Schwab account is in

12  Dr. Litvak's name solely and that the residence was

13  transferred to a trust where she benefits solely sometime in

14  2011.

15         MR. FRANCIS:  Judge, although I don't have the trust

16  documents, I don't know when the trust was created.

17  According to the title search, the property -- part was

18  transferred into the trust on October 29, 2011.

19         THE COURT:  When was that material sent that led to

20  this whole thing exploding?  I can't remember.

21         MR. FRANCIS:  November 12.  November 12th, I

22  believe.

23         THE COURT:  So that doesn't help you, does it?

24         MR. FRANCIS:  I'm sorry.  Let me -- may I consult?

25         THE COURT:  He was terminated in December.

1          MR. FRANCIS:  You are right.  You're right, Judge.

2    I'm sorry.  I was -- I had the wrong three-day weekend.  So

3    if November 12th the material was sent from Jefferies to

4    AllianceBernstein, they discovered it and that would be two

5    weeks before, in which case my argument would not pertain.

6          THE COURT:  As I recall the trial evidence, he was

7    terminated not that long after it was discovered?

8          MR. FRANCIS:  It was December 20 something.

9          THE COURT:  Yeah, right.  I'm recalling it was

10   November.  But again, we'll note that in the PSR and I'll --

11   you know, when I decide ability to pay, I will decide what

12   I'm going to do about that.  But I think as far as what's in

13   the PSR, that's fine.  So at this point, we should turn, I

14   think, to the loss question because, obviously, I have got

15   various paragraphs that I haven't ruled on because of that

16   issue.

17         So it is interesting.  I mean, you have the

18   objection to the PSR, Attorney Smith, but it is obviously the

19   government's burden to prove it.  If you don't mind, I will

20   start with you on the issue.

21         MR. SMITH:  I think confining ourselves to guideline

22   application purposes --

23         THE COURT:  Yes, that's what we're talking about.

24   I'm not talking about whether the guidelines are appropriate

25   or whether loss should be somehow viewed slightly differently

1   than how it might be calculated.  I'm talking about what is

2   the issue before me right now is in determining the

3   guidelines, which I am supposed to try to do, I need to

4   determine the only issue it seems to me in that calculation

5   is is there a loss enhancement, and, if so, for how much.  So

6   that's what I'd like to speak with you about at this point.

7           MR. SMITH:  Bearing in mind that the --

8           THE COURT:  I have read anything that has been

9   submitted.

10          MR. SMITH:  The basic point, is given the

11  government's concession that the bonds traded at fair market

12  value and there was no issue with respect to that, in other

13  words, in return for cash, each victim received a fairly

14  valued asset.  So if he paid a million dollars for a bond,

15  you got back a bond that was fairly valued at a million

16  dollars.  And that the negotiations and the

17  misrepresentations that were in the negotiations and upon

18  which the jury's verdict was based, did not go to enhancement

19  or financial loss, that they mattered for reasons other than

20  those issues.  But that on day one, a transaction date, the

21  clients, the counterparty, the victims here were completely

22  whole.  And --

23          THE COURT:  I have to stop you.  I am struggling

24  with -- and I'm not sure I'm right, but I struggle with the

25  concept that somebody who is lied to is paying fair market

1    value.  The fair market value that day is what a willing

2    seller and a willing buyer were wanting to pay.  The willing

3    seller -- I mean this is not every transaction, but many, put

4    the fair market value below the price paid by the buyer.  I

5    have trouble with the idea that we can use fair market value

6    as what the buyer paid for it, when there's fraud.  The

7    seller's fair market value wasn't 60, it was 58, for example,

8    in one of the trades.

9           MR. SMITH:  I think fairly standard, your Honor, the

10   fraud here is a false statement in the price negotiations

11   that sent a false signal to the other side.  And that had

12   there been no false statement, the negotiations may have

13   turned out differently.  I think that's the important point

14   to emphasize here, may have.  Whether or not the negotiations

15   would have been more beneficial --

16          THE COURT:  Tell me the answer to this question.

17   What was your client's intention when he lied?  What did he

18   intend to happen?  He intended to cause the buyer to view the

19   fair market value as the number he put on it because he said

20   that's what a willing seller will sell at, right?

21          MR. SMITH:  The bonds trade at fair market.  I think

22   the --

23          THE COURT:  You can't keep saying they traded at

24   fair market because I'm not persuaded that's fair market.  I

25   don't have an example.  I have too much paper.  But let's

```
 1   take a particular trade.  How about that?  Can you tell me
 2   one, Attorney Francis, just one of the straight up buy-sells.
 3   You know, the buyer will sell at 60 but really the buyer was
 4   going to sell at 59.  Not an inventory one, not one of those.
 5            MR. FRANCIS:  Count Three, your Honor, is a pretty
 6   clean one.
 7            THE COURT:  I don't know which one Count Three is.
 8   So I'm looking at your loss calculations.  Can you tell
 9   me --
10            MR. FRANCIS:  Tab 3.
11            THE COURT:  Tab 3.
12            MR. FRANCIS:  Tab 3 is Count Three.
13            THE COURT:  Okay.  So there, the seller's fair
14   market value was 67 and 15 ticks, right?  Is this a fair way
15   to look at it?  Is that what that column means, the buy
16   price?
17            MR. FRANCIS:  Right, that's the price Jefferies paid
18   to the seller.
19            THE COURT:  Right.  So why isn't that the fair
20   market value?
21            MR. SMITH:  Because Mr. Cantor testified he knew
22   what he paid for that bond, he'd do that trade again
23   tomorrow.  And he believed he was paying fair market value.
24            THE COURT:  I'm talking about the seller's side.  I
25   mean, why do we only look at the buyer's side for evidence of
```

1   fair market value?  Fair market value is a willing buyer and

2   a willing seller.  We had a seller here who put a fair market

3   value on that bond of 67 and 15 ticks.  Why isn't that the

4   fair market value?

5            MR. SMITH:  Well, because fair market value for --

6   these are liquid RMBS bonds at the time was not a pinpoint

7   price, it was a range.

8            THE COURT:  It was -- it was what the seller --

9   someone pinpointed it.  This was the price Mr. Litvak, I will

10  sell your bond.

11           MR. SMITH:  Well, your Honor --

12           THE COURT:  That's the trouble I have with -- with

13  your argument and your use of the phrase fair market value.

14  The definition requires a willing buyer and a willing seller,

15  and here the two didn't meet.  The seller put a fair market

16  value of X and the buyer, because of the misrepresentation,

17  put a fair market value of X plus.

18           MR. SMITH:  Well, your Honor, from the buyer's

19  perspective, and that's what matters on the example that

20  Mr. Francis just put out on Count Three.  The buyer came up

21  with its valuation and made an assessment of what it was

22  willing to pay, and it paid it.  A sophisticated investor

23  doesn't overpay for a bond.  That's clearly what Mr. Cantor

24  said.  So at the end of that transaction on Count Three, at

25  the transaction price, the bond was fairly priced and

1    AllianceBernstein put into its portfolio at the market and

2    market as of that day at market.  So it could have turned

3    around the next day, sold that bond at market if it could

4    find a buyer for it and there would have been no economic

5    harm at all.

6                THE COURT:  If it could find.  That's pure

7    speculation.

8                MR. SMITH:  We're focused on the exchange of cash

9    for an asset.  The asset was fairly valued, and that's the

10   victim testimony.  Mr. Cantor said, Mr. Lujenac said, other

11   witnesses said.  They came up with their own valuations, they

12   believed the price was fair and they paid willingly --

13               THE COURT:  But the seller is telling us that the

14   market is less.  And so the fact that somebody does analytics

15   and says, well, if you buy this house within the range of

16   200,000 to 220,000, that's a good buy.  I don't know any

17   buyer that -- you know, they may be happy if they think that

18   the 220 is the best that they're going to get.  But if they

19   know they can get 200 -- buy it for 200, who doesn't view

20   they've lost money.

21               MR. SMITH:  Your Honor, it is not my intention to

22   revert back here to issues that were argued and lost at

23   trial, but this does relate to what is the bid and spread on

24   an asset like this.

25               THE COURT:  What's the what?

1        MR. SMITH:  The bid and spread.  What -- the

2   difference between what a seller sells for.  And so the

3   broker/dealer sits in the middle, charges a lower price.  You

4   know, pays a lower price, sells at a higher price.  That

5   intermediation cost, that transaction cost doesn't mean that

6   either side is paying something other than a fair market

7   value price, but one is a bit higher than the other.  And the

8   more liquid the asset, the wider it is.

9        The point here is that at the time the transaction

10  is concluded, the buyer takes a fair market valued asset into

11  the inventory and the cash is exchanged.  It did not suffer a

12  financial loss.  It booked no financial loss.

13       THE COURT:  What about Mr. Norris?  He said that he

14  would have wanted to know that Mr. Litvak bought the bond at

15  79 and 16 ticks, and despite the fact that he paid more for

16  it.  He said absolutely I would have known it.  And then when

17  asked why would he want to know it, because he would have

18  demanded that money, the difference, for his own client.  The

19  answer is yes.  There's several others I could -- not every

20  one.  Cantor didn't say that.  But certainly, there's

21  evidence in the record that would support a reasonable

22  inference, I think, you know, we might not know that every --

23  I mean, as you say, your hypothetical at page, I think, 23

24  of your brief is that the buyer doesn't necessarily have a

25  right to know what is being paid for the bond or what the

1    seller is selling it for.  He could have been silent and he

2    would have committed no crime.  But that's not why we're

3    here.  We're here because he wasn't silent.

4              And I would -- I guess I would ask you to respond to

5    this thought.  I think I started by asking this question.  Is

6    there any other inference to be drawn from what Mr. Litvak

7    did than he wanted to put the spread in his pocket?

8              MR. SMITH:  Well, I think the inference to be drawn

9    is that --

10             THE COURT:  His being Jefferies.  I don't mean him

11   personally.

12             MR. SMITH:  Jefferies.  So the intent was the bond

13   is going to trade at a fair market value price, and the

14   upshot of the conduct is that a somewhat higher percentage of

15   the transaction price is going to Jefferies than the victim

16   knew.  That mattered, as the jury found.  Right?  It might

17   have influenced the negotiations.  And your point about

18   Mr. Norris, had he known that, he may have negotiated

19   differently.

20             THE COURT:  It mattered in the market in the sense

21   that somebody, I can't remember who, testified that, you know

22   -- I don't know, he paid 20 ticks over what the seller -- he

23   said nobody pays 20 ticks in this market.  You know, I think

24   I heard testimony that the commission, sort of the add-on for

25   the broker was somewhere in the 4 to 8 range typically.  And

1    that's what typically, in all of these transactions I heard

2    about, was negotiated.  So you know, what other conclusion I

3    can draw but that the buyers lost money.

4            MR. SMITH:  Well, I think the conclusion you can

5    draw fairly from the evidence and the conclusion your Honor I

6    don't believe is supported, is that Jefferies made more

7    money.  What we're talking about here is a gain to Jefferies.

8    And I'm not arguing with the jury's verdict on this point for

9    sentencing purposes.

10           THE COURT:  No, I understand.

11           MR. SMITH:  They said that the statements matter.

12           THE COURT:  It was material.

13           MR. SMITH:  They were material.  They may have

14   influenced negotiations.  These were facts that the investors

15   would have wanted to know, but that doesn't mean that the

16   investor suffered a financial loss.  The two are distinct

17   concepts.  So we have more gain to Jefferies, a somewhat

18   larger slice of the pie, if you will, of the principal amount

19   being paid on the bond than they were led to believe.

20           THE COURT:  Well, how about Mr. Wollman who said

21   what would you have done if he knew Mr. Litvak was lying.  He

22   said, I would have offered to pay a lower price.  What effect

23   for your clients would that have meant?  He would have bought

24   the bonds at a lower price.  Are you suggesting that in these

25   circumstances, Mr. Litvak would have said, if you don't let

1   me put 20 ticks in my pocket, for example, not Mr. Wollman,

2   the one before, I won't sell this bond to you, I won't

3   arrange for the seller to sell it to you.  Is that what he

4   would have done here, reasonably?

5           MR. SMITH:  I think what he would have done if we

6   have an example in our -- in our papers is that you could

7   have negotiated differently, not made an explicit false

8   statement but rather used different words to convey a similar

9   concept and we wouldn't be here.

10          The point we're trying to make, your Honor, is that

11  it's -- the loss is speculative.  We have to say what would

12  have happened.  Isn't the question to Mr. Wollman that you

13  just put is what would have happened, asking Mr. Wollman to

14  speculate about how things would have gone differently.  We

15  don't -- bond traders, all the time, I think we learned,

16  don't disclose their cost.  They are not obliged to.  And

17  it's just as likely as not that they would have been silent

18  about a cost and different tactics that didn't involve

19  overbuys.  Rather, the types of gray area statements that we

20  heard about from Mr. Eveland, if you recall, on the witness

21  stand.

22          So it's the government's burden here to prove loss,

23  your Honor.  You started with me, but it's the government's

24  burden to prove loss and not a speculative statement about

25  what would have happened.

1          THE COURT:  I still don't know that I have an answer

2     from you as to what was Mr. Litvak's intent in lying.

3          MR. SMITH:  He was intending to get the deal done,

4     make the counterparty victim feel good about the trade and to

5     make the trade more profitable for Jefferies.

6          THE COURT:  So as a result of the lie, Jefferies

7     gained, right?

8          MR. SMITH:  Jefferies did gain, but knowing that the

9     trades were at market and a fair market value -- and this

10    goes to Mr. Litvak's intent -- the victim did not lose.

11    There's a lot in the government's -- a lot about zero sum

12    gains.  I don't really understand that.  What you have there

13    is cash being exchanged for a fairly valued asset.  Jefferies

14    makes more than advertised.  That's a problem.  But that's a

15    gain, not loss under Section 2B1.1.

16         THE COURT:  Is it your view that there is not one

17    person's testimony that I heard at trial, one victim from

18    which I could reasonably infer that they suffered a loss?  We

19    might not know what it was.  In other words, the deal might

20    have been done at half the difference or a quarter of the

21    difference, but that they suffered a loss?  I can't make that

22    reasonable inference?

23         MR. SMITH:  If given the fair market value

24    conception by the government, I don't think the answer to

25    that question is yes.  I can't think of a victim on that

1   witness stand who said I overpaid for that.  I don't think

2   the hindsight questions put to Mr. Wollman really cut it.

3   And remember, these sophisticated market participants who

4   were here in this courtroom understand that these bonds

5   traded in a wide range.

6           THE COURT:  How about Mr. Lemin?  If you had known

7   that that price that they bought it for was 60 and a half,

8   would you have paid 20 ticks on top to pay 61.04?  No, we

9   don't pay 20-tick commissions, no.

10          MR. SMITH:  He would have negotiated differently.

11          THE COURT:  That's my question.

12          MR. SMITH:  And Magnetar still got a fairly-priced

13  asset.

14          THE COURT:  That's not my question.  My question is:

15  Can I not reasonably infer, based on Mr. Lemin's testimony

16  that there is a loss in the case, not how much, but a loss?

17  He would not have paid 20 ticks.

18          MR. SMITH:  Not a financial harm that is recognized

19  by the guidelines.  We're talking about pecuniary harm,

20  right?  Intent of loss, actual loss.  Magnetar was out of

21  pocket cash and got back a bond that was worth what they paid

22  for it.

23          THE COURT:  All right.  Attorney Francis.

24          MR. FRANCIS:  So, your Honor, Mr. Smith said a lot

25  of things.  I want to respond to them serially.

1          THE COURT:  That will be good.

2          MR. FRANCIS:  I will do the best I can.  He started

3     off with the fair market value.  I don't think fair market

4     value means what Mr. Smith is advocating.  How can it be a

5     fair market if there's fraud in it?  That just doesn't

6     follow.  And as your Honor pointed out, with the fair market

7     value we have some data what the fair market value on a

8     particular day is.  Now, I think what Mr. Smith is trying to

9     convey is just the idea that everyone got what they paid for.

10    They didn't try to buy a Corvette and get a Pinto.  But, of

11    course, if -- otherwise, Mr. Litvak wouldn't have been able

12    to perpetrate a fraud over three years.  He would have been

13    caught the first time.  So I just don't think that really

14    pertains to the issue of whether or not there's loss here.

15         He also raises a point about -- and I think this is

16    -- goes into our argument about zero sum gain.  He says he

17    doesn't know what that means.  I'll use different words.  The

18    money came from somewhere.  You can see that Mr. Litvak's

19    intent was to make more money for Jefferies.  So where did

20    that more money come from?  It came from his victims, or his

21    victims' investors.  I mean, it had to come out of their

22    pocket.  And as your Honor pointed out, Mr. Lemin says, we

23    don't pay 20 ticks.  Well, he did pay 20.  He thought he was

24    paying 4 and he paid an extra 16.

25         THE COURT:  Let's assume there's a loss such that

1    the table is triggered.  What proof do I have that the loss

2    is measured by the delta, are you arguing that's actual loss

3    to the victim when we don't know what transaction would have

4    happened if the truth had been told?  Or are you arguing it's

5    an intended loss?  Are you arguing that we're going to shift

6    over to proof by gain?  And that -- again, you have the same

7    problem on the gain side you have on the loss.  How do you

8    know what transactions would have occurred at what price if

9    the truth were told?

10            MR. FRANCIS:  So --

11            THE COURT:  And you're assuming to get -- I'm sorry.

12    Just to be clear so you know what I'm worried about.  You're

13    assuming that for every transaction that you have put in

14    front of me, which by the way I need to hear from Attorney

15    Smith about the argument that the ones not at trial are

16    speculative.  I forgot about that issue, but I will come back

17    to you.

18            But as to all the transactions the government urges,

19    you are getting to the number you get to in the loss table

20    and based upon the assumption that every transaction would

21    have occurred at the normal commission price, as evidenced in

22    the negotiation, plus the sale price told to Mr. Litvak.  You

23    are taking the delta in every transaction, right?

24            MR. FRANCIS:  That's true.

25            THE COURT:  A hundred percent.

1        MR. FRANCIS:  Although I wouldn't say it's an

2   assumption.  I would disagree with your Honor that it's an

3   assumption.

4        THE COURT:  So what's the proof upon which I find

5   that that is, in fact, the loss here?

6        MR. FRANCIS:  So to figure out what the loss is, I

7   think your Honor's first question is which of three methods

8   do we use.  I think you can use method one, which is actual

9   loss.  And I can describe that for you and I will.  Or method

10  three, which is gain.  Because once we get over the hump of

11  is there a loss, then figuring out the amount of that loss,

12  your Honor has a couple of different options.  We don't urge

13  it as intended loss.

14        THE COURT:  Why isn't that a better way to go here?

15  That when Mr. Litvak got -- I keep wanting to say on the

16  phone -- on these chats.  When he told the buyer, I can get

17  it for you at 60 when, in fact, the seller had just said I

18  will sell at 59, why isn't the reason he made that statement

19  and done with the intention to cause the seller to pay the 60

20  plus his commission?

21        MR. FRANCIS:  You're absolutely right, your Honor.

22  There's no reason why -- it is an intended loss.  It's

23  intended loss, but then it actually happened.  That's why I

24  think of it as actual loss.  But, yes, the --

25        THE COURT:  No.  See, that's the point I started

1    with with you is you are going to tell me, I guess, what

2    evidence is in the record that I can infer that every one of

3    these transactions would have occurred at exactly that delta,

4    the 59 to 60 is the measure of the loss, as opposed to when

5    you go with intended loss, that's a function of what he did

6    and what I draw an inference from, he intended to put that

7    point in his pocket or he intended to cause the buyer to give

8    up that point.

9           MR. FRANCIS:  You have convinced me, your Honor.  It

10   could be intended loss as well.  So --

11          THE COURT:  Well, explain to me why you think it is

12   actual then.

13          MR. FRANCIS:  Okay.  So we're back to method one,

14   actual loss.  If we look at the chats, which are

15   contemporaneous, verbatim Mr. Litvak's words with his

16   victims.  They agree upon a certain amount that is the plus,

17   in the cost-plus deal.  You know, I bought it at X, will you

18   pay me 4 ticks.  But he's lying about what X is, right?  So

19   you don't have to assume that there would have been further

20   negotiations or anything.  Once Mr. Litvak took it upon

21   himself to speak, he had an obligation to speak truthfully.

22   All you look at is the difference between the truth and the

23   lie.  That's the delta.

24          THE COURT:  Right.  But the argument of Attorney

25   Smith is, okay, let's look at the lie.  The lie is the guy

1    was selling at 59.  What's the proof that we know that had

2    the buyer known the truth, not the lie, he would have bought

3    it at 59 plus the 4 ticks?

4        MR. FRANCIS:  Well, I think your Honor can draw a

5    logical inference that if someone is offered an item at one

6    of two prices, one being higher and one being lower, they're

7    going to take the lower price.  More than that, you've got

8    victim testimony that they would not have paid the higher

9    price had they not been lied to.

10       And third and finally, I don't think that this

11   method that Mr. Smith urges is accurate.  What he is

12   basically saying is we would need to run a simulation of the

13   universe to know exactly what would have happened in every

14   fraud instance had the fraudster not lied.  That's

15   unworkable.  That -- that's not -- he labels it speculation.

16   That's not speculation.  That's just the wrong way to think

17   about it.

18       What your Honor can do is look at what is the value

19   of the lie told and did money come out of the victim's pocket

20   in an amount commensurate to that lie?  In this case, every

21   single time Mr. Litvak lied -- we say there's 76 instances,

22   they take issue with 24 of them, but I'll use my 76 number.

23   76 times he told a lie, and he did it in order to make a

24   specific amount of extra commission ticks.  In some

25   instances, more than a point.  Having done that, the fact

1    that the money actually flowed means that's the measure of

2    the loss.  His victim overpaid by that much.

3           Now, Mr. Smith gets agitated when I used the words

4    like overpaid because he thinks I'm referring to some market

5    metric.  I am saying had the victim been told the truth, had

6    Mr. Lemin been told the truth, he would have saved his

7    investors 16 ticks.  He wouldn't have paid 20 ticks, he would

8    have paid the 4 that Mr. Litvak represented he was paying.

9    That's why you can use the actual loss.

10          THE COURT:  Who testified at trial that had they

11   known the truth, the deal would have been done at 59 and not

12   60?

13          MR. FRANCIS:  Well, I don't think anyone testified,

14   because we wouldn't have asked that question.  And then had

15   we, we would have gotten --

16          THE COURT:  In a hypothetical.

17          MR. FRANCIS:  Yeah.  I don't think anyone can

18   provide you with that, although I believe it is a logical

19   inference.  And I think every fraud case presents this

20   scenario.

21          THE COURT:  This may be a little bit early for me to

22   raise this, but it's an important issue for me.  So I want to

23   be sure I don't forget to ask you about this, Attorney

24   Francis.

25          You represented to the Court at Page 23 of your

brief that the fraud guidelines were established after long

study and careful conclusion, unlike the crack guidelines in

Kimbrough, the loss guidelines, you know, have apparently --

the contrast would be that unlike crack, which has no

empirical data national experience, the fraud guidelines do.

I don't see that in Kimbrough.  And I see cases in the Second

Circuit, at least in conferring opinions, that say exactly

the opposite, that there is not an empirical basis.

When I go back and look at Justice Breyer's reason

for the loss table, he said if we took the empirical data

available to us, everybody would get probation.  That is not

the right and just result.  Therefore, we're going to write a

loss table that causes people to get imprisonment sentences.

Then Congress, of course, has put its finger on the scale and

upped those two or three times.  I've got it somewhere.  But

whatever, it doesn't matter.  To where we are now.  But I

don't know of any empirical data that supports the loss

table.  Am I mistaken?

MR. FRANCIS:  My understanding, your Honor, and I

can be mistaken about this, but I don't believe I am or I

wouldn't have put it in my brief.  What I was trying to do

was draw a distinction between the crack guidelines where

Congress has forced on the commission -- the sentencing

commission a certain table as opposed to what's going on in

the loss guidelines.  Those have been -- although there was a

1   mandate to put them in place, those have been adjusted over

2   time.  I'm aware of Justice Breyer's comments.  I'm aware of

3   the Second Circuit opinion concurring opinions.  I understand

4   that there are people who disagree that the results of the

5   guidelines of 2B1.1's loss table accurately maps where it

6   should go.

7          I think my point -- and maybe I inadvertently

8   overstated it, is that these guidelines were not imposed on

9   the commission.  The commission looked at the data in front

10  of them and put these guidelines in place, this loss table in

11  place in order to capture the distinction between different

12  kinds of fraud as measured by the magnitude of the loss.

13         THE COURT:  I have two responses to that.  That's

14  true, but the table now in place is not the guideline

15  sentencing commission's table.

16         MR. FRANCIS:  True.

17         THE COURT:  The second point I have is you cited me

18  to 109 of Kimbrough.  The only language I can find there is

19  that the court is saying in Kimbrough that the commission

20  fills an important institutional role, it has the capacity

21  courts lack to, quote, base its determination on empirical

22  data and national experience guided by a professional staff

23  with appropriate expertise.

24         I don't see anything in this opinion that tells me

25  the loss tables in Chapter 2 were arrived at that way, the

1    current loss tables, that you want me to apply.  Am I wrong?

2         MR. FRANCIS:  I don't believe so, Judge.  I don't

3    have Kimbrough in front of me.  Perhaps that citation is

4    incorrect.

5         THE COURT:  Diahann, do you want to give counsel

6    Kimbrough?

7         MR. FRANCIS:  Your Honor, I believe that if to the

8    extent my citation is incorrect, obviously, that is

9    inadvertent.  But I believe that the point --

10        THE COURT:  But you state in your brief, quote, the

11   fraud guidelines were established after long study and

12   careful consideration.

13        MR. FRANCIS:  I believe that's accurate with respect

14   to the original form of the guidelines.  I understand they've

15   changed over time.  But my understanding is that they were

16   originally imposed and they were originally put in place by a

17   sentencing commission in order to -- based on their review of

18   the cases in order to draw the distinction between frauds.

19        THE COURT:  So should I apply the '80s loss tables

20   then, the first loss table?  Because that's the one you are

21   talking about.  But you are writing about it in the brief

22   where that's not the table you are asking me to use.  You are

23   asking me to use a table adopted -- well, this one was after

24   -- in '03 or whatever, but -- or later, but it's basically

25   the '02 table as applies to this case.  And I don't think you

1    can make the argument that you have made to me.

2             Indeed, I would suggest -- and I'm sure you have

3    read this case, but I guess let me put it this way.   I

4    suggest you not make this argument to Judge Underhill because

5    you probably -- maybe you haven't read his concurring opinion

6    in Corsey, but he specifically notes -- and I think he's

7    accurate -- that they could not base it on empirical study.

8             MR. FRANCIS:  I have read that decision, Judge.  Of

9    course, I don't think that your Honor should apply the old

10   guidelines.  I don't think that's appropriate.  I don't think

11   that's what the statute calls for.

12            THE COURT:  Then why tell me that the table is based

13   on empirical and long study?

14            MR. FRANCIS:  I think we were just drawing a

15   distinction between the crack guidelines and the fraud

16   guidelines, where the fraud guidelines didn't come out of

17   some mandate from, you know, external to the sentencing

18   commission.  Work has been done on the fraud guidelines.

19   Now, where they've ended up, I understand the people have --

20   including Judge Underhill, have issues with the way that the

21   table ended up.  But I think we're talking more about the

22   genesis of the fraud guidelines.

23            THE COURT:  Attorney Smith, do you want to address

24   for me the argument you make that the -- I'm going to call

25   them the non-trial losses that the government includes in

1   their calculation?  I think you described them as

2   speculative.  I can't remember.  There's three adjectives you

3   hung around them, and I'm not sure -- I don't think you

4   really -- speculative, incomplete or imprecise.  That's your

5   brief at 24, but I don't really know in what ways they are or

6   what your argument is.

7          MR. SMITH:  Just based upon the evidence that the

8   government provided to us and what they cited in support of

9   inclusion in the relevant conduct, that you don't have the

10  type of crystallized clear misrepresentations that were the

11  subject of the proof at trial.  We have --

12         THE COURT:  In other words, there are no chats that

13  are comparable to the trial one?

14         MR. SMITH:  There are chats.  They are just not so

15  clear-cut.

16         THE COURT:  Give me an example.

17         MR. SMITH:  An example is Number 35, Mr. Litvak says

18  I'm assuming I can buy his piece a tick or two cheap to 96.

19  It is not a clear statement.  It's evidence like that, your

20  Honor.  You know, it's vague.  It's not clear.  And that's

21  the point.  And what it involves here, your Honor, is

22  approximately $1.9 million of relevant conduct that would

23  take us from 6.3 million that the government is saying down

24  to about 4.4 million.

25         I understand the government's not prepared to go

1    forward with a restitution order today.  And I think this is

2    probably more of a restitution issue than anything else.

3              THE COURT:  Well, does it affect the table?

4              MR. SMITH:  No, it doesn't affect the table because

5    it's over two-and-a-half -- I think -- if I may suggest, your

6    Honor, to disregard the difference for purposes of imposing

7    the sentence and making a finding.  Then we can take this up

8    when -- if and when we get to the restitution issues.  I

9    think we put a chart in that says why we think these are

10   speculative.

11             THE COURT:  Where is that?

12             MR. SMITH:  I think we attached it as an exhibit.

13             THE COURT:  Which one?

14             MR. SMITH:  I will get you that exhibit number in

15   just a minute, your Honor.

16             THE COURT:  Is it F?  No.  Did the government give

17   me not only the -- you know, a chart that's like what it was

18   -- what creates the delta that leads to the 1.4 loss, but did

19   you give me the chats?

20             MR. FRANCIS:  Yes, we did, your Honor.  We submitted

21   through Probation a sizeable binder of the chats that backed

22   up everything that's in our loss calculation table in April

23   or May,  I have another copy.

24             THE COURT:  I don't -- I didn't get -- I mean, if it

25   isn't in the PSR or attached to the PSR, I didn't get it and

1    therefore I didn't review it.

2              MR. FRANCIS:  May I approach, your Honor?

3              THE COURT:  Sure.

4              MR. FRANCIS:  (Handing.)

5              THE COURT:  But what about Attorney Smith's

6    suggestion it is not going to affect the guideline

7    calculation so I can just find the loss to be in the range of

8    that?  And then I guess -- I don't know what we're doing on

9    restitution because -- I almost issued an order to you, sir,

10   but I was advised by the Probation Office that the tone of it

11   wasn't very nice.  But I read your brief about how you don't

12   know yet about restitution, you are going to get an update.

13   The problem is how do I decide a fine if I don't know the

14   restitution amount?  I mean, if the restitution here -- and

15   this is hypothetical -- was $20 million, I'm not going to

16   impose a fine, right?  So I need to know the restitution

17   issue before I can decide about a fine.  I can't put off the

18   fine for 90 days like the statute says I can restitution.

19   But anyways, I didn't issue the order so I will just ask you

20   to explain to me how I'm supposed to decide a fine today if I

21   don't know restitution?

22             MR. FRANCIS:  Thank you for not issuing the order,

23   Judge.  I think Mr. Smith mistakenly says we're not

24   prepared to go forward on restitution.  I can tell you what

25   the number is today.  However, it's to Mr. Litvak's benefit

 1    to wait a little while because Jefferies continues to pay

 2    back.

 3             THE COURT:  Is there any question that they're

 4    going to pay back everything?

 5             MR. FRANCIS:  There is.  Whether or not they intend

 6    to.  They said they intend to, but whether or not they are

 7    able to reach settlement with everyone.  Mr. Litvak --

 8             THE COURT:  But aren't they liable?  I mean, his

 9    actions were as their employee.  Isn't their pocket a little

10    bit deeper than his?  Isn't it reasonable to assume that if

11    they don't reach an agreement, the victim is going to go

12    against Jefferies if they go against the defendant?  But who

13    are they going to collect against is likely they are going to

14    collect and they're going to collect against Jefferies.

15             MR. FRANCIS:  Absolutely.  And I wouldn't want to

16    opine on, you know, some civil action that hasn't been filed

17    yet, but absolutely.  I believe that they intend to pay it

18    all.  I think they are trying their best.  There's $2.1

19    million of outstanding fraud loss.

20             THE COURT:  Of the 6.3 number?

21             MR. FRANCIS:  Out of the 6.3 that has not been paid,

22    although Jefferies' counsel informs me that they are in the

23    process of negotiating further settlement agreements today

24    and tomorrow, and so that number may well go down presumably.

25    But I mean, it is absolutely the case that restitution is

1    likely to be very small, if anything, as compared to the fine

2    we're advocating for or as compared to the total loss amount.

3            And just one point of correction, your Honor,

4    because I think it will help you in looking at that binder.

5    It's not -- the defense has not taken issue with all of our

6    relevant conduct transactions that we didn't talk about at

7    trial.  They've only taken issue with -- I think it was 24 of

8    them.  So they effectively conceded that there are -- I say

9    there's 76 instances of fraud, and I think they say that

10   there's 52 transactions that are -- I don't want to put words

11   in Mr. Smith's mouth -- that are relevant conduct.

12           THE COURT:  And so should we go through the

13   difference of those two figures?  What did you say 52 says --

14           MR. FRANCIS:  So it would be  --

15           THE COURT:  24.

16           MR. FRANCIS:  Of the 24 different, we could do that,

17   your Honor.  But for purposes of today, and the reason we

18   didn't -- we haven't pressed this in our papers is, point one

19   is, is there a loss.  If there's no loss then there's no

20   restitution.  So we need a ruling from your Honor on that.

21   You know our position.  It's a strong one.  There is

22   substantial loss here.

23           Then I think that issue of is there 52 or 24 can be

24   done on the papers with respect to a restitution order

25   because for your Honor's purpose today, the issue is -- in

1    thinking about the fine, the ability to pay.  And at a

2    maximum, the restitution order will be $2 million.  As of

3    today, it is $2.1 million.  That's the maximum it could

4    possibly be.  And I believe the number will get smaller.  And

5    likely, the longer you put off resolving restitution, the

6    smaller that number will be so in comparison to Mr. Litvak's

7    substantial personal wealth, he has the ability to pay a

8    fine.

9            THE COURT:  Attorney Smith, you've identified -- is

10   he correct that it is 24 that you question?

11           MR. SMITH:  It is Exhibit F to our sentencing

12   memo.

13           THE COURT:  That's why I asked you if it was F.  So

14   I could look at F.  I could then go look at this binder.  I

15   can look at what the chats were and decide if it was clear or

16   a fudge, in effect, you know, maybe I could get them with

17   this, whatever.  I mean --

18           MR. SMITH:  That's correct, your Honor.  I think

19   that --

20           THE COURT:  And it goes to restitution, not to

21   loss.

22           MR. SMITH:  I do agree with Mr. Francis that could

23   be resolved on the papers.

24           THE COURT:  Okay.  Well, the issue before the court

25   is we're on the guidelines as a factor and we're on the

1    question of whether there was a loss under the guidelines,

2    which is a specific offense characteristic under Chapter 2.

3              The government and the probation officer agrees,

4    suggests that an enhancement of an 18 level increase is

5    appropriate because the loss is between 2.5 million and less

6    than 7 million.  The court, over the objection of the

7    defendant, will adopt Paragraphs 11, 13, 19, 20, 21, and 22.

8              At this point, Ray, 23 will -- I don't know what to

9    tell you how to deal with that, but it should really be --

10   I'm not finding the 76 are all part of the loss.  What I'm

11   going to find in a minute when I explain my reasoning is that

12   the loss is between the two-and-a-half and the 7 million, but

13   I may sustain, in effect, objections to certain of the trades

14   in Exhibit F of the defendant.  So I think maybe for purposes

15   of the probation report is what you say is that their -- the

16   government provided additional -- evidence of additional

17   losses, some of which were not objected to by the defendant,

18   which are the 50 something.  I presume they total a certain

19   number, and that number could be in Paragraph 23.  And that

20   will -- certainly puts it over two-and-a-half million, right?

21             THE PROBATION OFFICER:  Yes, your Honor.

22             THE COURT:  The reason for my conclusion in this

23   regard is -- I will start with the basic as to the

24   guidelines.  The guidelines provide in Chapter 2, 2B1.1(b)(1)

25   that, quote, if the loss -- insert the language from a

1    relevant offense -- exceeds $5,000, increase the offense

2    level as follows.  And then provides a table that we have

3    talked about listing various bracketed amounts of loss and

4    corresponding increase in the offense level.

5            Loss is defined in the guideline in an application

6    Note 3A as, quote, pecuniary, that is monetary, harm, end

7    quote.  Before I can determine a loss amount, however, I have

8    to determine that there is proof of a loss, as Attorney Smith

9    correctly argued.  And, of course, the burden of proof is on

10   the government and the standard is by a preponderance of the

11   evidence, not beyond a reasonable doubt as it was at trial.

12   There's been a lot of argument in the briefs, obviously we

13   had a fair amount this morning as well, in that Mr. Litvak

14   argues there is no loss here.  And the government argues

15   there was a loss, and that it was 6.3 million.  I have just

16   found that at some -- at least for purposes of the sentencing

17   some lower number than that, but certainly it is a

18   significant number.

19           The resolution of the issue, I think, is found in

20   the Application Note 3, Part A, to this guideline, which

21   provides that the loss is the greater of the following,

22   actual loss, that is pecuniary, that is money, harm, that

23   Mr. Litvak's conduct actually caused or which was reasonably

24   foreseeable to occur for a person in Mr. Litvak's situation.

25   Or alternatively, intended loss, that is pecuniary or

1    monetary harm, that Mr. Litvak knew or reasonably should have

2    known under the circumstances was a potential result of the

3    offense.

4         I think I can find both actual and intended loss

5    present.  Actual loss, I would base upon reasonable

6    inferences drawn from testimony at trial.  In particular, the

7    court has already quoted from Mr. Lemin and Mr. Wollman in

8    which, obviously, they were testifying on the element at

9    trial, which was materiality.  But I think their testimony

10   evidences, as well as other testimony, that talked about

11   normal or typical commission amounts or tick amounts over the

12   sale price that the amount that Mr. Litvak was falsely

13   raising the sale price to be was a loss to the buyer.  The

14   court concludes from at least Mr. Lemin and Mr. Wollman's

15   testimony certainly is enough to reasonably draw the

16   inference that they would not have done the trades at the

17   price that Mr. Litvak offered to them had they known the

18   truth instead of being misled my Mr. Litvak.

19        And I think part of Attorney Smith's argument is,

20   well, we don't know what would have happened, they would have

21   maybe walked away or negotiated a better deal.  But the fact

22   of the matter is that they suffered a loss.  Where a good

23   does not trade on an open market, such as is the case here, a

24   fair measure of loss is the difference between the price at

25   which an otherwise well-informed trader is fraudulently

1    induced to exchange a good, and the price at which the trader

2    would had they not been aware of the truth of the matter to

3    the person who is speaking the fraud have been willing to

4    execute that good.

5        I draw some help from the Second Circuit's decision

6    in the case USA vs. Boccagna, which is admittedly

7    interpreting the issue of value under the Mandatory Victim

8    Restitution Act.  And they talk there about how fair market

9    value is often the best measure.  But as I think I've

10   explained in my questioning of counsel, I struggle with the

11   idea of fair market value being evidenced by a price paid by

12   a person who has been misled, lied to.  As I say, I think the

13   seller's offer price is evidence of fair market value.  We

14   certainly know in each of these instances that the buyer

15   would have bought at a price lower than what they bought at.

16   So in my opinion, the seller's price, which that willing

17   seller was willing to sell at and the buyer, I think I can

18   reasonably infer by a preponderance of the evidence, that

19   every buyer here would have paid less than they actually

20   paid.  I think that's pretty reasonable.  Therefore, I know

21   they suffered a loss.  That's proof of loss, in my opinion.

22       Here, I mean, we don't know the actual price that

23   would have satisfied Mr. Wollman or Mr. Lemin had Mr. Litvak

24   not defrauded them.  It seems to me their testimony is

25   sufficient for the court to reasonably conclude that they

1    suffered a loss, that is it suffices to conclude that the

2    prices at which they would have been willing to trade with

3    Mr. Litvak, had they known the truth of the matters to which

4    he spoke, would have been more favorable to them than the

5    prices at which they actually executed transaction with

6    Mr. Litvak.  Therefore, I believe that under the guideline

7    there is evidence of loss.

8            So then the question becomes -- the other issue of

9    whether if it is not an actual loss, because as Attorney

10   Smith argues, it's somehow speculative what would the deal

11   have been done.  The alternative under the guidelines is

12   intended loss.  And as I've suggested in my questions, I

13   think that Mr. Litvak intended the buyer to lose in the sense

14   of paying more than they otherwise would have had to pay had

15   they known the truth.  He intended a loss of the difference.

16   He intended, in effect, to induce his buyer to complete the

17   transaction at a worse price than they otherwise would have

18   because he wanted them to believe that his offer price was a

19   fair one.  He believed that his lies about that offer was

20   available that -- I'm sorry.  Let me back up.

21           By making the lie, he can accomplish his goal, in

22   effect, his intention to extract for his company more money

23   than the buyer would otherwise have been willing to

24   surrender, and he knew that.  He knew, I conclude, even

25   though he didn't testify, that he was in this business long

1    enough what normal average commission prices were, so he knew

2    he was, in effect, getting the buyer to pay to his company in

3    many cases well over what they ever would have considered

4    paying.  For example, if you take Trade 2 on the government's

5    table, he intended the AllianceBernstein trader to believe

6    that Jefferies was actually buying the security at the price

7    he gave and that AllianceBernstein would thus be willing to

8    buy at that price, plus a typical commission of a few ticks,

9    whereas he did not believe that AllianceBernstein's trader

10   would be willing to buy the security at the higher price if

11   he hadn't made the misrepresentation.

12          I understand Attorney Smith's argument, and he's

13   absolutely right. If Mr. Litvak had not said anything, we

14   wouldn't be here.  But the fact is he did say something, and

15   that is why as an alternative you can find intended loss.

16   Because I think it is a reasonable inference why did he say

17   it?  He said it because he wanted to extract, in effect, a

18   super profit for Jefferies.

19          So the court concludes that there was, again, an

20   intended loss.  And so the question then reverts under either

21   of those two prongs, how do we estimate the loss.  As

22   Attorney Smith has argued, and the government's counsel, I

23   mean, we don't know.  We don't know because that's not what

24   happened.  But the fact is we will never know in fraud

25   situations what would happen in reality.  It is always

1    inferences to be drawn, it seems to me.  And fortunately, I

2    guess for the court, under the guidelines, if there is a

3    loss, first of all, I only need to make a reasonable estimate

4    of that loss.  That's Application Note 3C.  Further, if I

5    can't calculate the loss, I can look to the gain.  In this

6    instance, though, I think it is really both of them are the

7    same.

8         I believe -- it is my conclusion that where a

9    trader's fraudulent actions, his statements, fraudulent

10   statements induce a buyer, in this case generally, victims

11   generally, to execute a trade at a price at which they would

12   not otherwise be willing to trade if they knew the truth.

13   The court concludes that it can determine a fair measure of

14   loss by looking to the -- what I call the true value, which

15   is what the seller is willing to buy at and about which

16   Mr. Litvak made false representations.  So the difference

17   does become -- whether looked at as actual loss, intended

18   loss or gain, the delta between what Mr. Litvak represented

19   and what was the actual true situation.

20        There's a Second Circuit case from '09, U.S vs Nash

21   at 338 at Appendix 96, and the quote is at 98.  Cases

22   involving fraud, a district court may presume the defendant

23   intended the victims to lose the entire face value of a

24   fraudulent instrument, which, of course, is not this case.  I

25   don't think that the defendant can rebut that presumption by

1    presenting evidence to demonstrate he actually intended to

2    cause a lesser loss.  It seems to me that in this instance it

3    is not -- as Attorney Smith has argued, it is not that the

4    instruments were fraudulent.  Indeed, he put forward a lot of

5    evidence about what wonderful buys they were.  The problem is

6    they weren't quite as wonderful as they could have been

7    absent fraud. And so it's my view it is a reasonable

8    inference to estimate the loss here, the loss as used in the

9    table, by either -- because it's the same number in my view,

10   the actual intended or the gain.

11          And I have also looked at U.S. vs. Confrito, which

12   is a Second Circuit case about five years ago, which the

13   Circuit talks about the flexibility that the court has in

14   estimating loss, perhaps for just the reason that Attorney

15   Francis points out, and that is that when you have fraud, you

16   never have what would have happened happen.  And so we can't

17   say that, yes, for sure this transaction would have occurred,

18   but I think it is a reasonable inference to conclude based on

19   all the trial testimony of all the victims, in particular the

20   ones I cited, that the transactions would not have occurred

21   at the prices that Mr. Litvak, in effect, induced them to pay

22   because of his lie, but rather would have occurred at what

23   the seller was willing to sell plus a normal commission.

24          So that allows me to conclude for purposes of the

25   guideline calculations that the base offense level here under

1   2B1.1(A)(1) is 7 for securities fraud, that 18 levels are

2   increased because the loss is between two-and-a-half million

3   and less than 7.  I don't believe there was an objection to

4   2B1.1(B)(19)(a)(i),  that Mr. Litvak was convicted of a

5   violation of securities fraud while he was associated and was

6   licensed as a broker.

7           Further, I don't think there's a dispute even as to

8   the ones the defense contests, there are at least 35

9   victims.  Well, there are at least under 2B1.1(B)(a)(1), it

10  is not B and A.  B -- yeah, that's a typo, Ray.  Yeah.

11          THE PROBATION OFFICER:  B2A.

12          THE COURT:  It is 10 or more, increase by two.  I

13  think even disregarding the objected to transactions, there

14  are more than 10 victims.  I think there were at trial even,

15  certainly what the trial proof was, if not the charge proof

16  that was -- the guilty verdicts were returned on.  So the two

17  level are added.  That results in an adjusted offense level

18  of 31.

19          Attorney Smith, you are pressing on the court

20  acceptance of responsibility.  So before I can finish the

21  guidelines, I need to hear you on that.  You argue in your

22  memorandum that Mr. Litvak has never denied what he did.  And

23  I don't understand why you spent three-and-a-half weeks at

24  trial.  He denied he intended to defraud anyone.  You just

25  argued this morning, for example, that nobody was really

1   hurt.  I don't understand how that's acceptance of

2   responsibility.

3          MR. SMITH:  Well, I think there is a distinction

4   between the factual conduct and what to make of it.

5          Between the factual conduct, the statements whether

6   or not they were false, and then what the significance of

7   those were.  So we defended the case, I think it was clear

8   that misrepresentations were made, the statements were made

9   that were false.  And I think by the time, you know, all the

10  evidence was in and we summed up, there was very, very

11  limited instances where I disputed the government's proof

12  that some --

13         THE COURT:  Why did it take three weeks to try?  We

14  had eight or 10 witnesses testify on materiality and be

15  vigorously crossed by you.

16         MR. SMITH:  That's a separate issue from the

17  statements.  So the statements were false.

18         THE COURT:  But that's part of the crime.  He

19  doesn't accept responsibility that they were material.

20          MR. SMITH:  There were legal defenses, your Honor.

21  Materiality is a mixed question of law and fact.  You know,

22  we believe we had valid materiality arguments, you know.

23         THE COURT:  I understand that.  He had a right to go

24  -- I don't -- I'm not criticizing.  I am not adding points

25  because he went to trial.  You are asking me to find he's

1    accepted responsibility.  And the exception when you go to

2    trial, I think, is a very narrow one.  And I don't see how he

3    fits through it.

4          MR. SMITH:  I will leave with this what we put in

5    our papers, your Honor.  We think he fits that narrow class

6    of cases where he exercised his constitutional right to go to

7    trial and asserted legal defenses to the government's

8    charges, basically saying that the law doesn't apply to his

9    conduct.  His conduct, he always acknowledged and took

10   responsibility for.  He defended the case on, yes, we made

11   these misrepresentations on these days, but we stopped short

12   of saying that that constituted criminal fraud under the

13   circumstances because materiality and intent to defraud don't

14   arise from the circumstances.  And I think -- I don't want to

15   belabor the point, your Honor, but I think he's eligible.

16         THE COURT:  I meant to ask when I came out,

17   obviously Mr. Litvak has a right to address the court today.

18   And I want to be sure he understands he has that right.  Do

19   you, sir?  Mr. Litvak, do you understand you can address the

20   court today?

21         THE DEFENDANT:  Yes.

22         THE COURT:  Okay.  Thanks.

23         MR. SMITH:  We have advised him not to exercise.

24         THE COURT:  Not to do it.  I assumed that's what you

25   would do.  I received a letter yesterday, one of the letters

1    of the many letters that have been submitted on his behalf,

2    and the writer of that letter said he was ready to accept

3    responsibility -- he thought, the writer thought Mr. Litvak

4    was ready to accept responsibility, but I don't -- I don't --

5    and I'm not asking him to do this.  Please do not

6    misunderstand me.  I mean, but my view of him right now as he

7    sits here and you argue on his behalf, so I have only ever

8    heard from you so I can only take what you argue as what his

9    position is that he did not commit a crime.  Is that correct?

10              MR. SMITH:  I think that's correct, your Honor.

11              THE COURT:  That's fine.

12              Does the government wish to be heard?

13              MR. FRANCIS:  I don't think it is necessary, your

14   Honor.  Mr. Smith misrepresented what went on at trial.  He

15   fought us on facts and on the law, and the fact that we

16   prevailed, you know, for him to say, oh, at closing we gave

17   up all these arguments we admitted during the trial.  As your

18   Honor points out, that's what the three weeks was about, or

19   the two weeks prior to the closing arguments.  So I think

20   it's -- I don't think Mr. Litvak is eligible under the

21   guidelines.  We'd specifically point you to the pretrial

22   conduct of which there was no acceptance.

23              THE COURT:  The court needs to rule on this before

24   it can determine the guidelines.  Mr. Litvak argues he's

25   entitled to the two-point reduction.  Obviously, I couldn't

1    give him the third even if I was inclined to because no

2    motion has been made.  But the two points under 3E1.1A, the

3    guidelines provide that, quote, if the defendant clearly

4    demonstrates acceptance of responsibility for his offense,

5    end quote, his offense level is to be decreased by two

6    levels.  Generally, a defendant who puts the government to

7    its burden of proof at trial is not entitled to a reduction

8    of his offense level for acceptance.

9         The Application Note 2, which is quoted in U.S. vs.

10   Castano, which is a Second Circuit case from back in 1993,

11   reads, quote, this adjustment is not intended to apply to a

12   defendant who puts the government to its burden of proof at

13   trial by denying the essential factual elements of guilt is

14   convicted and only then if it's guilt and expresses remorse.

15   There is a rare exception under Application Note 2 where a

16   defendant may clearly demonstrate an acceptance for his

17   criminal conduct even though he exercises his constitutional

18   right to a trial, end quote.  If, for example, he admits the

19   relevant conduct but changes the applicability of a statute

20   to his conduct, or admits the conduct and that the statute

21   prohibited the conduct but makes a constitutional challenge

22   to a statute.

23        I don't believe that Mr. Litvak has done either of

24   those things.  Nor do I believe that he's demonstrated

25   clearly an acceptance of responsibility.  Again, he does not

1   have to do that.  But we're talking about whether I should

2   reduce his guideline range by two levels because he has.  And

3   it is the court's conclusion that he has not.  He did not

4   admit the elements of his conduct.  He didn't admit, for

5   example, that the materiality.  He didn't admit intent.  And

6   so he absolutely is entitled to his trial.  He's entitled to

7   challenge what the court has done and what the jury has done

8   on appeal, but the judgment I need to make right now is has

9   he accepted responsibility for this offense, and the court

10  could not make that finding, let alone clearly make that

11  finding.  So the court determines that a two-level reduction

12  in the guidelines for acceptance is not applicable.

13          So the adjusted offense level is 31.  The total

14  offense level is 31.  The defendant has no criminal history

15  so he's clearly in Category I.  The guidelines -- under the

16  current guidelines for that offense level and criminal

17  history is 108 to 135 months.

18          Other than your objections to loss and acceptance,

19  Attorney Smith, is the guideline calculation otherwise

20  acceptable?  Not much left to it, but there's no other

21  objection I have overlooked?

22          MR. SMITH:  No, your Honor.

23          THE COURT:  And for the government?

24          MR. FRANCIS:  No objection, your Honor.

25          THE COURT:  So that brings us really, though, to --

 1   well, that brings us to the other elements of 3553(a).  I

 2   guess I will hear from Attorney Smith on those, or I will

 3   turn it over to you, sir, to present to the court whatever it

 4   is you wish to present or argue.  Again, understand, please,

 5   that I have spent a lot of time reviewing everything that was

 6   filed.

 7            MR. SMITH:  I understand, your Honor.

 8            THE COURT:  Okay.

 9            MR. SMITH:  Your Honor, we submitted our papers and

10   we sort of separated this into two pieces, one is the

11   recognized departure grounds and then we make a variance

12   argument on 3553(a) that the factors are closely related.  So

13   I think my remarks apply to both.

14            THE COURT:  I think probably -- and I don't know,

15   maybe I'm wrong about this.  I view this as sort of the

16   arguments about what's wrong with the guidelines, shall we

17   say, are really addressed in the nature and circumstance

18   aspect of the factors.  In other words, that level is not

19   appropriate to what happened here for all the reasons you can

20   argue.

21            MR. SMITH:  I understand.  I do think there's -- we

22   want to call it a wrinkle or not, I think the loss overstates

23   the seriousness of the offense arguing, which is

24   circumstances and seriousness defense argument.

25            THE COURT:  That's right.

1          MR. SMITH:  It's an encouraged departure ground

2    under the guidelines.

3          THE COURT:  Do you want me to make a departure

4    decision or -- which you have a right to make me do.  I mean,

5    in other words I have to determine guidelines.  I

6    generally -- I will confess, I generally don't do that.  I

7    just do the guidelines.  Sometimes I will make a departure, I

8    mean if it's Fernandez, you know, if there's a plea

9    agreement, I'll do it there.  But usually I will take the

10   arguments you are making and put them into the 3553(a)

11   analysis.  But if you want a departure analysis on the

12   record, I guess I will do it.

13         MR. SMITH:  Well, I think you can do it in the way

14   your Honor's most comfortable.  I do think it adds force to

15   the argument about the seriousness of the conduct that under

16   the guidelines the commission has recognized and court's have

17   recognized is this special argument about loss overstating

18   the seriousness of the offense.  And now that your Honor has

19   made the loss finding, I do think that really does apply

20   here.

21         The -- what we have are victims that -- and bearing

22   in mind, your Honor made -- the loss finding that you made

23   did not suffer a true out-of-pocket loss.

24         THE COURT:  Okay.  Before you launch into your

25   argument, could you tell me which departures you want me to

1    rule on?  I assume extraordinary family circumstances.

2            MR. SMITH:  I want you to -- yes, I'd like you to

3    rule on --

4            THE COURT:  Loss overstates.

5            MR. SMITH:  And loss overstates the seriousness of

6    the offense.  Those are just the two.

7            THE COURT:  All right.  And if I forgot, please

8    remind me when you're done.  Because I'm just going to hear

9    your argument as a piece with appropriate interruptions, but

10   I am not going to have you argue departure by itself and then

11   go to the factors, if you don't mind.

12           MR. SMITH:  So with regard to loss, unlike most

13   investment fraud cases, heartland investment fraud cases,

14   there's no loss of principal here.  There's no sale of

15   security that had a diminished investment value or no

16   investment value.  I think the real difference here is -- and

17   the difference between a scheme that's designed to take an

18   investor's money and give nothing in return, like a Ponzi

19   scheme or policy boilerroom operation, those are vastly

20   different and more serious schemes than the scheme Mr. Litvak

21   was convicted of.

22           Even if we do see a loss here, as your Honor has

23   found, I do think that the idea that the asset that was

24   returned or transferred to the victims in connection with the

25   transaction was a performing asset that was -- bear in mind

1    our prior discussion on fair market value -- had the value on

2    the trade date that was a fair market value.  I think we have

3    a submission on that in terms of the proffer on the excluded

4    expert evidence, and we would have proved up that these were

5    fair market value prices.  So on day one --

6            THE COURT:  Let me just say I reviewed that in

7    connection with the motions at trial.  I mean, I have not

8    gone back and reread the reports, obviously.  You have put

9    the argument in your brief, but I'm refreshed by what I had

10   already reviewed.

11           MR. SMITH:  We just think that the fair market value

12   is a range of prices, and I think when you have a buyer that

13   -- bearing in mind your Honor's comments about fraudulent

14   statements that a borrower gets the asset within a range that

15   has been previously compensated buying the asset, is very

16   different from a scheme designed to bilk someone out of their

17   money by causing them to engage in a transaction that is

18   either a complete loss or a large loss as of day one.  Just a

19   vastly different set of circumstances and a different type of

20   offense.

21           We just don't think that the type of conduct that

22   Mr. Litvak engaged in raises to the level of heartland fraud

23   cases that are really contemplated by the guidelines in

24   fashioning a table that punishes to the extent that it does

25   based upon dollar value.  I think one of the markers of that

1    here, your Honor, is lack of real victim impact.  Lack of

2    true economic impact on the victims that mattered.  You know,

3    to the victims --

4              THE COURT:  You don't think it matters to me as a

5    taxpayer that my buyer, the person buying bonds for me using,

6    in part, my money got a deal that was more costly than it

7    should have been but for fraud.

8              MR. SMITH:  Respectfully, your Honor, I don't think

9    taxpayers were a victim of this offense.

10             THE COURT:  I didn't say victims.  You said -- well,

11   I guess you argued victims don't matter.

12             MR. SMITH:  We're talking about the funds.

13             THE COURT:  Why doesn't it matter to the fund?

14             MR. SMITH:  I think I want to compare the funds.

15             THE COURT:  He's negotiating over three or four or

16   five ticks of his commission when we're talking about a whole

17   point sometimes or more.  If it mattered to him how many

18   ticks he got on his commission to the tune of 1 tick or 2

19   ticks, you don't think 30 plus ticks matters to the buyer?

20             MR. SMITH:  I think when we look at the type of

21   entities that were the victims, these investment funds had

22   billions of assets in them.  And your Honor found loss.  Did

23   that loss matter to the financial health and well-being of

24   the fund, the entity?

25             THE COURT:  If what you are arguing is it's not a

1    little old lady who's lost her lifesavings and has no money

2    to pay for her prescription medicines, no, they are not that

3    type of a victim.  But does it matter to the victim?  I don't

4    know how you can say it doesn't.

5           MR. SMITH:  Matter in an important way that would

6    have altered the operations, financial well-being of the

7    fund.  I don't mean to be flip in any way, but it's -- the

8    differences really amount to a rounding error at the fund

9    performance level.  They don't move the meter on the

10   performance of the fund.  And when you layer on top of this,

11   your Honor, that the investments themselves were quite

12   profitable.  If you just look at --

13          THE COURT:  They would have been even more

14   profitable, though, but for the fraud.

15          MR. SMITH:  Vanishingly, marginally more profitable.

16   These bonds were valuable opportunities that Mr. Litvak

17   presented to the various counterparties and they were

18   valuable in the sense that there was not a lot of supply of

19   these bonds at the time to be able to get into the funds.

20   The modest point here your Honor is for AllianceBernstein, if

21   you look at all of their dealings with Mr. Litvak and

22   Jefferies that have arisen out of this investigation and

23   analyzed -- and we did the analysis, you know, in our proffer

24   of the evidence -- the bonds that Mr. Litvak sold, even

25   accounting for the overpayment that your Honor's put your

1    finger on in making your loss finding, these performed better

2    than the average investment in the AllianceBernstein PPIP

3    fund by a significant margin.  The fund returned

4    approximately 18 percent.  But when you backed out the fact

5    that it was a leveraged fund, the average investment in the

6    fund returned 9 percent, because there was 200 percent

7    leverage.

8          The bonds that Mr. Litvak sold to AllianceBernstein,

9    the Harborview Bond, the Lehman bonds that you heard about at

10   trial, by the time they were sold when you take into account

11   the principal and interest payment and the gain on the

12   resale, the annualized return on those was in the

13   neighborhood of 14 percent.  These were fabulous performers.

14   And to say that when you put in the alleged overpay, that is

15   something we can't really quite calculate, the difference in

16   the return is marginal.  Maybe it's a tenth of a point or a

17   quarter of a point.  It doesn't add up to much.

18          THE COURT:  Well, it's real money.

19          MR. SMITH:  It is money.  Real money on that scale,

20   the victims -- and you gave the little old lady argument, it

21   just doesn't have the type of impact that other core

22   heartland fraud schemes have on their victims.

23          I think one of the telltale signs, your Honor, we

24   don't have -- we don't have victims here to explain to your

25   Honor how they were adversely affected by the offense conduct

1    here.  We don't have victims that you often see in fraud

2    sentencings complaining about how the defendant's conduct

3    harmed them, how they were hurt.  They are not here.  They

4    are not motivated to be here, because while it is money, it

5    doesn't end up in the larger scheme of things matter to them.

6    What we have instead are representatives of victims

7    submitting letters, including the letter that you saw from

8    Red Top investors, which had been the victim on Count Seven

9    and remained a victim for purposes of the indictment.  In

10   fact, you have two of the Red Top investors here in court

11   today to show their support for Mr. Litvak.  Peter McMullin

12   and Rob Marr are here in part because they believe that your

13   Honor should afford Mr. Litvak leniency at sentencing.

14        You also saw letters from other representatives of

15   victims, Chris Rice from EBF put in a letter.  So we have --

16   on the victim impact side of things, we don't have an outcry

17   on the part of the victims that what happened here was

18   particularly bad or wrong or that Mr. Litvak is deserving of

19   punishment.  We have, I think for purposes of sentencing, we

20   have indifference, at most, and we have support at some.  And

21   I think that does speak volumes in terms of the victim

22   impact.  It's just the money, as your Honor has said, but the

23   money given the large, large sums in these funds, it's not

24   money that impacted their returns to the funds and their

25   investors.  So when the government goes the next step and

1    says that the pension fund, et cetera, were impacted as well,

2    well, your Honor, they weren't because the returns to those

3    investors from investing in these funds were not impacted

4    other than in such a tiny amount as something that nobody

5    would care about once all was said and done.

6         I think I noted the large outsized returns that the

7    investors made.  They all made money off these bonds.  They

8    were performing assets and they performed well.

9         I think the other thing that takes this out of the

10   heartland, and it's a factor that we really tried to

11   emphasize in our papers is we don't see direct personal gain

12   to Mr. Litvak.  We just don't.  The government was not able

13   to prove that at trial.  The testimony of Mr. --

14        THE COURT:  It wasn't a subject matter of proof at

15   trial.  I mean, there was testimony, was there not, that his

16   annual income was fairly low, if I recall.  I have seen that

17   somewhere anyways.  I don't remember from trial.  But

18   obviously, his actual income was quite substantial in these

19   three years.  The difference is a bonus, right?

20        MR. SMITH:  That's correct, discretionary bonus.

21        THE COURT:  In fact, he received a bonus, right?

22        MR. SMITH:  He did receive, yes.

23        THE COURT:  And we have testimony from his

24   supervisors as to what percentage of profits was used to

25   determine the amount of the bonus, don't we?

1              MR. SMITH:  No, I don't think we do.  I don't think

2     that was clear at all.  I think what we had from --

3              THE COURT:  How about this testimony?  Based on your

4     experience as a trader, what is the rule of thumb?  Expect 10

5     to 20 percent of that profit as a year-end bonus.

6              No, there's no rule of thumb.  I think generally

7     speaking the range is anywhere from, you know, 5 to 12

8     percent.

9              Question:  But it could be higher?

10             Answer:  It could be.

11             So we have at least 5 to 12 was established in

12    testimony.  That's the transcript at 1933.

13             MR. SMITH:  Well, we have to have the -- what your

14    Honor has indicated, no rule of thumb.  As your Honor will

15    recall, Mr. Eveland said that there were three main factors

16    that impacted bonus determination.  That was performance of

17    the firm, performance of the group and then performance of

18    the individual trader's book.  And all --

19             THE COURT:  I had the sense, though, the first two

20    had already been determined when they ended up with a pot of

21    44 million to distribute one year, half of which went to

22    traders like Mr. Litvak.  I mean, this is not -- the extent

23    of the increase in profits resulting from the fraud was to

24    hit the bottom line profit line of Jefferies, if not at 6.3,

25    at least maybe 4.5 if we take out your disputed transactions.

1   That was not insignificant with respect to his total  profit.

2   It could be as much as 10 percent or maybe 8 percent at the

3   low end.  A twelfth of 5 million or a twelfth of 4.8 million

4   is not a small amount of money.  Maybe it is to you, but not

5   to most people.

6           MR. SMITH:  Well, it would be to me, your Honor, but

7   the point here is I don't think the math is that

8   straightforward and simple.  It was a discretionary

9   determination.  And when you look at the --

10          THE COURT:  You tell me -- you think it is

11  reasonable for me to conclude based on what's in front of me,

12  that the additional profits to Jefferies from Mr. Litvak's

13  lies had no effect on his income in the three years in

14  question?  You want me to conclude that?

15          MR. SMITH:  I think it has an ennoble impact on --

16  and hasn't been proven up so that your Honor could --

17          THE COURT:  So why did he lie?  What did he intend

18  to do?  We already had this discussion about his intention.

19  I mean, why do you lie about this if you don't intend to

20  yield greater profit for your company which, in turn, will

21  have some benefit to you?

22          MR. SMITH:  Well, that's --

23          THE COURT:  If things line up.  And they did line up

24  in these years.  They did overall good performance.  They did

25  have good section performance, so there was a pot of money.

1    And that pot of money was determined by the profits.  Am I

2    missing --

3          MR. SMITH:  Your Honor, I'm not going to dispute

4    that there was a desire to earn more money for Jefferies, and

5    indirectly down the road, you know, the hope having a bigger

6    bonus, yes.  I don't think we can trace the money out that

7    neatly and cleanly.  And further response to why were there

8    misrepresentations made, I think that's another sort of

9    circumstance issue I will get to after I focus on the loss

10   which has to do with the culture of Jefferies, supervisory

11   approval, widespread instances of the conduct of others at

12   Jefferies that were involved in it.  I think that the culture

13   at Jefferies on Wall Street really gave, in effect,

14   Mr. Litvak's judgment on whether or not you could do it this

15   way and whether you were encouraged to do it this way.  So I

16   think the why question is not a neat and simple he did it for

17   more money.  I don't believe that to be the case.

18          But just focusing in on the mitigating factors on

19   why loss overstates the seriousness of the offense both the

20   departure ground and for the 3553 argument, I think the two

21   powerful mitigants were the de minimus victim impact combined

22   with this is not money in Mr. Litvak's pocket directly.  I

23   mean, a typical fraud scheme, the defendant winds up with the

24   proceeds of the scheme and is free to spend it on himself.

25   We can't say that that happened here.  And I would encourage

1    your Honor not to make that conclusion.

2           Then the -- under the heading of de minimus impact,

3    there's just the sort of robust investment performance of the

4    victims, who I think have sort of voted with their feet not

5    to be here and explain to your Honor why this scheme

6    necessarily harmed them.  So that's -- those are the points

7    we want to make in addition, just to highlight from our

8    papers on seriousness of the offense conduct.

9           I do want to talk a little bit about the family

10   circumstances issue because I think those factors are very

11   real here.  And you know, while we -- I do want you to make

12   this departure finding, I think it does go into the broader

13   context of Mr. Litvak, who he is, the nature of the support

14   he's received throughout this proceeding, which I think is

15   quite rare.

16          As your Honor knows, Mr. Litvak's in-laws were here,

17   they are here in court today.  Marc and Daniela are here in

18   the front row, as is Dr. Litvak, his wife.  Mr. Litvak's

19   parents, Steve and Nancy Litvak, were here every day of the

20   trial.  They are not here, as your Honor may have noticed.

21   And I just want to tell your Honor briefly why that is.  Mr.

22   Litvak was diagnosed with cancer about 10 days or two weeks

23   ago and needed emergency.  He desperately wanted to be here

24   and wanted to put off the surgery, but was persuaded not to.

25   And so he's home recuperating from that surgery and that's

1    why he's not here.

2          Mr. Litvak also enjoyed broad support at the key

3    moments in the trial in these proceedings.  I think as you

4    can see from the full gallery here today, we have many

5    friends, family members, former colleagues of Mr. Litvak here

6    to support him.  You've seen well over a hundred letters in

7    support which talk about the unique character that Mr. Litvak

8    has, the impact that Mr. Litvak's life has had on theirs.  I

9    think Mr. Litvak's father is not here to say it himself, but

10   I think the phrase he used is that Jesse is just good at

11   being human.  And that just comes across from this really

12   broad-based measure of support, which it is something I think

13   we don't see in the typical criminal case and it's something

14   that judges do call out in imposing a more lenient sentence.

15   And I would just flag briefly the sentence that was imposed

16   in U.S. vs. Ferguson, which was a case that was prosecuted in

17   this district.

18          THE COURT:  I'm familiar with that.

19          MR. SMITH:  That the broad support that the

20   defendant in that case enjoyed from the community, from the

21   family, from co-workers.  And I would add in this case, even

22   from victims is something that we hope your Honor will take

23   note of.

24          I want to focus back now on Jesse's son, XXXXX.  I

25   think it is clear and hopefully undisputed, that XXXXX

1    suffers from a learning disability that related back to a

2    hearing defect that he had at birth, that the family has

3    taken steps to address that.  And XXXXX has progressed

4    reasonably well, but it is perhaps an ironic upshot of

5    Mr. Litvak's circumstances that in the two-and-a-half years

6    he's been out of work he's become the principal caregiver to

7    XXXXX and XXXXX has become even more attached to Jesse and

8    has done better.  And what we see from the submissions is

9    that during the period when the case was being tried, XXXXX

10   acted out, as did his sister XXXXX, she acted out as well.

11   And that's disruptive circumstance for the children, in

12   particular XXXXX.

13           So what I think we see from the outpouring of

14   support for Jesse is that he's a special person who has

15   tremendous character and an ability to help others.  And the

16   numerous anecdotes of Jesse thinking of others first and

17   helping others and keeping others in mind, the charitable

18   works that he's undertaken and support for various projects.

19   But just the ability on a human level as a role model, as a

20   friend, as a family member, a spouse, a parent, to have a

21   positive impact.

22           When you take that specialness that Jesse has, an

23   ability to affect others, and then you focus it down on XXXXX

24   and his ability to make a difference in that child's life, I

25   think, your Honor, it really ought to influence how much

1    additional punishment is really necessary in terms of

2    incarceration and it should weigh on your Honor's decisions

3    that how much jail is necessary.  And each additional day in

4    jail beyond what's really necessary and adequate to the task

5    is a day when Mr. Litvak will not be able to bring to bear

6    his talents as a human being to help his son XXXXX to

7    continue to progress and overcome his learning disabilities.

8    So I think that's a factor that I would hope that your Honor

9    would weigh heavily especially in fashioning an appropriate

10   sentence.

11          And whether that's done in the form of departure

12   under the guidelines or just as a variance factor, it serves

13   no useful purpose to incarcerate Mr. Litvak for additional

14   time when XXXXX will suffer and XXXXX will suffer as well and

15   the family will suffer.  I do think that circumstance is

16   exceptional and we should have Mr. Litvak's talent brought to

17   bear where he can do most good.  I think you saw as a sense

18   but generally in the letters, please put, you know, Jesse on

19   community service, let him go out and do some good, impose

20   some sort of alternative sentence.  Those are all great

21   suggestions.  We're very realistic here, your Honor.  I know

22   you are going to impose some term of imprisonment.  We

23   suggest the 14 months as a max.  I think you rejected the

24   acceptance argument.  That's 18 months.

25          Your Honor, a lower -- a sentence that goes beyond

1    single digits, low single digits in terms of years in light

2    of impact on XXXXX and the family is one that we just don't

3    think would be fair and just under the circumstances.

4           The government spends -- so I know you have read

5    everything very carefully, your Honor, and I think just in

6    terms of support and the annotations to Mr. Litvak's

7    character, it may not square with what you saw in the

8    courtroom in terms of what you heard from witnesses, it may

9    not square with my comments on Mr. Litvak's behalf that he is

10   just not prepared to admit to conduct.  Bear in mind you said

11   he didn't have to.

12          And I don't want you to feel that Mr. Litvak is a

13   recalcitrant defendant who doesn't get it somehow.  I think

14   he completely gets what happened.  And I think the point that

15   I want to convey is that somehow you can have someone who

16   operated in this industry like Mr. Litvak  -- and this goes

17   back to the point I made earlier about culture, about

18   supervision, about encouragement.  Think about the proof at

19   trial we heard from Bill Jennings encouraging with the word

20   boom what Mr. Litvak was doing, the training he received in

21   the environment that was Jefferies, which I think we saw in

22   spades was toxic in a sense.

23          I think that Mr. Litvak could operate in that

24   environment understanding sort of what the rules of the road

25   were in terms of compliance there, and fairly I believe that

1   I can do these things.  Might have been the compliance sense

2   and the securities, what the SEC might do sense, be wrong,

3   but I cannot be at the same time committing a federal crime

4   that will land me in prison.  So it's the difference between

5   acknowledging the conduct what he said and did and the

6   misrepresentations that were made and what the upshot of that

7   conduct was.

8        I do think that when you think about that point I'm

9   just making and put it back against the character that we now

10  see coming through in terms of all of the submissions, I hope

11  it helps you better understand and put into context what the

12  man was thinking and the fact that there's tremendous

13  goodness in his heart, goodness in his character that will

14  hopefully be a fact that your Honor considers in imposing

15  sentence.

16       THE COURT:  I'm going to ask a few questions.

17  Please don't interpret this as -- you know, this is my focus,

18  but these are the questions that come to my mind in response

19  to what you are arguing.  Doesn't necessarily mean my

20  reaction to what you are arguing.

21       To the extent you want me to view the guidelines as

22  an inappropriate measure of what happened here, in effect,

23  all of the things in 3553(a), and that the guidelines are off

24  because loss isn't a good measure.  You have a lot of, you

25  know, good company for that argument, but the struggle I'm

1    having in this case is that I have in the past expressed that

2    same view in connection with sentencings where loss has --

3    well, in this case it's -- usually I will say the loss is

4    sort of too heavy a factor and the guidelines here, it's like

5    a tsunami.  It just overtakes the guideline.  60 percent of

6    the guideline calculation is loss.  So I'm sympathetic to the

7    argument that the guidelines are challenged in their ability

8    to help the Court make a judgment here.

9         But the problem I think for your side of the

10   courtroom today on this issue is when I have in the past

11   said, okay, just pure raw numbers are not the way to look at

12   what happened, what the nature of the circumstances is or how

13   serious this is.  What I usually then turn to is things like

14   how many times did the defendant do this, how many victims

15   were there, how long did he engage in this conduct.  Those

16   kinds of things.  My classic example is if you lie to a widow

17   with total assets of a million dollars and you lie and get

18   the million dollars from that widow, and -- or Attorney

19   Francis lies to five widows who have a net value each of

20   $200,000 and he's able to take the 200,000 from the five

21   victims.  Generally, I think I would say I would view

22   Attorney Francis' conduct more seriously than your conduct.

23   It is very comparable.  I don't want to split hairs.  But I

24   think things like how often you do it and how long you do it

25   are -- can be measures that help us determine seriousness or

1    nature and circumstances when sheer dollar totals maybe lead

2    us astray.  The problem here, those factors aren't in

3    Mr. Litvak's favor.

4            MR. SMITH:  Well, look, three's -- the number of

5    transactions are -- I think we're either in the 50-ish range

6    or the 75 range for a count purpose over a two or three-year

7    period.

8            THE COURT:  Right.  So once every week -- no, once

9    every other week.  Something like that.

10           MR. SMITH:  I think it is less than that.  The

11   spectrum that I think would be more helpful to your Honor is

12   in terms of quality of the fraud and what's happening is you

13   could put a Ponzi scheme, a Madoff-type fraud which was made

14   up of many little frauds on the individual victims over a

15   period of time that resulted in devastating out-of-pocket

16   loss and harm to the victim, and then without diminishing the

17   seriousness of what Mr. Litvak was convicted of, which was

18   lying to counterparties in the circumstances that mattered.

19   That was the jury's verdict.  But say that is just less

20   serious than a scheme that's designed to steal someone's

21   principal and sell an investment that is worthless or will

22   never have a return.  You could substitute boilerroom

23   operation in there.  So while there's numerous instances of

24   the conduct, it's numerous instances of conduct that's mild

25   in comparison, or less serious in comparison to heartland

1    frauds or more serious frauds.  And it is just -- on the

2    white collar offense spectrum, it strikes me as one that's

3    just not close to the average of seriousness.

4             And when you do take into account then -- and this

5    is why we spend so much time doing comparable sentencing

6    analysis, and I think a pretty thorough scrub of cases in

7    this district and cases in other districts where the

8    government has taken a position that a very serious offense

9    requires a certain sentence, we see almost uniformly below

10   guideline sentences imposed.  And in some circumstances,

11   quite mild in comparison to what the government is asking for

12   here.  And I think noted Ferguson before, but you had --

13   Ferguson is a case of $500 million in actual loss.  So a

14   figure that really, really dwarfs what the conduct is here.

15   The  guidelines were essentially life.  I think the Court

16   quite appropriately thought that was just an irrational

17   result.  It did have the government take the position I think

18   in a press articled that was cited, that there's nothing more

19   serious than an accounting fraud of a public company given

20   the scope of who it hurts, and he had a sentence imposed of

21   only 24 months.

22             Now, obviously, every case is different than -- so

23   the comparisons are imperfect.  But as we go one to the

24   other, we see, you know, for -- for conduct that the

25   government, by its own words definitionally says is far more

1    serious than this, we see a thoughtful sentencing decision of

2    24 months under the circumstances and essentially a complete

3    disregard for the advisory guidelines.

4            I'm not -- I don't think that the guidelines in this

5    case should be a starting point for your Honor's sentence.

6    They are advisory, are not binding and they don't have to be

7    a starting point.  You have to consider them, but I don't

8    think they are a benchmark that really applies at all in

9    these circumstances given the nature of the conduct.

10           THE COURT:  Could I ask one question?  And

11   obviously, I'm going to talk when I get to discussing the

12   factors and my views of the sentence decision in this case

13   about the support and all of letters they've written.  But I

14   would like to ask if you could tell me the time period in

15   which what is reported at Paragraph 53 of the PSR

16   approximately occurred.  It had to be after April of '08, but

17   I don't have it and the probation officer didn't have it in

18   his notes.

19           MR. SMITH:  2009, 2010.

20           THE COURT:  '09 and '10.  So Mr. Litvak's son was

21   born but not yet diagnosed at that time?

22           MR. SMITH:  I think that's the case, your Honor.  I

23   would say on that, that that was a single event in

24   Mr. Litvak's life.

25           THE COURT:  No, I understand.  I don't wish to

1    overstate it or whatever.  I just wish to understand the

2    temporal context for it.  I didn't mean to cut you off, sir.

3    If you want to argue about it, you can.

4          MR. SMITH:  No, no, I think that's enough on that.

5          So we put the comparable cases in there, your Honor.

6    I think the experience in recent years is that sentences

7    significantly below the low end of the guidelines are imposed

8    in cases that are more serious than this in terms of the

9    conduct, in particular the victim impact.  And I think that

10   in cases where the guidelines sort of trend towards an

11   irrational result because the dollars add up, the court's

12   readily recognize that.  The Butler case out of the Southern

13   District and the Parse case out of the Southern District,

14   which I think you cited, your Honor, are great examples of

15   that.

16         THE COURT:  What was the second one, Parse?

17         MR. SMITH:  Parse.

18         THE COURT:  The one with the P.  Yeah, I know.

19         MR. SMITH:  Tax shelter fraud case in front of Judge

20   Pauley.

21         THE COURT:  Yeah.

22         MR. SMITH:  Where the tax loss was, you know --

23         THE COURT:  Astronomical.

24         MR. SMITH:  -- was around 6 billion.  The defendant

25   had personal gain to the tune of $3 million.

1          THE COURT:  Which he then put in the fraud scheme.

2          MR. SMITH:  And he crammed that in the tax fraud

3    scheme.  The guidelines were sort of an absurd result,

4    nothing like here, 292 months on the low end.  The government

5    requested eight years and Judge Pauley imposed a thoughtful

6    and modest sentence under the circumstances of only 42 months

7    despite the central and long role.

8          Now, to your Honor's point about repetitive sort of

9    ongoing conduct, in Parse, they certainly engaged in that

10   over the life of that scheme.  But Judge Pauley, I think

11   thoughtfully put him into the context of the overall conduct

12   and took into account the other 3553(a) factors that came to

13   what was a just sentence in that case.

14         Butler is a case that involved a fellow at Credit

15   Suites who sold auction rate securities.  And I think the

16   point there is one I've already noted today, your Honor.

17   It's the culture in terms of an encouragement to commit  --

18         THE COURT:  The government's answer to that is going

19   to be, well, yeah, we have a culture problem, and the only

20   way to cure it is to impose extremely long sentences upon

21   people that are -- albeit only one of many doing it, but are

22   found, targeted and the prosecuted successfully.

23         MR. SMITH:  I'm glad you raised that, your Honor,

24   because I can address that now in anticipation of Attorney

25   Francis's argument.

1          THE COURT:  Right.

2          MR. SMITH:  That is we learned, I think, in

3    substantial detail about the culture at Jefferies and we

4    learned that numerous others at Jefferies, both at the

5    supervisory level and at the colleague level, were involved

6    in the conduct.

7          So on one level under the guidelines the factor is

8    avoid unwarranted sentencing disparities, and that's why we

9    spent the time and the care that we did in setting forth what

10   we think are appropriate comparables that show that modest

11   sentences under the guidelines have been applied in many

12   instances for conduct worse than Mr. Litvak's, also involved

13   clear-cut direct personal gain.

14         But there's a different type of disparity here

15   occurring, and has occurred.  Mainly, that Mr. Litvak to date

16   is the only one prosecuted for this conduct.  The government

17   has made arguments about general deterrence and they made

18   other arguments about the seriousness of this offense, how

19   bad it is, in an attempt to justify the guideline sentence.

20         But the evidence has been in the government's

21   possession for two plus years with regard to others at

22   Jefferies who engaged in identical conduct independent of

23   Mr. Litvak.  I'm not encouraging them to go out and prosecute

24   anybody else, but it is very undermining to their arguments

25   that -- about the seriousness of these crimes when they are

1    in possession of evidence and have done nothing about it, an

2    almost perverse result.

3          THE COURT:  Well, I guess maybe we should go to

4    Congress and ask for the U.S. Attorney to be funded.  Because

5    obviously, prosecuting these cases are not inexpensive

6    propositions, right?

7          MR. SMITH:  That may be, your Honor.

8          THE COURT:  I mean, the government never has to

9    prosecute everybody who commits a crime.  We went through

10   this at trial.  I mean, you may disagree with me.  And it

11   never does.

12         MR. SMITH:  That may be a reason why they are not

13   going forward.  But it does set up this disparity that

14   Mr. Litvak --

15         THE COURT:  That's not the sentencing disparity

16   factor that 3553(a) talks about.

17         MR. SMITH:  It is a point that I want to raise to

18   your Honor.  Here sits Mr. Litvak convicted of these crimes,

19   and your Honor, in short order, will impose sentence on him.

20   Others who your Honor heard about during the trial -- and I

21   don't mean to name names and I don't mean to encourage them,

22   but they are still working at Jefferies or in the industry.

23   The documentary evidence and proof at trial was that some

24   participated in the acts that Mr. Litvak was convicted of,

25   and others did it independently.  They are either working at

1    Jefferies or working in the industry or otherwise have gone

2    completely unpunished.

3            So the government's position is that a sentence at

4    the low end of the guidelines is appropriate and all of this

5    other conduct merits no action.  And the general deterrence

6    point is, what, single out one guy when there's evidence that

7    others did it.  I don't understand that approach and I think

8    it works an unfairness on Mr. Litvak to say we need a

9    stronger general deterrent action, when these other means at

10   the government's disposal, they have decided not to go

11   forward on.

12           But it just works out if Mr. Litvak has been singled

13   out, here we are, for conduct that in many, many

14   circumstances, your Honor, had come to light of enforcement

15   authorities over the years -- I think we cited numerous

16   examples -- and was not treated as a criminal offense.

17           The government did outline for your Honor another

18   case out of the Southern District that facially looked

19   similar to this.  This is the Leszczynski and Chouchane.

20   That was sentenced in front of Judge Keenan earlier this

21   year, in February.  I think it was attach -- the indictment

22   was attached to their reply brief.

23           THE COURT:  Oh, that --

24           MR. SMITH:  That looks similar, but it is actually

25   quite different given that it was stocks and not bonds.  That

1   case didn't involve price negotiations.  There are a lot of

2   other factors that distinguish them.  But I was actually

3   quite glad that the government pointed that sentence out

4   because even if we assume that the conduct was very similar,

5   the sentences were quite measured in terms of the losses in

6   that case and the proof in that case that the scheme resulted

7   in direct benefits in terms of cash bonuses pursuant to a

8   rigid formula that placed a percentage of the unlawful gain

9   in the hands of the defendants.

10          So you had something we don't have here, which is a

11   direct personal gain and the ability to use and enjoy the

12   proceeds from the scheme.  I think one of the defendants in

13   that case received a 24-month sentence, the other received an

14   18-month sentence.

15          And I think, you know, we suggested to your Honor

16   18 months now that acceptance is out.  You know, much beyond

17   that, your Honor, in view of all of the other factors at play

18   here, particularly the family essentials and the

19   circumstances of Mr. Litvak's son Jesse (sic), I think

20   warrant a measured approach to the term of incarceration in

21   this case.  And we hope your Honor will employ that measured

22   approach.

23          I don't know if you want to hear from me now on the

24   fine and ability to pay.

25          THE COURT:  Sure, yes, please.

1          MR. SMITH:  I just don't think this is a

2     clean-the-guy-out kind of case, your Honor.  That's

3     essentially what the government is arguing.

4          THE COURT:  Before you get going so I don't

5     interrupt you all the time, could you just -- I will ask the

6     government to address the same question.

7          Will there be an SEC proceeding and will they seek a

8     monetary penalty and will what I impose make any difference

9     on what that will be, in your experience?

10          MR. SMITH:  The SEC case is stayed.  I expect to

11     hear from them now that they may agree to keep the stay in

12     place until the mandate comes down from the Second Circuit.

13          I expect to hear from them.  I think they will want

14     a financial penalty.  I haven't had any discussions with --

15          THE COURT:  Will it matter what I impose here to

16     them?

17          MR. SMITH:  I argue that that should be credited.

18          THE COURT:  You'll argue that.

19          MR. SMITH:  I don't think if that ultimately makes a

20     difference.

21          THE COURT:  I'm sorry.  Now I stopped your argument,

22     so go ahead.  That was the specific question I had on fine

23     but --

24          MR. SMITH:  On ability to pay, your Honor, one of

25     the arguments the government makes is Mr. Litvak has

1    tremendous earning potential, or had.  I would emphasize had.

2    He hasn't worked for two and a half years.  He's unemployable

3    in the securities industry.  He's unemployable in many

4    industries.

5            The conviction, when and if final, will result in a

6    permanent bar.  So he'll never be able to work in the

7    securities industry again.  That's the only career he's

8    known.  Right now, Jesse is a smart guy and may be able to

9    fashion something for himself once he's done serving whatever

10   prison sentence your Honor imposes.  But that's -- we talked

11   a little bit about speculation. That will be speculation on

12   my part.  I have confidence he will be able to do it because

13   I think he's a smart fellow, but we don't know.  He has no

14   earning potential.

15           So the idea that we should take into account what he

16   might be able to earn in the future in terms of ability to

17   pay doesn't make any sense.  It's been completely devastated

18   by this case.

19           Assets on-hand, we went through that, your Honor.  I

20   think you have a picture of what's marital assets, what's in

21   Dr. Litvak's name, and what in Jesse's name.

22           THE COURT:  I don't know that I ever heard the end

23   of the issue that delayed the trial of this case, which was

24   the dispute with the company.  Did you eventually prevail and

25   they are paying the fees?  Is he now obliged to repay them

1    back if his conviction in upheld?  And if so, why didn't that

2    show up as a liability on his financial statement?

3           If all of that is attorney/client privilege, you can

4    just politely tell me.

5           MR. SMITH:  No, no.  It is a contingent liability,

6    your Honor.  It's really up to Jefferies if and when the time

7    comes to seek to repay the attorney's fees.  There was an

8    arbitration held in the September of 2013.  Jefferies was

9    found to -- you are required to do an advancement obligation

10   and they since advanced.

11          THE COURT:  That's what I assumed.  I never heard.

12          MR. SMITH:  Under the terms of the bylaws, if the

13   conviction becomes final, Mr. Litvak will owe all of that

14   money back, and not an insubstantial amount.  That's just

15   something he'll have to deal with when it comes.

16          The assets on-hand, you can see now what they are.

17   But in terms of a fine, I don't understand the government's

18   fine recommendation at the max of $5 million.  That's

19   equivalent of saying that this is at the most serious end of

20   the spectrum of white-collar offenses.  It also seems to me

21   to be one that says that all of Mr. Litvak's remaining assets

22   should be treated as proceeds of the offense of conviction.

23   And I don't think that's a logical conclusion, either.

24          I mean, crediting your Honor's observation about the

25   bonuses and they were influenced in part by the scheme and

1    its outcome, even if we were to do that, we couldn't say

2    that, you know, his remaining assets are the proceeds.  This

3    is not a forfeiture case.  There is no forfeiture allegation.

4    I think appropriately so because the former employer,

5    Jefferies, is the entity that received all the proceeds of

6    the scheme, and then later it made the discretionary bonus

7    decisions.  And some of that may have been included in Mr.

8    Litvak's bonuses, but the idea that a $5 million fine here,

9    particularly with the unresolved restitution out there, it

10   just seems to me to be just over the top.  I'm not quite sure

11   what's motivating the government in seeking a maximum here,

12   but I think it is an unfair request.

13           I think your Honor should impose a measured fine in

14   light of the remaining assets, in light of no ability to earn

15   any income to support his family while he's incarcerated, and

16   only speculative ability to earn income after.  Dr. Litvak is

17   now left to raise two children and essentially do it on her

18   own out of remaining assets and what she's able to earn.  To

19   clean out what's left on Mr. Litvak's side of that seems to

20   me to be, frankly, overkill and an unfair request under the

21   circumstances.

22           So I think we would ask that your Honor impose a

23   fine that appropriately reflects the seriousness of the

24   offense which, as I've argued, I think is at a lower end of

25   the spectrum of white-collar offenses and that reflects Mr.

1    Litvak's actual ability to pay in light of all of these other

2    things that are coming down the pike, the restitution order,

3    the SEC, and surely the action by Jefferies to recover the

4    attorney fees that have been paid.

5           I would like to thank you, your Honor, for your

6    consideration throughout the proceedings.  I reserve a little

7    time to respond to Mr. Francis, if I may?  I would like to

8    convey Mr. Litvak's thanks to you for your careful

9    consideration of everything that's happened here and for the

10   time that was afforded to Mr. Litvak and us to air out the

11   issues that we aired out at trial.  Thank you.

12          THE COURT:  Thank you.  Attorney Francis, tell me

13   another case of a nine-year sentence imposed for this kind of

14   conduct?  Can you name me one?

15          MR. FRANCIS:  I don't have a case name, Judge, but

16   based on the report handed to me -- I can't think of one.

17   Based on the report that probation provided to us, I think

18   that was requested by your Honor, it seems that sentences of

19   greater than nine years are, I think, 145 months.

20          THE COURT:  I didn't say that I needed you to tell

21   me a case.  I can tell you cases.  I have imposed sentences

22   well in excess of nine years.  I can tell you about

23   Mr. Trudeau, who I sentenced to 15 years because it was his

24   fourth fraud scheme and because I was persuaded that the

25   minute he walked out of any door and he was free to, he would

1    find his next fraud victim and besides which there was a

2    sizable amount of money lost by people, banks, individuals,

3    people involved in his fraud schemes that never would have

4    committed a crime and then faced a sentence from me.  There

5    were a few other characteristics that justified a 15-year

6    sentence, including I guess in the case, the guidelines.  I

7    wasn't informed much by the guidelines.  I was informed by

8    the facts and circumstances of the offense and his history

9    and characteristics.

10           I could name other cases where I sentenced, maybe

11   not over eight years, nine years, whatever it is you are

12   asking me to impose here, but I guess I will start with -- I

13   should start with this question:  Do you think Mr. Litvak is

14   likely to recidivate?  So you think he'll be before another

15   court in his lifetime?

16           MR. FRANCIS:  I don't know whether or not there will

17   be another court.  With respect to this crime, I agree with

18   Mr. Smith, he has no capability of committing this crime in

19   the future.  He's never going to work in the securities

20   industry again.  I sincerely hope -- he's certainly not going

21   to be able to be a broker/dealer because his license is

22   effectively gone.

23           THE COURT:  Right.  But do you think that his

24   history and characteristics, including what he did in this

25   circumstance, as a broker, suggest that he's going to commit

1    another crime?  He's a fraudster, as I call them, people who

2    seem incapable of preying upon others and stealing their

3    money.

4         MR. FRANCIS:  I can't say, your Honor, that I know

5    anything about or that the government has any facts in its

6    possession that lead us to think that Mr. Litvak is out there

7    or likely to recidivate.

8         THE COURT:  So I guess I will just sit back and

9    you'll tell me why 108 months is a reasonable sentence and

10   not more than necessary in this case.  Because I can tell you

11   when you start, I don't see it.  And I think that it --

12   what's the right word -- by taking that position -- I'm not

13   going to think of the right way to phrase it.

14        Just you make your argument.  I won't bother making

15   my statement that I'm having trouble phrasing in an

16   appropriate way.

17        Go ahead, sir.

18        MR. FRANCIS:  Thank you, your Honor.  I think your

19   Honor identified previously one of the reasons why we had a

20   hard time formulating a sentence that was below the

21   guidelines.  The loss in this case clearly is a driver of the

22   guidelines.  However, there's things that the loss doesn't

23   pick up and your Honor identified.  This is something that

24   Mr. Litvak did for nearly three years.  And even using the

25   defense's --

1          THE COURT:  He and apparently other people at his

2     company did for three years.  Or do you dispute there's a

3     culture at Jefferies as the defense argues?

4          MR. FRANCIS:  No, of course not.  They're clearly --

5          THE COURT:  Do you view it as the same as someone,

6     say, like Mr. Trudeau, who every month for three years

7     probably came up with a new fraud scheme or a new transaction

8     to defraud someone?  But in this case, it is not quite the

9     same.  It is sort of a practice, a habit.  Criminal.  I mean,

10    that's part of the problem I have with the defense is the

11    idea that I have the feeling that Mr. Litvak sits there and

12    sort of says, I'm a victim because I got singled out.  That's

13    not the way I look at it.  I look at it that he committed a

14    crime, at least in the judgment of the jury.  That's why

15    we're here.

16          But it is certainly not like -- I mean, yes, it is

17    three years, but it is not -- well, I don't know.  You tell

18    me why it is like somebody who, I don't know, their mother

19    dies but they cash the Social Security check every month for

20    the next three years.  Each time they go into People's Bank

21    to deposit that check, it is like in their hands, this is a

22    crime.

23          MR. FRANCIS:  Okay.  There's a number of reasons,

24    Judge.  So to try to differentiate between this case and

25    Trudeau on the one hand, Trudeau is a uniquely bad set of

1    circumstances for a defendant as a repeat offender.

2            THE COURT:  I think he would agree with you about

3    that.

4            MR. FRANCIS:  Right.  However, on the other hand,

5    this is why the government submits that apples to apples

6    comparison of prior cases is extremely difficult because

7    every defendant is different.  Your Honor is obligated to

8    look at them each individually, which is why we think that

9    Bradford Rieger on the other end, who is a closing attorney

10   in the mortgage fraud case that your Honor sentenced who got

11   24 months.  It's a completely difference situation from that

12   as well.

13           THE COURT:  It is.

14           MR. FRANCIS:  So that is why the government --

15           THE COURT:  Most especially in that case, he abused

16   his trust.

17           MR. FRANCIS:  Yes.  That's one of many ways in which

18   it's different.

19           In that case another difference is he was one of

20   several co-conspirators.  And although he was a necessary

21   part, he was not the driving force behind the conspiracy.  He

22   didn't share in any of the upside.  He got a flat fee.

23           We can do that all day long with different cases.

24   That's why the government says, your Honor, don't try and do

25   these apples to apples comparisons because they are not

1   apples to apples, they are apples to oranges.

2          Instead, look at what's before you about this

3   defendant.  And then look at what the Supreme Court has said

4   we're to do.  Do the guidelines calculation, look at the

5   statutory factors.  That's what my office did and we took

6   this very seriously.  We knew 108 is a big number.  It wasn't

7   something we took lightly, spent a lot of time thinking about

8   it.  We went through the statutory factors as well.

9          For nearly three years, Mr. Litvak is doing that.

10  Using the defense's numbers, he does it on 55 occasions.  So

11  it's, what, once every five weeks or something like that that

12  he goes out and commits fraud.  How is that different from a

13  Social Security check cashing instance?  In every single

14  occasion, Mr. Litvak told a lie to someone who trusted him to

15  execute their trades.  You heard from the victims who came in

16  and they testified.  Some of them actually, Mr. Wollman, for

17  instance, thought Mr. Litvak was his agent.  But in every

18  instance, they all thought they could trust Mr. Litvak.  And

19  they wouldn't want to do business with a broker dealer who

20  they didn't think they could trust.  They had a lot of

21  choices out there, and they chose Mr. Litvak and Jefferies.

22  And the reason the differentiating factor was their

23  perception that they could trust him.  He abused that trust.

24  I don't advocate for an abuse of trust guidelines enhancement

25  or anything like that.  That's a fact of what he's doing.

1    Every single time he told a lie, he did it with a price on

2    it.  He got to pick the price.

3            So this isn't one of these cases where, like, Bernie

4    Evers, where it's an accounting fraud case and the fraud goes

5    out there in the financial statements and market

6    capitalization collapses, and so it's hundreds of millions or

7    billions of dollars in losses that aren't -- you cannot

8    causally link the size of the loss and the lie that was told.

9    It's not that kind of case.

10           This is a case where at least on 55, we say 76

11   times, he told a lie and decided how much do I want to rip

12   off this particular victim?

13           THE COURT:  And the victim decided that he was

14   willing to pay the price.  If I recall correctly, I could be

15   wrong about this, but there were no other of that bond traded

16   on that day.  So it's not like he could have said, hey, I'm

17   not going to Jefferies.  I'm going across the street to

18   somebody else.

19           MR. FRANCIS:  We don't know that, your Honor.  With

20   respect to bid lists, those weren't bid lists --

21           THE COURT:  I'm talking about what I thought was the

22   majority.  At least the ones I focused on at trial where the

23   seller says I will sell at 59 and Mr. Litvak says the seller

24   will sell at 60.

25           MR. FRANCIS:  We don't know what would have happened

1    had Mr. Litvak not lied.  They could have called up Credit

2    Suisse or Goldman Sachs or some other broker dealer and said,

3    hey, can you resource some of this bond for me.  They didn't

4    do that because they never got past square one.  Mr. Litvak

5    had the bond.

6          So to say that whether or not that bond was actually

7    sold that day is irrelevant.  No one else wanted to buy that

8    bond that day is all that the defense has shown so far.  And

9    in addition, that's with respect to 20 bonds, 20 different

10   transactions.  There are at least another, what, 35

11   transactions that they concede were relevant conduct,

12   fraudulent relevant conduct that they haven't said anything

13   about because that wasn't used for the trial.  They didn't

14   have an expert do their analysis for that.

15         So his conduct was predatory.  He took advantage of

16   the way the market was structured.  I called it a flaw in the

17   market.  Mr. Smith didn't like that.  So at the very least,

18   it's a fact of the market that Mr. Litvak had superior

19   information to his customers and he abused that superior

20   information.  And he capitalized on it.  He did it repeatedly

21   over a long period of time.  He had numerous victims.  Even

22   if we just look at the 55 transactions that we can agree were

23   fraudulent for relevant conduct purposes, I believe it's in

24   the neighborhood of 20-something victims.

25         We talk about victims in this case.  What we mean by

1    that is the victims of his lie.  The recipient of his lie.

2    That's the investment managers and hedge fund managers that

3    were his customers and trusted him.

4         The money wasn't theirs, or it wasn't exclusively

5    theirs.  They had investors.  Those people are the people who

6    were hurt.  So to have Mr. Smith say, oh, it's not money that

7    anyone would have cared about.  That $6.3 million came out of

8    pension funds.  It came out of municipal pension funds.  It

9    came out of firefighter's, police officer's, teacher's

10   pension funds.  That's where the money came from.  It came

11   from charitable endowments.

12        THE COURT:  Do you know how much the impact was on

13   the firefighter whose pension was affected?

14        MR. FRANCIS:  I don't know at all because there

15   wasn't one particular firefighter who -- I mean, I don't know

16   where my 401K, what exactly is going on with it in any

17   particular transaction.

18        THE COURT:  No.  But if I have 10 things in my IRA,

19   I know in one of them there's a trade and that cost me X

20   dollars more than I probably should have paid for it, and I

21   look at the total amount versus X, I could figure out what

22   the impact would be on me.

23        I think that Attorney Smith is suggesting that it's

24   minuscule with respect to any one person that you want me to

25   think of when I sentence Mr. Litvak.  The firefighter, the

 1   school teacher, you want me to think of those as the victims

 2   but you haven't told me -- yes, there's a harm to them.  I'm

 3   not trying to tell you there's no harm.  But, I mean, part of

 4   his argument is that as it washed down, the harm is really

 5   very, very, very small.

 6        And thus the, whatever the number is, four and a

 7   half or 6.3 or somewhere in middle of there, whatever that

 8   number is, which of course sounds very large and which the

 9   tables make very large, really isn't very large in

10   relationship to the total amounts of money first that the

11   PPIPs were handling and secondly that their clients were

12   handling.

13        MR. FRANCIS:  I respectfully disagree.  I don't want

14   you to think about a firefighter.  I want you to think about

15   pension funds.  I want you to think about charitable

16   endowments.

17        THE COURT:  How much did they lose?  How much did

18   the charitable endowment lose?

19        MR. FRANCIS:  It's no one in particular, Judge.

20        THE COURT:  But you want you to think about it.

21        MR. FRANCIS:  I want you to think across the board.

22   This argument that you are phrasing is similar to the

23   argument --

24        THE COURT:  It's actually a question.  It's not an

25   argument.

1          MR. FRANCIS:  Okay.  The question you are posing to

2     me is similar to the argument that, well, GE is a big company

3     and I only defrauded them out of a million dollars.  No one

4     shareholder was really going to care about that.  They have a

5     lot of shareholders.

6          THE COURT:  But that is a consideration in many

7     cases, the fact that if loss is disbursed over many people

8     and it becomes -- I don't whether that's the ABA's construct

9     that we look at when it comes down to a few dollars per a

10    million people, that's a different type of fraud than one

11    person or five people who lose a million dollars.

12         MR. FRANCIS:  That's true.  It's factor to be

13    considered.

14         THE COURT:  You seem to be wanting me not to

15    consider it.

16         MR. FRANCIS:  No, I want you to consider it.  But I

17    also want you to consider the character.

18         Mr. Litvak knows who invests in hedge funds.  He

19    knows who invests in the PPIP funds.  He knew when he was

20    taking money from them, and I said, that money had to come

21    from somewhere.  That extra profit for Jefferies, he knew he

22    was taking it from those funds.  And he knew it was coming

23    from the investors.  Regardless of whether he knew it was Joe

24    Smith who lives on Main Street in Wallingford, he knows it's

25    people who have their money in pension funds.

1         This goes, your Honor, to one of the important

2    things, one of the reasons why this case was so important to

3    the government.  The effects of fraud on these markets is

4    significant beyond just Mr. Litvak.  If people can't trust

5    the market, where are they going to put their pension funds?

6    If pension funds can't trust that they can invest money with

7    hedge funds and not get ripped off, if the government, the

8    United States, doesn't have faith that it can come to the

9    rescue of a market that was essentially frozen solid in 2008,

10   2009, and put more than $22 billion of taxpayer money to work

11   there, if it doesn't have faith that it can do that without

12   risk of fraud, then it doesn't work.

13         The reason these markets exist is not for the

14   benefit of broker dealers and other people, Mr. Litvak and

15   his peers at Jefferies, that's not why we have markets.  The

16   reason we have markets is for the benefit of investors.  This

17   particular market, the RMBS market has a --

18         THE COURT:  Let's assume I accept every word you

19   just said in the last three minutes, I still have the

20   question, why 108 months?

21         Yes, I want markets to be transparent and honest,

22   but I still don't understand why the sentence the government

23   urges is necessary in this case to accomplish the need for

24   the sentence and to reflect the other factors.  I still don't

25   get it.

Case 3:15-cr-00155-RNC   Document 585-19   Filed 12/03/20   Page 107 of 179
Case 3:13-cr-00019-JCH   Document 298   Filed 02/10/15   Page 106 of 178

106

 1            MR. FRANCIS:  Let me keep going with the rest of

 2    analysis we did and the things we thought about in looking at

 3    the statutory factors.  And, your Honor, maybe 108 -- what we

 4    did is we looked at what the guidelines were, 108 to 135.

 5    And we said, he some arguments and he has some things about

 6    him that lead us to believe that the high end of the

 7    guidelines or mid range of the guidelines isn't

 8    appropriate.

 9            THE COURT:  Let me put it this way:  Let's assume I

10    come out here and I had bought Attorney Smith's argument,

11    that there's no proof of loss, or I could not measure a loss,

12    so I used zero for that enhancement.  The guidelines end up

13    wherever they end up, much, much lower.  Would you still be

14    standing here arguing for 108 months, or are you doing it

15    because that's where the guidelines take you?

16            In other words, even if I bought that argument as a

17    Judge, I would still consider the amount of money, in my

18    view, involved.  I may have made a technical guideline

19    ruling, but I would certainly not sentence Mr. Litvak with

20    the idea there were no dollars involved here.  It was a naked

21    fraud that had no monetary consequence to himself, to his

22    company or to the people who were buying these.  I wouldn't

23    do that.  I would still consider them.

24            It seems to me you have decided that because the

25    guidelines end up at a certain point, that's the end of the

1    conversation, or the consideration, I guess.

2         And I'm still struggling with that.

3         MR. FRANCIS:  Well, Judge, if I have given you that

4    impression, either in something I put in the papers or

5    something I've said here today, I respectfully disagree with

6    that and allow me to correct it.

7         We do not stop at the guidelines.  We did the

8    guidelines first because that's what your Honor has to do.

9    We may come to a different conclusion on this, but we looked

10   at the statutory factors and we took them very seriously.

11   Even under the --

12        With respect to your question, would we have come

13   out at 108?  I think so if we had the benefit of someone like

14   the sentencing commission who had done the work with coming

15   up with a fraud table.

16        THE COURT:  They didn't do the work.

17        MR. FRANCIS:  I'm sorry?

18        THE COURT:  I'm sorry.  That's why it was important

19   to me, they didn't do the work.  If I'm wrong about that, you

20   need to tell me because I'm going to carry this thought with

21   me, follow it in every loss table case.  It's like the crack

22   guidelines.

23        MR. FRANCIS:  I misspoke, your Honor, and I don't

24   disagree with you.  If we had the benefit of a loss table.

25        THE COURT:  Based on empirical data.  We don't.

```
 1            MR. FRANCIS:  Okay.  Under this hypothetical, i'm

 2   having a hard time -- I'm not sure what I would have done.

 3   But this is a case where every dollar of the 6.3 or the 4.4

 4   million in loss that we can agree on, was intended to be

 5   lost.  It's causally linked, it's directly, causally linked

 6   to the lie he told in each and every of the 55 instances.

 7            So, yeah, I don't want to be --

 8            THE COURT:  But how about answering the argument

 9   that this is not like a Ponzi scheme or a penny stock fraud

10   or a bait and switch where you sell something, you say it has

11   value and you convince the buyer it has value and, poof, at

12   the end of the day it has no value.

13            MR. FRANCIS:  Right.  No, that's true.  It's not

14   like that case.  But it also, to respond to the argument,

15   Mr. Smith said there's loss of principle.  That's just wrong.

16   Maybe all the funds made money, but they would have made more

17   money.  To say there's no loss of principle, I mean, frankly,

18   that minimizes beyond what the facts would bear.  And Mr.

19   Litvak actually did, he stole at least $4.4 million of

20   investor's money.

21            Now he did it in a culture, at a place where maybe

22   other people were doing it, too.  But to equate his conduct

23   and other people's -- and I know Mr. Smith sort of implies

24   that everyone out there is doing it, so we're picking on Mr.

25   Litvak.  Frankly, that argument is offensive.
```

1          We have all the evidence and hear the evidence,

2     which was contemporaneous verbatim chats of Mr. Litvak lying

3     and then going and bragging about the lies in some instances.

4          THE COURT:  You didn't find any chats by any other

5     broker that were comparable to that?

6          MR. FRANCIS:  Nothing in the number or the extent of

7     the loss comparable to Mr. Litvak.  He's in an elite class of

8     fraudster, to our knowledge.  If there were other people,

9     maybe he would have had co-defendants, but under the

10    circumstances --

11         THE COURT:  Well, the company's paid over 10

12    million?

13         MR. FRANCIS:  I'm sorry?

14         THE COURT:  The company has paid over 10 million in

15    restitution?

16         MR. FRANCIS:  Yes, I believe Jefferies has paid over

17    10 million.  And the reason, my understanding, is the way

18    they are doing that, they are just refunding -- I would

19    speculate it's in order to regain customer good will -- they

20    are just funding the entirety of their profits on a trade

21    that's been identified as fraudulent.  They are not trying to

22    calculating what the fraud loss was.

23         THE COURT:  In other words, they are giving back

24    what anybody would accept was a reasonable commission on the

25    deal as well?

1          MR. FRANCIS:  They are giving back all the money

2    they made.

3          THE COURT:  Okay.  But I still don't know how get to

4    10 million on just Mr. Litvak?  Especially, if there is still

5    2 million to go, that's 12 million.  That's double what Mr.

6    Litvak's, quote, the loss we have calculated.  Now I know

7    there's commission on top.  The commission was a fraction of

8    the fraud.  Sometimes it's less than a whole point, but many

9    times it was a whole point or more, whereas the commission is

10   anywhere from typically an 8th to a quarter, I think.

11         MR. FRANCIS:  Right.  I'm not sure about -- I mean,

12   I can't think of any particular instance, but my

13   understanding is, this is -- they are refunding the money,

14   they are not sweeping in other defendants.  Or if they are,

15   it's not -- the bulk of it is Mr. Litvak's fraud.  In fact,

16   I'm not aware they are sweeping in other defendants.

17   Although I haven't actually looked at it, so maybe they are,

18   but -- I said other defendants -- other brokers.  If they

19   are, that's a fraction of it.

20         The fact is, in many instances, Mr. Litvak would

21   have been -- Mr. Litvak's victim agreed to pay a substantial

22   amount of commission.  And then he took a substantial amount

23   of fraud, fraudulently took a substantial extra amount on top

24   of that.  What Jefferies is doing is, instead of just taking

25   the fraud amount, they are taking the entirety of it,

1    legitimate and illegitimate amounts of money they made and

2    refunding it, and that's how they got to the 10 million.

3         One of the other things I would like to touch on

4    here, one of things we thought hard about is Mr. Litvak's

5    background.  Mr. Smith is right.  He's relatively unusual for

6    a convicted felon or criminal to have the extraordinary

7    family support and network of friends that he has.

8         This is all just in keeping with the fact that Mr.

9    Litvak had every benefit in life that one could really hope

10   to have.  He comes from an intact family.  He had excellent

11   educational background.  He has -- himself he's part of --

12   he's married.  He has children.  He has every benefit of

13   family and friends that anyone could hope to have.  In

14   addition to which he has substantial wealth.  I mean, what I

15   think anyone and what any American would say is exceptional

16   wealth.  He makes more than $17 and a half million in three

17   years working at Jefferies, and legitimately.

18        Now some portion of that money, we argue, was the

19   results of -- sort of an award for fraudulent trades.  But

20   even if he hadn't done this, his peers, we have no reason to

21   believe are committing fraud, make millions of dollars.  He

22   has a multimillion dollar apartment on the upper east side

23   and a multimillion dollar home in the Hamptons.

24        This is what Mr. Litvak had to lose.  And yet, he

25   went ahead and committed fraud on a regular basis for months,

1    more than two years.  It seems that what Mr. Litvak was

2    motivated by was greed.

3           THE COURT:  Can I stop you for just one second?  I

4    thought you said somewhere that -- maybe he didn't say it,

5    Terri.  I thought you just said before you started talking

6    about him as an individual and the extraordinary support,

7    that the government had thought about it.  Yes, you did say

8    that:  One of things we thought about here was Mr. Litvak's

9    background.

10          In looking at the government's brief, I see one

11   paragraph at Page 20 in your original brief and I don't see

12   it discussed in your reply.  So I guess that causes me --

13   that's why I guess I'm coming at you strongly with the

14   questions about have you done anything other than look at the

15   guidelines.  Because I don't think you have really -- it

16   doesn't reflect that you have thought about it in terms of

17   his history and characteristics.

18          MR. FRANCIS:  Well, your Honor, I think what brings

19   us here is his offense.

20          THE COURT:  Absolutely.

21          MR. FRANCIS:  That's where our focus is.  We really

22   have no basis to dispute the fact that apparently Mr. Litvak

23   is an excellent son, father, husband, cousin, nephew.  Those

24   were what the letters were, friend.  But none of those

25   letters address what Mr. Litvak was doing when he was at

1    work.

2              The ones that do from other people in the industry,

3    are very revealing and I think are pretty good argument for

4    why general deterrence is so necessary.  And that's one of

5    the things we do focus on in our brief.

6              What people write is things like --

7              THE COURT:  Do you want to give me a page cite?

8              MR. FRANCIS:  Sure.  In Exhibit A-38, to the

9    letters, I guess it's in the brief.  This person writes --

10   this is one of Mr. Litvak's friends in the industry.  He

11   writes that Mr. Litvak knew this was the way the game is

12   played.  That he believes that Jefferies threw Mr. Litvak

13   under the bus and this is, at worst, minor infraction.

14             THE COURT:  Let me stop because there was a

15   question.  The defendant argued at Page 2 of his brief that

16   this was the first prosecution of its type.  I guess I took

17   that to mean the way this game, meaning these bonds, this

18   market, was played.  Is that correct, that this is the first

19   prosecution?

20             MR. FRANCIS:  With respect to these particular

21   bonds, I'm not aware of any others.  We attached -- we took

22   issue with that.  And I don't thing you need to have this

23   particular RMBS market --

24             THE COURT:  What were the facts in the indictment in

25   that case?  I know Attorney Smith touched on it briefly.  I

1    can't say the name.

2           MR. FRANCIS:  It escapes me, too, your Honor.

3    Mr. Smith had it.  That was a case, it had to do with stocks.

4    Basically, it was a case about markups where people were

5    taking -- or the defendants were taking an amount greater

6    than what was agreed upon.

7           What we point out that it is -- really the only

8    reason we cited it for your Honor was just to show that it is

9    not true, to our knowledge, that this is the only case of its

10   type.  Other cases like this are prosecuted.  But also one of

11   the things that's important is, it's not always the case that

12   you get a reported decision when a case is brought and

13   there's a guilty plea, things like that.  That case sort of

14   goes away.

15          THE COURT:  That kind of undercuts your deterrence

16   argument, doesn't it?

17          MR. FRANCIS:  Well, I think in case like this, it

18   makes deterrence more important.  Because this is a case

19   where people --

20          THE COURT:  Because the prior cases haven't

21   succeeded in deterring people, so we should just up the ante

22   because then that will deter them?

23          MR. FRANCIS:  No.  With respect to this particular

24   market, I'm not aware of any cases.  I am only aware of the

25   one other case that has facts similar to this.

1          Apparently people in the industry continue to

2    operate under the misimpression that what Mr. Litvak did is

3    not a big deal, is not a crime.

4          THE COURT:  He has been convicted, so puts a lie, at

5    least until Attorney Smith gets to gets to Foley Square, to

6    the fact it's not a crime.

7          The sentence -- I know the government never likes to

8    cite this and the defendant likes to have a banner put up in

9    the back of the courtroom, the parsimony clause, but I still

10   am struggling, sir, with how you can be creditable and argue

11   for 108 months in this case?

12         MR. FRANCIS:  I don't want you to think, your honor,

13   that I'm going to the mat for 108.

14         THE COURT:  But that's what you did.

15         MR. FRANCIS:  No, I recommended 108 because I can't

16   come up with a reason, but i'm not the Judge, I couldn't come

17   up with a reason under the statutory factors why it would

18   make sense to depart to any particular lower number.  My

19   office couldn't as well.  We talked about this at great

20   length.

21         Your Honor, you have the facts in front you that we

22   didn't have at the time we made the recommendation.  We are

23   not changing it, but maybe if your Honor looks at the facts

24   in front of you and says, well, maybe 108 isn't the right

25   number.  However, under any analysis that isn't basically

1    just proffered by the defense, there needs to be a

2    substantial sentence here to effectuate 3553(a) purposes.

3         Even under the ADA guidelines or proposed amended

4    guidelines that Mr. Smith brings to your Honor's attention,

5    the numbers would have been 78 to 87, I believe, months.

6    That's a significant sentence, and that's what's required

7    here.

8         People who are writing letters to your Honor in

9    favor of Mr. Litvak are doing it knowing he has been

10   convicted of securities fraud and they are still saying

11   things like, traders sometimes have to shade the truth.

12   That's on Page A-41.  Or on A-80, Jesse is a being made an

13   example by people who really do not fully understand the

14   financial markets.

15        The jury understood enough to know that what they

16   say Mr. Litvak doing was securities fraud.  They rejected the

17   argument that Mr. Smith made.  And frankly, it's a cynical

18   argument, that this is just like a pickup game of basketball,

19   and we need to trust these guys to call their own fouls.

20   That was the argument at closing, Judge.

21        The market does not exist for the benefit of Mr.

22   Litvak and his friends to make money.  That's not what the

23   market is there for.  It's to allocate capital as efficiently

24   as possible for the benefit of investors.  In this particular

25   instance, the investors included the American taxpayers, PPIP

1   and TARP, and they included pension funds and these

2   endowments.

3            And to the extent that the suggestion of it was in

4   the papers and now been repeated, so I need to respond to it,

5   that we did something to demonize Mr. Litvak or he's been

6   singled out.  The evidence at trial was Mr. Litvak's own

7   words.  We never characterized Mr. Litvak at all other than

8   just to say that what he had done was a crime.  This argument

9   that he's being singled out, this is offensive, Judge.  We

10  followed the evidence and it led to Mr. Litvak.  That's how

11  we got to him.  There was nothing about Mr. Litvak.  I've

12  never heard him say a word that wasn't directed to your

13  Honor, and most of them were not guilty.  And I don't intend

14  to testify.  I hear you, Judge.  I never heard him

15  substantively discuss this at all.  No one at the government

16  has.

17           The fact is we picked Mr. Litvak because that's

18  where the evidence led.  For him now to say I'm being singled

19  out, he's like the guy that gets pulled over in a red Ferrari

20  going 120 miles an hour and says, but all of those are guys

21  are going 65.  It's not fair.  He was the worst of the lie.

22  Someone has to go first, Judge.  We needed to prosecute

23  someone first in this market.  As your Honor says, maybe

24  there's others that will follow.  As Mr. Smith says, maybe

25  there are others that might come.  But someone has to go

 1    first.  In this case, it's Mr. Litvak.  In this instance,

 2    it's Mr. Litvak.

 3            THE COURT:  I'm moved to ask a question, not because

 4    I disagree with what you have just said necessarily, but

 5    because what you said leads me to the question.  And that is,

 6    accepting all of that, what sentence is sufficient for the

 7    first person who has been told, no, you really can't go 125

 8    in a red Ferrari on the merit.  We don't allow that.  That

 9    violates our concept of free markets, you are playing, you

10    are putting your finger on the scale.  All of it's very

11    wrong, and the jury told you that.  I don't know that I

12    should -- I mean -- I guess, how much is sufficient?

13            When the guidelines were adopted, Justice Briar

14    wrote remarks about the loss table, which I think are very

15    enlightening.  I happen, in some significant, not a small

16    measure, let's put it that way, to agree with him.

17            Judge Cleary, who was a beloved member of this court

18    when I was practicing as a lawyer.  Some of the folks in your

19    office will remember him.  Probably you could ask John Durham

20    about him.  Very, very wise judge.  He was a judge long

21    before there was anything known as the guidelines, long

22    before anybody thought about a loss table, empirically based

23    or otherwise.

24            His view was that in every white-collar criminal

25    that came before him, they needed to go to jail.  His

1   sentences were -- please don't take this as what I'm

2   thinking -- but three months, six months, nine months.  Every

3   other district court in the nation, as reported by the

4   Sentencing Commission and Justice Briar back in the eighties,

5   put those folks on probation.  Oh, you know, they look like

6   me.  They are good people.  They have done lots of good

7   things in their lives which caused tens of people to come

8   forward and stand behind them at sentencing.  He doesn't need

9   to go to jail.  He's already been punished enough.

10          I think what the Commission said, and rightly so,

11  that's not the right conclusion to reach, that incarceration

12  is a very powerful penalty for white-collar criminals.  I

13  think I share the office's comment to me that one of the most

14  powerful things that happened when he did the investigation

15  is the fact that Mr. Litvak understood that had to happen to

16  him.  A lot white-collar criminals don't understand that.

17  He's not admitting responsibility.  I have a little bit of

18  the same fear you have, that he views himself as a victim.

19  And I'm troubled by that, but that's not fair because I

20  haven't heard him say it, but I'm sort of inferring it.

21          At the end of the day, how much is necessary to

22  accomplish deterrence of others, to accomplish punishment for

23  what was done.  I'm still struggling.

24          MR. FRANCIS:  I see that, your Honor, and I don't

25  mean to make light of it when I say it's hard to know.  And

1    you have a hard job.  I have heard you say previously this is

2    the hardest part of being a judge.  This is the hardest part

3    of your job.  I imagine that's the case.

4         However here --

5         THE COURT:  That's why I get paid such big bucks.

6         MR. FRANCIS:  That's what I was going to say.

7         THE COURT:  I'm sorry.  That was really not

8    appropriate to say, and I apologize to you, Mr. Litvak.  It's

9    not a happy or funny day for you.  But it's been a long time

10   I have been up on the bench, and I haven't had much sleep

11   lately, so I will chalk it up to that.

12        MR. FRANCIS:  So not to belabor the point, Judge,

13   108 months, we recognize it's a big sentence.  We arrived at

14   it through what we thought was an analysis that made sense.

15   Maybe your Honor uses the same analysis because I don't think

16   our analysis can be any different.

17        You calculate the guidelines and you apply the

18   statutory factors and come up with a sentence that is

19   sufficient and not greater than effectuating the purposes of

20   the statute.  Going through that analysis, we came to 108.

21   Maybe your Honor comes to a difference number.

22        I think it's important if you do that, if you are

23   going to come to a different number, to inform your decision,

24   this information provided by the sentencing commission

25   apparently to probation, the lowest -- the average sentence

 1    for someone who committed a securities fraud -- and I note

 2    that Mr. Smith compares what Mr. Litvak did to a lot of

 3    apples and oranges comparisons.  He compares to investor

 4    fraud or completely different type of crimes -- but taking

 5    away the security fraud statute and similar guideline

 6    characteristics, people with relatively similar, roughly

 7    similar circumstances, the average sentence in the Second

 8    Circuit is 100 months.  And nationwide, it's 145 months. Even

 9    when there's a downward departure or a below guideline

10    sentence, the government doesn't sponsor.  Nationwide it's

11    103, and in the Second Circuit it's 72 months, Judge.

12            We feel that sentences in those range are

13    appropriate.  We're not outside the heartland of the offense.

14    We're are squarely within the heartland of the securities

15    fraudster.  We think that the circumstances in front of you,

16    which include everything, including the fact that Mr. Litvak

17    enjoys overwhelming support from his family.  That's

18    heartening to see and hopefully that means they will help him

19    not offend in the future.

20            However, despite that support, he offended in the

21    past, for years.  It's hard to say that he's a good man that

22    did a bad thing.  He's a good man except for the fraud he

23    committed over a period of years.  And the evidence is that

24    he did what he did out of a sense of greed and out of a sense

25    of competition.

1              There is an element in this case, Judge, that he was

2    trying to get over on his customers.  And that's particularly

3    a problem here where his customer's testified they thought he

4    was on their team.  They didn't know -- I mean, it's easy to

5    beat someone when you cheat.  It's easy to beat someone when

6    you tell them you are on their team, but really you are their

7    opponent.

8              So just finally, just because Mr. Smith addressed

9    this, although we don't think you should be doing the -- look

10   at the comparable cases, he addressed the Butler case and the

11   Parse case.  In their papers they address a lot of cases.  We

12   would say that each one of those cases can be distinguished

13   on its facts.

14             With respect to Butler, in that case Judge Weinstein

15   held that the loss was impossible to determine and the gain

16   was only $250,000.  Despite that, he imposed a sentence of 60

17   months and stripped -- and in his words -- the defendant was

18   stripped of all of his assets because it was a financial

19   crime.

20             With respect to the Parse case, so that's a tax

21   shelter case where Parse is more like Bradford Rieger.  He's

22   a necessary part.  He's the investment banker that helps the

23   scheme go, but he's not the one driving the scheme.  The

24   people driving the scheme in that case, the attorneys,

25   Jenkins and Gilchrist, who came up with the fraudulent tax

1   shelter schemes.  Paul Daugerdas, he got 15 years.  Ms.

2   Guerin, she got eight years.  And even there, Mr. Parse got

3   42 months, which is not nothing for somebody who is doing the

4   job effectively as Bradford Rieger.

5           With respect to the fine, I don't know what the SEC

6   is going to do, your Honor.  That case is stayed, but it's

7   before you.  I suppose they will come back and ask to bring

8   that case back to life.

9           There's no indication that Mr. Litvak has tried to

10  find work if the past two years.  I don't know -- as I said,

11  I don't believe he has any likelihood of finding work now in

12  the securities industry.  Most people in America don't work

13  in the securities industry and still manage to make money.

14          So I'm not sure that the fact he's unemployed and

15  won't work in this one particular industry should be

16  dispositive of anything with respect to his ability to pay a

17  fine.

18          Mr. Smith implies sort of implies some ill will

19  towards Mr. -- the fact -- he's says he's not sure why we

20  came up with a $5 million fine.  We assume that all the

21  restitution is going to be paid by someone else.  That's

22  money that Mr. Litvak owed.  And it's only --

23          THE COURT:  Let -- I'm sorry.  I interrupted you

24  again.

25          I was going to ask you, how much -- what is your

1   view of his gain?

2            MR. FRANCIS:  Of Mr. Litvak's gain?

3            THE COURT:  Yes.

4            MR. FRANCIS:  There is a couple of different ways

5   you can look at it.  One is you can look at Mr. Eveland's

6   testimony, that's 5 to 12 percent he would expect to make.

7   So you can look at 5 to 12 percent of his 17 and a half

8   million dollars total take home that he took.

9            I note that when your Honor talks about his salary

10  wasn't that much.  Mr. Litvak was, I think, guaranteed to

11  make a million dollars a year.  And everything on top of that

12  was bonus.

13            THE COURT:  I thought it was much less than that,

14  but maybe he was guaranteed the million and he just didn't

15  get it --

16            MR. FRANCIS:  I think it's phrased as a draw and

17  bonus.  But in realty, our information is you always get it,

18  and the bonus would be on top of that.

19            Another way to look at is, you could look at that

20  Mr. Litvak made $58 million in profits for Jefferies over his

21  time there.  If you take my $6.3 million fraud number,

22  then -- so 10 percent of all the proceeds he ever made for

23  Jefferies is fraudulent.

24            Or you could take Mr. Smith's number, which is 4.4

25  million in fraudulent proceeds.  So it's something less than

1  10 percent.  But a significant percentage of an enormous

2  amount of money that Mr. Litvak made is attributable to his

3  fraud.  You can infer from that, I think it's a reasonable

4  inference, that Mr. Litvak's value to the firm was informed

5  and enhanced by the substantial fraudulent proceeds he was

6  bringing in over this time.

7         As Mr. Smith says, I can't trace a dollar from a

8  fraudulent trade into Mr. Litvak's bank account.  That why

9  it's not a forfeiture case.  We didn't try to make it a

10 forfeiture case, it's just not.

11        That's all I have, your Honor, unless you have

12 questions.

13        THE COURT:  I'm trying to puzzle through your

14 argument.  The reason you went for the top of the fine was

15 because he's not going to have to pay likely on restitution.

16 And probably, legally, he's jointly and severally liable with

17 Jefferies for the full amount, the 4 to 6 whatever million

18 we're talking about.  And perhaps that total amount had some

19 benefit to him overall and his standing with the company.

20 But the fact of the matter is that he likely put in his

21 pocket, as a result of the fraud, I don't know, 700,000, a

22 million.

23        MR. FRANCIS:  The high end would be 1.7 million and

24 at the lower end --

25        THE COURT:  You said he was guaranteed a million.

1    So it's -- 14 million is what his bonus, extra he earned.  So

2    I took 10 percent of that is 1.4, 5 percent is 700,000, that

3    he would have made that much less over three years had he not

4    done what he did.

5            MR. FRANCIS:  That's right, but apparently Mr.

6    Litvak falls in the category of while-collar criminals who

7    think this is a game worth playing.  The Second Circuit has

8    explicitly said significant sentences -- enhanced sentences

9    in order to disprove that notion are appropriate.

10           THE COURT:  What case would that be?

11           MR. FRANCIS:  That's in Goffer, which is a case that

12   may have come up during the trial.  United States versus

13   Goffer, 721, F.3d, 113, and the jump cite is 132.  That's a

14   2013 case.

15           THE COURT:  With respect to -- I actually share your

16   view of trying to compare, you know, apples and oranges.

17   It's not likely to be terribly helpful, but it sometimes can

18   be.

19           You spoke about the Parse case in response to the

20   defense counsel's argument.  I had thought that the judge in

21   that case had talked about Mr. Parse having a central and

22   long-standing role, not a marginal role like you sort of just

23   characterized it as.

24           MR. FRANCIS:  I would not say either Bradford Rieger

25   nor David Parse had a marginal role.  But they were central

1    in the sense that they are necessary components to a scheme

2    that's originated by someone else.  And so that's why I think

3    Mr.  Parse's sentence, rightfully was so much smaller than

4    Paul Daugerdar's sentence who was the real driver of that the

5    fraud.

6              THE COURT:  The fraud being over a one half million

7    billion loss in revenue to the U.S.

8              MR. FRANCIS:  That's right.

9              THE COURT:  Why doesn't Judge Wood help me, by her

10   sentence or by reference to her decision in the Gambini case.

11   I'm not sure if I'm saying it correctly.

12             His guidelines were lower obviously, I know you are

13   going to start with that.  It's a bidding scheme for bonds,

14   it's not exactly like this case, but it sort of had an effect

15   on people either getting less or somebody paying more, which

16   is what happened here, than what they should have paid

17   because of the bid rate, if I'm remembering.

18             MR. FRANCIS:  That's right, it's a municipal bid

19   rigging.

20             THE COURT:  And it was part of -- Judge Wood found

21   there was a -- we should call it the toxic Wall Street

22   climate -- it was part of a corrupt culture at the firm.  He

23   went to trial.  He deprived his sellers of the true value,

24   market value of what they otherwise would have gotten when

25   the bonds went to market.

1        Why doesn't that case provide me some guidance?

2        MR. FRANCIS:  I suppose everything can provide --

3   should provide your Honor some amount of guidance.  I think,

4   in this case, it's probably not all that helpful to Mr.

5   Litvak.  Municipal bond bid rigging is completely different

6   exercise, although he was depriving sellers of money.  It was

7   being done in a completely different way.  Judge Woods seemed

8   to the indicate that she wasn't sure that the amounts of loss

9   were causally linked to what the defendants exactly were

10  doing.  And that the end victims, the municipalities, may not

11  have been, sort of, bearing the full weight of the loss.

12  It's a little hard to tell from the transcript that I read of

13  that.

14        However, what I did pull out of there was the loss

15  was only 2.9 million, which is roughly half, less than half

16  of what we think the fraudulent loss was here.  And there he

17  got 18 months, which is still four months from -- more than

18  what they originally had asked for and what they are asking

19  for now.  It seemed, frankly, like a different kind of case

20  as compared to what we have.

21        MR. SMITH:  Your Honor, I hate to interrupt, but

22  some of us need a restroom break.

23        THE COURT:  I'm going to take a break.  I don't know

24  how much you have in response.

25        MR. SMITH:  Very, very little.

1          THE COURT:  Can I take that, then we'll take a

2   break.

3          MR. SMITH:  Yes, your Honor.

4          MR. FRANCIS:  Thank you, your Honor.  If there's

5   nothing else.

6          THE COURT:  No.

7          MR. SMITH:  I will be brief.  The chart, your Honor,

8   we called the sentencing commission yesterday.  This is a

9   non-exclusive list of factors you might have applied.  It

10  doesn't take into account criminal history.

11         THE COURT:  The sentence -- yeah.

12         MR. SMITH:  I don't think it's a -- it's not a

13  representative sample.  Just one or two outside sentencing,

14  we think we identified a couple of sentences that were

15  included in the mix.  I don't think it's a guide in terms of

16  the averages.

17         I would also say that the only way under the ABA

18  guidelines to get to 78 to 87 months on the approach that the

19  ABA put out is to push every button, assess a victim impact,

20  which is inapplicable here.  You just can't get to 78 to 87

21  months on the ABA approach given the conduct.  You would have

22  to take the same sort of approach to the issues that the

23  government has taken across the board.

24         That's really all I have.

25         MR. SMITH:  We'll take a recess until quarter to

1    2:00.

2            01:51 PM.

3            THE COURT:  Please be seated everyone.

4            One question I had for the government before I

5    proceed, and I noted, Attorney Francis, that you wisely

6    retreated, I guess I will say.  You made the argument about

7    who were the -- where did the money -- who was impacted by

8    the fraud in terms of pension frauds or charitable

9    organizations, universities, things like that.  And I asked

10   you about how much any one of them suffered a loss and you

11   weren't able to tell me.  But you then retreated, you didn't

12   want me to call them victims.  That's probably because you

13   were conscious of what I had forgotten about, which is Note

14   20 to the guidelines, right?  I mean, if I view them as the

15   victims, which is what you were suggesting I do, kind of not

16   really technically, but kind of think of them, then the loss

17   per person or per entity is quite small and diffuse.  In that

18   instance, the guidelines suggest a departure, right?

19           MR. FRANCIS:  The guidelines do.  I can't claim

20   that's exactly what I was thinking when I retreated.

21           THE COURT:  I was giving you more credit than --

22           MR. FRANCIS:  I appreciate that, Judge.  In reality,

23   I don't think it's fair to call -- I think they are too

24   remote to call them victims.

25           THE COURT:  I agree with you.  I don't think it

1   meets the departure.  I can't remember, I think the defendant

2   pointed me to it.  I'm not going to depart on that basis.

3   I'm just suggesting that to the extent you asked me to think

4   about them, which I think is not inappropriate for you to do,

5   I'm not saying it's wrong for you to make that argument.  All

6   I'm suggesting is it does tend to -- I'm not going to depart,

7   but it may be become something I think about as far as nature

8   and circumstance.

9       MR. FRANCIS:  I think that's right.  I raise -- as I

10  tried to express -- I raise it more as a -- I think it's an

11  insight into Mr. Litvak's mindset and the nature and

12  circumstance of the offense, more than you need to calculate

13  the number of victims and do some math.

14      Also, I mean, we didn't regard those remote victims,

15  quote, unquote, victims, as victims for purposes of the crime

16  victims.

17      THE COURT:  I know you didn't, which I think under

18  the departure, you would have to think of them that way.

19      MR. FRANCIS:  It would be difficult, and also it

20  would raise all kinds of issues about how logistically we

21  would accomplish that.  Looking to be forthright, we didn't

22  think of them that way so they weren't --

23      THE COURT:  I was just looking at, at the break,

24  that Goffer case.  I actually had read that but before I was

25  not remembering in particular what they had said, which was

1   the end of the opinion about the sentence, but I'm mindful of

2   that as well.

3            Ray, your rec is attached to what?  Is it attached

4   to the second addendum or the first?

5            THE PROBATION OFFICER:  The first.  Should be

6   attached to the PSR.

7            MR. SMITH:  I have a copy.

8            THE COURT:  I may need it.  I had it, but I can't

9   find it.

10           THE PROBATION OFFICER:  (Handing.)

11           THE COURT:  Mr. Litvak, you and I have been in a

12  courtroom for a lot of hours.  I have not heard directly from

13  you, which is fine, but now is the time for you to hear

14  directly, I guess, from me.

15           The first thing -- well, as I said at the beginning,

16  what I'm going to do now before I impose sentence upon you

17  and actually finally determine that sentence, is to go

18  through the factors that I mentioned and talked about at the

19  beginning that Congress has required me by law to consider.

20  Their intention in that respect is that if I'm mindful and

21  thoughtful about these factors, that I will, in the process

22  of considering them and weighing them, arrive at what is a

23  fair and just sentence.

24           Among the factors is one we have already talked

25  about and I'm sure that everybody in the audience was puzzled

1    by how can we do arithmetic to decide what is a proper

2    punishment for a crime.  But a while ago Congress decided

3    that -- in the '80s -- that this was an appropriate way to

4    determine sentences was by assigning numerical values to

5    certain characteristics of an offense or a person's criminal

6    history.  And using a table or a chart, come up with a

7    sentencing range.  We have done that.

8            And in this case, based on my findings, your --

9    Congress would say your sentence should fall within 108 to

10   135 months.  About five or six years ago, the Supreme Court

11   looked at that scheme and said it would be unconstitutional

12   if we required sentences to be in that range.  So the way

13   that they decided to solve it was rather than throwing out

14   everything, they said we can have the scheme, but we will not

15   make it mandatory.

16           So what that means is, I'm required to attempt to

17   determine the guidelines, which I have done.  I'm required to

18   consider the guidelines seriously, they are a serious factor

19   to be considered and weighed.  But at end of the process of

20   considering all of the factors, it may be that the sentence I

21   impose is within that range because all of the factors drive

22   me to that sentence, but it may just as well be that it's

23   below it or it's above it.  It's really a consideration of

24   all of factors that will inform my judgment today and which

25   is what I think is my responsibility is today.

1          Your counsel asked me to depart from the guidelines,

2     the effect of which is really to make the factor a different

3     range, in effect.  If I departed, then I would have a new

4     range, and that would be the factor I would consider.

5          I want to state clearly for the record, I think

6     counsel asked me to depart on extraordinary family

7     circumstances and that the loss overstates the seriousness of

8     the offense and otherwise overstates what the sentence should

9     be.  I recognize that I have the authority to depart on both

10    of those basis.  I could, if I wish to, exercise my

11    discretion to do so, depart.  Also recognize that there is a

12    record here that might very well support both of those

13    departures, but I'm not going to depart.  I'm going to

14    exercise my discretion not to.

15         And the reason really is that while I think your

16    family circumstances will figure significantly in the

17    sentence I determine, I'm not going to depart from the

18    guidelines on a finding of extraordinary family

19    circumstances.  I don't believe that your situation meets the

20    facts of the cases that justify such a departure.  And I just

21    don't choose to exercise my discretion to depart.

22         On the loss table, in effect, the loss numbers

23    assigned due to loss overstates the guidelines or drives the

24    guidelines inappropriately up.  I'm certainly in agreement

25    with that argument, but, again, I exercise my discretion not

1    to depart to a particular range that I think it overstates.

2    Rather I will consider that argument quite significantly, I

3    think I would say, it would be fair to say, in addressing the

4    nature and circumstances of this offense and the seriousness

5    of the offense and how loss plays a role in that.  And also

6    probably by commenting a bit on the loss table and things

7    like deterrence of white-collar crimes, et cetera.

8         So we're still left with the 108 to 135 guideline

9    range.  So I will now turn to -- I guess I probably should

10   comment, just because the counsel have addressed it and I

11   need to -- I think I should address it on the record.  And

12   this really would probably go to the departure, but also, in

13   some respects, I think I will consider it in nature and

14   circumstances.  And that is whether the ABA proposed

15   guideline, the loss table, should be used here, shouldn't be

16   used here, whether it's helpful or not helpful.

17        Obviously, this case demonstrates that just like the

18   loss table in the guidelines, that there's lots of things to

19   be argued in the ABA loss table.  Lots of places where people

20   can disagree.  People can value certain aspects or

21   characteristics differently.  I have gone through the ABA

22   proposal.  I have looked at both parties arguments about what

23   they should tell me about what the loss table amount should

24   be or what the sentence should be.  Actually, it's not just

25   loss table, I'm sorry, but what the sentence should be, the

1    guideline ranges.  And I have to say that I am in complete

2    agreement with the drafters of this proposal, some of whom

3    are very highly regarded judges in this circuit, in which the

4    drafters urge the courts not to focus on things that are

5    easily quantifiable.  I agree with that.  I think that in

6    this case, obviously loss is easily quantifiable, in my

7    opinion, but that it shouldn't overwhelm or cause me to

8    ignore other important but less easily quantifiable

9    characteristics.  Having agreed with that, what I think this

10   case -- it could be Exhibit A to this point, is that -- that

11   the ABA proposal is just as difficult to struggle with

12   because it's trying to put numbers on things.  Where I think

13   the ABA proposal is helpful to me in this case is that it

14   articulates ways of thinking about factors and how they may

15   or may not be significant in a particular case.  That's

16   really my view of what I need to do here.  And that is to

17   take the broad factors that Congress has put upon me to

18   consider and to sort of break them down as they are present

19   in this case.

20          So I'm not going to adopt one or the other of your

21   views of the ABA calculations.  I'm very mindful of them.  I

22   think, as I say, there's parts of them where what they talk

23   about, like in the culpability area, the things to think

24   about, those are very helpful to me as a sentencing judge.

25   But to try then to decide which box they go in and which,

1   within that box, number I ascribe to them is not particularly

2   helpful, at least to this judge.

3         I will start, Mr. Litvak, with my view of the nature

4   and circumstances of what you did.  I think, unlike you, I do

5   not view you as a victim.  I don't view you as singled out.

6   I don't view you as somebody who happened to do something

7   that everybody is doing and nobody thought was illegal and,

8   bam, all of the sudden you got caught.  You lied.  Now maybe

9   that's what people do every day on Wall Street.  It still

10  doesn't make it legal.  Lots of us lie every day in our

11  lives.  Fortunately, most of the time it doesn't have much

12  consequence.  It's a white lie.  But when it has a

13  consequence, when it's material, which this jury found, it's

14  a crime.  If you don't think that -- obviously, you don't

15  think it in the sense that you wish to take an appeal and

16  challenge the convictions, but, in my mind, that's a no

17  brainier.  If anybody on Wall Street thinks it's okay to lie,

18  I hope that, to the extent any message gets out from this

19  sentencing, I hope that message gets out.

20        I agree with the government, we want our markets to

21  be open and transparent.  And I agree completely with you,

22  that you didn't have to tell this buyer anything.  For

23  example, you didn't have to tell them what the price was.

24  When you chose to tell him and you chose to lie about it,

25  that was a crime.

1        You also did it many times.  You did it such that
2    there were many victims in the case.  We have no disagreement
3    you have done it at least 55 times over a three-year period.
4    And certainly the loss is at least in the mid 4 million
5    range.  It may be that it is not a significant percentage of
6    the overall picture of Jefferies profits or even the profits
7    you brought to Jefferies in this period.  But it's, as
8    somebody once said, it's real money.  It mattered to you to
9    make the lie because you wanted to benefit from it.  You
10   didn't put it all in your pocket, but it mattered to you.  I
11   think it's fair to say it would have mattered, and it did
12   matter to the people you were dealing with.
13        Again, we don't have a precise formula for what your
14   bonus was in relationship to what you did.  But I certainly
15   think it's fair to say that, you know, certainly somewhere in
16   the range of 700,000 to a million is what you benefited.
17   It's possible that the last dollar you brought in the door,
18   which I would view as the last dollar, were more valuable in
19   the bonus calculus.  I don't know.  Could be that they were
20   less valuable.  We don't know whether it's 5 percent, 12
21   percent or 20 percent.  But there's no question that you went
22   to work every day to make sales.  You went to work every say
23   to earn a commission or a profit for your company because at
24   the end of the year, you thought you were going to make money
25   from that.  In my view, that's a significant part of the

1    circumstance of the crime you committed.

2            Your counsel has made much of the climate on Wall

3    Street, the climate at Jefferies.  I did see evidence that

4    what you did, at least in that one instance that I

5    specifically recall, was applauded.  I would view it as an

6    applaud by your supervisor.  It sounds like the government

7    has recognized there were others who engaged in conduct like

8    this beside you, but I also heard the government -- and I

9    didn't hear any evidence certainly presented or proposed or

10   proffered by your lawyer that you were, shall we say, the

11   star of this conduct.  That while others may have done it and

12   there may have been people telling you, yeah, this is a good

13   thing to do, you seem to have really run with it in a way

14   that others did not at the company.

15            I guess part of the circumstance of this crime that

16   I can't ignore is the context in which this market was

17   operating.  This was a market that was dead in the water.

18   These bonds were going to be nonmarketable, right, but for

19   the government's infusion of money over great debate and

20   disagreement of whether that money should have gone to this

21   purpose.  All the sudden there's buyers out there for this

22   market that you could then benefit from by being the broker.

23            And I don't disagree with counsel that, you know,

24   the United States isn't the victim here.  The way it is, say,

25   in a tax case, but you were mindful, I think.  I think there

1    was a chat to this effect, or certainly the man at Canter

2    called it out to you when you -- after you had disclosed what

3    had happened, that this was really government money.  This

4    was a market that existed because of taxpayer money.  And you

5    were, in effect, taking advantage of it through fraud.

6            Obviously, everybody on this side of the bar sat

7    through the whole trial and many of the people behind the bar

8    did as well, I know.  I should state for the record that the

9    nature of the fraud here was there were occasions when you

10   told the buyer that they could get the bond they wanted and

11   that the seller would sell it at X when, in fact, the price

12   the seller had told you they would take was less than X.

13   There were situations where you told a seller that a buyer

14   would pay X when, in fact, the buyer would pay X plus, but

15   you induced the seller to sell based upon that lower price

16   represented.  And there were times, as I recall, where you

17   said to the buyer that there was a third-party seller with

18   whom you were vigorously negotiating and had finally worked

19   out a price when, in fact, it was a bond that was in the

20   inventory of Jefferies, there was no other seller.  I'm not

21   sure if that covers every one of them but that's the

22   principle ones that I remember from trial.

23           I guess the bottom line is the nature and

24   circumstances of your crime was a crime of fraud, lies,

25   repeated lies.  It's my view that you were motivated to make

1   money.  That's what you said to the man, is it Canter from

2   AllianceBernstein?  Whoever that list was sent to, who called

3   you up.  I mean, your answer was something to the effect of

4   you were sorry, but there was a lot of pressure on you to

5   make money.  I understand that's a pressure from the company.

6   They want you to make more profits for them, but at the end

7   of the year, those more profits also translate into your

8   pocket, which obviously over those three years, you did very

9   well.

10          However, I also recognize that your gain, the gain

11   that you did put in your pocket, even if I account for a

12   nonmonetary gain on the level of you benefited in stature or

13   standing at your company because you had more profits

14   certainly doesn't approach the actual loss that I found and

15   that I believe the victims here suffered.  As I have already

16   gone through about how much did you gain from this, it's a

17   percentage obviously.  It's probably, as I say, somewhere

18   between 5 and 10 percent.  I'm sorry.  Maybe, as I say, my

19   sense of it is somewhere between 700 and a million dollars.

20          I think I'm going to stop in -- I'm going to take a

21   slight digression on the nature and circumstances to speak a

22   few moments about the loss table and why I think the

23   guidelines here are very unhelpful.  They are unhelpful for

24   some of reasons I sort of hinted at in my questions.  They

25   are unhelpful because they effectively overwhelm the

1    guideline analysis.  I mean, I think although the guidelines

2    don't consider all factors that I should consider now under

3    3553(a), they certainly were designed to consider more than

4    one factor.  The aspects of was somebody a leader, was

5    somebody a minor player?  Did somebody abuse a trust like a

6    lawyer, or did somebody -- was it a vulnerable victim?  Those

7    kind of things, the guidelines tried to put a value on each

8    of those characteristics so that ultimate total offense level

9    was supposed to reflect sort of a panoramic view of the

10   offense committed.

11        What I think happens here with the loss tables at

12   the levels they are now at, is that the loss aspect of the

13   crime, in effect, overwhelms all the other aspects.  As I

14   say, in this instance I think 60 percent of the total offense

15   is attributable to just sheer dollars without any regard for

16   any other characteristic of the offense.  Therefore, I don't

17   find the guidelines helpful to me at all.

18        There's Murphy's law, whatever I want is not in

19   front me.  Everything I don't need at the moment is in front

20   of me.  I had notes about loss.  I mentioned Justice Briar's

21   comments about the loss table as originally adopted, which

22   was at a much lower level than the current ones.  Which were

23   designed -- I guess in that sense, those could be said to be

24   maybe empirical.  They were designed to reflect the fact that

25   the actual data of sentencing reflected that the chart --

1    that it should be zero points for loss, for any amount of

2    loss because everybody got a probationary sentence.

3            And Justice Briar wrote to mitigate the inequities

4    of these discrepancies, the commission decided to require

5    short but certain terms of confinement for many white-collar

6    offenders who traditionally have received only probation.

7    And I would also agree with Mr. Bowman, an oft commentator on

8    the guidelines and sentencing in which he says, an

9    archeological foray as into how the particular numbers of the

10   loss table were chosen is likely to be of little practical

11   use for judges or lawyers.

12           And I don't lightly -- I'm not, in effect, saying

13   I'm ignoring the guidelines.  But I think to the extent that

14   they have been driven to where they are by a loss table which

15   is not based on empirical data and which overwhelms the rest

16   of the guideline considerations such that it's almost without

17   regard to the rest of the characteristics in this case, in my

18   opinion, I need to really scrub through the nature and

19   circumstances and decide what that informs my judgment to be

20   as opposed to be taking a guideline number that's derived in

21   principle part by the sheer dollar amount, which, as I said,

22   while it's a loss, one aspect of it that isn't reflected in

23   the loss table is that it's not money that he put in his

24   pocket.  In other words, a defendant who put between two and

25   a half million and seven million in his pocket would get the

1    same loss table calculation as this defendant who did not do

2    that.

3            Again, by saying this, I don't mean to say that I'm

4    not mindful that there was that damage to victims.  I'm just

5    saying that it is a different case.  And the loss table

6    doesn't reflect that.

7            The other thing is -- about the nature and

8    circumstance I haven't touched on is the victims here.  The

9    people whom you were chatting with who represented -- who

10   were managers, I guess, and therefore represented the funds

11   that had been created by Congress and which had both public

12   and private funds -- money.  The victims, I would agree with

13   your lawyer, they are sophisticated.  They are not, you know,

14   the 90-year old widow who lost every penny of her investment.

15   To the extent that the government asks me to drill down a

16   little bit and think about the impact on the ultimate

17   victims, I don't disagree that I should do that.  I think if

18   I did that, I would find the loss as to any one pension or

19   any student whose tuition might go up because the endowment

20   fund at Harvard decreased in value by some amount, the loss

21   is there is going to be pretty small.

22           I think in this case, the sophisticated nature of

23   the victims and even considering the maybe less sophisticated

24   ones who were behind the managers causes me, again, to

25   question whether the guidelines are terribly helpful in

1    understanding the nature and circumstance of the offense.

2           Before I turn to Mr. Litvak's history and

3    characteristics, I think I will address the need for the

4    sentence here.  Congress has imposed penalties for violations

5    of the law and has given judges like myself the

6    responsibility of imposing a sentence, not because we want to

7    ruin your life or because we just do it to be mean, I guess.

8    I'm not quite sure how else to put it.  It's done because

9    Congress, and I suppose in that sense society, feels that

10   there is a need for the sentence when criminal conduct is

11   engaged in.  One of the needs of the sentence is to reflect

12   the seriousness of the offence.  The reason for that is if it

13   doesn't reflect the seriousness of you what did, Mr. Litvak,

14   then I don't think people will respect the law.

15          For example, I would put in the most serious

16   category of offenses if somebody's life is taken or a child

17   is sexually abused.  But if somebody runs into a 7-11 and

18   steals $20 and nobody gets hurt, I think we would all agree

19   that's not a very serious crime.  They are both crimes, but

20   the sentence -- if a judge were to sentence both of those

21   people the same, I think everyone would agree that's a

22   travesty.  That isn't justice.  They wouldn't respect the

23   courts or the justice system.  Part of what I have to do

24   today is to weigh and consider the need for your sentence to

25   reflect the seriousness of what you did.  In that regard, I

1    think my view is that your sentence is a serious offense.

2    It's not the most serious economic crime ever committed in

3    this country.  I think that there's a lot of other names that

4    we could roll off who have caused greater harm to more

5    victims, who are more vulnerable over a longer period of

6    time, et cetera, et cetera.  Who, as your lawyer keeps

7    wanting to point out, foisted onto vulnerable victims perhaps

8    something of absolutely no value, created it out of old cloth

9    when, in fact, in your instance your victims received

10   something of value.  I agree with the government, they didn't

11   receive what they thought they were receiving and they paid

12   more than they should have paid, but they definitely got

13   something of value.

14        I always find this -- sentencing is always hard, but

15   I find trying to articulate how this factor comes out in any

16   particular defendant's case very difficult because -- I

17   always keep using the word "serious."  As I just said a

18   minute ago, I view your offense as serious.  I think it's a

19   significant amount of money.  It occurred over a significant

20   period of time.  It occurred in a market where the government

21   had stepped in to support.  And it's in a market in which we,

22   as people who invest or funds that invest, expect that to be

23   an honest market and your conduct robbed the participants in

24   that market of that honesty.

25        But as I say, it's not the most serious economic

1    crime that's ever been committed.  I think in that respect,

2    my assessment of the need for the sentence in terms of the

3    seriousness of the offense will be really driven in large

4    part by my conclusions and what I have already said about the

5    nature and circumstance.

6           The second need for the sentence is to provide

7    adequate deterrence to future criminal conduct.  I think I

8    got the government to agree with me -- well, certainly they

9    agreed with me that you won't commit this crime again because

10   you won't be able to commit it.  The government has taken

11   away your license and they will not give it back to you.  So

12   your ability to commit this crime again is, in my opinion,

13   zero.  But I also -- it's my pretty confidentially held view,

14   I am never going to say I am always going to be right, but

15   even with the view that it bothers me a little that you feel

16   like you were singled out or a victim, I don't see you as

17   committing any other crimes.  And I think the government kind

18   of agreed with me on that.  And I actually happen to think

19   that in crimes like this, that need for the sentence is a

20   very important one.  I think I referenced it earlier talking

21   to Attorney Francis.  But if I thought that there was any

22   chance you would go out and commit another fraud, the

23   sentence today would be significantly different than what I

24   think it's going to be.  But I don't see that as present in

25   this case, as far as a need for your sentence.

1          The tougher question though is, is there a need for

2     this sentence to provide deterrence generally to other

3     people.  As the government suggests, to people who still

4     don't realize that this is a crime apparently.  To people who

5     are possibly going to be able to engage in this kind of

6     conduct in the future.  Should the sentence be such that it

7     works a deterrent effect upon the public, generally, not just

8     upon you.  And on a theoretical basis, the answer to that

9     question for me is a whole-hearted yes.  I agree with the

10    government.  We want to deter other people.  We want them, if

11    they happen to learn of your case, to say, wow, I wouldn't

12    want that to happen to me, so I won't do that.  If I thought

13    about doing it, I won't do it.  And I think in a --

14    deterrence is a very difficult factor to deal with because

15    there's very little good research, I think, the government

16    cites me to a Law Review article in which a professor, in

17    effect, collects the literature on deterrent studies.  But

18    while the government reads part of it -- and I'm not saying

19    they are misreading it -- but part of it to support the

20    conclusion that the government makes, that generally

21    white-collar crimes -- sentences and long sentences provide

22    the deterrence we need from the public in general, of the

23    public in general.  I'm not sure that that's what this

24    article says or what those studies say.

25          There does seem to be, based upon the studies

1    reported, some evidence that in some white-collar crimes,

2    there can be deterrence with jail sentences.  I think there's

3    less evidence that longer sentences would necessarily lead to

4    more deterrence.  In other words, a correlation between the

5    length of the sentence resulting in less crime because

6    there's greater deterrence.  I would love for there to be

7    evidence on this question one way or another.  I don't know

8    that I have that evidence.  I am of the mind, in the

9    antitrust area, there's some old evidence that jail sentences

10   in antitrust cases lead to deterrence.  But the problem with

11   that evidence is those sentences, I believe, were typically

12   about six months long.  Those were imposed in the '60s in an

13   electrical equipment price fixing case.  And what the Justice

14   Department noticed for the next decade is whenever they got

15   records from companies and they went to look at what the

16   price fixing activities were, is that the activity stopped

17   precipitously on or about the date of sentencing in those

18   cases.  That supports the government's argument that

19   white-collar crime sentences will deter other people if they

20   hear about them, which those were very widely published.  On

21   the other hand, it doesn't support the government's argument

22   that a really long sentence is necessary to accomplish that

23   need.  It might be to accomplish other needs or because of

24   other factors present, but I'm not persuaded that I have

25   anything in front of me and my own judgment is that very long

sentences, absent other circumstances and other factors that

would justify them, are necessary or appropriate to serve the

need for the sentence to provide deterrence to others.  I do

believe that some jail sentence is appropriate and will serve

that purpose.  But I don't think it's a sentence in the range

of which the government argues, certainly is not needed to

deter others from doing this themselves.

        The last need for the sentence -- well, is to

provide you with needed care or treatment, things of that

sort, which I don't think applies in this case.

        Another factor that's a challenge in these cases, I

would agree with the government, I think I did, but trying to

look at other sentences in this area is very difficult.  But

I'm supposed to try to consider and avoid unwarranted

sentencing disparities.  That is, that if two defendants

commit the same crime essentially in the same way and they

have the same background, criminal history, or lack thereof,

they should receive essentially the same sentence.  It would

be unjust if they didn't.

        The problem is, and I have come over 17 years of

experience to only come to believe this even more strongly

than I did when I first went on the bench, there are no two

defendants who are alike.  I can look and I have looked.  I

mean, I have the summary that defendant's prepared.  I have

the summary that was attached, that was also Defendant's

Exhibit H.  I have cases cited by the government.  I prepared

my own chart of cases and sentencings the circuit basically,

which is mostly Eastern, Southern and in Connecticut, of

similar crimes, security fraud cases.  And each one of them

is different than your case.  And so, on the surface it might

appear that there are disparities and they can't be justified

because people will say the loss is X, the loss is X here.

There were Y number of victims.  Well, there's Y victims

here.  As I tried to point out at the beginning, loss can be

accomplished in lots of different ways.  And in this case, as

I said, while you caused the loss that we talked about, you

could have another defendant who not only caused that loss

but benefited to that amount of money as opposed to yourself

who didn't -- directly, I mean.  So I'm mindful of avoiding

unwarranted sentencing disparities.  I'm not sure there is

much more I can say about that other than to just represent

on the record that I have spent a lot of time looking at

other sentencings.  I have gone and reviewed all of the

sentencings I have imposed in what could be called

white-collar crimes since I have been on the bench.  I looked

at a lot of other decisions, mostly in New York, but that's

where, really, a lot of case have come out of.  But I looked

elsewhere.  But I don't think -- I think the government

agrees with me on this -- I don't think it's fruitful for me

to sit here and say, well, the Smith case was this sentence,

but here's the four factors that distinguish it.  The Jones

case was this sentence that's lower, but here's the four

factors that make this case more serious.  We would be here

for a very long time than we have already been here for.

Actually, another factor is the need to provide

restitution.  I really don't know how to deal with that,

Attorney Francis, I think I'm sort of going to assume when I

impose the sentence that the chance that Mr. Litvak will have

to pay restitution or that I will order an order of

restitution in the next 90 days is not probably very high.  I

think there's some chance he might.  I think if there is,

it's not going to be a very substantial amount.  I don't

think it's going to be a very high likelihood.  That's

troublesome because he could then say to me, how can you

decide the fine?  What happens if I do get hit with the

restitution, shouldn't you change the fine.  I guess what I

am going to say is that I'm going to impose a fine that I

think probably more accurately reflects a punishment for what

you did as opposed to reflecting whether you're capable of

paying more or you're not capable of paying this much.

The last factor, Mr. Litvak, is -- I think it's the

last factor -- is your history and characteristics.  I often

say to defendants who are in front of me for sentencing that

their fortunate to have people behind them for two reasons.

One, because it speaks to the fact that -- it evidences to

1    the Court, I guess is probably a better way to put it, it

2    evidences to me that you have lived your life in a way in

3    which people view you, that you are worth supporting, in

4    effect.  People don't come to court for, what I assume for

5    many people out there today in the back behind you, to take a

6    day off of work or drive a distance, whatever it is, but sit

7    here and listen to all of us do what we have done for the

8    last five hours just because they think that would be a good

9    way to spend their day.  They are here because they think you

10   are worth supporting.

11           That tells me two things.  One, that you are a

12   person, your history and characteristics are very positive

13   factor here today.  It also tells me, I think it's what the

14   government took from it, and that is that -- that you have

15   that support and you will continue to have it.  They are here

16   knowing you have been convicted of a crime.  Yet they are

17   still here.  They are here, in effect, to say to you we're

18   going to help you get through this.  Again, not having heard

19   from you, I don't really know what your frame of mind is

20   right now, but I can only imagine if it were me, I would be

21   thinking, how can I get through this?  I think that what you

22   need to -- if you haven't, I'm sure you have turned around at

23   the break -- be mindful of the outpouring of support that's

24   there and that will be there for you over the coming years as

25   you need it.  You need to draw on it.

1          I think your case has probably set the record in the

2   number of sentencing letters, I guess, of support that I have

3   received.  I think it probably has.  I don't want to say that

4   to encourage another lawyer to try to break the record.

5   Sounds like you and your family have a wonderful time in

6   Hampton Beach every summer.  I have to say, my grandfather

7   owned a house on Hampton Beach until the hurricane of '38

8   when the end of M Street was swept out to the sea.  I haven't

9   been to Hampton Beach in a long time, but it sounds like you

10  have a very loving and supporting and large family that comes

11  together, that values family, which to me is a very important

12  thing and it tells me that you value family.  Obviously, you

13  were this hard-charging Wall Street broker, right, and yet it

14  sounds like every year you found the time to go up there and

15  spend it with your family.  I think that's a very positive

16  aspect of your history and characteristics.  Not just

17  particularly the vacation, but what the letters represent.

18          They also tell me that you are a very thoughtful,

19  caring, kind, I guess good-natured, I flagged some and I went

20  back and reread some of them.  Those are probably the main

21  themes that come through.  I don't know if you read them all.

22  It's kind of like having your wake before you die.  I mean,

23  in some respects, you are blessed in that respect.  I know

24  you don't feel that way right now.  Some people don't hear

25  good things about themselves because they are not good

1   people.  But even good people don't hear good things about

2   themselves just because people don't feel comfortable saying

3   them and there's no occasion to say them.

4         What struck me is that you are a friend.  You are a

5   friend just to be a friend, but you are also a friend when

6   people are in need of a friend.  I was particularly struck --

7   I don't mean to single out one letter over another, they are

8   all very compelling and very thoughtful.  I have to say, I

9   don't know whether your lawyer told them to say this or you

10  did, but I appreciate that they inevitably ended with, Judge,

11  we know you have a tough job and we know you have to do it.

12  Please think of what I have said.  That's nice, for me

13  anyways.  The one I just mentioned is written by Father

14  Noonan, I guess, is on the Noonan side of your family,

15  talking about a situation involving, I think, his sister and

16  the fact that you reached out.  I have to say I agree with

17  him, I think that people generally are afraid to reach out to

18  people who are in need and who have suffered some type of

19  loss or bad situation, maybe that's better way to say it.

20  Because you feel awkward and you don't know what to say.  You

21  feel that they might not want to talk about it.  But he wrote

22  very compellingly about how important that was to her and how

23  thoughtful it was, as I said, and supportive.  I think that

24  sort of resonates throughout all the letters, that type of

25  thoughtfulness on your part.  So, obviously, I could go on a

1    really long time as a lot of people went on a really long

2    time.  I think in a nutshell, you sound like a person that's

3    a person worth knowing.  And a person who, if I could ignore

4    today what brings you before me, is someone who is a good

5    person and I probably would enjoy knowing.

6              You also, by all measure, sound to be like an

7    outstanding son and son-in-law, I will say, as well.  I'm

8    very sorry about your father's situation.  I hope that he

9    enjoys a speedy recovery.  And with a few bumps in the road,

10   you sound like you have been a very good spouse and obviously

11   a good father.

12             That brings me, of course, to your son's situation.

13   I didn't find extraordinary family circumstances.  Again, I

14   didn't because I just didn't chose to exercise my discretion,

15   but I don't want you to think that I, in any way, that would

16   diminish my view of the challenge that you and your wife face

17   in trying to bring your son along to a life that can be full

18   for him.  The difficulty -- the reason why I'm sure the

19   government opposed the departure, among others, is that the

20   case law suggests, and probably appropriately so, that such a

21   departure is only appropriate when the facts are there's a

22   single mother and there's no other relative to be of any

23   assistance.  Obviously, unfortunately, all of the letters

24   that were written and all of what I found from Officer Lopez

25   and his investigation is that you have a very loving and

1    supportive family.  Your in-laws have been very supportive of

2    you, your own parents have been very supportive.  Your wife

3    obviously has her own career and challenges and has two

4    children, but she's obviously capable as well.  I don't think

5    it fit the departure category, but it's definitely something

6    that I'm mindful of.  How can I put it?  I guess I will put

7    it this way, I spoke to the government about how much of a

8    sentence is long enough to accomplish the goals of sentencing

9    without being too much.  And in this instance, the too much

10   part of that sentence is going to probably feel a finger of

11   weight from what your absence from your son's life could mean

12   to him.  It doesn't mean -- that's a double negative.

13   There's going to be a sentence of incarceration, but how long

14   it needs to be is informed by lots -- all of the factors, all

15   of the things I have talked about, but it's also informed by

16   the circumstance with your son.

17        The first thing I need to do is the restitution,

18   which, as I understand the government, is not today asking me

19   to enter an order of restitution.  It's asking for the right

20   to submit something subsequently.  I guess I will consider

21   that at the time you submit it.

22        MR. FRANCIS:  It might be useful if you put a

23   deadline because I know we have up to the --

24        THE COURT:  You have 90 days, but the last

25   assistant, again, who I had to remind that we were at the

1    88th day and I haven't heard from him.  I hope I don't have

2    to do that with you.

3            MR. FRANCIS:  I was thinking something along the

4    lines of 45 days.

5            THE COURT:  That would be good.  If you make the

6    motion, I'm going to have to go back and make findings,

7    right, about the amounts because we kept that open, the

8    number that the defendant disputed.

9            MR. FRANCIS:  My hope is no.  Jefferies will have

10   paid such significant amounts that there will be no

11   restitution.  We'll alert your Honor to that.  I think 45 is

12   enough time to --

13           THE COURT:  Then I'll so order.

14           I would ask, sir, if you would please rise so I

15   might impose sentence.  It's the sentence of this Court to

16   impose upon you a period of incarceration of 24 months.

17   Followed -- and that would be on each of Counts 1 through 6,

18   8 through 11, 12, 13 through 16.  Each of those sentences of

19   24 months is to be served concurrently.

20           Further, the Court imposes a supervised release

21   period of three years on each of the counts, also by law

22   required to be served concurrently.

23           With respect to the fine, it's the sentence of this

24   Court that the Court imposes upon you a fine of $1.75

25   million.  Basically, I'm estimating.  It's clearly an

1    estimate, but an estimate of double, just for purposes of

2    other proceedings, double what I think the gain to you was.

3    So to the extent Attorney Smith wants to use that somewhere

4    else, that's what my thinking is anyways.

5         Further, the Court imposes a special assessment of

6    $1500, which is $100 per each of the 15 counts as required by

7    law.  The sentence is clearly not a guideline sentence.  It's

8    a variance or non-guideline sentence.  And I haven't

9    disregarded the guidelines, but I view the guidelines as not

10   terribly helpful in this case.  I think this sentence is

11   sufficiently long to serve the need for the sentence,

12   particularly deterrence, both general and specific.  But also

13   to reflect the nature and circumstance of the offense and Mr.

14   Litvak's history and characteristics.

15        I want to put on the record that -- and I actually

16   thought about this because I will tell you, at some point in

17   my consideration of this case, I was thinking about the loss

18   being zero.  Maybe it was when I finished Mr. Smith's brief,

19   or maybe it was some other time.  At some point, I did think

20   about that.  And I consciously thought about the fact that

21   sentence would be the same.  If the guidelines didn't ascribe

22   a value of loss to this case, in effect, there was a loss.  I

23   think of it as a loss.  The people who paid the money to Mr.

24   Litvak's company would have viewed it as a loss as evidenced

25   by the testimony that I heard.  In that case, I probably --

1    it would have been an upward departure from the guidelines,

2    but nonetheless, the sentence would have been the same.

3    Because in that instance, as I say, I think that the zero of

4    a loss table calculation would have understated the

5    seriousness of this offense and the nature and

6    characteristics of the offense, just as, in my view, the loss

7    table number used overstates the seriousness of the loss in

8    this case.

9         With respect to the period of supervised release,

10   the Court imposes upon you, Mr. Litvak, the standard

11   conditions of supervised release, the mandatory conditions.

12   Number one, you not commit crime.  Two, you not unlawfully

13   possess a controlled substance.  Four, you refrain from the

14   unlawful use of a controlled substance and submit to a

15   periodic test provided by the condition.  Six, you make

16   restitution, if it is ordered, and pay the special assessment

17   fine that I have imposed.  Eight, that you cooperate in the

18   collection of a DNA sample.

19        Further, the Court imposes the following special

20   conditions:  First, you will participate in a program

21   approved by the probation office for in or outpatient

22   substance abuse treatment and testing.  You will pay all or a

23   portion of the cost associated with that treatment based on

24   your ability to pay.  Second, you will pay any restitution

25   that is ultimately imposed.  And this condition might be

1    mooted, but if there's restitution that the Court finds

2    appropriate, it will be due immediately and any that remains

3    unpaid at the commencement of supervised release will be paid

4    at a rate of not less than 10 percent of your net income.

5    The monthly payment schedule may be adjusted based on your

6    ability to pay as determined by the probation office and

7    approved by the Court.  Three, you hall not incur any new

8    credit card charges above $250 or open additional lines of

9    the credit without the prior permission of the probation

10   office until your criminal debt obligation is paid.  You will

11   not add any new names to any lines of credit, not be added as

12   a secondary card holder on another's line of credit, and

13   shall provide the probation office with electronic access to

14   any online management of lines of credit, including lines of

15   credit for any businesses that are owned, operated or

16   otherwise associated with you.  Four, you will close any

17   existing savings or checking accounts, transfer your assets

18   into one main account and not add any other account holders

19   to that account, it can include your spouse if there are

20   joint expenses or assets.  The defendant shall provide the

21   probation office with electronic read-only access to those

22   online management of that account.  The defendant shall

23   provide the final statement from each account that's closed

24   to ensure that no funds dissipated during the closing of

25   existing accounts and the opening of the single account.

Case 3:15-cr-00155-RNC   Document 585-19   Filed 12/03/20   Page 163 of 179
Case 3:13-cr-00019-JCH   Document 298   Filed 02/10/15   Page 162 of 178

162

1    Five, the defendant shall permit the probation office to

2    monitor investment and retirement accounts to include

3    coordinating with the account administer to notify the

4    probation office of any activity in the account.  Six, you

5    will not encumber any personal homes or investment property

6    without permission of the Court and not transfer, sell, give

7    away, barter or dissipate in any way any assets including

8    personal property without the express permission of the

9    probation officer and notification to the Court.

10           Until the debt obligation, financial debt obligation

11   of the defendant is satisfied, the defendant shall submit a

12   proposed budget with detailed expected expenses and income to

13   the probation office after which the officer will communicate

14   his or her approval.  And the defendant shall adhere to the

15   approved budget and any deviations must be approved before

16   occurring or paying any additional expenses.  Receipt of any

17   income or asset not anticipated shall be reported to the

18   probation office within two days of the receipt or your

19   knowledge of the receipt.  Such unanticipated income or asset

20   cannot be dissipated without prior permission of the

21   probation office.  Eight, the defendant shall retain receipts

22   for inspection upon reasonable notice of expenditures greater

23   than $250.  Nine, the defendant shall not possess ammunition,

24   firearm or other dangerous weapon.

25           I think -- should this go in the judgment, that

1   supervision.  You recommend that it be transferred to the

2   southern district of New York, but it may be that they are

3   not there.  Let the Bureau of Prisons deal with it.

4          THE PROBATION OFFICER:  Can I add something.  In

5   light of the fine that you imposed, does your wish to

6   consider the question of interest.  Also that it be due and

7   payable immediately.  And that it be a special condition of

8   supervised release, similar language that you used for the

9   restitution.

10          THE COURT:  Right.  All of the conditions apply not

11   just to restitution or, if the special assessment is not

12   repaid, also to the fine.  So in terms on the -- that's what

13   I call the financial obligations.  So all of those conditions

14   apply until it's paid.  The fine is payable immediately.  If

15   not paid within 30 days, interest -- do you know what the

16   current interest is?

17          THE PROBATION OFFICER:  I don't know that.

18          THE COURT:  Does the government have a

19   recommendation on that, what the interest would be?

20          THE COURT:  Attorney Sciarrino may help us.  I don't

21   know which interest rate is the right one.

22          MS. SCIARRINO:  Pursuant to the statute, interest is

23   based on the T bill rate.

24          THE COURT:  I will say at the legal rate as provided

25   by the statute.

1              MS. SCIARRINO:  Yes.

2              THE COURT:  Thank you very much, Attorney Sciarrino.

3    It's very small right now.

4              MS. SCIARRINO:  It is, your Honor.

5              THE COURT:  Maybe Diahann put in there that the

6    interest will accrue at the legal/T bill rate in accordance

7    with the statute.  Somebody will know what that means.

8              Ray, let me start with you.  Is there anything about

9    the sentence that i've imposed that is unlawful or that I

10   have overlooked.

11             THE PROBATION OFFICER:  No.

12             THE COURT:  From the government.

13             MR. FRANCIS:  Your Honor, just for the record, the

14   government would object on procedural and substantive

15   grounds.

16             THE COURT:  That's pretty heavy.  What did I do

17   wrong procedurally.  I understand you don't agree with the

18   sentence, but if I did something procedurally wrong, I could

19   fix that if you told me what it was.

20             MR. FRANCIS:  I think with respect to your Honor's

21   references to your consideration of the guidelines.  I

22   believe your Honor did not give them the weight required

23   under the statute.  And particularly with respect to your

24   consideration of the ABA draft rules and the consideration of

25   loss under the guidelines, in particular.

1          THE COURT:  I think it's fair to say, for the

2    record, that I think that the loss tables are not helpful in

3    reflecting what it is I should consider in sentencing.  It's

4    not to say -- I hope, if I said this, I want to correct the

5    record, I did not disregard the guidelines.  I spent a lot of

6    time calculating them and I found them to be what the

7    government proposed they should be and what the probation

8    officer agreed.  But I think having done that, I'm not bound

9    to them.  I set forth, as best I could, if it is inadequate,

10   I will try again when the circuit corrects me.  I tried, as

11   best I could, to articulate why I think they are not

12   deserving of the weight at the full level of the guidelines

13   that they calculate out to be.  I can't really add anything

14   more.

15          If I, in any way, suggested that I was going to

16   ignore them, I didn't mean to say that.  I didn't ignore

17   them.  I just don't agree that they reflect an appropriate

18   sentence in this case, and I really don't need to say much

19   more other than to explain why.

20          So that was the procedural.  And then substantive

21   goes to the fact that we'll agree to disagree.  Is that it,

22   Attorney Francis?

23          MR. FRANCIS:  I think we'll have to, Judge.  If I

24   may raise one housekeeping matter, with respect to the PSR, I

25   understand your Honor ruled on the objections.  Can you just

1   clarify for the record whether or not you adopted the

2   findings.

3           THE COURT:   Thank you.   I'm not sure I said that.

4   You're absolutely correct.

5           Once I went back and adopted whatever, 11, 13, 20,

6   21, 22 and amended 23, I adopted the PSR as then amended as

7   the finding of this Court in connection with this sentencing,

8   as relevant to the sentencing I think is the correct way to

9   say it.   Sorry.   Yeah.   Thank you.

10          I need to advise you, Mr. Litvak, that you have a

11  right to appeal this sentence.   You have a right to appeal

12  everything that happened in this case.   By appeal, I mean you

13  have a right to go to the Second Circuit and to tell them,

14  suggest to them, I guess, that I either made an error, either

15  before or during or after the trial.   Or I have made error in

16  the sentencing, or the jury made an error in their verdict.

17  You obviously are represented by counsel.   All you have to do

18  is say to your counsel, I want to file an appeal and he will

19  file the notice.   I wouldn't be surprised if he's going to

20  file it on his way out of the courthouse.   I still need tell

21  you that you should discuss it with counsel now.   You need to

22  have that notice filed in no more than 14 days from today.

23  If it's not filled in that time, it is as if you never filed

24  it.   And I can't then give you more time to file it.   By

25  filing it, it means it has to be received in our clerk office

1    on the second floor.  I want to just be sure you understand

2    there's a very short time period in which to file a notice of

3    appeal.  Do you understand that?

4              THE DEFENDANT:  Yes, your Honor.

5              THE COURT:  Is there anything that the defense

6    requests further?

7              MR. SMITH:  A couple of items, your Honor.  With

8    respect to the designation by the Bureau of Prisons, we

9    request that your Honor recommend the satellite camp at FCI

10   Otisville, which is in close proximity to Manhattan.  Given

11   the length of the sentence, the family will remain in the

12   New York Metropolitan Area.  If it were longer, they would

13   relocate.  I think we're looking at, with that length of

14   sentence, they will probably stay in New York.  So we

15   recommend FCI Otisville satellite camp.

16             THE COURT:  The Court will make that recommendation.

17             MR. SMITH:  Your Honor, there's two sort of related

18   requests.  One is the surrender date.  The other is we'll

19   have a motion for the bail pending appeal.

20             On the surrender date, we would ask for 90 days for

21   Mr. Litvak to wind up his affairs, if he's required to

22   surrender and bail is not granted.  Among other factors, the

23   health of his father, Mr. Litvak, Steven Litvak, plays into

24   this, and we respectfully request a 90-day surrender date.

25             THE COURT:  The government's position?

 1          MR. FRANCIS:  The government has no objection to

 2    that surrender date.

 3          THE COURT:  The Court will order that the

 4    defendant -- give me a day of the week in early November, a

 5    Wednesday.

 6          THE CLERK:  November 5.

 7          THE COURT:  Mr. Litvak, the Court is going to permit

 8    you to self surrender.  I do so because obviously you have

 9    appeared here whenever you have been required to.  I have a

10    report from probation that you have been compliant, and the

11    government doesn't oppose it.  So the Court will allow you to

12    self surrender.  What I will do set a deadline date of

13    November 5.  If by that time you are not in the custody of

14    the Bureau of Prisons, then you are obliged and ordered to

15    surrender to the U.S. Marshal Service on mezzanine above me

16    in this courthouse at noontime the 5th of November.  I expect

17    before that date the Bureau of Prisons will inform you of

18    where to go and when you need to be there.  You must obey

19    that instruction.  Otherwise, if you don't appear at that

20    time and place, you will be treated as a fugitive and a

21    warrant will be issued for your arrest.  I assure you they

22    will find you and you would then face further penalties.

23          Do you understand that?

24          THE DEFENDANT:  I do.

25          THE COURT:  I will also set a no earlier than date

1  of October 23, just in the case that the Bureau of Prisons

2  was really efficient and designated a date in the next few

3  weeks.  The judgment, Diahann, should say he should surrender

4  to the marshal by November 5 to their custody, if not

5  earlier.  But at no date earlier than October 23.  FCI camp

6  at Otisville.

7         The other thing I think I need to advise you of, Mr.

8  Litvak, you have been subject to certain conditions and

9  supervision by the probation office, I believe, by the

10  Southern District of New York office and those conditions

11  continue.  As you walk out the door, they are going to be the

12  same as when you walked in.  If the officer told you to do

13  something or not do something, if you signed a piece of paper

14  that says you must do this or you can't do that, all of those

15  conditions remain exactly the same.  Do you understand?

16         THE DEFENDANT:  I understand.

17         THE COURT:  Any violation would be treated seriously

18  by me and would likely result in revoking the self surrender

19  aspect of the judgement.

20         MR. SMITH:  I'm going to make a brief oral

21  application.

22         THE COURT:  I know what issues you are going to

23  raise.  The problem I think for you is that even if I charged

24  wrong on TARP, even if I'm wrong on securities fraud, what is

25  the grounds?  I will get the statute.  What's the

1    grounds that you are likely to prevail on?

2            MR. SMITH:  I will outline it briefly.  I think

3    because your Honor is familiar with it, I don't think it

4    requires briefing.  I think we all agree we had plenty of

5    briefing in this case.

6            THE COURT:  I understand your arguments.  If you

7    give me a minute, I will find the statute that I had copied

8    for this purpose, which tells me the standard.

9            MR. SMITH:  3143.

10           THE COURT:  Thank you.  That's exactly what it is.

11   You need to show that there's a substantial likelihood that

12   the motion for acquittal or new trial -- that's pending

13   sentence.  Pending appeal, you have to show by clear and

14   convincing evidence he's not going to flee.  That there

15   wouldn't be any contest.  Let the government tell me that.

16           It's not for the purpose of the delay and raises a

17   substantial question of law likely to result in a reversal,

18   an order for a new trial, a sentence that does not include

19   imprisonment or a reduced sentence that would be less than

20   the total of the time served by the time the appeal process

21   ends.  These days is about a year.  Especially given the

22   transcripts were done, I think might it be less than that.

23           MR. SMITH:  So we appreciate the findings on the

24   first two issues.  On substantial questions, as I think your

25   Honor will know, substantial question means close question.

1    Because you resolved certain issues against us does not

2    nonetheless mean that the issues are not close.  So let me

3    flag what I think the four substantial issues are.  One is

4    the sufficiency of the evidence.

5              THE COURT:  On which count?  All of them?

6              MR. SMITH:  All counts as to materiality.  Across

7    the board.  It's an issue we briefed on a motion to dismiss,

8    it's an issue we argued extensively.  The Second Circuit case

9    that we cited to you in the Rule 29, Fineman versus Dean

10   Witter Reynolds, this case squarely fits within that.  That's

11   84 F.3d 539 Second Circuit, 1996.  We think the circuit may

12   well view your Honor ruling otherwise.  That's a close

13   question on materiality as a matter of law and it goes to

14   each count of conviction.

15             The second issue, your Honor, is whether Mr. Litvak

16   acted with adequate intent to defraud under the

17   circumstances.  This is essentially the United States versus

18   Starr argument that we had raised with your Honor at several

19   junctures in the proceedings.  And that since the victims got

20   the benefit of the bargain in terms of -- I hate to revisit

21   this.  I will be very brief -- fair market value bond at the

22   price they agreed to pay, that this is just not a situation

23   where adequate intent to defraud is shown.  I think that's

24   substantial issue.  There's just not sufficient basis for

25   economic harm here.  And we had this argument at the time of

 1   the jury charge, whether, under the authority we cited to

 2   your Honor from the Southern District, the U.S. versus

 3   Whitman case, whether the Starr standards, the economic harm

 4   standard, should apply under 10(b)(5).  We think that's a

 5   substantial question that's close and could go the other way.

 6   The third is the cluster of evidentiary rulings related to

 7   the experts, your Honor, which we think are substantial

 8   evidence of good faith.  And evidence that would have more

 9   appropriately framed, the materiality and intent to defraud

10   issue.  We think, respectfully, your Honor, abused the

11   Court's discretion in denying our application to put on

12   expert evidence.  That's all contained in the briefing there

13   and the proffer of evidence that your Honor has written on

14   that.  And finally, your Honor, the last issue is simply the

15   loss issue.  We think that was a close issue.  I think your

16   Honor --

17            THE COURT:  That's a sentencing issue.  I have just

18   said I would have given him the same sentence if the loss was

19   zero.

20            MR. SMITH:  If the --

21            THE COURT:  That's how unhelpful loss was in this

22   case to me, I guess, if it doesn't say anything else, it says

23   that.

24            MR. SMITH:  We do think it's an issue that could

25   reduce the sentence.  We think there are sentencing issues

1    that we may raise that may result in a reduced sentence.

2    That's the fourth issue.

3           We think the three issues that we framed are

4    substantial, that's our motion.  And we move for bail pending

5    appeal.

6           THE COURT:  I'm about to say something again that I

7    shouldn't say -- I will restrain myself.

8           MR. SMITH:  I'm very mindful --

9           THE COURT:  You are going to have a hard time

10   sustaining the sentence I imposed on appeal.

11          MR. SMITH:  We're very thoughtful and mindful of --

12          THE COURT:  I'm not being critical of you.  I'm

13   saying that's not a serious grounds for appeal.

14          MR. SMITH:  I want to be complimentary to your

15   Honor --

16          THE COURT:  You don't need to be.

17          MR. SMITH:  Very thoughtful and mindful of the

18   thoughtful sentence you imposed, but I feel we need to make

19   the motion.  Those are the grounds.

20          THE COURT:  Attorney Francis, to the first three

21   grounds, would you respond to those as he has a serious

22   question on getting a reversal or a new trial, whatever on

23   those.  I think he argued sufficiency of the evidence on

24   materiality and the intent defraud and I'm sorry --

25          MR. FRANCIS:  Experts.

1          THE COURT:  The proof of the fact there wasn't any

2     really loss here.

3          MR. FRANCIS:  The experts were precluded.

4          THE COURT:  Were precluded, right.  Okay.

5          MR. FRANCIS:  So whether or not it raises a question

6     of law or fact, apparently he disagrees, but the standard in

7     the statute is likely of prevailing on these.  Your Honor's

8     decisions on these three points are completely consistent

9     with the Second Circuit and Supreme Court.  The facts as

10    phrased in order to torture them into being able to make

11    these arguments, your Honor, those facts to obtain unless the

12    arguments they were making were premised on the factual

13    misstatements or misunderstanding of what the circumstances

14    was.  It seems there is practically no chance of success on

15    these three arguments, much less likelihood of success.

16    Although they are creative and do justice to counsel's

17    creativity and hard work, they are unlikely to prevail in the

18    Second Circuit.  And bail in this circumstance would be,

19    pending appeal, would be unwarranted under the statute.  I

20    agree that there's no likelihood of flight to the extent that

21    your Honor posed a question, we have no dispute.

22         THE COURT:  On the first three points raised by

23    Attorney Smith, we have argued about them.  I have decided

24    them several different times, most recently in the ruling

25    post trial.  You know, anyone can make a mistake and I put

1    myself right of top of list.  Obviously, my goal is not to

2    make a mistake.  I don't want people to have to go through

3    this again to start with.  Also just because that's just.

4    And so I hope I haven't made any mistakes, but I cannot see a

5    mistake or a combination of mistakes that would result in the

6    reversal of the convictions on all 15 counts.  The TARP

7    fraud, I think it's the first charge in the country.  I mean,

8    maybe I got it wrong.  We sort of -- not made it up.  It had

9    to be written by us.  But there's other counts that, you

10   know, in many respects it's a fact finding by the jury.  And

11   there certainly was sufficient evidence for them to draw the

12   inferences they needed to draw.  There was evidence on the

13   record.  So I think -- I don't think.

14         My ruling is to deny the oral motion for release

15   pending appeal because I do not find a substantial question

16   of law or fact that's likely to result in a new trial or

17   reversal or a lower sentence.  Obviously, you are able to go

18   to the circuit.  They'll take a look at it.  If they see

19   something that they think is going to result in a likely or

20   at least a serious question for them, they obviously can give

21   you this relief, but I could not.  Again, I'm not -- I know

22   I'm far from perfect, but I just can't any basis on which I

23   can make the finding required by 3143 BB.  I don't have a

24   basis to make that finding, so the motion is denied.  Is

25   there anything further?

1          I hate to prolong this, but I think I probably

2     failed to sort of sum my consideration of the factors.  And I

3     think the nature and circumstance of the crimes Mr. Litvak

4     committed, particularly in terms of their seriousness, their

5     impact on markets, the impact on the victims, his clients,

6     who as was argued, trusted him.  Indeed even to today still

7     trust him.  All of that is serious and weighs very heavily in

8     determining my sentence and imposing a sentence upon Mr.

9     Litvak.  There is, of course, his history and

10    characteristics, which all, in many respects if you take out

11    this conduct, all weigh very heavily in his favor, in effect,

12    in terms of the balance of these factors.  I think the last

13    factor really that's the most important in this case is the

14    whole deterrence issue, which I struggle with every time in a

15    white-collar case.  I don't have an empirical study.  I don't

16    have data that I have collected, but it's my belief that the

17    sentence should be significantly longer if I believe the

18    person will recidivate or is not a Category I defendant,

19    which is not unusual in fraud cases.  There are defendants

20    who commit multiple frauds.  In those cases, the need to

21    deter that defendant is significant and therefore the

22    sentence has to be long enough to accomplish.  That was not

23    present here, and least not present in my opinion.  That

24    didn't really weigh into my determination.  The general

25    deterrence issue is the one I really grapple with because of

1    the lack of good analysis, good data, to show that I'm pretty

2    persuaded, but I don't know that I have any evidence to prove

3    it, but that a term of incarceration is a significant

4    deterrent effect in white-collar crimes.  I'm not persuaded

5    that making them long, whatever you define long is, longer

6    than I made it here is necessary to accomplish that in this

7    case.  I think sometimes those of us involved in the criminal

8    justice system lose sight, and we have lost sight, certainly

9    in drug cases, of how really long sentences are.  I just

10   suggest that you think about what you were doing two years

11   ago and ask yourself what's happened in your life, that will

12   measure to you what a two-year sentence is for this

13   defendant.  I think it's long enough to provide the public

14   deterrence, I will call it, the general deterrence that I

15   need to address.  Those are really how I kind of weighed and

16   considered and in the end balanced to come out to the

17   sentence that I did.

18          Unless there's anything further, the Court will

19   stand in recess.

20          (Whereupon, the above hearing adjourned.)

21

22

23

24

25

1

2

3

4

5    COURT REPORTER'S TRANSCRIPT CERTIFICATE

6    I hereby certify that the within and foregoing is a true and

7    correct transcript taken from the proceedings in the

8    above-entitled matter.

9

10   /s/  Terri Fidanza

11   Terri Fidanza, RPR

12   Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25