# EXHIBIT N

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3      *  *  *  *  *  *  *  *  *  *  *  *  *  *
        *UNITED STATES OF AMERICA        *
 4                                       *   CRIMINAL ACTION
                    v.                   *   No. 06-10116-1-RGS
 5      *                                *       06-10116-2-RGS
        ROBERT PROSPERI,                 *
 6      GREGORY A. STEVENSON,            *
                        DEFENDANTS       *
 7      *  *  *  *  *  *  *  *  *  *  *  *  *  *

 8

 9

10

11                  BEFORE THE HONORABLE RICHARD G. STEARNS
                       UNITED STATES DISTRICT JUDGE
12                            DISPOSTION
                             May 25, 2010
13

14

15

16

17

18                               Courtroom No. 21
                                 1 Courthouse Way
19                               Boston, Massachusetts 02109

20

21

22

23                     JAMES P. GIBBONS, RPR,RMR
                      7205 Moakley Federal Courthouse
24                    1 Courthouse Way, Suite 7205
                      Boston, Massachusetts  02210
25                       jmsgibbons@yahoo.com
```

PDF created with pdfFactory trial version www.pdffactory.com

```
1    APPEARANCES:

2          UNITED STATES ATTORNEY'S OFFICE (By AUSA Anthony E.
     Fuller, and AUSA Fred M. Wyshak) 1 Courthouse Way, Suite
3    9000, Boston, Massachusetts  02210, on behalf of the
     United States of America

4
           LAW OFFICE OF E. PETER PARKER (By E. Peter Parker,
5    Esq.) 151 Merrimac Street, Boston, Massachusetts
     02114, on behalf of Robert Prosperi

6
           LAW OFFICE OF RICHARD M. EGBERT (By Patricia A
7    DeJuneas, Esq.,) Suite 1800, 100 Summer Street, Boston,
     Massachusetts, 02110, on behalf of Robert Prosperi
8
           DONOGHUE, BARRETT & SINGAL, P.C., (By Bruce A.
9    Singal, Esq., and Michelle R. Peirce, Esq.) One Beacon
     Street, Boston, Massachusetts 02108, on behalf of
10   Gregory A. Stevenson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2              THE CLERK:  The case before this Court carries Case

 3     No. 06cr10116, United States of America versus Robert

 4     Prosperi and Gregory Stevenson.

 5         Counsel, please identify yourselves for the record.

 6              MR. WYSHAK:  Good afternoon, your Honor.  Fred

 7     Wyshak and Tony Fuller for the United States.

 8              MR. PARKER:  Good afternoon, your Honor.  Peter

 9     Parker for Mr. Prosperi.

10              MS. DeJUNEAS:  Good afternoon, your Honor.

11     Patricia DeJuneas for Mr. Prosperi.

12              MR. SINGAL:  Good afternoon, your Honor.  Bruce

13     Singal for Gregory Stevenson, who is with us at counsel

14     table.

15              MS. PEIRCE:  Michelle Peirce for Gregory Stevenson.

16     Good afternoon, your Honor.

17              THE COURT:  Good afternoon, counsel.

18         I think the only case in which I have had as much to

19     read, and particularly as much that was as significant,

20     might have been the Bradstreet case years ago.  But I want

21     to assure everyone that I have read not only, of course, the

22     presentence report and the sentencing memoranda, but the

23     many, many letters that were submitted.  I, perhaps, did not

24     read some of the exhibits as closely as I did the letters,

25     but I found them all of assistance and of significance.
```

```
 1        I thought the way we would proceed is the way we

 2   customarily do.

 3        As far as I am concerned, the presentence report and

 4   the Guidelines calculation, which we all recognize are

 5   advisory, are influenced by the difficulty of assigning an

 6   accurate loss value to the case, which is the critical

 7   element around which the Guidelines are structured.  I wrote

 8   a short memorandum on the subject, and I think counsel

 9   understand my view of the loss issue.

10        As a formal matter, I thought the government's formula

11   was probably as good as any, and it is the one I adopted.

12   It, of course, then results in a loss figure in excess of $5

13   million, if you extrapolate an estimated number of

14   out-of-specification loads of concrete that were delivered.

15   This -- because, again, the way the Guidelines are

16   structured -- adds an 18-point escalator to the Guidelines

17   advisory range, which, since the convictions are identical

18   in both the case of Mr. Prosperi and Mr. Stevenson, results

19   in the same recommended or putative sentencing range of 87

20   to 108 months, and a range of fines from $15,000 to $20

21   million.

22        I would note parenthetically that without the 18-point

23   escalator, one would be looking at an 8- to 14-month range

24   with a Zone C alternative sentence available to the Court if

25   the Guidelines, again, applied in a mandatory fashion, as
```

1      they, more or less, did a few years ago.

2          I think there are other factors in the case that are,

3      perhaps, more interesting to reflect on than the mechanics

4      of the Guidelines, per se.

5          I would like to proceed, again as is customary, with

6      hearing first from the government with respect to the two

7      cases and its recommendation to the Court.

8          Then, of course, I would like to hear from defense

9      counsel; and, although not a matter of compulsion, but, of

10     course, the defendants are invited to speak if they choose

11     to during the course of the hearing.

12         Mr. Wyshak, you will be speaking for the government?

13         MR. WYSHAK:  Yes, your Honor.

14         I, too, your Honor, have spent more time than usual in

15     thinking about the sentencing in this case and going through

16     all the materials submitted by the defendants in this case.

17     And this is truly a challenging issue that I have given a

18     lot of thought to.  And as challenging as it may be for the

19     government, I'm sure it's even more so for the Court, since

20     the Court has to ultimately make the final decision here.

21         But in thinking about this, and in thinking about the

22     government's recommendation, I keep coming back to the

23     enormity of this crime, the enormous breach of the public

24     trust involved in this case.

25         When the tunnel wall burst in the mainline tunnel in

1    September of 2004, the Attorney General of Massachusetts,

2    and the U.S. Attorney put together a Big Dig Task Force.

3    Mr. Fuller, myself, and several other Assistant U.S.

4    Attorneys were assigned to work on that task force.  And,

5    quite frankly, the experience of investigating what went on

6    in this largest public works project in the history of this

7    country was extremely disheartening.

8        After the wall burst, it came to light that there were

9    hundreds and hundreds of leaks in the tunnel walls, and in

10   investigating what went on, the one theme, the recurring

11   theme, was the lack of personal responsibility by anyone who

12   worked on that project, the lack of corporate responsibility

13   by any of the companies who worked on that project, the lack

14   of accountability by the business community for what had

15   occurred on that project.  Nobody was responsible for

16   anything.  Everybody blamed everybody else.  If it was a

17   contractor, they blamed the designer, they blamed the

18   suppliers.  The suppliers blamed the contractors.  Bechtel,

19   who was the construction manager, they blamed everybody

20   else.

21       It was, quite frankly, appalling to me.

22       As you know, I've worked in the organized crime area

23   for a number of years, and the refreshing thing about most

24   people engaged in organized crime or crimes of violence is

25   they admit their guilt.  They know what they did was wrong.

PDF created with pdfFactory trial version   www.pdffactory.com

1          It's not so when you're dealing with this type of

2     criminal activity.  And I think, you know, we not only saw

3     it in this case, but it's exactly what is going on today in

4     front of Congress when they investigate the collapse of the

5     banking community on Wall Street, when we have a massive oil

6     spill in the Gulf of Mexico.  There is clearly a lack of

7     accountability and unwillingness of the business community

8     to take responsibility for anything that went wrong, and

9     that's what I think we've dealt with throughout this case.

10          Even in Mr. Prosperi's sentencing memorandum I sense no

11     admission of wrongdoing.  I sense no remorse.  I sense none

12     of those types of characteristics that the Court should take

13     into consideration in sentencing Mr. Prosperi.

14          Mr. Prosperi continues to want to beat the drum that

15     this was industry practice, the use of old, and recycled,

16     and adulterated concrete.

17          At least in Mr. Stevenson's sentencing memo, I think he

18     essentially concedes that this was not industry practice,

19     this was Aggregate Industries' practice, and this practice

20     was, in fact, limited to this particular company.

21          Attached to Mr. Prosperi's sentencing memorandum are

22     two letters from the president and the vice president of

23     Boston Sand & Gravel, who are the main competitors of

24     Aggregate Industries in this area for concrete.  And

25     although both of those letters are highly complimentary of

PDF created with pdfFactory trial version   www.pdffactory.com

1    both Mr. Prosperi and Mr. Stevenson, what they glaringly

2    omit is any statement or concession that the conduct engaged

3    in in this case was, in fact, a practice in the concrete

4    industry.  There's no mention of that in either letter, and

5    one would think that if that were the case, it would be in

6    there.  In fact, the government did investigate whether or

7    not Boston Sand & Gravel engaged in this type of practice,

8    and, in fact, that investigation proved that they did not.

9         So this is a practice limited to this one company who

10   was the largest supplier of concrete on the nation's largest

11   public building project.

12        But the enormity of the crime doesn't end just with

13   what happened on the Big Dig.  This is a practice of this

14   company on hundreds and thousands of other projects.  The

15   Court heard evidence that this was "business as usual" at

16   Aggregate Industries as far back as the '70s or '80s; that

17   concrete was watered down; that different mixes were mixed

18   together; that concrete that was not used on one project was

19   loaded over with newer and fresher concrete at the batch

20   plants and redelivered to customers who were not only the

21   federal and state government, but who were private

22   individuals, people building buildings, people pouring house

23   foundations.  This conduct has gone on for decades.

24        And I think that one thing that the Court should

25   consider in sentencing the defendants is the deterrent

1    effect of that sentence, that the business community needs

2    to know that individuals who are responsible for criminal

3    activity cannot hide behind this corporate veil.  They

4    cannot say, Oh, this was not me, this was Aggregate

5    Industries.  Because, as the Court knows, every company acts

6    through its employees.  And the Court must let the business

7    community know that individuals will be held responsible and

8    accountable.

9        Now, the defendants have made much of the fact that

10    they seem to be the only individuals singled out in this

11    entire investigation that the government was involved in

12    regarding the Big Dig.

13        Number one, that's not true.  There were numerous

14    individuals who have been indicted and convicted and

15    sentenced to periods of incarceration for crimes which are

16    much less significant than the crimes involved in this case.

17        And one thing that sticks out about this particular

18    case, which we really didn't see in any of the other Big Dig

19    fraud cases, was the fact that this case was a premeditated

20    scheme to defraud.  Most of the other fraud that we found

21    was billing-type fraud, work that had not been performed

22    pursuant to specification, which, after the fact, documents

23    were falsified to make it appear as though the work had been

24    performed pursuant to specification, bills that were

25    submitted based upon certification of work done pursuant to

1   specification.

2       Even the ceiling collapse does not have the

3   characteristics of this particular scheme, which had been

4   ongoing for a number of years and was clear and blatant

5   fraudulent conduct.

6       And to the extent that there may be some distinguishing

7   factors between what happened with Bechtel and Parsons

8   Brinckerhoff and Modern Continental; that is, one of the key

9   facts, is that this was intentional, premeditated, and basic

10  fraud.

11      The defendants claim that, essentially -- and I think

12  the Court, to some extent, seemed to indicate in its

13  decision -- that there was no harm intended, and I want to

14  talk a little bit about that.

15      The fraud in this case was so fundamental.  The truck

16  drivers who testified at the trial, the batchmen who worked

17  at the batch plant, dispatchers who worked in the dispatch

18  office, everybody knew that this was wrong.  Everybody knew.

19      I mean, it's a basic premise.  You don't lie.  And when

20  you are representing to not only the United States or the

21  Commonwealth of Massachusetts but to somebody building a

22  private building, when you represent to them that you're

23  selling them X and, in fact, delivering Y, and creating

24  documents which make Y look like X, you don't have to have

25  gone to Harvard Business School to understand that that is

PDF created with pdfFactory trial version www.pdffactory.com

1    wrong.  And to the extent that Mr. Prosperi, who has been

2    with this company through many of its variations over the

3    years, and Mr. Stevenson, who may have joined the company, I

4    think, during the mid 90s, they were clearly in a position

5    to stop something that was fundamentally wrong to say, This

6    is not right.  You can't lie to customers.  You can't sell

7    them something and tell them it's something else.

8         And I think to some extent that the evidence at the

9    trial shows that there was some cognition of this fact with

10   regard to the Big Dig because, as you heard the evidence at

11   trial, during the early years of the Big Dig, the rule at

12   Aggregate was no 10/9 concrete to the Big Dig.  So at some

13   point the lightbulb went off at Aggregate that we're not

14   going to commit this kind of fraud when it comes to this

15   contract with the United States and the Commonwealth of

16   Massachusetts.

17        But at some point, as we've heard, in the late '90s,

18   Mr. Prosperi and Mr. Stevenson changed that policy, and they

19   decided, We are going to use 10/9 concrete on the Big Dig,

20   primarily dump it into the slurry walls.

21        And I think that that fact, that change in policy, not

22   only shows that they knew what they had been doing prior to

23   that was wrong, but it also shows that when they changed

24   policy back to the old ways, they intended to engage in

25   ongoing wrongdoing.

1        Now, there's been a lot of talk about what the loss is

2    in this case, and I'm not going to rehash all the arguments,

3    but I think that the elephant in the room here is something

4    that we haven't talked about, and it's something that we

5    asked Mike Praul to testify about.  And that is not the

6    amount of money that the government paid for materials that

7    it didn't get, which is probably the easiest way to come up

8    with a dollar figure in this case, but in terms of the

9    extent of harm, it is infinitesimal.

10       I think one of the things that the government intended

11   to demonstrate to the Court through the testimony of Mike

12   Praul is that the activities in which Aggregate Industries

13   was engaged in will ultimately jeopardize the long-term

14   viability of these tunnels.

15       These tunnels are supposed to have a 75-year life, and

16   you heard the testimony from Mike Praul.  When you

17   over-water concrete, when you add fresh concrete to concrete

18   that's already hardening in a truck, when you add a Big Dig

19   mix to some other mix which is not in specification, when

20   you don't add fly ash to cement that needs fly ash, that all

21   those things are going to affect the long-term durability of

22   this concrete.

23       Now, you know, if we built the Big Dig in the desert of

24   Arizona, we might not have as many problems as we will have,

25   and I say "will have" in this construction project.  These

PDF created with pdfFactory trial version www.pdffactory.com

1   tunnels are up against a seabed.  Some of these walls go

2   down 125 feet into the ground.  They are constantly exposed

3   to wet, salty conditions.

4        And it is exactly those conditions that the defendants

5   were aware of.  Everybody had access to topographical-type

6   information in this case.  It's exactly those conditions

7   which are especially harmful to concrete which does not have

8   the desired durability.  And one thing that Praul testified

9   about is permeability of concrete.  And the permeability,

10  which is different from the strength of the concrete, the

11  permeability is what prevents water from intruding through

12  that concrete; water that if it gets inside the concrete is

13  going to cause the steel girders, which hold up these walls

14  and any steel inside those walls, to start rusting and

15  expanding.

16       Another thing that Praul told us about adding too much

17  water to concrete is that when that concrete starts drying,

18  it starts cracking.  I think he used the example of a river

19  bed.

20       And that is exactly what we saw in the tunnels after

21  the blowout.  There were hundreds and hundreds of cracks and

22  holes and defects in these walls, which the government has

23  spent the last five years and millions of dollars patching

24  and grouting leaks.

25       Now, I'm not going to say that that's all the

1    responsibility of Aggregate Industries.  Clearly -- you

2    know, there's design issues.  There's construction issues.

3        But what I am saying is how dare, how dare, these men,

4    who took $100 million of the public's money, how dare they

5    not deliver the best product they could.  How dare they

6    decide.  This is not the project to cheat on.  This is not

7    the project to lie about.

8        They want to claim, Well, they got so busy and the work

9    was so intense that, you know, we had to do what we had to

10   do to get it done.

11       And the letters from the men from Boston Sand & Gravel

12   say the same thing.  But you know what?  Boston Sand &

13   Gravel didn't lie, cheat, and steal to get their job done,

14   like the people from Aggregate Industries did.

15       And, you know something, if you can't get it done, you

16   tell Bechtel, you tell Modern Continental, Look, we can't

17   deliver this much concrete.  We can't do it as fast as you

18   want.  If you want it done this fast, we're going to use old

19   concrete.  We're going to falsify batch reports.

20       I don't think anybody in this room would say that if

21   Bechtel knew or Modern knew that they would have agreed to

22   the delivery of concrete under those conditions.  Maybe you

23   hire subcontractors who can deliver concrete.  I don't know

24   what the solution is, but certainly the solution is not to

25   commit fraud to get the job done, which seems to be the

1    excuse that the defendants are propounding to the Court.

2         One thing I did want to point out in Mr. Prosperi's

3    sentencing memorandum was he seemed to indicate that

4    92 percent of old or leftover concrete was disposed of by

5    Aggregate, and that is not true.

6         In fact, the evidence at trial, I think there were

7    documents put in, just based upon Aggregate's own records on

8    the 10/9 loads between 1999 and 2004, only a five-year

9    period, there were 30,000 loads of 10/9 concrete.  16,000

10   were redelivered, 16,000.  Over 50 percent were redelivered.

11        Now, they weren't all redelivered to the Big Dig.

12   There were two or 3,000 loads redelivered to the Big Dig.

13   The rest of those loads went to someplace else.  They went

14   to foundations in buildings in this city.  They went to

15   roadways.  So it was part of Aggregate Industries' business

16   plan to resell leftover concrete, to misdescribe it in order

17   to conceal the fact that it was leftover, to take a sidewalk

18   mix and add it to a foundation mix and have a mix which is

19   not what the customer ordered.

20        Now, in terms of, again, the loss, I think that the

21   settlements by Bechtel and the settlement by Aggregate

22   Industries really reflects reality in this case.  And the

23   reality is that the conduct of the defendants is going to

24   lead to long-term maintenance issues on the Big Dig concrete

25   structures.

PDF created with pdfFactory trial version www.pdffactory.com

1          Aggregate Industries paid $50 million to the United

2    States.  I think 7 million of that went to criminal fines.

3    There was another 15 million which went to satisfy the False

4    Claims Act tort cases of the state and the federal

5    government.  And the rest of that money, about $30 million,

6    went into a fund that was specially created by the

7    Legislature in the Commonwealth of Massachusetts to hold

8    this money for anticipated repairs of Big Dig concrete

9    structures.

10         Bechtel and Parsons Brinckerhoff also entered into an

11   agreement with the United States and the Commonwealth of

12   Massachusetts where they paid approximately $485 million,

13   again, to pay for some of the costs, the remediation costs,

14   that had already been incurred to repair tunnel walls.  We

15   had the ceiling collapse.  There was money for that.  But

16   the bulk of this money was put into the fund and is there

17   for long-term maintenance of concrete structures.

18         Now, if there is any indicator of what the true harm

19   is, it's the fact that these companies were willing to place

20   this huge sum of money in a fund to be held in trust by the

21   state, because everybody who's looked at this issue,

22   engineers, contractors, lawyers, understands that there will

23   be problems.  There will be maintenance issues that go

24   beyond normal maintenance.

25         So in reading the probation report, defendants'

PDF created with pdfFactory trial version www.pdffactory.com

1   submissions, as well as the Court's order, the concept that

2   the loss is overstated in this case, I think, is just

3   totally incorrect.  If anything, the loss is overwhelmingly

4   understated.

5       Another thing that the Court said in its decision and

6   that the defendants have argued in their submissions is that

7   there was no personal profit to the defendants in this case,

8   and, again, I submit that that is not correct.

9       Mr. Prosperi, and later on Mr. Stevenson, ran the

10  Concrete Division of a large corporation.  Like any company,

11  their jobs depended upon their business success.  The more

12  successful their division is, the bigger their salaries are,

13  the bigger their bonuses are, the bigger their division

14  grows.

15      These are all personal motives to engage in activities

16  which enhance the corporate bottom line.  Everybody wants to

17  have a good job.  Everybody wants to earn more money.

18  Everybody wants to keep their job.  Everybody wants whatever

19  business empire they preside over to grow and not to shrink.

20  These are all personal motives to make their division look

21  more profitable.

22      When they resell a load of concrete that has already

23  been paid for by one customer, and now they can resell it to

24  a second customer, they get paid twice for the same load.

25  Not only do they get paid twice for the same load, but they

| | |
|---|---|
| 1 | eliminate the costs of taking a truck offline, sending it to |
| 2 | a location to dump concrete, which then has additional costs |
| 3 | of chopping it up and recycling it and disposing of it in |
| 4 | some manner. |
| 5 | This is all money, and when you're talking about |
| 6 | thousands and thousands and thousands of loads, over 10, 20 |
| 7 | years, that is a lot of money, your Honor.  And that's a lot |
| 8 | of money that enhances Mr. Prosperi and Mr. Stevenson to |
| 9 | maintain their positions in this company, to improve their |
| 10 | personal salaries, their year-end bonus. |
| 11 | So I do dispute the fact that there was no personal |
| 12 | gain here. |
| 13 | Maybe what they were really doing was disregarding the |
| 14 | harm that they were doing.  There may be no actual intent to |
| 15 | commit immediate harm, but I suggest to the Court that |
| 16 | everybody in this business knew that sooner or later there |
| 17 | would be harm, but by the time that harm was discovered, |
| 18 | legal liability would be expired.  I suggest to the Court |
| 19 | that by the time we see the consequences of the harm in this |
| 20 | case, you and I will probably no longer be here.  It may be |
| 21 | 20, 30, 40, 50 years down the road. |
| 22 | So it's the kind of harm that one can disregard.  Well, |
| 23 | it's not going to happen tomorrow, it's not going to happen |
| 24 | next year, maybe it's not going to happen for 10 or 15 |
| 25 | years, and by the time it does happen, I'll be gone.  And I |

1    think that's really the mindset in this case.

2         Now, you know, I don't want the Court to think that I

3    am not sensitive to the situation involving Mr. Prosperi and

4    his wife.  But one thing I do know is that the letter that

5    was submitted by the doctor at Mass. General is, at this

6    date, about nine months old.  There is no indication of what

7    the prognosis is.  It's hard for me to address whether or

8    not, or to what extent, the Court should take this into

9    consideration based upon old information and the lack of a

10   medical prognosis.  And I would suggest to the Court that,

11   you know, more information would be helpful at this

12   juncture; that, perhaps, you know, if the Court were to

13   sentence Mr. Prosperi today and he needed six months or nine

14   months to care for his wife, his surrender to an institution

15   could be delayed.  I'm not in a position, based upon the

16   information that has been provided, to assess that or to

17   make a recommendation in that regard.

18        And I do not think that the cases cited by the

19   defendant are that applicable.  I mean, one thing that

20   struck me in reading all the letters submitted by friends

21   and family members of Mr. Prosperi is that there is, or

22   seemingly is, a huge support network out there for

23   Mrs. Prosperi.

24        She has a daughter who resides with her.  There are

25   numerous relatives, family, and friends, who seem to care

PDF created with pdfFactory trial version www.pdffactory.com

1    greatly about her.  I don't think that this is the case

2    where there is no other person to provide the support to

3    Mrs. Prosperi.

4         I have read all the letters, not only written for

5    Mr. Prosperi but for Mr. Stevenson, and, you know, I've done

6    this for a long time.  I've seen a lot of these letters.  I

7    don't think that the behavior in this case is aberrant at

8    all.  I think this is a classic case of white-collar crime,

9    where people engaged in all sorts of business fraud, whether

10   they're doctors, lawyers, businessmen, also -- you know,

11   they have private lives.  They are loving family members.

12   They are active in their community.  They're even

13   philanthropic.

14        The biggest fraudster, Bernie Madoff -- five years ago

15   if somebody were to talk about Bernie Madoff, they would

16   have said, He's one of the biggest philanthropists in the

17   country.  Today we know he's behind the biggest fraud in the

18   history of the United States.

19        So, you know, people have two sides to them and can

20   engage in criminal activity and also be loving family

21   members and productive members of the community.  So I don't

22   think that this case is not a classic case of fraud or that

23   the conduct in this case is aberrant.

24        So, again, the government's recommendation, I think, is

25   a 20 percent deviation from the low end of the Guidelines,

PDF created with pdfFactory trial version www.pdffactory.com

1    which I think works out to about 70 months as to both

2    defendants in this case.

3         Thank you.

4              THE COURT:  Mr. Parker, are you going to speak

5    first?

6              MR. PARKER:  Yes, your Honor.

7         I didn't think we'd really be revisiting the loss,

8    especially since the government, quote/unquote, won the loss

9    battle, to the extent that's going to influence sentencing,

10   is what I think we're going to be focused on today.

11        I didn't think we'd be talking about the ceiling panel

12   collapse, which had nothing to do with Aggregate, these

13   defendants, this case, or this concrete.

14        I didn't think we'd be talking about leaks in tunnel

15   walls, which I have a videotape on my desk in my office, I

16   think it was Tom Reilly then announcing at a press

17   conference, that I think Mr. Wyshak was at, that the

18   Aggregate Concrete problems that they were investigating at

19   the time didn't have anything to do with the leaks in the

20   tunnel.

21        I certainly didn't think we'd be talking about Bernie

22   Madoff's philanthropic aims.

23        I thought we'd be talking about this case and these

24   defendants, and I didn't think we'd be talking about

25   hundreds of loads, or thousands of loads, of concrete over a

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    20- or 30-year period that was, in Mr. Wyshak's view,
 2    garbage, fraud, resold, watered down, adulterated, unfit for
 3    the purposes that it was being sold for.  That is not the
 4    case factually, and it has nothing to do with this case.
 5         When Aggregate Industries sells concrete on private
 6    jobs, nonpublic jobs, that have nothing to do with a
 7    90-minute rule or Mass. Highway construction guidelines, the
 8    only specifications is compressive strength.  There's no
 9    batch slips on private jobs.  There's no fraud going on on
10    private jobs.  There's no doctored documents going on on
11    private jobs.
12         Customers order 3,000-, 4,000-, 5,000-PSI concrete, and
13    Aggregate delivers them, 3,000-, 4,000-, 5,000-PSI concrete.
14         Mr. Wyshak is sure we will have problems due to the
15    10/9 and leftover concrete supplied.  If he's right that
16    hundreds of thousands -- or thousands of other projects were
17    getting the same type of deficient concrete for decades,
18    we'd have bridges collapsing, buildings caving in on their
19    foundations, sidewalks caving in, you name it.  Aggregate
20    Industries would be out of business if it didn't supply
21    quality products for decades, and its predecessors didn't
22    supply quality products for decades, that are suitable and
23    fit for the purposes intended, and that have, in fact, held
24    up, lasted as long as they should have lasted, and met
25    whatever specifications the customers wanted.
```

1        So we're not talking about history.  We're talking

2   about this case, this project, these defendants.  And when

3   Mr. Wyshak talks about that, he says that the fact that

4   these -- the company didn't provide or didn't reship

5   leftover concrete at the outset of the project, that that's

6   an indication that the Court should draw the inference that

7   they knew it was wrong, and they knew it was wrong when they

8   decided to do it, and they willingly and intentionally

9   committed fraud.

10       And I think that for the reasons that we articulated at

11  trial, in my pleadings, and the loss memoranda, that's not

12  the inference that should be drawn from that.  That

13  presupposes that these defendants and this company looked at

14  the Big Dig as a license to steal.  And there wasn't a

15  lightbulb that went off in their head four, five, six,

16  seven, eight years into the project and said, Boy, all this

17  time we could have been stealing, we could have been

18  committing fraud, and we could have been really padding the

19  corporate bottom line.  What idiots.  Let's start doing it.

20       That's Mr. Wyshak's argument, and that doesn't square

21  with the trail testimony, even of his own witness, Gerry

22  McNally.

23       And it also doesn't square with the testimony of his

24  own witness, Gerry McNally, that Aggregate was the only

25  outfit in the world, or at least here, that was doing this.

PDF created with pdfFactory trial version www.pdffactory.com

1    McNally's company, McNamara Concrete, was reusing concrete

2    long before Aggregate ever came along and bought McNamara.

3         What happened was exactly what we argued at trial and

4    what the letter writers from Boston Sand & Gravel confirmed.

5    This project got compressed.  I think the vice president,

6    McNeil, from Boston Sand & Gravel said, The last four years

7    of this project got compressed into an 18-month period, and

8    the demands on the concrete suppliers were extraordinary and

9    unprecedented.  And it was in response to that that, in

10   consultation with Gerry McNally, the company decided to

11   start providing leftover concrete to the Big Dig.  It wasn't

12   for the purpose of padding the bottom line, and it wasn't

13   for the purpose of stealing.

14        And I think -- I know your Honor has read the letters,

15   and that's not the way Mr. Prosperi had lived his life.

16   That's not the reputation he had developed either as an

17   executive at a major concrete company for decades, or as the

18   president, later treasurer, and a board member of the MACAPA

19   trade organization.  That's not how he lived his life, and

20   that's not what he was motivated by, the bottom line.

21        He was motivated by doing.  He was motivated by what

22   was necessary to do to produce the big picture good, your

23   Honor, and that's why this company started shipping leftover

24   concrete to the Big Dig, and that's why, If I wrote 90

25   percent disposed of, I should have written 90 percent

PDF created with pdfFactory trial version   www.pdffactory.com

1    disposed of or delivered elsewhere than the Big Dig, because

2    that was the testimony of the government's expert.

3        With respect to the settlements of Aggregate Industries

4    and Bechtel, it's dangerous to interpret those settlements

5    as acknowledgments that there are going to be problems down

6    the road.

7        Bechtel didn't even admit that any of its conduct was

8    criminal, let alone have any individuals at Bechtel charged

9    criminally.  Bechtel had a lot of business reasons to enter

10   into the settlements it did and to pay the monies it decided

11   to pay to put these problems behind them and to avoid

12   criminal prosecution for itself as an organization, or the

13   separate organizations, the joint venturers, and any

14   individual at Bechtel.

15       The Aggregate settlement was a settlement of not only

16   the leftover concrete issue on the Big Dig, but it also

17   wrapped up a government antitrust investigation.  It wrapped

18   up an investigation into providing asphalt throughout the

19   Commonwealth.  It resulted, I believe, in the divestiture of

20   an asphalt plant.  And to the extent the company put money

21   into a fund to be set aside for anticipated repairs, that,

22   too, is a business decision.  Going forward, Aggregate has

23   the ability, if something else goes wrong with the tunnel,

24   to say, That's not a result of our providing this concrete.

25   That's the result of something else.  Or they even have a

1    business incentive to say, That is the result of us

2    providing this concrete, because the settlement fund for

3    repairs is the extent of their exposure.

4         So there were good business reasons for these companies

5    to enter into the agreements that they did with the

6    government and to write the checks they were able to write

7    to put these problems behind them corporately.

8         Now, I want to talk about Mr. Prosperi, but, before I

9    do, I have to just do two housekeeping matters on the

10   Guidelines, your Honor.

11        I never formally objected to the loss calculation

12   because it I didn't come up until the final PSR.  I object

13   to it now for all the reasons in my written submission on

14   loss, the arguments and evidence we produced at the loss

15   hearing and at trial, and the sentencing memorandum.

16        I'm not sure if your Honor's -- I think your Honor's

17   calculations of the applicable guideline range did adopt the

18   probation officer's four-level leadership-role enhancement.

19   Am I correct in that, your Honor?

20             THE COURT:  Yes.

21             MR. PARKER:  I want to formally object to that as

22   well for the reasons that I have set forth in my memorandum

23   and my objections to the presentence report and my

24   sentencing memorandum.

25        One other point on the Guidelines, your Honor.

1          A Supreme Court case was reported today, I believe, or

2     yesterday.  I got an email about it today.  It's United

3     States v. O'Brien and Burgess [ph], and the case dealt with

4     the machine gun enhancement for a 30 year on-and-after

5     mandatory minimum sentence.  And the unanimous Court said

6     that, As a matter of the statutory interpretation -- or at

7     least the majority said, or plurality, or whatever you would

8     call it when they're unanimous.  But the main opinion says

9     that, As a matter of statutory interpretation, a machine gun

10    is a fact that must be pleaded and proved to a jury beyond a

11    reasonable doubt.  In concurring opinions, Justice Thomas

12    and, I believe, Justice Stevens said they would have reached

13    the same result but on constitutional grounds.  In other

14    words, any factor that would increase a sentence, either set

15    a mandatory minimum or increase a maximum, has to be pleaded

16    and proved to a jury beyond a reasonable doubt.

17         Based on that case, and notwithstanding First Circuit

18    law that might be to the contrary, at least in terms of

19    applying sentencing enhancements like the loss table and the

20    leadership role, I'm going to object based on that case,

21    that the leadership role and the loss calculations, to the

22    extent that they increase the exposure of these defendants,

23    were not pleaded, presented to the jury, and decided by the

24    jury beyond a reasonable doubt.

25         THE COURT:  Well, I do not want to deviate into

```
 1    that.  Actually, it is not applicable because it does not
 2    change -- there is no mandatory minimum, and there is a
 3    ten-year maximum on any number of counts of conviction.  It
 4    does not raise the enhancement.  But I do not think that
 5    that really is the issue here.
 6              MR. PARKER:  Part of that is wishful thinking.  I'm
 7    done with that.  It's wishful thinking on my part, and an
 8    intention to protect the record.
 9         Your Honor, I'm not going -- I just want to talk very
10    briefly about the Guidelines themselves.  I've done this in
11    another case that I had with your Honor, the O'Neil case,
12    which you may or may not remember.  And I've set forth in my
13    sentencing memorandum the reasons why the Guidelines
14    themselves are open to question on a policy basis, the
15    applicable guidelines in this case.
16         And I'm not going to revisit that here at argument,
17    your Honor, but I did set forth in my memorandum why, if you
18    do a Kimbrough analysis on the fraud guidelines, you can
19    reach, and should reach, the same result, that the
20    Guidelines overstate the seriousness of white-collar
21    offenses and that, as a matter of policy, they are not
22    supported by the same type of empirical analysis, historical
23    analysis, and expertise by which the Sentencing Commission
24    came up with other guidelines.
25         I have attached as an exhibit to my sentencing
```

PDF created with pdfFactory trial version www.pdffactory.com

1    memorandum Exhibit 9, a chart, which I believe the final

2    offense level for these two defendants is Level 29, and I

3    have attached a chart to my sentencing memorandum that I

4    prepared which compares other offenses and lists other

5    offenses that result in a guideline level of 29.  And I

6    submit, your Honor, that if you look at that chart, that the

7    types of crimes that equate with Level 29 that are not

8    financial crimes involve far more serious, purposeful,

9    criminal conduct, and result in tangible -- far more

10   tangible societal harm than the mechanical calculation of

11   the 29 level here in this case for these offenses for these

12   defendants.

13        And, again, I know that your Honor has read everything,

14   but 29 is the same level for voluntary manslaughter, which

15   is an intentional killing and an intentional infliction of

16   injury likely to cause death.

17        Providing material support to a terrorist organization,

18   knowing it would be used to commit a violent act.

19        The mechanical application of the loss table here,

20   using every conceivable dollar that possibly could have

21   flowed from this fraud significantly over punishes these

22   defendants when you equate it with other offenses that

23   correspond to these levels, either on a *mens rea*, or a

24   personal-commission-of-the-crime, or a societal-harm

25   analysis.

1        So those are reasons, your Honor, that I have given you

2   and that, I submit, are reasons to impose a variant

3   sentence.

4        There are other reasons, which I would like to devote

5   the rest of my comments to.

6        The first I've touched on, and that is the loss

7   overstates the culpability of these defendants.  A

8   $5 million loss significantly and substantially overstates

9   the culpability of these defendants.

10       This was an encouraged departure ground under the

11  mandatory guideline regime, and it remains an encouraged

12  departure or variance ground now.  Even the Probation

13  Office, your Honor -- and I don't mean to belittle the

14  Probation Office -- but this may be the second PSR that I've

15  gotten since Booker where I've had a probation officer

16  acknowledge that there is a reason, a specific reason, for a

17  variant sentence.  And in Paragraph 116 the probation

18  officer says so in this case, that the Court may wish to

19  consider whether the loss overstates the defendants'

20  culpability.

21       Most of the PSRs, all but one that I can remember since

22  Booker, don't have that last paragraph.  They have the

23  previous two paragraphs which say, essentially, that,

24  Information appears throughout this presentence report from

25  which the Court could find a departure, but they don't go

1    the step further and say, and here's one particular reason.

2    So I think that's significant.

3        I also think that the Court can firmly impose a variant

4    sentence here on the basis of aberrant behavior.

5        Again, this was a recognized departure ground in the

6    mandatory guideline era.  It remains an available ground for

7    departure or variance now.

8        The criminal conduct in this case is entirely and

9    completely out of character with the way Mr. Prosperi has

10   conducted his personal life, his participation in his

11   community's affairs, and his professional life.  To a

12   person, your Honor, the letter writers attest to the

13   integrity and the honesty of Mr. Prosperi.  Even the union

14   reps who write to your Honor that they would hold him out as

15   an example to others when they thought they were getting the

16   short end in negotiations, they would say, Boy, Bob Prosperi

17   wouldn't do it that way.  And the union reps who have

18   written to the Court and whose letters are attached and

19   you've read, explain, not surprisingly, that earning that

20   type of reputation in the cauldron of labor-management

21   negotiations is a hard-earned and not-a-lasting reputation.

22   It's only as good as the next negotiation.  But for decades

23   Mr. Prosperi has developed and held on to that reputation

24   within his professional community.

25       He's taken professional pride not only in the affairs

PDF created with pdfFactory trial version www.pdffactory.com

1    of Aggregate Industries and its predecessor companies, but

2    the entire ready-mix industry, and worked hard for decades

3    to professionalize and develop its trade association,

4    MACAPA, into a respected industry leader.

5        Your Honor, again, these are not easy reputations to

6    develop.  You develop them by your behavior over time -- in

7    this case over decades -- in which Mr. Prosperi served as

8    president, treasurer, and board member of MACAPA, and as

9    trustee of the Teamsters Health & Welfare Fund, and as a

10   representative of the executive committee that negotiated

11   statewide labor contracts on behalf of the Commonwealth that

12   applied statewide in heavy industry and highway construction

13   projects.

14       These were all unpaid positions that Mr. Prosperi did

15   in addition to working full time and in addition to being

16   engaged in his community, in addition to being engaged in

17   his parish, and in addition to devoting a considerable

18   amount of time to his family.

19       This is not a life, your Honor, when you read the

20   letters, that's marked by a relentless drive to seek every

21   advantage or to use every available resource to come out on

22   top, or to crush opposing interests, or to maximize

23   corporate profit above all else.

24       This is a life marked by attention to the bigger

25   picture and the bigger good, and this is a man who strives

1    for a fair result and has earned, by his conduct over

2    several decades, a reputation for fairness and integrity.

3    The criminal conduct in this case stands in stark contrast

4    to the way Mr. Prosperi has led his entire life and the

5    values he strives to live up to and the values he has

6    instilled in others.

7        The last area that I want to touch on is the first area

8    that I wrote about, your Honor, and that is the

9    extraordinary family circumstances in this case.

10       Again, this was a recognized ground for departure when

11   they were extraordinary under the old mandatory guidelines,

12   and they remain a ground for departure or variance in the

13   post-Booker, non-mandatory guideline era, and they don't

14   need to be extraordinary anymore and can be considered as

15   part of the history and characteristics of the defendant,

16   which is one of the 18, 3553 factors.

17       The First Circuit case of Martin, which I cited and

18   discussed in my pleading, illustrates how far we've come in

19   this area.   In Martin, the First Circuit upheld a 91-month

20   variance simply because the defendant showed promise for

21   rehabilitation and had a supportive family, and those were

22   idiosyncratic family circumstances that the First Circuit --

23   the district court found merited a 91-month variance, and

24   the First Circuit upheld.

25       Well, even though we don't need extraordinary family

PDF created with pdfFactory trial version www.pdffactory.com

1    circumstances anymore, we've got them.  We've got them here.

2    We've got them in this case, and we've got them by any

3    measure.

4         Mr. Wyshak says this is old information, and there's a

5    lack of a prognosis.  But that's not true.  Carol Prosperi

6    has terminal malignant melanoma.  Her prognosis -- the

7    average prognosis is a survival of the less than a year.

8    When the cancer spreads to the brain, as it had for

9    Ms. Prosperi, the prognosis is -- or an average survival

10   rate of four months.

11        She had, as I say in -- or as the doctor says in his

12   letter, shortly after had trial undergone, I believe it was

13   her fifth, brain surgery to remove a tumor and to implant

14   radioactive seeds that, it was hoped, would prevent tumors

15   from recurring.

16        That surgery was successful, and just last week there

17   were follow-up visits with an MRI to see whether there was

18   regrowth of the tumor inside her brain, and, thankfully, the

19   MRI showed that this operation, so far, is holding and that

20   a tumor has not started to regrow in Ms. Prosperi's brain.

21        That could change tomorrow.  That could change in a few

22   weeks.

23        Also part of the recent examination was an examination

24   of some new spots on her scalp, which are being watched

25   carefully and closely.

PDF created with pdfFactory trial version www.pdffactory.com

1          The prognosis for Ms. Prosperi in 2005 when she was

2     diagnosed was, You're going to live a year, and if it

3     spreads to your brain, you're going to live four months.

4          The prognosis for Ms. Prosperi now is no different.

5     And we don't need an updated doctor's letter to tell us

6     that.  This cancer a terminal, and it's a miracle that she

7     is alive today.  And what Mr. Wyshak didn't focus on in

8     Doctors Lawrence's letter is the role that he says

9     Mr. Prosperi plays in that remarkable result.

10          He says, and on page 2 of my memorandum -- I can't put

11     it any better than Dr. Lawrence, the way he put it -- "Carol

12     would certainly not be alive today without Mr. Prosperi's

13     attentiveness and his capacity to recognize when she is in

14     trouble.  Our ability to offer her the optimal treatment

15     will be compromised if he cannot participate in her care."

16          Now, Mr. Wyshak says that there's countless family

17     members who probably can do that.  He doesn't know, but

18     that's what he says.  He says incorrectly that

19     Ms. Prosperi's daughter lives with her.  She doesn't.  She

20     has her own household where she lives with her six-year-old

21     daughter, Mikala.

22          While there are, fortunately, sisters, step-sisters,

23     sister's-in-law, brother's-in-law, all of them have their

24     own lives, and none of them can live with Ms. Prosperi, and

25     none of them can do the types of things that Dr. Lawrence

PDF created with pdfFactory trial version www.pdffactory.com

1    has described he relies on Mr. Prosperi to do, to the extent

2    that Mr. Prosperi can do them.  Dr. Lawrence's fear is real,

3    that there is no one else that can do it.  And his fear is

4    real that if Mr. Prosperi goes to jail, Carol's care would

5    be compromised, Carol's emotional stability would be

6    affected, and Carol's remarkable success story could come to

7    a premature end.

8        Your Honor, for all the reasons that I have set forth

9    in my memorandum and discussed today, it's not necessary to

10   put Mr. Prosperi in jail.  For all the reasons I just

11   touched on and set forth in my memorandum, a

12   non-incarcerative sentence is sufficient, but not greater

13   than necessary, for this defendant, who has lived the life

14   the letter writers describe, who is the only person in this

15   family who has dealt and can deal with the extraordinary

16   circumstances that they face and who has committed what the

17   Court has recognized is this atypical white-collar offense.

18       Your Honor, a term of probation with a one-year period

19   of home confinement is sufficient, but not necessary, to

20   promote all of the sentencing goals, and to promote

21   deterrence, and to afford adequate punishment for all of the

22   reasons I've set forth in my memorandum.

23       And, your Honor, you can tell from the letters that

24   Mr. Prosperi has a lot to give and has demonstrated a

25   willingness to give to church, community, family,

1    profession.

2        I would encourage your Honor to impose, if you were

3    inclined to go along with this sentence, some very

4    meaningful community service as a condition of his

5    probation.  He's capable of doing it and willing to do, your

6    Honor.

7        Thank you.

8            THE COURT:  I realize that this is a longer

9    sentencing hearing than is customary.  If anyone feels the

10   need to take a break, I can suspend for a few minutes.

11       (No response.)

12           THE COURT:  Mr. Singal.

13           MR. SINGAL:  Thank you, your Honor.

14       Let me, first of all, for the record preserve the

15   objections that we made on behalf of Mr. Stevenson to the

16   presentence report.  For ease sake, I'll simply refer to

17   those objections and incorporate them in my remarks as they

18   appear beginning at page 31 of the addendum to the final

19   presentence report.

20       Before turning to the comments I prepared on behalf of

21   Mr. Stevenson, I do feel compelled to respond to certain of

22   the points that Mr. Wyshak made.  Like Mr. Parker, I was

23   perplexed to hear Mr. Wyshak present, right from the outset,

24   effectively what appeared to be the core of his sentencing

25   argument, discussion of a host of circumstances that have

1    nothing to do with this case.  Why the prosecutor is

2    standing up here at sentencing on a case involving the

3    delivery of out-of-spec concrete to the Big Dig and talking

4    about things like collapse of the ceiling that killed the

5    poor woman, blowouts, leaks, a failure of accountability by

6    a host of people involved in a host of unrelated portions of

7    the Big Dig and, not the least, Bernie Madoff, is

8    perplexing, and, perhaps when one thinks about it, suggests

9    a need to go beyond the evidence of record in order to

10   attempt to support what I believe to be a disproportionate

11   sentencing recommendation.

12       Perhaps more dangerous than the comment and the

13   irrelevancies, however, are the actual misstatements, and I

14   would like to focus on two or three of those for a moment

15   before I turn to my other remarks.

16       Mr. Wyshak's stands here and says with definitiveness,

17   your Honor, this conduct of these defendants will cause

18   structural harm to the Big Dig.  No qualification, and, by

19   the way, no support.  He talks about Mr. Praul's testimony,

20   and I would suggest that he does so in the same way the

21   government presented Mr. Praul's testimony; because, if

22   you'll recall, when Mr. Praul sat there, he testified on

23   direct about some permeability tests which were failed, and

24   it was only in cross-examination that it was brought out

25   that the test he was talking about were tests that a

PDF created with pdfFactory trial version   www.pdffactory.com

1      consulting firm did to try to replicate the Big Dig, and

2      that Mr. Praul had not been asked a single question about

3      the actual core samples that had been taken by the Big Dig

4      and tested by a company called Wiss Janey on behalf of the

5      Big Dig, which showed unequivocally that the test passed a

6      permeability test, that they passed the compressive strength

7      test, and that they were in full compliance with the Big Dig

8      specifications.

9           I don't know why that wasn't mentioned and brought out

10     by the government in its direct examination, and I don't

11     know why it wasn't brought out by Mr. Wyshak here.

12          And so that there can be no uncertainty about that, let

13     me direct the Court's attention to Mr. Praul's testimony on

14     January 12, 2010, at pages 52 to 54, including his

15     conclusion that:

16          "QUESTION:  And in each case they passed -- referring

17     to those compressive strength and permeability tests -- they

18     passed with flying colors, those permeability tests,

19     correct?

20          "ANSWER:  The results were good."

21          And previously he said that they passed both the

22     compressive strength and permeability test.

23          So I am not sure why we're indulging in this fiction,

24     as we stand before your Honor for sentencing, that there

25     were tests that were failed when the actual tests, the

1    actual core samples extracted from the Big Dig itself,

2    showed in all cases permeability and compressive strength

3    tests were passed and in full compliance with the Big Dig

4    specifications.

5         Similarly, to stand here and say there will be harm to

6    the public, there will be harm to the structural integrity,

7    belies the relatively miniscule percentage of out-of-spec

8    concrete that was delivered in the overall course of the

9    massive structure which ended up being produced.  And the

10   evidence specifically is that of all of the 10/9 concrete

11   between 1996 and 2004, about close to half of it was not

12   delivered to anybody.  And much of it -- I don't have the

13   actual percentage here -- was delivered to people other than

14   the Big Dig.  The end result, according to the government's

15   own expert, again on cross-examination, Aggregate delivered

16   to the Central Artery Tunnel 10/9 concrete compromising only

17   2 percent of the total loads it delivered to the Central

18   Artery Project.

19        So why is it that the government, in the face of such

20   sparse and questionable testimony, is standing up here with

21   all of the public pressures being brought to bear saying,

22   There will be harm.  We may be gone, your Honor, but there

23   will be harm.  There will be harm to the structural walls.

24        There is no support for that.  It is a gross

25   exaggeration, and I would suggest it has no place in your

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    Honor's sentencing considerations.
 2         Now, I first met Greg Stevenson, your Honor, in July of
 3    2005, and at that time he asked me to represent him in this
 4    case, and at that time it became my job to prevent this day
 5    from ever happening.  When you are in a situation where you
 6    stand at sentencing and you have not accomplished that job,
 7    it is daunting, it is humbling, and it is disappointing in
 8    any case.  But I will tell you that in this particular case
 9    the sense of disappointment and the sense of humility and
10    the sense of regret that I personally experience is as great
11    as any felt in my 34 professional years.  And the reason for
12    that is because of Greg Stevenson.  The reason for that is
13    the type of person this man is, the type of life he has led,
14    and the type of character and honor and integrity he has
15    demonstrated throughout the course of a lifetime of good
16    deeds.
17         And when you represent somebody like that, believe me,
18    you care any time you're at sentencing.  Nobody wants to be
19    there when you're in our business, but I will tell you that
20    this -- when you represent somebody like Greg, it is
21    different in marked fashion than it ordinarily is.  And the
22    reason for that, I think, your Honor, is because of the
23    vastness of the gulf that separates the type of life that
24    Greg has lead and the conduct for which he was convicted.
25         Now, yes, I'm not going to stand here and pretend that
```

1   he did not have a jury in that box find him guilty of

2   federal felonies, and certainly he made mistakes of

3   judgment, and certainly he got caught up in an untoward

4   corporate culture, and, yes, he acquiesced in certain

5   conduct that he could have distanced himself from.

6       But I would suggest to your Honor that when you look at

7   the great balance sheet of life, if you will, these are

8   relatively minor debits when they are compared to the other

9   side of the ledger, and they are dwarfed by those enormous

10  assets of honesty and integrity and good works and deeds

11  that have otherwise pervaded this man's life.

12      Now, we have tried our best to convey this in our

13  papers.  I know your Honor well enough to know you've read

14  everything we've given you, and you've given it your closest

15  attention; but, with the Court's indulgence, I would like to

16  briefly summarize some of the highlights that we have

17  presented to you in order to illustrate what I think is a

18  paradox, and that is a paradox that presents itself today of

19  a man of the utmost honor and the utmost character who,

20  nonetheless, stands before you today convicted of these

21  federal felonies.

22      Now, I would suggest to your Honor that perhaps nowhere

23  is the test of this man's character illustrated better than

24  in the adoption of his daughter Stephanie.  As your Honor

25  recalls from what we've presented, that adoption has its

PDF created with pdfFactory trial version   www.pdffactory.com

1    derivation in his own biological daughter Kerri's

2    life-threatening cancer as a young child, and he and his

3    wife seeing children when they visited Kerri -- who

4    fortunately recovered after a long bout with chemotherapy at

5    a young age -- seeing other children who did not have

6    parents to care for them in the way they were able to care

7    for Kerri, and vowing at that time when Kerri recovered that

8    they would adopt a child of this sort.

9         Many people make vows like that in times of distress.

10   Most people don't follow them.  In this particular case,

11   Greg and his wife, Wendy, fulfilled that vow, and after

12   their daughter recovered, they met a ten-and-a-half -- then

13   ten-and-a-half-year-old girl by the name of -- actually she

14   had the name "Kerri," which was changed to "Stephanie."  She

15   was the product of a variety of foster homes.  She was

16   blind.  She was hearing impaired.  She had cerebral palsy,

17   and she was developmentally disabled.  And I would suggest

18   to your Honor that in rescuing that young girl from the

19   foster homes which she traveled to and from and bringing her

20   into their own home and making her a part of their family

21   and showing her the love and affection of a member of their

22   own family, Greg Stevenson has demonstrated a selflessness

23   and a sacrifice that most of us could not even envision, and

24   which, I would suggest, speaks volumes greater about him as

25   a person than anything, than anything, you saw in this

1       courtroom for the two or three weeks of this trial.

2            Now, the commitment to Stephanie has had a number of

3       other consequences.  As you've read, it led Greg to become

4       an advocate for the disabled and to volunteer at some

5       organizations that protected the interests of disabled

6       individuals.  Beyond that, though, the example that he set,

7       and his wife, was an example that has carried over to their

8       children and has influenced the career choices of their

9       children, such that the daughter, Kerri, is getting her

10      Ph.D. in special education, dealing with autistic children,

11      and their son Brad teaches handicapped children.

12           The need we've described, and I am not going to go into

13      it in any great detail because I know your Honor has read

14      it, but although their current residence is separate, for

15      reasons stated in the sentencing memo, from both the home in

16      which Stephanie resides up here and from where Greg's

17      parents live in Pennsylvania, he plays a vital role in the

18      care of both.  He is a frequent visitor and contributor up

19      here to Stephanie's care.  He is the only surviving child of

20      his parents, who are in the 90s, and I cannot underestimate

21      the difficulties that would be created were he no longer

22      able to perform the functions for both Stephanie and for his

23      parents.

24           Mr. Stevenson has demonstrated, through various acts,

25      his commitment to the community, which we've illustrated.  I

1    am not going to repeat them today.

2        And his professional life, I think most importantly,

3    your Honor, has demonstrated the aberrance of the conduct

4    for which he was convicted.  We have example after example

5    of individuals who are saying, I worked with Greg Stevenson.

6    He did everything to protect worker safety.  He did

7    everything to protect environmental concerns.  He made sure

8    the workers got air conditioning in their trucks.  He didn't

9    care how this affected the profits of the company.  He was

10   an individual who was devoted to doing what was right in the

11   workplace, regardless of its effect on company profits or

12   consequences.

13       The circumstances of the conduct and the nature of his

14   conduct I think I would also like to touch upon briefly.

15       I'm not going to repeat the corporate culture

16   conclusion which your Honor referenced in your opinion, but

17   I think it's important to understand the position that

18   Mr. Stevenson held.

19       This was multinational corporation.  He was a low- to

20   mid-level manager in one unit, not even in the headquarters

21   in Massachusetts.  And in that position it's important to

22   recall that he was not -- the quality of the concrete was

23   not part of this man's job.  He was responsible for

24   environmental concerns.  He was responsible for testing the

25   trucks for efficiency and working properly, and certainly

PDF created with pdfFactory trial version www.pdffactory.com

 1      all the evidence pointed, and I think Mr. McNally himself

 2      pointed, to Mr. McNally as the quality control person.  Greg

 3      Stevenson was not responsible for the quality of the

 4      concrete here.  It was Mr. McNally, who was his equal within

 5      the company, who was responsible for the quality of the

 6      concrete.

 7           Nor was Mr. Stevenson a decision-maker.  I take issue

 8      with the statement by Mr. Wyshak that he decided -- he was

 9      among those deciding to change the 10/9 program so that it

10      was delivered to the Big Dig.  There was evidence that 10/9

11      deliveries generally started before Mr. Stevenson had begun

12      at the company in late 1996, and there was also evidence

13      that a particular management meeting, which Mr. Disano

14      testified about, occurred before Mr. Stevenson even began

15      working at the company.  So this notion of a premeditated,

16      intentional offense that Mr. Wyshak emphasized, I think, is

17      belied by the fact that Mr. Stevenson was not in the role of

18      a decision maker, and the evidence does not support that

19      conclusion.

20           And in terms of the profit motive, let me address that.

21      That's also another area where, perhaps, I should have

22      jumped on at the beginning in terms of Mr. Wyshak's remarks.

23           These sort of amorphous notions that well, gee, if you

24      have a job, then you're going to increase your bonuses, and

25      you're going to increase your salaries if you increase your

PDF created with pdfFactory trial version   www.pdffactory.com

1    profitability.  I mean, that is not the type of stuff of

2    which sentencing decisions are made, respectfully.  And you

3    can be sure that Mr. Wyshak and his cohorts who were very

4    skilled and spent years investigating this case, looked

5    under every nook and cranny, your Honor, for evidence of

6    bonuses or other monetary considerations that went to

7    Mr. Stevenson or others.  You can be sure they were looking

8    for it, and you can be sure they would have been delighted

9    to present it to those folks in the jury box if they found

10   it.

11        They didn't find it, and now they're relegated to

12   speculative assumptions of the sort that, well, they must

13   have gotten higher bonuses.  They must have gotten more

14   money.

15        There was no profit.  There was no profit motive.

16   There was no intent to profit, and that is simply beyond any

17   dispute and beyond any evidence in this case.

18        The Guidelines figures that have been proffered by the

19   government, I would suggest, are out of whack with reality.

20   They are out of whack with any sense of proportionality.

21        As Mr. Parker has pointed out well, they equate to

22   manslaughter, smuggling of aliens with a death, trafficking

23   in large-scale prepubescent child pornography.  I don't know

24   where the type of conduct we have seen in this courtroom can

25   possibly be deemed to equate with that type of conduct, and

PDF created with pdfFactory trial version   www.pdffactory.com

1    I would suggest to your Honor that a sentence of probation

2    with a year of home confinement is much more aligned to the

3    statutory objectives than the Guidelines that the government

4    suggest, and they are much more aligned to further the

5    statutory objectives in 3553(a)(2), which we've discussed in

6    some detail in the sentencing memorandum.

7         Your Honor, we've tried to give you a fair and accurate

8    and complete portrait of Greg Stevenson as a human being,

9    and as that portrait emerges, I hope you can measure all the

10   good he has done in his life.

11        The Adelson [ph.] case from the Southern District of

12   New York, which we've quoted at page 9 of our sentencing

13   memo said, and I quote, "If ever a man is to receive credit

14   for the good he has done, it should be at the moment of his

15   sentencing, when his very future hangs in the balance."

16        Regrettably, your Honor, in terms of the job that I was

17   hired to do and set out to accomplish, that time has now

18   come.  Mr. Stevenson stands before you.  His life does hang

19   in the balance, and I do hope that, and urge, that in

20   rendering judgment on this fine man, you can take the

21   measure of him as a man and you can see and recognize all

22   the good he has done and will do in the future.

23        And so when I ask for leniency, your Honor, for

24   Mr. Stevenson, it's not leniency for the sake of leniency,

25   and it's not leniency out of some misguided sense of

PDF created with pdfFactory trial version www.pdffactory.com

1    sympathy for his plight; but, rather, when it's viewed in

2    light of sentencing objectives, the statutory objectives,

3    and the advisory Guidelines, the leniency I am asking for is

4    leniency which this man has earned with a lifetime of

5    virtue, and honor, and integrity that makes his conduct in

6    question in this case pale in comparison.

7         Thank you.

8              THE COURT:  Mr. Prosperi, do you wish to address

9    the Court?

10             DEFENDANT PROSPERI:  Yes, your Honor.

11        Your Honor, I'm a little nervous.  I want to thank you

12   for allowing me to express my thoughts prior to my

13   sentencing.

14        I never intentionally did anything during the course of

15   my entire career that I thought would harm any project,

16   particularly this project.

17        On the Big Dig, we got caught up in milestones that

18   were totally unrealistic, and it just caused problems with

19   these unrealistic milestones that we were all caught up in.

20        I am absolutely confident that the concrete that we

21   supplied to the Big Dig is good concrete, is very good

22   concrete, and is within specifications, and is not going to

23   cause a problem.  I'm also absolutely confident that down

24   the road the concrete that we supplied to this project is

25   not going to cause any problems whatsoever.  I truly believe

PDF created with pdfFactory trial version   www.pdffactory.com

1    that we supplied good concrete, although it was out of

2    specification.

3         I apologize to my family, my friends, my coworkers, and

4    everybody else for the mistakes I made, and the

5    embarrassment and stress that I caused them.  And I promise

6    I will do everything in my power, and work as hard as

7    possible, to regain my reputation of a fair, good, and

8    trustworthy person.

9         Your Honor, I beg you to allow me to care for my wife,

10   as I have for the past five years.  I need to give her the

11   spiritual, the moral, and the physical support so she can

12   continue with this, as Dr. Lawrence said, "miraculous

13   recovery."  She is an incredible woman.  We've been married

14   for 43 years, and I believe I'm part of the team that's

15   helping to keep her alive.

16        I believe, your Honor, if I'm sent to prison at all,

17   it's going to have a detrimental effect on her.  I think it

18   will affect her both emotionally, physically, and

19   spiritually, and I hope to God that that does not happen and

20   that I be able to spend my life caring for her and waking up

21   beside her each day.

22        I pray to God that after you've sat through this

23   grueling trial, read all of the documents and letters of

24   support that have come in, that you will render a sentence

25   that you feel is fair, and I would hope to God that it would

PDF created with pdfFactory trial version   www.pdffactory.com

1    not have me go to prison for any reason whatsoever.

2        God bless America and this Court.

3        THE COURT:  Mr. Stevenson, would you like to

4    address the Court?

5        DEFENDANT STEVENSON:  Good afternoon, your Honor.

6        I hope you understand if I read my statement I'm

7    nervous and want to be sure that I can say what I have

8    prepared.

9        I am truly embarrassed and deeply regret what took

10   place at Aggregate.  I want the Court and the prosecutors to

11   know that I have been working hard and will work hard the

12   rest of my life to be an example to my family and friends

13   that I have always hoped to be and be there for them, as

14   they've been there for me.

15       Without trying to downplay anything that you heard at

16   trial, I do want to be sure that you know what I said to the

17   state troopers when they came to my home was true.  I always

18   believed, right or wrong, that we were sending good concrete

19   to the project, and I never intended to jeopardized the

20   project.  My only goal was to complete each day's scheduled

21   workloads and deliveries with the equipment and manpower we

22   had as the company wanted and required.  We all worked long

23   hours to accomplish this.

24       I realize this does not excuse anything, but I do hope

25   you will consider this when you consider my punishment, as I

PDF created with pdfFactory trial version www.pdffactory.com

1    never intended to harm the project and was never seeking to

2    benefit myself.

3         I also sincerely apologize to my family -- excuse me --

4    including my wife, Wendy; children, Greg, Kerri, Brad,

5    Stephanie; and my parents, for they have all had to

6    endure -- for all they have had to endure through this.  I

7    have always tried my best to provide a comfortable home and

8    good education for my family by working hard and being a

9    good example to my children in both my personal and

10   professional life.

11        I truly hope that your decision about my punishment

12   will factor in the way that I have lived my entire life, not

13   just by the small piece you heard last summer.

14        Thank you.

15        THE COURT:  It is not my habit to be long spoken at

16   sentencing, although I do recognize that I do have an

17   obligation to explain the reasons why I have reached the

18   decision that I have.

19        I was pleased that Mr. Singal actually brought the

20   focus of the hearing back to the defendants personally,

21   which is the piece of the puzzle that has perplexed me the

22   most listening through the trial, but, more importantly,

23   having read very carefully through the letters that were

24   submitted with the sentencing memoranda, all of which I

25   found sincere, supportive, and, I'm sure, an accurate

1    portrayal of the defendants' lives.  What is puzzling is

2    what I referred to as a "corporate culture."  I am confident

3    that when I read the letters from children, friends,

4    nephews, and nieces, had any one of these family members or

5    friends come to either Mr. Prosperi or Mr. Stevenson and

6    explained that they were being asked to do in a culture like

7    the one in which defendants were operating something

8    similar, defendants would have been the first to say, This

9    is morally wrong, you shouldn't do this, this should not be

10   the choice that you should make.  Why they made that wrong

11   choice for themselves, as I say, is the piece of this puzzle

12   that I find hardest to answer.

13        On the other hand, it is not clear to me why these

14   defendants were necessarily plucked out to be the "poster

15   children" -- if I may use the phrase -- for a larger

16   corporate culture that I agree was morally lazy, and so

17   focused on the short term that it became heedless to the

18   consequences or impacts of the behavior that it encouraged.

19        It is tempting but ultimately, I think, an abuse of my

20   power as a sentencing judge to hold these defendants

21   responsible for all of the excesses of modern corporate

22   ills; nor can I prospectively ask these defendants to bear

23   the weight of a speculative failure of the Artery Project.

24   I heard no evidence that that is likely, but, beyond that, I

25   do not think it is an appropriate factor at this point for

1     me to take into account at sentencing.

2         At the end of the day, I really cannot sentence a

3     culture.  I have to sentence the defendants as human beings,

4     and the real choice in this case is what are the punishment

5     alternatives?

6         Well, the most obvious punishment is incarceration.

7     There is one benefit, and only one, that I see in this case

8     to incarceration, and that is the sanction of deterrence

9     that an incarcerated sentence would pose for others.

10        Beyond that, society's interest in incarceration as

11    opposed to atonement does not weigh heavily.  There is no

12    risk of recidivism on the part of either of these

13    defendants.  Incarceration will incur a large cost to

14    taxpayers, and an even larger personal cost in

15    Mr. Prosperi's case to his ill wife and, to some degree, to

16    Mr. Stevenson's family, as I recognize that they both play

17    important roles as caregivers and caretakers in their

18    families.

19        I have given perhaps more reflection to this than

20    perhaps any but one or two other sentences I have had to

21    impose, and I have come to the conclusion that an

22    alternative to incarceration is the appropriate sentence in

23    this case.

24        Now, I expect to be heavily criticized for the sentence

25    I am going to impose.  It is not going to be an easy

PDF created with pdfFactory trial version www.pdffactory.com

1     sentence.

2          I am going to impose not a year of home detention but

3     six months.  Instead, but I am going to impose a substantial

4     term of community service.  I want 1,000 hours performed by

5     the defendants over a three-year probationary term.

6          I am going to impose a fine, which I think is within

7     the differing means of the defendants to pay.

8          As I say, the sentence will be criticized because I

9     think in the public mind this case will always be associated

10    with the collapse of the Williams Tunnel.  This is was not

11    the Williams Tunnel case.

12         I think what the defendants did they may justify in

13    their own minds.  I think it was wrong, and I have made it

14    clear that I think it was wrong; but I do think my decision

15    is the correct one given all of the factors that are at

16    play.

17         Mr. Prosperi, if you would stand, please.

18         Mr. Prosperi, pursuant to the Sentencing Reform Act of

19    1984 and, more particularly, having considered the

20    sentencing factors enumerated at 18, United States Code,

21    Section 3553(a), it is the judgment of the Court that you be

22    placed on a term of probation for three years.  This term

23    will be imposed on each count of conviction and served

24    concurrently, each with the other.

25         It is further ordered that you pay to the United States

PDF created with pdfFactory trial version www.pdffactory.com

1     a fine of $15,000.  That fine will be due immediately as a

2     lump-sum payment.

3         While on probation, you will comply with the following

4     terms and conditions:  You will comply with the standard

5     conditions adopted by the Court and as set out in the United

6     States Sentencing Guidelines Section 5B1.3(c).  These will

7     be set forth in writing in detail in the judgment.

8         You will, of course, not commit any federal, state or

9     local crime, nor will you illegally possess a controlled

10    substance.  I am suspending any drug-testing conditions,

11    based on the determination that you pose no risk for

12    substance abuse.

13        You are required by law to submit to the collection of

14    a DNA sample as ordered by the Probation Office.

15        You are prohibited by law from possessing a firearm,

16    destructive device, or any other dangerous weapon.

17        As a special condition of probation, you will serve six

18    months in home confinement with electronic monitoring.  You

19    are to bear the costs of such monitoring.

20        You are also to perform 1,000 hours of community

21    service at a task deemed appropriate by the Probation Office

22    and approved by the Court.

23        Finally, it is ordered, as the law requires, that you

24    pay to the United States a special assessment of $13,500.

25    Again, that will be due immediately.

PDF created with pdfFactory trial version www.pdffactory.com

1    The clerk will advise Mr. Prosperi of his right of

2    appeal.

3         THE CLERK:  Mr. Prosperi, you have the right to

4    file a Notice of Appeal in this case.  If you do wish to

5    file a Notice of Appeal, you must file it within ten days

6    from the date on which I enter the judgment.  If you cannot

7    afford an attorney to file that appeal on your behalf, you

8    may request me to do it, and I will file it in the Clerk's

9    Office for you.

10        DEFENDANT PROSPERI:  Thank you very much.

11        THE COURT:  Mr. Stevenson, would you stand, please.

12   Mr. Stevenson, pursuant to the Sentencing Reform Act of

13   1984 and, more particularly, having considered the

14   sentencing factors enumerated at 18, United States Code,

15   Section 3553(a), it is the judgment of the Court that you be

16   placed on probation for a term of three years.  This term

17   will be imposed on each count of conviction, each to be

18   served concurrently with the other.

19        It is further ordered that you pay to the United States

20   a fine of $5,000.  That shall be paid in a lump-sum payment.

21   It is due immediately.

22        While on probation you will comply with the following

23   terms and conditions:  You will comply with the standard

24   conditions adopted by the court and described at United

25   States Sentencing Guideline Section 5B1.3(c).  These will be

1    set forth in writing in detail in the judgment.

2         You will, of course, not commit any federal, state or

3    local crime, nor will you illegally possess a controlled

4    substance.  Again, the Court suspends all drug-testing

5    conditions on its determination that you present no risk of

6    substance abuse.

7         You are required by law to submit to the collection of

8    a DNA sample as directed by the Probation Office.

9         The following special conditions are imposed:  By law,

10   you are prohibited from possessing a firearm, destructive

11   device, or other dangerous weapon.

12        Six months of the probation period is to be served in

13   home detention with electronic monitoring.  You are to bear

14   the costs of such monitoring.

15        You will also perform 1,000 hours of community service

16   at a task deemed appropriate by the Probation Office and

17   approved by the Court.

18        It is further ordered that you also pay to the United

19   States a special assessment of $13,500, which, by operation

20   of law, is due immediately.

21        Will the clerk advise Mr. Stevenson of his right of

22   appeal.

23             THE CLERK:  Mr. Stevenson, you have the right to

24   file a Notice of Appeal in this case.  If you do wish to

25   file a Notice of Appeal, you must file it within ten days

PDF created with pdfFactory trial version www.pdffactory.com

1   from the date on which I enter the judgment.  If you cannot

2   afford an attorney to file the appeal on your behalf, you

3   may request me to do it, and I will file it in the Clerk's

4   Office for you.

5         THE COURT:  I will ask the Probation Officers if

6   I've omitted any part of the proposed judgment?

7         PROBATION OFFICER MARCY:  No, your Honor.

8         PROBATION OFFICER ORZE:  No, your Honor.

9         THE COURT:  Good luck, gentlemen, and I thank

10  counsel for their service on this case.

11      We will be adjourned.

12        THE CLERK:  All rise.

13     (Proceedings adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    **C E R T I F I C A T E**

2

3        I, James P. Gibbons, Official Court Reporter for the

4   United States District Court for the District of

5   Massachusetts, do hereby certify that the foregoing pages

6   are a true and accurate transcription of my shorthand notes

7   taken in the aforementioned matter to the best of my skill

8   and ability.

9

10  /s/James P. Gibbons                    June 2, 2010

11

12

13  _____

14  James P. Gibbons

15

16

17

18            JAMES P. GIBBONS, CSR, RPR, RMR
                    Official Court Reporter
19            1 Courthouse Way, Suite 7205
                  Boston, Massachusetts 02210
20                    (617) 428-0402

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com