# EXHIBIT P

81S7ARGS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              07 Cr. 683

5    CAROLE ARGO,

6                   Defendant.

7    ------------------------------x

8                                             January 28, 2008
                                              10:00 a.m.
9

10   Before:

11                        HON. JED S. RAKOFF
                                             District Judge
12

13                            APPEARANCES

14   MICHAEL J. GARCIA
          United States Attorney for the
15        Southern District of New York
     BY:  JOSHUA AARON GOLDBERG
16        DEIRDRE ANN McEVOY
          Assistant United States Attorneys
17
     PAUL ENGELMAYER
18   MATTHEW HOLMWOOD
          Attorneys for Defendant
19

20

21

22

23

24

25

81S7ARGS

1              (Case called)

2              (In open court)

3              MR. GOLDBERG:  Good morning, your Honor.  Joshua

4    Goldberg and Deirdre McEvoy for the government.  And with us at

5    counsel table is Ilunga Kolala, a paralegal in our office.

6              THE COURT:  Good morning.

7              MR. ENGELMAYER:  Good morning, your Honor.  Paul

8    Engelmayer and Matthew Holmwood for Ms. Argo.

9              THE COURT:  Good morning.  All right.  We are here for

10   sentence.  Let me first find out from defense counsel whether

11   his client has read and discussed with him the presentence

12   report.

13             MR. ENGELMAYER:  Yes, she has, your Honor.

14             THE COURT:  Are there any objections to the report

15   other than those set forth in your written submissions?

16             MR. ENGELMAYER:  There are not, your Honor.

17             THE COURT:  Are there any objections from the

18   government?

19             MR. GOLDBERG:  Your Honor, not an objection.  There is

20   a small error which is the government's fault with regard to

21   the restitution calculation that probation put forth; it's

22   contained in the sentencing recommendation.  You may have

23   noticed there is a slight deviation from the amount in the

24   government's brief and in the attachment.  The reason for that

25   is that in an earlier version which the government had provided

81S7ARGS

1    to probation and the defense the closing price was off by two

2    cents, and so that has been corrected and we have since given a

3    corrected copy to both probation and defense.  That is the

4    reason for the difference.

5             THE COURT:  All right, very good.  I caught what I

6    believe is an error at line 134 -- I'm sorry, excuse me --

7    paragraph 133, statutory provision for fines.  I believe that

8    the statutory provision for fines is set by 15 U.S.C. Section

9    78ff, and that would be $5 million, not as given here

10   $4,366,241.16.  Do both sides agree with that?

11            MR. GOLDBERG:  Yes, your Honor.

12            MR. ENGELMAYER:  Yes, your Honor.

13            THE COURT:  All right.  Very good.  So, the next thing

14   we have to do is calculate the guidelines.  But for any

15   departure, both sides are agreed that the total offense level

16   is 30, the Criminal History Category is I, and the guideline

17   range is therefore 97 to 121 months in prison.

18            The defense counsel has moved for a departure in light

19   of extraordinary family circumstances.  The prosecution has

20   opposed.  This court finds the issue to be of almost no

21   materiality because in post-*Booker*, post-*Gall* world the court

22   can give much more particularized attention to the issue of

23   family circumstances than it was permitted to do when the

24   guidelines were mandatory and where the courts were required to

25   set some fairly bright-line rules as to when extraordinary

81S7ARGS

 1    family circumstances would warrant a departure from the

 2    guidelines or not.  So, as far as I'm concerned it's an issue

 3    on which counsel should spend no more than about 30 seconds,

 4    but I will hear whatever either counsel wishes to say,

 5    beginning with defense counsel, that is to say, on the

 6    guideline aspect of it, not the underlying aspect, which of

 7    course we will want to spend some time on in a few minutes.

 8            MR. ENGELMAYER:  Your Honor, I don't want to overstay

 9    my welcome on this.  I think we said what we intended to say in

10    the briefs.  Suffice it to say that this is a defendant who

11    provides support not just tangible but emotional to a wide

12    circle of people.  I think the letters that chronical that are

13    impressive and will support a determination that this is an

14    extraordinary situation.

15            THE COURT:  Anything the government wants to say?

16            MR. GOLDBERG:  Your Honor, we will rely on our papers.

17            THE COURT:  All right.  I'm going to deny any

18    guideline departure because I think the history of the

19    guidelines in this area is they opened the door and then they

20    closed it in substantial measure.  The case law -- while it

21    certainly permits and it would be within my discretion in

22    granting such a departure -- has effectively limited the

23    circumstances that warrant a family departure under the

24    guidelines to circumstances even more compelling than might be

25    argued are Ms. Argo's situation.  But I'm going to take a full

81S7ARGS

1    account of this in my consideration of the sentence, and it

2    will come as no surprise to anyone that there is going to be a

3    nonguideline sentence in this case.  But the specific motion

4    for a departure is denied.

5            So, let's turn to the real issue, which is, what the

6    sentence should be under all the factors implicated by Section

7    3553(a).  And of course the guidelines are an important

8    component of that, and the court has carefully considered them.

9    The probation office recommends a nonguideline sentence of 55

10   months.  The government strongly hints that it does not believe

11   that a nonguideline sentence is unreasonable.  Do I read that

12   correctly?

13           MR. GOLDBERG:  I think that is a fair

14   characterization.

15           THE COURT:  OK.  But I don't want to get defense

16   counsel's hopes too high.  Barring something amazing that you

17   tell me now, there is still going to be some prison time in

18   this case.  The nature of the crime is too serious, lasted too

19   long, was too intentional, to not require some punishment, and

20   there is important general deterrence issues here as well.

21           Let's talk, however, first, about the area where there

22   is perhaps the biggest disagreement between the parties, which

23   is on the question of restitution.  I come at that issue

24   perhaps slightly differently than either side.

25           The probation office did not recommend a fine in this

1    case.  And, incidentally, there is some interesting issue what

2    the guideline range for a fine would be, but neither side

3    objected to the guideline range set by the probation officer at

4    paragraph 134 of her report.  But in terms of restitution there

5    is a major, major issue very fully briefed by the parties as to

6    whether the court can reasonably calculate what the loss was in

7    this case; and it's also, I think, noteworthy that in the long

8    list of shareholders who suffered losses presented by the

9    government as Exhibit 1 to their sentencing memorandum, the

10   vast, vast majority of individual human beings who suffered

11   losses under the government's analysis suffered losses of the

12   range, if one had to pick the medium, it looks like it would be

13   something like $60, $70.  There were big losses by mutual

14   funds, and institutional investors and those kinds of folks,

15   and I don't mean to minimize that.  This, of course, is

16   assuming the government's analysis that there was a loss

17   attributable to this defendant's conduct at all.

18           The probation officer recommended no fine --

19   notwithstanding a guideline range of $15,000 to over 4 million

20   and a statutory range, as we just established, that goes up to

21   5 million -- because of the probation officer accepting the

22   government's arguments as to what the substantial restitution

23   should be, namely on the order of over $2 million.  I have very

24   grave doubts, very grave doubts, that I can meaningfully

25   calculate the loss occurred in this case.  The nature of these

1    backdating situations, when coupled with all of the other

2    things that was going on with this company, introduces what

3    scientists call confounding factors that makes such a

4    calculation perhaps not reasonably possible.

5           But I have no doubt in my mind that a substantial

6    financial penalty in the form of a fine is appropriate here,

7    because when all is said and done this was a financial crime

8    motivated by the defendant's personal gains, but even more so

9    by what she saw as the benefits to her fellow executives, and,

10   therefore, independent of any prison term, some fine seems to

11   me to be totally appropriate if there is no restitution.

12          If there were restitution, the law is the restitution

13   takes precedence over the fine, and therefore you would have to

14   look at what even someone in Ms. Argo's position could

15   reasonably be expected to pay over the three years or so of

16   supervised release that is probably going to be imposed.  But

17   if there is no restitution, then a substantial fine would seem

18   to be in the cards.

19          So, this was not addressed, so far as I could see, by

20   either counsel, so now is your opportunity.  Let me hear first

21   from defense counsel.

22          MR. ENGELMAYER:  Thank you, your Honor.  In concept we

23   don't disagree of course that a fine is an appropriate part of

24   the deterrent in sentencing calculation here.  I would only ask

25   the court in thinking about what a fine should be, to take the

81S7ARGS

| | |
|---|---|
| 1 | following two things into consideration.  One is the payment |
| 2 | already by Ms. Argo to SafeNet.  And one thing I should have |
| 3 | and failed to do is to clarify the value that she went above |
| 4 | and beyond what might be appropriately called pro disgorgement. |
| 5 | THE COURT:  I'm going to interrupt you, because I |
| 6 | don't want to lose the thread.  I am aware of what you are |
| 7 | referring to there; it was set forth in your papers. |
| 8 | And I might take a moment to say that I thought the |
| 9 | submissions by both sides in this case were as fine as I have |
| 10 | ever seen in any sentencing.  They were really superb |
| 11 | submissions on both sides. |
| 12 | My understanding is that your own estimate is that if |
| 13 | this scheme had gone to fruition in its entirety, that your |
| 14 | client might have gained as much as $1.3 million.  Yes? |
| 15 | MR. ENGELMAYER:  The in-the-money starting value of |
| 16 | the options as granted to Ms. Argo was $1.3 million. |
| 17 | THE COURT:  And I understand that that wasn't all |
| 18 | realized.  She has made disgorgement of actual gains in excess |
| 19 | of actual gains.  What's the total amount of disgorgement she |
| 20 | has made? |
| 21 | MR. ENGELMAYER:  $236,000, your Honor.  That was |
| 22 | the -- |
| 23 | THE COURT:  So wouldn't an appropriate fine be about a |
| 24 | million dollars? |
| 25 | MR. ENGELMAYER:  Well, let me try to reset that a bit, |

81S7ARGS

your Honor.  She did several things.  She disgorged the value

of the head start, if you will, on the only backdated options

that she exercised.  That was a subset of the October 1, 2001

options.  She also repriced all of her other options so as to

strip out any backdating gain from the others.

        The point I wanted to make, which I think we failed to

make in our papers, was that she did something else which goes

well beyond disgorgement of gain.  For October 1, 2001 she

received a total of 45,000 options.  She exercised 18,500 of

them, leaving 26,500.  Even when one reprices those, so as to

get rid of any error in the measurement date, those were still

in the money, properly in the money, no backdating gain, of

about $267,000.  She forfeited those to SafeNet.  So, when one

looks at, if you will, some notion of expectation damages, or

putting her in the position she would have been in, she has in

effect in that respect overpaid voluntarily.

        THE COURT:  Sure.  But from the standpoint of a

fine -- which is to serve as punishment and deterrence -- one

normally thinks in terms of a multiple of what the defendant

intended to profit.

        So, for example, from the Sherman Act on down to today

a typical multiple has been treble.  So, if she intended to

make 1.3 million and one were to treble that, an appropriate

fine would be $3.9 million.  Now, I'm not inclined to go to

that level, but I think you're going to have a very hard time

81S7ARGS

1    convincing me it should be anything less than 1 million.

2         MR. ENGELMAYER:  Let me continue to try, if I may.

3    The point I was making here was that through her voluntary

4    actions -- unusual I think in I would hope in the court's

5    experience -- she has already incurred a punishment that had

6    she not done that would have been properly considered towards

7    the amount of her fine.  In effect she has out of her own

8    pocket, in order to resolve things with SafeNet, in exchange

9    for a mutual release, she has paid $267,000 more than she by

10   any measure actually gained.

11        In addition, as we pointed out in our briefs, she

12   acceded to a measurement date as to even the backdated options

13   that was more favorable to SafeNet than she might have argued.

14   Price Waterhouse, SafeNet's auditors, ultimately agreed with

15   the position Ms. Argo would have taken.  The point here being

16   that she has gone above and beyond, and I think that belongs in

17   the fine calculation.

18        But there are two other points I would like to make.

19   One is directly in response to your point.  I don't disagree

20   with the proposition of law that your Honor makes, but it is

21   important, I think, to view the offense in some context.

22        Unlike, for example, a typical fraud case or a typical

23   theft case where the putitive victim is unaware, this is a

24   grayer fact pattern here.  The compensation committee of

25   SafeNet was aware of the dates that were being used and the

81S7ARGS

1    prices that ran with them.  It's a separate issue of whether

2    they were aware that the accounting was inaccurate, and in that

3    respect this is probably cast as dominantly an information

4    offense.  But those who were authorizing the grants here

5    approved the dating.  It was on the unanimous written consents

6    for each of these grants.

7            So, in thinking about the gravity, if you will, of the

8    offense here, I don't think it's fair to analogize this to a

9    straight arms-length theft case.  I think primarily this is --

10           THE COURT:  No, I don't think it is analogized to a

11   straight arms-length theft case.  I think it was in fact far

12   more sophisticated.  And I am going to have many positive

13   things to say about Ms. Argo, as she well deserves, before this

14   morning is over, but someone with her accounting background,

15   someone who had been specifically told by auditors some of the

16   concerns, someone who even had a commonsense appreciation, as

17   I'm sure she did, that one doesn't artificially make up dates

18   when events didn't really occur unless one has some

19   circumstance in mind that one ought to be very sure is legally

20   solid before one goes down that road -- nothing that I have

21   seen will convince me that this was anything other than a

22   rather blatantly intentional misconduct.

23           MR. ENGELMAYER:  And I was not suggesting to the

24   contrary.  I was only suggesting that to the extent that the

25   focus is on "intended gain" there is a consent by the

81S7ARGS

1    compensation committee to the use of the date in question that

2    makes the primary offense here not the receipt of the gain but

3    the failure to properly account for it, and I think that

4    belongs in the --

5        THE COURT:  Now I understand your point.  That is a

6    fair point, and I will take account of it.

7        MR. ENGELMAYER:  The other point I would want to make,

8    your Honor, apart from the fact that she has gone above and

9    beyond in already making SafeNet much more than whole, and

10   apart from the distinct nature of the offense, is the

11   consequences of the fine.

12       We don't dispute that there is a deterrent value to a

13   fine, although I think we've made some points as to deterrence

14   in this case.  What I would want to point out is the

15   pass-through quality of the fine imposed here.  This is

16   different from your typical white collar case I think in that

17   there is no suggestion here -- the truth is quite to the

18   contrary -- that Ms. Argo lives a lavish lifestyle or exists to

19   finance many cars in a driveway or a fancy home or what not.  I

20   think you can see from the assembled record that the money she

21   obtains is being used for her children, for her sister Cynthia

22   and Cynthia's children, she is financing their educations, and

23   for a variety of other socially constructive things.

24       So, yes, to be sure a message of a hefty fine will in

25   some respects get out there and send a message --

81S7ARGS

```
 1              THE COURT:  But you see through her own misconduct she
 2     places me in the position of having to choose between evils.
 3              If I thought that by taking money from her in the way
 4     of a fine I was thereby impeding her ability to be helpful to
 5     others -- that's the argument you are making -- I would then
 6     have to consider instead should I increase the amount of prison
 7     time, because we need to have punishment somewhere.  Then you
 8     would say, oh, Judge, if you increase the amount of prison
 9     time, you are going to be impeding her efforts to be of service
10     to others, especially her children, but others as well.
11              So, the trouble I have with the combined arguments is
12     they push to no punishment at all, and that's not going to be
13     acceptable to the court.
14              MR. ENGELMAYER:  I understand that, your Honor.  I am
15     just suggesting that the currency here, if you will, has a
16     particular value in this situation.  A $25,000 fine, a $50,000
17     fine is not merely removal of next year's Mercedes; it's a
18     tuition fund.  So, I say that only in the sense that even a
19     marginal fine here, particularly with her husband being
20     unemployed, particularly with her limited earnings potential
21     for the foreseeable future, and given where the family money
22     goes, is going to have a wallop of an impact.  So, I would just
23     urge the court to think in a concrete way about the impact of
24     even a modest fine here.
25              THE COURT:  Let me hear from the government.
```

81S7ARGS

1          MR. GOLDBERG:  Your Honor, let me begin by saying we

2    do agree that there should be a substantial financial component

3    at a minimum to this sentence.

4          The court is correct we did not address the fine in

5    our brief largely because we were really focused on the

6    restitution aspect.  And we do agree that it is a difficult

7    case to set restitution, although we attempted to do our best

8    to estimate it.

9          THE COURT:  I thought the government's memo and its

10   approach throughout this case is an absolute model of fairness.

11   I have had occasion in other sentencings to be critical of the

12   government, to feel they lost sight of the balance of the very

13   human aspects that a case like this involves.  I cannot say

14   that here.  I commend the government for a very balanced

15   approach and I agree with what you just said.

16         MR. GOLDBERG:  We appreciate the kind words, of

17   course, your Honor.

18         THE COURT:  It only comes from me about once every 12

19   years or so.

20         MR. GOLDBERG:  I think it's the first time I have

21   gotten it.

22         THE COURT:  OK.

23         MR. GOLDBERG:  Your Honor, I don't want to walk away

24   from the restitution argument, although given your Honor's

25   questions, I do want to focus on the fine aspect.

81S7ARGS

1          Just briefly, I don't know the intricacies of the

2    settlement that Ms. Argo had with SafeNet, so I can't speak

3    exactly to what it was.  However, as your Honor noted, the

4    purpose of a fine is more than to compensate the aggrieved

5    party.  There is a punitive aspect to the fine, and it does

6    seem like that's different than what may have been encompassed

7    in the settlement that Ms. Argo reached with the company.

8    Again, I believe if you look at the way that was calculated, it

9    was meant to make the company and the shareholders whole to the

10   extent that that could be done.  So, I think it is different

11   than what your Honor is talking about with regard to the fine.

12          I do want to address just one point Mr. Engelmayer

13   made, it's a factual issue, and I do want to just make clear

14   when Mr. Engelmayer says that the compensation committee at

15   SafeNet was aware of both the dates and prices on these

16   options, that is true in most instances; however, there was a

17   key component that the compensation committee was not aware of,

18   which is how Ms. Argo and the others were selecting the dates.

19   So, there was an aspect, an important aspect of deception

20   towards both the compensation committee and to the shareholders

21   who were seeing something very different in the public filings.

22          THE COURT:  I think that's a point well taken.  I

23   think the more general point is I don't see -- and I am not

24   taking Mr. Engelmayer to suggest -- I don't see how Ms. Argo

25   can pass the buck on this to anyone else.  She was the

1    centerpiece of this particular misconduct, and there is no two

2    ways around that.  But I take your point as well.

3              MR. GOLDBERG:  And didn't hear Mr. Engelmayer to be

4    trying to pass the buck, but I did want to point out that there

5    is a distinction between I think what he said and what the

6    compensation committee members would have testified to if this

7    case had gone to trial.

8              Your Honor, I don't have much to add beyond that.  We

9    did do our best to try to calculate the harm.  And whether

10   that's dealt with by the court in terms of restitution or a

11   fine, I believe that's within the court's discretion.  But we

12   do think that the amount we came up with is in many ways

13   conservative.  It was cautious, but we do believe it's an

14   appropriate measure of the harm here.

15             THE COURT:  I commend the government on attempting to

16   come up with a measure in a fact pattern that did not easily

17   lend itself to a determination of loss.  There have been many

18   cases where I have been able to calculate loss even in cases

19   involving securities fraud, but this is different for reasons

20   that the defense submissions make plain.  And I thought the

21   expert report submitted by Ms. Stam in support of the defense's

22   position was quite persuasive in many respects.

23             I think in the end, not that there was necessarily no

24   loss, but that the calculation of the loss on this record is

25   impossible.  I do not forgo -- or I do not gainsay the

81S7ARGS

1    possibility that we could have months of testimony, a Fatico

2    hearing that Dickens could, if he were alive, write about in

3    Bleak House and finally come up with a number.  That would not

4    be a provident use of anyone's resources.

5         I do, however, believe that a strong message has to be

6    sent through the financial side of this sentence and not just

7    through any imprisonment side.  And on any analysis of

8    deterrence in a crime that is totally an economic crime and one

9    that occurred over a substantial period of time, among very

10   sophisticated people at high levels, a fine of anything less

11   than a million dollars would I think not send the appropriate

12   message.  So, I'm not making any determination until I hear

13   from everyone finally, but my strong inclination at the moment

14   is to impose no restitution and to impose a million dollar

15   fine.

16        Now let's go to the question of imprisonment.  The

17   guideline range is something like nine to ten years'

18   imprisonment.  To me this just speaks volumes about why the

19   Supreme Court's decisions in *Booker* and *Gall* are monumentally

20   wise decisions.  We have here a woman who has in so many

21   respects led a more than admirable life.  The many, many

22   letters I received attest to this, but the unquestioned,

23   undisputed facts attest to it.

24        I thought the government in the next-to-last page of

25   its brief, going over to the final page, really summed it up

1    pretty well.  They say beginning at the bottom of page 24 of

2    their memorandum, "On the other hand, the government concedes

3    that Argo has presented the court with a compelling portrait of

4    a woman who excelled in both her professional and personal life

5    and who gave generously of herself to her family, friends,

6    coworkers and community.  In many ways the image presented by

7    the defense is incongruous with the crime Argo committed, and

8    the government has no reason to believe Argo will commit

9    further crimes in the future."

10          The notion that because the backdating scheme here

11    involved -- which while unquestionably serious pales in

12    comparison with some of the financial frauds that have been

13    before this and other courts in recent years -- would send to

14    prison for nine or ten years "a woman who excelled in both her

15    professional and personal life and who gave generously of

16    herself to her family, friends, coworkers and community" is to

17    my mind a testament to why on the facts of this case the

18    guideline range is unreasonable.

19          So, the issue is what is a reasonable sentence,

20    keeping in mind also the statutory requirement of Section

21    3553(a), that "the court shall impose a sentence sufficient but

22    not greater than necessary to comply with the purposes set

23    forth in paragraph 2 of this subsection," and those include, of

24    course, the various punishment and deterrence factors that are

25    a necessary element of any sentencing.

81S7ARGS

1          The probation office recommends a sentence of 55

2     months, half or less of what the guideline range is, but that

3     still seems to me to be far more than is necessary to comply

4     with the purposes set forth in 3553(a).

5          At the same time, factors of general deterrence alone,

6     along with other factors set forth in 3553(a) would compel

7     prison time in this case, real prison time, not a home

8     confinement, not a halfway house, but real prison time.  So,

9     the court is thinking of a sentence somewhere in the range of

10    six to 12 months.

11         So, of course I'm happy to hear arguments on anything

12    anyone wants to say, but I thought it might be useful to have

13    the benefit of the court's preliminary views in that regard.

14    So, Mr. Engelmayer, you are on first, and then the government,

15    and then I will hear from your client if she wishes to be

16    heard.

17         MR. ENGELMAYER:  Sure.  Your Honor, I promised you

18    that I wouldn't repeat our memo, and I won't.  There are four

19    points I wants to make, and I will be brief, and I will focus

20    them on what you just said.  Before I do though, I just wanted

21    to draw your court's attention to what is obvious, which is

22    that a large number of Carole's family and friends and former

23    coworkers from SafeNet are here today.  We didn't ask them to

24    come.  Quite the contrary, they wanted to come to support

25    Carole and organized themselves to do so.  Carole's husband,

81S7ARGS

1    her brother, her sister, her in-laws, Steven's uncles and his

2    aunt are here.

3            THE COURT:  Well, many of them, if not all of them,

4    have written letters which I have read very carefully, and it's

5    as much because of them as anyone that I am only at least

6    tentatively considering a sentence in what to my mind is an

7    extraordinarily low level; although I thought the single two

8    best letters -- they were all terrific -- were those of

9    Ms. Argo and her husband.  But in any event, go ahead.

10           MR. ENGELMAYER:  What I wanted to draw out just also

11   is that obviously there are a number of her friends here,

12   including Jennifer Brown, whose I think remarkable letter you

13   read.

14           There are also I think significantly 12 to 15 -- and

15   it may turn out to be more -- of her colleagues from SafeNet.

16   That includes the company's president, Chris Fetti; its general

17   counsel, Kevin Hicks; one of its directors, or former

18   directors, Shelly Harrison; and the large majority of the

19   executives team.  SafeNet rescheduled a global sales meeting to

20   enable many of these people to come to what would have been the

21   original sentencing date, and people have inconvenienced

22   themselves to come here today.  As your Honor is aware from the

23   various hats you've worn, often in this type of situation a

24   company will try to wash its hands of the former employee and

25   treat them as persona non grata.  Not so here.  The fact that

81S7ARGS

1    so many people voted with their feet and came up with from

2    Maryland to be with Carole today I think says something about

3    her overall contributions to the company and more about just

4    the lives that she touched there.

5          The first point I want to make bearing on the

6    appropriate sentence here relates to the unusual extent to

7    which Carole accepted responsibility.  I won't restate our

8    papers, and I have already captured the additional factoid I

9    wanted to give you about her having paid more than was needed

10   to disgorge or make SafeNet whole.

11         The point here is that while the purpose was not

12   intended as punitive in a judicial sense, the effect visited on

13   Ms. Argo is much the same monetarily, and I was urging the

14   court to take that into account in fashioning the right amount

15   of a fine.  Had she not paid that extra $267,000 and acceded to

16   the more demanding measurement date calculation, a greater fine

17   would be in order than what one would otherwise impose, and we

18   ask the court to think about it, if you will, as a form of an

19   offset that has already come out of her pocket voluntarily.

20         The other point relating to acceptance that I wanted

21   to underscore that has a new dimension involves her work for

22   Family Tree.  That's the anti-child abuse, anti-child neglect

23   charity in Baltimore, and we made the point in our sentencing

24   papers that she has stepped up her involvement in that as a

25   result of having the time to do so.

81S7ARGS

1         We have since reached out to Family Tree's executive

2   director in the hope that the court might be inclined to impose

3   as part of her sentence some form of community service.  The

4   executive director has confirmed that Family Tree would be

5   thrilled to put Carole to work there.

6         THE COURT:  I understand your reason for making that

7   argument, but unless I have been totally deceived as to the

8   kind of human being Ms. Argo is -- and I don't believe I

9   have -- Ms. Argo will perform community service, as she has in

10  the past, whether this court orders her to or not.  In some

11  ways, to be frank, I think it would be an insult to order

12  community service in this case, because I expect that she will

13  do that.  And I take account of that aspect of her personality

14  in suggesting that the sentence should be at such a low level

15  as I do, but it is no substitute for prison at that low level.

16        MR. ENGELMAYER:  I thoroughly agree with you, having

17  gotten to know Ms. Argo, that she would do this voluntarily,

18  but to the extent the court is thinking about the message that

19  may be sent, to the extent that may blunt or offset some prison

20  time, we would welcome it.

21        THE COURT:  OK.

22        MR. ENGELMAYER:  The second point I want to make

23  involves the heavy price that Carole has already paid as a

24  result of her offense, and frankly will now pay if the court's

25  intentions with respect to a fine stay anywhere near what you

1    have indicated.

2            THE COURT:  My intent, by the way, with respect to the

3    fine, if I impose that, would be to give her three years to pay

4    it back.  It would be over the life of the supervised release

5    period.  I only mention that because no one really can predict

6    what her financial situation will be a year from now or two

7    years from now.

8            MR. ENGELMAYER:  I do want to speak to that, but let

9    me just say though in terms of the range of price she has

10   already paid, this is a person who started from ordinary

11   beginnings, eventually wound up at SafeNet.  It was her dream

12   job.  She loved the job, the people, she was proud of her

13   contribution she made.  I think that comes across in the

14   letters that others write.  And at age 45, as a result of

15   nothing other than her own conduct, she lost that job, but that

16   has consequences.

17           She hopes obviously to eventually return to the work

18   force, and that's because she is committed to funding a quality

19   education for her children and being a supporting, in effect,

20   surrogate parent for her niece and nephew who are living in a

21   house without a bread winner at this point.

22           But job-wise, given that she is going to forever have

23   the scarlet letter of a felony conviction, as a practical

24   matter her sights are going to have to be set low, and there is

25   a high degree of unpredictability.  A job at a place like

81S7ARGS

1    Family Tree is more realistic than the sort of job that could

2    yield substantial income.

3         THE COURT:  Yes, but again just so we are all on the

4    same page, if I impose a million dollar fine that's not paid in

5    three years -- and I would waive the interest component for

6    that three-year period.  She would then be required, if she

7    hadn't paid it, or hadn't paid a certain portion of it, to

8    enter into a confession of judgment for the remainder which

9    would have interest, so she would have a motive to pay it off

10   sooner rather than later.  But I'm not inclined to, and I don't

11   think the law permits me, to expect the impossible in terms of

12   payment, so it will be flexible in that respect.

13        MR. ENGELMAYER:  I'm suggesting that the spirit may be

14   willing and the flesh may make it impossible, your Honor.  I

15   think you can't get blood from a stone.  There is money there,

16   but a million dollars way exceeds what is conceivably on hand,

17   is going to become on hand in three years.  We have a convicted

18   felon and an unemployed husband and three children.

19        THE COURT:  What you have is two very talented

20   individuals, with an immense number of folks from all walks of

21   life who can attest to any prospective employer -- as they have

22   attested to me -- how lucky they would be to have Ms. Argo as

23   an employee.  And there is no reason to believe her husband

24   won't gain future employment as well.  But I know less about

25   him.  But just dealing with her, you may be right, it's

81S7ARGS

1    certainly not going to be easy for her to find employment at

2    the level that she was at, but I'm not quite as skeptical as

3    your argument would want me to be.

4              MR. ENGELMAYER:  Well, I hear you.  I mean my point is

5    only that the wallop that the family will feel at a fifth of

6    the fine is going to be much the same.  There is just not that

7    much money there, and the earning capacity is --

8              THE COURT:  It's designed to be punishment.

9              MR. ENGELMAYER:  I understand, and I'm respectfully

10   submitting that it is a hefty punishment even at a lower

11   fraction.  Obviously we agree with your fundamental premise

12   that as between the offset of a fine and imprisonment, we will

13   take the fine.  Her emotional connections to all of these

14   children take priority.

15             THE COURT:  By the way, I wasn't meaning to suggest --

16   and I may have come out -- that there is some kind of offset in

17   any measurable sense.  Simply one has to look at the overall

18   impact of both fine and imprisonment in seeing that one arrives

19   at a sentence that is sufficient but not greater than

20   necessary, and therefore inevitably if a fine is more, prison

21   may be less, and if prison is more, the fine may be less.  But

22   it's not like there is some sort of mathematical equation

23   there.  Only the guidelines deal in mathematical equations, and

24   you know what I think is the result.

25             MR. ENGELMAYER:  I accept the point that there is an

81S7ARGS

1   inverse relationship between the two, or there is a

2   relationship.  The point here is just that a substantial fine

3   here is a millstone for life, and a life where the money is

4   being used for others, and therefore I'm submitting that if the

5   court is going to stick to its current intention of having a

6   fine that is high six or seven figures, that is, if I may, at

7   least sufficient if not more to achieve the deterrent purposes.

8              Also, just in terms of the price she has paid, there

9   is a pending SEC investigation; we hope to resolve that as soon

10  as sentencing is over.  We have been waiting frankly to see the

11  outcome here.  There is a putitive class action in front of

12  Judge Crotty, and as noted in our papers, and I won't restate

13  them, in her relatively small community of Baltimore, all

14  things being relative, she has suffered significant reputation

15  damage and to her credit has held her head up.  Our view is all

16  these things are sufficient to deter and communicate and

17  punish.

18             The third point I wanted to make -- and I won't

19  restate what we said in our briefs -- involves disparities with

20  other cases which thankfully after *Booker* and 3553 are a fair

21  point for the court to consider.

22             In our briefs we compared and contrasted this to the

23  five cases that have thus far reached sentencing, and we have

24  attempted to show why relative to the two that yielded prison

25  time, both in terms of the offender and the offense, the facts

81S7ARGS

1    here are materially more favorable.  We stand by that.

2         THE COURT:  Yes.  Well, I'm not unpersuaded by that,

3    which was a factor in the range that I suggested, because Judge

4    Breyer -- not to be confused with Justice Breyer, because Judge

5    Breyer holds a more important position -- gave 21 months to the

6    backdater in his case, and I think the other one was a year and

7    a day with Judge Karofolis, and so I think those are important.

8    It was one of the reasons why I thought the 55 months suggested

9    by the probation officer, while a move in the right direction,

10   was still quite excessive in comparison with other cases.

11        MR. ENGELMAYER:  And I guess my submission there would

12   be that with respect to the Reyes case, once you strip out the

13   obstruction, the lack of acceptance and the sheer scale of the

14   thing, putting entirely aside the positive aspect of Ms. Argo,

15   which I will say Mr. Reyes can't touch, it seems to me at that

16   point just doing the guidelines math as a rough measure of the

17   significance of each with those mitigating facts, you are well

18   into noncustodial territory.

19        with respect to Sorren, again a much greater personal

20   gain, much larger misstatements.  While there were charitable

21   contributions, again we will stack up her record.

22        And maybe if I may, then there are the state cases --

23   and I understand it's a different system, and so they maybe get

24   less weight, but they are not irrelevant, and there are three

25   probationary sentences with a company where the facts are

81S7ARGS

1    frankly statistically much more garrish.

2            THE COURT:  Well, as always, Mr. Engelmayer, you have

3    rightly put the Brady material up front.  It's a state system,

4    a state sentence, and regretfully, for reasons that we don't

5    have time to explore, the sentences there tend to be less

6    weighty in terms of how they would impact a federal court,

7    so...

8            MR. ENGELMAYER:  Let me try my hand then at a slightly

9    broader disparity point, which is that there was I think value

10   in widening out the prison beyond the few case of this nature

11   that have been prosecuted.  This whole backdating scandal began

12   in March of 2006 when The Wall Street Journal published an

13   article called "The Perfect Payday," and exposed the prevalence

14   of intentional backdating.  I can personally vouch for the fact

15   that this has been an intense focus of prosecutors and

16   regulators across the country.  Since then there have been, you

17   know, many, many investigations of corporations and individuals

18   that have been opened, there have been 150 to 200 or more

19   restatements, there have been many enforcement actions, there

20   have been very few prosecutions.  In any given case it's fair

21   to say that this may have been a function of the evidence, for

22   example the absence of a really smoking gun terrible e-mail,

23   and we accept that those are the breaks.  In others it's safe

24   to say that discretion was probably being exercised in view of

25   the nature of the offense.  That's not, you know, a complaint.

81S7ARGS

1    Carole accepts responsibility for what she did here.  But I do

2    think it is at least relevant that the fact that almost all

3    cases of this nature have been resolved by means short of

4    criminal prosecution has at least some relevance in the

5    disparity analysis.  I won't overstate the case beyond that,

6    but I think it's not irrelevant.

7            THE COURT:  I agree.

8            MR. ENGELMAYER:  And the fourth and final point, and

9    by far the largest, is something that you and to its credit the

10   government have already alluded to which is the totality of

11   Carole's life, and the many contributions she has made to

12   others, and continues to make to others, and under any

13   circumstances will make to others, which was the foundation of

14   the departure motion.

15           She made a very bad mistake, she has paid for it, she

16   is clearly going to keep paying for it; but that mistake, you

17   know, ought to be viewed against the backdrop of an otherwise

18   exemplary life.  I can't say it any better or even nearly as

19   eloquently as the 110 letters we submitted, which speak for

20   themselves.  I do think there are an extraordinary, in my

21   experience, outpouring.  They are a remarkable testament to the

22   quality of person she is.  This is a giving person who in time

23   energy and money gives to others.  This is not a person who is

24   living life large.

25           Let me conclude just on a personal note which is --

81S7ARGS

1      THE COURT:  I also should say that I have not made

2   reference to it because I think there are privacy interests

3   that need to be adhered to, but there are aspects of the

4   family's circumstances that also argue for less incarceration.

5      MR. ENGELMAYER:  Thank you, your Honor.  Just on a

6   personal note, as of the time that Carole pled guilty, even

7   though we had spent a lot of time with her, I don't think any

8   of our team had any clue about the extent of her good deeds.

9   This was not something she volunteered.  She was way too modest

10  to have ever advertised it.  And we were I think blown away is

11  not too strong a word, just to get a sense of the sheer range

12  of good works that she has done, you know, epitomized most

13  dramatically by her help for the Browns, and really across the

14  boards dozens and dozens of goods acts.

15      This is someone I have come to see as a supremely

16  decent and empathetic person who quietly and consistently

17  performs acts of grace and goodness for no other reason than

18  she has been brought up to believe that this is the way a

19  person behaves, it's the right thing to do.  We hope you will

20  see that side of Carole in deciding on a just sentence.  That's

21  where I was going to wrap up, but let me just add something.

22      If your Honor -- we continue to believe that this is

23  the rare white collar case where a probationary sentence,

24  particularly given the fine you are talking about, would amply

25  satisfy the 3553(a) factors, so what I am about to say, please,

81S7ARGS

shouldn't be taken as taking away from that.  But if your Honor

concludes that some sentence needs to be imposed of jail time,

we did speak about this with Carole and tried to figure out, if

there was a sentence, whether there was a time frame or a

window that at least would minimize the burden on the family.

What we came up with was that during the window of three months

during the summer, roughly June 7 through Labor Day, there is a

possibility of at least merging the two families, Cynthia's and

Carole's, such as if Steven is off job hunting, Cynthia can

keep the lose ends together.  It's a way of minimizing the

damage.  I don't know if your Honor has the appetite for it,

but that is a possibility.  Under any circumstances if there is

a way for the sentence not to span into the next school year,

that would be of particular value to the family.

        THE COURT:  Very good.

        MR. ENGELMAYER:  Thank you.

        THE COURT:  Thank you.  Let me hear from the

government.

        MR. GOLDBERG:  Your Honor, I am going to be brief,

because we did try to put everything relevant in our papers.  I

do want to point out, you know, notwithstanding the concessions

we have made.  As your Honor correctly pointed out before, this

is a serious offense, and it is a serious --

        THE COURT:  Yes, I think I need to read into the

record the other half of the penultimate portion of your memo,

81S7ARGS

1   because I think it's what you are about to allude so, and I

2   thought it was well taken.

3          "This was a serious offense that was neither

4   short-termed nor impulsive.  This was a long-running scheme in

5   which Argo played a central role and stood to gain millions of

6   dollars if the scheme had not been disclosed.  Argo is a

7   certified public accountant who received guidance from

8   SafeNet's auditors and who knew that the backdating scheme was

9   wrong."  So, I think that's essentially correct.

10         MR. GOLDBERG:  And so the government, as we said in

11   our papers, we do not take a position on the sentence, but we

12   do think whatever sentence the court imposes should reflect

13   that, as it must under 3553(a), the seriousness of the offense,

14   and along with all the other good things that have been brought

15   out by the defense.

16         In terms of sentencing disparity, I don't want to get

17   into this, and I don't want it to become a big dispute.  Just

18   two brief points.

19         First, as I think your Honor pointed out and

20   recognized, the analogy to the state sentences, I believe there

21   is Second Circuit case law that talks about that really the

22   sentencing disparity analysis looks at similarly situated

23   defendants within the federal system.  There is lots of good

24   reasons why that's the case.  You really can't have a system

25   where district court judges in 50 different states are applying

81S7ARGS

1   a different standard.

2           THE COURT:  It's not only that.  It's that in the

3   state courts they are confronted with challenges and

4   difficulties and problems, no matter which way they go, that

5   are fortunately for us and unfortunately for them of a

6   magnitude not even remotely confronted by federal courts, so

7   it's a different ballpark all together.

8           MR. GOLDBERG:  And, your Honor, the only other

9   sentencing disparity issue I wanted to address with regard to

10  the Reyes case, which is the Brocade case in California by

11  Judge Breyer, there certainly are similarities in terms of the

12  offense conduct; there, however, two distinguishing factors

13  that I think the court should be aware of, and you probably are

14  aware of, but I feel we should put it on the record.

15          The first is that the guidelines range to begin with

16  in that case was substantially lower for reasons related to

17  loss.  This is not to say that we are urging a guideline

18  sentence necessarily.  But in assessing the 3553(a) factors,

19  one factor is the guidelines, and that's certainly a starting

20  point.  And the starting point in this case is much, much

21  higher than Reyes, largely because of the loss.  In part that

22  was because my understanding of that case -- and I don't

23  pretend to be an expert in that case -- but my understanding is

24  there was no proof offered by the government in that case that

25  Mr. Reyes himself had ever received any options.  This was a

1    situation where Mr. Reyes I believe as the CEO of Brocade was

2    involved in a scheme but it was a scheme to give others at the

3    company backdated options.  That is different than here where

4    Ms. Argo was one of the chief beneficiaries of the scheme and

5    would have been one of the chief beneficiaries, perhaps not at

6    the level of the former CEO, but it is a distinguishing factor

7    from Reyes.  Again, I'm not raising that to --

8          THE COURT:  Yes, the actual sentence there would have

9    been 15 months, not 21 months, as I understand it, but for the

10   quote obstruction.

11         MR. GOLDBERG:  I think that's right.  Now, Mr. Reyes

12   did go to trial, he did not accept responsibility, so there are

13   distinguishing factors which are to Ms. Argo's credit.

14         Beyond that, your Honor, we agree with what you have

15   said.  We believe there are many factors cutting both ways.  We

16   do believe that it's a serious offense, and we do believe that

17   there are many commendable things that Ms. Argo has done in her

18   life.

19         THE COURT:  Very good.  Let me hear from Ms. Argo if

20   she wishes to be heard.

21         THE DEFENDANT:  Your Honor, I spent my entire life

22   trying to be a person of good character, and that's why I'm so

23   sorry that my actions have caused harm.

24         I truly loved working for SafeNet, working with my

25   colleagues and building a successful company.  I'm so thankful

81S7ARGS

1    for the support of my colleagues, and I deeply regret that we

2    cannot work together to continue the success that we worked so

3    hard to achieve.  It means more than I can express that I have

4    my colleagues here and my friends here to show me support.

5         I especially want to apologize to my family and my

6    friends for letting them down and causing so much pain.  I've

7    tried to set a good example for my children, and I'm trying to

8    do so here also, and really teaching them that when a person

9    makes a mistake that you have to accept responsibility, and I'm

10   definitely doing that.

11        Again, I'm just very sorry for what I did, the mistake

12   I made, but I know that as good a life I tried to live, I know

13   I'm going to live a better life.  I've learned from this, I

14   truly have.  And again my apologies to everyone that was harmed

15   by this.  Thank you.

16        THE COURT:  Thank you.  The vice in so much sentencing

17   in white collar cases today is that the public has been so

18   rightly outraged by the misdeeds of cases like WorldCom and

19   Enron and the need to put an end to that kind of extraordinary

20   misconduct, that the public and Congress, and I should say the

21   courts, have not always been able to focus on the

22   particularities of individual cases and individual defendants

23   in the way that they should, in the way that the Supreme Court

24   requires.

25        This is a serious crime but it's not an Enron, it's

1   not a WorldCom, it's not anything like that, and it does not

2   bespeak, for lack of a better word, the evil that was so

3   transparent once those cases were exposed, the hypocrisy, the

4   connivance of innumerable persons inside and outside those

5   companies in the most despicable kinds of frauds.  This is

6   nothing like that.  But that doesn't mean that it wasn't a

7   serious offense.  It was.  It was a knowing, intentional,

8   prolonged course of misconduct, and that's why my heart goes

9   out to Ms. Argo and to her many supporters.  There has to be

10  some general deterrence exercised in a case like this.

11         Ms. Argo is the sort of person who most people would

12  rightly admire in so many ways, is the sort of person who most

13  people would rightly want to be their friend and their

14  colleague.  She is in that sense worlds apart from the kinds of

15  defendants that I was alluding to a few minutes ago, but she

16  also was willing when push came to shove to break the law, to

17  at least put at some incalculable risk the welfare of investors

18  and shareholders, to create statements of fact in effect that

19  were false, and to act in a way that was wholly out of keeping

20  with her own values, let alone those demanded by the court and

21  by the rule of law.

22         So, from the standpoint of Section 3553(a) and the

23  factors implicated by that -- all of which I have very

24  carefully considered -- both general deterrence and punishment

25  mandates some prison time in this case.  But general deterrence

1   is such a difficult thing to quantify, and a court must always

2   be careful not to punish a human being solely for symbolic

3   effect.  In the court's view, any prison time beyond the modest

4   levels that the court has already indicated it was thinking of

5   would be simply pandering to abstract ideologies and symbols as

6   opposed to having any real incremental deterrent effect.  So, I

7   have struggled a great deal with this sentence.  Counsel to

8   their credit have made my job no more easy today.

9          I think in the end I am persuaded that a six month

10  sentence is the right sentence.  So, the sentence of the court

11  is that the defendant will be sentenced to six months in

12  prison, to be followed by three years of supervised release, on

13  terms I will get to in a moment.  I am also convinced, for

14  reasons I have already elaborated, that a fine of $1 million is

15  called for, and that will also be imposed on conditions I will

16  get to in a moment.  Restitution, as mentioned, will be zero,

17  based on the court's finding that it cannot calculate and it

18  would be virtually impossible to calculate meaningfully

19  restitution in this case.  There is, however, a $100 mandatory

20  special assessment that has to be paid.

21         The fine will be paid at the rate of 15 percent of

22  Ms. Argo's gross monthly income, beginning with the second

23  month following her release from prison, and, therefore, it

24  will take account of the problems that defense counsel had

25  raised.  If it is not fully paid at the end of three years --

81S7ARGS

and that of course is quite possible -- the defendant will then

enter into a confession of judgment for the remaining balance.

No interest will be imposed during the three-year period, but

there will be interest at the normal federal rate on the

balance that is the subject of any confession of judgment.

With respect to the terms of supervised release, they

will include the mandatory conditions that the defendant not

commit any other federal, state or local crime; that the

defendant not illegally possess a controlled substance; that

defendant not possess a firearm or destructive device; and that

the defendant cooperate in the collection of DNA.  The fifth

mandatory condition, the drug testing condition, is suspended

based on the court's determination that the defendant poses a

low risk of future substance abuse.

There will also be imposed the standard conditions of

supervision 1 through 13.  They appear on the face of the

judgment, and will be gone over with the defendant by the

probation officer when the defendant reports to begin her

period of supervised release.

Finally, there are the special conditions, first, that

the defendant shall provide the probation officer with access

to any requested financial information; and, second, that the

defendant is to report to the nearest probation office within

72 hours of her release from custody, and she will be

supervised by the district of her residence.

81S7ARGS

1          Now, before I advise the defendant with respect to

2     appeal, let's deal with any other outstanding matters.

3          First of all, let me ask the government, are there any

4     open counts?

5          MR. GOLDBERG:  There is.  The government would move to

6     dismiss the outstanding counts, which in this case is Count One

7     of the indictment.

8          THE COURT:  That motion is granted.

9          MR. ENGELMAYER:  Your Honor, I have one application

10     and one informational question.  With respect to the

11     application it is this:  Your Honor has imposed a six month

12     sentence.  For reasons that are set out I think in full in the

13     various letters there is a particular inconvenience,

14     particularly given the older son's issues, to having this span

15     into the second school year, the one that begins shortly after

16     Labor Day.  The application I would make would be, given the

17     reality that a surrender would probably be set about 60 days

18     from now, on or about late March, early April, could your Honor

19     see clear to having a five month sentence so she would be back

20     on or about Labor Day?

21          THE COURT:  Well, I agree she should be back on or

22     about Labor Day.  I think the way to solve that is by arranging

23     with the Bureau of Prisons for a speedier designation.  I don't

24     think it takes 60 days.  I think it takes in the normal course

25     45 days, and I think that can be expedited to be as little as

81S7ARGS

1      30 days.

2              But why don't we do this:  What is the date she would

3      have to surrender to meet the schedule that you are talking

4      about?

5              MR. ENGELMAYER:  Your Honor, having conferred with

6      Ms. Argo, and given the importance of having the last Easter

7      together with the family, I will withdraw the request and hope

8      that the surrender date winds up falling shortly after Easter.

9              THE COURT:  Well, then I'm happy to give you within

10     limits any surrender date you want.  We ought to fix that now.

11             MR. ENGELMAYER:  One second, your Honor.  In the

12     meantime maybe I will ask the other question, which is a

13     product of my limited experience with the confession of

14     judgment.  But on the assumption that there is a large amount

15     of the fine as yet unpaid as of the end of the three years

16     supervised release, how does that work?  Would the money to be

17     paid pursuant to the confession of judgment be a proportion of

18     income?  Or would it then --

19             THE COURT:  Well, the short answer is that there is a

20     whole -- and I am surprised you didn't know that there is a

21     whole little unit at the U.S. attorney's office that works this

22     out.  I know that's in the civil division, and I know you

23     probably therefore never had any contact with it, but they work

24     out terms, and they are usually worked out consensually without

25     any intervention from the court, so they take account of -- no

81S7ARGS

1    one really knows what her circumstances will be three years

2    from now, so it makes no sense to work out the further terms at

3    this point, but my experience is the U.S. attorney's office is

4    very reasonable in working out appropriate terms in that

5    connection.

6          MR. ENGELMAYER:  I mean our hope would be that any

7    such payment would be measured as an offset of future income

8    rather than coming out of what assets there are.

9          THE COURT:  And, you know, usually it is, but I'm not

10   going to mandate that.  I mean, you know, if there is a

11   problem, both you and the U.S. attorney's office are invited to

12   come to the court at that time, but frankly I can only remember

13   like one case in 12 years where there has ever been a problem.

14         The U.S. attorney's office, you know, they're very

15   grateful to get anything.  This has nothing to do with fines,

16   but there is now outstanding over $2 billion in uncollected

17   restitution by the U.S. attorneys.  Most of this traces back to

18   the mandatory provision, both guideline and statutory, where

19   you have, for example, a low level person in a huge narcotics

20   conspiracy or a huge Hobbs Act robbery conspiracy, someone who

21   will never in his or her life make anything because they are

22   either going to spend it in prison or they're going to spend it

23   as a welfare case, but they have the normal $10 million

24   restitution mandated by Congress.  It's these things that

25   really make you proud to be an American.  But anyway it will be

81S7ARGS

1    worked out.

2            MR. ENGELMAYER:  That's helpful, because I know a

3    concern would be whether those assets which already exist will

4    be touched, and I understand from your Honor's sentence that

5    during the period of supervised release the fine is solely paid

6    out of future earnings.

7            THE COURT:  Exactly.

8            MR. ENGELMAYER:  And there is reason to expect that is

9    likely to persist.  Let me just confirm the date.  We would

10   recommend, your Honor, a March 25th surrender date.

11           THE COURT:  All right.  March 25 is fine.

12           MR. ENGELMAYER:  And we respectfully urge or ask the

13   court to recommend that she be assigned to FPC Alderson in West

14   Virginia, which I understand is the nearest minimum low

15   security women's facility.

16           THE COURT:  I can't order it but I can certainly

17   recommend it.

18           MR. ENGELMAYER:  Thank you, your Honor.

19           THE COURT:  There was a waiver of appeal in this case?

20           MR. GOLDBERG:  There was, your Honor.

21           THE COURT:  So, Ms. Argo, under your agreement with

22   the government you have agreed not to appeal this sentence.

23   Nevertheless, you should go over the appeal question with your

24   counsel, because in very extraordinary circumstances -- none of

25   which I think are present here -- there would still be a basis

81S7ARGS

1    for appeal.  So be sure about that, because if you were to

2    appeal you would have ten days to file a notice of appeal.  You

3    understand?

4              THE DEFENDANT:  I do.

5              THE COURT:  And if you do file an appeal and you can't

6    afford counsel for the appeal, the court will appoint one for

7    you free of charge.  Do you understand that?

8              THE DEFENDANT:  I do.

9              THE COURT:  Very good.  Thanks a lot.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25