# EXHIBIT Q

```
 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF CONNECTICUT

 3      _____
        United States of America    )April 26, 2017
 4                     Government    )9:30 a.m.
                   v.                )
 5      Jesse C. Litvak              )3:13cr19(JCH)
                       Defendant.    )
 6      _____)

 7                                   141 Church Street
                                     New Haven, Connecticut
 8

 9               SENTENCING HEARING.

10               (REDACTED ON 11-12-19)

11      B E F O R E:
                        THE HONORABLE JANET C. HALL, U.S.D.J.
12

13      A P P E A R A N C E S:

14      For The Government   :    Jonathan Francis
                                  William Nardini
15                                Heather Cherry
                                  U.S. Attorney's Office
16                                157 Church St., 23rd floor
                                  New Haven, CT 06510
17

18      For the Defendant    :    Dane Butswinkas
                                  C. J. Mahoney
19                                Adam Harber
                                  Katherine Trefz
20                                Elise Baumgarten
                                  Krystal Commons
21                                Williams & Connolly
                                  725 12th St., N.W.
22                                Washington, DC 20005-5901

23                                Michael Chase
                                  Shipman & Goodwin
24                                One Constitution Plaza
                                  Hartford, CT

25
```

```
 1            THE COURT:  Good morning.  We're here this morning
 2   in the matter of the United States versus Jesse C. Litvak,
 3   313CR19.
 4            If I can have appearances, please.
 5            MR. FRANCIS:  Good morning, Your Honor.  For the
 6   Government, Jonathan Francis.  With me at counsel table is
 7   AUSA Heather Cherry and AUSA William Nardini.
 8            THE COURT:  Yes.  Good morning.
 9            MR. MAHONEY:  Good morning, Your Honor.  C.J.
10   Mahoney for the defendant, Jesse Litvak.
11            THE COURT:  Yes.
12            MR. MAHONEY:  With me today are my colleagues,
13   Mr. Butswinkas.
14            MR. BUTSWINKAS:  Good morning.
15            THE COURT:  Morning, sir.
16            MR. MAHONEY:  Mr. Chase from Shipman and Goodwin,
17   Mr. Harber, Ms. Trefz, Ms. Commons, Ms. Baumgarten and
18   another member of our team, Mr. Hazelwood.  I will also note
19   that Jesse is in the courtroom as well.
20            THE COURT:  Yes.  Good morning to all of you.
21            We are here, as you all know -- I think everyone in
22   the courtroom knows, we're here in connection with the
23   sentencing following a return of verdict by the jury in the
24   second trial of guilty on Count Four.  There's a lot of
25   things I need to cover today.  There are a lot of issues
```

1    raised in the pleadings before the Court.  I need to address,

2    of course, the PSR and a number of other matters.

3            I guess where I will start is to tell you all that I

4    have reviewed the PSR and the addendum.  I reviewed three

5    memorandums submitted by the parties, along with the

6    exhibits, the binders that are here.  I should note there

7    were two additional letters on behalf of Mr. Litvak that came

8    in subsequent to the binders.  I looked at them, given them

9    to the probation officer.  I assume the Government had them.

10   I reviewed Section 3553(a), 3582, 3583 and 3572 in connection

11   with today's sentencing and the matters I needed to consider

12   as dictated by those statutes with respect to all aspects of

13   the possible sentence.  And I would inquire, is there

14   anything I failed to list that I should have looked at which

15   I might have looked at but just forgot?

16           The Government, anything I've overlooked?

17           MR. FRANCIS:  Obviously, Your Honor is aware of the

18   evidence from both trials.

19           THE COURT:  Yes.  I have -- actually, I should say

20   that.  I should say in preparation for today, I have gone

21   back and looked at not only everything cited in the various

22   briefings, I have looked at other sections of the transcript.

23   I have looked at sections of the first trial.  I reviewed my

24   notes from the first trial.  I spoke with the probation

25   officer yesterday at some length.  I have looked at exhibits

1    as either directed by the memorandum or even other exhibits

2    that I chose to look at.  I read a lot of cases, both those

3    you directed me to and a few others.  But other than that, I

4    think that's the end of my memory.

5            MR. FRANCIS:  Probably goes without saying, Your

6    Honor.  Thank you.

7            THE COURT:  Anything I have overlooked from the

8    defense?

9            MR. MAHONEY:  No, Your Honor.  That's a

10   comprehensive list.

11           THE COURT:  Okay.  Great.  I think before I forget,

12   Mr. Litvak, I need to ask you to tell me if you had the

13   opportunity to review what we call the presentence report

14   prepared by our Probation Officer Welks, who interviewed you

15   and your wife, I believe, and did a further investigation

16   prepared -- well, mine is all marked up, but a report.  Did

17   you have a chance to read that before today and to discuss it

18   with counsel before today?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  And were they able to answer any

21   questions you had about the report?

22           THE DEFENDANT:  Yes, Your Honor.

23           THE COURT:   Great.  I hate to take up -- hate to

24   keep us from getting to the merits, I guess, of why we're

25   here, but I do need to deal, I think, before I begin to speak

1    about what's in the memos, et cetera, with the motion to

2    seal.  The Government's motion to seal relates only to their

3    Exhibit B, which I believe is an interview of a witness that

4    has to do with an ongoing investigation.

5            Is there objection by -- it seems to me appropriate

6    to seal it, but is there objection by the defense?

7            MR. BUTSWINKAS:  We have no objection.

8            THE COURT:  So, Number 531, Diahann, is granted.

9            The defendant's motion to seal is broader.  I have

10   no difficulty in sealing any of the references to personal

11   matters relating to Mr. Litvak's children.  Does the

12   Government object to any of that aspect of the motion to

13   seal?

14           MR. FRANCIS:  No, Your Honor.

15           THE COURT:  I do not understand, however, on what

16   basis I would seal -- well, I have to pull it out to go over

17   it with you, but I think in the index to the memorandum,

18   there's a reference to the guideline sentencing range.

19   There's also later on other references to the guideline

20   sentencing range at Page 11, the fact that the probation

21   officer calculated a range.  I mean, I could go on.  There's

22   a number of those at Page 25, you asked to redact another

23   range reference in your argument.  And at Page 28, you asked

24   me to take out -- one portion at the bottom of 28 relates to

25   his son, but the other is just an argument about the

1    hardship, being deprived of their primary caregiver.  I don't

2    know how I seal that.

3           MR. BUTSWINKAS:  Your Honor, I think our motion was

4    a little overbroad, I agree.

5           THE COURT:  So I'm going to deny it in part and

6    grant it in part, and I would ask the defendant to refile a

7    redacted memorandum that reflects my ruling that the

8    references -- and I can go through and be more specific, but

9    references about particular circumstances relating to his son

10   in particular, but I suppose also his other child.  Those can

11   be redacted, but references to the PSR range, references -- I

12   better tell you this one, on Page 17, to an argument made by

13   the Government which, of course, isn't sealed, but where the

14   Government asked the Court to assume certain facts,

15   references to texts that the Government argues about in their

16   unredacted memo following the first sentencing.  That's at

17   Page 37 through 38.

18           And then there's references to other traders or

19   government investigations -- I can give you examples, if you

20   would like -- and how those matters were resolved.  I don't

21   know if those are justified being sealed.  I am going to

22   refer to them today, so I don't know how your brief would be

23   sealed.  That's at Page 2, Page 4, 33.

24           MR. BUTSWINKAS:  Your Honor, we'll submit a new

25   redacted version that only redacts personal family

1    information of the type you described.

2             THE COURT:  That's fine.  So it's granted in part

3    and denied in part as set forth on the record.  Diahann,

4    that's 526.

5             All right.  We need to move now, I guess, to the

6    PSR.  There are objections.  Obviously, the probation officer

7    as is not unusual in the district in a complicated case

8    providing each side the opportunity to put forward their

9    version.  But I think now is the time where I have to decide

10   what facts I'm going to adopt in relation to the sentencing.

11            First, I will just want to make clear -- there was

12   one -- there's one typo in Paragraph 110.  I'm expecting,

13   January, you will do an amended report --

14            THE PROBATION OFFICER: Yes, Your Honor.

15            THE COURT:  -- but the last line, it says "determine

16   his conduct."  And that's a misstatement.  It should be

17   "condition."  Other than that correction, is there -- I don't

18   see there's any objection to what I call the personal part of

19   the report, Part C, Offender Characteristics.  I don't see

20   any objection to criminal history, and I don't see an

21   objection to an enhancement for a license by -- securities

22   license.  So I'm seeing nodding heads, so we're really

23   focused on offense conduct, which raises, of course, the

24   defendant's argument about loss amounts, I think in some

25   respect, although maybe not necessarily.  So I guess I'll

1    hear from the parties as to whether you think I need to

2    address the loss amount question first before I resolve what

3    facts I'm going to adopt or whether you want to go through --

4    you want me to go through the PSR and tell you what facts I'm

5    adopting?  Any views which makes most sense?

6         MR. FRANCIS:  Your Honor has done more sentencings

7    than I have, so I will defer to Your Honor if you think one

8    is a more efficient way of proceeding.  Ultimately, you are

9    going to have to grapple with --

10        THE COURT:  Yeah, I think we need to do the loss

11   first.  I don't see how I can pick between portions of the

12   Government's versus the defendant's, so I'm afraid we need to

13   put the PSR aside for a moment and turn to the loss

14   questions.  As sharply raised in the defendant's memorandum,

15   I believe that the defendant's position is there is no loss

16   in this case.  Is that correct?

17        MR. MAHONEY:  Your Honor states our position

18   accurately.  Thank you.

19        THE COURT:  Well, don't sit down.  I have a few

20   questions for that one.  Would you agree with me that for

21   purposes of sentencing, a sentencing court considers all

22   conduct, all relevant conduct, as defined in Chapter 1, that

23   it finds by a preponderance of the evidence?

24        MR. MAHONEY:  I would, Your Honor.  Relevant conduct

25   as it is defined.

1          THE COURT:  All right.  Okay.  So why isn't the

2    acquitted counts conduct and the uncharged conduct -- we'll

3    just start with that chunk first.  The conduct that was at

4    issue at trial and about which I heard a lot of evidence, why

5    isn't that relevant conduct?  It is the same conduct in each

6    trade, of those 20.

7          MR. MAHONEY:  In order to be relevant conduct, Your

8    Honor, the Government has to prove by a preponderance of the

9    evidence that each of the elements of securities fraud has

10   been met as to each one of those transactions.  So before we

11   even get to the question of loss, there's a threshold

12   question of --

13          THE COURT:  Right.

14          MR. MAHONEY: -- were the elements met.  And with

15   regard to the acquitted counts, the jury acquitted  -- in

16   Vaughn, the Second Circuit said that's something that Your

17   Honor needs to consider.

18          THE COURT:  Oh, I have to consider it.  But if after

19   considering the evidence I heard, weighing the credibility of

20   the witnesses, one against the other, deciding what, if not

21   all, of the testimony of the witnesses I heard I will accept

22   as credible, if I conclude that the jury had a beyond a

23   reasonable doubt standard, I have a preponderance standard, I

24   would find proof by a preponderance that, in fact, securities

25   fraud, the section charged -- I can't remember the numbers --

1   was proven by a preponderance.

2           MR. MAHONEY:  Your Honor has discretion to consider.

3           THE COURT:  Okay.

4           MR. MAHONEY:  Has discretion to consider acquitted,

5   not charged conduct.  We just don't think that the evidence

6   here rises to the level of establishing materiality on any of

7   those acquitted or uncharged transactions.

8           THE COURT:  All right.  So none of your argument is

9   that it's not Chapter 1 conduct, it's not relevant, it's that

10  the -- there hasn't been a showing by a preponderance, that,

11  in fact, the conduct equals securities fraud.

12          MR. MAHONEY:  Exactly.  If Your Honor were to find

13  by preponderance, the elements had been met as to each one of

14  these transactions, it would meet the definition of relevant

15  conduct.

16          THE COURT:  All right.  Give me just a minute.  Tell

17  me, in a nutshell, the thrust of why you think that there

18  hasn't been a preponderance of the evidence showing as to the

19  nine acquitted and 10 uncharged.

20          MR. MAHONEY:  Your Honor, the evidence as to the

21  nine acquitted counts was very transaction specific.  If

22  there's anything that we learned at this trial, and I think

23  it flowed directly from the evidences and also from Your

24  Honor's instruction, is that materiality is something that

25  has to be decided on a transaction-by-transaction basis.  And

1  that total mix of information that we spent so much time at

2  the trial talking about, that's different from

3  transaction-to-transaction.

4       THE COURT:  Does that fly in the face of your

5  persistent position that this -- all of these have to be

6  judged by a reasonable investor?

7       MR. MAHONEY:  That is to be judged by a -- from the

8  perspective of a reasonable investor similarly situated to

9  the counterparty in the trade.  So what the mix of the

10 information looks like, for example, the Katie Corso trade.

11 She talked about in her post-trade emails with her boss,

12 talked about how the price at which Jesse purchased the bond

13 was a full seven marks higher than the mark she had.

14 Mr. Canter talked about how when you own a bond, when it's

15 already in your inventory, the mix of information is

16 different.  A referral that -- Your Honor, also in

17 Mr. Lemin's testimony, it was -- you know, of all the

18 witnesses that we heard from, I think that he was perhaps the

19 one who played it the most straight right down the middle.

20 And what he said is that the relative weight of the

21 acquisition price can change depending on a number of

22 factors.  What information you have in the market, what the

23 trading volume is, what the trading strategy of the entity

24 is.  And that doesn't -- that isn't incorporating a

25 subjective element into materiality.  It is looking at the

1    objective facts relevant to that trade on that day.

2            But, Your Honor, the jury sat in that box and

3    deliberated -- sat in that room and deliberated for almost as

4    long as they heard evidence.  They didn't take the

5    Government's position that lies about the acquisition price

6    are per se material.  They didn't totally accept our position

7    that they were immaterial in all circumstances.  What they

8    did was they went --

9            THE COURT:  The Government didn't argue they were

10   per se material.  I don't think they argued that, but -- I'm

11   sorry, I shouldn't have interrupted you.  But that isn't

12   where we are today.  You know, I mean, it's not -- it is not

13   what did the jury do, which we really -- the Supreme Court

14   tells us we shouldn't ever be able to figure that out.

15   Right?  They made a judgment, they issued a verdict.  And we

16   are not going to sit here and wonder why did they return --

17   why didn't they return on the other nine.

18           The question for me today as a sentencing judge is,

19   is there proof by a preponderance of the evidence that under

20   the definition of "material" as I charged the jury, I'm

21   sticking with that standard.  I don't think you objected to

22   it.  This made a difference, in effect, or could have made a

23   difference.  I could get the language -- I should get the

24   language exactly in front of me.

25           But I don't know -- I don't know why if you argue --

1  first of all, you didn't want the Government proving 76

2  transactions.  I don't know, maybe that wasn't an issue in

3  the second trial, but, boy, we spent days --

4          MR. FRANCIS:  It was.

5          THE COURT:  -- arguing over how many transactions

6  can they prove.  So I don't understand how you now say it is

7  a reasonable investor and I need to decide what the proof

8  persuaded me would be important to a reasonable investor by a

9  preponderance of the evidence.  And you want to argue as you

10  did in your post-trial motion, and as I'm sure you will do on

11  appeal, that Mr. Norris wasn't a reasonable investor.  In

12  other words, the jury found that it was material in his case,

13  but he isn't reasonable, therefore, you should reverse that

14  verdict, but you don't want me to be able to say by a

15  preponderance standard I have to look at what is a reasonable

16  investor.  And even if you have a stray comment or stray

17  testimony from a witness that this wouldn't have been

18  important or that wouldn't have been important, it's still a

19  judgment of what's the objective investor's decision that I

20  need to make.

21          MR. MAHONEY:  Your Honor, the transaction is

22  specific factors.  I'm not talking about the subjective

23  comments of particular investors.  But when they -- these are

24  all separate transactions.

25          THE COURT:  Right.

1         MR. MAHONEY:  They happened on different days, they

2    happened under different market conditions.

3         THE COURT:  True.

4         MR. MAHONEY:  And the information that populated the

5    total mix, those are objective factors.  I am not talking

6    about whether Joel Wollman actually believed what Jesse was

7    saying, which he said he didn't in a parallel conversation.

8    That's not what I'm asking Your Honor to rely upon.  What I'm

9    asking you to rely upon as to the acquitted counts are the

10   specific objective facts about what constituted the total mix

11   of information.  And then on the uncharged -- the 66

12   uncharged counts, I'm pointing to the absence of evidence.

13   You know the kinds of things that populate the total mix of

14   information.  The Government has given you nothing on the

15   bulk of those transactions other than a binder full of

16   Bloomberg chats.  We don't know what the marks on those bonds

17   were.  We don't know what the market conditions were.  We

18   don't what other --

19        THE COURT:  You are going to say that about all 56?

20   We don't what the marks were?  You mean what he went and

21   bought it at versus what he told the buyer he was buying it

22   at, his customer he was buying --

23        MR. MAHONEY:  We don't know on the -- we don't know

24   what information was available to the counterparty on the

25   other side of the trade, and that is information that

1    populates the total mix.

2          THE COURT:  Would they ever have known what

3    Mr. Litvak was actually paying in contrast to what he said he

4    was paying?

5          MR. MAHONEY:  Your Honor, that kind of gets to --

6    that sort of gets to the whole case.

7          THE COURT:  Well, I have a lot of trades, I heard

8    about a lot of them, and then I have seen paperwork on more.

9    I have never seen a trade where anybody says I know you're

10   paying more or less, or whatever the fraud is.  I never -- I

11   have never seen anybody say in a trade I know they got it a X

12   dollars so go get it a X so he couldn't lie about it.  I

13   mean, I've just never seen it.  And I guess you don't have a

14   burden, but I would have assumed that if that was the case, I

15   would have seen that.

16         MR. MAHONEY:  Your Honor, the total mix --

17   materiality is a relative standard.  That's how Your Honor

18   instructed the jury.  Misstatement has to be mix altering

19   relative to the total mix of information.  I don't see how

20   Your Honor can make a finding, especially as to the 66

21   transactions for which the Government presents no evidence in

22   the sentencing brief other than the Bloomberg chats

23   themselves.  I don't see how you can possibly make a finding

24   that the misstatements at issue in those transactions are mix

25   altering when the Government doesn't give you any information

1   about what constitutes the total mix.

2          THE COURT:  So you think that per se in uncharged

3   trades shown in Exhibit 403 A and B to Alliance Bernstein,

4   that the fraud loss of 24 ticks resulting in nearly $150,000

5   to Mr. Litvak out of the pocket of his customer wouldn't have

6   mattered, per se, I should conclude that?

7          MR. MAHONEY:  Your Honor's jumping forward to loss,

8   and I disagree with the loss calculation, but that doesn't --

9   what the investor -- what markup the investor ultimately paid

10  is not dispositive of the issue of materiality.

11         THE COURT:  No.  It's -- well --

12         MR. MAHONEY:  Materiality is what was important to

13  the investor, what would have been mix altering.

14         THE COURT:  See, you are going to lose me on your

15  argument.  I mean, if you want to argue that it all depends.

16  And we had a case where it was a difference of $100 or

17  $1,000, you might persuade me that in that case, maybe the

18  reasonable investor, it wouldn't have mattered.  I don't know

19  that I'm saying that, but hypothetically you might.  But when

20  I look at $150,000 on one trade that took about a total of 75

21  seconds, you lose me.  I don't want to say it is per se

22  material because you are correct, I have got to see what the

23  context is of the buy and the sell, what was said.  There's a

24  lot of things I have to look at.  But at the end of the day,

25  I would be hard-pressed.  Maybe it is the world I live in,

 1    but I can't believe that's not material to the buyer.  And

 2    based of the evidence I heard, the victims' testimony that I

 3    credit, by a preponderance of the evidence, I don't know.

 4              MR. BUTSWINKAS:  Judge, not to play tag team.

 5              THE COURT:  But you will.

 6              MR. BUTSWINKAS:  But if I may.  Just by way of

 7    example, and I agree with Mr. Mahoney, fortunately, that it

 8    is an objective standard and that the snapshots that you see

 9    with the specific counts go to the issue of the Court's

10    preponderance finding on an objective standard basis.

11              But when I see Mr. Canter testify as to Count One

12    and Count Two, that in the same trade with everything except

13    for the misrepresentation, I would have made the same

14    decision.  Just point blank, which is what he testified to.

15    And what Ms. Corso testified to, and what Mr. Lemin said may

16    well have been the case.  It is hard to say that it is

17    probably material if when you extricate it from the

18    transaction and the person who is actually there comes to the

19    exact same result, you could say it might be material or it

20    could be material.  But when the person who was actually

21    there was at the sophisticated hedge fund said, I would have

22    done the same thing without the misrepresentation, exactly,

23    but -- it's hard for me to see how it gets over the 51

24    percent.

25              THE COURT:  My head is spinning.  I have to stop it

1   and try to respond to you because I'm confused by your

2   argument.  Over the course of two trials and all the pretrial

3   leading up to it, I have been hammered by the defense about

4   the reasonable investor standard.  I -- well, one, because I

5   think it is the law and I agree with you, but I also think

6   you knew there would be victims who would come and say it

7   mattered.  And you want to argue, jury, that isn't the

8   question.  You have to decide who is reasonable.  Indeed,

9   post-trial, you argued about Mr. Norris.  He's not a

10  reasonable investor.  So even though he stated unequivocally

11  it mattered to him, he literally mouthed the legal standard

12  for materiality on the witness stand, and I believed him, you

13  argue and I don't -- and perfectly appropriately, Judge, set

14  aside that conviction, he's not a reasonable investor.  I

15  then have trouble when you come and your argument on a

16  preponderance standard, which is less, and you argue, Judge,

17  we have all these individual witnesses who said -- and they

18  said it at certain places in certain ways, but they said

19  other things at other times, but let's just take what you

20  want me to look at.  So that means you can't find this was

21  material because those investors said to them it wasn't.

22  Well, why can't I, just like you wanted to on Norris, say

23  they are not a reasonable investor?  I am persuaded by all

24  the testimony I heard that this would matter to a reasonable

25  investor.  Matter meaning -- yes, so how do you get to do

1    that?

2            MR. BUTSWINKAS:  That's a very good question, Your

3    Honor.  Here's my response.

4            THE COURT:  Okay.

5            MR. BUTSWINKAS:  With respect to Norris --

6            THE COURT:  Yeah.

7            MR. BUTSWINKAS:  -- we argued that he was not a

8    reasonable investor for a specific reason.

9            THE COURT:  I understand.

10           MR. BUTSWINKAS:  That only applied to Mr. Wollman,

11   and that is that he thought it was an agency relationship.

12   As a matter of law, it's not.  That argument was not made by

13   the Government and testimony was not elicited by the

14   Government on that issue with respect to the other investors.

15   When deciding what an objective, as I think Mr. Mahoney

16   properly says, each transaction is different.  It is based on

17   the individual facts that apply to that transaction.  A

18   significant factor in determining what the objective investor

19   would have done in those specific circumstances undoubtedly

20   is the testimony of the very person who was there.

21   Subjective or not, it's an important heavily-weighted piece

22   of information.

23           If Your Honor is saying that I find that all these

24   people who said that they would do the same thing, same

25   conditions and the only thing you take out is the

1   misrepresentation, that they are all unreasonable investors,

2   we didn't argue that.  We argued that Norris and Mr. Wollman

3   were not reasonable investors because they believed -- or at

4   least they said they believed they were in an agency

5   relationship.  But irrespective of that, objective or

6   subjective, the people who are actually in the circumstances,

7   that testimony has important weight in determining what an

8   objective investor in those exact circumstances would have

9   done.

10          So I'm not -- I really don't think the difference

11  between objectivity and subjectivity decides this question.

12  The issue is how important is Mr. Canter's testimony to

13  determining what an objective investor in those circumstances

14  would have done.  And what I'm saying is, for Your Honor to

15  find a preponderance, you have to completely reject what

16  Mr. Canter said.  You have to completely reject what Ms.

17  Corso said.  You have to completely reject what Mr. Wollman

18  said, and say I'm replacing them with a hypothetical

19  objective investor.

20          And so I'm not saying that they may perfectly

21  replicate because they are obviously subjective because they

22  were involved, that they may perfectly replicate the

23  objective investor, but they have great weight in Your

24  Honor's determination.  That's what our argument is.  And I

25  am going to turn it over to Mr. Mahoney before he gives me

1    the cane, Your Honor.

2           THE COURT:  I would just like to ask about various

3    things you argue in your first brief, and I think maybe one

4    thing in your reply.  Page 29, you make the statement,

5    Mr. Litvak did not take advantage of vulnerable investors or

6    misrepresent the nature or price of the bonds he was trading.

7    What's the basis for saying that he didn't misrepresent the

8    price of the bonds he was trading?

9           MR. MAHONEY:  He didn't misrepresent the price that

10   the investors would pay.  We are not disputing that he made

11   it -- we are not disputing as to the nine acquited counts

12   that there's not evidence that he made a misrepresentation

13   about the acquisition price.  But that's what he meant.

14   Perhaps it could have been said artfully.  We certainly

15   didn't mean to --

16          THE COURT:  At Page 24, I believe you say that in

17   each of these transactions, and I think you're including

18   Mr. Norris in Count Four, the buyer effectively set a floor

19   on the price it would pay before any misrepresentations.  I

20   don't view Mr. Norris setting a floor.  He indicated he might

21   go higher if he had to, but he didn't say, gee, Jesse I won't

22   take it if it is cheaper.  Did he?  What's the floor?  What

23   is it Mr. Norris said that created a floor?

24          MR. MAHONEY:  Well, Your Honor, I don't want to move

25   for -- I'm not going -- don't want to make arguments that

1   seem to be in the line of asking for reconsideration on the

2   Rule 29 motion, but --

3           THE COURT:  Well, it is in your sentencing memo.  It

4   is in your sentencing memo.

5           MR. MAHONEY:  And that's my position, Your Honor.

6   This is a principal-to-principal trade.

7           THE COURT:  No, no.  Did he set a floor?  How did

8   Mr. Norris set a floor?

9           MR. MAHONEY:  I believe he set a floor because he

10  opened the trade by saying you put in a bid of 79-24, and

11  there was an assumed -- there was an assumption given the way

12  that Mr. Norris suggested he wanted to structure the trade

13  that there would be a markup on that of 6 to 8 ticks.  That's

14  what Mr. Norris testified.  So the very first thing that

15  Mr. Norris communicated to his counterparty on the other side

16  of the table who didn't have -- who had no obligation to work

17  in his own economic best interest was that I'm willing to pay

18  79-30.  It is the exact same thing as if I walked into a

19  Honda dealership and I tell the dealer, no, I'll pay $25,000

20  for this car.  I'm not driving that car out of the lot, if

21  I'm without paying at least $25,000 and maybe more.

22          THE COURT:  I have two problems with that argument.

23  One, tell me where Mr. Norris said he wouldn't pay any less

24  for this bond, and, two, this isn't a Honda dealership, this

25  is a securities transaction, which for 80 years this country

 1   has said, we don't tolerate lies in securities transactions.

 2   Obviously material lies, but we don't tolerate them.  It is

 3   different.  So I don't know.  It is not is worth quibbling

 4   about.  I will just leave it.

 5          Also, that's the no loss argument.  We'll get to

 6   that, I guess, later.  I think in your reply you say that --

 7   I should -- where is it?  I think you said something to the

 8   effect that the price would be the same.  I failed to mark

 9   it.  Well, I guess it is not important.  Forget about that.

10          One of the arguments that you make in terms of

11   measuring loss appears to me to be, you tell me if I misread

12   your argument, that the way we measure loss is -- obviously

13   we know what happened, that's a fact.  At least, as the jury

14   found on Four and as I will find on other of the

15   transactions.  We know what price was paid as a result of

16   fraud.

17          You seem to want to suggest that the way we measure

18   loss is by replacing the fraud with silence.  And I don't

19   think that the law permits that.  I think that the law says,

20   okay, he chose to speak.  He didn't have to.  He could have

21   chosen silence, but he didn't.  So to measure loss, we look

22   at what happens if we put the truth in place of the lie.

23          MR. MAHONEY:  I disagree with that, Your Honor, I

24   recognize --

25          THE COURT:  Tell me a case that I could read that

 1    would persuade me that you have the correct view.

 2            MR. MAHONEY:  I think our best cite is the Alphas

 3    case.  I'm sure that Your Honor has --

 4            THE COURT:  I've read very carefully.

 5            MR. MAHONEY:  -- has committed it to the memory.  I

 6    just want to point out that I think, with respect, I think

 7    that you're mixing up what the obligation is versus what the

 8    benchmark is for the loss.  I don't dispute it is black

 9    letter law.

10            When you have the option of remaining silent, if you

11    decide to speak, at that point you have the obligation to

12    tell the truth.  But I'm not aware of a case that says that

13    in this context, you determine loss by looking at what

14    happened and then you imagine some hypothetical negotiation,

15    especially in a situation there was no obligation to

16    disclose, you inject the truth into it.  And then you

17    consider how the transaction would have come out.

18            The case that I think gets closest to this kind of a

19    fact pattern is the Alphas case.  And what the First Circuit

20    said in that opinion was you have to remove -- you have to

21    remove the fraud from the equation.  You have to determine

22    where would the parties have ended up absent the fraud.

23            THE COURT:  Let's see, I had a couple of thoughts to

24    respond to that.  I still want to know when a securities

25    broker speaks when he doesn't have to, but he's now spoken

1  and he's obliged to tell the truth, that the law says I don't

2  measure loss, other than Alphas by replacing the lie with the

3  truth.

4        The closest case I think that I've had drawn to my

5  attention is the Government pointed to a civil securities

6  fraud case called ZareVivendi Securities Litigation where the

7  circuit says expressly what I'm articulating.  Now you can

8  argue to me, well, it is a civil securities case.  It is not

9  a criminal one.  But, of course, you have to then

10 recognize -- well, Alphas was criminal, but not a securities

11 case.  That's one difference.  Also, all of your reliance in

12 Alphas in your argument on loss, Alphas went to an intended

13 loss analysis, right?

14       MR. MAHONEY:  Correct, Your Honor.  Last time, if

15 I'm reading the sentencing transcript from the first

16 sentencing correctly, that's how Your Honor ultimately

17 calculated the --

18       THE COURT:  I think I did it alternatively.  I think

19 I did actual first, then I did intended.  I think I might

20 have moved to gain, but I could be wrong about that.  I

21 intend to do that today, so maybe that's clouding my

22 memory.

23       MR. MAHONEY:  But regardless, Your Honor, Alphas

24 says that that is -- that absent the fraud standard is the

25 requirement for loss under the guidelines, period.  That's

 1    what we are talking about here.  We are talking about loss

 2    under the guidelines.  There's not --

 3            THE COURT:    That's absolutely correct.

 4            MR. MAHONEY:  There's not a specific loss test for

 5    securities fraud.  And absent the fraud means removing the

 6    fraud from the equation.  I don't see any other way to -- any

 7    other way to read it.

 8            THE COURT:  But Alphas has the unusual situation,

 9    the Government was trying to say, well, there's the void --

10    the void clause in the insurance contract.  If you lie to us

11    about anything, we don't owe you any coverage.  I think what

12    the First Circuit is saying, which I don't necessarily

13    disagree with, is, no, what did this guy intend to cause this

14    insurance company to lose?  He had $25 in actual losses.  He

15    files a fraudulent claim for 100.  He knows he could get the

16    25 if he didn't lie about it, right?  So the loss is the

17    delta here.

18            I don't know what in the record -- you keep talking

19    about I am going to have to speculate, I am going to have to

20    spin what would happen.  I don't know of -- I mean, I haven't

21    seen every chat that Mr. Litvak did.  I'm sure there's

22    millions of them over the time period he was at Jefferies,

23    okay, but I have seen a fair number of them.  And it is like

24    they -- I can't imagine a conversation where what he's paying

25    didn't come up.  In other words, the argument that he could

1    have stayed silent and therefore, there's no loss, I haven't

2    seen that.

3            MR. MAHONEY:  Your Honor, there was much testimony

4    at trial that a lot of trades in this market -- Your Honor

5    has seen the chats where Mr. Litvak made representations

6    about price, but there were several witnesses who testified

7    that -- I know Mr. Canter said this, others did, that

8    oftentimes they do trades without ever knowing what the

9    dealer acquired the bond at.  This is not --

10           THE COURT:  I haven't seen them.

11           MR. MAHONEY:  Your Honor, we cited that in --

12           THE COURT:  You cited his testimony.

13           MR. MAHONEY:  We cited the testimony.

14           THE COURT:  I can't imagine the chat.  I mean, it's

15   like look at Mr. Norris, you know.  Mr. Litvak comes back.

16   He volunteers I bid your price or I bid your level, I can't

17   remember the phrase.

18           No.  Okay.  So say it exists.  I still would say

19   that Alphas is quite distinguishable.  I mean, here the

20   Government hasn't sought to get back the commission that was

21   negotiated because it was all part of a fraudulent

22   negotiation.  The Government's argument could be, look, this

23   trade wouldn't have happened, right?  So we just wipe it off,

24   so give me back everything or you intended that loss.  They

25   didn't ask for that.  In the same what that in Alphas --

```
 1          MR. MAHONEY:  I don't think that is just their
 2    generosity --
 3          THE COURT:  No, I don't, either.  I think as Alphas
 4    teaches, that is the right thing to do.  But I don't see how
 5    Alphas says, I can't attribute any loss in these trades
 6    because I would have to speculate about what portion would
 7    get divided.  I mean --
 8          MR. MAHONEY:  Your Honor, the benchmark that the
 9    Government argued for in Alphas was the truth.  It said if
10    the insurer had known the truth, the insurer then would have
11    voided the entire clause.  And therefore, we should consider
12    the loss to be where the insurer would have been had they
13    known the truth.  That's the same argument they are making
14    here.
15          My point is that the commercial realities are such
16    that it is not clear that the truth ever would have been
17    revealed.  I think that's especially the case as to --
18          THE COURT:  But that's the problem with your basic
19    argument, is you are assuming that when there's fraud and
20    when there's a, gotcha, you lied, that the defendant gets to
21    step back and say, okay, let's go back to where I could have
22    been silent.  Okay.  If I was silent, I would get to put all
23    of this in my pocket, right?  But that isn't what happened.
24    You can't ignore the fraud.  I don't see how you can go back
25    to silence is the measure of loss.  It strikes me that the
```

1    obligation, once he opens his mouth, is to tell the truth.

2    So the loss is measured by what the truth was.

3         And we know, at least from the trades and the ticks

4    I saw, we know what they negotiated would be his payment.  I

5    don't know why you think we should get lost in the

6    speculative analysis of how much would he get paid if, in

7    Norris's case, the bond got purchased at a lower price.  I

8    would think he would get the six ticks they said he's going

9    to get.  I think that's certainly a reasonable conclusion to

10   draw.  I don't know why that's speculative or unreasonable.

11        MR. MAHONEY:  Your Honor, I think -- whenever you

12   are talking about loss in a situation like this, you've got

13   to compare it to some sort of but for benchmark.  The

14   question here is what's the but for benchmark.

15        THE COURT:  Correct.

16        MR. MAHONEY:  I understand what Your Honor says, and

17   I don't dispute that it is black letter law that in the

18   securities industry, if you speak, you have the obligation to

19   speak truthfully.  I'm not aware of a case on point that says

20   that the truth is the absolute benchmark for determining loss

21   for the purposes of the guidelines here.  And I interpret

22   Alphas as standing for the opposite proposition.

23        THE COURT:  We'll respectfully agree to disagree.

24   Your Footnote 5, I wrote in the margin actually, your

25   argument in about the middle of the paragraph is very clever,

1   but I don't think it is right.  I don't think it's --

2           MR. MAHONEY:  You've used that term to describe my

3   arguments in the past, Your Honor.  I'm not sure it's a

4   compliment.

5           THE COURT:  No, no, it is.  It makes me have to

6   work harder and think to figure out whether they are sound or

7   whether they aren't.  I just think your statement that

8   there's no -- absent the fraud, there's no reason -- you

9   know, absent the fraud means the truth.  And I have heard

10  more than one person, but certainly Mr. Norris say, had I

11  known the truth that day, I would have paid him six ticks and

12  got it at the price he got it for, in effect.

13          You made an argument, I don't have the page

14  citation, but you point to the fact that on Count Four,

15  Invesco made a 12 percent return, $3.8 million.  That's

16  entirely irrelevant, isn't it?

17          MR. MAHONEY:  I don't think it is irrelevant to the

18  nature and circumstances on the offense.  I agree that that's

19  not -- that's not dispositive of the question of materiality

20  or loss.  That's clear from the Second Circuit's opinion.

21          THE COURT:  Well, they would have made more money

22  but for the fraud, right?

23          MR. MAHONEY:  Right.  In a sentencing

24  proceeding like this, as you know, you have got to look at

25  this conduct and you have got to think about where it stands

1    in the spectrum.

2         THE COURT:  Because the victim made money, their

3    analysis led them to make a good investment, right, I mean

4    their analytics, that's what I heard about, decided that at

5    this price they would get a decent yield and they did better

6    than that.  The assumptions that they made were more dark

7    than they needed to be, right?  That means that the fraud is

8    less serious?  The nature of the offense is less serious?

9         MR. MAHONEY:  I think, Your Honor, in comparison to

10   a Ponzi scheme where someone loses --

11        THE COURT:  No value.

12        MR. MAHONEY:  -- the entirety of their retirement

13   savings.  I'm not saying, and it's never been our argument

14   and I just want to be very clear, we are not saying that

15   because they made money, it wasn't a crime.  Because they

16   made money, there couldn't be any loss and it couldn't be

17   material.  I'm using it for this very narrow point, which I

18   think is appropriate in the context of sentencing.

19        THE COURT:  Yeah.  And I know I don't have the right

20   mathematical analysis to do this, but I added the 73,000 to

21   3.8 that they made.  And that gave a yield of 12.23, which is

22   almost a quarter of a point higher, which, if I understood

23   the analytics and their discussion about them, your experts

24   discussion about them, you know, they do their analytics and

25   at some point decide, okay, this is the lowest we go on

1    yield.  In other words, that's the corresponding price,

2    that's the highest price we would pay.

3            If the price is higher than that, let's assume a

4    transaction, a broker-dealer comes back, truthfully says, I

5    can't get you that bond for your maxed out yield level.  That

6    would make a difference to them as to whether they bought it,

7    right?  It is clearly material and significant, that 73,000.

8            MR. MAHONEY:  I'm not going to admit that, Your

9    Honor, but I will stipulate that clearly people would rather

10   pay less rather than more in this market.  One of

11   Mr. Burnaman's points was that there's a range, and

12   particularly when you're talking about distressed assets like

13   this, there's the degree to which something moves the needle

14   within a couple of percentage -- a couple of fractions of

15   percentage point yield might not be all that important.

16           THE COURT:  I'm sorry.  There's a couple more on

17   loss.  Would you agree with me that the victims here had a

18   best execution obligation to their client?  Not between Mr.

19   Litvak, but the buyers or the sellers with Mr. Litvak,

20   vis-a-vis their customer or client had a best execution

21   requirement, obligation, duty, however it is called?

22           MR. MAHONEY:  Yes, they were fiduciaries to their

23   investors, yes.

24           THE COURT:  And, again, I took to heart your

25   expert's testimony about there can be reasons why what's

1   available in the market at any one time, that a difference in

2   price might -- you might not get the lowest price given you

3   have another requirement of volume or some other reason.  But

4   certainly the lowest price is an important component of best

5   execution.  Would you agree with that?  Not the only one, but

6   it's --

7          MR. MAHONEY:  Not the only, I will agree and say you

8   want to get the bond, you want to make sure that in the

9   negotiations that you don't play them so hard so as to risk

10  not getting the bond.  There are other -- what the portfolio

11  is, but it's a factor.  I'm willing to say that it is a

12  nontrivial factor.

13         THE COURT:  I guess I would have to ask this.  I

14  didn't think I did but I do on loss, if I am going to do loss

15  in the PSR findings.  You cite, I'm not sure which case you

16  cite me to, I think it's Pimental you maybe cite me to about

17  how I shouldn't consider the acquitted conduct.

18         Doesn't Vaughn out of the Second Circuit reject that

19  argument?

20         MR. MAHONEY:  It rejects the constitutional argument

21  that and it's -- listen, it is the law of the Supreme Court

22  of the United States and you can consider acquitted conduct.

23         THE COURT:  I just wanted to make sure because I

24  wasn't quite sure why you were referring me to Judge

25  Gertner's opinion.

1          MR. MAHONEY:  Because one of things in <u>Pimental</u> and

2     the other cases that we cite is, it talks about the message

3     that is sent when the Government is able to make up for a

4     mostly unsuccessful prosecution by relying on the counts that

5     they lost at trial to drive the sentencing, which is

6     troubling to Judge Gertner, it's troubling to me.  I'm not in

7     minority in showing you the -- based on the sources that we

8     cited you in -- in our brief in taking that position.

9          THE COURT:  Hypothetically, if I didn't count it in

10    loss in determining guidelines, isn't it something that I

11    could consider as to the nature and circumstance or history

12    and characteristics factors of 3553(a), that he engaged in

13    conduct which looks, to me, quite similar across tens of

14    cases, 70-plus, as contrasted with one count of conviction?

15         MR. MAHONEY:  Yes.  You could consider it as a

16    relevant in the broad rubric of all of the things that are

17    relevant at sentencing, which is basically everything.  It is

18    not relevant for purposes of calculating the -- not relevant

19    for purposes of the fraud table because in order for a

20    transaction to count there, it has to be relevant conduct.

21    In order to be relevant conduct, it has to meet the

22    requirements that we have already talked about.

23         THE COURT:  I think I asked that.  I think that's

24    the questions I have for you on loss.  Thank you, Attorney

25    Mahoney.

1              Are you taking this?

2              MR. FRANCIS:  I am, Your Honor.

3              THE COURT:  Where is that phrase, "largely

4    unsuccessful prosecution."  I should just be sentencing Mr.

5    Litvak based on Count Four?  Would you want to respond to

6    that?

7              MR. FRANCIS:  No, Your Honor.  Yes, I want to

8    respond.  And no, I don't agree this is a largely

9    unsuccessful prosecution.

10             The cases that -- you can imagine a case where we

11   charge Mr. Litvak with -- or a defendant with VICAR, murder

12   and terrible crimes and then 1001 for lying in the course of

13   the investigation.  He's acquitted on everything except the

14   1001.

15             One might say that would be a -- or I think there's

16   some cases that -- or at least one case the defense points

17   out with a lesser included offense.  In the State context,

18   it's not murder, it's not first degree murder, it's not

19   second degree murder, it's not manslaughter, it's vehicular

20   homicide or something, and then we try and pull everything

21   back in.  That's not this case.

22             We charged a scheme that went on for years.  The

23   unit of prosecution or particular trades, we charged ten.

24   And he was convicted on one of those executions of the

25   scheme.  If we had pled Mr. Litvak like we would have pled

Case 3:15-cr-00155-RNC   Document 585-23   Filed 12/03/20   Page 37 of 187
Case 3:13-cr-00019-JCH   Document 611   Filed 11/12/19   Page 36 of 186

36

1  him to one execution of the scheme.  So we don't view this as

2  an unsuccessful prosecution.

3          I would note that for sentencing purposes, I don't

4  think Your Honor should either.  As you noted, you looked at

5  the facts of the first trial and the evidence from the first

6  trial.  And 3661 says Your Honor should look at everything,

7  or has the discretion to look at everything.

8          This defendant was convicted twice by two different

9  juries represented by two different defense counsel --

10         THE COURT:  I don't think that that's a fair

11  argument.  The first trial is flawed.  I can't look at the

12  verdict in the first trial, right?  The circuit reversed it.

13         MR. FRANCIS:  I'm not sure that you can't look at

14  the --

15         THE COURT:  I can look at the evidence, absolutely.

16  I think defense concedes it.  I don't know that it is right

17  to rest anything I do today on the first verdict.

18         MR. FRANCIS:  Okay.  Well, then, don't look at the

19  first one.  Just look at second one.

20         THE COURT:  I don't think I should.

21         MR. FRANCIS:  Just look at the second one.  If he

22  had been acquitted on all counts, then obviously we wouldn't

23  be here today.  He was convicted on a count of securities

24  fraud that carries a 20-year maximum sentence.  That's a

25  serious crime.  And this was not two different schemes and we

1    lost on scheme one and got him on scheme two.  This was one

2    unitary scheme.

3         So I don't want to deprive the defense of their

4    advocacy.  They have a right to make the arguments they want

5    to make.  And I understand they have a client to serve.  So

6    continually saying this was an unsuccessful prosecution.  I

7    understand why one might want to say that as a thing to say,

8    but that seems like cold comfort to someone who's been

9    convicted of securities fraud.

10        THE COURT:  I suspect it is, but I don't think that

11   means it's any less of an argument to be made by the

12   defense.

13        MR. FRANCIS:  I think it is under these facts.  I

14   think it is less of an argument.  This is not a situation

15   like the Buffis case that they point you to from the District

16   of Massachusetts.  They reference the sentencing order.

17   There, there was a special verdict.  So they could tell -- or

18   special verdict form, they could tell, well, the jury

19   rejected -- it was an extortion case.  It was extortion, and

20   the jury checked the box for extortion but under official

21   right -- by official right and not by theft.

22        So all the extortion by theft carry on counts that

23   were acquitted were out.  And the judge could say, well, I

24   know that because the jury checked the box.

25        THE COURT:  If the judge thought it was proved by a

1    preponderance, the judge could have considered that.

2              MR. FRANCIS:  He could have, but he took it as

3    relevant to his determination the fact that the jury had

4    rejected that exact theory.

5              Here we don't know.  We didn't have a special

6    verdict form.  We don't know exactly what the jury did.  And

7    it is inappropriate, as Your Honor said, to speculate.

8              I would take issue with calling this unsuccessful

9    prosecution, which I think then, once you get rid of the

10   premises, what follows from it.

11             THE COURT:  Okay.  Let's go to the -- you want me to

12   count 76 transactions.  I clearly heard testimony on -- I had

13   ten charged and ten uncharged at trial.  And at the first

14   trial, I heard testimony on many of those.  I think some I

15   only saw documents but most of them I heard testimony on.

16             But how do I use the 56, is it?

17             MR. FRANCIS:  56.

18             THE COURT:  The defense argues, all you got is a

19   couple of pieces of paper.  How can you know the mix of

20   information and what else was going on in that transaction?

21             MR. FRANCIS:  Well, I think the defense has turned

22   the total mix of information on its head.  It is not the

23   Government's burden to prove everything that's going on in

24   the world and then attempt to fit the fraud into that.  That

25   would be -- it would seem daunting then to ever bring a

 1    securities fraud prosecution if we had to prove everything

 2    that was in the mix of information.

 3         Instead, our burden is to prove that the information

 4    was material in the total mix of information.  Information --

 5    lies going to price.  You could imagine a situation where

 6    they are not always material.  Would seem to be sort of the

 7    kind of thing you would assume to be material.  And when you

 8    look at these chats, you see these are negotiated terms as

 9    they were in the 20 that Your Honor saw and heard about at

10    trial.  They are --

11         THE COURT:  I mean, the charge says that to be

12    material, it need not -- the fact at issue that's misstated

13    need not determine a particular outcome.  However, you have

14    to prove there beyond a reasonable doubt, here by a

15    preponderance, a substantial likelihood the disclosure of the

16    truth or omitted fact would have assumed significance in the

17    deliberations of a reasonable investor.  I should remember

18    that.  Go ahead.

19         MR. FRANCIS:  I embrace that, Judge.  I mean, the

20    Government isn't trying to pull a fast one on you.  Your

21    Honor found that at least some portion of these 76 in the

22    first sentencing you had met the preponderance of the

23    evidence standard.  I understand there's a little different

24    posture because some had been more or less conceded, some had

25    been objected to.

1           You should find by the preponderance of the evidence

2    that the elements of securities fraud were met on 76

3    occasions, not because we're pulling a fast one, but because

4    this is the same MO.  Mr. Litvak is doing the same thing 76

5    times.

6           Now, I raise this not because it matters to the

7    Government, the bottom line here.  Just because you have to

8    do the guidelines calculation.  And we want to be helpful in

9    that respect.  I don't think we have the option of saying,

10   oh, it is going to annoy the Judge if we point out the 76

11   times he does it.  Let's throw away a bunch of them.  We have

12   an obligation to bring them to your attention, so we have

13   done that.

14          THE COURT:  What do I do with ones like the

15   interviews reflect the Angelo Gordon, whatever, people who

16   work there, the buyers or the sellers with Mr. Litvak from

17   that company said it wouldn't have mattered to them, didn't

18   matter to them.

19          MR. FRANCIS:  Well, I think you have to -- once

20   again, you have to use the objective standard for

21   materiality.  And you could read that whole interview, that

22   whole 302, and you would see that the particular person,

23   Mr. Durkin, was very close friends with Mr. Litvak.

24          If somehow his subjective intent became -- if you

25   thought that was relevant, we would be happy to call him to

1    the stand.  We would show you some documents, some chats

2    where he makes reference to going over to Mr. Litvak's house

3    socially, who has a key to whose apartment, things like that.

4    So you might then have reason to question whether Mr. Durkin

5    is a reasonable investor or not.

6         But I don't think you need to do that.  I don't

7    think you need to make 76 different -- well, it is really 35

8    different, because there's 35 victims, assessments of, are

9    you reasonable or aren't you reasonable?  Instead, I think

10   Your Honor has enough, based on the 20 you saw and the

11   copious amount of evidence you heard in the testimony and the

12   documents you have seen during trial, to make a determination

13   that this really matters to people in this market.

14        A reasonable investor cares about what their

15   broker-dealer tells them when it moves -- for a buyer when it

16   moves their price up and when a seller, when it drives their

17   price down.

18        THE COURT:  I have questions about a couple of the

19   trades that were not the subject of evidence at either of the

20   trials, I don't believe.  One happens to involve Angelo

21   Gordon, Tab 25.  It appears, from my reviewing the documents

22   and my knowledge from the trials, that Mr. Litvak

23   misrepresented to the Angelo Gordon trader that he, Litvak,

24   had bought the bond at 77-12.  Based on that

25   misrepresentation, Angelo Gordon agreed to pay 8 ticks above

1    Litvak's purchase price for a total purchase price of 77-20

2    as reflected in the ticket.

3              It looks like another ticket shows that Jefferies,

4    that is, Mr. Litvak, actually purchased the bond for 77 and 8

5    ticks.

6              MR. FRANCIS:  Yes.

7              THE COURT:  So the lie is a 4 tick lie, have I

8    correctly interpreted the documents in front of me?

9              MR. FRANCIS:  That's how we interpret them as well,

10   Your Honor.

11             THE COURT:  And 55, it looks like it was an

12   inventory trade based on the dates, I think, is where I'm

13   drawing inference.  Again, you are going to tell me if I'm

14   mistaken.

15             MR. FRANCIS:  You are correct.

16             THE COURT:  The victim is -- the buyer of the bond

17   from Jefferies is Marathon.  And in the chat, like some of

18   the ones I saw at trial, Mr. Litvak appears to have invented

19   a seller who's allegedly able -- that Jefferies is able to

20   convince -- Litvak is able to convince this hypothetical,

21   nonexistent seller to sell at 65-12 when, in fact, the bond

22   was in inventory.  Then on top of 65-12, a commission is

23   paid, which I heard credible evidence that commissions were

24   not paid on inventory trades.  So is that the sum of the

25   fraud in that transaction?

1          MR. FRANCIS:  Yes, the 4 tick commission added,

2     yes.

3          THE COURT:  Lastly, 75 and 76.  I think that 75 is

4     the sale of the bond to Jefferies, and 76 is the sale by

5     Jefferies out to another buyer.  I think it is the same bond.

6     But I'm not sure I understand your scheme evidence chart

7     which shows a certain amount of fraud based upon the chats as

8     I read them.

9          They, first of all, appear to be all internal chats,

10     but, of course, recounting some things that are being said, I

11     think, outside.  I probably should look at them before I say

12     that based on my recollection.

13          MR. FRANCIS:  Yes, that's right.  Those are both

14     salespeople.

15          THE COURT:  Mr. Plansky, not Mr. Litvak, appears to

16     be the one misrepresenting the information to Fidelity.  Then

17     in 76, it looks like Mr. Litvak is speaking to Kevin Blaney,

18     but it is not clear to me from those chats where Mr. Litvak

19     makes a misrepresentation to the buyer as opposed to somebody

20     else doing it.  Or that there's even any misrepresentation at

21     all here.

22          MR. FRANCIS:  I'm drawing on my memory, and there

23     were a lot.  Your Honor is more conversant with this trade

24     than I am, it sounds like.

25          But that's my recollection.  That our sort of theory

1    of what's happening here is that Mr. Litvak is conveying

2    information to the salesman at Jefferies to then convey to

3    the customer.  Mr. Plansky, what he is conveying to the

4    buyer, Mr. Plansky, what he's conveying to the seller that is

5    false information.

6            Your Honor saw at trial instances of Mr. Litvak

7    working with a salesman, in particular Mr. Plansky.  I think

8    it was a trade with Vladimir Lemin at Magnetar where they

9    would have an offline conversation.  I think that one was,

10   let's see what the Russian will pay us.  Then they go back

11   and they sort of double team Mr. Lemin.

12           THE COURT:  Give me one second.  Because now that I

13   look at the chats, I'm not sure why I was confused.

14           Tell me the best authority -- what I have said to

15   defense counsel is my view that the measure of loss is -- or

16   that there is a loss and then the measure of it is -- in

17   securities cases, if you speak a lie, you replace the lie

18   with the truth and measure the effect of that lie, in effect.

19   He cites me to the First Circuit Alphas case.  You cited me

20   to a civil securities case.  Are there any criminal

21   securities cases that say that's how you measure loss for

22   guideline purposes?

23           MR. FRANCIS:  I'm sure there are.  I would say --

24           THE COURT:  I wouldn't be so sure about it, but

25   maybe there are.

1              MR. FRANCIS:  I think it is the fact that in every

2    fraud case, the way that the fraud loss is determined,

3    including in Alphas, as the First Circuit's kind of -- what

4    they said the district court should have done in Alphas is

5    you look at the difference between the lie and the truth, and

6    without hypothesizing something that might have happened, you

7    evaluate that.  Right?  It's the same thing the guidelines

8    tell you.  How do you evaluate actual loss versus intended

9    loss?  You look at what actually happened.  Facts on the

10   ground.  No hypothesizing necessary.  That's what we want you

11   to do, Your Honor.  Not hypothesize what might have been

12   different in the trade had the victim known the truth.  And I

13   actually -- they keep referring to Alphas.  I didn't know

14   about Alphas because I don't read the First Circuit case law

15   as closely maybe as I should, but we -- without even knowing

16   about Alphas, that's exactly what we did in our loss

17   calculation.

18              THE COURT:  I actually agree with you.  I wrote when

19   I read the case that it looked to me the case was helpful to

20   the Government's argument, not to the defendant's, but I

21   understand the defendant's argument they are making from it.

22   But I think it's -- I mean, they want to say here -- there,

23   you knew the actual value of the real claim, I guess, whereas

24   here, they want to argue we don't know what the negotiation

25   would have been.  But I guess --

1          MR. FRANCIS:  I think we do.

2          THE COURT:  I think we can draw reasonable

3    inferences from the testimony of people like Mr. Norris as to

4    they -- you know, what do they typically pay for compensation

5    for 6 or 8 ticks, would it matter to have known, would they

6    have bought it at that price.  I don't think that because we

7    don't -- we don't know what would have happened because of

8    the fraud.  If he hadn't committed the fraud, then we

9    wouldn't be here, but we wouldn't know what the negotiation

10   as the defendant wants me to assume would happen happened.

11   But if I credit the testimony of the victims about its

12   importance and their usual practice and the compensation paid

13   to people like Mr. Litvak, I don't see how the loss doesn't

14   exist here as you calculate it.

15         MR. FRANCIS:  Obviously, I agree with Your Honor.

16         THE COURT:  Yeah, I know.  I don't think I have any

17   more questions for you on just loss.  I have other questions

18   about the sentencing, but I don't know if you want to add

19   anything more, Attorney Mahoney.

20         MR. MAHONEY:  I think Your Honor understands our

21   position.

22         THE COURT:  I do.  Yeah.  I'm afraid you are going

23   to have to be patient with me because actually may -- you may

24   not think this, but I spent a lot of time thinking about your

25   arguments, analyzing them, trying to reach the right decision

1    on them.  So I want to put on the record what I have done

2    because, obviously, if I have made a mistake I want the

3    Circuit to at least know what I considered and why I

4    reached the conclusion that I did.

5            Obviously, we're talking about a guidelines

6    calculation.  That's the first thing I want to say.  That's

7    why we had this argument about loss.  And the guidelines in

8    Chapter 2, provide at 2b1.1b1 that, quote, if the loss from a

9    relevant offense exceeded $6,500, increase the offense level

10   as follows, and then provides a chart.  And then in the

11   notes, Application Note 3a, it says to apply the greater of

12   actual or intended loss.  Of course, the issue here is how to

13   determine whether there was a loss, and, if so, how much.

14   Obviously, both sides have argued quite a bit over this

15   question.  Mr. Litvak's position is that there is no loss and

16   the Government's position is there was a loss, and it's

17   $6,332,202.76, which I am going to refer to from now on as

18   6.3 million.

19           How to resolve that disagreement, which is quite a

20   chasm.  As I said, I need to look at the greater of either

21   actual or intended loss.  Actual being the reasonably

22   foreseeable pecuniary harm that results from the offense.

23   And intended loss is the pecuniary harm the defendant

24   purposefully sought to inflict.

25           The Court finds, as I think I did the first time,

1    that there is an actual and there is an -- or it could also

2    be measured intended, but it ends up at the same number and

3    so it doesn't much matter, I guess, under the guidelines.

4          First of all, I want to note, fortunately, I guess,

5    for judges who labor trying to apply the guidelines, that the

6    guidelines make it clear that I have latitude in calculating

7    this, making this judgment.  They provide in Application Note

8    3c that I need only make a reasonable estimate of loss.  The

9    sentencing judge is in a unique position to assess the

10   evidence and estimate the loss based upon that evidence.  And

11   again, as already been agreed to, unlike the jury at the

12   trial, the Court may find and rest its findings about loss

13   facts relevant to this issue by a preponderance of the

14   evidence and including acquitted conduct.  United States

15   versus Vaughn, obviously, that I discussed with Attorney

16   Mahoney.  I think I'm bound by Vaughn.  I don't -- and I want

17   it to be clear, I don't think that a Court must consider

18   acquitted conduct.  I think the Government correctly reminded

19   me in their argument that there are circumstances as you

20   argued where consideration by a Court acquitted conduct would

21   be inappropriate, either for lack of proof by a

22   preponderance, but even more importantly to kind of this sort

23   of constitutional issue that the jury's verdict or their

24   findings or the relationship of the different charges is such

25   that it is not -- it is just not appropriate for a sentencing

1  judge to consider.  So I recognize that I am not bound to

2  consider them, but I also recognize that, under Vaughn and

3  other cases, I can if I find it by a preponderance.

4          Under actual loss, reasonably foreseeable pecuniary

5  harm is defined as, quote, pecuniary harm the defendant knew

6  of or under the circumstances reasonably should have known,

7  was a potential result of the offense.  Application Note

8  3aiiii.

9          Obviously, we heard from Mr. Norris on Count Four

10 that -- and I draw the conclusion from his testimony that

11 Invesco suffered an actual loss.  His testimony at 751, Lines

12 23, to 752, Line 20, is, I think, very compelling in, one, I

13 credited it and, two, it leads reasonably and strongly to the

14 conclusion that Invesco suffered a loss.  He viewed the

15 $73,000 difference between the lie and the truth as

16 significant.  It is very unlikely they would pay that much to

17 Mr. Litvak for this transaction.  And it mattered to them.

18 And absolutely it was important.

19         Coupled with that testimony is the recognized fact

20 that Mr. Norris had an obligation to his client for best

21 execution, a significant part of which is the consideration

22 of the price and that if a lower price could be obtained,

23 which clearly on the day of the transaction with Mr. Litvak a

24 lower price was available in the market.  He needed to take

25 advantage of that lower price.  So that if he had known about

1     it, that further supports my conclusion that he would not

2     have paid the 14 ticks to Mr. Litvak.  So I conclude that

3     Invesco suffered an actual loss and that Norris would not

4     have done the trade absent the misrepresentation by

5     Mr. Litvak.  I find that by a preponderance, as the jury

6     found beyond a reasonable doubt, Mr. Litvak misstated the

7     price he bid on Invesco's behalf -- the jury didn't find

8     this, I should say.  I find it -- in order to obtain hidden

9     additional gains at Invesco's expense.

10            Mr. Litvak's contention in his reply brief that

11    absent the fraud there's no reason to believe that Mr. Litvak

12    would have revealed Jefferies' acquisition to Mr. Norris at

13    the lower price.  It in my view is entirely belied both by

14    the chat where Mr. Litvak -- well, he's the one who

15    volunteers he bid his level, i.e., the lie, and Mr. Norris's

16    unrefuted testimony about the way in which BWIC trades

17    worked.  That's trial transcript 750 Line 6, at 750 Line 13.

18    In a BWIC trade, according to Mr. Norris, whom I credit, it

19    is essential to know whether a broker-dealer has bid your

20    level or backed up your bid.  There's no other way for the

21    BWIC buyer to determine his purchase price and what he's

22    going to pay to the broker-dealer.  Now, again, there's no

23    obligation for Mr. Litvak to have spoken.  But I really don't

24    think that this trade would have happened if somebody didn't

25    tell him what the bond was bought at, or did he bid his level

1    or did he back up his bid.  Thus, Mr. Litvak could have told

2    Mr. Norris the truth, that he backed up his bid, Norris's

3    bid, or a lie, that he bid some higher price.  In this

4    instance, he bid Norris's level.  Mr. Litvak chose the latter

5    course.  And so in no sense, in this Court's view, can it be

6    said that absent the fraud, that is Mr. Litvak's lie, that

7    Norris would have paid 79-30.  Rather, Mr. Norris made it

8    clear that if he had known the truth, he would not have paid

9    the price he did.  In my view, a reasonable estimate of the

10   loss his company suffered as a result is the amount of money

11   that's the difference.

12          We talked a bit about Alphas from the First Circuit,

13   and I actually think Alphas is supportive of what I have just

14   done by way of analysis.  I will note that Alphas is in the

15   context of intended loss, but that's all right.  I consider

16   it here and again in intended loss analysis.  But in my view,

17   Alphas merely applies the guideline definition of loss to the

18   specific facts of that case.  And in Alphas, the First

19   Circuit instructed in an intended loss context that the

20   district court on remand should, quote, compare what the

21   defendant appellant sought to bamboozle his insurers into

22   paying with what they would have paid had the appellant

23   submitted only bona fide claims, end quote.  785 F.3d, at

24   784.

25          The Government has done just that in this case in

1    their submission of their fraud loss analysis.  As they

2    pointed out in their memo at 18 through 19, it did not

3    include in the alleged loss or in Four -- Count Four or any

4    other trade, any amounts that Mr. Litvak's counterparties

5    agreed to pay in addition to the misrepresented price.  That

6    is to say the Government's loss calculations only include the

7    amount of the harm Mr. Litvak reasonably should have known

8    would be the result.  In Norris's case, for example, the

9    8-tick difference between 79-16, the price Mr. Litvak

10   actually paid for the bond, and 79-24, the price he told

11   Mr. Norris he paid for the bond.  It doesn't include, for

12   example, the 6-tick commission that Mr. Norris agreed to pay

13   to compensate Mr. Litvak for the trade.  And the Government

14   hadn't calculated the loss as the total amount of -- in

15   effect that Mr. Litvak earned from this transaction.

16           If we were to, you know -- I think the whole

17   argument about how -- you know, if I assume that but for the

18   fraud Invesco would have been able to negotiate for a lower

19   price that I -- you take -- Mr. Litvak's counsel takes issue

20   with the Government suggestion about that.  That's at

21   sentencing memo 13 to 14.  I find that unconvincing.  In my

22   view, but for the fraud the transaction would not have

23   occurred at the price it occurred at.  And that I find by a

24   preponderance of the evidence that based upon Mr. Norris's

25   testimony about BWIC trades that Mr. Norris likely would have

1   been able to negotiate to buy the bond for less than 79-30

2   absent his misrepresentation, and indeed would have been able

3   to avoid a loss caused to him of the difference between the

4   lie and the truth of the purchase price.

5          The defendant's argument about sort of the

6   hypothetical negotiation that we'll never know what -- that

7   argues that we would never know what that would be, and that

8   my view is that they are recouping the entire 73,000 that

9   Mr. Litvak, by his lie, was able to put in Jefferies' pocket.

10  To me, that's speculative to sort of -- and I guess that may

11  be the thrust of the defense's argument, that, oh, it is

12  speculative so we can't make any judgment.  There is no loss

13  because we can't know if maybe they might have split the baby

14  or maybe Mr. Litvak could keep a third of that 73 and Invesco

15  would take two-thirds.  I think that Mr. Litvak's counsel

16  asked me -- or his counsel to engage in what are speculative

17  hypotheticals, and that I conclude as I have said -- I am not

18  going to repeat the evidence, but on the evidence that I have

19  mentioned here and all of the evidence I heard, that in light

20  of his testimony, Mr. Norris said he would not have paid what

21  he did to Jefferies if he hadn't been defraud.  That's 751,

22  Line 23, at 752 Line 7.  The $73,000 that Mr. Litvak obtained

23  because of this lie is the proper measure of the loss

24  suffered by Invesco.  Again, I need only make a reasonable

25  estimate.  I have concluded it is an actual loss.  And in

1   this Court's view, I think this measure of the lie, the

2   73,000, is a reasonable, and on the record the most

3   reasonable, estimate of their loss on that count.  Of course,

4   if loss can't reasonably be determined which maybe that's a

5   suggestion of all of these hypothetical speculations that I'm

6   being told I would have to engage in to figure out the loss,

7   then Application Note 3b tells me to look at the gain that

8   the defendant obtained.  Now, I suppose the defense would

9   say, well, yeah, but we don't know the gain because there

10  would have been this negotiation and Invesco would have taken

11  some or all of that.  But in reality, the actual gain to

12  Mr. Litvak because of his fraud is $73,000 to his company.

13  In my view, that's an alternative measure of loss in the

14  event someone concludes an actual loss can't be calculated.

15          As I did in the first sentencing, I will do an

16  alternative finding on intended loss, which is the pecuniary

17  harm that the defendant purposely sought to inflict and

18  includes intended pecuniary harm that would have been

19  impossible or unlikely to occur.  That's not the case here, I

20  don't think.

21          I find alternatively, again by a preponderance,

22  that Mr. Litvak intended that his victims would suffer losses

23  and that in every event in which he made a misrepresentation,

24  he intended to induce them to complete a transaction with him

25  in which he received more money than they -- than his -- what

1    he -- what the truth would cause them to pay.  In lying, for

2    example, to Mr. Norris about the price at which he purchased

3    the SARM bond in the BWIC at issue in Count Four, the Court

4    finds that Mr. Litvak intended for his lie to lead to profits

5    at Invesco's expense.  I will refer to Government's Exhibit

6    202b where Mr. Litvak says -- I think in a chat, that I want

7    more -- dollar signs four times.  Clearly, that was

8    Mr. Litvak's motive.

9         I should note because this is a finding as to

10   intended loss, it might be that Invesco, some hypothetical

11   situation, would have been satisfied to purchase at the price

12   Mr. Litvak -- at the higher price even if Mr. Litvak had been

13   truthful, but I don't think that matters.  I don't think

14   that's the case and I don't find that to be the case.  I

15   think Mr. Norris is very clear he wouldn't have done this

16   trade at that price.  But for purposes of intended loss, it

17   is in my view clear that Mr. Litvak, presumably

18   believing that Invesco would not be willing to buy at the

19   higher price had Mr. Norris known of Mr. Litvak's lower

20   acquisition price, that making this representation would

21   cause Invesco to hand over more money than it otherwise would

22   have.  And the amount of that intended loss by Mr. Litvak was

23   $73,000.

24        I just will say in passing -- I'm not sure it

25   belongs here -- but the efforts of the defense in their memos

1    to import the heart of the bargain argument from the wire

2    fraud cases and to the extent it sought to be imported into

3    loss calculation, I think is unavailing.  I have in mind the

4    defendant's memo at 15.  I -- there are no cases cited in

5    which any Court has adopted that and suggested reading of

6    that line of cases in the loss guidelines.  I don't know a

7    reason to do so.  So I find both actual, intended and even

8    viewing it from the perspective of Mr. Litvak for gain, that

9    on Count Four the loss is $73,000.

10           With respect to acquitted conduct, I mean, I really

11   -- I broke it out by acquitted conduct, uncharged conduct and

12   the other trades that -- that are part of the binder that we

13   have referenced and that I have reviewed carefully, but I

14   don't really know that I need to set on the record my

15   reasoning.  The only -- it is the same analysis, I guess.

16   The only points I would have to make clear is, first of all,

17   the Application Notes to 1(b)1.3 makes it clear that the

18   defendant -- the application of this provision doesn't

19   require the defendant to have been convicted of the multiple

20   counts when considering, in other words, acquitted conduct.

21   I have addressed the fact that I -- that Vaughn, I think,

22   clearly says in the Second Circuit that it is not

23   unconstitutional to consider acquitted conduct, and that for

24   the -- absent some of the reasons I mentioned, things of that

25   nature where I could decline to consider it, I don't see a

1    reason here to decline to consider acquitted conduct.

2           As the Circuit said in the Casey case, 796 F.3d,

3    176, 199, the Court being the Second Circuit Court, they made

4    clear that, quote, there is neither a logical inconsistency

5    between acquittal by a jury, i.e., a finding on the fact not

6    proven by a reasonable doubt, and the factual finding of

7    guilt by a sentencing court, meaning it is not really guilt,

8    but it is by a preponderance that the elements have been

9    proven based on the same evidence.  And that's really exactly

10   what's occurred here.

11          I find by a preponderance of the evidence that

12   Mr. Litvak's actions with respect to each of the charged

13   trades and each of the uncharged conduct, both those

14   introduced at trial and those that are submitted by way of

15   exhibits to the sentencing memo of the Government, that those

16   all satisfy the elements of securities fraud, including

17   materiality by a preponderance of the evidence.  I am of the

18   view that all of this conduct really was part of the same

19   scheme.  It is all in the same nature.  It's -- you know, I

20   don't have everything in front of me, but I'm not sure I can

21   say I had everything in front of me with Mr. Norris.  I mean,

22   there may have been things about his company, were they being

23   pressured to buy more this month, to not buy as much.

24   There's a whole lot of other facts that I don't know even

25   about the convicted conduct, but I think that the test is

1    whether -- well, I guess I shouldn't -- shouldn't -- whether

2    the disclosure of the truth of the omitted fact would have

3    assumed significance in the deliberations of the reasonable

4    investor.  And it doesn't require proof of a substantial

5    likelihood that disclosure of the truth of the admitted fact

6    would have caused the reasonable investor to act differently.

7           So it's my conclusion based on a preponderance of

8    the evidence that as to the 76 transactions before me, the

9    convicted count plus the 75, which represent nine acquitted

10   counts, 10 uncharged counts that were at issue in the second

11   trial and 56 other transactions that the misrepresentations

12   by Mr. Litvak about either his acquisition price, his -- in

13   other words, what his firm paid or what he paid to buy the

14   bond or what he was going to sell the bond at or that it was

15   an inventory trade, or not saying it was an inventory trade.

16   In other words, the three ways which are set forth in great

17   detail in my post-trial ruling, the three different lies or

18   types of lies all were material to the victim and there was a

19   loss suffered by them measured the same way I described as to

20   Count Four.

21          And I should say that in reaching that decision

22   about the trades beyond Count Four, I'm not only using

23   testimony from the second trial, but I reminded myself of

24   Mr. Lemin's testimony at the first trial, 647, Line 8 -- I'm

25   sorry -- trial transcript at 647, Line 8 to 647, Line 12.

1    Mr. Wollman at 830, Line 1 to 830-14, says, would it have

2    mattered to you if you had known that Litvak actually bought

3    the bonds as 50 and a half and not 51?  Answer yes.  Mr.

4    Norris's testimony from the first trial, I have Vlajinac, if

5    I'm saying that right.  I looked at transcript 787, Line 19,

6    to 789, Line 3.  Again, that is the first trial.  And

7    Sarabanchong from the first trial, at 2229, Line 1 to 2229,

8    Line 7, and 2232, Line 12 to 2233, Line 5.

9           So I conclude that based upon that testimony that

10   the counterparties to Mr. Litvak's trade would not have done

11   the trade at the price that he offered them to him if he had

12   known the truth and not been misled by Mr. Litvak's lies.  I

13   further find that their testimony in the regards that I

14   cited, I credit and conclude is the testimony of reasonable

15   investors in this specialized bond market.

16           I will just pause to mention that the defense called

17   an expert about this market, and much of what is he said I

18   would credit.  His explanation of the nature of the market.

19   His explanation of the analytics that the companies engaged

20   in and the importance to them.  Clearly, there were points

21   based on the analytics that they wouldn't pay above a price

22   or below a price selling it.  But I do -- did not find it

23   credible when he spoke in terms of as long as the analytics

24   said buy it at 20, that if Mr. Litvak had told the buyer I

25   can get it for you at 19, that that wouldn't matter to a

1  purchaser.  I just be credit -- I don't have the exact line

2  of the exact testimony, but to the extent he was offered to

3  say something like that, I just don't credit it.  I found

4  that the investors themselves as they testified, the ones I

5  mentioned, there were probably others that I haven't

6  collected, but as to the testimony I have cited, I found much

7  more compelling and believable as to what would matter to

8  investors.

9        Also, I guess since I'm speaking about -- I could

10  have spoken about this earlier or maybe more clearly, but let

11  me just say again in the context of all the other trades

12  beyond Count Four, I reject any invitation to attempt to

13  reconstruct what the negotiations would have looked like but

14  for the lie.  In point of fact, at least on the record before

15  me, Mr. Litvak regularly and repeatedly misrepresented the

16  prices at which he bought and sold securities.  I know

17  three's a lot of other trades, presumably that he made in

18  which he didn't do that, but the 75 I have looked at is -- is

19  a fair amount.  And that his counterparts relied on what he

20  said as in determining how to compensate and what to

21  compensate Jefferies for doing the transactions.

22        And I think the way in which Mr. Litvak sought to be

23  compensated for the transactions really undermines any

24  argument, quote, absent the fraud, end quote, Mr. Litvak

25  would have remained silent as to the prices he was buying or

 1    selling and still effectuate the trade at -- in Mr. Norris's

 2    case -- the higher price that he actually paid.  I know

 3    Mr. Litvak isn't obliged to reveal his purchase price, but as

 4    I said, at least the universe I have looked at, all the

 5    trades were affected by him volunteering the false

 6    information about acquisition or sale price.  And further, I

 7    think it is correct that all of the trades involve

 8    negotiations of 4, 6 or 8 ticks for compensation for

 9    acquiring the bond.  And I think that also undercuts the

10    argument that but for his lie he would be silent and he would

11    have gotten the same benefit of his lie even if he had been

12    quiet.

13            As I say, I think the best case I can cite to is the

14    Vivendi case from the Second Circuit, 838 F.3d, 223, 258 in

15    2016, a securities fraud -- civil securities fraud, but the

16    language is as follows:  It becomes clear that once a company

17    chooses to speak, the proper question for purposes of our

18    inquiry into price impact is not what might have happened had

19    the company remained silent, but what would have happened if

20    it had spoken truthfully, end quote.

21            And further, I find the Alphas court helpful to the

22    extent that it says the following -- at Page 781, it says,

23    under the sentencing guidelines, loss does not include sums a

24    victim would have paid to the defendant absent the fraud.  I

25    will take Mr. Norris's example.  He agreed to pay Mr. Litvak

1    6 ticks, right, for getting his bond?  And so we should not

2    include, and the Government doesn't ask me to include those 6

3    ticks in the loss, just like the $25 insurance claim that

4    Mr. Alphas had -- truthfully had should not be counted as a

5    loss.  But it then says the relevant inquiry is what the

6    fraudster reasonably expected to euchre out of his victim.  I

7    love that -- citation omitted.  It's citing to the guideline

8    Note 3a, defining intended loss as the pecuniary harm that

9    was intended to result from the offense, end quote.  Not what

10   would have slipped through his fingers had he been caught in

11   the act, end quote.

12           Again, I would also find as to the nine uncharged --

13   I'm sorry, the 10 uncharged, the nine acquitted and the

14   remaining 55, that intended loss, if analyzed, and Alphas

15   would be helpful on that, I would come to the same

16   conclusion.  It's the delta of the lie, not speculation about

17   what silence would have led to.

18           And lastly, I think if the defendant argues it's

19   impossible to determine loss here because it is speculative,

20   then I look to the gain.  And I believe the gain here to

21   Mr. Litvak's company is the same as the loss I have just

22   calculated.  So with respect to the 10 charged trades, both

23   the convicted Count Four and other nine, I think that

24   1,238,340.50.  With respect to uncharged counts, that's --

25   well, if I add it all together, all the trades as I say give

1   rise to 6,332,202.76, and I will consider all of those trades

2   and all of that loss in determining the guideline loss table,

3   which I believe results in an 18-level increase and also if I

4   consider the 76 trades, as I am, there are more than 10

5   victims clearly, and that results in a two-level enhancement.

6   So yes, the answer is yes.

7        I think at this point, we'll take a 15-minute break

8   and then I will come back and we'll address the PSR, what's

9   going to be my adopted findings in the PSR, give you the

10  opportunity to object to them or take exception to them, I

11  suppose.  And then I think at that point we will be able to

12  move to arguments, which include some remaining legal

13  arguments, your due process argument and other arguments

14  raised in connection with sentencing.

15       So we'll take a recess at this time.  Thank you very

16  much.

17       (Whereupon, a recess was taken from 11:02 a.m. to

18  11:16 a.m.)

19       THE COURT:  Please be seated.  I know I said we were

20  moving on, but I think there's one thing that I didn't

21  address in trying to shorten up what I said, is that I didn't

22  address the arguments of defense counsel that certain

23  uncharged trades, in particular, shouldn't be considered.

24       For example, you argue that if it was the same

25  counterparty as an acquitted trade count, I shouldn't

1    consider it.  And I think given my conclusion that it's been

2    shown by a preponderance of the evidence that these acquitted

3    trades involved misrepresentations that were material and

4    should be considered in sentencing, then -- then I think that

5    argument fails because I reached the same conclusion as to

6    those other uncharged conducts -- trades that involve the

7    same counterparty.

8            It is likewise, in my view, there is a showing by a

9    preponderance of the evidence that the uncharged trades

10   involving those same counterparties were material and should

11   be considered in sentencing.

12           The second specific argument is that the Government

13   didn't solicit witness testimony as to the loss for some of

14   the transactions and that, in some cases, the interviews that

15   the Government undertook demonstrate -- undermine, excuse me,

16   demonstrate the defendant's view, but undermine the

17   Government's loss theory.

18           I think I went at this a bit with questioning and

19   back and forth with Attorney Mahoney, but I think that the

20   question is whether by a preponderance of the evidence the

21   objectively reasonable investor would have viewed the

22   misstatements in these trades to be material.

23           The fact that there may be a particular line of

24   testimony from a witness that would suggest he didn't or that

25   a particular witness would say, as some of these interviewees

1    did or even as some of the support letters, I think I recall

2    Redtop writing letters in the first sentencing, that, you

3    know, this is the way the world worked.  I don't find that

4    reflective of the reasonable investor, objectively reasonable

5    investor, that I think we all agreed was the standard.

6            So for those reasons, I do not accept that argument.

7            And then defense counsel argued that counterparties

8    payment of a price that they bid before the misrepresentation

9    renders the misrepresentation immaterial I find unpersuasive.

10   I think actually that's Mr. Norris.  And the jury found,

11   beyond a reasonable doubt, it wasn't persuasive.  That it was

12   material.  But, generally speaking, as to the uncharged ones,

13   in my view the lies that Mr. Litvak made allowed him to

14   receive money for Jefferies that his counterparties would

15   otherwise have been unwilling to pay if told the truth.

16           The fact that they might have paid that price if, in

17   fact, in the Norris trade, for example, Mr. Litvak had to

18   pay, had to bid, did bid the bid that Mr. Norris gave.  The

19   fact that Mr. Norris would have paid that amount doesn't mean

20   that the lie wasn't material to an objectively reasonable

21   investor and similarly with the uncharged conduct.

22           In my view, these investors were harmed because they

23   paid more money to Jefferies and most likely more than they

24   would have been willing to pay if Mr. Litvak had not lied and

25   they were material.

1          Lastly, there's an argument, I think, about the

2     trades at Tab 2 and 6.  And I -- in my view, the evidence

3     that the Government has put forward on those particular

4     trades by way of the documents as well as the other evidence

5     in the case is sufficient for me to draw a reasonable

6     inference that, for example, at Tab 2, Mr. Litvak

7     misrepresented to the selling victim the price that Mr.

8     Litvak's buyer was willing to pay.  And similarly, in Tab 6,

9     I believe the evidence supports the inference and conclusion,

10    by a preponderance of the evidence, that the Court's -- that

11    Mr. Litvak purchased the bond for far less than a couple of

12    ticks, which is the language used in the chat, a couple of

13    ticks cheaper than 24.

14          In my dictionary, a couple means two, maybe it could

15    mean a little bit more than two, but in actuality in this

16    trade, Mr. Litvak paid 48 ticks cheaper than 24 to buy the

17    bond.  And I think in no one's world would a person willing

18    to pay a couple of ticks view 48 as what they meant, or that

19    48 would not affect them in making the decision.

20          So we now need to turn and get to where I have a PSR

21    and facts upon which to impose a sentence so we can discuss

22    the sentence.

23          Based upon what I have said in connection with the

24    loss calculations, I am essentially going to adopt what's

25    called the Government's version.  I would remove that from

1    the PSR, edit it out, between paragraphs 4 and 5.  I have

2    some minor edits.  I have some places where I do not.  I am

3    going to excise some of what's in -- I think it is still the

4    Government's version.  And then also, clearly, I will adopt

5    some of the paragraphs in the defendant's version, but

6    clearly will not accept others.  It should be pretty clear.

7           I think what I would like to do is I will tell you

8    how I am going to direct that the PSR be prepared to reflect

9    what I'm adopting.  If you have objection to particular

10   things I'm doing, if you just make a note or something and

11   kind of we'll take them up.

12          As I say, I will delete that caption between four

13   and five, January, Government's version, because it is now my

14   version.  In paragraph 8, I added the language in the first

15   line after much less transparent than the stock market,

16   comma, indeed it is described as quote, opaque, end quote.

17          I mean, there's a possessive mark missing that's in

18   paragraph 20.  I don't think I have to go over that.  I

19   believe that in paragraph 25 in the seventh line, Invesco

20   PPIF fund, I think you need to add bid level to make the

21   sentence make sense.

22          Paragraph 33, I am not going to adopt because I

23   don't find it relevant to sentencing here today.  The second

24   sentence beginning, further, and ending with the word

25   "months."  Paragraph 42, you should take out the phrase in

1  the first line, in the Government's view.  Between 42 and 43,

2  you should take out, defendant's version.

3       There's a typo in 45 in the last sentence.  Instead

4  of my making, it should be by making, January.  I am not

5  going to adopt -- I'm going to excise from the report 51

6  through 53.  At 56, third line from the bottom, Invesco's

7  willingness to pay, I would delete, at least I would pay

8  79-30.  I would delete paragraphs 60 and 61, 62, 63, 64, 65,

9  66, 67.  I view that primarily by way of argument.

10       And 69, I will not be adopting because, of course,

11  it is not the calculation I'm going to do.  And 70, I

12  understand why you wrote it that way, January, but I think it

13  is not -- it doesn't convey what's happening here.  I think

14  you need to say that there are -- take out the word "no" in

15  that sentence, so that there are identifiable victims.  And

16  add the sentence, which you pointed out to me, there are --

17  no victim statements have been received by you and none have

18  been received by me.

19       Are there any objections to those edits?

20       MR. FRANCIS:  For the Government, Your Honor, I

21  think paragraph 70, I understood what probation was saying,

22  the way they had phrased it.  If you are saying no victim

23  statements were received, would Your Honor consider adding

24  something about victims testified at trial?  Just to make

25  clear what's being relied on.

1    THE COURT:  Well, yeah, we can say that.  But I

2    don't know.  I guess victim impact I thought usually is

3    statements, but I'm happy to add that.  That's a true

4    statement.  I don't think anybody would object to that.  So

5    you'd add no victim statements were received, but there was

6    victim testimony at the two trials in this case.

7         MR. FRANCIS:  May I just have a moment?  I want to

8    review, just make sure I got it all.

9         THE COURT:  That's fine.

10        MR. MAHONEY:  Your Honor, I could state our

11   position.

12        THE COURT:  I don't know if he needs to listen to

13   you, though, Attorney Mahoney.  I'm sorry.

14        MR. MAHONEY:  That's fine.

15        THE COURT:  I think I failed to -- I have it here,

16   but I misspoke.  I'm going to not adopt 46.  Again, I would

17   view that from the Government's side to be argumentative.  It

18   is not really facts that are important to me at sentencing,

19   relevant to me at sentencing.

20        MR. FRANCIS:  Paragraph 68, Your Honor.

21        THE COURT:  Yes, sir.

22        MR. FRANCIS:  I believe there's argument in there.

23   And I believe there's some counterfactual statements with

24   regard to Mr. Litvak and the lawsuit against Mr. Canter,

25   which I think is probably going to be at issue.  I think

1    probably ironing that out is worthwhile.

2          THE COURT:  What's your objection to the way it is

3    phrased there?

4          MR. FRANCIS:  Well, whether -- I think we just need

5    to maybe with regard to the lawsuit filed by Mr. Litvak, he,

6    through his attorneys, noted that the Government

7    mischaracterized the purpose of the filing which he stated or

8    claimed -- I don't want pejorative about it, but I want to

9    make clear this is not a finding of fact --

10         THE COURT:  He stated it was done.  That's fine.

11   I'm not finding anything more than that.  That's what he

12   stated.  And I would probably say -- well, I guess his

13   attorney said you mischaracterized.  I'm not sure I would

14   call your characterization a mischaracterization.  I guess, I

15   would probably take that phrase out, again, we're into

16   argument.

17         So with regard to the lawsuit filed by Mr. Litvak,

18   he stated was done to preserve.

19         Anything else about that paragraph?

20         MR. FRANCIS:  Once, again, it is not so much that I

21   doubt Mr. Smith's representations to the Court, but I think

22   it would be appropriate to say, who stated in court that he

23   did not suggest or who represented or something along those

24   lines -- in the third from the bottom line.

25         THE COURT:  Well, it says his prior criminal counts,

1   you want me to call them out by name?

2          MR. FRANCIS:  No.  All we have on this point -- once

3   again, it is not that I doubt it so much as I just want to

4   make clear, Mr. Smith told you he had read it and didn't

5   suggest that it might -- that it would be a potential

6   violation of the conditions of release.  I think it would be

7   more appropriate, he represented to the Court that --

8          THE COURT:  That's what I'm writing right now.  His

9   prior counsel, Attorney Smith, who represented to the Court

10  that he did not suggest it would be a violation of his

11  conditions.  I have the transcript.  I thought I had a pretty

12  good recollection of that hearing, but I wanted to be sure.

13  "I didn't speak up and say, we have to go get the Court's

14  permission.  This could be potentially construed as a

15  violation of the condition of release, Your Honor, I just

16  didn't."

17         MR. FRANCIS:  That's my recollection, as well.

18  Particularly because it treads on issues about advice.

19         THE COURT:  I understand.

20         MR. FRANCIS:  Then in the final line, immediately.

21  My recollection, I don't have the correspondence, I believe

22  there was a period of days where we were discussing it.  I

23  just think you can just take out immediately and say it was

24  withdrawn.

25         THE COURT:  I think we should say, after the

1   Government expressed concern, the summons was withdrawn.

2   That's a correct statement in my recollection.

3          Mr. FRANCIS:  I agree.  Beyond that, thank you.

4          THE COURT:  Defense.

5          MR. MAHONEY:  Your Honor, just a couple of things.

6   I will start with 68 just so I'm sure -- so I'm clear on

7   where we landed here.  Is what Your Honor going to adopt,

8   will it make clear that the complaint, that the idea of

9   filing the complaint was run by -- that Mr. Smith represented

10  at the last hearing it was something he was -- was run by him

11  before --

12         THE COURT:  I don't know "run by" is the right word.

13  He said that he was aware of it, and he did not say it would

14  be a problem or a violation of his conditions, which I think

15  there is a pretty good argument that it was a violation of

16  his conditions.  I was very troubled by it.

17         I didn't mean or now to say that a supervisee can't

18  file a lawsuit that involves a witness or a victim, but I

19  think he's got to ask the supervising court about it.  That's

20  how I got to asking Attorney Smith, you know, did you know

21  about this?  Because if you did, why didn't you say

22  something?  He basically fell on his sword.

23         So I'm not making any comment about whether I

24  credited what he said.  He said what he said.  That's what I

25  want the paragraph to reflect.

1          MR. MAHONEY:  What he said that he was aware of.

2          THE COURT:  Correct.  In effect, I'm adopting the

3    transcript from that hearing as to what was said about it to

4    me.

5          MR. MAHONEY:  The only other thing I would raise is

6    the paragraphs that Your Honor has indicated that you will

7    excise in the defendant's version of the offense conduct.

8    Now, obviously I understand that a lot of that -- the

9    arguments that are made there are counter to some of the

10   findings that Your Honor in the guideline's calculation, but

11   just so that I'm sure that I'm preserving everything, I am

12   going to formally object to --

13         THE COURT:  That's correct.  You should.

14         MR. MAHONEY:  -- the deletion of those paragraphs.

15         THE COURT:  I understand.

16         MR. MAHONEY:  In terms of -- and that applies

17   also -- I gather what's being done in paragraph 70 is just to

18   state the fact that there are no victim impact statements,

19   but that --

20         THE COURT:  By my findings, there are victims.

21         MR. MAHONEY:  But by Your Honor's findings there are

22   victims, again, just for clarity, we dispute that there are

23   victims.

24         THE COURT:  I understand that.  No, you should take

25   exception.

1          MR. MAHONEY:  Right.  That's it, Your Honor.

2          Mr. FRANCIS:  So, I'm sorry, Your Honor.  I'm not

3    clear, is the defense objecting to all the deletions or only

4    certain ones that they think pertain to Your Honor's finding

5    with regard to loss calculations?

6          THE COURT:  Let me tell you what I'm going to do

7    when you all sit down, I am going to adopt the PSR as

8    amended, so any objection you have to the way I said it would

9    be reprepared as an amended report, you need to state your

10   objection.

11         I thought I was asking both the Government and the

12   defendants to do that.  So, let's do it again.

13         Are there any objections you have to what will

14   become the amended PSR as I have articulated it to the

15   probation officer on the record here today?

16         Mr. FRANCIS:  No.

17         THE COURT:  From the defense, is there anything more

18   you wish reserve as to objections?

19         MR. MAHONEY:  The only objections I'm preserving are

20   to the deletions of the paragraphs in the defense description

21   of the conduct which Your Honor previously mentioned.

22         THE COURT:  Okay.  All right.  Then objection is

23   noted.  I was -- understood that will be your objections.  In

24   other words, I think I thought about and considered your

25   arguments.  And the Court adopts the PSR to the extent it, as

1   amended now, sets forth facts which are relevant to the issue

2   of sentencing before the Court today.

3          That then, of course, leaves me with the calculation

4   of the guidelines, which obviously -- over the objection of

5   the defendant, which I will ask you to put on the record -- I

6   adopt what is the probation officer's calculation of a base

7   offense level of 7 based on the $6.3 million loss that falls

8   on level 18 of the table.  Two levels are added because in

9   the 76 transactions, there are more than ten victims,

10  somewhere in the 30s, if I recall correctly.  And lastly, and

11  undisputed, there's a four level increase because Mr. Litvak

12  was a registered broker, or dealer, that results in a total

13  offense level of 31.

14         There are, of course, as I said earlier, no criminal

15  history points.  So it's a 31, 1, which, in the current book,

16  would call for a guideline sentencing range of 108 to 135.

17         I assume the defendant objects.

18         MR. MAHONEY:  We do, Your Honor.

19         THE COURT:  I assume the Government doesn't

20  object.

21         Mr. FRANCIS:  Correct.

22         THE COURT:  Now we have the guidelines calculated.

23  And the facts, at least, to the extent they are set forth in

24  there found.  In there meaning the PSR.

25         I guess I just want to, for the record, make it

1    clear there is no request for restitution.  I gather in light

2    of the firm's compensation of the victims and their failure

3    to seek reimbursement compensation from Mr. Jefferies (sic)

4    as restitution?

5              Mr. FRANCIS:  From Mr. Litvak.

6              THE COURT:  I'm sorry, Mr. Litvak.

7              MR. FRANCIS:  Do you need me to put anything on the

8    record about that?  Are you comfortable with your information

9    about that.

10             THE COURT:  You probably should.

11             MR. FRANCIS:  So I can do that briefly.  Jefferies

12   entered into a nonprosecution agreement prior to the first

13   trial in 2014.  It was disclosed to the defense, but not

14   publicly released until after the first trial.  The terms of

15   that nonprosecution agreement included a restitution

16   provision of up to, I believe it was $12 million, but there

17   was a deadline on it.

18             Your Honor, at the first sentencing, gave us 90

19   days --

20             THE COURT:  I remember that.  I read the

21   transcript.

22             Mr. FRANCIS:  So we -- Jefferies had made, I believe

23   it was at that point, something along the lines of 4 or

24   $5 million.  We were confident they would hit the total

25   amount of the loss as calculated by Your Honor, but because

1    Your Honor gave us the time, they were able to hit that.

2          Now, restitution was an issue in the first

3    sentencing because there were Title 18 offenses on which Mr.

4    Litvak was convicted, namely 1031 and 1001.  Now there are

5    only Title 15 offenses.  Restitution is not available under

6    Title 15 in the first instance, as a legal matter is my

7    understanding, but even leaving that aside --

8          THE COURT:  Not available or not mandatory?

9          Mr. FRANCIS:  Not mandatory.  I haven't done the

10   research to determine whether it would be available.

11         Leaving that aside, every victim has been

12   compensated that we know of that went into the calculations.

13   Jefferies, I think there's an argument, is not entitled to

14   seek contribution from what might be a co-conspirator, but in

15   any event, haven't done it.

16         THE COURT:  They have not.  Okay.  Fine.

17         All right then, I think at this time we now really

18   get to the meat of the matter, I guess.  I know we've had a

19   lot of arguments already about loss and things and the facts

20   of the case, but I'm now at the point where I usually turn to

21   defense counsel and ask them to address the Court on the

22   various arguments you wish to make.

23         I ask defense counsel to advise me if the defendant

24   wishes to address the Court and whether counsel wishes to

25   call other people to speak on his behalf.  And I will, in the

1  course of all of that, ask questions, likely of defense

2  counsel, not of the other speakers, but questions that I have

3  on various issues, both the -- I think the remaining kind of

4  what I will call legal argument that the sentence can't be

5  more than 24 months.  But I also have questions about what

6  I'm sure will be other part of your argument, like family

7  circumstances, the size of the fine and the spouse's assets,

8  things of that sort.

9          But somebody needs to begin.  Let me know who is

10  going to speak, and we'll get started.

11          I guess also, I'm sorry, I have forgotten that

12  there's also the argument I assume you will make, if you are

13  not, you should tell me, but why -- I mean, you are making an

14  argument a guideline sentence isn't appropriate, I assume.  I

15  know part of that is the loss table, but that's also another,

16  quote, legal argument to be made, I suppose.

17          MR. BUTSWINKAS:  Thank you, Chief Judge Hall.  I'm

18  going to be brief with my presentation, then I am going to

19  turn it over to Mr. Mahoney.  On Monday night, I learned that

20  my friend and client's college age daughter had suddenly

21  passed away in the evening.  I spent yesterday trying to

22  figure out what to say here.  I could only think about that.

23          And I even thought briefly about not coming today

24  because I knew that Mr. Litvak would be more than ably

25  represented by Mr. Mahoney and Mr. Harber and our team, but a

1  big part of me thought it would be disrespectful to the Court

2  not to come and see this matter through.

3       THE COURT:  I appreciate that.  I don't think I

4  would have taken -- I have actually meant to say at the end,

5  that I appreciated having you in my court.  And I have always

6  felt respect from you, which is not easy to say through a

7  trial that's highly contested.

8       I'm very sorry for your friend's terrible loss, and

9  it isn't right to say I appreciate you being here.  I guess I

10 appreciate what you are saying by being here, but I don't --

11      MR. BUTSWINKAS:  And I don't say it in any way as

12 something that weighs on the scale of Your Honor's decision,

13 but there were three things that I thought were important to

14 say, and then I will turn it over to Mr. Mahoney.

15      First is our team's recognition about how hard

16 sentencing is.  In fact, Mr. Mahoney passed me a note just

17 moments ago saying basically he wouldn't want to be a judge.

18 What I would say as Your Honor approaches that difficult

19 burden, as you know, there isn't a perfect mathematical

20 formula.  The sentencing commission and others, for almost 50

21 years now, have tried to squeeze the humanity out of

22 sentencing and make it a one size fits all formula.  That has

23 largely failed for a very, very good reason.

24      There isn't a computer model, as you know well, that

25 gives you right answer.  It is feel, it is experience, it is

1    perspective.  It's frankly the ultimate test of the integrity

2    of our system.  And it also involves a real person, not a

3    variable in an equation.  And real people are judged and

4    evaluated not on snapshots, not solely on their mistakes, but

5    on the whole photo album, which we think is best reflected by

6    the 120 letters that Your Honor received that describe Mr.

7    Litvak, not by platitude but by example of actual things that

8    is he did.  And also with the recognition of how difficult

9    this stage of any criminal proceeding is, not only for the

10   defendant and his family, but for the Court.  So that's point

11   one.

12          Point two, is I think probably something the

13   Government shares, so it really doesn't weigh, again, on the

14   scale of sentencing, but -- and I have got to say that I

15   never said this in a court, but I feel like I would be remiss

16   if I didn't say it.  We want to personally acknowledge the

17   role of the Court in these proceedings.  It is important to

18   us to note that it is rare to find the situation where the

19   Judge is working as hard as the lawyers.

20          THE COURT:  I don't believe that.

21          MR. BUTSWINKAS:  Well, it is a reminder about how

22   hard and tedious fairness is.

23          THE COURT:  That's true.  That is absolutely true.

24   It is in the details.  And that's why guidelines don't work,

25   because there aren't enough details in the picture painted.

1          MR. BUTSWINKAS:  It is also, I think, a reminder

2     that people in the audience don't see, that most of the hard

3     work happens when no one is here and when most of the lights

4     are out.

5          THE COURT:  Well, it's not even the lights are out.

6     This is extraordinary for this many people to be in the

7     courtroom.  I have trials, there is no one in the back of the

8     courtroom, other than the CSO, Hi Vlad.  That's the only

9     person.  So it is extraordinary.  So I guess they might have

10    a misimpression because there's so many of them.

11         MR. BUTSWINKAS:  I think probably with respect to

12    these proceedings, as you know, which were very trying for a

13    whole bunch of reasons, but we were especially thankful of

14    the way Your Honor navigated the personal circumstances that

15    arose with jurors.  It was, for many reasons, a stressful

16    situation that has never arisen in my 30 years in a trial.  I

17    know you, Your Honor, you've had many more trials than I

18    have, but I would be surprised if you had it, either.

19         THE COURT:  I've never heard of a juror dying during

20    trial.

21         MR. BUTSWINKAS:  It wasn't just that, as you know.

22    Every other day we had some complication that required the

23    Court to deftly navigate to preserve the opportunity to have

24    a fair trial.  That was very important.

25         The third point that I want to make, and then I will

1    sit down, is that we think that we stand before the Court in

2    different circumstances that warrant a different sentence

3    than Your Honor imposed after the first trial.

4          Mr. Litvak has now essentially been restricted by

5    the system for five years, been unable to be employed.  16

6    counts have now become one count.  And that may reflect loss

7    one way, but it still can be considered with respect to your

8    sentence in other ways.  The law of materiality has been

9    clarified.

10         What I personally was concerned about with respect

11   to the Government's submission -- and I take this from many

12   years ago when I was -- when I fancied myself as an athlete,

13   I played on a softball that was mostly made up of Assistant

14   U.S. Attorneys.  So we had a lot of arguments and a lot of

15   discussions.  But one of the things that they remind me of is

16   that this, though adversary, is not something that should be

17   reduced to a contest or a competition or something that is a

18   devotion to the original outcome regardless of intervening

19   circumstances.  We have submitted, I'm sure Mr. Mahoney will

20   talk about some of them, things have happened in the

21   chronology that should, I think, compel the Court to resist

22   the historical inertia of just imposing the same sentence.

23         I think the different outcome is a factor in that.

24   I think that the other resolutions of cases that are similar

25   is a factor in that.  I think that the fact that Mr. Litvak's

1    supervisor, who was involved in some of these, at least

2    according to the evidence in the case, not only had nothing

3    happen to him but received a -- Your Honor knows, a

4    significant severance and a document that, to this day, the

5    Government hadn't explained the delay in producing.

6         So we come before Your Honor with and we understand

7    we haven't always agreed on the legal points because that's

8    the nature of this business, but we think we come before Your

9    Honor with different circumstances that compel a different

10   result than at the first sentencing.

11        So with that, Your Honor, I am going to turn it over

12   to Mr. Mahoney with the Court's permission.

13        THE COURT:  So I should talk to him about different

14   circumstances.  I can assure you, though, before you sit

15   down, that wherever I end up in my sentence, whether it be

16   the same, higher or lower, it is not because of inertia.

17        I have spent -- I really should keep track like I

18   used to, but one of the best parts of my job is I don't have

19   to record my hours I spend.  But I would say a hundred or

20   hundreds of hours for this sentencing, not counting

21   everything else, in rereading everything and going back.

22        So, I don't know, there's no way to prove that it

23   would be inertia if it were the same, but I can assure you I

24   have in mind not only the things you've just argued, and I

25   have my own view of whether they weigh or not, I also have in

1    my mind things that I think could argue that changed

2    circumstances are not beneficial to your client.  I mean,

3    beneficial in the sense of help him get the outcome you are

4    arguing, that is a lower sentence.  So I don't know.

5         That's self-serving for me to say it because there's

6    no way that anybody can look inside my mind, but I honestly

7    can say that, because I just spend too much time looking.

8    Yes, I know what I sentenced last time, but I didn't start

9    with that as the assumption here, I guess is what I want to

10   say.

11        MR. BUTSWINKAS:  Thank you, Your Honor.

12        MR. MAHONEY:  Your Honor, I think that was our --

13   that was our statement.  I'm happy to answer any of Your

14   Honor's questions.

15        THE COURT:  Okay.  Well, I guess I'm assuming that

16   you're -- given the sentence you asked me to impose, that you

17   wish me -- I don't think you made any technical downward

18   departure motions, so I am going to treat it as I would

19   prefer to under a variance argument that I should not weigh

20   the guidelines as heavily, and instead look at the other

21   factors that would cause me to come out to a sentence that

22   isn't in the guidelines.  Okay.  That's what I am assuming

23   you're asking me to do.

24        MR. MAHONEY:  Your Honor, I think we did -- we

25   technically did in our opening briefs.

1          THE COURT:  I asked somebody to go back and

2     double-check that.  You did?

3          MR. MAHONEY:  But I don't think it matters.

4          THE COURT:  Well, if you are asking, I have got to

5     rule on it, technically.

6          MR. MAHONEY:  We are asking, so I'd ask you to rule

7     on it.

8          THE COURT:  All right.  So let me go back.  Is it

9     family circumstances or the loss table or both arguments

10    those were both made at the first sentence?

11         MR. MAHONEY:  Both are our arguments that warrant a

12    departure as opposed to a variance.

13         THE COURT:  Okay.  All right.  Let me just see.

14    Okay.  So the guideline --

15         MR. MAHONEY:  Would Your Honor prefer I go to the

16    podium?

17         THE COURT:  Sure.  I think Terri would probably more

18    than anybody.

19         I think the only one is the loss table.  If I'm

20    missing that, let me know where I'll find it.

21         MR. MAHONEY:  So it's Page 25, I believe, of the --

22         THE COURT:  I should depart if I adopt the

23    Government's view of relevant conduct and loss.  That's

24    Number 4 in Part C.  All right.  Well, I guess I should hear

25    from the Government, but I recognize my ability to depart

1    under Second Circuit precedent and the guidelines, and I

2    intend to -- I'm not going to grant a downward departure, but

3    I will later on explain my view of the table and its impact

4    on the guideline sentence and, thus, the weight to which I

5    give the guidelines in this particular case.

6           So I don't think you need to argue any more on that.

7    If the Government wishes to argue as to departure -- I mean,

8    I'm technically denying the departure, but if the Government

9    wants to argue, I guess, about what weight I give to the

10   guideline as a result of the loss table, maybe that's just

11   part of your argument.  I'm denying the departure, but I'm

12   signaling that I will consider it as a variance.

13          MR. FRANCIS:  Okay.  I understand what Your Honor

14   has said.  That's not a surprise.

15          THE COURT:  Yup.

16          MR. FRANCIS:  I don't say that flippantly.

17          THE COURT:  No.

18          MR. FRANCIS:  We -- there is some water under the

19   bridge in this case, and so we went back and reread the prior

20   sentencing.  Obviously, we would agree with Your Honor and so

21   we don't need to belabor the point that a downward departure

22   is not appropriate here.  So I don't know -- I'm trying to be

23   mindful of the process.  Procedurally, I don't know if you

24   need to hear from the defense on that point alone or if they

25   have anything in addition to what they already raised with

1    respect to loss in their papers before you enter your ruling

2    denying the downward departure, and then separately hear the

3    arguments about variance.  But I also don't want to be, you

4    know, like in the minutia about this.

5            THE COURT:  I guess let me just share briefly my

6    thoughts.  I guess if you want to tell me how wrongheaded you

7    think I am to think about this question overall.  The first

8    level I think of it as is effectively what I said at the

9    first sentencing.  I think that in these fraud cases with the

10   loss table, it -- the table essentially overwhelms the

11   calculation of the guidelines.  I mean, here we're talking

12   about 18 levels when the whole rest of the points assigned is

13   13, including four for his license.  And it does so -- you

14   know, you can say, all right, well something can have that

15   much weight, but it does it with just one fact, the amount.

16   A total amount without regard to the details that Attorney

17   Butswinkas mentions.  It -- you know, the defendant's motive

18   to get that money, the number of times he acted to get that

19   money or what time period did he commit fraud over, who's the

20   victim.  I mean, it does so without regard to any of those

21   facts, and really many others.  And I think -- maybe the

22   Government will correct me, but in this case it creates a

23   range that I don't think the Government is seeking.  I mean,

24   I think you've told me you want a, quote, significant

25   sentence, but I haven't heard anything -- and which I

1   sometimes hear from the Government, Judge this should be a

2   guideline sentence.

3          So, however, on the other hand, I said I'm not going

4   to depart, even though I have this view generally of the

5   table being less -- not as helpful as some other enhancements

6   are in driving to a range that is a reasonable range and not

7   overwhelmed by just one aspect of the crime or the conduct,

8   but I will point out that the guideline range using that loss

9   amount is 108 to 135.  That's a 31.  You know, the defendant

10  argued I shouldn't look at all of this conduct.  If I just

11  looked at the 10 charged and the 10 uncharged conduct at the

12  trial, I would be at a 16.  Loss would be over 2 million and

13  I would be at 27, which I think is 70 to 87 months.  If I

14  just looked at the 10 charged, I would be at 25, 14 levels up

15  with a million-two loss.  If I just looked at Mr. Litvak's

16  gain based on the testimony from the first trial, it is going

17  to be somewhere between three plus and seven plus hundred

18  thousand, which is somewhere between 12 and 14, so say 13.

19  That -- I think -- I could be wrong.  I might have added

20  victims, which I wouldn't intend to add there.  So it would

21  it would be 7 and 4 is 11 -- 24 -- that would be 51 to 63.

22          If I just considered the loss on the convicted

23  conduct, which I really struggle with the defense argument

24  that I don't count that.  I understand that it is a different

25  view of how to calculate the loss, but that would give me a

1    level of 24 to 30 months.  And to the extent an argument can

2    be made that, look, that commission increased these tables

3    without any basis, the no empirical evidence argument, I went

4    back and looked at the old tables, even though that wasn't

5    specifically an argument made by you folks.  And, you know,

6    in the range that I found the loss, there's not a significant

7    difference.  It clearly went up and then came down a little

8    bit in 15.  But we're still talking about ranges in the 51 to

9    63 range might be where we end up.  We looked at one of the

10   older tables, even the original loss table, more than

11   $5 million loss was a Level 11.

12          So again, I recognize the fact that the guideline

13   determined in this case being driven so heavily by that one

14   number makes, in my view, the guideline not as helpful as it

15   might otherwise be in some other cases.  But I also, on the

16   other hand, note that even if given he's a licensed

17   securities broker and it is fraud, and I don't think you can

18   say there's no loss here, I just cannot find that argument at

19   all as a likelihood, we're talking about guideline ranges

20   that are above and -- significantly above what the defense

21   argues here.

22          So just so you understand, I denied the departure.

23   I recognize I could depart, but I don't wish to exercise my

24   discretion to do it because of the things I just articulated.

25   There's a reason to depart because of the loss table, but

1  there's also a -- I will take -- let me put it this way.  I

2  will take it into consideration in connection with the

3  sentence and as a variance sentence.  I don't intend to

4  impose a guideline sentence as I have determined it, but I

5  just do not wish to exercise my discretion to depart, which

6  would require me to pick a particular level, whereas I would

7  rather consider all of the factors at the time in determining

8  the sentence.  So I hope that's clear.  I hope I haven't

9  stated error.

10       MR. FRANCIS:  No.  Thank you.  I didn't detect

11  anything erroneous.  I'm sure someone at my table would have

12  given me a sign if they had.  And with that clarification,

13  we think the departure question is -- we're clear on Your

14  Honor's ruling,  Obviously, we don't object to that.  And I

15  don't want to jump my place in line and so I --

16       THE COURT:  I think I should hear from the defense

17  on the issue of sentencing.  In other words, I determined the

18  guidelines range.  I indicated to you I'm not inclined to put

19  a whole lot of weight on that particular range, and I --

20  really what I want to hear now is -- and I know I have read

21  about it, but if you want to add anything or recoup your

22  argument of why the sentence you wish me to find is

23  reasonable and fair in light of all of the factors and which

24  ones you think weigh the most.

25       MR. MAHONEY:  Thank you, Your Honor.  I think one of

1    the factors that is -- we obviously listed the factors that

2    we think have changed and the way that militates in favor of

3    lesser punishment this time around.  Two of them that I want

4    to emphasize right now are the change in the result, which I

5    don't think that's something that can be overlooked.  And

6    Your Honor has ruled on the guidelines calculations as you

7    have, and I don't want to reopen that argument, but I just --

8    I can't believe that a just sentence in this posture can fail

9    to take account of the fact that Mr. Litvak prevailed on 14

10   of the 15 counts that he was originally charged with.

11        THE COURT:  So if the Government had charged one

12   count, and he was found guilty and then they came in, but,

13   Judge, that's the one we charged him with, but he really did

14   this 76 times, here's the evidence, it is all the same, same

15   pattern of conduct, you know, falls into one of three buckets

16   of what was at issue, it would be inappropriate for me to

17   consider that?  In other words, I'm trying to get at whether

18   your argument rests on the fact that the jury said no, you

19   know, failure of proof beyond a reasonable doubt and that

20   makes it different.  Or is it more of it is just unfair to

21   consider acquitted conduct?

22        MR. MAHONEY:  We object to the use of acquitted

23   conduct.  Even if you accept existing precedent on that

24   question as it is, the fact that Mr. Litvak prevailed on 14

25   of the 15 counts I think says something about the nature and

1    circumstances of the offense.  It says something about the

2    seriousness of the offense.  And at the very least, what it

3    says that the Government's theory, which last time when the

4    Government was here with a clean sweep, they had at least

5    some grounds for arguing that a lie told in this market is,

6    per se, material, it, per se, causes loss.  I think the

7    jury's verdict stands, if nothing else, for the proposition

8    that it is a lot more complicated than that.

9              THE COURT:  I don't -- I don't know that I -- you or

10   I are supposed to parse out what the jury's verdict by way of

11   acquitted counts means that the jury did to reach that

12   verdict.  I could be wrong, and you tell me if I am.  I

13   thought the Supreme Court made pretty clear that it is a

14   dangerous path and we're not going to trod it, I guess more

15   importantly, to try to parse out, well, how could they have

16   convicted on this count and not on that one and, oh, it must

17   mean that on the acquitted they didn't find this.  There can

18   be a thousand permeations on why the outcome is the way it

19   is.

20             MR. MAHONEY:  Your Honor, I seriously disagree with

21   that in this case.

22             THE COURT:  The law or my statements that there's

23   different outcomes it would --

24             MR. MAHONEY:  I disagree that there was any

25   ambiguity about what the jury rested its opinion on given the

1  defense in this case.  But I don't think that -- that's not

2  the central point of my argument.

3          THE COURT:  Okay.

4          MR. MAHONEY:  My argument is what the jury did here

5  has got to matter to some extent.  And what does it say about

6  our system if somebody can be convicted on 15 counts, go up

7  to the Court of Appeals, have five of them knocked out,

8  present the defense that he wanted to present at the second

9  trial, prevail on nine of those counts and the sentence is

10 exactly the same or, God forbid, as the Government, you know,

11 at least suggests higher.  I think that's something -- I

12 think basic fairness.  Your Honor is right on the law here.

13 I'm not quibbling with that.  But I think that especially one

14 of the things that the Supreme Court did in Gall and

15 Kimbrough was to give Courts greater discretion to

16 consider --

17         THE COURT:  No question.

18         MR. MAHONEY:  -- basic matters of -- factors that

19 matter to basic notions of justice.  And I think that to the

20 person on the street, looking at the sentence, the message

21 that it sends, if there is not some accounting for the

22 different result here, I don't see how that can be looked at

23 as a just sentence.

24         THE COURT:  Because -- and I don't mean to

25 disrespect the person on the street, but that person would

1    have to understand that the sentence today is because he was

2    convicted on Count Four and because I found and I think

3    reasonably so, but you disagree, that's fine, but I have made

4    the find -- the sentence is based on my finding that the

5    other conduct was all of the same kind, that there is a

6    reasonable investor I found, and that it would matter.  And

7    so by a preponderance, he committed fraud, in effect,

8    securities fraud in all of the transactions.  And so I would

9    tell the reasonable person on the street think about the

10   person being sentenced for committing securities fraud 76

11   times, not the one count of conviction.

12            MR. MAHONEY:  But he wasn't convicted on 76 --

13            THE COURT:  I didn't say he was convicted.

14            MR. MAHONEY:  So I don't accept that that's the

15   right way to -- that that's the only way that you can look at

16   the sentence and that what happened in the second trial is

17   irrelevant.

18            THE COURT:  You don't think it comes under the

19   nature and circumstance of his offense or his history and

20   characteristics.  That I should just look at the one time

21   with Mr. Norris and I should close my eyes to the fact that I

22   believe that the people I heard testify, that it was

23   material.

24            MR. MAHONEY:  That's not my -- that's not my

25   argument.  My argument is consistent with what the Second

1    Circuit said in the Vaughn case.  I agree there is a -- Your

2    Honor has laid it out as to why there's not necessarily a

3    logical inconsistently with relying on these acquitted and

4    uncharged counts to come up with the overall loss

5    calculation.  There's not necessarily a logical inconsistency

6    between that and the jury's verdict.  I understand that.  But

7    what the Second Circuit said in Vaughn was that that doesn't

8    mean that the acquittals are not something that should weigh

9    on the Court's assessment of what is a fair and equitable

10   sentence, what is a sentence that's sufficient but not

11   greater than necessary to achieve the goals of sentencing.  I

12   still think -- I think that it is very relevant.

13          Again, I will fall back on what I think is our sort

14   of basic notions of justice here, the idea that 15

15   convictions versus one conviction is just totally irrelevant.

16   We're exactly in the same place.  I just don't -- I think

17   that that's an unreasonable position, Your Honor.  And I

18   recognize the law is what it is, but I think especially in a

19   post-Gall and Kimbrough world that considerations like that

20   are very relevant to the Court's assessment of the nature and

21   circumstances of the offense.

22          THE COURT:  I guess I would like to test what your

23   argument is.  Let's assume I had two cases, one was a case

24   where a person was charged with 15 counts, convicted on all.

25   Five go out on a legal question, 10 come back, retried, one

1  convicted.  Mr. Litvak's situation.  Okay.  The other

2  defendant is charged in one count.  He's convicted.  He's in

3  sentencing in front of me and the Government gives me the

4  same book that I have for today's sentencing, the 76

5  transactions.  And assume everything is the same, family,

6  history, characteristics, everything is identical between the

7  two defendants.  Are you arguing that the sentence should be

8  different?

9        MR. MAHONEY:  I'm arguing that what the jury and

10 Mr. Litvak's peers said matters, and that matters in the

11 first example.  That is something that is different in the

12 first example that you gave in this case than it would be in

13 the other case.

14        THE COURT:  You are saying the sentence should be

15 different?

16        MR. MAHONEY:  I think it's a factor that matters at

17 sentencing.  There's not necessarily --

18        THE COURT:  You are not answering my question.

19 Should -- given the hypothetical I just gave you, should I

20 impose a different sentence in the first defendant's case

21 from the second defendant?

22        MR. MAHONEY:  Yes, Your Honor.  I think that is

23 that important a circumstance.  I can't imagine -- yes, this

24 is one factor.  I mean, we're going to talk about other ones.

25 This is one factor that I think is really important.  As Your

1   Honor has said today, and as I know you said several times in

2   the last sentencing transcript, it is difficult to reduce any

3   of these factors and say that it is the dispositive thing

4   that causes the sentence to be greater or lesser.  But this

5   is something that we think -- that we think is quite

6   important.

7          Now, let me go on, if I may, as to changed

8   circumstances.  I also think that the other resolution that

9   the Government has entered into are hugely important to Your

10  Honor's consideration of the nature and circumstance of the

11  offense.  Let's just consider Mr. Chin.  Mr. Chin was the

12  head of the RMBS desk at Goldman Sachs, top investment bank

13  in the world.  And he was basically to Goldman Sachs, not

14  what Mr. Litvak was to Jefferies, but what Mr. Jennings was.

15  So in addition to doing exactly what Mr. Litvak did on a

16  greater scale, he also had supervisory responsibility for

17  other traders.  I don't see how in light of the

18  administrative penalties that the Government thought was

19  sufficient to deal with his situation, how the Government can

20  argue that a term of incarceration is the only punishment

21  here that is proportionate to the crime.  That has got to be

22  something that Your Honor considers.

23          The same I think with Mr. Binocci, the same thing

24  with Mr. Jennings.  Mr. Butswinkas brought up the

25  circumstances about Mr. Jennings, of which the Court is well

1    farm.

2         THE COURT:  I can't resist making this observation,

3    Attorney Mahoney.  It's interesting.  I sentence a lot of

4    people for drug crimes and gun crimes.  Never once in any of

5    those cases have I ever heard a defendant argue, Judge, you

6    know, Sammy is out at the corner of Chapel and College and

7    he's selling drugs and he is not being charged.  Or Tommy,

8    he's over in State Court right down the street on the very

9    same street, Church Street, and he's getting six months and

10   you are telling me I need to get six years.  I mean, I don't

11   ever hear that.  And I don't understand why -- maybe I should

12   just ran habeases for ineffective assistance of those lawyers

13   for not arguing that.  But I think the reason really is that

14   I don't think it is the right way to look at the factors that

15   are in front of me in Mr. Litvak's case.

16        Now, I do have to consider disparity and I have some

17   questions on that and I will get to some of those issues.

18   But I think the people that you cite, like Mr. Chin or Blaney

19   or Binocci.  I can't remember all the names.

20        MR. MAHONEY:  Chin, Blaney, Binocci and Jennings.

21        THE COURT:  Okay.  You know, they were treated I

22   will call it administratively, and Mr. Litvak was charged

23   criminally.  I don't know that I'm supposed to say, oh, well,

24   you know, those guys weren't charged or they were only dealt

25   with lightly non-criminally and, therefore, I should consider

1    that.  I don't know.  The factor is disparity in sentencing.

2    It's not disparity in prosecution.  It's not disparity in

3    failure to prosecute.  It is disparity in sentences.

4            MR. MAHONEY:  And Your Honor will note that we have

5    made this argument primarily not as a sentence -- as a

6    technical sentencing disparity argument under the guidelines

7    because I think you're right, that at least the way the

8    guidelines are phrased, it talks about other offenders.

9    These are people who have been dealt by the SEC.  But I think

10   that this says something about the seriousness, the nature

11   and circumstances of the offense.  When they -- when

12   prosecutor --

13           THE COURT:  That's fair.

14           MR. MAHONEY:  When prosecutors can look at the same

15   conduct and say we'll pump this one over to the SEC, this is

16   an administrative matter.  But when Mr. Litvak's case, the

17   exact same conduct, exact same scale, it is decided we're

18   going to go after him criminally, I think that that's a

19   factor that the Court has got to consider.

20           THE COURT:  Well, is it the same?  For example, I

21   have a note here -- maybe I'm wrong, so you're going to catch

22   me if I am -- that Mr. Binocci, who got a fine that you told

23   me about, he cooperated with the Government.  Am I correct

24   about that?  And Mr. Blaney, I think he agreed that he did

25   and they charged him with doing five trades.  And I think

1  that I found that Mr. Litvak did more than that, by

2  multiples.  He did 76 that I know of.  That isn't the same

3  conduct.  It may be -- it may be the same act that underlies

4  the culpability and liability.  But numbers of times make a

5  difference in whether the Government chooses to prosecute or

6  not, whether somebody is cooperative.  The Government gets to

7  use that, I think properly, in deciding how to treat or deal

8  with a person.  So I don't know that they are the same.

9          MR. MAHONEY:  As to the scope of the -- I agree,

10  Your Honor, all of these things are factors.  But again,

11  these people were not charged criminally.  And as to Chin and

12  Binocci, I just don't think that there's a serious argument

13  that there is a meaningful difference and the extent of the

14  conduct.  I mean, with Mr. Chin, the loss value that is --

15  that the Government would calculate from the face of the SEC

16  order, which is the same methodology that Your Honor has

17  used, for those five transactions would be 1.5 million.  And

18  then they are 32 transaction that Goldman, in its letter to

19  the Government as part of its -- as part of its cooperation

20  agreement, identified as basically being in the same

21  contrary.  So we're talking about somebody who did the exact

22  same thing similar number of times, loss amounts that are of

23  similar magnitude.  The only key difference between Litvak

24  and Chin is that Chin was much higher on the pecking order at

25  a much more powerful and profitable investment bank.

1      THE COURT:  And I should ignore the fact that I have

2   a colleague in Hartford about to start a multi-month trial of

3   -- is it three or somebody pled out, I don't remember -- but

4   at least three traders like Mr. Litvak charged criminally,

5   and I think another colleague of mine in Hartford has another

6   single defendant case with the same type of conduct charged

7   criminally.

8      MR. MAHONEY:  I'm not asking Your Honor to ignore

9   that.  We certainly don't know what the results of those

10  cases.  We don't know what the sentences are going to be.

11  And my point still stands, which is that when the Government

12  can look at this conduct for some of these people and say,

13  okay, this is criminal, but for the same conduct but just

14  other people they say that it's fine to treat this as a

15  regulatory matter, that undermines the argument that is the

16  thrust of the Government's pleadings and their submissions

17  today that only a substantial term of imprisonment is an

18  option here given the seriousness of the offense and the need

19  for deterrence.  The Government's own actions greatly

20  undermine that.

21     THE COURT:  All right.  You did make an argument

22  about the constitutional limit to the sentence here today.

23     MR. MAHONEY:  Right.

24     THE COURT:  Which, of course, raises the

25  differences.  I mean, I think that Attorney Butswinkas

1    suggested I need to start with a clean tablet.  And I think I

2    have done that.  Nonetheless, at the end of the day, I have

3    conduct that's the same, but there are changes.  Things have

4    happened, and the Government cites to texts, which I have

5    some questions about.  They cite to the suit against

6    Mr. Canter, which I have to say you are going to have to

7    address.  I find that very disturbing.  And I think -- I

8    don't know if it was clear on the record, I always thought

9    that I didn't make it clear enough because I was concerned

10   about revealing personal -- you know, private information.

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14           XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXX  And I -- you have to understand because I'm afraid

21   I didn't say it clearly.  I said it in the SOR, which you

22   probably saw on appeal.  I tried to make it clear there how

23   important.  But that was a very weighty factor in my

24   thinking.  And again, I think that's changed.  As I say, it's

25   not eliminated, but it's changed.

```
 1            So you argue, you know, there's acquittals and
 2   you're arguing compared to other people, but I -- that have
 3   happened since the last sentencing, but I think there are
 4   those differences, too.
 5                XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.
11            Since the last sentencing, the Litvaks have moved.
12   They now live in Florida.  They don't live in Manhattan
13   anymore.
14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
15   XXXXXXXXXXXXXXXXXXXXXXXXXXXX
16                XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

9            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

14           XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16           XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20           XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

24           XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

```
 1          XXXXXXXXXXXXXXXXXXX.

 2             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 8    XXXXXXXXXXXXXXXXXXXXX

 9             XXXXXXXXXXXXXXXXXXXXXXXX

10             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

19             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXr
```

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXX.

12            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXX.

23            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

```
 1    XXXXXXXXXXXXX.

 2              XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 3            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 7    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 8    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

 9    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

18              XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23    XXXXXXX

24              XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

```
 1   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 2   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 3   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 4   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 5   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 6   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 7   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 8   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
 9   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
10   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
11   XXXXXXXXXXXXXXXXX
12            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
20   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
21   XXXXXXXXXXXXXXXXXXXXXXXXX
22            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
23   XXXXXXXXXXXXXXXXX
24            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
25            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
```

1            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

6            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13    XXXXXXXXXXXXXXXXXXXXX.

14            XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16            THE COURT:  Let's talk briefly about the texts that

17    is were sent after the sentencing, the blaming a dumb jury

18    and Mr. Canter I think is the one I recall.

19            I don't know that it is terribly significant, but I

20    guess doesn't it -- it kind of tends to reinforce the

21    impression I have of Mr. Litvak's view of this, that, you

22    know, this is terribly unfair, the arguments you're making,

23    he's been selected and other people haven't been punished the

24    same.  And it seems to me that's what it reflects.  But it

25    just tells me even after the sentencing process, he's still

1   of that mind.  It is like the opposite of acceptance of

2   responsibility.  It is like -- I understand you have a right

3   to say I'm not guilty.  I didn't commit a crime.  I am going

4   to appeal.  I will be vindicated.  That's fine.  But this is

5   a little bit more than that, I think.

6         MR. MAHONEY:  Well, let me make three points.  One

7   is that I have not done a very good job today if Your Honor

8   is left with the impression that our complaint is that Mr.

9   Litvak has been singled out.  That's not the reason why we

10  have talked about Chin, Binocci.

11        THE COURT:  You have done a good job.  I understand

12  and I'm not sure I did before, that you think it goes to the

13  nature and circumstance or the -- more the seriousness of the

14  offense.  It is reflection, it is a mirror against which the

15  Government's other conduct reflects and reflects the

16  seriousness is not as great as it might be viewed in the

17  abstract.  I got it.

18        MR. MAHONEY:  Your Honor, understands that, very

19  good.

20        THE COURT:  So you did a fine job.  How about the

21  texts?

22        MR. MAHONEY:  So, the texts I want to make two

23  points.  The first one is general, the second is more

24  specific as to the individual messages.

25        The general point is that the idea that a text

1  message sent to a friend on a couple of the most -- a couple

2  of the most stressful periods in a person's life is

3  reflective of their character and that it somehow is more

4  reflective of their character than all of the letters that

5  the Court has received, I just think that that's an

6  unreasonable notion.

7          I wouldn't want to be judged on the basis of text

8  messages that I have sent at stressful times.  Maybe others

9  are different, but I would suspect that I'm probably in the

10  majority.

11          THE COURT:  How about suing the lead witness in the

12  first trial after sentencing?  How about that?  Would you

13  want to be judged on that?

14          MR. MAHONEY:  I think the context of that merits

15  discussion as you are considering what weight to give it.

16          There were issues with Mr. Litvak's separation from

17  Jefferies.  He had to retain an employment lawyer in order to

18  deal with those issues.  As you know, some of those dealt

19  with indemnification.  So there was an employment lawyer,

20  very aggressive employment lawyer who had been retained.  He

21  drafted a complaint, suggested that there was a claim against

22  Mr. Canter that should be preserved.  It was run by Mr.

23  Litvak's criminal counsel as Mr. Smith said at the last

24  hearing.

25          You know, this is not a situation -- Jesse Litvak,

1    although he was in finance and obviously is an intelligent

2    guy, he had no familiarity with the legal process before this

3    case.  He obviously relied on counsel.  And Mr. Smith, as you

4    said earlier, I think rather forthrightly, fell on his sword

5    at that hearing.

6              THE COURT:  He didn't said it was run by him,

7    though.  He said --

8              MR. MAHONEY:  He said he was aware of it.

9              THE COURT:  -- I understood this lawsuit was going

10   to be filed, and I didn't speak up.  That's different than

11   running it by him.

12             But put that aside, I understand the aggressive

13   employment lawyer, but at the end of the day, unless you are

14   going to tell me that employment lawyer filed the suit

15   without his client's approval, Mr. Litvak had to say, yeah,

16   go sue Mr. Canter.

17             I have to say -- and maybe this is totally

18   irrelevant to this point, probably is, probably shouldn't say

19   it but I am just going to say it anyways -- I have to say,

20   Mr. Canter's testimony at the second trial in comparison to

21   the first was startling to me.  I kept thinking, is this the

22   same witness?  I'm not saying that he lied.  I'm not

23   saying -- just his whole manner, his whole demeanor.  Maybe

24   I'm being unfair.  I hate people who try to create a record,

25   oh, Judge, you are making a face at me.  I'm there like, no,

1    I'm not.  So how do I fix that record?  You weren't even

2    here, so how do you fix this?

3           I just have to say that I did react that way.  Did

4    it have anything to do with this lawsuit, probably not.  But

5    I think that's what wrong with the conduct, is the idea that

6    before a judgment is final, you go out and, in effect, lob a

7    grenade into the lap of one of the people that's a victim who

8    is testifying against you.

9           MR. MAHONEY:  I would be -- not to cast dispersions

10   on anyone -- but I would note that there was a different

11   lawyer cross-examining Mr. Canter at the second trial.  We

12   had different evidence.  We were able to trap Mr. Canter in

13   some lies that didn't come out during the first trial.  I

14   think that some of those things might have affected his

15   demeanor in a way that --

16          THE COURT:  Did he know that was coming when he

17   testified on direct?

18          MR. MAHONEY:  We certainly didn't give him a copy of

19   our outline.

20          THE COURT:  I don't think Attorney Butswinkas or

21   whoever did it was going to reveal it to him.  So, I mean, I

22   could be wrong, but my reaction to his testimony began with

23   his direct, he was different.  He was subdued.  He was quiet.

24          MR. MAHONEY:  I can't --

25          THE COURT:  I know you can't --

1              MR. MAHONEY:  I can look at the transcripts.  I

2    don't see really any material difference between the first --

3    the transcript of the direct of Canter in the first trial and

4    at the second.  And in both of them, he maintained his

5    position.  In fact, this was --

6              THE COURT:  He did.  I'm talking about his demeanor,

7    sir.  I'm sorry to interrupt you.  But I would say in the

8    first trial, I would characterize his testimony on direct as

9    aggressive.  Sort of the tone of what came out about the

10   conversation with Mr. Litvak at the time of Mr. Canter's

11   discovery.  I was angry.  This was wrong.  You lied to me,

12   Jesse.  Okay.  That was sort of the tone I recall his

13   testimony being.  I don't even, on direct, remember him being

14   of that way in the second trial.

15             MR. MAHONEY:  Your Honor, it was still -- the

16   conduct was several years removed --

17             THE COURT:  I understand.  There is that.

18             MR. MAHONEY:  Mr. Canter probably wasn't thrilled

19   about having to come and repeat the whole thing.

20             THE COURT:  That's true.

21             MR. MAHONEY:  I mean, is Your Honor suggesting that

22   you are making a finding that there was --

23             THE COURT:  No, I'm not.  I'm really more pressing

24   you about the idea that Mr. Litvak brought a suit against a

25   victim witness after -- you know, before -- after sentencing.

1    In other words, it is a new fact.  It is something different.

2         Isn't it -- I don't want to put too much weight on

3    it, but it's like -- I don't know if you read the transcript

4    from that bond hearing with Mr. Smith, but I was very, very

5    upset.

6         MR. MAHONEY:  And I think Your Honor, frankly,

7    was -- I don't lightly criticize another colleague.  And,

8    again, I note that Mr. Smith, I think, fell on his sword.  I

9    think that this was not -- this wouldn't have happened if I

10   had been counsel and -- but I think at the same time that

11   Your Honor, when considering this, has got to consider how

12   the counsel acted.

13        Yes, Mr. Litvak's lawyers, that is part of this.

14   That's a fact that I can't escape from.  But their reactions

15   to it and the advice that they were giving to Mr. Litvak I

16   think have got to be considered when Your Honor is

17   determining what weight, if any, to give to that incident.

18        THE COURT:  I have some questions on his financial

19   statement.  I think you told me you were done, so I should

20   ask my questions.  You are going to have to be patient with

21   me.  Here it is.

22        I guess I have -- there's sort of different

23   questions.  One sort of in the nature of I just don't

24   understand.  The other is in the nature of why certain

25   numbers are in certain columns of the spouse versus Mr.

1  Litvak.

2          MR. MAHONEY:  Are you referring to the PSR?

3          THE COURT:  Well, mostly to the Declaration of

4  Defendant's Net Worth and Cash Flow Statements, upon which I

5  think the probation officer relied but which is, at least in

6  this district, we attach it as an exhibit to the PSR.  So I

7  look at it in connection with the PSR.  And obviously there's

8  a fine issue here that I have to consider.

9          There's a note somewhere that basically says the

10 income from the rental of the New York apartment is net of

11 the depreciation.  I wondered why you would show it that way.

12 This isn't a tax return.  It's a cash flow return.

13         The fact that they can take deductions for

14 depreciation on their tax returns doesn't mean they don't

15 have the cash in their pocket, which is -- and I say "they,"

16 I should say Mrs. Litvak.  It's the living trust of

17 Mrs. Litvak.  But I'm just not following why you would show

18 it as net of depreciation on the cash flow, whether it's hers

19 or his or whoever it is.  I have that question.

20         MR. MAHONEY:  Well, it better reflects the economic

21 reality, but I agree with Your Honor that it is sort of a --

22 if you are looking at strictly cash in and cash out,

23 depreciation doesn't have a month-by-month effect on that.

24         THE COURT:  Right.  This is called a monthly cash

25 flow statement.  And he's reported, I believe, the cash flow

1   from the apartment.  I mean, I understand the argument that

2   it is in a trust for the benefit of his spouse, but

3   nonetheless he reported it.  I think the proper reporting is

4   the cash flow because that's what's going into his, her,

5   their pockets, right?

6          MR. MAHONEY:  We explained how it was done, but I

7   don't disagree with -- I don't disagree that if we're just

8   looking at cash in and cash out, that Your Honor has got it

9   wrong.

10         THE COURT:  And he reports business income of in

11  excess of 5,000 a month, but a negative.  I mean, what

12  deductions, I guess, are reflected there that results in him

13  earning no cash flow that he sees on a monthly basis from the

14  job he's had, which was a condition of his release?

15         MR. MAHONEY:  He has a. -- he's in the ticket

16  brokerage business.

17         THE COURT:  I understand.

18         MR. MAHONEY:  So he has to buy the tickets.  Then --

19  so there's a cost of goods sold there and the way --

20         THE COURT:  If every month you lose almost a $1,000,

21  why would you stay in the business?  I mean, it can't be that

22  he pays out $1,000 more every month.

23         MR. MAHONEY:  Over the period that we reported, that

24  was what it was on a per month -- if you took the loss on a

25  per month basis.

1          THE COURT:  What's the period, 2016?  Do you know

2     what it was in '15?

3          MR. MAHONEY:  I don't, Your Honor.  We probably can

4     get that information if you -- I do know in some cases, some

5     of the tickets are things that would planned to be sold at

6     later points and in different years.

7          THE COURT:  Right, but presumably in '15 he bought

8     tickets that he sold in 16.

9          MR. MAHONEY:  I'm not sure how -- you know, he's

10     done this kind of on the side and has done it -- the volume

11     differs depending on events and what he can get access to.

12     So I don't think the fact that he has a negative number in

13     one year is necessarily an aberration in this kind of

14     business.

15          THE COURT:  I guess to the extent he's going to be

16     on some sort of supervision going forward from this day, I

17     would suggest the probation officer needs to address whether

18     this is an appropriate employment as required by the standard

19     condition that you be employed, but whatever.  If that's what

20     it is, it is.

21          Another question I have is -- I remember from the

22     last time but also now, that you have reported very various

23     bank accounts, which I think are pretty much reflective of

24     split of the sale of the Quag house that Mr. and Mrs. Litvak

25     owned, which I believe roughly, I'm going to really round it,

1    but about 650,000 went to each at the closing, in effect,

2    each took a half.  I suppose on the theory that it was joint

3    tenants with right of survivorship.

4            It would be fair for me to say, wouldn't it, that

5    when they acquired this house, Mr. Litvak's income was in the

6    millions and Dr. Litvak's income was in the low 100,000s.  I

7    don't really know for sure, but I am just going to assume

8    that.  You tell me if I'm way off.

9            MR. MAHONEY:  But she also had other assets even

10   during that period, as well.

11           THE COURT:  Did those go into the acquisition and

12   the payment of monthly mortgage and principal, et cetera,

13   principal and interest on a mortgage of that house?

14           MR. MAHONEY:  The cash, the specific cash flow and

15   how it worked, I'm not -- I'm not sure.  But, again, I think

16   for purposes of calculating what the total assets are, we

17   have not -- we are -- we're taking the big accounts and

18   agreeing that if Mr. Litvak has access or benefits from them,

19   those are properly considered his assets for purposes of

20   determining what his net worth is.

21           THE COURT:  What do those total up to, the ones you

22   are conceding are his net worth?

23           MR. MAHONEY:  Well, I think we -- let me just get

24   the exact number that we concede.  It is not that far off

25   from what the Government says.  I think we get to like 7. --

1    just one second here.  We get to 7.1 million, which I think

2    the PSR gets to something a few hundred thousand dollars

3    higher than that, 7.26.

4              THE COURT:  What's 7.1 or 7.26.

5              MR. MAHONEY:  The only thing that we quibble with,

6    again, it is just the -- I don't think this -- this is not

7    something that makes -- I can't imagine that this is

8    something that's going to --

9              THE COURT:  It isn't if you answer the one question

10   I just asked.  What is that number -- what is the term that

11   that number is the answer to?

12             MR. MAHONEY:  It is the net worth.

13             THE COURT:  So Mr. Litvak's net worth?

14             MR. MAHONEY:  Right.

15             THE COURT:  That's all.  That's fine.  I have,

16   though, two questions.  Did Mr. Litvak -- he has a pension,

17   right, a pension fund or not?

18             MR. MAHONEY:  He has some retirement accounts.

19             THE COURT:  Retirement accounts.  That's what I

20   meant.

21             MR. MAHONEY:  He has an annuity and some life

22   insurance.

23             THE COURT:  He spends quite a bit on life insurance.

24             MR. MAHONEY:  He does.  He does.

25             THE COURT:  The policies are about 11 million.

1              MR. MAHONEY:  I'm not sure what the face value --
2   what the face value is.  What we included in the asset count
3   is what can be borrowed against them.

4              THE COURT:  I thought you gave me the face, too.

5              MR. MAHONEY:  Perhaps we did.  I know it feeds into
6   the 7.1 million if you take what can be borrowed against
7   them.

8              THE COURT:  Document 519-1, page 11 of 18.

9              Last question, the mortgage on the apartment that is
10  in the name of the wife's living trust.  Is Mr. Litvak on the
11  mortgage?

12             MR. MAHONEY:  I believe the mortgage is taken out in
13  the name of the trust.  Let me just consult my --

14             THE COURT:  When the transfer occurred, it was
15  refinanced?

16             MR. MAHONEY:  Let me make sure I get the correct
17  answer to that.

18             THE COURT:  That's fine.

19             MR. MAHONEY:  He's actually on the mortgage.

20             THE COURT:  That's what I would have expected, I
21  needed it confirmed.  Thank you.

22             I don't have any further questions.

23             Actually, I undertook -- I thought that sentencing
24  commission report that I requested and was provided to both
25  sides.  I was surprised by it, I guess.  So I tasked a law

1    clerk to see if they could find the cases that are likely

2    behind the statistics reported, i.e., look for sentencings in

3    this time frame with this enhancement at this loss table, et

4    cetera.

5            MR. MAHONEY:  I gave the same assignment.

6            THE COURT:  Oh, did you?  What did you come up with?

7    Did you find a 85-year sentence that was within guidelines.

8            MR. MAHONEY:  What I found was that the averages in

9    that table are really not very helpful when you consider --

10           THE COURT:  Right.  I agree.

11           MR. MAHONEY:  -- that there's some huge outliers,

12   when you consider their different criminal history scores.

13           And then when you get to looking at victims and the

14   vulnerability of the victims, impact on victims --

15           THE COURT:  Or number of victims.

16           MR. MAHONEY:  Right, number -- the whole -- number

17   of convictions, the whole thing.  I just think it is not a

18   useful tool.

19           THE COURT:  I agree in the sense that, and I will

20   speak about this under the disparity factor, that it is a

21   very real challenge, I think, for the Court to try to address

22   that factor in the context certainly of these kind of cases

23   reflected in that table, but anyways.

24           I think that's all the questions I have.

25           I need to make it clear on the record, if Mr. Litvak

1  wishes to address the Court, you have advised him of his

2  right to do so and you need to tell me if he's going to.

3       MR. MAHONEY:  We have advised him.  Obviously, the

4  proceedings are ongoing.  He's decided on our advice not to

5  speak.

6       THE COURT:  That's fine.  Is that right, Mr. Litvak?

7       THE DEFENDANT:  Yes, that's right.

8       THE COURT:  Thank you.  Is there anything further?

9       MR. MAHONEY:  No, Your Honor.

10      THE COURT:  Thank you very much.

11      I guess I would like to ask you to address, first,

12 the argument that I said he didn't do badly in making me

13 understand, and that is, that the regulatory treatment of

14 people who engaged in similar conduct isn't woe is me and it

15 is selective prosecution, it isn't that.  It is that when I

16 have to weigh the seriousness of the offense, it can inform

17 my judgment in that respect as it reflects the Government's

18 view of the seriousness of the offense.

19      MR. FRANCIS:  So I think Mr. Mahoney's argument,

20 while not intended this way, functionally was a very strong

21 argument in favor of additional funding for Department of

22 Justice white-collar investigations and prosecutions.

23      Our resources are necessarily finite, as Your Honor

24 is well aware.  I think we said in our sentencing memo, we

25 give the example of tax fraud.  We don't have the resources

1    to criminally prosecute every tax fraudster.  Some of those

2    cases are resolved on a regulatory basis, but that doesn't

3    mean that tax fraud isn't a serious crime, it just means it

4    is a popular one.

5            So as Your Honor is painfully aware from this case

6    alone, these cases require a massive dedication of

7    investigatory and prosecutive resources.  Mr. Litvak's case,

8    the investigation took over a year.  And obviously, even just

9    taking one trial took more than a year of pretrial and then

10   many weeks of trial.

11           So I can't speak to why exactly Mr. Chin and Mr.

12   Bonacci were not prosecuted.  Those are other components of

13   the Department of Justice.  I'm not familiar with enough of

14   the facts of the case.  What I can tell from reading here,

15   Mr. Chin was engaged in five bad trades.  We always have

16   thresholds here.  When the case came in the door, Mr. Litvak

17   had admitted to more than that already.

18           THE COURT:  The Canter e-mail.

19           MR. FRANCIS:  With Mr. Canter.  But we had

20   documentary evidence of way more than five.  Mr. Bonacci, I'm

21   sorry.  I don't even know how many it was, but understanding

22   is he is even further down the pecking order.  He was a -- I

23   think a junior trader at JP Morgan and -- I believe that's

24   right.  Not a salesperson, a trader.

25           So with respect to Mr. Jennings and Mr. Blaney,

1    those are two people at Jefferies who Your Honor has heard

2    about.  Mr. Blaney was an unindicted co-conspirator in this

3    case.  Mr. Jennings was an unindicted co-conspirator in this

4    case.  As Your Honor pointed out when we were looking at

5    trades No. 76, I believe it was, in the binder, Mr. Blaney is

6    sort of Mr. Litvak's puppet for talking to the victim.

7           I'm not sure that the -- Mr. Litvak, a defendant

8    gets to complain, my co-conspirators should have come in for

9    more punishment or been prosecuted, as well.  Maybe --

10          THE COURT:  That's not his argument.  I think his

11   argument is that, I'm here.  I'm going to get punished.  But

12   in deciding the seriousness of the offense, you can consider,

13   Judge, that others who engaged in similar conduct, indeed

14   unindicted co-conspirators in the scheme that Mr. Litvak is

15   engaged in, engaged in similar conduct and they were

16   treated -- they were treated in a way that suggests the

17   Government views, and therefore you should view, this conduct

18   not as seriously.

19          MR. FRANCIS:  So I understand the argument to be,

20   the Government doesn't think this is as serious as they now

21   claim to for sentencing purposes.

22          THE COURT:  Correct.  I think that's -- he wouldn't

23   put it that way --

24          MR. FRANCIS:  He would say it in a nicer way.

25          THE COURT:  He would say it more eloquently.

1          MR. FRANCIS:  At the very least.

2          So as the Court knows because the defense brought

3     this to your attention during the first trial, Mr. Litvak was

4     approached by the government and asked to cooperate.  You

5     shouldn't hold that against him that he choose not to for

6     sentencing purposes.  He had a right to refuse to cooperate.

7          But now turn it around and say, well, Government,

8     you didn't have enough evidence to pursue these guys and

9     therefore I shouldn't -- that's evidence that you didn't take

10    this seriously is perverse.  We took it --

11         THE COURT:  Not everybody he's mentioned cooperated.

12    Mr. Bonacci I think did, but not Mr. Chin.

13         MR. FRANCIS:  I don't know --

14         THE COURT:  Well, that's true.  We might not know.

15    I'm assuming not.

16         MR. FRANCIS:  Let me be clear, I'm not aware that

17    Mr. Chin did cooperate.  I don't want to indicate that I

18    think he did.

19         But we asked Mr. Litvak to cooperate against some of

20    these people.  So it's a little weird for him to turn around

21    and say, you didn't go after those people.  Why not?  And say

22    it is because the Government didn't take it seriously enough.

23    We took this so seriously that we were willing to cooperate

24    Mr. Litvak and pursue others.

25         Obviously, we would like to pursue every instance of

1   criminal conduct we could, but we can't run down everything.

2   So we have to make decisions.  One of the decisions we might

3   make is Mr. Blaney was a salesman, much like Beth Star who

4   was on the phone call with Mike Canter.  One might make a

5   decision that, you know, the traders are really the issue

6   here.  With scare resources, they are the one we should

7   pursue.

8           THE COURT:  This is a random question, but it has

9   come to my mind.  Is it correct that Mr. Litvak was arrested

10  in his home?

11          MR. FRANCIS:  Yes.

12          THE COURT:  Why?  I didn't think the Justice

13  Department did that in these circumstances?  Clearly, you

14  approached him precharge.  He had a lawyer, I presume.

15          MR. FRANCIS:  Yes.

16          THE COURT:  Is that standard practice?

17          MR. FRANCIS:  I don't think we have a standard

18  practice.  It is on case-by-case basis and obviously with the

19  input of the arresting agents and the agency because there's

20  issues about safety.  But in Mr. Litvak's situation, we

21  approached him, I mean, I suppose I can say this, we

22  approached him several times over a period of months and

23  asked him to come in and proffer through his attorneys.  He

24  refused to come in and --

25          THE COURT:  So you charged him?

1          MR. FRANCIS:  And so we charged him.  But we

2     typically, and not in every case, but in many cases that's a

3     factor that weighs against people when we're making decisions

4     whether or not to let them self-surrender.

5          Another case that Your Honor referenced, Mr. Demos

6     who has been indicted for similar conduct, that's the case

7     before Judge Thompson, he did come in and proffer and he was

8     permitted to self-surrender.

9          THE COURT:  Sorry.  That's sort of off the track.

10          MR. FRANCIS:  I don't know, I think Your Honor -- I

11     think -- I don't have a whole speech for Your Honor, but my

12     point is Your Honor should consider everything.  So I don't

13     think there are any random questions.  I'm here to help, but

14     to the extent that what the defense is indicating is that

15     they want Your Honor, or that we are advocating for something

16     mechanistic and heartless, definitely not.  Let me reject

17     that explicitly.  We want Your Honor to take everything into

18     account.

19          THE COURT:  Okay.  How about on deterrence factor,

20     which I have to consider, right, the need for the sentence.

21          The fact that the United States Attorney said after

22     the verdict in this case that deterrence, we have

23     accomplished deterrence.  Why do I need to think about that

24     in sentencing Mr. Litvak, as you argue, that incarceration is

25     a key way to do that.

 1            MR. FRANCIS:  So I could look, I'm not sure that's

 2    exactly what the U.S. Attorney's comment was in the press

 3    release.  But I'm not -- the Government's strongest argument

 4    here in favor of a significant sentence, I don't think, is

 5    general deterrence in this particular case because I have

 6    already had that disagreement, let's say, with Your Honor on

 7    very similar facts about what general deterrence can be

 8    achieved.

 9            Let me say that I think you and I can at least agree

10    that a term of imprisonment -- the certainty of punishment

11    and a term of imprisonment, there's indications that that can

12    lead to general deterrence in white color crimes.  What we

13    maybe disagree about is whether the significant -- the length

14    of the sentence has -- how proportionate effect of general

15    deterrence because there's not good empirical research on

16    that.

17            THE COURT:  I think I would agree with everything

18    you just said.

19            MR. FRANCIS:  So, in this sentencing we have

20    advocated for a significant sentence and said that home

21    confinement isn't it.

22            THE COURT:  By the way, that will look good on the

23    judgment, the Court imposes a significant sentence.

24            MR. FRANCIS:  I'm not sure that us picking a number

25    is helpful to Your Honor without knowing --

1           THE COURT:  Might not be.  But, I mean, you know,

2     you say tomato, I say tomato.  I mean, what is significant to

3     you may not be significant to me.  So by using a phrase, I'm

4     not sure, you may be conveying something to me that I

5     understand, but you might not be.

6           MR. FRANCIS:  I think in this case we're probably

7     conveying something to Your Honor.  And I think, you know, we

8     don't just say significant sentence on one piece of paper and

9     hand it in.  We have 35 pages after that.  And so home

10    confinement, not significant sentence.  And --

11          THE COURT:  That I understood.

12          MR. FRANCIS:  For the general deterrence, the thing

13    we can agree on, it has include some period of incarceration

14    because to white color defendants, that is meaningful in a

15    general deterrent way.

16          The last thing I have to say about general

17    deterrence, Mr. Mahoney had a lot to say about the person on

18    the street and their view of the injustice of sentencing

19    someone who was acquitted on nine counts.  I'm not sure that

20    talking about the man on the street is necessarily the

21    strongest argument for the defense because I think the man on

22    the street has a view of -- I think that raises general

23    deterrence issues.  I think they have a view of white collar

24    criminals as feathering their own nest.  They have a very low

25    likelihood of being detected.  They can fight, they have the

 1    resources to fight to the ends of the Earth.  And then

 2    once -- if convicted, they receive light sentences.

 3            Whether or not that's -- those are empirically valid

 4    views, I think they are pretty widely held.  I don't say that

 5    Your Honor should sentence someone to more time because what

 6    the man on the street is thinking.  I just don't think the

 7    defense should say Your Honor should sentence him to less

 8    time because the man on the street might view it in a certain

 9    way.

10            THE COURT:  Well, we do have differences from the

11    first sentencing, right?

12            MR. FRANCIS:  Absolutely.

13            THE COURT:  We have no crime committed by Mr. Litvak

14    that involved TARP funds, right?  And I mentioned, I think in

15    the first sentencing, Government -- the idea that the

16    public's -- the Government's money was at issue in the TARP

17    accounts.

18            MR. FRANCIS:  Let me respectfully just disagree with

19    you a little bit.  We don't have a count of conviction that

20    is for 1031, but we have --

21            THE COURT:  Oh, the trade is being counted.  I'm not

22    saying that.  I'm saying the nature of the crime is that I

23    find by a preponderance is different than was found by the

24    jury beyond a reasonable doubt as to those five counts at the

25    first trial.

1          MR. FRANCIS:  Right.  Factually it is still the same

2     case that TARP funds were at issue.  Mr. Litvak knew TARP

3     funds were available.  He knew he was operating in a market

4     that only existed because the American taxpayer, indirectly

5     but kind of unwittingly, in some cases against their will,

6     but nonetheless put in $24- or 5 billion into this market.

7     Mr. Litvak then had the opportunity to commit his crime.

8          In fact, in some instances it appeared that he

9     specifically targeted people who had that money, PPIFs, like

10    Mr. Canter asking things like, how much -- when does the next

11    TARP report come out?  Things along that line.

12         So factually it is still the same -- the same crime

13    was committed and that he was -- TARP funds were at issue.  I

14    think there are -- there are many factors about his crime

15    that Your Honor has to take into account.  The fact that

16    taxpayer funds were at issue is just one.

17         THE COURT:  You have to explain to me the

18    significance of the text as you related it to somebody

19    changing his plea or not changing his plea at a certain time.

20    Obviously, I'm having trouble explaining it.  I obviously

21    didn't catch why that meant what you argued or the

22    significance that it has vis-a-vis Mr. Litvak.

23         MR. FRANCIS:  Right.  So there's two text messages

24    that we raised.  One is the dumb jury one that convicted

25    him.

1          THE COURT:  I'm aware of that one.

2          MR. FRANCIS:  The second one is that his prior

3   sentence was a victory.  And if necessary, he would crash

4   that shit is what he said.  The point we make --

5          THE COURT:  I thought there was one about Siegel and

6   changing his plea and how what Mr. Litvak said was passed on

7   to him and therefore, he didn't change his plea.  I just

8   don't get that.

9          MR. FRANCIS:  I don't think the causal link is that

10  strong, Your Honor.

11         THE COURT:  That's good.  I didn't see it.

12         MR. FRANCIS:  We think Your Honor has to consider

13  all the facts, so we are giving them to Your Honor.  I

14  wouldn't say that Mr. Siegel -- I can't say tell you that

15  Mr. Siegel didn't plead earlier because of this.  However, it

16  is suggestive.

17         Let me explain the facts because apparently my brief

18  didn't lay it out clearly enough.  Mr. Litvak writes that

19  second -- that victory text message to an employee, a

20  supervisor at RBS.  RBS he knows is under investigation.

21         Our point is kind of twofold.  One, this shows at

22  least a lack of appreciation on Mr. Litvak's part about the

23  seriousness.  And two, to the extent that he's going out and

24  telling people who are under investigation, kind of crowing

25  about the results of his sentencing, it is not helpful to

1    general deterrence.  It tends to undercut.

2         I think one of things Your Honor said at the first

3    sentencing, in your comments, was if anyone in Wall Street is

4    paying attention to this, something along the lines of they

5    should know it is not okay to lie or lying is wrong or lying

6    is a crime or you can get in trouble, something to that

7    effect.  Then to have Mr. Litvak that same day send a text

8    message to someone who is under investigation, or a bank that

9    is under investigation for the exact same crime, and he knows

10   it because it's been publicly reported, undercuts what --

11        THE COURT:  Say what?  What is it that he said that

12   is -- undercuts?

13        MR. FRANCIS:  He said that the sentence imposed by

14   Your Honor was a victory.  We quoted the whole thing in

15   our --

16        THE COURT:  Right.  No, no, why is saying those

17   words -- I don't know why I read into it, I guess, what you

18   are trying to read into it.

19        MR. FRANCIS:  We point out that -- so I think there

20   are a couple of things.  First, it is not the biggest deal in

21   the world.

22        THE COURT:  It is a victory.  You wanted him to be

23   sentenced to ten years.  I think it was a victory.

24        MR. FRANCIS:  I don't think it was ten, I think it

25   was nine.  But, yes, he clearly took it as a victory.  And --

1          THE COURT:  I wouldn't characterize it that way.  I

2    wouldn't characterize it as a victory or not a victory.  But

3    in terms on what he said -- I just don't get the reason why

4    his having a view that -- you know, I don't know what the

5    right word is, grateful, appreciative, surprise, happy,

6    whatever the adjective is that that was his sentence and not

7    the nine years the Government wanted, why that is relevant

8    probative to the factors I have consider.

9          MR. FRANCIS:  Well, Your Honor, as -- I understand,

10   and I don't mean to minimize this, sentencing is hard on

11   judges.  Sentencing is difficulty for prosecutors, too,

12   because there are things under consideration by Your Honor

13   that we have a hard time investigating.  So we can do a lot

14   on conduct, right, that's this binder.  But it is very hard

15   to address things about character.  And that's the large part

16   of this binder is letters in support.

17          So what we're trying to do, and typically we don't

18   have this kind of insight into someone's character, I can't

19   tell you, exactly -- I can't weigh Mr. Litvak's soul and tell

20   you if it is wanting or not.  But I can tell you things he

21   said that tend to maybe be at odds or shed some more light on

22   his character that we didn't know about previously.

23          So it is relevant because it is new conduct.  It is

24   not the biggest deal in the world.  And I can't tell you that

25   even what was he was doing was more than bravado.  However,

1    at the very least, it was ill-advised bravado and he can't

2    blame a lawyer for it, like the lawsuit, which apparently is

3    where he's going now.  But that's not his fault, that's an

4    employment lawyer in New York who convinced him to do it,

5    which I'm not sure how persuasive Your Honor finds that.

6              THE COURT:  I think unless they want to say at the

7    end of the day that the lawyer filed a suit without

8    authority, he had to have, at some point, said, yeah, that's

9    a great idea.  My view is it's not a great idea.  It is not a

10   great idea because it violated his conditions of release.  I

11   also don't think it is a great idea generally.

12             If he has a right that needs to be protected, then

13   you deal with it in a better way than that.  But to just go

14   off and, okay, the case is over.  I understand it wasn't

15   over.  It was up on appeal.  But to go sue him given your on

16   appeal and you think you are going to win and you did win, is

17   kind of sending a message to a witness and to a victim that

18   I'm very troubled by.

19             MR. FRANCIS:  I think it's possible that Mr. Canter

20   took it that way.  He -- I agree with Your Honor with respect

21   to your observations about Mr. Canter's demeanor on direct.

22   And I will tell you that his approach to -- we talked to

23   Mr. Canter in preparation for trial.  He was much less

24   enthusiastic and much less forceful, I think, in his

25   delivery.  I wouldn't be surprised if the jury found him less

1    persuasive, let's say, as -- than the first jury did.

2          THE COURT:  The defense argues, I think in their

3    brief anyway, that I should consider that the victims here

4    made millions of dollars on these bonds.  Now, clearly the

5    circuit has said that's not relevant to the issue of whether

6    a crime was committed, was it material, et cetera.  But why

7    isn't it relevant in connection with considerations of

8    sentencing, either as to seriousness, nature and

9    circumstances, et cetera?

10          MR. FRANCIS:  I wouldn't say it is irrelevant.  I

11   think the Government is hard-pressed to say anything when you

12   are in a 3553A analysis is completely irrelevant.

13          In this case Your Honor knows -- you have sat

14   through enough evidence, I think it would be hard for you to

15   exclude any factor about the case from your mind at this

16   point.  So we would encourage you, go with it.  You should

17   take it into account.

18          However, I think it is a vanishingly small factor

19   because Mr. Litvak didn't know.  It wasn't through his

20   largess that the victims made all this money.  In fact, it

21   was because the victims were so sophisticated and so good at

22   their jobs that they managed to pick a right time to get out

23   of the trade.  You know, if they bought a bond from Mr.

24   Litvak in a fraudulent trade, they could have just as easily

25   held onto it too long or sold it too soon and lost money on

1     that.

2              XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6     XXXXXXXXXXXXXXXXXX.

7              XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

8     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

9     XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

10    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

20    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

21             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24             XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

6    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

7    XXXXXXXXXXX.

8             THE COURT:  Okay.  Thank you.

9             MR. FRANCIS:  So if I might, if Your Honor has no

10   more questions, I would just say that there's one thing that

11   strikes me that Your Honor can conclude about -- there's many

12   things Your Honor can conclude about Mr. Litvak, but there's

13   one thing in particular I want to draw your attention to.

14             As probation suggested in the PSR, it is almost like

15   Mr. Litvak has more than one persona.  Or there's more than

16   one side to Mr. Litvak.  Now everyone in life has more than

17   one side to them.  But the two sides of Mr. Litvak that I'm

18   aware of, or the evidence indicates, are very different.

19             There's the one that gets all the letters written

20   about him, where he's kind and generous and thoughtful, and

21   that's the private Mr. Litvak.  That's the Mr. Litvak at home

22   and with his family and friends.

23             Then there appears to be a different Mr. Litvak at

24   work, where he's aggressive, he is dishonest and nothing is

25   his fault.  And I would suggest to Your Honor that

1    throughout, Mr. Litvak has had opportunity to show remorse

2    without giving up his appeal rights.  Many defendants find a

3    way to express remorse to the sentencing judge.  He's not

4    taken advantage of those.

5            In fact, some of his family members have attempted

6    to do it for him.  His wife very eloquently, I think,

7    attempted to state his remorse, but that's not the same thing

8    as -- and I don't think it is very convincing that Mr. Litvak

9    has the remorse.  His counsel, in sentencing briefs, they

10   talk about regret, but they don't talk about how his -- his

11   reconciliation with the fact that he was the one who brought

12   himself and his family to this state of affairs.

13           THE COURT:  Right.  But, in effect, you want him to

14   accept responsibility when he doesn't think he committed a

15   crime.

16           MR. FRANCIS:  No, not at all.  I have been in court,

17   perhaps not with Your Honor, but with other judges where

18   defendants find a way, particularly with such able counsel,

19   to thread that needle.  To say I want to preserve my

20   appellate rights, but I recognize this is a bad place for my

21   family to be.  I regret my actions, even though they are not

22   criminal, things of that nature.

23           Nonetheless, he hasn't done any of that.  I don't

24   say Your Honor should punish him, but it is a thing to take

25   into account.

1          I will note that when he does do something that is
2     demonstratively bad and wrong, it's not his fault.  He sues
3     Mike Canter personally and Alliance Bernstein.  I understand,
4     Alliance Bernstein is a deep pocket, but there's no reason on
5     Earth to sue Mike Canter.  And there is certainly no reason
6     for his lawyer to go and make a bunch of defamatory
7     statements, maybe not defamatory, but at least attacking
8     statements about Mike Canter in the press.  Then he comes
9     before Your Honor and rather than say that was a mistake, I
10    regret it, it was unauthorized by my lawyer, I take it all
11    back, I disavow it.  He doesn't do any of that.  Everything
12    is sort of someone else to blame.
13         In fact, the Government is to blame because we're
14    picking on him because we aren't going after everyone in the
15    industry, or we picked him to go first.  I think Your Honor
16    needs to take into account this, and this is new -- there's
17    some new information for Your Honor to consider that if Your
18    Honor wanted to, we would allow Your Honor to sentence him
19    irrespective of the prior sentence of 24 months and $1.75
20    million fine which were the principle terms of his prior
21    sentence.
22         I have nothing further unless you have questions.
23         THE COURT:  No, I don't.
24         Yes, sir.
25         MR. MAHONEY:  Your Honor, I want to address

1    primarily the last thing that Mr. Francis said, the idea that

2    today there's a public Jesse Litvak and a private Jesse

3    Litvak and that somehow on the basis of this schizophrenic --

4    this diagnosis of schizophrenia, you should punish the bad

5    Jesse.

6              Participating in a proceeding like this, I think,

7    should give all off us, given the stakes, a little bit of

8    humility.  And the ability of any us to really understand

9    this person given even as a lawyer and the interactions that

10   I have had with him, which are extensive, they pale in

11   comparison to the people that actually know him.  The people

12   that know him have written Your Honor and have talked about

13   his character.  And they have talked about how he's changed

14   in the last five years.  The Jesse Litvak that's sitting

15   before Your Honor today is not the same Jesse Litvak that was

16   sitting on the trading desk a Jefferies.

17             Read Renee's letter, read how she talks about how

18   her husband has changed, about how his role has changed.  I

19   also just want to point out that, you know, we haven't had --

20   again these are ongoing proceedings.  As Mr. Francis notes,

21   you haven't had a statement from the defense, but actions

22   should count for something here.

23             What Mr. Litvak has done with his life after having

24   his career destroyed for reasons for which he's to blame,

25   let's be clear, but how has he reacted to that.  He's put

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    dental practice from the ground up in Florida, moving his

4    family to a different jurisdiction.

5            Now the Government says in its sentencing memo,

6    well, he didn't have anything to do anyway, so you should

7    just sort of throw up your hands at that.  I do not believe

8    that everybody would have reacted to these circumstances in

9    the way that Jesse Litvak did.

10           Jesse's friends and family have spoken about the

11   impact that these proceeding have had.  Again, look at

12   Renee's letter.  I mean, Renee Litvak is a very formidable

13   woman and look what she says about Jesse's conduct.  Does she

14   say it is okay, we all think this is wonderful and the

15   Government is just picking on him?  No, that's not her

16   attitude.  That is not the attitude of the Litvak family.

17   That's not the argument that the defense has presented here

18   today or in our sentencing papers.

19           I think one of more telling things in Mr. Francis's

20   last presentation was when he said that general deterrence is

21   not the Government's strongest point.  I agree with that.

22           During the last sentencing proceeding, Your Honor

23   found that individual deterrence was not a factor because Mr.

24   Litvak is out of the industry and he will never return.  Last

25   time -- after the last verdict, the SEC entered a bar order.

1    I think that's a near certainty now.  Even if that wasn't the

2    case, he is persona non gratia in this industry.

3           Deterrence is the only reason why a significant term

4    of imprisonment would be justified here.  And given all of

5    the factors, given the personal circumstances, given how the

6    Government's treatment of similar matters bears on the

7    seriousness of the offense, a sentence of significant jail

8    time, particularly given the impact that that would have on

9    children for whom Mr. Litvak is the primary caregiver, that

10   militates in favor of a sentence that is far closer to what

11   the defense is requesting than what the Government is

12   requesting.  So --

13          THE COURT:  All right.  Thank you very much.  I

14   think we need to take a recess.  All of us, I mean, not the

15   proverbial we.  And I will be back on the bench, I hope, at

16   2:00, and I'll state my sentence at that time.

17          Stand in recess.

18          (Whereupon, a recess was taken from 1:15 p.m. to

19   2:01 p.m.)

20          THE COURT:  Please be seated.

21          I'm going to start, obviously, with addressing the

22   factors set forth in 3553(a).  Clearly, they all apply in my

23   consideration under 3582(a) as to what sentence to impose.

24   When I turn to the decision about a term of supervised

25   release, I am mindful that as it applies in this case, I'm

1   not to consider A2a of 3553(a), I think which is seriousness

2   of the offense.  And finally, when I -- as I proceed through

3   the factors in deciding the fine, I believe that I'm supposed

4   to consider the factors in 3553(a), but there are additional

5   factors set forth in 3572 of the statute that I'm also

6   supposed to consider.  3572, yes, in addition to.

7          Since this is the first time I have sentenced

8   somebody for a second time, Mr. Litvak, other than act of

9   Congress or the Sentencing Commission changing the sentences

10  that are applicable, I feel like I should start with some

11  opening remarks.

12         I think it is your wife who wrote, and I couldn't

13  agree more with her, that it is almost surreal that I have

14  spent so much time with you, but I have of my own firsthand

15  knowledge no idea of who you are.  I know from what I have

16  seen in the evidence in the case.  I can draw conclusions

17  from that.  I can obviously draw conclusions from the letters

18  that have been written both the first time around when I read

19  those and these which are sometimes attached to that letter

20  but also added new letters.  But I don't know you.  I mean,

21  in a way that I might know a defendant who took the witness

22  stand or I might know a defendant who pleads guilty and

23  speaks to me at sentencing.  I don't have any of that.  And

24  it is surreal.

25         I think one thing, though, that's pretty clear to me

1    is that you and I -- and when I say you, I mean as expressed

2    through your lawyers, view this case extremely different,

3    whether it is a result of our perspective, the conclusions we

4    draw from the evidence and the facts.  I don't really know

5    how to characterize it.  But as I read through everything

6    over the last 10 days probably, I kept -- I finally this

7    weekend said to myself, I'm looking at an orange and he's

8    talking about an apple.  We're just not talking about the

9    same thing when I see the arguments made on your behalf.  And

10   that's, therefore, difficult, I think.  It makes sentencing

11   you difficult.

12          I mean, I guess if you are right, then what I have

13   done here today and the sentence I impose will be of no

14   moment because based on the arguments made in the post-trial

15   briefing, some of the arguments made here, there won't be a

16   conviction, but there is one and that's what I'm here today

17   to do is to sentence you on that conviction.  And while I

18   understand your counsel -- I don't think there's two Jesse

19   Litvaks, but certainly Jesse Litvak in this binder is not the

20   same Jesse Litvak -- it is the same Jesse Litvak, but it

21   reflects a different aspect of who you are in the chats that

22   I have seen.

23          I think I heard your lawyer today take a step back

24   from the argument made by -- at your first sentencing where I

25   definitely had the feeling that I was being argued to, you

1  know, woe is you, this is unfair, you shouldn't have been

2  charged.  I think that the present counsel have made, in

3  effect, the same point, but not with that tone or that theme

4  to it.  It is more in the nature of how does it reflect on

5  the seriousness.  But I think things like, you know, there

6  was no harm here, people got what they paid for, everybody

7  does it.  There's still a lit of that left.  And I just --

8  that doesn't -- isn't the way I view the case.  And so I

9  guess when I say I see this differently than you do, that's

10  some of the ways.

11       My view is -- and this goes to the -- a little bit

12  of what your argument here today is, is that it is clear the

13  Government cannot prosecute everyone.  They have to make

14  choices based upon resources, limitations, as well as

15  discretion.  That power is given to them.  There is nothing

16  that says if you find a crime has been committed, you must

17  charge them, you must seek an Indictment.  There's no such

18  law and no such doctrine.  I think it is a good thing.  I

19  think they should have discretion.

20       So as to whether you have been -- well, we view it

21  as an argument that you are treated different than others or

22  an agreement that the way others are treated means that what

23  you did is less serious.  I think that suffers from the same

24  challenge that we're all faced when we look at other

25  sentences.  We try to compare a sentence of a person

1    convicted of the same crime to a sentence of another person

2    convicted of the same crime.  And I think as Attorney Mahoney

3    admitted to me he found on researching what I found on

4    researching, is that the average reflected in that report

5    goes as high as 85 years.  And so the -- and the facts are so

6    very different in each case.  And I think that's true of the

7    situations that you asked me to look at of people who have

8    been proceeded against in a regulatory sense and not

9    criminally, or even in terms of sentences received.

10           I think that, you know, the numbers of trades is

11   different, whether people cooperated or not could have been

12   different.  I may know of that in one of the cases.  I don't

13   know if it was true in other cases.  I guess at the end of

14   this is the following point:  My obligation today is to

15   impose what I think is a fair sentence.  Fair and just, I

16   think is the correct wording.  And in my view, while, yes, I

17   have to worry about disparity, and, yes, the seriousness of

18   the offense can be judged among other ways, by comparison to

19   how other people are doing, what drives the decision today,

20   in my opinion, most significant is it's a function of what

21   you did and how I view that.

22           And I guess in terms of the harm here, is -- as I

23   said, the securities laws have now for over 80 years provided

24   that we don't allow misrepresentations that are material in

25   connection with the sale of securities.  We think it is

1    important in our economy and in our markets that they may not

2    be distorted by people lying.  It is not true in the car

3    industry.  It is not true on the sales lot.  It's not true if

4    I'm buying a refrigerator.  It's different.  Securities are

5    different.

6          And I am firmly persuaded well beyond preponderance

7    of the evidence that your victims were harmed by your lies,

8    that they would not have paid you what they paid if they had

9    known the truth.  And I think that there's no question --

10   another aspect of your crime, is that you did what you did in

11   order to make more money for yourself.  And, you know, I

12   can't pretend to know what pressures you were under, whether

13   by your bosses or by your personal situation, but being

14   pressed for money or wanting more money is never an excuse or

15   even an explanation for lying.

16         I will turn first to the factor of nature and

17   circumstance.  As I have already alluded to, there were three

18   types of lies, three ways in which you committed the fraud.

19   Basically, a person buying, a person selling and then lying

20   about whether it was an inventory trade or not.  I found, and

21   as I say, it's clearly by a preponderance of the evidence

22   that you did this 76 times over, I think, a period of

23   approximately three years, and there were, I think, 35, I

24   could be off one or two, but approximately 35 victims.  And

25   even though you are not guilty of and can't be charged with

1    the crime, the TARP crime, it still remains the fact that the

2    market in which you lied was a market that really existed and

3    clearly involved government money.

4          I think based on the testimony that came in at the

5    first trial, I think it is very reasonable to conclude that

6    you personally benefited.  I don't have a basis to say it is

7    more than this, but certainly at least somewhere in the range

8    of excess of 300,000 up to in excess of 700,000.  And I think

9    that the lies that I see as I look at the chats are -- they

10   are not kind of "oops" lies, they are like conscious,

11   intentional, "let me defraud this person" lies.  I think that

12   you took advantage of the nature of the market here, the fact

13   that it is opaque and they couldn't have known, didn't know

14   the price you were going to be paying when you went out to

15   the market, for example, in Mr. Norris's case.  And they

16   couldn't check.  I mean, there was some testimony by your

17   expert, oh, well, they could call up their buddies and they

18   could phone here and phone here.  But I think at the end of

19   the day, my sense in this market is I don't think that that

20   was really a very practical way of being able to uncover your

21   fraud.

22         Many of these were thinly traded, I think is fair to

23   say.  The market really was being created by the Government,

24   didn't really exist in the beginning.  I don't -- not that it

25   was on the victims to check to see if you were lying, but I'm

1    not really sure practically they could have found out the

2    price you were getting from that seller on the other side of

3    Norris's trade on that day, other than you saying to

4    Mr. Norris, bid your level.

5              On the other hand, under the nature and

6    circumstances, it is very clear -- your lawyer makes very

7    good points -- this is not the worst securities fraud

8    possible.  Obviously, we can sit here a long time and mention

9    a lot of other frauds that are worse.  And it is not like a

10   Ponzi scheme where you sold somebody something that had zero

11   value.  Your lawyers made a very good record demonstrating

12   that these things had values, that they -- people made good

13   choices in buying them and made money from them.  You know,

14   part of that is their decisions about what to buy.  But

15   nonetheless, they had value.  It wasn't a Ponzi scheme where

16   it was an empty bag they bought.  I mean, it's not -- I don't

17   know why I always come back to this, but, you know, the

18   fellow who had been convicted of three or four prior fraud

19   count convictions who then put a mortgage on his mother's

20   house without paying off the mortgage that was already on it,

21   I always was really offended by that fact pattern.  This

22   isn't that fraud.  This is not -- I mean, the victims, they

23   are entitled to honest treatment, but, you know, they are not

24   -- I better watch -- you know, little old ladies.  They are

25   not people -- and I have had victims who fraudsters have

1   taken every penny they had or I've had letters from victims,

2   this was my son's college account, he can't go to college

3   now.  It's not that case, so I guess I don't want to

4   overemphasize what it isn't, but it isn't that.

5          The investors here are sophisticated, albeit they

6   really had no way to protect themselves from your lies.

7   Admittedly, underneath those people are little guys, but when

8   we go that far down to see the pensioners in the accounts or

9   taxpayers whose money went into this, the loss is really

10  quite small.  So I don't think that's a fruitful way to look

11  at the victims here.

12          I turn next to the need for the sentence.  And the

13  first need for the sentence, and I know a lot of this

14  probably sounds repetitive not only to you but all the folks

15  here supporting you, but the sentence here today has to serve

16  certain needs, as Congress has identified it.  And one of

17  them is to reflect the seriousness of what you did, to

18  promote respect for the law and to provide, thus, a just

19  punishment.  I have already talked about the nature and

20  circumstance and the relative seriousness of it.  I always

21  have difficulty -- I think I said this to you the last time

22  -- struggling with putting -- so qualitatively assigning

23  what's the most serious crime versus the least serious crime.

24  I don't think your crime is either of those.  It's somewhere

25  in the middle.  Where is it in the middle?  Probably in the

1   middle.  It's a lot of money, occurred over a long period of

2   time.  It -- it threatens the sanctity of the securities

3   market, which the laws are designed to protect and make

4   honest so people rely on them, but it is not the most

5   serious.

6              The next is that the sentence should afford adequate

7   deterrence to criminal conduct and a related factor is the

8   need for the sentence to protect the public from further

9   crimes.  Obviously, if we talk about individual deterrence,

10  the length of sentence needed to accomplish that will be the

11  same as the length of sentence needed to protect the public

12  from further crimes.  I think on an individual level, while I

13  can never say that a person who appears in front of me will

14  not commit another crime, you obviously have never committed

15  a crime before this one.  You are not in a category of people

16  likely to commit another crime.  The argument has been made

17  correctly that you probably will, in all likelihood, not have

18  the opportunity to commit a securities crime, but I think

19  that that cuts a little narrowly.  I think I need to really

20  ask, you know, are you a person who might commit another

21  crime, and, in particular, a fraud crime.  And again, I can't

22  say for certain, but I don't expect that you will and I don't

23  think that's a need for the sentence to accomplish protection

24  of the public and individual deterrence in your case.  If it

25  exists here, it is very small.  So to the extent I weight the

factors, it is small.  It's not non-existent.

General deterrence, however, is another story.  I
think the Government is correct that there is some literature
reflecting studies, empirical studies that some sentences,
some imprisonment in white collar cases has a general
deterrent effect.  I always cite a very old example, 50
years ago, the electrical equipment case out of Pittsburgh, a
criminal case, it was first jailed sentences for antitrust
convictions.  And later on when the Government went to
investigate in the early '60s other cases, other industries,
they found that price fixing that was still occurring in
those industries had been suspended or stopped in the period
after the imposition of the sentence.  I can't give you a
case cite -- I mean, a cite for that, but I know I have seen
it, but a long time ago.  But I do think currently there's
some literature that suggests what is, I think, rational to
me, and that is when you're speaking about defendants who are
known as white collar defendants, as yourself, you are
talking about generally educated, generally rational people
who make decisions based on risk and benefits, cost and
rewards, however you want to characterize it.  It doesn't
mean that people like that can't commit crimes.  They might
commit a crime out of passion or without thinking about it.
But more likely, in committing a commercial or a fraud type
of crime, they are going to probably, I think, weigh the

1    likelihood of getting caught with the benefit to be achieved,

2    the risks, in other words, to the benefits flowing to them.

3    And I think if the risk calculus for those people, I would

4    say it for myself, if part of the risk is I'm going to go to

5    jail, that changes the risk calculus.  I'm not saying it will

6    make people not commit the crime, but I think it has to have

7    some impact on rational people who have a lot to lose.

8           In contrast, for example, to what I say when I

9    sentence drug defendants, if I have a defendant in front of

10   me who is a drug -- drug-addicted, and he's out on the street

11   selling dime bags in order to be able to feed his habit and

12   maybe to put some food on the table, he's not making a

13   rational calculus.  He doesn't really have a lot of other

14   choices to feed that habit.  I'm not excusing what he does.

15   But in terms of will my putting him in jail deter the next

16   fellow from standing on the street corner, my answer is no.

17   But in white collar cases, my answer is yes.  I come to that

18   conclusion without regard to what I'm going to add next.  But

19   I will just observe that it is, I think, striking that in

20   cases that are called white collar cases, I can't think of

21   one where the thrust of the defendant's position at

22   sentencing was to avoid a period of incarceration.

23          And I don't -- maybe it is not rational for me to

24   draw from that the inference that that's what matters most.

25   Clearly, that's what matters most when you are caught.  Will

1    it matter most before you are caught?  I guess I draw the

2    inference that it doesn't.  I don't think it is rational.  I

3    don't think it's speculative.

4         The last is that I need to provide you with needed

5    care or treatment, et cetera, and I don't really think that's

6    an issue here at all.  I mention it because I'm aware of it.

7         The next is the kind of sentences.  Obviously, the

8    defense argued that with no loss the kind of sentences

9    available were different.  I rejected that argument and found

10   loss, and I think that the guideline range that I have found,

11   the kind of sentences, for a guideline anyways, would not be

12   home confinement as argued.  Obviously, I have said I will --

13   I'm not departing, but I will vary from the guideline range.

14   So I suppose in that sense I'm aware that by variance, I

15   could impose any sentence here today, including a

16   non-incarceratory one.  I'm not aware of any guideline policy

17   statements and there's not restitution here required.  And if

18   it is allowed, I don't have any request for it.  So I don't

19   have that as a need.

20        That leaves me with the need to avoid unwarranted

21   sentencing disparities among defendants with similar records

22   and similar conduct.  I think as I said at the first

23   sentence, and I have to confess I spent a lot of time at the

24   time of the first sentence researching all kinds of cases.  I

25   think defense counsel, Attorney Smith put a chart, or at

1    least in the brief argued about look at these sentences, the

2    Government responded, no, look at these sentences.  I then

3    went off and looked at a whole lot more and made my own

4    chart.  What I looked at -- and what I learned from it is

5    pretty much what I learned from trying to find those 15 cases

6    in the Sentencing Commission's report.  Every case is

7    different.  And many of the cases, I -- interesting to learn,

8    which was helpful to go look for them because it showed me

9    that while they all have the same characteristics as this

10   case, securities dealer, victim numbers, loss level and

11   fraud, many of them had many more enhancements.  So the

12   guidelines were tens of years, decades of years.  But also,

13   it taught me looking at all the cases I looked at the first

14   time around that there's just a whole lot of things that I

15   need to try to consider and sort of wrap up and put together

16   and balance and weigh that are present in this case with

17   Mr. Litvak that aren't present in any other case I have seen.

18        On the same token, many of the cases I have seen,

19   there are things, pluses and minuses, that are present that

20   aren't present here.  I guess at the end of day I'd say

21   hooray, thank God for Booker and the recognition as I think

22   was argued by Attorney Mahoney that I need to consider the

23   individual who is in front of me in light of these factors.

24        And so I understand I'm supposed to try to avoid

25   unwarranted disparities, and I will try to do that to the

1    extent I'm mindful of other cases and sentencings in

2    connection with securities violations, but I think that it is

3    only unwarranted, and hopefully I can identify on the record

4    the particular facts about this case, both those facts that

5    are present and the ones that aren't present, which would

6    justify a different sentence than the fellow who got 85 years

7    or the person who got probation.

8            Lastly, history and characteristics.  As I have

9    already said, I have read all of your letters, I read all of

10   them before.  I will talk in a minute about I think what they

11   reflect about who you are and what your characteristics are

12   as a person.  But I have to start -- and again, I am probably

13   saying things that might create issues, but there is in

14   several of the letters kind of -- maybe more than several --

15   the sense of -- or a point of view, I guess, and I'm not

16   criticizing here, but it goes to the effect of, you know,

17   this is really hard what Jesse and his family, his children,

18   his parents, his in-laws have lived through.  This has been

19   five years of hell.  That isn't the word that was used, but

20   it's been torture, it's been an ordeal, it has been

21   stressful.  Isn't that enough?  And indeed, I think Attorney

22   Butswinkas sort of made a feign at that kind of an argument,

23   that I have to look at today at the fact that we have been

24   five years to get to today, or you have been through five

25   years to get to today.

1          As I say, I'm not criticizing that point of view,

2     and I don't even mean to say that it is not something I'm

3     mindful of, but I'm also mindful that no matter how long it

4     took us to get here and to the extent I made mistakes and my

5     apologies for having dragged out this ordeal for you.  But at

6     the end of the day, you were convicted on the one count and I

7     found that you committed other criminal conduct and the law

8     requires that I need to impose a sentence on you.  And I

9     don't -- again, I don't mean to say I'm disregarding the

10    argument or that -- that point of view or that feeling, but I

11    don't know -- if we could have pretried, tried the case,

12    sentenced and it had been over in six months, I don't -- I

13    don't know that I would have then thought that the Government

14    was right to say, oh, gee, Judge, he hasn't suffered long,

15    it's only been six months so you should increase his

16    sentence.  And I'm not sure on the other hand that you have

17    suffered as you have or you've had this hanging over, it has

18    affected your life, your wife's life, your children's lives,

19    that that answers the question I have to ask in the context

20    of sentencing.

21          You did write a text, which I don't know whether you

22    regret writing it or not, about the fact it is a dumb jury,

23    the first jury anyways, that Mr. Canter is to blame for what

24    -- where you are.  You then sued Mr. Canter.  That is

25    troublesome because, although in a minute I'm going to talk

1    about all the wonderful things about who Jesse Litvak is,

2    that's also who Jesse Litvak is.  And I don't think it is

3    schizophrenic to say that.  I think we're all very complex

4    people, but -- and I don't even think of it in terms of you

5    don't get it.  You don't have to get it.  I mean, clearly it

6    obviously weighs to your benefit if you accept responsibility

7    or if you get it, but you don't have to and I don't -- I

8    shouldn't punish you, and I won't, for not getting it.  But

9    it still is -- it's something I know about you that you did

10   and said, just like I know about all the wonderful things you

11   did and said that are written about.

12           I guess also before I turn to the specifics that I

13   have drawn from those letters, I share your friend's view.  I

14   forget the person's name, but who asked the question having

15   commented on what a wonderful person you are, you know, how

16   could this man cross the line.  It's at Page 97 if anybody is

17   curious.  Or at 26, where someone said how could this man be

18   in this predicament.  He's suffered enough.  And usually I

19   ask the defendant these questions because they have either

20   changed their plea and they're ready to speak at sentencing,

21   and I can.  And I can't ask you those questions.  I can only

22   look at the record in front of me as to the how are you in

23   this predicament.  Besides making reversible error, you are

24   in this predicament because you made material

25   misrepresentations in connection with securities

1    transactions.  That's how.  You wanted more money.  That's

2    why.

3         I mean, however, I think the positives clearly

4    outweigh all of that, other than the fact of committing the

5    crime.  But in terms of things you have said or done that are

6    negative that I just pointed to, obviously there's a

7    tremendous amount of positive to be said about you.  I think

8    I said to you the last time it kind of felt like I was

9    speaking -- well, I think I said the wake, but your funeral.

10   I mean, in a way, how many people get to see how much other

11   people appreciate the life that they live?  XXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXX.  I think in some respects maybe a

16   silver lining you ought to take is the fact that all those

17   folks sitting back there and all the other people who wrote

18   letters who describe you as a wonderful husband, a fantastic

19   father, a loving son, a great friend, thoughtful, supportive

20   friend, a person who remembers events in people's lives that

21   are that are meaningful to them but not to you necessarily,

22   but you still remember to tell them I remember, I'm still

23   with you on that event.  A person who does what I think

24   someone described as private acts of humanity that people

25   wouldn't know about other than this sentencing, I suppose.

1  Is a very caring person.  I mean, I can't call them all out,
2  but I was struck.  I don't think I knew this the last time.
3  Someone wrote who was on your tennis team at Emory about the
4  fact that one of your teammates had suffered a terrible --
5  sounds like brain injury, I think, if I've got it right, and
6  that you made it a point to petition the coach to visit with
7  that fellow who was at home because of the condition in Texas
8  when you played there.  That's pretty amazing for a
9  20-something year old to be that caring about other people.
10  The fact that you've been supportive of your nephew or your
11  aunt who is suffering through health issues.  The fact that
12  you -- I mentioned this at the first sentencing, but that you
13  picked up the phone to reach out to support your cousin who
14  was a victim of domestic violence.  I mean, I would like to
15  think that we all do little acts of kindness, maybe not every
16  day, but once in a while, but I -- this is really quite an
17  extraordinary outpouring.  It sounds like you're a hard
18  worker, you're fun and you're considerate.  I mean, those are
19  all very positive qualities.
20          I think that probably the part I like best about all
21  of these letters is what comes through is your love of
22  family, probably because I -- that's important to me, and how
23  you invest your time to keep that going, whether it is the
24  cousins at Hampton Beach other the years or children of your
25  cousins or friends that you help out or care for.  And most

1    especially, your relationships and how it's grown with your

2    wife and your children since this situation started, but

3    certainly before that as well, but most especially since.  I

4    think that's all a very strong and important positive history

5    and characteristics to consider and for me to weigh in

6    connection with sentencing.

7              I need to turn particularly to the issue which I

8    don't think -- I'm not sure if I ruled on the downward

9    departure.  If you asked me to, I did.  But I know I said I

10   would consider in particular in the factor considerations of

11   a variance, XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

18   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

19   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.

20              XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

21   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

22   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

23   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX.   But I

6    think it is well established that to the extent that every

7    separation of a parent from a child, particularly young

8    children as your children still are, not as young as they

9    were in '14, but they are still young, will wreck -- wreck is

10   the wrong word -- but will affect disruption, setbacks, pain.

11   I could say that about every defendant who is a parent.

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

16   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

17          As I say, every parent who is a defendant works an

18   impact upon their family and there are consequences to your

19   criminal conduct, but I believe that it is wrong to look at

20   the parenthood relationship is not exceptional.   It can be,

21   but it isn't a force exception.   And indeed, I just want -- I

22   think I went back and looked at my statement of reasons

23   because, as I said, I wasn't certain I made this so clear.

24   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

2    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

3    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

4    XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

5    XXXXXXXXXXX.

6            Those, of course, are the factors in connection with

7    any decision about incarceration.  With respect to the

8    supervised release period, all of those factors apply except

9    for the seriousness of the offense and the need for the

10   sentence to satisfy it.

11           With respect to the fine, I'm mindful that I must

12   consider all the factors I have gone through, but I also need

13   to consider in the context that a fine is punitive the

14   factors set forth at 3572(a), which in this case I think that

15   1, 2, 3, 5 and 6 are relevant, and certainly 1 and 2 are

16   particularly significant, and 3 probably right behind it.

17           I think that I failed to address something which I

18   need to put on the record.  Maybe I don't need to, but I'm

19   prepared to so I'm going to, and that is the defendant's

20   argument that I'm limited to imposing no more than the

21   original sentence.  I agree completely with the

22   principals articulated by the defendant that on remand from a

23   successful appeal, resentencing cannot be a function of

24   vindictiveness.  Actual vindictiveness, that is payback for

25   exercising what are Mr. Litvak's Constitutional rights to

1    appeal and, in this case, win on significant issues requiring

2    a retrial.

3          I agree completely -- obviously, that's Alabama

4    versus United States, Wasman at Supreme Court, 104 Sup.Ct.

5    3217 in 1984.  I agree completely with that principle, and I

6    hope when I finish and I impose the sentence, that the

7    proceeding that's now taken three or four hours so far will

8    reflect what is the truth, and that is that nothing I'm doing

9    here today to Mr. Litvak has been done because I'm angry he

10   took an appeal or angry I got reversed or I want to punish

11   him for doing any of those things.  I certainly hope that

12   what I said and I how I have approached this reflects that.

13   But if it needs saying, I wanted to say that.

14         My obligation today is to decide a sentence today

15   based on the record before me today.  That record is not the

16   same as 2014.  And if the differences are significant as they

17   relate to sentencing factors, then the sentence does not have

18   to be the same.  And I think that's true both as in a lower

19   sentence as well as in a higher sentence.  Here, I think that

20   the differences -- I understand, I think, the argument now

21   better than I did on briefs about the acquittal reflects the

22   seriousness factor, it diminishes the seriousness, or the

23   charging or lack of charging, the treatment of other people

24   reflects the seriousness, changes the seriousness.  I guess I

25   will say I think that could be the case, but I can't say that

1    I find that to be the case here in this case.  And maybe it

2    is because my view of the evidence is that Mr. Litvak

3    committed the nine crimes and that the other conduct that's

4    in front of me is also criminal.  It was material.  I know --

5    or I assume respectfully disagrees with me.  His lawyers

6    certainly respectfully disagree with me, but that's just my

7    view of the case.  And so while the argument is a viable

8    argument, it doesn't hit me with weight, I guess.  I don't

9    know how else to say it.  I'm mindful of what you said, but I

10   don't find it weighty in this instance.

11          XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

14   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

15   XXXXX

16          I think the fact that he sued Mr. Canter is a

17   different fact in front me.  I understand that the position

18   that judge -- that's really bad lawyering, you know.

19   Aggressive lawyering by this employment lawyer and bad

20   lawyering by his first criminal lawyer and not saying, wait a

21   minute, we can't do that without going to the judge.  But the

22   fact of the matter is, at some point he sat with his lawyer,

23   his employment lawyer and said sue Mr. Canter.  Now, my view

24   might be, if it were me, I would say, well, the case is over,

25   right, but his view wasn't that it was over.  His view was he

1   was going to take an appeal and win, which he did, and we'd

2   be back here.  Maybe he thought he might not have to come

3   back, but that I think isn't probably realistic.  So he did

4   it in the context of knowing that he might very well face

5   Mr. Canter again in a courtroom.  I don't know.  I think

6   that's a difference.

7        I think the last thing that the Government has

8   mentioned is the texts and while, you know, it is kind of

9   like fingernails on the blackboard, you know, they don't make

10  me happy to read the text.  I don't really see them as

11  terribly significant.  In fact, I don't really see them as

12  signature in all in terms of saying, oh, that's the

13  difference between the first sentencing and the second

14  sentencing.  I think it is just as likely the victory word is

15  a reflection that he beat back the Government's argument of

16  nine years as opposed to he pulled something over the

17  sentencing judge and he got away with two years.  I don't

18  think -- I don't know.  I guess if you are facing nine, you

19  might think you succeeded by getting two, but I'm not sure

20  that anyone in Mr. Litvak's situation really views that as a

21  victory.  Maybe it is.  It is the word he used, but I don't

22  take it the way I think the Government wants me to take it.

23        So I think I would state I have discussed all the

24  factors, I think probably the most weighty ones are the

25  nature and circumstance, and to the extent it incorporates

1    the seriousness or weighing in favor of the Government's view

2    of sentencing, I guess I will call it that, and I think the

3    principal portion of your history and characteristics weighs

4    in favor of the defendant's view of sentencing.  And as I

5    say, my confidence level about the actual deterrent effect

6    isn't super high, but I do have a belief that I think is

7    rational and has a basis that there is a deterrent benefit

8    here.

9            I reference my view that Mr. Litvak committed the

10   crimes.  Of course, I mean that I have that view by a

11   preponderance of the evidence.  Obviously, the jury found

12   that it wasn't proven by a reasonable doubt, but I'm talking

13   about as the sentencing judge, my view of the conduct that

14   brings Mr. Litvak before me.  It isn't just the count of

15   conviction.

16           I'm hesitating because having spent the five hours

17   or so that we've had here today and the hundred-plus hours I

18   have spent over the last week, having heard all of the

19   arguments, having considered all the papers, having looked at

20   and researched a lot of issues, even again this time in

21   addition to what I had already done, and while it is my view

22   that I think there are factors present that would support a

23   finding by me of a higher sentence than I imposed the last

24   time, there is some weight that might support a lower one.

25   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

1    XXXXXXXXXXXXXXXXXXXXXXXXX And the -- suing Mr. Canter is a

2    negative to me, pulling it above by negative, I mean, that.

3         It is my conclusion -- and I don't find facts that

4    suggest, there's a hint here and there, it is not anything

5    significant enough that makes me conclude the facts are

6    different to justify a lower sentence.

7         It is still my decision to remain at a period of

8    incarceration at the 24 month sentence I imposed.  And I'm

9    hesitating even uttering the words because it feels like I

10   didn't go through anything to get there, but I assure you I

11   did.  I gave consideration to a higher sentence.  I

12   considered the defendant's arguments of a lower sentence.

13        At the end of the day, I guess, it is my view that,

14   weighing the factors as I have, even with the additional

15   maybe slightly plus factors, that the sentence is sufficient

16   but not greater than necessary to effectuate the purposes of

17   sentencing.  It reflects, I think, the nature and

18   circumstance of the offense and the history and

19   characteristics of Mr. Litvak, including that he's a criminal

20   history category one.

21        While it is a variance sentence, I hope I have

22   articulated why I think the guidelines, while I have

23   considered them and I'm mindful of them, are not as helpful

24   as they sometimes are.  And that other factors, I think, are

25   more informative of the Court in making a decision.

1          And I believe that -- I think in terms of the period

2     of supervised release, the Court will impose a guideline term

3     of three years reflecting upon all the factors I mentioned

4     with the exception of the seriousness of the offense.

5          With respect to the fine, it is the judgment of the

6     Court to impose upon Mr. Litvak a higher fine than I imposed

7     before.  It is my intention to impose a fine of $2 million in

8     light of the factors I have gone through, as well as the

9     factors that I am specifically supposed to consider.  One,

10    that it be punitive.  Two, he has the financial wherewithal

11    to pay it.

12         I believe the defense counsel conceded that even

13    with keeping to his wife certain assets, he has a net worth

14    well in excess of that, as well as an ability to earn a

15    salary himself.  And to the extent it is a burden on his

16    family, people who are dependent upon him, obviously his wife

17    is -- has a profession and capable, as demonstrated by the

18    financial statement, of supporting that family.

19         And there was, in my view, a significant loss

20    affected here upon the victims that I'm not sure my original

21    fine adequately reflects.  But primarily in light of his

22    financial capacity and the need for this to be punitive the

23    Court will alter that portion of the sentence.

24         So, Mr. Litvak, I really already told you the

25    sentence, but I would ask you to rise, which is a formality

1   at this point, but it is the sentence of this Court to impose

2   upon you a period of incarceration of 24 months, followed by

3   a period of supervised release of three years and a fine of

4   $2 million.  And a special assessment of $100.

5           The Court imposes the standard conditions of

6   supervised release.  The Court also imposes mandatory

7   conditions of supervised release.  Number 1, you not commit

8   another crime.  Number 2, you not unlawfully possess a

9   controlled entrance.  Number 4, you refrain from the unlawful

10  use of a controlled substance and submit to the periodic

11  tests required by the condition.  Six, you pay a special

12  assessment I have imposed.  And eight, you cooperate in the

13  collection of a DNA sample.

14          Further, the Court imposes the following special

15  conditions:  You participate in a program approved by the

16  probation office for in or outpatient substance abuse

17  treatment and testing.  Pay all or a portion of the cost

18  associated with that treatment based on your ability to pay

19  as determined by the probation office.  That you pay the fine

20  that's imposed by this judgement immediately.  If it's not

21  paid within 30 days, interest will accrue at the legal T-bill

22  rate in accordance with the statute and law.  Any amount that

23  remains unpaid at the commencement of supervised release

24  shall be paid at a rate of not less than 10 percent of the

25  defendant's net income.

1          Although I think given your assets, if it is not

2     paid I would expect that they will seek to take assets, but

3     to satisfy the supervised release conditions, you must make

4     the monthly payment as scheduled.

5          You not incur new credit card charges over $500 or

6     open additional lines of credit without prior permission of

7     the probation office until your criminal debt obligation is

8     paid.  You will not add any names to any lines of credit, not

9     add a secondary cardholder on another's line of credit and

10    shall provide the probation office with to electronic access

11    to any online management or lines of credit, including lines

12    of credit for businesses or LLCs owned or operated or

13    otherwise associated with the defendant.  This is, of course,

14    is while any criminal debt obligation remains open.

15         The defendant shall close any savings accounts,

16    transfer all assets into one main account, not add any new

17    account holders to that account, you may include your spouse

18    if they are joint assets.

19         You will provide the probation office with read only

20    access to the online management of the account and provide a

21    final statement from each account that is closed to ensure

22    that no funds are dissipated during the closing of existing

23    accounts and opening of a single one.

24         You will not encumber your assets until your fine is

25    paid without the express permission of the probation office.

1          Further, you will not possess ammunition or firearm

2   or other dangerous weapon.

3          Are there any other conditions that the probation

4   office would request?

5          THE PROBATION OFFICER:  Your Honor, just the

6   condition about notifying third parties of potential risk

7   based off of the offense.

8          THE COURT:  Okay.  It is a condition of supervised

9   release, I think it is a standard condition, but I will add

10  it as a special condition, Mr. Litvak, that you be employed

11  while on supervised release.  What the probation officer has

12  asked me to do is to add, which I will, a condition that in

13  their judgment, if third parties, meaning people you are

14  working for or clients you are dealing with are at risk given

15  your criminal history involving fraud, that they will have to

16  be notified of that criminal history if the probation office

17  determines there is a risk to that given the nature of what

18  you are doing and your interaction with those people.

19          Anything else, January?

20          THE PROBATION OFFICER:  Nothing, Your Honor.

21          THE COURT:  Is there anything unlawful about the

22  sentence that I've imposed from the Government or the

23  probation office?

24          THE PROBATION OFFICER: No, Your Honor.

25          MR. FRANCIS:  No, Your Honor.

1          THE COURT:  Is there anything you would request,

2    Attorney Mahoney?

3          MR. MAHONEY:  We maintain our objections, Your

4    Honor, as we have stated on the record.

5          I would request that Your Honor give a

6    recommendation as to a facility and the surrender date.

7          THE COURT:  Yes, go ahead.

8          MR. MAHONEY:  I will note that at the last

9    sentencing, Your Honor recommended 90 days out from the

10   sentencing.  XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

11   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

12   XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

13   XXXXXX.

14         THE COURT:  What do you request?

15         MR. MAHONEY:  I would request until September the

16   8th, that's 134 days.

17         THE COURT:  Does the Government have objection to

18   that?

19         MR. FRANCIS:  We're not crazy about it, but we'll

20   defer to Your Honor.

21         THE COURT:  I think it is not unreasonable, in my

22   view, so I will grant that request.  Do you mean that to be

23   the last date by which -- usually when -- especially when

24   it's far out, and it is far out because the defendant has

25   asked and been granted the right to have it be far out, I

1    phrase it that he'll self-surrender to a facility designated

2    by the Bureau of Prisons no sooner than, and I pick a date

3    that it's no sooner than, then I give a drop-dead date, a

4    closing date.  In other words, if he hasn't got a designation

5    and hasn't reported, that he has to surrender to the

6    marshals.

7            So is the 8th that first date or the second date.  I

8    assume it's the first date.

9            MR. MAHONEY:  The first date, Your Honor.

10           THE COURT:  So I am going to phrase it that, Mr.

11   Litvak, I will allow you to self-surrender.  And that I am --

12   at a date, at a place in time designated by the Bureau of

13   Prisons, but that date shall be no sooner than September 11,

14   which is the following Monday, and in no event later than

15   September 22.  So it gives the Bureau of Prisons two weeks

16   window to find a date and place.

17           Mr. Litvak, you need to understand that if you are

18   told by the Bureau of Prisons to surrender at a particular

19   place on or after September 11, you have an obligation to get

20   yourself there and to surrender on time.  If you don't, you

21   would face further consequences in addition to violating my

22   order.

23           However, if by September 22 at noon you have not

24   surrendered, you have not been told where to surrender and

25   your lawyer has not advised you that an extension of that

1    date had been graduated by the Court in the absence of a

2    designation from the Bureau of Prisons, you must then

3    surrender, I suppose, to the U.S. Marshal in Florida?

4              MR. FRANCIS:  I believe that's appropriate.

5              THE COURT:  I don't know what district in Florida

6    you are or what's the closest.  You're in southern, right?

7              THE COURT:  So I would say, I don't know if there's

8    a courthouse in Palm Beach.  So I am going to say surrender

9    to the United State's Marshal's Office in Miami in the

10   Federal Building, wherever the marshal service is, by noon on

11   the 22 if you have not already surrendered as designated.

12             Do you understand that, Mr. Litvak?

13             THE DEFENDANT:  Yes, I do.

14             THE COURT:  Thank you.

15             You said you had a request for a recommendation for

16   designation.

17             MR. MAHONEY:  Yes, the federal prison in

18   Pensacola.

19             THE COURT:  The Court strongly recommends the

20   designation to the federal prison camp at Pensacola, Florida.

21             THE PROBATION OFFICER:  One other note, Your Honor,

22   would the Court transfer jurisdiction, transfer supervision?

23             THE COURT:  I'm sorry.  You asked me that three

24   times.

25             The probation office has requested, given that Mr.

1  Litvak has relocated to Florida, that supervision be

2  transferred to the United States Probation Office for the

3  Southern District of Florida.

4       I am not, at this time, transferring the judicial

5  supervision of the supervision of Mr. Litvak, that may come

6  to be.  I can't do it now because I am not the only person

7  who does it.  The other side has to accept.  But I will, at

8  the request I think of the southern District Probation

9  Office, state that the supervision is transferred to the

10  Southern District of Florida.

11       Is that the right way to say it?

12       THE PROBATION OFFICER: Yes, Your Honor.

13       THE COURT:  Anything else?

14       MR. MAHONEY:  We make a motion for appeal.  I can

15  state the grounds for the record.

16       THE COURT:  Well, I think what I would like to ask

17  you, you have until September 11, that Mr. Litvak is not at

18  risk.  I think it would be proper to await the filing of the

19  appeal, which I assume will come before September 11.  Once

20  you make the filing of your notice of appeal, that at that

21  time you make a written motion to me so I can consider

22  whether I think it meets the standard.

23       I can't remember the exact phrases.  I think it is

24  something like serious questions, something like that.  I

25  would rather see that in a motion.  I would like the

1    Government to have the opportunity to respond.

2          I guess I would ask the Government, can we agree if

3    that motion is filed, is it unreasonable to ask the

4    Government to responded in 7, 14 days?  I don't think you

5    need 21.  We know what the universe of the possible issues

6    are on appeal, maybe not.  Maybe there's some evidentiary

7    ones I haven't heard.

8          MR. FRANCIS:  I'm a little confused as to the

9    process Your Honor has in mind here.  Obviously, it would

10   have to be resolved.  Your Honor will have ruled before

11   September --

12         THE COURT:  Right.  But it is a release pending

13   appeal.  He hasn't filed the appeal.  I hate to be a

14   stickler, but I think he needs to file a notice of appeal.

15   Once he does that, then he can ask me to release him pending

16   appeal and -- in a motion that you can respond to.  And then

17   I would make that decision, hopefully in enough time to then

18   allow him, if I don't agree with his motion, to go to the

19   circuit like he did the last name.

20         MR. FRANCIS:  I'm not sure that the motion for bail

21   pending appeal has to wait on the notice of appeal.  For

22   instance, last time in 2014, Your Honor denied the motion at

23   the end of the sentencing hearing, I believe.  And then the

24   notice of appeal followed weeks later.

25         So what Your Honor is laying out is fine, I suppose.

1    The timing, if Mr. Litvak's notice of appeal, the judgment

2    will enter within --

3              THE COURT:  A day or two.

4              MR. FRANCIS:  So he has two weeks to file his notice

5    of appeal, which, of course, Your Honor will advise him.

6    When do you want the motion from the defense filed by?

7              THE COURT:  You want me to set a deadline.  I would

8    expect I will get it two weeks from Attorney Mahoney two

9    weeks after that, but if I -- he didn't think he was going to

10   act that quickly, I would tell him that is the time.  I don't

11   know that I can set a limit.  He could file that motion --

12   just like you said, I can decide it today.  I think he could

13   file it -- he could really probably file it the day before

14   the surrender date, theoretically.  Not wise, but I think he

15   could.

16             But anyway, it is not going to happen.  So he's

17   going to do within 14 days of his notice of appeal.  I guess

18   I would just like to have it in writing.

19             MR. FRANCIS:  No that's fine.  I'm trying to

20   understand what the staging is going to be, and now I get it.

21   So thank you for bearing with me.

22             Your Honor, before we move --

23             THE COURT:  You didn't answer me.  How much time do

24   you need to respond?

25             MR. FRANCIS:  Two weeks is fine.

1          We've moved on from the sentencing?

2          THE COURT:  Well, I haven't advised him of his

3    appeal rights yet.

4          MR. FRANCIS:  Before you do that even, if I may.

5    Your Honor said something, I believe you just misspoke.  I

6    just wanted to clarify.  You mentioned that there had been a

7    text message about how Mr. Canter was to blame in connection

8    with the stupid jury's text message.

9          THE COURT:  Yeah.

10         MR. FRANCIS:  I don't believe there was a text

11   message to that effect.  If Your Honor would clarify for the

12   record that you would impose the same sentence.

13         THE COURT:  Where did I get Mr. Canter was to blame,

14   though?

15         MS. CHERRY:  You may just be conflating the lawsuit

16   and the --

17         THE COURT:  That's what that was.  It was a note I

18   had in my -- when I'm speaking, I have sort of notes to

19   remind me.  I think that's what I did.

20         No, that text doesn't have anything about Mr. Canter

21   in it.  You are right.  So I misspoke.  If I made it sound

22   like it was in the text, I misspoke.

23         MR. FRANCIS:  I believe it's implicit in what Your

24   Honor has said about the guidelines and its effect on your

25   sentencing calculation, but if you could just clarify for the

1   record that Your Honor would have imposed the same sentence

2   had you calculated the guideline range to be different.  I

3   suppose this most pertains to loss and the issue about

4   victims.

5           THE COURT:  I thought about that.  And I have this

6   to say about that, I guess.  This it is record I will give

7   you.

8           I went through with Attorney Mahoney how the

9   guideline table is helpful but not all that helpful.  But on

10  it's helpful, I pointed out that even if I found, you know,

11  loss on 20, you're still at a range that's above where I

12  sentenced.  And, yes, if that's the loss, I would impose the

13  same sentence.

14          I could go through what I iterated at all of those

15  levels including, I think, looking at it from the perspective

16  of his gain, his -- the bonus in his pocket gain.  Even on

17  the bonus in his pocket on the Count Four only.  But if the

18  answer is that Attorney Mahoney is right, that there's zero

19  loss to consider, I hate to tell you this, but I think I

20  would have to think about it again.

21          MR. FRANCIS:  Thank you, Your Honor.

22          THE COURT:  I don't know how -- it's just honestly

23  how I feel.  I thought about it, obviously, as I said that

24  earlier to Attorney Mahoney about how, look, you are still up

25  in a guidelines range of incarceration at least in the teens

1   if not the 20s or the 50s under different loss scenarios.

2   But I think if I went where they argued I should have gone,

3   zero loss, I can't with confidence -- I might impose the same

4   sentence.  I'm not saying I wouldn't, but I can't say that I

5   would.  I can't do that honestly just to avoid having us all

6   suffer and being in front of me yet again, speaking at much

7   too great lengths about things that everybody has already

8   heard about.

9          MR. FRANCIS:  I wouldn't suggest you say it for that

10  reason, but thank you for clarifying.

11         THE COURT:  Mr. Litvak, as I advised you the first

12  time and as I think you are quite well aware, you have the

13  right to appeal the sentence.  What that means is you get to

14  file a notice of appeal through counsel and go to the Court

15  of Appeals and tell them the ways in which you think I've

16  made mistakes here during the trial, pretrial, at sentencing,

17  whatever I have done, everything I have done here can be the

18  subject of your appeal.

19         The only thing I need you to acknowledge to me on

20  the record is the fact that -- and you have very able

21  counsel, so I don't imagine this is an issue, but I need you

22  to tell me you understand that that notice of appeal must be

23  filed within 14 days of today.  If it is not filed within 14

24  days, it is as if you have no right to appeal.  You've lost

25  it.  I can't give it back to you.  The Court of Appeals can't

1   give it back to you.

2           Therefore, I urge you to speak to counsel, I suspect

3   it has already happened, but I urge you to speak to counsel

4   and direct them to file the notice of appeal as soon as you

5   can.  Giving them the time to get the note and to be sure

6   they get the notice here into the courthouse, in the hands of

7   the clerk's office and docketed within that 14-day period.

8           Do you understand there's that 14-day period?

9           THE DEFENDANT:  I do, Your Honor.

10          THE COURT:  Anything further?

11          MR. FRANCIS:  It's a formality, but I would like to

12  hear it anyway.  If Your Honor would just remind the

13  defendant that even if he cannot afford counsel, that one

14  will be provided.

15          THE COURT:  Yeah, I always forget that one in

16  retained counsel cases.  What the Government wants me to be

17  sure you know, as you were advised probably a long time ago,

18  if you can't afford a lawyer, one will be provided for you.

19  It is pretty clear you can afford one, and it's pretty clear

20  that you have a lawyer.  A very good and very many lawyers.

21  But I need to be sure you know that if for some reason they

22  quit tomorrow and you have no money to pay anybody else, that

23  you can ask the Court to appoint a lawyer for you.

24          Do you understand that?

25          THE DEFENDANT:  Yes, I do, Your Honor.

```
 1            THE COURT:  Thank you.  Anything further?

 2            MR. FRANCIS:  Nothing from the Government, Your

 3     Honor.

 4            THE COURT:  I can't remember, Mr. Litvak, if I said

 5     this to you the last time, I'm getting old.  I don't think I

 6     did.  I say this to some people.  I will say it to you.  If I

 7     see you again, I guess it will kind of be like, oh, okay.  I

 8     didn't have to say it to you.  But assuming your conviction

 9     stands and you serve time in prison as I just directed, I

10     have in mind to say to you really two things.

11            One is, it something that I heard a lawyer who

12     represents actually death penalty defendants, but he talks

13     about his clients are more than -- they are not defined by

14     their crime.  And obviously, this is not a death penalty

15     case, but I think I want to say the same thing to you.  You

16     aren't and you shouldn't allow yourself to think of yourself

17     as defined by the crime that has you standing in front of me

18     and has me imposing upon you a sentence that you would rather

19     more not have.  You are more than that.  Clearly, you are

20     more than.  And I think you need to remind yourself of that.

21            I understand your regret of the circumstances you

22     put yourself and your family into and the fact that you are

23     really sorry about that, but I think that you still need to

24     remember that you are more than that.  And that the sentence

25     related to that is the idea that, assuming the sentence
```

1   stands and you serve it, that when you are done, you should

2   say to yourself, okay, I did something wrong.  Society thinks

3   I did something wrong.  I was assessed a price for that

4   wrongdoing, and I paid it.  And you should get on with your

5   life in the sense of the positive things that there are about

6   you and not just dwelling on how this has defined your life.

7          Again, as I say, I don't view you as just the crime

8   you are in front of me on.  You shouldn't view yourself or

9   measure yourself going forward in your life just that way

10  either.

11          Enough talking.  Thank you all very much.

12          (Whereupon, the above hearing adjourned at 3:11

13  p.m.)

14

15

16  COURT REPORTER'S TRANSCRIPT CERTIFICATE

17  I hereby certify that the within and foregoing is a true and

18  correct transcript taken from the proceedings in the

19  above-entitled matter.

20

21  /s/  Terri Fidanza

22  Terri Fidanza, RPR

23  Official Court Reporter

24

25