UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                     CRIM NO. 3:15CR155 (RNC)

    v.

MICHAEL GRAMINS                              December 14, 2020

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

**Table of Contents**

I.   Introduction ...................................................................................................................... 1

II.  Relevant Background ......................................................................................................... 2

   A.   Procedural History ...................................................................................................... 2

   B.   Summary of the Facts ................................................................................................. 3

      1.   Background ......................................................................................................... 3

      2.   Evidence of Gramins's Conspiracy ................................................................... 4

      3.   Evidence of Materiality .................................................................................... 10

      4.   Evidence of Willfulness ................................................................................... 12

      5.   Litvak Indictment ............................................................................................ 15

      6.   Additional Trades ............................................................................................ 16

      7.   Evidence of Motive—Bonuses and Compensation .......................................... 17

III. Sentencing Guidelines ..................................................................................................... 18

   A.   Loss ......................................................................................................................... 20

      1.   Intended Loss ................................................................................................... 20

      2.   Actual Loss ...................................................................................................... 27

      3.   Gramins's loss arguments are meritless .......................................................... 29

   B.   Victim Enhancement ................................................................................................ 49

   C.   Role in the Offense .................................................................................................. 50

   D.   Acceptance of Responsibility .................................................................................. 57

IV.  Gramins's Additional Attacks On The Guidelines Are Unwarranted .............................. 58

   A.   The Guidelines Are the Appropriate Starting Point for the Court's Analysis .................. 58

   B.   Gramins's Fraud Is Well Within the Heartland of the Guidelines ............................... 61

   C.   The ABA Guidelines Are Not Helpful Here .............................................................. 62

      1.   Base Offense Level 6-8 .................................................................................... 62

      2.   Actual Loss Adds 12 ........................................................................................ 63

      3.   Culpability Adds 6 ........................................................................................... 63

      4.   Victim Impact Adds 2 ...................................................................................... 64

      5.   No Special Offense Considerations .................................................................. 65

      6.   Total Offense Level of 26 ................................................................................. 65

V.   The Sentencing Factors Suggest A Meaningful Term of Imprisonment .............................. 65

   A.   Nature and Circumstances of the Offense ........................................................ 66

   B.   Seriousness of the Offense, Respect for the Law, and Just Punishment........................... 66

   C.   Adequate Deterrence and Protection of the Public ............................................... 71

   D.   History and Characteristics of the Defendant ................................................... 74

   E.   A Sentence of Imprisonment Does Not Create an Unwarranted Sentencing Disparity .... 75

VI.  Conclusion ....................................................................................... 78

I.    **Introduction**

Between 2009 and 2013, defendant Michael Gramins engaged in a scheme and conspiracy to commit wire and securities fraud.  Time and again, he lied to Nomura's customers during negotiations to buy and sell bonds in the opaque RMBS marketplace, inducing them to buy at higher prices or sell at lower prices than they would have otherwise.  Gramins's motive was not complex—he did it to make more money for Nomura's RMBS desk and, ultimately, for himself. And his crime did not stop with his own conduct—he trained and helped others to do the same thing, ultimately resulting in millions of dollars of loss to victims.

Now, on the eve of sentencing, Gramins has still not taken responsibility for his conduct, but instead blames everyone else for his situation: the Government for enforcing the securities laws; his victims for believing anything he said; Nomura for not stopping him from lying; the jury for finding him guilty; and the RMBS market for setting a bad example.  Whether he accepts it or not, it was Gramins who violated the law and is now to be sentenced.  His upbringing, education, and training gave him every advantage and reason to conform with the law.  But Gramins chose what must have seemed an easier, more lucrative path.  Taking advantage of the opaque RMBS market, he and his colleagues expected to get away with lying.  Having been proven wrong, and guilty of conspiracy to commit securities fraud and wire fraud, at long last, Gramins faces punishment.

The Government does not seek a Guidelines sentence of 60 months in prison.  But Gramins's sentence must include a substantial term of imprisonment if it is to satisfy the goals of sentencing, to reflect the seriousness of the crime, achieve general deterrence, and account for the history and characteristics of the defendant.

1

## II.   **Relevant Background**

### A.  **Procedural History**

On September 3, 2015, a grand jury returned an indictment charging Michael Gramins and co-defendants Ross Shapiro and Tyler Peters with one count of Conspiracy to Commit Securities Fraud, Wire Fraud and False Statements, in violation of 18 U.S.C. § 371; two counts of Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5; and seven counts of Wire Fraud, in violation of 18 U.S.C.§ 1343.   The grand jury later returned a superseding indictment on February 4, 2016, removing the third object of the conspiracy count (False Statements), as well as second and third superseding indictments on August 3, 2016 and March 6, 2017, respectively, making minor changes.   Gramins surrendered voluntarily and was arraigned on September 10, 2015.   He was released on a $1 million surety bond, and has remained at liberty during the entire pendency of this case.

Following extensive pre-trial motion practice, trial began on May 8, 2017.   On June 15, 2017, following a six-week trial, the jury convicted Gramins of conspiracy (Count One), failed to reach a verdict on one count of securities fraud and one count of wire fraud (Counts Three and Nine, respectively) , and acquitted him on the remaining counts.   A mistrial was declared as to the unresolved counts.   After post-trial motions, the Court denied Gramins's motion for acquittal and dismissal on due process grounds, but granted his motion for a new trial under Fed. R. Crim. P. 33.   On September 20, 2019, the Second Circuit Court of Appeals reversed the Court's new trial order and reinstated Gramins's conspiracy conviction.   *United States v. Gramins*, 939 F.3d 429 (2d Cir. 2019).   Once the case was returned to the Court, the parties further litigated Gramins's motion to reconsider dismissal and acquittal.   On September 22, 2020, the Court denied Gramins's motion.   On October 7, 2020, the Government and Gramins jointly moved the Court to set a

sentencing date, with the understanding that the Government would dismiss the unresolved charges so long as the conspiracy conviction is not reversed on appeal or collateral attack. The Court granted the parties' motion on October 8, 2020. Sentencing is set for December 17, 2020.

**B.  Summary of the Facts**

A fulsome summary of the offense conduct is set out in the PSR at ¶¶ 10-60, which the Government incorporates by reference. Much of the factual background was drawn directly from the Second Circuit's decision in *Gramins*.

1.  <u>Background</u>

During the relevant times in this case, Nomura Securities International, Inc. ("Nomura") was a securities and investment banking company that, among other things, engaged in the purchase, sale and brokering of Residential Mortgage Backed Securities ("RMBS). Nomura had RMBS clients throughout the United States, including Connecticut. PSR ¶ 10. Gramins was the Executive Director of Nomura's RMBS Desk, for which he oversaw Nomura's trading of bonds composed of sub-prime and option adjustable rate mortgage loans. Shapiro was the head of the RMBS desk and Gramins's supervisor. PSR ¶ 11.

As relevant here, Nomura traders, including Gramins, often attempted to match a prospective buyer of a particular RMBS with a prospective seller of that RMBS (and vice versa), reaping a small commission in return. Industry participants refer to this function alternatively as "facilitating," "market making," and "riskless trading." The last term reflects the fact that because Nomura "had the potential buyer and potential seller already matched up at the time of the transaction," it had practically eliminated any of the "market risk" associated with holding the security on its own books. PSR ¶ 16. These were called "order" trades. Gramins and Nomura also engaged in "BWIC" ("Bids Wanted in Competition") trades, wherein a putative seller sends

a list of bonds potentially for sale to multiple broker-dealers, who then solicit expressions of interest and price ranges from potential buyers and place a bid in the auction for that particular security. Both order and BWIC trades fall within the "riskless" category because the broker-dealer has the potential buyer and potential seller already matched up at the time of the transaction. Moreover, in both contexts, the broker-dealer typically obtains compensation for its "matching" efforts by selling the bond for slightly more than it paid for it. Industry participants refer to this difference as "commission," "pay on top," or "spread," and often negotiate the amount of the difference explicitly with their broker-dealer. PSR ¶ 17.[1]

### 2. Evidence of Gramins's Conspiracy

Between 2011 and 2013, Gramins and his co-conspirators on the RMBS desk engaged in a conspiracy to defraud their RMBS customers. As described by the Second Circuit, Gramins and his colleagues:

> lied to their counterparties about contemporaneous price negotiations with other, third-party counterparties. Those lies caused Nomura's counterparties to increase their bids and decrease their offers when they would not otherwise have done so. The counterparties believed that they were adjusting their bids or offers in response to bona fide, contemporaneous negotiations with those other, third-party counterparties and paying Nomura a modest commission to facilitate supposedly "riskless" transactions with those counterparties. In reality, Gramins's false statements carved out sizable spreads between Nomura's buying-counterparties' bids and its selling-counterparties' offers, allowing Nomura to reap substantial profits unbeknownst to the counterparty on either side of the transaction.

*Gramins*, 939 F.3d at 434.

---

[1] The PSR and *Gramins* also described a third type of trade, an "inventory" trade, wherein Nomura sells a bond out of its own inventory. PSR ¶ 18. Unlike order and BWIC trades, in an inventory trade, Nomura has borne the risk that the market value of the bond decreased since purchasing it, there are only two parties to the deal (Nomura and the buyer), and no extra commission is paid by the buyer.

Among the evidence of Gramins's fraud was the testimony of three co-conspirators from the Nomura RMBS desk.  Caleb Chao, a former junior analyst at Nomura, explained that Gramins and others would "misrepresent...prices to clients," for instance by "tell[ing] the seller that we were seeing a bid that was lower than what the bidder had actually bid" or "tell[ing] a bidder that we had an offer that was higher than the offer actually was."  Chao testified that the effect of these representations "was to get either one side or both sides to lower their offer [to sell] or increase their bid [to buy]," thereby "increas[ing] the spread or money that Nomura earned on the trade."  Chao testified that Gramins taught him to engage in these deceptive tactics and that he had observed Gramins engaging in them himself.  PSR ¶ 20.

Frank Dinucci, a former vice president at Nomura, similarly explained that he and other Nomura RMBS traders "would lie about where we were actually buying or selling securities to clients" in order to "increase the profit for Nomura."  Dinucci testified that such misrepresentations induced Nomura's counterparties to adjust their bid or offer prices because counterparties "typically only had the information that we were giving them regarding price" and thus "basically had to take our word when it came to the actual price on the bond."  Like Chao, Dinucci testified that he had originally learned these deceptive tactics from Gramins and that he had observed Gramins engage in them.  PSR ¶ 21.

Alejandro Feely, a former associate at Nomura, described the RMBS trading desk's trading tactics in a similar manner.  Both Dinucci and Feely testified that Nomura's RMBS traders would engage in these tactics to defraud their clients "every time the opportunity presents" and noted he believed it to be "on a daily basis."  Similarly, Chao testified the practices would occur "fairly often."  PSR ¶ 22.

The PSR includes four examples of fraudulent trades in which Gramins directly participated that were introduced into evidence at trial. *See* PSR ¶¶ 23-34. These narratives are drawn nearly verbatim from the Second Circuit's *Gramins* decision.

*January 5, 2010 AHMA Trade (Government Exhibit 10 Series)* (PSR ¶¶ 24-26)

On January 5, 2010, Gramins facilitated an order trade of AHMA 2007-1A1 ("AHMA") bonds between Joel Wollman of QVT Financial (the seller) and Chris Creed of Goldman Sachs Asset Management (the buyer).

Gramins first raised the subject of the AHMA bonds with Wollman and confirmed that Wollman owned some amount of them. Gramins then told Wollman: "guy looking to add a bit of this...wants me to show a few holders a 46 bid." Wollman then offered to sell the AHMA bonds at 47-16. Several minutes later, but before initiating any conversation with Creed, Gramins replied to Wollman, "ok, can show you a 46-16 bid on the ahma," as if Creed had increased his bid in response to Wollman's offer. Wollman responded to Gramins by lowering his offer price to 47-08.

Only then did Gramins message Creed, writing: "hey chris ... have a matcher for you." When Creed expressed interest, Gramins inflated Wollman's 47-08 offer price to 49-00, falsely telling Creed: "being offered 33mm ahma 07-1 a1 @ 49-00." Gramins and Creed discussed the bond for a few minutes. Before receiving any bid from Creed (but after suggesting to Creed that he bid above 48-00), Gramins resumed his chat with Wollman, falsely telling him: "i have really been pushing this guy on ahma ... / he says 47-00 is best, otherwise wants me to move onto other holders." Wollman then agreed to sell his bonds at 47-00.

Gramins then returned to his chat with Creed. When Creed suggested 48-12 and 48-20 as possible bids, Gramins replied: "happy to show what you want, but honestly dont think this guy is

gonna budge," referring to the fictitious 49-00 offer he had previously conveyed.  Creed then told Gramins he would "pay the 49" if necessary but would prefer to pay less if possible.  Minutes later—and without any intervening interactions with Wollman, who had already agreed to sell at 47-00—Gramins told Creed: "chris this guy isn't moving at all...wants to just stick to his guns...so is 49-00 ok?"  Creed agreed to pay 49-00.  Nomura then purchased the AHMA bonds for 47-00 and sold them for 49-00, taking a 64-tick commission.

*February 9, 2011 WAMU Trade (Government Exhibit 11 Series)* (PSR ¶¶ 27-28)

On February 9, 2011, Gramins brokered a trade of WAMU 2005-AR15 A1C3 ("WAMU") bonds between PK Banks of DW Investments (the buyer) and Jordan Rieger of Monarch Alternative Capital (the seller).

Gramins began by contacting Rieger about the WAMU bonds that Rieger owned.  Gramins recommended a range in which Rieger might sell the bonds, but then clarified: "happy to reflect what you like / and i am purely looking to broker."  Rieger offered to sell the bonds at 52-24.  One minute later, Gramins falsely inflated that offer price in a conversation with Banks, telling him: "have an order on [the WAMU bond] @ 53-16."  Banks bid 51-16 in response.

Moments later, Gramins misrepresented Banks's bid back to Rieger, telling Rieger: "i have 51-00 bid."  Rieger reacted by lowering his initial offer to 51-28.  One minute later, Gramins lied to Banks, telling him: "have the wamus down to 53-00 now."  Banks reacted by raising his bid to 52-00.  At this point, even though Banks's bid of 52-00 now exceeded Rieger's offer of 51-28, Gramins continued to simulate an ongoing negotiation to both counterparties.  He misstated Banks's bid to Rieger, telling the latter: "ok ... i am trying to push him more but have 51-16 [from the buyer]."  This time, Rieger declined to lower his offer and told Gramins to "keep working."  Nevertheless, a few minutes later, Gramins told Banks, "I have 52-24 now."  Banks then raised his

7

offer again.  Banks's ultimatum to Gramins—"best @ 52-04 ... paying you 52-10 all in,"—indicated that he understood Gramins to be making a 6-tick commission for facilitating the trade.  Several minutes later, though, Nomura bought the WAMU from Rieger at 51-20 and sold it to Banks at 52-10, taking a 22-tick commission.

*March 16, 2011 INDX Trade (Government Exhibit 13 Series)* (PSR ¶¶ 29-30)

On March 16, 2011, Gramins employed similar practices while soliciting a bid from Wollman in the context of a BWIC auction of INDX 2005-AR14 A1B2 ("INDX") bonds.

After Gramins informed Wollman of the BWIC opportunity, Wollman bid on the bonds, stating that he "would take a shot at 18-1."  Wollman asked Gramins: "you gonna use?"  Gramins confirmed that he would use Wollman's bid, telling him: "yes using."  Several minutes later, Gramins informed Wollman that the bid had been successful.  As the evidence showed, however, Gramins did not in fact use Wollman's bid of 18-01.  Instead, Gramins bid only 17-17, won the auction, and purchased the INDX at that price.

Gramins continued deceiving Wollman after the auction had finished.  With respect to the amount of commission to be paid, Wollman asked Gramins if he could "do something like 18-5" given the low price of the bond.  Based on the 18-01 price that Wollman thought Nomura had paid, Wollman's proposal would have netted Nomura a four-tick commission.  Several minutes later, though, Gramins pushed back on that proposal, noting that he (Gramins) would have been "happy to buy [the INDX] at 19," and asking Wollman, "do you mind sticking w the qtr pnt?"  Wollman agreed to Gramins's request and paid Nomura 18-09, which he believed would net Nomura a market-standard eight-tick commission.  But because Nomura had bid only 17-17 for the bond, rather than using Wollman's bid of 18- 01, Gramins reaped a 24-tick commission from Wollman's purchase.

*May 1, 2012 PPSI Trade (Trade 26)* (PSR ¶¶ 31-32)

Chao also testified to an order trade that he and Gramins brokered jointly on May 1, 2012. Chao testified that he sat to Gramins's immediate left on Nomura's trading desk, and that Gramins instructed him on how and what to communicate to clients while brokering trades.  While Chao instant messaged the buyer (Aadil Abbas of Hartford Investment Management Company ("HIMCO")), Gramins messaged the seller (Gabe Sunshine of Bracebridge Capital).  Gramins began by alerting Sunshine to a potential trade of PPSI 2004-WWF1 M3 ("PPSI") bonds, saying: "gonna have a bid for you shortly."  One minute later, Chao engaged Abbas regarding those same bonds and Abbas bid 78-22.  One minute after Chao received Abbas's bid, Gramins messaged Sunshine: "78 bid."  Sunshine responded by offering to sell all his PPSI bonds at 78-16.

Even though, at that point, Abbas's bid (78-22) exceeded Sunshine's offer (78-16), Nomura did not execute the trade.  Instead, a few minutes after Gramins had received Sunshine's offer, Chao falsely stated to Abbas: "seller came back to us with an 80-16 offer."  Abbas raised his bid to 79-00 in response.  Chao then told Abbas that the seller "usually likes to engage so dont think we want to move to best level right away," and offered to "show 78-24 and see what comes back." Chao testified at trial that the purpose of this false statement "was to give Abbas sort of an illusion, a false illusion that, you know, we were trying to buy the bonds cheaper for him."  Contrary to Chao's statement to Abbas, though, Gramins did not discuss the PPSI's price with Sunshine any further.  After waiting a few minutes, Chao simply pretended that Sunshine had lowered his offer again, telling Abbas: "ok, showing 79-24 offer now ... there might be a little wiggle room here." This time, Abbas declined to raise his bid above 79-00.  Gramins then bought the PPSI from Sunshine at 78-16 and Chao sold it to Abbas at 79-02.  Nomura took an 18-tick commission on the trade.

*November 22, 2013 JPMAC Trade (Trade 29)* (PSR ¶¶ 33-34)

On November 22, 2013, Gramins facilitated an order trade of JPMAC 2006-WMC1 A4 ("JPMAC") bonds between Wollman (the buyer) and Harrison Choi of The TCW Group, Inc. (the seller).

Gramins messaged Choi, who offered to sell the bonds at 80-00.  Minutes later, Gramins lied to Wollman about Choi's offer, saying: "ok here's what i just got / 29+mm A4's @ 81-16." That caused Wollman to raise his bid to "80 flat."  Minutes later, Gramins lied again, this time to Choi, and over the phone, telling him: "[The buyer] wanted to be 78. I said no. I have 78 and three-quarters."  That caused Choi to lower his offer to "79 and a quarter."

After speaking to Choi, Gramins called Michael Romanelli, a salesperson for Nomura. Gramins and Romanelli discussed how to phrase Choi's latest offer to Wollman and whether Romanelli (instead of Gramins) should convey it to Wollman over the phone.  The two agreed on a phrasing of "80 and a half to you," and Romanelli told Gramins: "keep it in chat, because if I call, he's gonna get suspicious and start asking me questions."  Minutes later, Gramins told Wollman, over instant message: "i have beaten [Choi] up as much as i can / 80-16 is the best i can get them to you."  Gramins confirmed to Wollman that this price factored in a commission from Choi, even though he and Choi had not discussed any.  Wollman agreed to the price.  Gramins then bought the JPMAC bond from Choi at 79-08 and sold it to Wollman at 80-16, taking a 40-tick commission on the trade.

3.   <u>Evidence of Materiality</u>

All four counterparty witnesses—Zachary Harrison of Putnam Investments, Eric Marks of Ellington Capital Management, Abbas of HIMCO, and Wollman of QVT Financial—testified that they considered the lies of the Nomura traders important to them in the context of the price

negotiations in which they occurred.  PSR ¶ 36.  They also testified that the defendants' lies did, in fact, cause them to pay more than they would have otherwise.  PSR ¶ 37 (Harrison: "Q: Can that information…affect what you ultimately pay for a bond? A: Yes. Q: How so? Can you explain that to the jury? A: …[I]t appears that I agreed to pay a quarter-point commission based on the price that Nomura paid."); *id*. (Abbas: "If I had known that the offer is 78 and a half, I would never had paid 79 and 2. So that's the effect I could see."); *id*. (Wollman: "Well, I had assumed that he had, in fact, bid 18-1; and then when he said that it's yours, I assumed it was bought at 18-1, and it influenced the all-in price that I ultimately agreed to pay.").

The co-conspirators testified likewise.  Dinucci testified that he was told by Shapiro and Gramins that the purpose of giving clients false bids was to "increase the profit on the trade," thereby taking additional money from "the clients."  PSR ¶ 38.  Chao testified as to the impact of such a lie, saying "[t]he effect would be hopefully, that Abbas would increase his bid based on that information.... It would hopefully increase the spread or amount of money that Nomura earned on this trade."  *Id.*  Feely testified, "[i]f I would tell the buyer I can buy the bond higher than the actual truth, or I'd tell the seller that the bid that I have is lower than is actually truth, and they agree on the trade, I get to keep that difference between the truth number and the number that I am representing; and I kept that for the desk."  *Id.*  Feely called the lies that the defendants told at Nomura "hurtful" for victims because they had the effect of getting them to "pay more or some more than they would otherwise."  *Id.*

The effect on price of Gramins's lies was further reinforced by the trades themselves.  In every trade presented at trial, a victim reacted to a conspirator's lie, adjusting the amount of money he was willing to part with to buy a bond or the amount of money he was willing to accept to sell a bond.  The PSR provides several examples of Gramins and his co-conspirators successfully

inducing victims to change their prices based on lies.  PSR ¶ 39.  The Second Circuit agreed with that finding.  *Gramins*, 939 F.3d at 434 ("Those lies caused Nomura's counterparties to increase their bids and decrease their offers when they would not otherwise have done so.").

### 4.  Evidence of Willfulness

There was extensive evidence proving Gramins's willfulness in participating in the conspiracy.  The Government introduced several passages from the Nomura compliance manual that dealt with truthfulness as probative of the state of mind of defendants and their co-conspirators.  PSR ¶ 40.  Not only did company policy require employees to review that manual, Nomura maintained records of each employee's annual compliance with that policy.  Gramins repeatedly certified that he understood his obligation to read the compliance manual and "abide by all provisions contained therein."  Gov't Ex. 161, PSR ¶ 41.

Similarly, the relevant compliance policies were digested in presentations given to Gramins and his co-conspirators, which instructed Nomura employees to refrain from "omission of material facts or making untrue / misleading statements."  That directive to refrain from lying was not new in 2013—it was reflected in several places in the pre-existing compliance manuals and in an earlier presentation.  Moreover, Nomura had no policies to the contrary, meaning that there was nothing in any manual that suggested employees were permitted to lie or to maximize profits by deceiving customers, or that deception was permissible in certain circumstances.  PSR ¶ 42.

Gramins also had his FINRA Series 7, 63, and 24 licenses.  Jonathan Raiff, an experienced securities trader and Head of Global Markets for the Americas at Nomura (making him Shapiro's direct and Gramins's ultimate supervisor), testified that all Nomura traders had to pass Series 7 and 63 exams, and that "[s]ubjects of the exam are primarily focused on things like Securities Act of '33, '34, and other SRO rules."  In discussing his training as a licensed representative, Dinucci

explained that he learned of his ethical obligations as a trader, and specifically "[t]o be truthful in your negotiation with the clients."  During trial Dinucci stated, "Basically, while I was actually doing these deceptive trading tactics, I didn't think they were illegal tactics, yet my licenses that I needed to be certified for to trade effectively said that I had to be honest and truthful and not deceptive in my communications to concur with the law."  PSR ¶ 43.

Raiff explained that the Nomura compliance manual's message on misrepresentations was "[d]on't do it, everything you say has to be truthful and accurate."  Raiff testified that Nomura's policy was not unique, saying "[m]y previous employers have had similar policies. And when I started trading, it was also made very clear to me."  Moreover, the policy against lying did not change during Raiff's tenure, which encompassed Gramins's and his co-conspirators' employment.  Raiff testified that he was unaware that people at Nomura were engaged in the deceptive practices described above.  PSR ¶ 44.

Raiff also testified about Nomura's compliance trainings, in particular, the two discussed above.  Raiff first testified on the May 2012 training, attended by Gramins, entitled "Trading Practices" as part of "Fixed Income Compliance Training."  He reviewed its directive prohibiting "omission of material facts or making untrue statements," stated that this was not announcing any new policy at Nomura, and pointed to one place (among others) in the pre-existing compliance manual which echoed the same idea.  Raiff then testified about the February 2013 training, which Gramins attended:

> Q. Was this [February 2013] announcement of Nomura's policy at this training a shift in what had been Nomura's policy prior to the Litvak indictment? [As discussed below, in January 2013, the Government indicted a trader at another firm named Jesse Litvak for making misrepresentations in RMBS trades.]
>
> A. In no way.
>
> Q. Can you explain?

13

A. So this was in 20- -- early 2013, February 5, as we just said, so all the compliance manuals had these principles in there. There were previous annual training sessions which had this—perhaps not written in this way, but had similar wordage and verbiage. And of course the actual content of the presentation, as presented by compliance, where we went into each of these bullet points in detail, made it very clear repeatedly through the years that this was not within the ordinary bounds of business.

PSR ¶ 45.

Raiff also talked about the role of supervisors—like Shapiro and Gramins—in compliance, describing them as "the first line of defense in terms of compliance." Raiff explained that because "[t]hey are the people sitting amongst the individual traders or salespeople," compliance "is their primary responsibility as far as the firm is concerned." Raiff testified that compliance personnel had no role in day-to-day monitoring of trading activity. Instead, Raiff explained that the supervisor was responsible for monitoring and keeping track of what was happening on the trading desk. During the course of the conspiracy, Gramins formally supervised at least one other trader, Caleb Chao, and was an informal supervisor prior to that. Dinucci reported to Gramins, as well as to Shapiro. PSR ¶ 46.

The testifying co-conspirators acknowledged that they understood they were engaged in wrongful conduct, judged by common sense standards. Dinucci testified that he knew their deceptive trading was wrong because "[l]ying in any sort of instance is not the right way to handle anything," but he did it to "increase the profit for our book." Similarly, Chao agreed that "it's generally-speaking wrong to lie to people," and "in particular wrong to lie to people to take their money." As mentioned above, Feely identified the co-conspirators' actions as "hurtful" to their customers, agreed that he had an obligation to be truthful, and stated he knew his conduct was wrongful even before Litvak was indicted. In short, all three co-conspirators acknowledged that they understood their obligations to be truthful and the wrongfulness of their fraudulent conduct.

14

PSR ¶ 47.  Likewise, these three witnesses acknowledged that they understood their training and licenses forbade deceptive conduct.  PSR ¶ 48.  While they acknowledged the wrongfulness of their actions, the co-conspirators claimed they did not necessarily think about them as illegal at the time.  PSR ¶ 49.

The co-conspirators principally limited their statements about industry practice to their time at Nomura, and were much more reluctant to opine beyond that.  Chao agreed that his "understanding of industry practice came from the only place that [he] worked at in the industry," that is, Nomura.  Moreover, even at Nomura, there was no evidence that the existence or knowledge of the fraudulent trading practices extended beyond the RMBS desk; Raiff testified that he had no idea that people at Nomura were engaged in the deceptive conduct described above.  During trial, Dinucci conceded that he continued to engage in the same conduct after leaving Nomura to work at Auriga USA, a different broker-dealer, where he no longer worked under Gramins.  PSR ¶ 50.  Counterparty Aadil Abbas was the only witness with RMBS sell-side experience who had not worked as an RMBS trader at Nomura, and he explained that when he had chosen to share price information, he did it truthfully because he understood that to be the correct way to trade.  PSR ¶ 51.

### 5.  Litvak Indictment

In late January 2013, the Government indicted Jesse Litvak, a trader at the global securities broker-dealer Jefferies & Company ("Jefferies"), for making misrepresentations in the context of RMBS trading activities.  *See United States v. Litvak*, 808 F.3d 160, 166 (2d Cir. 2015) ("*Litvak I*").  Jefferies was one of Nomura's competitors, and Litvak occupied a trading position similar to Gramins's.  The Litvak indictment alleged that Litvak had "fraudulently misrepresented to purchasing counterparties the costs to Jefferies of acquiring certain RMBS" and "fraudulently

misrepresented to selling counterparties the price at which Jefferies had negotiated to resell certain RMBS." PSR ¶ 52.

Raiff testified concerning Nomura's reaction to the Litvak indictment. In early February 2013, about a week after the Litvak indictment, Nomura scheduled a compliance training session for traders and salespeople in its securitized products groups, which Gramins attended. Raiff testified that the training session "was held specifically to discuss the conduct at issue in the Litvak indictment," and that the "general focus of the session was if you say something, make sure it's accurate." The training session also operated as a "refresher" on principles from Nomura's compliance manual, including its prohibitions on making misrepresentations to clients. PSR ¶ 53.

As discussed above, there was evidence introduced at trial of one post-Litvak indictment trade involving Gramins. Moreover, there was testimony that Gramins continued to use the same tactics after the Litvak indictment, but took steps to conceal his conduct. For example, Chao testified that after news of the Litvak indictment, "There was – I remember one time – I don't remember the timing of it, but there was a time when Gramins had used – had used the phone intercom system, and he had talked with another salesperson and told a salesperson to tell the client that Nomura's buying a bond at a price that I didn't know as true." Chao also testified that there was an increased use of the phone after the Litvak indictment by everyone on the trading floor and affirmed that the head of compliance told employees to use the phones more, which at the time were not recorded. PSR ¶ 54.

### 6. Additional Trades

The fraudulent trades introduced at trial were not the only ones in which Gramins and his co-conspirators engaged. In total, the Government's investigation has revealed that the conspiracy executed 161 fraudulent trades, which caused a total of $15,262,651.93 in fraud loss. These figures

are limited to fraudulent trades negotiated by the conspirators in writing or over a recorded phone line.  Exhibit 1, attached to the presentence report, summarizes the fraudulent trades in which Nomura conspirators engaged; for each such trade, that table identifies the specific personnel involved in the trade, the victim, the bond traded, trade date, the buy and sell prices, the associated fraud loss, and other relevant factors.  The fraud loss was calculated as the portion of Nomura's profit (or the commission) on each trade which the victim paid based on Gramins's or his co-conspirator's lies.  PSR ¶ 55.

### 7.   Evidence of Motive—Bonuses and Compensation

The testimony at trial showed that Gramins and his co-conspirators were motivated to lie in order to make more money for the RMBS desk which, in turn, factored into their compensation. Dinucci, who worked with Gramins on the RMBS desk, testified that he had a base salary and a year-end bonus, but that the bonus was the "majority of" his total compensation.  His bonus was based on his "performance throughout the year," the main factors of which were "[h]ow diligent you were on the desk, what sort of profit and loss you helped generate for the desk."  He understood that the profit he brought in for the desk would affect his compensation.  Dinucci explained that the lies he and his co-conspirators told "would increase the profit on the desk, which theoretically would increase the bonus pool at the end of the year."  PSR ¶ 57.

Raiff, who supervised Shapiro (who, in turn, supervised Gramins), testified consistently with Dinucci.  He explained that each trader had a base salary and a bonus, and that sometimes a trader may have a guaranteed minimum bonus, often as a hiring or retention incentive.  Gramins had a guaranteed minimum bonus when he was first hired by Nomura.  A significant consideration in the compensation process was the desk's performance, which was based "first and foremost"

on the "revenues, the trader's P and L."  Raiff explained that "all else being equal, a higher P and L as a trader meant a larger bonus."  PSR ¶ 58.

Gramins was paid significant bonuses in most years with Nomura, including discretionary bonuses for 2011-14, as follows:

|  | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| Salary | $150,000 | $175,000 | $200,000 | $210,000 | $230,000 |
| Discretionary Bonus |  | $1,950,000 | $500,000 | $3,990,000 | $2,130,000 |
| Guaranteed Bonus | $1,750,000 | $1,075,000 | - | - | - |
| Total Bonus | $1,750,000 | $3,025,000 | $500,000 | $3,990,000 | $2,130,000 |
| Total Compensation | $1,900,000 | $3,200,000 | $700,000 | $4,200,000 | $2,360,000 |

PSR ¶ 59.[2]

Profits made through riskless trading were an important part of the performance of Gramins and the RMBS desk.  In Gramins's review for 2012, a particularly bad year for the RMBS market, Shapiro (as his supervisor) noted: "Despite the challenging pnl year, Michael was able to mitigate losses by growing our distribution in both the poa/subprime markets as well as creating substantial alpha through low-risk/riskless trading with key relationships."  PSR ¶ 60.

## III.  **Sentencing Guidelines**

The Guideline covering Gramins's conspiracy conviction is § 2X1.1, which directs the Court to the base offense level for the underlying offense, plus any adjustments.  PSR ¶ 66.  The base offense level for the underlying offense (wire fraud and securities fraud) is 6, pursuant to

---

[2] Compensation was by fiscal year ending March 31.  Tr. 389.  Thus Gramins's 2014 compensation included work from 2013.

§ 2B1.1(a)(2).   Twenty levels are added because the loss is more than $9,500,000, but less than $25,000,000.   U.S.S.G. § 2B1.1(b)(1)(K).   Two levels are added as the offense involved ten or more victims.   U.S.S.G. § 2B1.1(b)(2)(A)(i).   Four levels are added as the offense involved a violation of securities law and the defendant was a registered broker or dealer, or person associated with a broker or dealer.   U.S.S.G. § 2B2.1(b)(20).   Three levels should be added because the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive.   U.S.S.G. § 3B1.1(b).   This results in a total offense level of 35.   There are no adjustments for acceptance of responsibility.

The defendant is in Criminal History Category I, and so the advisory sentencing range is 168 to 210 months' imprisonment.   However, because the statutory maximum is 60 months' imprisonment, that becomes the Guideline sentence.   Because this offense occurred prior to November 1, 2015, the Court looks to the November 1, 2014 Guideline manual for the fine range.   U.S.S.G. § 5E1.2(h)(1).   The applicable fine range is $20,000 to $200,000.   U.S.S.G. § 5E1.2(c)(3) (Nov. 1, 2014).

The above calculation is largely consistent with the PSR, except that the PSR does not include the role-in-the-offense enhancement advocated by the Government in its initial letter to Probation.   The base offense level and 4-level enhancement for violation of securities law by a registered broker dealer are uncontested by Gramins.   Otherwise, Gramins contests enhancements for loss, number of victims, and role in the offense, and claims he should receive credit for acceptance of responsibility notwithstanding that he still cannot articulate what criminal behavior he acknowledges committing.

### A. Loss

The PSR correctly adds twenty levels because the loss was greater than $9.5 million but less than $25 million.  U.S.S.G. § 2B1.1(b)(1)(K).

"Loss for purposes of the fraud guideline [of the United States Sentencing Guidelines]...is defined as 'the greater of actual loss or intended loss.'"  *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 103 (2d Cir. 2014) (quoting U.S.S.G. § 2B1.1 cmt. 3(A)).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt. 3(A)(i), whereas "'[i]ntended loss'...means the pecuniary harm that was intended to result from the offense," *id.* cmt. 3(A)(ii).  Moreover, in the context of a conspiracy, each co-conspirator is liable for "all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B).

"A district court is not required to calculate loss with absolute precision, but need only by a preponderance of the evidence make a reasonable estimate of the loss given the available information."  *United States v. Binday*, 804 F.3d 558, 595 (2d Cir. 2015) (internal quotation marks omitted); *see also United States v. Rigas*, 583 F.3d 108, 120 (2d Cir. 2009).

### 1.  Intended Loss

The evidence in this case showed that the loss that Gramins and his co-conspirators "intended to result" from their lies was the extra money that they duped buying victims to pay and selling victims to forego, thereby increasing the spreads on riskless trades and Nomura's profits at their victims' expense.  Chao explained that the effect of their lies "was to get either one side or both sides to lower their offer [to sell] or increase their bid [to buy]," thereby "increas[ing] the spread or money that Nomura earned on the trade."  PSR ¶ 20.  Similarly, Dinucci testified that

Nomura traders "would lie about where we were actually buying or selling securities to clients" in order to "increase the profit for Nomura." PSR ¶ 21.  And Feely explained that the lies were intended to "make more money" for the RMBS desk, which would "get to keep the difference between the truth number and the number that I am representing." PSR ¶ 38.

Every bond trade is a zero-sum game, so Gramins and his co-conspirators knew that the extra profit that they made Nomura in their many fraudulent trades necessarily was coming from victim funds and their investors.  Gramins's coconspirators testified directly to their intent to cause harm to the victims.  Dinucci testified that he was told by Shapiro and Gramins that the purpose of giving clients false bids was to "increase the profit on the trade," thereby taking additional money from "the clients."  *Id*.  Chao said "[t]he effect [of a lie] would be hopefully, that Abbas would increase his bid based on that information.... It would hopefully increase the spread or amount of money that Nomura earned on this trade."  *Id*.  Feely called the lies that the defendants told at Nomura "hurtful" for victims because they had the effect of getting them to "pay more or some more than they would otherwise."  *Id*.  *See also Gramins*, 939 F.3d at 434 ("In reality, Gramins's false statements carved out sizable spreads between Nomura's buying-counterparties' bids and its selling-counterparties' offers, allowing Nomura to reap substantial profits unbeknownst to the counterparty on either side of the transaction.").

This witness testimony comports with the obvious inference from the documentary evidence.  The most logical explanation for Gramins's and his co-conspirators' lies was their desire to make more money for the RMBS desk.  As explained in the PSR, in every trade presented at trial, a victim reacted to a conspirator's lie by adjusting the amount of money he was willing to pay to buy a bond or the amount of money he was willing to accept to sell a bond, always in Nomura's favor.  PSR ¶ 39 (giving examples); *see also Gramins* 939 F.3d at 434 ("Those lies

caused Nomura's counterparties to increase their bids and decrease their offers when they would not otherwise have done so.").

Any estimate of intended loss here underrepresents the true scope of Gramins's and his co-conspirators' lies, and thus the amount of loss they intended to cause their victims. Dinucci testified that the fraudulent practices would occur "[p]retty frequently. Almost on a daily basis." PSR ¶ 22. Similarly, Feely testified that the co-conspirators would defraud their clients "every time the opportunity presents," Tr. 1932, which to his recollection, occurred "on a daily basis," Tr. 1933, PSR ¶ 22. Likewise, Chao testified that these practices would occur "fairly often." Tr. 1689. However, while it may only be a subset of the conspiracy's fraudulent activity, for loss purposes the Government relies only on the 161 fraudulent trades where Nomura traders lied in negotiations memorialized in writing or a recording in order to increase Nomura's profit. *See* PSR Exhibit 1 (revised).

Each of these trades involved lies by one or more members of Gramins's conspiracy, that is, Nomura RMBS traders and (in some cases) salespeople, leading to pecuniary harm to a victim. In many of the trades, the loss is calculable as the difference between the total spread resulting from the conspirators' lies, less the agreed-upon commission. Of the 16 trades introduced at trial, there were explicit misrepresentations about commission in 12 of them—Exhibits 11, 12, 13, 14, 15, 16 (lied to both sides), 17, 18, 19, 21, 22, and 25. For example:

- In Exhibit 11 (Trade 96), Gramins lied to PK Banks of DW, telling him that Nomura bought a WAMU bond at 52-10, when Nomura had in truth agreed to buy at 51-20. The final price was based on Banks's bid of 52-04, plus a 6-tick commission for Nomura. *See Gramins*, 939 F.3d at 438 ("Banks's ultimatum to Gramins—"best @ 52-04...paying you 52-10 all in,"—indicated that he understood Gramins to be making a 6-tick commission for facilitating the trade."). The intended loss was the total spread (22 ticks) less the agreed commission (6 ticks), which was 16 ticks, worth $50,000.

- In Exhibit 12 (Trade 29), Feely lied to Michael Canter of AllianceBernstein, telling him Nomura bought a WAMU bond at 86-01, when Nomura had in truth bought at

85-25.  They then negotiated a 4-tick commission, such that Canter bought from Nomura at 86-05.  The intended loss was the total spread (12 ticks) less the agreed commission (4 ticks), which was 8 ticks, worth $4,421.96.[3]

•   In Exhibit 13 (Trade 98), Gramins lied to Wollman, telling him he was using his 18-1 bid on an INDX bond, when in fact Gramins bid for and bought the bond at 17-17.  They then negotiated an 8-tick commission, such that Wollman bought the bond from Nomura at 18-09.  The intended loss was the total spread (24 ticks) less the agreed commission (8 ticks), which was 16 ticks, worth $97,332.43.  *See also Gramins*, 939 F.3d at 438 ("Wollman agreed to Gramins's request and paid Nomura 18-09, which he believed would net Nomura a market-standard eight-tick commission.  But because Nomura had bid only 17-17 for the bond, rather than using Wollman's bid of 18-01, Gramins reaped a 24-tick commission from Wollman's purchase.").

•   In Exhibit 14 (Trade 181), Shapiro lied to Harrison, telling him that Nomura bought an HVMLT bond at 62.75, when in fact Nomura bought at 62.  They then agreed on a 1/4 point (8 tick) commission, such that Harrison bought from Nomura at 63.  The intended loss was the total spread (1 point or 32 ticks) less the agreed commission (8 ticks), which was 24 ticks, worth $273,993.24.

•   In Exhibit 15 (Trade 182), Shapiro lied to Harrison, telling him that Nomura bought an LXS bond at 53.5, when in fact Nomura bought at 52.  They then agreed on a 1/4 point (8-tick) commission, such that Harrison bought from Nomura at 53-24.  The intended loss was the total spread (56 ticks) less the agreed commission (8 ticks), which was 48 ticks, worth $371,184.70.

•   In Exhibit 18 (Trade 482), Gramins lied to Harrison, telling him that Nomura bought an HVMLT bond at 61, when in fact Nomura bought at 60.  They then agreed on an 8-tick commission, such that Harrison bought from Nomura at 61-08.  The intended loss was the total spread (40 ticks) less the agreed commission (8 ticks), which was 32 ticks, worth $323,711.26.

•   In Exhibit 21 (Trade 280), Shapiro lied to Harrison, telling him that Nomura was going to sell Harrison's GPMH bond for 85, when in fact Nomura had negotiated to (and did) sell it at 87.  Shapiro and Harrison agreed on an 8-tick commission, such that Harrison sold the bond to Nomura at 84-24.  Thus the intended loss was the spread (72 ticks) less the agreed commission (8 ticks), which was 64 ticks, worth $1,125,787.34.

Even if the Court were to ignore the full scope of the relevant conduct and limit its loss calculations to the trial evidence that included express or implied misrepresentations about commission, the intended loss from Gramins's conspiracy was enormous.  Indeed, for just the

---

[3] This would also be the actual loss, as discussed below.

seven examples above where the commission was explicitly misrepresented, the intended loss totaled $2,246,430.80; even if that were the extent of the loss (which it is not), the advisory Guidelines range would still be 108-135. Thus, the Guidelines calculation using just the most straightforward subset of the conspiracy's fraudulent trades to calculate loss far exceeds the 60-month statutory maximum.

However, the loss calculation cannot be so limited because the Second Circuit made clear that explicit agreement on commission was not a prerequisite to the fraud, but that more generally Gramins's and his conspirators' "lies caused Nomura's counterparties to increase their bids and decrease their offers when they would not otherwise have done so." *Gramins*, 939 F.3d at 434. In many cases, in fact, Nomura traders (including Gramins) were even more clever—instead of lying about the amount of commission, they falsely claimed that the other counterparty was paying the commission in order to misrepresent the true transaction price. Regardless, the intent behind the lies were still the same, that is, to hurt the counterparty by moving the price on one or both sides of the trade, thereby increasing the spread to Nomura's benefit and the victims' detriment.

In order to be maximally conservative, where the commission was not explicitly agreed upon, the Government has credited Gramins with a market-standard 8-tick offset. *See Gramins*, 939 F.3d at 436 n.3 ("A typical (market-standard) commission is eight ticks, or 0.25% of a bond's face value."). *See also* Tr. 143 (Dinucci: "A typical range was anywhere from four to eight ticks to as high as 16 ticks."); Tr. 728 (Harrison: "general range was usually between 4 and 8 ticks, or sometimes up to 16 ticks"); Tr. 730 (Harrison citing eight ticks as the common commission among all his counterparties); Tr. 1683 (Chao: "When I initially started on BWIC trades, typically [Nomura's compensation] was eight ticks."); Tr. 2124 (Wollman: "I would say probably a quarter point was more the typical commission amount," but asking to use four ticks with a lower dollar

amount); Gov't Ex. 18A at 22 (Gramins: "going rate for poa trades is usually 8 ticks"); Gov't Ex.

16A at 4 (Peters: "I mean, out of comp we usually work for 8 ticks. I'll work for 4 here to get

something done but can't do less than that.").

Here, there were myriad examples where, even without an explicit misrepresentation about

commission, Gramins and his co-conspirators lied in order to increase their profit, thereby causing

loss to one or both of Nomura's counterparties. Indeed, three of the five trades cited by the Second

Circuit as evidence of Gramins's fraud fell into this category:

> • In Exhibit 10 (Trade 86), Wollman offered to sell an AHMA bond to
> Nomura at 47-16, with the buyer to pay the commission. Gramins then lied to Wollman,
> first about a fictional bid of 46-16, and then by falsely claiming that the bidder had gone to
> 47, when in truth Gramins was separately pressing the buyer to pay 49. As a result,
> Wollman agreed to sell at 47, still with the false understanding that the buyer would pay
> the commission. *See Gramins*, 939 F.3d at 437. The intended loss to Wollman here was
> the amount Wollman agreed to reduce his offer based on Gramins's false statements or 16
> ticks, worth $45,536.07.

> • Concurrently in Exhibit 10, Gramins also lied to the buyer, Creed of GSAM,
> falsely claiming that the best the seller (Wollman) could offer was 49. In truth—as
> discussed above—Wollman initially offered at 47-16 and then reduced his price to 47.
> Thus, Creed agreed to pay 49, even though Wollman had already sold at 47. *See Gramins*,
> 939 F.3d at 437. In this instance, the intended loss could be 2 points, or the entire spread,
> since the entire spread was created by Gramins's lies; however, to be maximally
> conservative, and assuming that Creed would have expected Nomura to make something
> on the trade, the Government gave Gramins credit for the market-standard commission of
> 8 ticks. Thus, the intended loss to Creed was 1.75 points, worth $454,716.36.

> • In Exhibit 26 (Trade 702), Chao—working with Gramins—lied to Abbas,
> first telling him that a PPSI bond would be offered in the low 80s when the seller had
> actually suggested he would sell in the high 70s, and then falsely telling Abbas that the
> seller offered the bond at 80-16, when the seller had actually offered at 78-16. The latter
> lie caused Abbas to raise his bid from 78-22 to 79-00. *See Gramins*, 939 F.3d at 439. This
> was precisely Chao's intent in lying. Tr. 1715 (asked about the false 80-16 offer, Chao
> testified "[t]he effect would be, hopefully, that Mr. Abbas would increase his bid based on
> that information," which "would hopefully increase the spread or amount of money that
> Nomura earned on this trade."). Abbas testified that he believed that he was paying a two-
> tick commission for a total price of 79-02 (Tr. 1502), and the intended loss to Abbas was
> the spread (18 ticks) less that commission (2 ticks), which was 16 ticks, worth $61,500.

• In Exhibit 29 (Trade 17), Choi offered Nomura a JPMAC bond at 80, and Gramins lied to Choi, telling him that the buyer was at 78 ¾, when the buyer (Wollman) had actually bid 80. That lie "caused Choi to lower his offer to '79 and a quarter,'" *Gramins*, 939 F.3d at 440, the price that Nomura paid. Choi did not believe he was paying any commission, because Gramins falsely told him that the buyer had agreed to pay it. Therefore, the intended loss here the amount by which Gramins fraudulently induced Choi to lower his offer, or 24 ticks, which was worth $143,959.26.

• Concurrently in Exhibit 29, Gramins also lied to Wollman (the buyer), telling him that the bond was being offered at 81-16, when in truth Choi had offered at 80. "That caused Wollman to raise his bid to '80 flat,'" *Gramins*, 939 F.3d at 440 (quoting JA1574), from 77.5.[4] As discussed above, Gramins did not follow Wollman's instruction to bid 80. Then, Gramins came back with an 80-16 price, which he falsely claimed "factored in a commission from Choi, even though he and Choi had not discussed any." *Gramins*, 939 F.3d at 440. Wollman bought the bond at 80-16, resulting in a fraudulently inflated spread of 40 ticks. Even though arguably the entire spread was intended loss to Wollman, since Gramins falsely claimed that the seller was paying, the Government gave him credit for a market-standard 8-tick commission to be conservative. Thus, the intended loss to Wollman was the spread (40 ticks) less a standard commission (8 ticks), or 32 ticks, worth $191,945.69.

*        *        *

Of course, the true measure of intended loss on these trades could actually be much higher because the Government excluded unsuccessful attempts from its calculation. The 161 fraudulent trades in PSR Exhibit 1 reflect only the degree to which Nomura traders successfully enlarged their profits based on lies, and not the many instances where Nomura traders tried to lie their way into even greater profits, but were unable to get their victims to bite. For example, in Exhibit 26, after having lied to Abbas to induce him to lower his bid to 79-00, Chao lied again, this time falsely telling Abbas that the seller had come down to 79-24. However, "[t]his time, Abbas declined to raise his bid above 79-00." *Gramins*, 939 F.3d at 439. In that example, that additional 24 ticks of intended loss was worth $92,250. The Government did not even attempt to calculate the intended loss from the myriad times that Nomura attempted to lie its way into even more profit, but failed.

---

[4] The chat suggests that Wollman started even lower than 77.5, likely at 76.

Using a conservative methodology of including only trades where Gramins and his conspirators used affirmative lies in written or recorded negotiations to successfully increase Nomura's spread at a victim's expense while giving Nomura credit for an 8-tick commission where not otherwise specified, the relevant conduct in this case includes 161 different transactions and an intended loss of $15,262,651.93.

       2.  <u>Actual Loss</u>[5]

Because the Government does not seek to calculate attempted loss, the actual loss in this case—that is, the "reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt. 3(A)(i)—is the same as intended loss. Put differently, the lies told by Nomura traders were successful in getting victims to change their prices, and PSR Exhibit 1 measures the monetary effect of those lies. The more than $15 million in loss was derived the same way—Nomura traders lied, and their victims set or moved their price in response. This was true, without exception, in all of the trades in the indictment and all relevant conduct reflected in Exhibit 1 to the PSR. The PSR sets out several examples:

- In Government Exhibit 29E, Choi decreased his offer from 80 to 79-8 after Gramins lied that "this guy's [Wollman] passing over 80";

- In Government Exhibit 26E, Abbas raised his bid from 78-22 to 79-00 after being falsely told by Chao that the "seller came back to us with an 80-16 offer";

- In Government Exhibit 11A, Banks raised his bid to 52 from 51-16 after Gramins falsely told him he had a 53-00 offer;

---

[5] Restitution may not be an issue in this case, given that Nomura will be making remediation to victims in connection with its SEC settlement well beyond the Government's calculation of loss. Based on its preliminary calculation, Nomura intends to pay over $20 million to victims, representing a complete disgorgement of Nomura's profit on 176 trades. The Government anticipates that Nomura's remediation will be complete within the 90 days after sentencing, and will seek restitution consistent with the Court's determination of actual loss in the event that some victim or loss is not made whole by Nomura.

- In Government Exhibit 19A, Harrison agreed to sell at 86-08, giving Nomura an 8-tick commission, after Shapiro falsely told him that he had an 86.5 bid;

- In Government Exhibit 21A, Harrison lowered his offer from 86 to 84-24 (or 85 less an 8-tick commission) after Shapiro falsely said the buyers "aren't going to pay >85 i think i can get her to pay 85 for whole piece").

PSR ¶ 39. At trial, the counterparty witnesses verified the effect the conspirators' lies had on their price negotiations. For example, Abbas explained "If I had known that the offer is 78 and a half, I would never had paid 79 and 2. So that's the effect I could see." PSR ¶ 37; *see also id*. (Harrison explaining that the lies caused him to pay more in commission than he agreed); *id*. (Wollman explaining how lie about the bid Gramins made on his behalf influenced the final price).

In *Gramins*, the Second Circuit acknowledged that the traders' lies were successful in increasing the spread beyond what the victims would have otherwise agreed. The court explained that the lies "caused Nomura's counterparties to increase their bids and decrease their offers when they would not otherwise have done so." 939 F.3d at 434. The court explained that, while the counterparties believed they were only paying Nomura a "modest commission to facilitate supposedly 'riskless' transactions," in truth, "Gramins's false statements carved out sizable spreads between Nomura's buying-counterparties' bids and its selling-counterparties' offers, allowing Nomura to reap substantial profits unbeknownst to the counterparty on either side of the transaction." *Id*. As discussed above, the court reviewed five trades, and in each case found that Nomura had successfully used lies to increase its profits. *See, e.g., Gramins*, 939 F.3d at 437 (after Gramins falsely represented a bid, "Wollman then agreed to sell his bonds at 47-00"); 438 ("Gramins inflated the offer price…. Banks bid 51-16 in response"); 439 (after Chao's false offer, "Abbas raised his bid to 79-00 in response"); 440 (Gramins's lies about Choi's offer "caused Wollman to raise his bid to '80 flat,'" and about Wollman's bid "caused Choi to lower his offer to '79 and a quarter.'").

28

3.   Gramins's loss arguments are meritless

Even though Gramins was convicted of conspiring to lie to increase Nomura's profit on trades at his victims' expense—which the Second Circuit found he successfully did—Gramins nonetheless impossibly claims that there was no loss as a result of his fraud.  Def. Mem. at 22. Each of Gramins's arguments against a loss enhancement must fail.  *First*, Gramins's argument that the Government's loss numbers are speculative ignores the Court's obligation to assess intended loss, and with regard to actual loss demands a level of certainty far beyond what is required for sentencing.  *Second*, Gramins's alternative argument that the Court should only consider loss from the 2013 JPMAC trade fails because, notwithstanding the parties' conjecture about the basis for the jury's decision, the defendant was convicted of a conspiracy that encompassed all 161 fraudulent transactions for which the proof is more than sufficient to include for sentencing purposes.  *Third*, Gramins's claim that there was no loss from the JPMAC trade ignores the obvious evidence of Gramins's intent to cause loss to TCW and QVT, and runs counter to the Second Circuit's findings that Gramins's lies actually did cause the spread on the JPMAC trade to increase over what it would have otherwise been.  *Fourth*, Gramins's characterization of certain trades as "acquitted" or "uncharged" conduct ignores that the count of conviction was a conspiracy of which all 161 fraudulent transactions were a part.

a.   *Loss in this case is not speculative*

Gramins claims that assessing loss is speculative because, in his view, the Court cannot know with certainty what would have happened if Gramins and his colleagues had not lied.  That argument is fatally flawed.

First, Gramins ignores intended loss, which renders irrelevant the hypothetical question of whether a victim might have bought or sold the bond at the same price if he had known the truth.

29

The Guidelines call on the Court to apply the greater of actual or intended loss, where intended loss is the "pecuniary harm that the defendant purposely sought to inflict," even if such harm would have been "impossible or unlikely to occur."  U.S.S.G. § 2B1.1 cmt. 3(A); *see also United States v. Ravelo*, 370 F.3d 266, 271 (2d Cir. 2004) ("The definition of 'intended loss' now makes clear, however, that a loss may be intended irrespective of whether it could actually occur.").  For purposes of intended loss, it is irrelevant whether the loss actually occurred, or whether it occurred to the extent that a defendant intended, but need only "encompass a defendant's reasonable expectation of loss."  *United States v. Lacey*, 699 F.3d 710, 719 (2d Cir. 2012).  Indeed, in the Second Circuit, "'[i]ntended loss' is tantamount to the probable loss from a particular misstatement 'because one is presumed to intend the natural and 'probable' consequences of one's acts.'" *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000) (quoting *United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir. 1997)).  Where intended loss is higher than actual loss, "the larger intended amount is a better measure for the defendant's culpability."  *Lacey*, 699 F.3d at 720.

Under this law, in assessing culpability, the Court first should look to what Gramins and his co-conspirators intended by their lies.  As discussed at length above, it is clear from the evidence (including co-conspirator and counterparty testimony, and the written record of trade negotiations) that Gramins's and his conspirators' lies were aimed at increasing Nomura's profit by duping victims into adjusting their prices in response to those lies.  Regardless of whether the trade would have happened the same or differently had the truth been known, it is beyond debate that Gramins intended to cause loss, and the extent of that loss can be mathematically calculated.  For example, in Exhibit 18 (Trade 482), Gramins accurately communicated Wollman's initial 60 bid to a seller (which that seller ultimately accepted), and then embarked on a barrage of lies to Wollman about non-existent counteroffers from, and negotiations with, the seller, in order to

30

fraudulently induce Wollman to unnecessarily raise his bid to 61-00.  Gramins also added an 8-tick commission, which he called the "going rate."   In this example, the only explanation for Gramins's lies was to induce Wollman to raise his bid.  Gramins knew perfectly well that Wollman would have transacted at 60-08 (Wollman's bid plus the 8-tick commission); but lied in order to fraudulently increase Nomura's profit at Wollman's expense.  Therefore, on this trade, Gramins's "reasonable expectation of loss," *Lacey*, 699 F.3d at 719, was 32 ticks, which was worth $323,711.26.

Second, Gramins mistakenly claims that loss cannot be estimated for trades in which Nomura and its victim did not agree on compensation.  Gramins relies principally on cherry-picked comments made by the Government in the context of its request to use a demonstrative with a summary witness at trial, which the Court ultimately denied.  Def. Mem. at 23.  The Government offered that exhibit, which calculated Nomura's ill-gotten profit on certain trades, so that the jury could "infer that it was a motive for the defendant's actions."  Tr. 2393.  The Government exhibit was limited to examples of trades where such profit was based on simple math—the spread less agreed-upon commission—as "simply a facilitator" to "make it easier and make it quicker" for the jury in doing the math themselves.  *Id*.; *see also* Tr. 2397, 2402.  The Government did not propose to call this a "fraud loss" chart, *see* Tr. 2401, nor did it purport to limit the Government's arguments at sentencing, *see* Tr. 2392 ("We may take a different position at sentencing, but for the purposes of this, I think that's, you know, a fair way to proceed.").  By looking only at trades in which there was an agreed-upon commission, the Government sought to simplify its argument for the jury at trial, and to avoid being "unnecessarily controversial."  Tr. 2394.  However, the Government did not suggest this was the only way in which the defendants caused loss, but noted that "it's the most straightforward way for the purpose of doing the math here."  Tr. 2442.  Indeed, the Government

explained that "there are other trades in which you could look at and say, I was lied to about the price representation and so I, as a result, moved my price to X." Tr. 2441.[6]

The Government's explanation of the purpose for a simplified demonstrative at trial, one which it was not even permitted to use, can hardly limit the Court's ability to calculate loss at sentencing. The Court's mandate at sentencing is to make "a reasonable estimate of the loss given the available information," and to do so by a "preponderance of the evidence." *Binday*, 804 F.3d at 595. Where there has "clearly been some loss," the Second Circuit has hesitated to place a whole category of fraud "outside the reach of the loss guidelines," particularly where there is an absence of a better alternative. *Id*. at 597. Here, the Government's proposed loss calculation is eminently reasonable in the subset of trades where there was no agreement on compensation, but where Gramins still lied in a way that, as the Second Circuit explained, "caused Nomura's counterparties to increase their bids and decrease their offers when they would not otherwise have done so." *Gramins*, 939 F.3d at 434. For example, in Exhibit 29, the intended (and actual) loss to Choi was the amount by which he fraudulently induced Choi to reduce his offer, or 24 ticks. Where Gramins's lie induced a victim to move their price more than the ultimate spread, the Government not only limited the loss to the spread, but also gave credit to Nomura for the market-standard 8-tick commission. Again using Trade 29 as an example, Gramins's lies induced Wollman to raise his bid by more than 2 points, which was more than the ultimate spread (40 ticks). Even though Gramins falsely claimed that Choi had agreed to pay the commission, the Government still gave Gramins credit for an 8-tick commission and reduced the loss to Wollman in its calculation

---

[6] Even in summation, where the Government did some of the simple math it was not permitted during evidence, the Government still noted that "[y]ou can look at each trade, you can go decision by decision, change of price by change of price, and put numbers to it and see why the defendants -- what their motive was, why the defendants were doing what they were doing." Tr. 2728.

accordingly.  To the extent that loss is designed to measure culpability in fraud cases, evaluating loss in this way is far more reasonable that Gramins's proposal to simply decide that loss was zero.

Third, Gramins argues that if he had simply given an "all in" price, without misrepresenting commission or the buy/sell price from another counterparty, the trades may have occurred at the same prices nonetheless, and therefore there can be no loss from his fraud.  Def. Mem. at 23-24. This argument is absurd—the reason Gramins chose not to negotiate in that way was so that he could corrupt the negotiation process in his favor by lying about a material matter that would influence the outcome of the trade.  Gramins's claim that it is "equally plausible" that the trades would have happened at the same price is speculative and contradicted by his own actions; if Gramins had actually believed that, he would not have lied in the first place.  Indeed, he and his co-conspirators chose to volunteer information to their victims about Nomura's commission or about the other counterparty's bid or offer precisely because they expected those misrepresentations to influence the prices at which their victims would trade.   PSR ¶ 38 (summarizing co-conspirator testimony).  The contemporaneous evidence, ignored by Gramins now, showed that Gramins and his co-conspirators knew that his victims cared about these matters and exploited them accordingly.  *See*, *e.g.*, Gov't Ex. 18A at 22 (Gramins: "going rate for poa trades is usually 8 ticks"); Gov't Ex. 16A at 4 (Peters: "I mean, out of comp we usually work for 8 ticks. I'll work for 4 here to get something done but can't do less than that."); Gov't Ex. 14C ("can we do 1/4pt on out of comp stuff?").

Using Gramins's example of Exhibit 25 (Def. Mem. 24), notwithstanding what might have happened if Chao hadn't lied to Ben Hunsaker of WAMCO, Chao testified that the objective of the lie was "[s]o Nomura could earn two points plus an additional pay-on-top commission."  Tr. 1742.  In that instance, Chao believed that lying about his acquisition price and compensation

33

would influence the price Hunsaker was willing to pay, and thus the two-point price change Chao was able to induce by lying reflects a reasonable estimate of the intended loss. Moreover, the same two points is a reasonable estimate of actual loss because Chao's lies actually succeeded in obtaining that additional profit for Nomura, just as he intended.

Fourth, Gramins's similar argument that his victims might have traded at the same prices even if they knew Nomura's commission is simply not supported by the evidence. Gramins relies on Abbas's testimony that there was a "non-zero probability" that he might have bought the PPSI bond even if he knew of Nomura's secret 18-tick compensation. Def. Mem. 25. But Abbas's testimony that he might have agreed to an 18-tick compensation was pure conjecture, based on the hypothetical that "let's say I'm really in love with that bond," Tr. 1524-25, of which there was no evidence at trial. In the same breath, Abbas also speculated that he could also have concluded that "that's a lot of compensation you guys are making," especially when he had paid much less that morning. Tr. 1524. When looking at the actual evidence in the case, Abbas concluded that "[i]f I had known that the offer [was] 78 and a half, I would never had paid 79 and 2. So that's the effect I could see." Tr. 1515. Moreover, while there might be isolated instances where a counterparty would agree to pay a unusually large commission, there is no evidence of that in most of Nomura's trades; indeed, as discussed above, there was evidence that all parties expected a fairly stable range of commissions. *See Gramins*, 939 F.3d at 436 n.3 ("A typical (market-standard) commission is eight ticks, or 0.25% of a bond's face value.").

Fifth, Gramins's argument that Nomura might not have been willing to transact if they had not lied distorts Nomura's role in the fraudulent trades. These were "riskless" trades in which Nomura "typically obtains compensation for its 'matching' efforts by selling the bond for slightly more than it paid for it." *Gramins*, 939 F.3d at 435-56. None of the evidence here suggested that

34

Nomura was otherwise looking to acquire the bonds, and none of the trades involved Nomura selling from its own inventory.  If Gramins wanted to attempt to broker these trades with higher-than-normal spreads, then he certainly had the right to try, so long as he did so without misrepresentation; the fact that he chose not to is compelling evidence that he believed at the time that would have been unsuccessful.

Ultimately, what would have happened absent the conspirators' lies is irrelevant because the Guidelines calculation requires a factual finding, not a metaphysical one.  Gramins chose to speak about Nomura's cost and profit, and therefore took on the obligation to speak truthfully.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016) ("It is well-established precedent in this Circuit that 'once a company speaks on an issue or topic, there is a duty to tell the whole truth,' '[e]ven when there is no existing independent duty to disclose information' on the issue or topic.") (citations omitted).  It would turn the fraud Guidelines on their head to reduce loss to zero simply because a defendant had the option to tell the truth, in which case the victim might have made a similar decision—that possibility exists in all fraud cases.

Finally, none of the factually distinct cases cited by Gramins support his attempt to exclude loss.  In fact, one such case, *United States v. Alphas*, 785 F.3d 775 (1st Cir. 2015), cited at Def. Mem. at 20, 27, supports the Government's position.  There, the court reversed a loss calculation in an insurance fraud case where the district court had erroneously used the entire amount of each insurance claim as intended loss, and not just the amount by which the claim had been fraudulently inflated.  *Id*. at 780-81.  The district court theorized that if the insurers had known of the fraud, they would have rejected the entire claim under a void-for-fraud contractual clause, not paid the lower differential amount.  *Id*.  But, as the First Circuit found, that is an inaccurate way to measure intended loss, because "[f]raudsters do not expect to be found out but, rather, expect to reap the

benefits of their contrivance." *Id.* at 783.  Instead, "[t]he relevant inquiry, then, is what the fraudster reasonably expected to euchre out of his victim." *Id*.  Thus the intended loss in *Alphas* was limited to the amount by which the claim was falsely inflated, which is the truer measure of "how much the fraudster set out to swindle." *Id*.  So too here.  The Government does not suggest that the Court equate loss either to the entire buy or sell price, or even to the entirety of the profit made by Nomura on a trade, simply because Gramins lied in order to induce the trade to happen.  Rather, the Government suggests a methodology squarely in line with *Alphas*—to measure the amount by which the Gramins (or a co-conspirator) sought to illicitly increase his profit at the victim's expense, and even gave Gramins credit for either the agreed-upon compensation or a market-standard compensation in order to better approximate the loss he intended.

Nor does any of the language Gramins plucks out-of-context from various cases or sentencing transcripts augur for a different result.  In *United States v. Connolly*, for example, the district court indeed rejected the use of 74 oral requests to "skew the fix," which the court found were entirely speculative because they had no date, no record, and could not be assigned to a particular trader.  Def. Mem. at 27, Def. Mem. Ex. E at 52.  However, the district court did not deny the existence of intended loss, but instead relied only on the 130 other written requests—a fact omitted by Gramins.  Def. Ex. E at 54.  Here, as the court did in *Connolly*, the Government calculated loss only for the transactions in which there is an undisputable written or audio record, even though witnesses testified that the fraud occurred much more frequently.  The Government's loss calculation is therefore hardly "speculation," as Gramins contends, but mathematical computations drawn from documented facts.

If this Court is inclined to look to how other courts have evaluated loss, it should look to the most similar circumstance, that is, the sentencings in *Litvak*.  Though the convictions were

ultimately overturned on other grounds unrelated to sentencing, the sentencing proceedings before

Judge Hall involved many of the same arguments made by Gramins here.  In the first sentencing,

the court "[found] both actual and intended loss present."  Def. Mem. Ex. M at 50.  The court drew

from victim testimony—including from Wollman—that it found "is enough to reasonably draw

the inference that they would not have done the trades at the price that Mr. Litvak offered to them

had they known the truth instead of being misled my Mr. Litvak."  *Id*.  The court explicitly rejected

the argument advanced here—that "we don't know what would have happened, they would have

maybe walked away or negotiated a better deal"—finding instead that "the fact of the matter is

that they suffered a loss."  *Id*.  The court looked to intended loss, finding that Litvak "intended the

buyer to lose in the sense of paying more than they otherwise would have had to pay had they

known the truth."  *Id*. at 52.  Litvak had been "in this business long enough" such that he knew

"what normal average commission prices were, so he knew he was, in effect, getting the buyer to

pay to his company in many cases well over what they ever would have considered paying."  *Id*.

at 52-53.  While the court acknowledged the defense argument (just as here) that Litvak could have

said nothing, and then there would be no fraud, "the fact is he did say something," and the court

found it a "reasonable inference" that "[h]e said it because he wanted to extract, in effect, a super

profit for Jeffries."  *Id*. at 53.

On the question of how to estimate loss, again answering the same argument made by

Gramins, Judge Hall explained, "the fact is we will never know in fraud situations what would

happen in reality.  It is always inferences to be drawn, it seems to me.  And fortunately, I guess for

the court, under the guidelines, if there is a loss, first of all, I only need to make a reasonable

estimate of that loss."  *Id*. at 53-54.  The court continued: "[t]he court concludes that it can

determine a fair measure of loss by looking to the -- what I call the true value, which is what the

seller is willing to buy at and about which Mr. Litvak made false representations.  So the difference does become -- whether looked at as actual loss, intended loss or gain, the delta between what Mr. Litvak represented and what was the actual true situation." *Id*. at 54.  This is precisely the situation here, and precisely the conclusion advanced by the Government.

> b.    *Loss includes more than just the 2013 JPMAC trade*

The Court should next reject Gramins's attempt to limit his sentencing liability to whatever loss came from the 2013 JPMAC trade.  Def. Mem. at 27-28.

First, Gramins's argument is based solely on non-binding reasoning from the Court, the Second Circuit, and the Government that the jury *may* have based its verdict on the JPMAC trade. While this may indeed be a reasonable conclusion, it is certainly not necessary a true one.  *See* Hg. Tr. 4/29/20 at 62 (Government: "I would be probably [be] way out over my [skis] to…speculate as to what the jury did with [the willfulness instruction]").  Moreover, whereas the Second Circuit employed this inference as one component of an alternative harmlessness argument regarding the importance of challenged testimony, *see Gramins*, 939 F.3d at 455, Gramins now proposes to accept the inference as a factual finding by the jury, that is, that Gramins is only criminally culpable for the 2013 JPMAC trade.  Both the Second Circuit and Supreme Court have long discouraged speculation about the bases for jury verdicts, recognizing the "the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation."  *United States v. Zane*, 495 F.2d 683, 690 (2d Cir. 1974); *see also United States v. Powell*, 469 U.S. 57, 66 (1984) (in upholding inconsistent verdicts, and rejecting attempts to look at the reason for the inconsistency, holding that "an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake.").

Second, Gramins ignores the different standards of proof between trial and sentencing, which renders even more inappropriate a reliance on speculation about the reason for the jury verdict. Whereas the jury followed beyond-a-reasonable-doubt standard at trial, it is up to this Court to make its own factual findings as to the scope of loss "by a preponderance of the evidence." *United States v. Brennan*, 395 F.3d 59, 74 (2d Cir. 2005). Gramins stands convicted of a conspiracy that spanned 2009 through 2013, a period that includes 161 fraudulent trades, not just the ones introduced at trial. Gramins's attempt to limit his culpability to the 2013 JPMAC trade incorrectly implies that he did not know of the wrongfulness of his fraud prior to learning of Litvak's indictment in January 2013, and improperly gives legal weight to that argument.

Applying the law as the Court instructed here, that is, that "that the defendant knew his conduct was wrongful and involved a significant risk of violating the law," Tr. 3009, there was more than sufficient evidence to find the defendant criminally culpable both before and after the Litvak indictment. And as the Government has often argued in this case, it cannot be the law that the mere fact of a similar indictment is required to provide notice that something is wrong. Indeed, Litvak's conduct was, by definition, prior to his own indictment, and yet the Second Circuit twice validated the theory of prosecution (even while reversing on evidentiary grounds), never once posing the concern that his actions were not willful.[7] At most, Litvak's indictment provided Gramins and his confederates with reason to believe that the Government might have the wherewithal or interest in prosecuting such fraud, not that its legality had somehow changed.

Rather, the Court should find by a preponderance of the evidence that Gramins knew full well, both before and after Litvak's indictment, that his fraudulent conduct was wrongful. *See*

---

[7] To be sure, Litvak certainly argued that lying was rampant in the secondary RMBS market, just as Gramins did here. *See, e.g., United States v. Litvak*, 889 F.3d 56, 72 (2d Cir. 2018).

PSR ¶¶ 40-51.  The evidence of Gramins's willfulness included myriad passages from Nomura's compliance manuals that concerned not only truthfulness and Rule 10b-5, but also introduced the possibility of criminal prosecution, PSR ¶ 40; compliance presentations attended by Gramins that expressly prohibited making untrue statements, PSR ¶ 42, including prior to Litvak's indictment (Gov't Ex. 156); Gramins's various FINRA licenses, PSR ¶ 43; and unequivocal testimony from Nomura that it was always their policy that lying was prohibited, PSR ¶¶ 44-45.  Moreover, the only testimony at trial suggesting that Nomura employees did not consider the legality of their conduct at the time came from people trained by Gramins and/or Shapiro.  Aadil Abbas was the only sell-side RMBS trader witness who had not worked as an RMBS trader at Nomura, and he rejected the notion that traders could lie in the way Gramins did.  PSR ¶ 51.  In fact, Gramins's use of Nomura's phone intercom system to transmit a lie after the Litvak indictment, *see* Tr. 1758, is more an indicator that he viewed that indictment as a warning that the Government may be watching, not that he should refrain from illegal conduct.[8]

> c.   *The Court should reject Gramins's attempt to exclude loss from the 2013 JPMAC trade*

As with other trades, Gramins mistakenly claims that there was no loss associated with the 2013 JPMAC trade because such loss would be speculative and there was no agreement on

---

[8] Alternatively, while there is sufficient evidence of willfulness applying the Court's standard, proof of a specific intent to defraud is sufficient for both securities fraud and wire fraud.  *See United States v. Porcelli*, 865 F.2d 1352, 1358 (2d Cir. 1989) ("The specific intent required under the mail fraud statute is the intent to defraud . . .  and not the intent to violate a statute." (internal citations omitted)); ); *United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010) (willfulness for purposes of securities fraud requires only "awareness of the general wrongfulness of [a defendant's] conduct," which equates to knowledge that "the statements were false and fraudulent and that he made those statements with intent to create a deception" (internal quotation marks omitted)).  We incorporate by reference the Government's discussion of the intent standard in its omnibus response to the defendants' post-trial motions (Doc. 482), particularly pages 3 through 35.

compensation.   As explained at length above, the fraudulent intent and effect of Gramins's contemporaneous lies to Choi and Wollman were clear and obvious, and were validated by the Second Circuit.  *See Gramins*, 939 F.3d at 440 (Gramins's lie "caused Choi to lower his offer to 79 1/4"), *id.* (Gramins's lie "caused Wollman to raise his bid to '80 flat'").  The only logical inference is that Gramins's lies were intended to increase Nomura's profit, and the reactions of both Wollman and Choi are evidence that those lies had the desired effect.  It is counterfactual speculation by Gramins to theorize now that either party would have nonetheless agreed to raise or lower their prices if they had known the truth.

Gramins misleadingly also claims that Wollman was less price sensitive at the time of this trade because he may have been looking to acquire a certain threshold of JPMAC bonds.  Def. Mem. at 29.   Although Gramins attempted to guide Wollman to that conclusion on cross-examination, Wollman emphatically disagreed.  *See* Tr. 2242 ("Q. And that's really all I was trying to establish; that there are some considerations where not every tick matters, right?  A. But I disagree with that.").  Likewise, Gramins unhelpfully notes that the JPMAC bond was sold years later at 146-tick profit.  Def. Mem. at 29.  Just because QVT made a profit on the bond by holding it for several years does not mean their investors were not deprived of additional profit that they could have earned had Gramins not lied.  Moreover, Gramins surely cannot suggest that, at the time he lied, he knew the price would eventually go up.

> d.  There are no "acquitted counts" that can be excluded from the loss calculation in this case

Gramins incorrectly characterizes all but one of the trades that were part of the Government's proof at trial as "acquitted counts" or "acquitted trades."  Def. Mem. at 30-32.  As discussed above, the false premise of Gramins's argument is that the jury convicted only on the

2013 JPMAC trade, thus rendering all other conduct "acquitted."  There is simply no basis for that conclusion.

Gramins was convicted of a conspiracy to defraud Nomura's investors, which he and his co-conspirators accomplished by their fraudulent trading activity, whether introduced at trial or not, and whether referenced in the indictment or not.  All of the fraudulent trades—not just the many articulated as overt acts in the indictment—were part of the conspiracy for which he was convicted, and the Court should consider all of them for sentencing purposes.  As a co-conspirator, Gramins is liable for "all acts and omissions of others that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B).  Conspiracy is a separate crime, and acquittal on related substantive counts does not absolve a defendant of responsibility at sentencing for the conspiracy to commit those underlying acts.  *See United States v. McGinn*, 787 F.3d 116, 130 (2d Cir. 2015) ("The jury's determination that he was acquitted on certain of the substantive mail fraud charges related to the post-bankruptcy mailings is not inconsistent with a conclusion that he entered into a conspiracy involving these sales and does not absolve him of liability for the conspiracy and the losses it caused.").  There is nothing unfair about sentencing Gramins for conduct for which he was convicted of conspiring to carry out, whether or not he personally participated in the conduct and whether or not he was found guilty of the related substantive offense.

Second, only two trades were themselves charged in the indictment—Trade 702 (Gov't Ex. 26, charged in Counts 3 and 10) and Trade 519 (Gov't Ex. 22, Counts 2 and 6), which involved Connecticut-based victims—and the jury reached no decision as to Gramins's guilty of the former, and acquitted him on the latter.  The remainder of the wire fraud counts charged so-called "blast"

emails sent to victims in Connecticut, advertising where a trade had already occurred. There is no inconsistency between the jury's verdict holding Gramins responsible for conspiring to commit those trades and its determination acquitting him of substantive responsibility for the blast emails, particularly where the defense argued those emails were not in furtherance of the scheme. *See,* e.g., Tr. 2840, 2891. Moreover, to the extent that the most likely theory of Gramins's liability for Count 2 was conspiratorial liability under *Pinkerton* (since he was not directly involved in the trade), the jury was entitled but not required to make such a determination. Tr. 2672. And regardless of the jury's verdict beyond a reasonable doubt on the related substantive counts, the Court has a much different responsibility now—to determine loss using facts established by a preponderance of the evidence.

Finally, even if the Court were to consider the non-JPMAC trades to be "acquitted conduct," controlling precedent dictates that such conduct is appropriately considered at sentencing. Indeed, it is telling that the legal "support" for Gramins's position comes mainly from other circuits, out-of-circuit district court cases, and a law review article. Def. Mem. at 31. In this circuit, the only limitation on considering any relevant conduct, regardless of the jury's finding, is that it be proved by a preponderance of the evidence. *See United States v. Booker*, 543 U.S. 220, 251 (2005) ("a sentencing judge could rely for sentencing purposes upon a fact that jury found unproved (beyond a reasonable doubt)"); *United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012) ("district court may treat acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of the evidence that the defendant committed the conduct"). The jury's verdict on acquitted counts signifies only that the Government failed to prove securities or wire fraud beyond a reasonable doubt as to those counts, but does not preclude the Court from finding they were fraudulent for sentencing purposes. As the Second Circuit has said, "[t]here is neither a legal

nor logical inconsistency between acquittal by a jury (*i.e.*, a finding that a fact was not proved beyond a reasonable doubt) and a factual finding of guilt by a sentencing court (by a preponderance) based on the same evidence." *United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015).   Thus, in Litvak's second sentencing, Judge Hall followed Second Circuit law and considered acquitted conduct, finding those trades to have been proved to have been relevant conduct by a preponderance of the evidence. *See* Def. Mem. Ex. Q at 57.[9]

e.    There are no "uncharged trades" in this case

The same analysis applies to fraudulent trades that were not mentioned in the indictment or presented at trial, but are nonetheless part of the conspiracy.   These trades do not constitute "uncharged conduct," as Gramins claims, but are parts of the conspiracy, no different than the trades that were referenced in the indictment as overt acts and/or introduced at trial.   But even if they could be considered uncharged, they nonetheless constitute relevant conduct.   "Under the relevant conduct principles of subsection 1B1.3(a)(1)(B), all reasonably foreseeable acts...of others in furtherance of [a] conspiracy may be taken into account to determine a defendant's sentence." *United States v. Molina*, 106 F.3d 1118, 1121 (2d Cir. 1997) (internal quotation marks omitted).   As discussed above, all 161 fraudulent trades were conducted by members of the conspiracy, within the timeframe of the conspiracy, and applying the same scheme and plan.   *See* Def. Mem. Ex. Q at 57 ("I find by a preponderance of the evidence that Mr. Litvak's actions with respect to each of the charged trades and each of the uncharged conduct, both those introduced at trial and those that are submitted by way of exhibits to the sentencing memo of the Government, that those all satisfy the elements of securities fraud, including materiality by a preponderance of the

---

[9] In the second trial, Litvak was convicted of a single count of securities fraud.   There was no conspiracy charge.

evidence.  I am of the view that all of this conduct really was part of the same scheme.  It is all in the same nature.").

In claiming that the Court should disregard this additional fraudulent conduct, Gramins first repeats the same argument answered above, that is, that the Government cannot prove what would have happened had he not lied.  Def. Mem. at 32-33.  As discussed above, such an argument would eliminate loss in virtually all fraud cases.  Indeed, it is Gramins's lies that prevents us from knowing what would have happened.  Accordingly, the law concerns itself with what actually happened and requires only a reasonable estimate of loss by a preponderance of the evidence.  The lies underlying the 161 fraudulent trades are sufficient in that regard for the Court to conclude by a preponderance of the evidence that Gramins intended to, and did in fact, cause loss, and to reasonably estimate the amount of that loss.

Second, Gramins offers a number of letters from former trading partners with whom he has personal friendships, and who to varying degrees vouch for Gramins and claim they were not victimized.  Def. Mem. at 33-34.  But the most any of these victims can say is the undisputed proposition that they bought or sold bonds at prices that were acceptable to them based on their financial analysis, which is both obvious and beside the point here.  The sentencing calculus here is not about whether the victims traded at prices that were acceptable to their models (presumably, otherwise they would not have traded), but whether Gramins's lies were intended to or did cause them to buy higher or sell lower than they otherwise would have in executing those trades.  As Abbas explained, once a trader determines that the fundamentals of a bond support owning it, his "goal is to buy it as cheap as possible because the less money [he pays] for it, the more return it generates for [his] client[s]."  Tr. 1446; *see also* Tr. 700 (Harrison: "I would decide…a range in which I thought a security had an attractive value amongst the other opportunities.… [Then a]ll

else equal, I would attempt to buy it as low in price as possible, because that would help my clients make as much money as possible."). For purposes of determining loss, Gramins's victims' personal views of his character are irrelevant; the chats and the testimony of Gramins's former colleagues establish by a preponderance of the evidence that the purpose for the conspirators' lies was to increase Nomura's profit at the victims' expense in amounts that can be reasonably estimated.

Moreover, none of Gramins's friends claim that they lied in the same way, or that they believe his lying was acceptable or appropriate. Gramins omits from his quotation of Greg Handler's letter the statement "*I cannot condone what was done*, but I never experienced that behavior when dealing with him for over a decade." Def. Mem. Ex. A-22 (emphasis added). Indeed, there is no evidence that Gramins lied to Handler; but there is ample evidence that Gramins's co-conspirator did. Similarly, although Brian Loo explains that his firm made money by trading with Gramins, Def. Mem. Ex. A-14, he does not confront the fact that he was separately lied to by Shapiro in Trade 681. There, although Loo and Shapiro explicitly agreed on an 8-tick commission, Shapiro lied to get Loo to raise his purchase price enough to increase Nomura's spread to 22 ticks. *See* Ex. 1. After Loo was noticed as a character witness by Shapiro at trial,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████. *See* Ex. 2 at 1-2.[10]

Regardless of certain traders' personal affinity for Gramins, it is noteworthy that victim firms have generally agreed to accept compensation as victims in the SEC's settlement with Nomura. Moreover, individual traders are always motivated to deny being cheated out of a

---

[10] Not surprisingly, Shapiro declined to call Loo as a witness.

concern for their personal reputations in the market.  Indeed, while a particular trader may have been the audience for the conspirators' lies, their fiduciary duty is to—and the financial losses were ultimately borne by—their investors.

Third, Gramins's invocation of snippets of victim deposition testimony or interview reports is similarly unhelpful in assessing loss.  Def. Mem. at 35-36.  At most, these passages re-state Gramins's argument that the Court cannot know what would have happened had the conspirators not lied, addressed repeatedly above.  But several of Gramins's citations leave out other, more affirmative, statements from the traders.  For example, while ███████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████.  *See* Def. Ex. H-2 at 6

("████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████").  Similarly, while ██████

████████████████████████████████████████████████████████████

██████████████, Def. Mem. at 36, he was more forceful than that.  He told agents that he

"████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████"

Def. Mem. Ex. H-4 at 3-4.

Gramins's next perversely claims that Peters actually *saved* victim trader Robert Graham money by cheating him.  Def. Mem. at 36.  But Gramins's reading of ██████████████

██████ and Trade 28 misunderstands the context of this trade, in which Graham expressly made a "pay on top" bid.  Ex. 3 at 5.  In other words, in addition to expressing to Peters that he wanted

to buy as cheaply as possible, the compensation Graham paid to Nomura for arranging the trade mattered to him.  Indeed, after Peters falsely reported that he bought the bond at 97-08, Graham asked Peters to explicitly confirm the seller's price.  *Id.* ("so u paid 97-08, right?").  Only after Peters repeated his lie did Graham decide on a final price to pay, building in his commission to Nomura.  *Id.* ("use 97-18").  ███████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████.  Ex. 4 at 2.[11]  As a result, ████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████.  *Id.* at 1. Understanding that Graham was focused on paying a market-appropriate commission, Peters chose to lie in order to induce Graham to pay more "on top" than he was otherwise willing to.  There was no reasonable scenario wherein Peters could have sold to Graham at 97-24 without lying or omitting a material fact, as Graham had already put Peters on notice that he intended to pay a cost-plus price.  Far from being an "perfect example" of why the Court should not accept the Government's loss calculations, this trade is yet another example of how each of the 161 trades involves a similar pattern of conduct—lying by conspirators in order to induce victims to pay more or accept less than they would have otherwise.

Finally, Gramins reiterates the same argument he made several times prior, that some of the 161 transactions did not involve affirmative representations about commission.  Def. Mem. at 37.  But this case is not about whether Nomura over-billed for trade execution; instead, explicit lies about commission were merely one way that Gramins and his conspirators fraudulently

---

[11] Gramins's █████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████ attached here as Exhibit 4.

induced victims to change their trade prices to Nomura's benefit.  As discussed above, each of these trades nonetheless involved lies by conspirators that "caused Nomura's counterparties to increase their bids and decrease their offers when they would not otherwise have done so." *Gramins*, 939 F.3d at 434.  The loss figures proposed by the Government are a reasonable estimate of the amount by which Nomura increased their profit at their victims' expense.

### B.  Victim Enhancement

In calculating Gramins's Guidelines, the Probation Office applied a two-level enhancement because the offense involved 10 or more victims, specifically 55.   PSR ¶ 66, U.S.S.G. § 2B1.1(b)(2)(A)(i); PSR Exhibit 1.  Gramins incorrectly opposes this enhancement by rehashing two earlier arguments, namely that (i) only the JPMAC trade and its two victims are relevant to the Guidelines calculation, and (ii) in the alternative, there were no "victims" in the 161 trades identified in PSR Exhibit 1.  Def. Mem. at 37-38.

Gramins's first erroneous argument is addressed at length above.  As for the second, Gramins is incorrect on the facts.  Under § 2B1.1 cmt. 1, the term "victim" includes "any person who sustained any part of the actual loss determined under subsection (b)(1)."  As relevant here, a "person" includes corporations, companies, firms, and partnerships, that is, the firms for whom the victim traders invested.  As discussed above regarding determination of actual loss, Gramins and his co-conspirators caused pecuniary harm to more than 50 victims[12] by lying about the price of bonds in a way that caused the victim traders to buy higher or sell lower than they would have

---

[12] Because the Government did not tabulate the many examples where Gramins's and his conspirators' lies were unsuccessful in getting victims to raise or lower their prices, the victim count includes only those who actually lost money as a result of Nomura's lies.

otherwise, thereby making their firms less money as a result.[13]   The fact of such losses are the inescapable inference of the incontrovertible evidence—principally the conspirators' Bloomberg chats and trade tickets.

### C.  Role in the Offense

The Court should add three levels because the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive.  U.S.S.G. § 3B1.1(b).

A three-level enhancement is required "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1.  "A defendant may properly be considered a manager or supervisor if he 'exercise[d] some degree of control over others involved in the commission of the offense…or play[ed] a significant role in the decision to recruit or to supervise lower-level participants.'" *United States v. Burgos*, 324 F.3d 88, 92 (2d Cir. 2003) (quoting *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002) (alterations in original)).  "It is enough to manage or supervise a single other participant." *Id*.  Moreover, "[t]he fact that [a] defendant was subordinate to another participant in the offense does not preclude a finding that the defendant himself was a manager or supervisor within the meaning of § 3B1.1." *United States v. Brophil*, 122 F.3d 1057, 1997 WL 537991, at *1 (2d Cir. 1997) (unpublished).

While "role enhancements should not be *automatically* imposed on business owners or executives," the Second Circuit has made it clear that it is a factor to consider, particularly where the defendant had "active involvement in the conspiracy." *United States v. Huerta*, 371 F.3d 88,

---

[13] The funds managed by the victim traders for their firms are ultimately held for the benefit of investors which included pension funds, endowments, and PPIP funds investing taxpayer money. Tr. 1429-30, 2083, 2291.

92 (2d Cir. 2004); *see also United States v. Duncan*, 42 F.3d 97, 106 (2d Cir. 1994) (applying enhancement where defendant was president of company that was "the primary vehicle" through which corrupt payments and bribes were made, and defendant "knew of and profited from [the] corruption"); *United States v. Wisniewski*, 121 F.3d 54, 58 (2d Cir. 1997) (per curiam) (vacating and remanding for resentencing because the district court had not imposed a role enhancement; defendant was the owner of a car dealership that was the locus of operations for a major money laundering scheme and an "active participant" in the scheme); *United States v. DeRiggi*, 72 F.3d 7, 9 (2d Cir. 1995) (per curiam) (holding that "when a business's top officer knows of corruption in the business and implicitly approves it by participating in the corruption, a four-level enhancement...is proper").

Here, Gramins was a supervisor on the RMBS desk that was the "primary vehicle" through which the fraud conspiracy was perpetrated; he directly supervised at least two other members of the conspiracy; and, consistent with the jury's verdict, he had "active involvement" in the fraud. This is sufficient on its own to warrant application of a role enhancement, particularly given the large bonuses that Gramins received based primarily on the success of the RMBS desk.

But the Court need not rely only on Gramins's formal supervisory position in assessing his role in the offense. Witnesses testified that Gramins not only provided general supervision over at least two junior traders, but that he specifically trained them to participate in the fraud. Frank Dinucci, who was directly supervised by Gramins (Tr. 137), testified that when he first joined Nomura, he observed Gramins and Shapiro using misrepresentations that "they wanted to employ in our day-to-day business." Tr. 159. Gramins and Shapiro "taught [Dinucci] this tactic" of using lies to increase Nomura's profit. Tr. 175. Dinucci also explained that he was instructed by Gramins and Shapiro not to get caught lying. Tr. 162. Dinucci had frequent conversations with

Gramins (his supervisor) about how they were going to use lies in order to increase Nomura's spread in particular trades.  Tr. 164.

Similarly, Gramins was both Chao's direct supervisor and trainer (Tr. 394, 1671, 1677-78), and taught him to use misrepresentations to defraud customers, Tr. 1685 ("I mostly learned [how to lie to customers] from Mr. Gramins and Mr. Dinucci."), 1686 (Chao learned how to lie "from Mr. Gramins and Mr. Dinucci"), 1687 (Gramins instructing Chao what to write in chats), 1688 (Chao learning from Gramins and Dinucci how to lie in inventory trades), 1692.  In fact, with respect to Trade 702 (Exhibit 26), where Chao lied to Aadil Abbas, Chao made clear that "[i]n a trade like this, [Gramins] would instruct me on what to tell the client."  Tr. 1706.  Thus, Gramins supervised Chao by providing general oversight and instruction in the mechanics of the conspiracy, including how to specifically execute the fraud scheme.

Gramins's arguments against a role enhancement suffer from several legal and factual flaws. Def. Mem. at 38-41.

First, Gramins appears to argue that the Court should ignore his supervisory role on the RMBS desk.  Def. Mem. at 39.  But that suggestion is contrary to the controlling precedent, discussed above, holding that executive position can be a critical factor in assessing role in the offense, particularly where (as here) the defendant is a supervisor in an organization that is central to the offense and the defendant is an active participant in the scheme.

Second, Gramins argues that Chao and Dinucci could not have been "participants" in the conspiracy because they testified that they did not think their conduct was illegal.  Def. Mem. at 39-40.  But the Court's obligation here is to determine the application of a role enhancement by a preponderance of the evidence, and there is more than enough evidence to conclude that Chao and Dinucci each "had knowledge of and participated in the criminal conspiracy," and that neither was

52

merely an "uninformed, 'unwitting' participant on the outskirts of [the] criminal conspiracy." *United States v. Brinkworth*, 68 F.3d 633, 641 (2d Cir. 1995); *United States v. Ojeikere*, 545 F.3d 220, 222 (2d Cir. 2008) ("For the purposes of the supervisory role enhancement, the government must prove disputed facts by a preponderance of the evidence.").  Even if the Government was required to show that each participant had specific knowledge of the illegal nature of their fraud, the Government's burden has been satisfied.  Both Dinucci and Chao testified that they frequently lied about prices in order to benefit Nomura at their customers' expense, as taught to them by Gramins.  PSR ¶¶ 20-21.  Nomura's manuals, compliance presentations, and their FINRA licenses—not to mention their common sense—all led them to know that such fraudulent activity is both wrongful and illegal.  PSR ¶ 40-42.  In that context, Chao and Dinucci's muddled testimony—purporting to understand that it was wrongful and illegal based on their training and common sense, but at the same time claiming that they did not think of it in legal terms at the time—was at best self-delusional, likely borne of a desire to fit in at their place of employment and avoid insubordination when their supervisors were breaking the law and urging them to do the same.  But whatever its motive, that testimony is insufficient to undermine the other evidence that they knew full well the wrongfulness and illegality of their conduct.

Of course, as the Government has argued several times previously, knowledge of illegality is not an element of securities or wire fraud, and the law merely requires Dinucci and Chao's intentional and knowing participation in the fraud.  *See United States v. Kaiser*, 609 F.3d 556, 569 (2d Cir. 2010) (willfulness for purposes of securities fraud requires only "awareness of the general wrongfulness of [a defendant's] conduct," which equates to knowledge that "the statements were false and fraudulent and that he made those statements with intent to create a deception" (internal quotation marks omitted)); *United States v. Porcelli*, 865 F.2d 1352, 1358 (2d Cir. 1989) ("The

specific intent required under the mail fraud statute is the intent to defraud, and not the intent to violate a statute." (internal citations omitted)); *United States v. Precision Medical Laboratories, Inc.*, 593 F.2d 434, 443 (2d Cir. 1978) ("Appellant was convicted under 18 U.S.C. §§ 287 and 1341.  The Scienter requirement in both of those sections is 'knowledge.'"); *United States v. Middendorf*, No. 18-CR-36 (JPO), 2019 WL 4254025, at *7 (S.D.N.Y. Sept. 9, 2019) ("The problem with the Sand instruction is that it arguably can be read as requiring that a defendant must know the law and intend to violate it in order to be found guilty of wire fraud.  But that is an incorrect statement of the law, according to the vast weight of authority."); *United States v. Gole*, 21 F. Supp. 2d 161, (E.D.N.Y. 1997) ("'Willfully' appears nowhere in the mail fraud statute, and the Second Circuit has expressly held that the only scienter requirement for a violation of § 1341 is that the acts proscribed be carried out 'knowingly.'"), *aff'd* 158 F.3d 166 (2d Cir. 1998).  *See also United States v. DiRoberto*, 686 Fed. App'x 458, 461 (9th Cir. 2017) ("The mail and wire fraud statutes do not require proof of willfulness.  18 U.S.C. §§ 1341, 1343.  Accordingly, the district court's instruction that DiRoberto did not need to know his actions were illegal was not erroneous."); *United States v. Blagojevich*, 794 F.3d 729, 739 (7th Cir. 2015) ("The wire-fraud statute requires a specific intent to defraud but *not* willfulness or any other proxy for knowledge of the law."); *United States v. Reyes*, 577 F.3d 1069, 1080 (9th Cir. 2009) (citing Second Circuit and writing that "our circuit and others have rejected the argument that, in the context of the securities fraud statutes, willfulness requires a defendant know that he or she was breaking the law."); *United States v. Tarallo*, 380 F.3d 1174, 1188 (9th Cir. 2004) ("Under our jurisprudence,…'willfully' as it is used in § 78ff(a) means intentionally undertaking an act that one knows to be wrongful; 'willfully' in this context does *not* require that the actor know specifically that the conduct was unlawful."); *United States v. Stockheimer*, 157 F.3d 1082, 1088

(7th Cir. 1998) ("Both bank fraud and mail fraud require an intent to defraud the victims…. But a defendant's belief in the legality of his conduct is not a defense to mail or bank fraud."); *United States v. Paradies*, 98 F.3d 1266, 1285 (11th Cir. 1996) ("In mail fraud cases, the government need only prove that the defendant had the intent to deceive, and ignorance of the law is no defense."); *United States v. Wicker*, 80 F.3d 263, 267 (8th Cir. 1996) (rejecting defense that defendant did not know his fraudulent activity was illegal, and holding that "[t]he critical inquiry is not whether [Wicker] intended to break the law, but, rather, whether [he] intended to defraud the [homeowners]." (citation omitted)).

Third, Gramins once again repeats his argument that the only trade to be considered in the Guidelines analysis should the 2013 JPMAC trade.  Def. Mem. 40-41.  As discussed above in the loss section, this is both legally and factually wrong.  Gramins was convicted of a conspiracy that was alleged to have made fraudulent trades from 2009 to 2013, and it would be speculative to conclude that the jury only convicted on a conspiracy of a more limited scope.  Moreover, each fraudulent trade during that period, at a minimum, constitutes relevant conduct which should be considered in assessing Gramins's role in the offense.  *See Brinkworth*, 68 F.3d at 641 ("The district court's inquiry is not limited to defendant's role in the count of conviction; rather, the court may take all 'relevant conduct' into account."); U.S.S.G. Section 3, Part B, Introductory Commentary ("The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of §1B1.3 (Relevant Conduct), *i.e.*, all conduct included under §1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction.").  Gramins's supervision of Chao and Dinucci was a core part of the conspiracy, and included mentoring Chao through one of the alleged overt acts.

Fourth, Gramins makes an equitable argument against assessment of a role enhancement, claiming that the Guidelines' secondary justification for that enhancement (concerning profit and likelihood of recidivism) does not apply to him. Def. Mem. at 41. But while Gramins is free to argue the equities in the context of 18 U.S.C. § 3553(a), they have no bearing on application of the role enhancement. "Once its factual predicates have been established, the managerial role enhancement under § 3B1.1 is 'mandatory.'" *United States v. Pristell*, 941 F.3d 44, 49-50 (2d Cir. 2019) (quoting *United States v. Jimenez*, 68 F.3d 49, 51-52 (2d Cir. 1995)).

Even considering the purposes of the enhancement, the background commentary makes clear that the role enhancement squarely addresses Gramins's culpability. In principally addressing "concerns about relative responsibility," U.S.S.G. § 3B1.1 cmt. background, "Section 3B1.1, more broadly, 'provides a range of adjustments to increase the offense level based upon the size of a criminal organization (*i.e.*, the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense.'" *United States v. Kent*, 821 F.3d 362, 368-69 (2d Cir. 2016) (quoting U.S.S.G. § 3B1.1(a) cmt. background.)). This is consistent with the Introductory Commentary to Part 3B, which states that "[t]his Part provides adjustments to the offense level based upon the role the defendant played in committing the offense." Here, the evidence was overwhelming that Gramins played two important functions in the offense, that is, he was both a frequent participant in defrauding Nomura's customers, as well as a teacher of at least two other junior traders in how to execute the scheme. It was through that latter, leadership role that the scheme was able to expand and harm even more investors, and that aspect of the fraud should be captured in assessing Gramins's culpability.

A three-point managerial enhancement is thus appropriate.

### D.  Acceptance of Responsibility

Finally, Gramins should not be given credit for acceptance of responsibility because he has not, in fact, accepted responsibility for any criminal conduct.  Def. Mem. at 42-43.

Under U.S.S.G. § 3E1.1, a defendant is eligible for a 2-level reduction if he "clearly demonstrates acceptance of responsibility."  The Guidelines explain that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."  *Id*. cmt. 2.  A defendant convicted at trial may receive acceptance credit in "rare situations" when a defendant "goes to trial to assert and preserve issues that do not relate to factual guilt," such as "a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct."  *Id*.  Contesting criminal intent is one way to contest factual guilt which forecloses credit for acceptance of responsibility.  *See United States v. Nouri*, 711 F.3d 129, 146 (2d Cir. 2013) (rejecting acceptance of responsibility credit based on defendant's claim that he "contested only legal conclusions and not underlying facts," because defendant "contested his guilt by arguing to the jury in summation that he lacked any intent to defraud his customers and recommended Smart Online in good faith").

While Gramins indeed challenged the indictment on due process grounds, his trial defense was much broader.  Indeed, he contested factually most elements of the charged crimes.  Gramins argued at trial that he "never intended to defraud anyone," Tr. 2845, "never intended to harm anyone," *id.*, thought that everything he did was "lawful and legitimate," *id.*, and that he "acted in good faith at all times," Tr. 2875.  He also argued that the Government had not proven that his lies were material, *see, e.g.*, Tr. 2853, and that the charged wirings were not in furtherance of the fraud scheme, Tr. 2890-91.  Moreover, Gramins argued that he had not lied at all in the 2013 JPMAC

trade.  *See* Tr. 2888-90.  In other words, at trial, Gramins contested making a misrepresentation, intent to harm, intent to defraud, willfulness, materiality, and the use of the wires, all parts of the required proof to convict.  Even now, Gramins does not articulate what he is taking responsibility for.  Under these circumstances, there can be no credit for acceptance of responsibility.[14]

## IV.   Gramins's Additional Attacks On The Guidelines Are Unwarranted

### A.  The Guidelines Are the Appropriate Starting Point for the Court's Analysis

Gramins invokes U.S.S.G. § 2B1.1 cmt. 21(C) to argue that the Court should depart from the Sentencing Guidelines because the § 2B1.1 loss enhancement substantially overstates the seriousness of his offense.  Def. Mem. at 44-47.  Although the Government does not seek a Guidelines sentence, an accurate Guidelines calculation is still the appropriate starting point for the Court's assessment of the seriousness of this case, in part because losses are an effective proxy for harm to victims and a defendant's culpability.  Moreover, the Guidelines are capped by the 60-month statutory maximum, rendering Gramins's complaints about overstatement moot.

First, the fraud guidelines were established after long study and careful consideration.  The fraud guidelines were drafted by the Sentencing Commission, "bas[ing] its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *United States v. Kimbrough*, 552 U.S. 85, 109 (2007).  Specifically, in 2001 the Commission significantly amended the fraud guidelines to remedy deficiencies that had come to light in prior versions.  The Commission spent six years gathering information from the defense bar, the Justice

---

[14] There is nothing rare about a prosecution where the defendant claims his conduct is not illegal, particularly in cases of complex white-collar crime.  Def. Mem. at 43.  *See, e.g.*, *United States v. Johnson*, 945 F.3d 606, 615-16 (2d Cir. 2019) (rejecting challenge to a fraud case on the ground that the conduct was not illegal); *Binday*, 804 F.3d at 568 ("[D]efendants argued that they did not intend to inflict, and that the insurers had not in fact suffered, any harm that is cognizable under the mail and wire fraud statutes.").

Department, probation officers, academic commentators, and others.  *See* Frank O. Bowman, III,

*The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History*, 35

Ind. L. Rev. 5, 7-8 (2001).  In 2015, § 2B1.1 was again updated in a way that reaffirmed the

empirical approach of the Commission.  The Commission adjusted the loss table according to the

"gradual decrease in the value of the dollar over time."  *See* U.S.S.G. Supp. to App. C., Amdt. 791

at 101.  The Commission observed that "previous Commissions engaged in careful examination

(and at times, a wholesale rewriting) of the monetary tables and ultimately included monetary and

enhancement levels that it considered appropriate at that time."  *Id.* at 102.  The fraud guidelines

are thus a carefully considered and oft-adjusted effort by the Commission to reach empirically

sound sentences for white collar criminals.

Second, the Guidelines appropriately give significant weight to loss, which has historically

been used as a proxy for both harm and culpability.  *See* Bowman, 35 Ind. L. Rev. at 16; *Lacey*, 699

F.3d at 720 (where intended loss exceeded actual loss, "the larger intended amount is a better

'measure for the defendant's culpability' than is the actual loss").  Gramins argues, however, that

the loss enhancement "is wildly excessive in relation to the offense conduct," particularly because

Gramins was not involved in many of the transactions.  Def. Mem. at 55.  But that argument asks

the Court to overlook his role on the RMBS desk and his participation in others' trades.  Gramins

was a manager on the RMBS trading desk, training and mentoring his subordinates, and teaching

them how to lie.  *See e.*g., Tr. 175 (Dinucci stating the Gramins and Shapiro taught him the tactic

of lying to clients); 1686 (Chao learned how to lie "from Mr. Gramins and Mr. Dinucci").

Moreover, he participated cooperatively in fraudulent trades with others on the desk.  *See* Tr. 164

(Dinucci explaining involvement by Gramins and others in lying to clients); 1707 (Chao: "In a

trade like this, [Gramins] would instruct me on what to tell the client.").  Gramins's motive to train

his subordinates in this way was obvious—his compensation was derived from the profits of the desk and therefore Gramins benefitted from his and his co-conspirators' lies. *See* Tr. 476-77 (Raiff: "The actual compensation someone would receive would be a function of their performance, the desk's performance, that business's performance, and the firm's overall performance."). And Gramins was rated in part on his ability to make money for Nomura through riskless trading. *See* PSR ¶ 60 ("Despite the challenging pnl year, Michael was able to mitigate losses by growing our distribution in both the poa/subprime markets as well as creating substantial alpha through low-risk/riskless trading with key relationships.").

While the trades on the loss chart may be a small fraction of Nomura's overall RMBS trading activity, they vastly underestimate of the extent of the fraud, which occurred on a near daily basis for years. PSR ¶ 22. As large as it is, if anything, the Government's loss calculation understates the seriousness of the offense and Gramins's culpability.

In any event, the loss table's effect on Gramins's sentence are muted by the 60-month statutory maximum for his offense of conviction. Indeed, once loss reaches $150,000, it has barely any impact on the Guidelines calculation (since it results in a range of 57-71 months); loss greater than $250,000 (resulting in a range of 63-78 months) has no impact whatsoever on that calculation. U.S.S.G. § 2B1.1(b)(1). Gramins's argument might have some weight had he been charged with a wire or securities fraud conspiracy under 18 U.S.C. § 1349, in which case the statutory maximum sentence would be 20 years and the full extent of the Guidelines would be in play. But here, the Guidelines are not piling on with a 20-level loss enhancement (corresponding to $15,262,651.93 of intended or actual loss) because the Government's charging decision has already resulted in a significant discount below the Guidelines. No further departure is warranted under § 2B1.1 cmt. 21(C).

### B.  Gramins's Fraud Is Well Within the Heartland of the Guidelines

Gramins's claim that his conduct falls outside the "heartland" of fraud cases is nothing more than a rehashing of his uncompelling arguments against intent, materiality, and loss.

While Gramins may claim that this fraud case is somehow unusual, the evidence shows just the opposite: it is a classic instance of theft-by-trick.  Gramins and his co-conspirators made material misrepresentations to dupe their trading counterparties into buying and selling bonds at prices they otherwise would not have agreed to had they known the truth.  Simply put, Gramins lied to make more money.  *See*, *e.g.*, Trial Tr. 1684-85 (Chao: "The effect was to get either one side or both sides to lower their offer or increase their bid, and that would increase the spread or money that Nomura earned on the trade."); *Gramins*, 939 F.3d at 434 ("Those lies caused Nomura's counterparties to increase their bids and decrease their offers when they would not otherwise have done so.").  The securities laws have prohibited such conduct since 1934.

Furthermore, although Gramins still claims that he believed he was complying with the law (both before and after *Litvak*), Def. Mem. 49, the Government offered (and the jury credited) extensive evidence establishing Gramins's criminal intent and willfulness.  PSR ¶¶ 20-22, 38, 40-51.  Moreover, the Second Circuit described the post-*Litvak* trade as strong evidence of Gramins's unlawful intent.  *See U.S. v. Gramins*, 939 F.3d 429, 455 (2d Cir. 2019) ("The fact that the JPMAC trade postdated the Litvak indictment provided strong evidence for Gramins's consciousness of wrongdoing.").  Though Gramins now purports to accept responsibility, in the same memorandum, he still contends that in the 2013 JPMAC trade he used "negotiating tactics that, at the time, he believed adhered to instructions from Nomura's compliance department and addressed the legal concerns presented by the Litvak indictment."  Def. Mem. at 49.  In short, there is nothing outside the fraud heartland about a defendant who spent years lying to customers for money, and continues

to deny any real responsibility for his actions despite the jury's verdict and the Second Circuit's decision.

### C.  The ABA Guidelines Are Not Helpful Here

Gramins has suggested that the Court should use the Shadow Guidelines from the Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes (the "ABA Report"), to determine the appropriate sentence in this case.  While the Court can consider a large range of relevant matters in determining what sentence is sufficient but not greater than necessary to comply with the purpose of 18 U.S.C. § 3553(a), the Shadow Guidelines are subjective and poorly defined, making them a poor substitute for the Sentencing Guidelines.  Moreover, in response to the ABA Report, the Sentencing Commission made "targeted changes to focus the economic crime guideline more closely on individual culpability and actual harm to the victim were in order."  Letter from Judge Patti B. Saris, April 15, 2016, United States Sentencing Commission, *available at* https://www.ussc.gov/about/news/press-releases/april-14-2016 (last visited December 13, 2020).

Nonetheless, even if the Court were to apply the Shadow Guidelines, Gramins's calculations are incorrect and significantly understate the outcome suggested by the ABA Report.

### 1.  Base Offense Level 6-8

The Shadow Guidelines start with a base offense level of between six and eight.  Gramins's naturally chooses six, the same base offense level under the Sentencing Guidelines.  But the ABA Report provides no guidance as to the appropriate base offense level, and each case scenario in the ABA Report shows a range.

### 2. Actual Loss Adds 12

Gramins does not add any points for loss, incorrectly arguing that there was no actual loss. As discussed above, a conservative estimate of actual loss is $15,262,651.93. Under section (b)(1) of the ABA Report, the offense level should increased to account for actual loss. Therefore 12 levels should be added for a loss that exceeds $10,000,000 but is less than $50,000,000.

### 3. Culpability Adds 6

Gramins argues that his culpability is moderate, therefore no levels should be added or subtracted. But the ABA Report's concept of culpability encompasses such factors as motive, the gain to the defendant or others, the sophistication and organization of the offense, the duration of the offense, extenuating circumstances, and steps the defendant took to mitigate the harm. Applying that methodology to the facts of this case leads to the "highest" culpability designation and a six-level enhancement.

Motive and nature of the conduct weigh against Gramins. The ABA Report offers examples to illustrate the effect of motive and the nature of the offense, one of which is "predatory" conduct, defined as "intended to inflict loss for the sole or dominant purpose of generating personal gain to the defendant or to others involved in the criminal undertaking." ABA Report Application Note 2(A). The ABA Report calls these "among the most culpable types of offenses sentenced under this guideline." *Id.* Gramins's motive for committing his fraud meets this definition: he used his lies to defraud his customers and their investors to increase Nomura's profits and likewise his own bonus. The fact that Gramins did not receive all the gain directly does not necessarily reduce his culpability, in the ABA Report's view, because "a defendant who intentionally inflicts a large loss on others for the purpose of achieving a small gain would be more culpable with respect to the gain factor than someone who did not intend the loss." *Id.* In such circumstances, the

dispositive factor seems to be "the extent to which the loss was foreseeable to the defendant," which it clearly was to Gramins.  *Id*.

Gramins's organization of the offense likewise increases his culpability.  According to the ABA Report, "[c]riminal undertakings involving a high degree of sophistication and/or organization generally reflect a greater threat of harm and higher level of culpability."  ABA Report Application Note 2(C).  Gramins's fraud was not particularly sophisticated, however, it and the conspiracy that carried it out required substantial amount of organization.  Gramins needed to train co-conspirators and coordinate with them to present believable lies to victims, all while avoiding detection by compliance personnel, innocent coworkers, and those victims.

The duration of the offense also weighs against Gramins.  This fraud occurred from 2009 to 2013.  The ABA Report states that "[c]riminal undertakings that extend over several months or longer suggest a greater degree of culpability."  ABA Report Application Note 2(D).

There were no extenuating circumstances or attempts at mitigation.

Under the ABA Report factors that he urges on the Court, Gramins falls into the category of "highest culpability" because he had a predatory motive, reaped his victims' losses for his own benefit, organized within Nomura to perpetuate and conceal the scheme, and continued the scheme for years.

### 4.  Victim Impact Adds 2

Under section (b)(3) of the ABA Report, the offense level may or may not be increased based on the victim impact.  The relevant application note contemplates "many factors" to make this determination, which include the vulnerability of victims and the significance of the loss.

Gramins caused an actual loss to his victims.  Moreover, those victims were fiduciaries of pension funds, endowments, and PPIP funds investing taxpayer money—Gramins's indirect

victims.  Thus, while there is no evidence that the pecuniary harms caused by Gramins threatened any victim's financial stability, it would not be correct to call the victims' losses *de minimis*. Taking this into account, Gramins should be assigned a "low" victim impact enhancement of at least two levels.

### 5.   No Special Offense Considerations

Under section (c) of the ABA Report, the treatment of certain "special offense considerations" that fall within U.S.S.G. § 2B1.1(b)(3)-(9), (11)-(14) or (16)-(18) are contemplated.  None apply here.

### 6.   Total Offense Level of 26

Under the ABA Report, Gramins's base offense level would be six, increased by 12 levels for loss, by six levels for "highest culpability," and by two levels for "low victim impact," resulting in a total offense level of 26, which corresponds to a 63 to 78-month term of imprisonment that exceeds the statutory maximum.[15]

## V.   The Sentencing Factors Suggest A Meaningful Term of Imprisonment

Consideration of the Guidelines and the statutory factors demonstrate that this is a serious crime warranting a significant term of imprisonment and supervision.  18 U.S.C. § 3553(a).

---

[15] Gramins also argues that, under the ABA Report, (i) his offense level should be capped at 10 because it was not a serious offense and (ii) he should be sentenced to a term of probation.  The ABA Report states that "in determining whether an offense is not 'otherwise serious,' the Court should consider (1) the offense as a whole, and (2) the defendant's individual contribution to the offense."  This cap is best understood as a fail-safe that permits sentencing courts to avoid unfair results caused by some unforeseen application of the ABA Report's methodology.  The ABA Report also lists a number of considerations for whether probation is appropriate, including loss, sophistication, duration, and the defendant's participation.  Given that Gramins was a licensed broker-dealer who participated in a conspiracy to defraud customers for years, used his seniority to teach and encourage others licensed broker-dealers to lie, and caused $15,262,651.93 in loss, Gramins's conduct was serious and he is not entitled to a sentence of probation.

### A.  Nature and Circumstances of the Offense

The Court is well-versed in the nature and circumstances of Gramins's offense, detailed at length in the PSR and above.  Gramins was a senior participant in a years-long conspiracy to commit crimes of deception motivated by greed.  This variety of criminal conduct merits a sentence that is consequential to both the defendant and society.  A significant term of imprisonment is such a sentence.

### B.  Seriousness of the Offense, Respect for the Law, and Just Punishment

Gramins's crime was a serious offense warranting substantial punishment, including a significant period of incarceration.  While "securities fraud" and "wire fraud" are both broad terms that encompass various types of crimes, Gramins did not commit some technical violation of the law.  He committed a fraud in the classic sense of a theft-by-trick, lying with the specific intent to take money he was not entitled to.  Even more than some frequently prosecuted frauds (such as insider trading), Gramins's crime falls within the heartland of Rule 10b-5 and the wire fraud statute.

That Gramins should have known better because of his privileged upbringing is clear.  But it does not stop there.  Gramins was not a used car or carpet salesman; he was a licensed broker-dealer in a highly regulated industry constrained by guardrails meant to ensure ethical and honest behavior.  He was trained, retrained, and trained again, with the consistent message to be honest and ethical.  He was instructed on the laws and regulations that govern securities trading and the conduct expected of him as an employee of a FINRA-registered firm like Nomura.  If there is one area of the American economy where the participants know that unethical or fraudulent business practices are prohibited and subject to prosecution, it is our financial markets.  Indeed, the "fundamental purpose" of the securities laws is "to substitute a philosophy of full disclosure for

the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186 (1963)).

The applicable anti-fraud laws, clearly articulated to Gramins and his co-conspirators by their FINRA certifications and Nomura trainings, are not complicated.  Rule 10b-5, which makes it a crime to  (among other things) "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," is straightforward.  As the Second Circuit put it decades ago, "[n]o honest and reasonable citizen could have difficulty in understanding the meaning of 'untrue,' 'material fact,' 'any omission to state a material fact,' 'in light of the circumstances under which they were made,' or 'misleading.'"  *United States v. Persky*, 520 F.2d 283, 287 (2d Cir. 1975) (citing *Coplin v. United States*, 88 F.2d 652, 657 (9th Cir. 1937)).

The clarity of these rules makes Gramins's crime all the more brazen.  His conduct was not an isolated incident or a one-time lapse in judgment.  Over several years, on a nearly daily basis, Gramins made the choice to participate in a dishonest course of conduct.  In just the limited subset of 161 fraudulent trades for which the Government was able to unearth a written record, Gramins and his co-conspirators caused more than $15 million of loss to Nomura's customers.

Moreover, not only did Gramins himself lie repeatedly to make more money for his firm, but he taught junior traders to do the same; when the fish rots from the head, it has a pernicious effect on a company's culture.  As a supervisor, Gramins was supposed to be the "first line of the defense in terms of compliance" with legal and ethical rules, not the one corrupting junior traders to break those rules.  Tr. 458.  Caleb Chao explained that he was initially surprised when Gramins lied to a customer, but he went along because that is what he saw Gramins and the other Nomura

traders do.  Tr. 1690-91.  When Dinucci first saw Gramins lie to customers, he was "taken aback … because it was not a tactic [he] had seen prior," including when he had previously worked for a broker-dealer.  Tr. 160.  By training other traders in fraud, Gramins both extended the reach of scheme and made his own crime more serious.

In addressing the seriousness of his crime, Gramins still does not take responsibility for— or even address—the fact that he repeatedly and intentionally violated the securities the laws.  Def. Mem. at 57-66.  In fact, he appears to deny any real culpability even for the 2013 JPMAC Trade. Def. Mem. at 49.

First, despite the clear evidence that he intended to dupe clients that trusted him (according to his letters of support), Gramins reverts to his oft-repeated refrain that they still got value for their money and that none really lost any money.  Def. Mem. 57-59.  That argument is a straw man meant to divert the Court's attention from his true offense.  He was not charged with tricking his counterparties into making bad investments or buying bonds at prices that did not match their investment goals.  Indeed, given the nature of the RMBS market, where sophisticated investors did their own research based on the fundamentals of the bond, and where those fundamentals are knowable to the market (*see* Tr. 2268), it would have been very difficult to trick a customer into such a bad investment.

Instead, Gramins stands convicted of exploiting his informational advantage over the negotiations between a buyer and seller unknown to each other.  He knew that those investors had no choice but to react to the lies he told.  Accordingly, when he provided pricing information, "the counterparties believed that they were adjusting their bids or offers in response to bona fide, contemporaneous negotiations with those other, third-party counterparties, and paying Nomura a modest commission to facilitate supposedly 'riskless' transactions with those counterparties."

68

*Gramins*, 939 F.3d at 434.  The evidence showed that counterparties expected dealers acting in a broker capacity to accurately relay information back and forth; in every one of the 161 fraudulent trades for which there was a written record, victims altered their prices based on Gramins's or his co-conspirators' lies.  Tr. 2270 ("[A]n objective fact about a transaction is not something that I am skeptical about."); *Gramins*, 939 F.3d at 450 ("In light of this corroborating testimony from other counterparties, Wollman's description of his expectations when Gramins acted in a "broker" capacity were hardly atypical.").  While counterparties may have been skeptical about some market color, they had no other source for that information; the securities regulations exist precisely so that market participants do not have to try to gauge the truthfulness of each other's factual statements.  Thus, Gramins is wrong to repeat his earlier argument that there was no actual loss from his conspiracy.

Second, Gramins complains that he could not have known (and seemingly still does not know) that his conduct was illegal, making his crime less serious.  Def. Mem. at 59-61.  But the simple fact that fraud was a frequent practice on the Nomura RMBS desk that Gramins helped to supervise exacerbates, rather than minimizes, his culpability.  Gramins also blames Nomura for not telling him to stop lying, Def. Mem. at 59, when he knew that what he was doing was wrong and contrary to his training.  Desk supervisors, like Gramins, were the only ones with sufficient insight into trading operations to identify fraudulent conduct.  Tr. 458-67.  Senior Nomura management had no idea their middle managers were permitting and participating in illegal conduct.  Tr. 456.  Finally, the handful of unsworn and untested statements in letters from Gramins's friends do not support a factual finding that (contrary to the evidence at trial) the market believed that blatant lying was legal.  Def. Mem. at 62.  None of those letters suggest that any of the writers actually engaged in or condoned such conduct, and at most provide isolated and

unsubstantiated hearsay that the conduct was pervasive.  Moreover, to the extent that the Litvak prosecution was a "wake-up call" to the industry, as letter writers claim, it only signaled that the Government has the resources to pursue violations of the law in what had been considered a completely opaque market; it was not the law that had changed, just the risk of getting caught.  Tr. 436, 456.

Third, Gramins claims that the Court should glean from the jury verdict that this offense is somehow less serious.  Def. Mem. at 63.  But Gramins was convicted of the broadest reaching charge in the indictment—a four-year conspiracy involving many participants and nearly daily fraud.  This was not a situation where Gramins was convicted of a minor crime isolated from the bulk of the case.  Moreover, the length of the jury's deliberations reflects the appropriate care they took with thousands of pages of evidence and testimony elicited over a month-long trial, with extensive jury instructions and many counts to consider for each defendant.  After all of that, the jury found Gramins guilty of conspiring to commit securities and wire fraud based on a lengthy consideration of facts and arguments.  The jury's vote to convict Gramins of a serious crime deserves to be weighed heavily by the Court, even if it is discounted by Gramins.[16]

Finally, Gramins attempts to undermine the seriousness of his offense by claiming disparate treatment compared to other RMBS traders.  It is certainly true that the Government has discretion to prosecute all, some, or none of individuals engaged in similar criminal conduct, so long as the basis for that decision is not illegal (such as one based on race or religion).  *See United States v. Armstrong*, 517 U.S. 456, 464–65 (1996).  No such illegal selection is alleged to have

---

[16] Gramins also addresses, as a matter of the seriousness of the offense, the effect this prosecution has had on his employment and other aspects of his life.  Def. Mem. at 63-66.  The Government addresses this issue below, along with similar arguments made in the context of Gramins's history and characteristics.

occurred here.  Based on its investigation into the secondary RMBS market, the Government pursued banks like Nomura where the frequency and impact of the fraud was greatest, the conduct was most pervasive, and the evidence was best.  Indeed, Nomura was particularly concerning not just because it was at or near the top in terms of loss, but also that (as compared to the RBS, Jeffries, and Cantor Fitzgerald prosecutions) it was the most pervasive, infecting the entire RMBS desk.  Other banks, where the number of fraudulent trades and loss amount were far less, were pursued civilly by the SEC or not at all.  Even within Nomura, the Government prosecuted only the three traders with the most fraudulent trades, who committed their offenses despite having supervisory authority over the RMBS desk.  In short, while Gramins may complain that others were not prosecuted, comparisons with those who were not prosecuted do him no credit, and only emphasize the seriousness of his offense.

### C.  Adequate Deterrence and Protection of the Public

Alarmingly, despite the clarity of the rules and regulations governing securities trading, highly trained and certified traders like Gramins felt that they could break them without facing punishment.  Prior to the advent of Bloomberg chats, when trades were executed over the phone, the Government had no opportunity to police misrepresentations in fast-paced negotiations.  Even afterwards, the complexity of putting together the various components of a trade were a high bar to perfect enforcement.  Accordingly, traders were often governed by the dictates of their conscience—some, like Abbas, chose the legal path, while others, like Gramins, engaged in a race to the ethical bottom because it suited their firm's bottom line.  As with so many other frauds, the threat of prosecution and eventual incarceration is the only way to send a message of deterrence to would-be scofflaw traders who believe the odds are slim that regulators will catch them.

Accordingly, a prison sentence for Gramins's criminal conduct will serve as a powerful deterrent against the commission of financial fraud, particularly by broker-dealers in opaque markets where participants think their illicit conduct can be hidden.  As this case shows, there can be a huge personal financial incentive for broker-dealers to commit fraud on their customers.  The broker-dealer has an informational advantage over his customers, victims lack the ability to detect when they are being lied to, the amounts of money at stake are enormous, investors are unaware of the negotiations that go into trades, and the broker-dealer's employer is hard-pressed (and often lacks incentive) to police its employees.  Victims are unenthusiastic to find that they were defrauded by the broker with whom they often do business, and loath to be perceived in the market as either an easy mark or a fool.  As evidenced by the numerous bad acts by traders seen at trial, any suggestion that this market might (or is even willing to try to) self-police is frivolous.  Thus, the Government requests that the Court seriously consider general deterrence in fashioning an appropriate sentence here.

In this regard, the Government notes that the author of a survey of academic research regarding the efficacy of criminal sanctions for white collar crimes found the following:

> White-collar crime is believed to be particularly amenable to deterrence due to its rational and profit-oriented motivation.  In a conceptual analysis of the topic, Braithwaite and Geis observed that white-collar offenders are not committed to a lifestyle of illegality, are risk aversive, and have more to lose as a result of a criminal conviction than street offenders.  Elsewhere Geis noted that "[j]ail terms have a self-evident deterrent impact upon corporate officials, who belong to a social group that is exquisitely sensitive to status deprivation and censure."  It is generally perceived that executives exhibit distress at the thought of being sentenced to incarceration: "It results in hypertension, it causes heart attacks, it is very serious."

> Most judges and prosecutors view general deterrence as the one of the goals, if not the major purpose, in sentencing white-collar offenders.  Punishment should serve to discourage others from committing similar offenses and jail or prison sentences, judges and scholars alike tend to believe, are particularly effective as a general deterrent.

Elizabeth Szockyj, "Imprisoning White-Collar Criminals?" 23 S. Ill. U. L.J. 485, 492 (1999) (footnotes omitted). *See also* Paul H. Robinson & John M. Darley, "The Role of Deterrence in the Formulation of Criminal Law Rules: At Its Worst When Doing Its Best," 91 Geo. L.J. 949, 956 (2003) ("We can expect greater deterrent possibilities when dealing with more rational target audiences, such as white collar offenders."); David Weisburd, Elin Waring, & Ellen Chayet, "Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes," 33 Criminology, 587, 589 (1995) ("White-collar crime is seen as a highly rational form of criminality, in which the risks and rewards are carefully evaluated by potential offenders, and white-collar criminals are assumed to have much more to lose through sanctions than more common law violators.").

Unless those in a position to commit this sort of fraud are made to fear serious and certain repercussions for their actions, the temptation to defraud their customers and steal millions of dollars from their investors cannot be eliminated. When someone like Gramins, who succumbed to that temptation, is detected and found guilty of a federal felony, his peers should see that the consequence is a substantial period of imprisonment.

Gramins's response to the goal of general deterrence is far too specific, relying on reports of changes in practice in the secondary RMBS market that came as a result of the Litvak prosecution. Def. Mem. at 68-70. But general deterrence is not satisfied just because some firms in a particular market have taken some steps to make their traders' practices more transparent to management and regulators. A sentence of imprisonment here would show both market participants and those who rely on healthy financial markets that there are certain, serious consequences to breaking the law.

### D.  History and Characteristics of the Defendant

The Court should, of course, take into account Gramins's personal history and characteristics, and the many letters in support from his family and friends, who obviously wish the Court to spare him a jail term.  Likewise, the Court should consider the impact that this conviction has had and will have on Gramins's employment prospects.  And, the Court should consider the impact his imprisonment will have on his wife and children.  Def. Mem. at 56-57, 63-66.

But these factors do not augur for sparing Gramins a prison term.  First, Gramins does not have the frequently offered excused that nobody taught him any better.  Instead, the PSR makes clear that Gramins has lived a privileged life—upbringing, education, family, friends, wealth.  Judged by their letters to the Court, there is little doubt that his family instilled solid values in him, including honesty and loyalty.  However, such advantages come with responsibility, and make his fall all the more disappointing.  Second, the impact on Gramins's employment is no doubt dispiriting, but one that is not unique among criminal defendants.  The Court should not provide Gramins with a lower sentence simply because his fall affected him more financially than a defendant who never had the chance to reap millions in bonuses in the first place.  Third, and similarly, all criminal cases have an unintended but inevitable effect on the families of defendants.  This case is clearly no different.  But try as Gramins's lawyers might to blame the Government for his fate, it is ultimately Gramins who violated the law, and Gramins who has brought this hardship on his family.  He is no more deserving of leniency than any other defendant whose family has to bear their loved one's absence.

As Judge McMahon recently observed, in denying compassionate release for a white collar defendant:

Our prisons are heavily populated with individuals who do not look like Samuel Israel. They did not come from prominent and wealthy families, grow up in privileged communities, attend prestigious prep schools and colleges, and live in luxury in Westchester, New York. They come from inner-city poverty and have little education or job training. Many of them have committed serious crimes as a way of "getting by" in a world in which they have been dealt a bad hand; often joining gangs in search of the structure that those lacking an intact family often crave. This does not lessen their criminality; but it explains why they do what they do in a way that Israel's criminality cannot be explained. Moreover, these young men, most of them members of minority groups, are far more likely to commit crimes, be caught and incarcerated for periods of 10 or 20 years or even longer during the prime of their lives—the very years when Israel was perpetrating his fraud—or even younger.

These defendants and their families and communities have for years argued that white-collar criminals are hardly ever prosecuted, and that the few who are—no matter the damage they do—tend to receive lighter sentences and are incarcerated in less onerous conditions. They are not wrong. Privileged individuals who commit financial crimes from behind the walls of ostensibly legitimate financial institutions frequently go undetected and unprosecuted. The few who are prosecuted can hire the finest defense attorneys in the world to represent them. And those who are convicted are often designated to lower-security prisons, which—while admittedly still unpleasant places—are far less so than the facilities at which young men from minority communities typically serve their time. Adjusting Israel's sentence downward on "compassionate" grounds, despite the seriousness of his crime and the amount of his fraud, while leaving these other defendants where they find themselves, does nothing to promote respect for the law. It simply reinforces the belief that there is one law for the white-collar criminal and another law altogether for the ghetto dweller or the drug dealer.

*United States v. Israel*, No. 05 CR 1039 (CM), 2019 WL 6702522, at *10 (S.D.N.Y. December 9, 2019).  Despite his many personal and professional advantages (which most in prison never enjoyed), Gramins committed a serious crime.  While he deserves no greater punishment for those advantages, he also should not be permitted to walk away from his crime because of them.

### E.  A Sentence of Imprisonment Does Not Create an Unwarranted Sentencing Disparity

Gramins's final argument is that the Court should disregard the fact that Litvak was (twice) sentenced to a two-year prison term for remarkably similar conduct.

18 U.S.C. § 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." This mandate is not meant to be applied on a local or isolated basis, but to ensure that similarly situated defendants across the country are treated the same, and not based on the individual assessments of the courts that happen to be sentencing them. "The method chosen by Congress to avoid unwarranted disparities is a guideline system that prescribes appropriate sentencing ranges for various combinations of facts concerning an offense and an offender and permits a sentencing judge to depart from the recommended range in unusual circumstances." *United States v. Joyner*, 924 F.2d 454, 460 (2d Cir. 1991). Here, the Guidelines call for a 60-month sentence, although absent a statutory maximum, that calculation would otherwise result in a far higher advisory sentence. The Court must consider this result both because it is specifically mandated by statute and because it serves the goal of making sure that Gramins is sentenced the same in this Court as he would be anywhere else.

*Litvak* provides helpful guidance as to how Judge Hall arrived at a two-year sentence for almost identical conduct, with many similar considerations. In Litvak's first sentencing, the court calculated a Guidelines range of 108-135 months. Def. Mem. Ex. M at 133. The court rejected the notion that Litvak had been "singled out" for prosecution. *Id*. at 137. Responding to Litvak's argument that he did not know his conduct was wrongful, the court said:

> I don't view you as somebody who happened to do something that everybody is doing and nobody thought was illegal and, bam, all of the sudden you got caught. You lied. Now maybe that's what people do every day on Wall Street. It still doesn't make it legal. Lots of us lie every day in our lives. Fortunately, most of the time it doesn't have much consequence. It's a white lie. But when it has a consequence, when it's material, which this jury found, it's a crime.

*Id*. at 137. Just like here, the court found that "[Litvak] also did it many times. [Litvak] did it such that there were many victims." *Id*. 138. Litvak was motivated to make more money for himself,

just like Gramins.  *Id*.  While others at Litvak's firm also may have lied, he did it more.  *Id*.  At bottom, the court said, Litvak's crime was "a crime of fraud, lies, repeated lies."  *Id*. at 140.  On the other hand, the court weighed heavily Litvak's personal history and characteristics, including more sentencing letters than Judge Hall had ever received.  *Id*. at 154.  In particular, the court weighed the significant challenges Litvak faced in caring for his son (a consideration that does not exist here).  *Id*. 156.  Taking all this into account, Judge Hall sentenced Litvak to 24 months' imprisonment and a $1.75 million fine.

Gramins attempts to distinguish *Litvak* are unpersuasive.  First, Gramins first draws inapt distinctions between his conduct and Litvak's, employing many of the same arguments as Litvak.  Def. Mem. at 71.  Judge Hall answered all of Gramins's erroneous arguments—that the trades would not have come out differently had Litvak not lied, that Litvak did not intend to break the law, and that incarceration would not serve a deterrent purpose.  Moreover, Judge Hall considered and rejected Gramins's most spurious arguments that he is the "victim" of a novel Government prosecution, and that he could not have known that lying to steal money exposed him to criminal liability.  Def. Ex. M at 97, 137.

Gramins next claims that there was some outsized significance to the Government being a victim in Litvak.  But what Judge Hall said was that the entire RMBS market was propped up by Government money, not that the Government was a special victim.  Gramins's conduct was in the same market as Litvak's, and benefitted from the same infusion of Government capital.  In any event, the Government (through taxpayer-funded PPIP funds) was also a victim of Gramins's scheme.

On the other side of the coin, Litvak benefitted from certain factors, particularly because of the Court's concern with Litvak's role in caring for his partially disabled son.  Gramins raises no corresponding concern.

In sum, while the Government does not suggest that the Court simply sentence Gramins to the same term as Litvak because they are similar cases, there is nothing so different about their crimes or the sentencing factors that would support Gramins's request for a non-incarceratory sentence.

**VI.**    **Conclusion**

For the reasons stated above, the Government urges the Court to sentence the defendant to a substantial term of imprisonment consistent with the aims of 18 U.S.C. § 3553(a).

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

/s/
_____
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY

/s/
_____
HEATHER L. CHERRY
ASSISTANT UNITED STATES ATTORNEY

U.S. Attorney's Office
157 Church Street
New Haven, CT 06510
(203) 821-3700
David.Novick@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

      This is to certify that on December 14, 2020, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/
_____
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY