UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MICHAEL GRAMINS,<br><br>               Defendant. | S3 15-cr-00155 (RNC)<br><br>December 15, 2020 |

**REPLY SENTENCING MEMORANDUM OF MICHAEL GRAMINS**

 

Mukasey Frenchman & Sklaroff LLP
2 Grand Central Tower
140 E. 45th St., 17th Floor
New York, New York 10017
Tel (212) 466-6400

*Attorneys for Michael Gramins*

**TABLE OF CONTENTS**

**ARGUMENT** ..................................................................................................................................1

**I. THE GUIDELINES ANALYSIS** ..........................................................................................1

    A.    There Was No Loss in This Case................................................................................... 1

    B.    There Should Be No "Manager or Supervisor" Enhancement Under § 3B1.1................ 3

    C.    There Should Be No Increase To The Base Offense Level Based On the Number of Victims Under § 2B1.1(b)(2)(A)(i)................................................................................... 4

    D.    The Court Should Apply a Two-Level Reduction for Acceptance of Responsibility..... 4

    E.    The Court Should Consider the ABA Task Force Report ............................................... 5

**II. THE FACTORS IN SECTION 3553(a) STRONGLY FAVOR A NON-CUSTODIAL SENTENCE** ..................................................................................................................6

**CONCLUSION** ..............................................................................................................................10

Defendant Michael Gramins, by his counsel, respectfully submits this Reply Sentencing Memorandum in further support of his request for a non-custodial sentence. For the following reasons, the government's egregiously draconian request for a "substantial term of imprisonment" (Gov. Memo at 1) should be denied.

## ARGUMENT

I. THE GUIDELINES ANALYSIS

### A. There Was No Loss in This Case

The government has ignored entirely the Court's prior statements regarding the government's inability to prove loss (*see* Gramins Memo at 22), and argues instead that it has adequately established loss because "the lies told by Nomura traders were successful in getting victims to change their prices." Gov. Memo at 27. This is not the appropriate measure for loss because it ignores the basic principle that the Court cannot include in its loss calculation sums that Nomura's counterparties would have paid "absent the fraud." *United States v. Alphas*, 785 F.3d 775, 781 (1st Cir. 2015).

As this Court stated at trial, the government's witnesses "didn't attempt to use some sort of a crystal ball to tell the jury what would have happened" in the absence of misstatements. Trial Tr. 2478:25-2479:1. Nor does the government explain why it is appropriate to calculate loss for trades where either i) the "victim traders" *expressly stated* that they may have paid the same prices had they known Nomura's acquisition costs, or ii) the government never even bothered to speak to the relevant "victim traders." *See* Gramins Memo at 33-36. It is telling that the government belittles the supporting letters submitted by a number of its alleged "victim traders" – including by desperately referring to the letters as "unsworn and untested" (Gov. Memo at 69) – but wants the

Court to rely on the completely theoretical views of scores of individuals who have made no statements at all.[1] This distorted logic should be disregarded.[2]

The government also continues to insist on calculating a loss for trades in which the Nomura traders made no express statements about the size of Nomura's profits, despite its concession at trial that it would not be "fair" or "appropriate" to do so. *See* Trial Tr. 2439:8-18. The government now claims that it has alleviated this admitted problem by using the "maximally conservative" approach of "credit[ing] Gramins with a market-standard 8-tick offset" for such trades. Gov. Memo at 24. This is blatantly improper; "the government bears the burden of supporting its loss calculation with reliable and specific evidence, and it may not simply guess where such evidence is unavailable." *United States v. Ring*, 811 F. Supp. 2d 359, 380 (D.D.C. 2011) (citation omitted). Nor is it clear how the government's approach is "maximally conservative" when the government's own witnesses testified that certain trades warranted spreads larger than 8 ticks. *See, e.g.*, Trial Tr. 1014:3-10 (Zach Harrison conceding that certain trades "could qualify" for a markup of "two and a half points" – *i.e.*, 80 ticks).[3]

---

[1] While the government scoffs that the "victims" who wrote in support of Mike had "personal friendships" with him (*see* Gov. Memo at 45), it is clear from the letters that such relationships were developed solely in connection with Mike's work as an RMBS trader. Thus, while Mike certainly had social relationships with these counterparties (as was common in the industry), the government's attempt to trivialize these letters demonstrates its utter inability to explain away how someone whom the government insists on calling a victim refuses to accept that label.

[2] The government also attempts to minimize "victim trader" Brian Loo's letter by claiming that the defense "[n]ot surprisingly" declined to call Loo as a trial witness in light of statements contained in Loo's government interview notes. Gov Memo at 46. Yet the government fails to tell the Court that it never produced these interview notes to the defense (as it was required to do pursuant to this District's Standing Order on Discovery in Criminal Cases). Instead, the defense saw these interview notes for the first time when they were attached to the government's sentencing memorandum. Gramins requests that the government immediately turn over any other undisclosed witness interview notes.

[3] In fact, the government cites to interview notes wherein a counterparty stated that 16 ticks is within the range of typical spreads. *See* Gov. Memo at 46. Moreover, neither the SEC nor FINRA, the regulators charged with enforcing the federal securities laws, ever adopted or endorsed any standard markup for the RMBS market.

Finally, perhaps realizing its inability to establish actual loss, the government now pivots to a theory of intended loss and claims that Mike's loss arguments are inapplicable to such theory. However, just like "actual loss," a calculation of "intended loss" excludes sums that would have been paid "absent the fraud." *Alphas*, 785 F.3d at 783.  Moreover, the government's theory of this case has always been that it involved actual, manifest, and certain loss – not some potential, hypothetical, or intended loss – and its eleventh-hour change in theories is contrary to everything it argued before the jury.  *See, e.g.*, Trial Tr. 2696:10-12 (government summation: Zach Harrison "paid orders of magnitude above what he had actually negotiated to pay" due to the defendants' misstatements); Trial Tr. 2942:7-8 (rebuttal summation: "for four years, the defendants stole money from their customers").  The Court should therefore reject the government's last-minute switch.  *See, e.g.*, *United States v. Walker*, No. 2:09-CR-00478, 2011 WL 3417110, at *12 (E.D. Pa. July 28, 2011) (rejecting the government's loss calculation when it was "completely inconsistent with the theory of fraud under which [the defendant] was prosecuted").[4]

### B.  There Should Be No "Manager or Supervisor" Enhancement Under § 3B1.1

The Probation Office correctly excluded a § 3B1.1 enhancement in the PSR.  Indeed, no such enhancement is appropriate in this case because Mike was not a supervisor of any "participant" – *i.e.*, anyone "criminally responsible for the commission of the offense." *See United States v. Beckford*, No. 05 CR 944(RWS), 2006 WL 1390414, at *4 (S.D.N.Y. May 17, 2006).

The government cannot contest that Chao and Dinucci testified that they did not believe that using deceptive negotiating tactics was illegal, so it instead insists that "knowledge of illegality

---

[4] As discussed in Mike's initial Memorandum, even if the Court agrees with the government's loss calculation, it should depart from the Guidelines because the more than $15,000,000 loss amount that the government urges upon the Court severely overstates the seriousness of the offense.  *See* U.S.S.G. § 2B1.1, cmt., n. 20(C).  While the government claims that "the Guidelines are capped by the 60-month statutory maximum, rendering Gramins's complaints about overstatement moot" (Gov. Memo at 58), it cites no authority to support the notion that the statutory maximum alone renders it unnecessary for the Court to determine whether the loss amount overstates the seriousness of Mike's conduct, which it clearly does in this case.

3

is not an element of securities or wire fraud." Gov Memo at 53. The Court, however, rejected this argument at trial and expressly instructed the jury that the government must prove that the defendants acted "with a bad purpose to disobey or disregard the law." Trial Tr. 2649:23-25; *see also* Trial Tr. 2650:24-2651:3 ("[A] defendant cannot be convicted if . . . he held an honest belief his actions were permissible and not in furtherance of unlawful activity."). The government therefore cannot establish that Mike was the supervisor of any "participant" under the meaning of § 3B1.1. *See, e.g.*, *United States v. Badaracco*, 954 F.2d 928, 934–35 (3d Cir. 1992) ("[T]o be considered a participant under the Guidelines an individual must be criminally responsible, *i.e.*, s/he must have committed all of the elements of a statutory crime with the requisite *mens rea*.").[5]

### C. There Should Be No Increase To The Base Offense Level Based On the Number of Victims Under § 2B1.1(b)(2)(A)(i)

As we have explained, no increase is warranted based on the number of victims because "victims" are defined as individuals or entities "who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1, cmt., n. 1. The government has not established any "actual loss" in this case, nor can it rely on a calculation of "intended loss" (which is contrary to its entire theory of the case) to support this enhancement. *See United States v. Skys*, 637 F.3d 146, 153 (2d Cir. 2011) (a § 2B1.1(b)(2)(A)(i) enhancement cannot be based on a finding of "intended loss").

### D. The Court Should Apply a Two-Level Reduction for Acceptance of Responsibility

Mike relies on the arguments set forth in his initial Memorandum as to why the Court should apply a two-level reduction for acceptance of responsibility. *See* Gramins Memo at 42-43.

---

[5] Even if the government could demonstrate that Chao and Dinucci were "participants," it has not established the existence of "five or more" participants – *i.e.*, five or more people who acted with the requisite *means rea*. *See* U.S.S.G. § 3E1.1(b).

4

We also note that, just as the government ignores the Court's prior statements concerning loss, it also fails entirely to address the Court's prior statements about this case that directly track the language of § 3E1.1. *Compare* MFR Tr. at 5:1-8 ("This has been a highly unusual case in my experience. The issue at the heart of this case is not whether the defendants engaged in the conduct alleged in the indictment, as is usually the case, but whether their conduct constituted a crime."), *with* U.S.S.G. § 3E1.1, cmt., n. 2 (stating that a defendant may be eligible for an acceptance of responsibility reduction when he goes to trial to "make a . . . challenge to the applicability of a statute to his conduct"). Because the example set forth in § 3E1.1 is exactly what happened here, a two-point reduction for acceptance of responsibility is fully justified.

### E. The Court Should Consider the ABA Task Force Report

The government urges the Court to disregard the Task Force Report's "Shadow Guidelines," claiming that they are "subjective and poorly defined, making them a poor substitute for the Sentencing Guidelines." Gov. Memo at 62. Once again, however, the government simply ignores this Court's contrary analysis of the Task Force Report. Indeed, in *United States v. Rivernider*, a case where the government's loss calculation resulted in a Guidelines range that was "plainly excessive," this Court stated that it "prefer[red] the guidance provided by the Task Force." Transcript of Sentencing Hearing at 211:17-212:18, *United States v. Rivernider*, No. 3:10-cr-00222-RNC (Dec. 18, 2013) (ECF No. 609).

The government also claims that the Shadow Guidelines are of no use to the Court because "in response to the ABA Report, the Sentencing Commission made targeted changes to focus the economic crime guideline more closely on individual culpability and actual harm to the victim were in order." Gov. Memo at 62 (citation omitted). The government, however, fails to elaborate

5

as to how any of these changes alleviate the concerns that this Court has expressed about § 2B1.1's loss enhancement provision.[6]

Finally, the Court should swiftly reject the government's argument that a two-level "victim impact" increase is warranted under the Shadow Guidelines because Mike's "indirect victims" included "pension funds, endowments, and PPIP funds investing taxpayer money." Gov. Memo at 64-65. The Court has already rejected any implication that the victims in this case were vulnerable and should do so again here. *See, e.g.*, Trial Tr. 2986:22-2987:23 (this case it not about "widows and orphans," but about "sophisticated institutional investors that control billions of dollars" who "make huge sums of money on trades exploiting the lack of information about the price they paid"); MFR Tr. at 15:14-19 ("Here you can categorize the conduct as a principal to principal negotiation involving sophisticated parties who rely on analytics in a dog-eat-dog market where everybody is looking out for himself and everybody's supposed to be on their guard and, after all, these people are looking at making huge, huge profits[.]").[7]

## II.     THE FACTORS IN SECTION 3553(a) STRONGLY FAVOR A NON-CUSTODIAL SENTENCE

The government has failed to establish that *any* custodial sentence – much less a "substantial" one (*see* Gov Memo at 1) – is "sufficient, but not greater than necessary" to achieve the goals enumerated in 18 U.S.C. § 3553(a). *See United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008)

---

[6] This is not the only Court to criticize the Sentencing Guidelines for yielding "plainly excessive" sentencing ranges based on loss amounts in fraud cases. *See* Gramins Memo at 44-47 (citing cases). In fact, just last week the New York Criminal Bar Association hosted a CLE titled "Federal Fraud Sentencing: It's Time to 'Stop the Madness'" in which the panelists – including Judge Jed S. Rakoff of the Southern District of New York and Judge Frederic Block of the Eastern District of New York – discussed the flaws associated with § 2B1.1's loss table.

[7] Additionally, no increase is warranted under the Shadow Guidelines based on Mike's culpability level. *See* Gramins Memo at 52-53.

*First*, perhaps in an effort to suggest that Mike should be punished simply because of what he was paid by Nomura, the government has included in its memorandum a highly inflammatory chart that lists Mike's purported compensation from 2010-2014. *See* Gov. Memo at 18. However, the compensation figures in this chart are wildly misleading because they fail to disclose that much of this amount was "deferred compensation" that Mike was only to receive if he remained employed by Nomura for a certain of number years. Indeed, Nomura never paid Mike the vast majority of his deferred compensation after he was terminated as a result of this case.

The government also refuses to acknowledge that the widespread nature of the conduct underlying this case is relevant in assessing the severity of Mike's offense. In fact, despite the overwhelming evidence to the contrary, the government continues to suggest that the conduct was isolated and largely limited to the RMBS desk at Nomura. *See, e.g.*, Gov. Memo at 15 ("[E]ven at Nomura, there was no evidence that the existence or knowledge of the fraudulent trading practices extended beyond the RMBS desk."). The government is wrong. Not only were deceptive negotiating tactics used at virtually every bank with an RMBS desk (*see* Gramins Memo at 61), but Nomura has entered into a settlement agreement with the SEC as a result of its CMBS traders engaging in the same conduct as Mike. *See* Order Instituting Proceedings, *In the Matter of Nomura Sec. Int'l, Inc.*, Exchange Act Release No. 86373, 2019 WL 3074082 (July 15, 2019).[8] Nor does the government make any attempt to explain why a "substantial term of imprisonment" is

---

[8] The government also continues to emphasize the content of Nomura's compliance manuals in an attempt to amplify Mike's culpability level. *See, e.g.*, Gov Memo at 12-14, 67. As this Court has noted, those manuals merely reflect "what was in the mind of a committee at Nomura that sat down to put together an aspirational statement that might appeal to customers." Trial Tr. 275:8-10. And, even the government's witnesses admitted that they did not review the compliance manuals in detail. *See, e.g.*, Trial Tr. 1779:14-1780:8.

7

appropriate for Mike when Tyler Peters – who worked on the same exact desk and engaged in the same exact conduct – will not face even civil penalties imposed by the SEC.[9]

***Second***, the government does not – and cannot – dispute that Mike has lived an upstanding and honorable life that is entirely at odds with his conviction in this case. Instead, the government seems to suggest that Mike is more culpable than most defendants *because* he has an otherwise unblemished record and comes from a loving family. *See* Gov. Memo at 74-75. This logic, however, is plainly antithetical to the purpose of § 3553(a). *See, e.g.*, *Adelson*, 441 F. Supp. 2d at 513-14 (S.D.N.Y. 2006) ("[S]urely, if ever a man is to receive credit *for the good he has done*, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." (emphasis added)).

***Third***, the government simply does not address whether a custodial sentence is needed to accomplish the goal of specific deterrence (which it is not), and instead leans heavily on the notion that incarceration is needed to accomplish general deterrence. That can only be because there is no credible argument that a term of imprisonment is necessary to prevent Mike from reoffending. *See, e.g.*, Transcript of Sentencing Hearing at 88:23-89:3, *United States v. Connolly*, No. 1:16-cr-00370-CM (S.D.N.Y. Oct. 24, 2019) (ECF No. 457) ("The government -- knowing full well that neither of these defendants needs to be punished any more than they already have been in order to fulfill the goal of specific deterrence . . . extols the goal of general deterrence as justification for imposing a lengthy term of incarceration on these two men.").

As to general deterrence, the government has repeatedly crowed that is has already achieved such deterrence in the RMBS market. *See* Gramins Memo at 69 (citing DOJ press

---

[9] Indeed, while the government repeatedly reminds the Court that it need only make sentencing findings by a "preponderance of the evidence," the SEC seemingly did not think it could meet this burden in its now-dismissed case against Peters.

8

releases). Yet the government claims that "general deterrence is not satisfied just because some firms in a particular market have taken some steps to make their traders' practices more transparent to management and regulators." Gov. Memo at 73. The government's restricted and narrow view fails to recognize that general deterrence is in part viewed "as a means of preventing like or related crimes." *United States v. Molton*, 743 F.3d 479, 486 (7th Cir. 2014); *see also Ahuama v. United States*, No. CV 17-6779, 2019 WL 5800311, at *5 (D.N.J. Nov. 7, 2019) ("[T]here's a need to provide adequate general deterrence to prevent this conduct from happening the future."). The market reforms touted by the government in its press releases are powerful proof that it has already achieved general deterrence against the conduct at issue in this case, making a custodial sentence unnecessary to deter market participants from repeating the conduct at issue here.[10]

***Finally***, the government's reliance on the *Litvak* sentences as "helpful guidance" is misplaced. *See* Gov Memo at 76. Litvak received a two-year sentence after he was convicted at his first trial of all fifteen counts in the indictment, including 10 counts of securities fraud, one count of TARP fraud, and four counts of making false statements.[11] In contrast, Mike was convicted of a single count of conspiracy in a case where the jury failed to convict on 26 of 27 counts. Moreover, although Litvak received the same two-year sentence after his second trial (where he was convicted of a single count of securities fraud), Judge Hall relied on a number of factors that were unique to that case and which are not present here. For example, Judge Hall

---

[10] Additionally, the government's RMBS prosecutions – including the two-year sentences imposed on Jesse Litvak – have been widely publicized. *See, e.g.*, Sara Jerving, *Former Jefferies Trader Litvak Sentenced to Two Years*, WALL ST. JOURNAL (July 23, 2014); Peter J. Henning, *A Warning to Wall St. About Misleading Clients*, N.Y. TIMES (Jan. 30, 2013). This widespread publicity leaves little doubt that the message of general deterrence has been heard not just in the RMBS market, but in financial markets in general.

[11] At the *Litvak I* sentencing, the government claimed that Litvak was "in an elite class of fraudster, to our knowledge." *Litvak I* Sentencing Tr. at 109:7-8. It is hard to imagine that the government could make the same statement today given the number of banks and RMBS traders that were later implicated in the same conduct.

9

found that Litvak violated his conditions of release after his first trial by suing the government's star witness (Michael Canter of AllianceBernstein) for tortious interference of contract.

*Litvak* was a different case involving different facts, a different defendant, and different evidence. It was also the first criminal case in the RMBS arena, and it looked at the time to be the first of many – a bellwether of sorts. Instead, it turned out to be an example of a gross injustice and led to nothing other than sweeping losses for the government. The Court should impose a sentence that is fair and just in this case, and that is a non-custodial sentence.

## CONCLUSION

For the foregoing reasons, Mr. Gramins respectfully requests that the Court impose a non-custodial sentence.

Respectfully submitted,

Mukasey Frenchman & Sklaroff LLP

By: /s/ Marc L. Mukasey
Marc L. Mukasey (CT29885)
Jeffrey B. Sklaroff (PHV08423)
Robert S. Frenchman (CT30437)
Kate E. Olivieri
2 Grand Central Tower
140 East 45th Street, 17th Floor
New York, NY 10017
Tel (212) 466-6400

*Attorneys for Michael Gramins*

CERTIFICATION OF SERVICE

I hereby certify that on December 15, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York
December 15, 2020

 /s/ Marc L. Mukasey
Marc L. Mukasey
Mukasey Frenchman & Sklaroff LLP
2 Grand Central Tower
140 E. 45th St., 17th Floor
New York, New York
Tel (212) 466-6400